1               UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2                   SOUTHERN DIVISION
                    AT PIKEVILLE
3
     UNITED STATES OF AMERICA,
4                               No. 07-CR-35-GFVT
          PLAINTIFF,
5                               Pikeville, Kentucky
                                June 16, 2008
6                               2:52 p.m.
     VS.
7
     RANDALL CLINTON THOMPSON,
8    JOHN MAC COMBS,
     PHILLIP G. CHAMPION,
9    RONNIE ADAMS,

10        DEFENDANTS.

11          PARTIAL TRANSCRIPT OF JURY TRIAL
            TESTIMONY OF HAROLD DEAN BENTLEY
12
                * * * * * * * * * *
13
     APPEARANCES:
14

15   For the Plaintiff:
                         Hon. Kenneth Taylor
16                       110 West Vine Street
                         Suite 400
17                       Lexington, Kentucky  40507-1671
                         (859) 233-2661
18
     For the Defendant
19   Randall Clinton Thompson:
                         Hon. R. Kent Westberry
20                       Hon. Kristin N. Logan
                         Landrum & Shouse, LLP
21                       220 West Main Street
                         Suite 1900
22                       Louisville, Kentucky  40202-1395
                         (502) 589-7616
23
                         Hon. Terry D. Jacobs
24                       P. O. Box 991
                         Hindman, Kentucky  41822
25                       (606) 785-9876

```
 1

 2

 3    APPEARANCES (Cont.)

 4    For the Defendant
      John Mac Combs:          Hon. Lawrence R. Webster
 5                             163 Main Street
                               Suite 2
 6                             Pikeville, Kentucky  41502
                               (606) 437-4029
 7
      For the Defendant
 8    Phillip G. Champion:
                               Hon. Thomas L. Jensen
 9                             Jensen, Cessna, Benge & Webster
                               303 South Main Street
10                             London, Kentucky  40741
                               (606) 878-8845
11
      For the Defendant
12    Ronnie Adams:
                               Hon. Jason E. Williams
13                             111 West 5th Street
                               London, Kentucky  40743-3199
14                             (606) 877-5291

15

16

17

18

19

20

21

22

23    Court Reporter:          Sandy C. Wilder, RMR, CSR (IL)
                               8081 Perryville Road
24                             Danville, Kentucky  40423-9713
                               (859) 516-4114
25                             wildercaptions@kywimax.com
```

1

2

                                    INDEX

3

4

Direct Examination of HAROLD DEAN BENTLEY
     By:  Mr. Taylor                       4-23

Cross-examination
     By:  Mr. Westberry                    24-27

Cross-examination
     By:  Mr. Webster                      27-43

Cross-examination
     By:  Mr. Jensen                       44-58

Cross-examination
     By:  Mr. Williams                     58-63

Redirect Examination
     By:  Mr. Taylor                       63-67

Reporter's Certificate                     68

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Thank you, sir.  The record
 2      will reflect the jury has returned to the
 3      courtroom again, and the United States is asked
 4      to call their next witness.
 5              MR. TAYLOR:  I call Dean Bentley.
 6              THE COURT:  Dean Bentley is called as a
 7      witness for the United States.
 8              [WITNESS SWORN]
 9                  DIRECT EXAMINATION
10      BY:  MR. TAYLOR:
11          Q.      Sir, would you state your full name,
12      please.
13          A.      Harold Dean Bentley.
14          Q.      And, Mr. Bentley, where do you work?
15          A.      Right now I work for M & R Trucking.
16          Q.      What's the name of the firm?
17          A.      M & R Trucking.
18          Q.      M & R?
19          A.      Yes.
20          Q.      And where do you live?
21          A.      At Pine Top.
22          Q.      That's in what county?
23          A.      Knott County.
24          Q.      And have you lived in Knott County
25      all your life?
```

1      A.      Pretty much, you know, not all my

2   life, but pretty much.

3      Q.      And did you at one time work for the

4   county, Knott County?

5      A.      Yes.

6      Q.      And what years did you work for

7   Knott County?

8      A.      I don't know the exact years.  I've

9   worked --

10      MR. TAYLOR:  I'm having trouble

11   understanding you.  Would you lean close to the

12   microphone and speak very carefully in it.

13      A.      I don't know the exact, you know,

14   date when I started, but it's 13 or 14 years;

15   I know it's been that long.

16      Q.      When were you terminated?

17      A.      About seven months ago.

18      Q.      Sometime in '07?

19      A.      Yeah, November the 16th, 17th,

20   18th, right along in there.

21      Q.      Of '07?

22      A.      Of -- last year.

23      Q.      What did you do for the county?

24      A.      At the time I was terminated, you

25   know, I was running a backhoe.

1      Q.    And give us a little bit of your

2    history.  What jobs have you held over the

3    years with the county?

4      A.    Well, before that, you know, prior

5    to that, probably -- prior to that year, you

6    know, I was the road foreman.

7      Q.    How long were you the road

8    foreman?

9      A.    Right around five years, somewhere

10    in that neighborhood.

11      Q.    So I take it you went back to the

12    Donnie Newsome Administration, you were road

13    foreman then?

14      A.    Yes.

15      Q.    When Judge Thompson took over from

16    Donnie Newsome, did you stay on as road

17    foreman?

18      A.    Yeah, what time -- until he served

19    his term, you know, what time he finished his

20    term out.

21      Q.    Now, I want to direct your

22    attention back to the Summer into the Fall of

23    2006.  Was there an election going on in Knott

24    County?

25      A.    Yes, yes.

1      Q.     And who was running against whom?

2      A.     Well, Mike Hall was running

3   against, you know, Randy Thompson, against

4   Randy in the fall.

5      Q.     For what?

6      A.     For county judge/executive.

7      Q.     During that election cycle in the

8   summer going into the fall, did your job

9   change any?

10     A.     Yeah, some -- yeah, drastically.

11     Q.     How did it change?

12     A.     Well, Randy sent Phillip Champion

13   up there, more or less, you know, was, you

14   know, he more or less run the show after a

15   little while after he was up there, I mean, he

16   sent Phillip up there.

17     Q.     Now, you say he more or less ran

18   the show.  Was he named road foreman?

19     A.     No, no, he wasn't road foreman.

20     Q.     What was his title?

21     A.     I think he was like deputy judge

22   or assistant judge, something to that effect,

23   you know.

24     Q.     What do you mean by he ran the

25   show?

1        A.      Well, after he was there awhile,
2    you know, if there was something that he
3    wanted done, you know, he would come and tell
4    me, you know, what to do.
5        Q.      When you reported to work every
6    morning, who decided where you would go and
7    what you would do?
8        A.      Well, sometimes Phillip, you know,
9    he would come and tell me, you know, Randy
10   wants this done or whatever, you know, and I'd
11   go do whatever they wanted done at that point,
12   you know, when Phillip was there.
13       Q.      Can you give us an approximate
14   date when Phillip showed up on the scene?
15       A.      I don't know the exact date.  It
16   was sometime back in the first part of '06 of
17   that year.
18       Q.      Now, during that summer and
19   leading into the fall, did you notice
20   something different in terms of who was paving
21   the roads in Knott County?
22       A.      Yes.
23       Q.      Tell us what you observed.
24       A.      Well, they, you know, had some
25   contractors come in, little small contractors

1    come in and --

2         Q.      How was this different?

3         A.      It had never been done, to my

4    knowledge.  Mountain Enterprise had always,

5    you know, done the blacktopping there.

6         Q.      Mountain Enterprises normally did

7    the blacktopping?

8         A.      Yes, they were --

9         Q.      Who were these new people that

10   were coming in?

11        A.      There was -- East Kentucky Paving

12   was in there and R & L Paving.  I remember

13   those two.

14        Q.      And could you describe these

15   firms, these businesses; were they big ones

16   like Mountain Enterprises?

17        A.      No, they were just, you know,

18   little small outfits.

19        Q.      What do you mean by small outfit;

20   how much equipment did they have?

21        A.      Well, they probably had a couple

22   of dump trucks and a paver and a little small

23   roller.

24        Q.      And what did Mountain Enterprise

25   have?

1      A.      I'd be afraid to even —— you know,
2   all kinds of equipment.  I'd be afraid to even
3   start.
4      Q.      Did these new pavers, these three
5   new pavers, did they come in about the same
6   time?
7            THE WITNESS:  I didn't understand
8   you.
9      Q.      Did they all come in about the
10   same time?
11      A.      Oh, yes.
12      Q.      What were they doing; did you see
13   them paving?
14      A.      Well, I knowed about the paving.
15   I mean, as far as seeing them directly paving
16   places, there was places I didn't know, I
17   mean, I didn't see, but I did know they was
18   paving places.
19      Q.      Where were you working at the time?
20      A.      In Laurel Fork.
21      Q.      And where is Laurel Fork in
22   relation to where they were paving?
23      A.      Well, it's way over in what part a
24   place, what they call Quick, you know, Quick
25   Sand.

```
 1          Q.      So you weren't able to observe

 2     them paving?

 3          A.      No, uh-uh.

 4          Q.      Well, why were you over in Laurel

 5     Fork?

 6          A.      Well, Phillip told me to go over

 7     there and patch the road with, you know, some

 8     blacktop.  I mean, he sent us, me and some

 9     boys over through there, I mean, to patch with

10     a grader, and we went and rented a little

11     roller.  We would just dump the blacktop out

12     on the road, you know, and spread it with a

13     grader and run over it with a roller.

14          Q.      Did you want to be over in Laurel

15     Fork?

16          A.      Well, at the time I was glad I was

17     there.

18          Q.      Why were you glad you were there?

19          A.      Because of stuff that, you know,

20     was going on with the other, you know --

21          Q.      Well, you're going to have to

22     specify what you're talking about.  Because of

23     what?

24          A.      Because of the blacktop, the

25     contractors, you know, that was blacktopping
```

```
 1     the other places that I didn't think they
 2     should be blacktopping.
 3          Q.     And what places were those?
 4          A.     Well, places --
 5               MR. WILLIAMS:  Objection, Your Honor.
 6               THE COURT:  Would you approach,
 7     please.
 8               [CONFERENCE AT THE BENCH]
 9               THE COURT:  State your objection.
10               MR. WILLIAMS:  This witness has
11     already testified that he was -- he didn't
12     know where any of these companies paved, and
13     now Mr. Taylor's asking him, Can you tell me
14     specifically where they were doing this
15     assumed illegitimate work, is going to be his
16     question, and this guy's already testified he
17     doesn't have personal knowledge of that.
18               MR. TAYLOR:  Just because he couldn't
19     name specific places doesn't mean he wasn't
20     generally aware of what he considered to be
21     improper, and he was glad he wasn't doing it.
22               THE COURT:  You can test his
23     credibility on cross-examination.  I'll
24     overrule the objection.
25               [IN OPEN COURT]
```

```
 1        Q.      Mr. Bentley, I think you assume
 2   everybody knows what you're talking about.
 3   Assume we don't, okay?
 4        A.      Okay.
 5        Q.      Tell us what it is that you were
 6   glad you weren't seeing or being a part of?
 7        A.      Well, like I said, when you, you
 8   know, that the contractors was in there
 9   blacktopping places where I felt like, you
10   know, they shouldn't -- shouldn't be.
11        Q.      And what kind of places were
12   those?
13        A.      They was what I would call
14   driveways.
15            MR. TAYLOR:  Okay.
16        A.      And let me say this.  You know, I
17   was in Laurel Fork.  The road that I put the
18   blacktop on was a county road, what I had put
19   on it with the grader.
20        Q.      All right.  Over in Laurel Fork?
21        A.      Yeah.  That's the reason I said
22   that I was glad to be there.  I would rather
23   be there than somewhere else.
24        Q.      Do you know how long these three
25   companies put the blacktop down?
```

1      A.      No, I don't have no idea.

2      Q.      Who were some of the other people

3  that were with you in Laurel Fork?

4      A.      There was Chris Conley was there;

5  he run that little roller, Don Fugate, Ralph

6  Dyer, Kenny Duyer, John Slone, and there could

7  have been one or two more.

8      Q.      Well, who -- if you were the road

9  foreman and you're in Laurel Fork and you got

10  these three new pavers in the county, who's

11  heading them up; who's telling them where to

12  go?

13      A.      All the contract blacktop, like I

14  said --

15      MR. TAYLOR:  Could you speak more

16  into the mic.

17      A.      All the contract -- you know, the

18  contractors that was in there, that all that

19  blacktop come through to the judge's office.

20  I stayed in Laurel Fork probably five or six

21  weeks or something.  I don't know.  I mean, we

22  go over there at least a good month, I mean,

23  right there in Laurel Fork.  And the

24  contractors, you know, I don't have no -- I

25  had no way of knowing where they was

1      blacktopping or what they was doing.

2          Q.      How were you putting down

3      blacktop?

4          A.      With a grader.  We just dump it

5      out of a dump truck and spread it with a

6      grader and then run over it with a little

7      roller.

8          Q.      So you weren't doing any long

9      stretches; you were just doing patches?

10         A.      Well, yeah, more or less, but, you

11     know, that road's a big long road through

12     there and we wasn't getting maybe a couple of

13     loads a day was all we could get.

14         Q.      Did you keep some kind of record

15     as to where you were working?

16         A.      Yeah, I kept a kindly like a

17     logbook of just, you know, notes.

18         Q.      And that showed you were over in

19     Laurel Fork?

20         A.      Yes, sir.

21         Q.      Is that something you typically

22     did every day?

23         A.      Well, pretty much kindly, you

24     know, I kept it up to date pretty much.

25         Q.      Did anyone ever ask you to produce

1    that for them?

2        A.      Yes, at one time.

3        Q.      And who was that?

4        A.      Phillip Champion.

5        Q.      And when did he do that?

6        A.      It was somewhat after, you know,

7    all this investigation got -- took place.  It

8    was after Marcus had been up to my house the

9    first time.

10       Q.      Have you had any contact with any

11   other defendants -- well, let me ask you if

12   you can point out Phillip Champion in the

13   courtroom.  You may have to stand up.  I don't

14   know.

15       A.      Yes, he's standing up.

16       Q.      The gentleman standing?  All

17   right.  Did you have any contact with any of

18   the other defendants after the investigation

19   began?

20       A.      I had a phone call with one one

21   day that they called me.

22       Q.      Who's that?

23       A.      Ronnie Adams called me.

24       Q.      And what did he want?

25       A.      He tried to say that I had got a

```
 1      list and hauled some gravel for Mike Hall, you

 2      know, after I had went to the grand jury and

 3      testified.

 4           Q.     After you went to the grand jury?

 5           A.     Yeah, after the -- that I'd went

 6      down there.

 7           Q.     Well, tell me exactly what he

 8      said.

 9           A.     That he -- he had some witnesses

10      that would say that they brought a list to the

11      garage and we hauled some gravel for Mike

12      Hall.

13           Q.     Was that true?

14           A.     No, sir.

15           Q.     How did you interpret what he was

16      saying to you?

17           A.     I kindly thought he was just

18      trying to scare me up because -- and another

19      thing -- let me say this for the rest of it.

20      He told me, he said the way to stop this is to

21      go and talk to Randy.

22                MR. TAYLOR:  One moment, Your Honor.

23           Q.     Tell me how it was that you were

24      terminated initially.

25           A.     I just got a letter, you know, a
```

1    note in my check we was laid off, which, you

2    know, there was some other boys laid off, too,

3    at the same time that I was.

4         Q.    Who were the other boys that got

5    laid off?

6         A.    Let's see, there was Kirby Slone,

7    John Slone, Jesse, and that's all I can think

8    of right now.  I know there's probably some

9    more.

10              MR. TAYLOR:  I'd like to move the

11    introduction of Exhibit 27.

12              THE COURT:  Is there objection?

13              MR. WESTBERRY:  No objection, Judge,

14    but not for me.  I'll let other counsel ...

15              MR. WEBSTER:  No objection.

16              THE COURT:  Okay.  Without objection,

17    it will be entered as a Government exhibit.

18              MR. TAYLOR:  If we could put that on

19    the screen, please.

20         Q.    Do you recognize that letter?

21         A.    Yes, sir.

22         Q.    This appears to be out of your

23    personnel file.  Can we turn that over to the

24    right so we can see the name, rotate.  It will

25    not rotate?  Well, let's just -- everybody

1     turn their head this way.  Do you see your

2     name there?

3          A.     Yes, sir.

4          Q.     Is that Harold Dean Bentley?

5          A.     Yes, sir.

6          Q.     And if I represented to you that

7     this was in your personnel file, this is a

8     photograph from your personnel file, you would

9     -- that would be consistent with your memory

10    of this letter, correct?

11         A.     This letter was in my check, the

12    last check I got of that year.

13         Q.     Can you enlarge the body of that?

14    Now, this indicates that there was a plan to

15    re-organize the county road department.  Did

16    you later -- it indicates that you might get

17    your job back at an hourly rate.  Did that

18    happen?

19         A.     No, sir.

20         Q.     Was that the last you worked for

21    the county?

22         A.     No.  This was, like I said, in

23    '06, and then I worked up to '07, up to

24    November.

25         Q.     Well, how did you work -- I take

1     it you were put in at a lower scale?

2         A.    Well, I went back more or less as

3     a worker, you know.

4         Q.    Who became county road foreman?

5         A.    Ronnie Adams.

6         Q.    And did you have a reduction in

7     pay during that period of time?

8         A.    No, they said -- now, I was paid

9     pretty well the same as what I was before, but

10    I, you know, was drawing salary, but they paid

11    me by the hour when I went up to this.

12        Q.    Now, why were you ultimately

13    terminated?

14        A.    I feel like it's because I, you

15    know, cooperated with Marcus, I mean, the

16    times he come up there, and, you know, in a

17    small county, word gets out.

18        Q.    Who's Marcus?

19        A.    The FBI agent that come to the

20    house.

21        Q.    Okay.  And when -- why do you

22    connect the two up?

23          THE WITNESS:  I'm sorry, what?

24        Q.    Why do you connect the two events?

25        A.    I really don't understand your

1       question, what you're ...

2           Q.      If you believe one event led to

3       another event, why do you say that?  Why do

4       you believe you were let go because you were

5       cooperating with Marcus?

6           A.      Well, because, you know, they

7       didn't want me to.  And like when Ronnie

8       called and done that, wanted me to go talk to

9       Randy and, you know, I never would talk to

10      him, and they really didn't know what I had to

11      talk to Marcus about.  I mean, they had no way

12      of knowing.  After Ronnie had called, that was

13      like I --

14              MR. WILLIAMS:  Objection, Your

15      Honor.  May we approach?

16              THE COURT:  You may.

17              [CONFERENCE AT THE BENCH]

18              MR. WILLIAMS:  A couple of things,

19      Your Honor.  I fail to see the relevance of

20      this subsequent termination and to this

21      action.  I thought we pretty much determined

22      that these subsequent lawsuits and work

23      actions that were taken later were not

24      relevant to this action.  Also, I think this

25      witness is being led into speculating.

1          THE COURT:  Mr. Taylor?

2          MR. TAYLOR:  Well, I think it's been

3    my position all along that there were a lot of

4    attempts to suppress the truth getting out and

5    we characterize this as a form of retaliation

6    against a witness, which shows a consciousness

7    of guilt.

8          THE COURT:  Well, let me see if

9    anybody else has anything else to say.

10         MR. JENSEN:  I can't hear.

11         MR. WEBSTER:  I actually don't object

12   myself for my own particular reasons.

13         THE COURT:  Yeah, on behalf of your

14   client?

15         MR. WEBSTER:  Yes.

16         THE COURT:  Well, here's what I think

17   we'll do.  I'm going to overrule the

18   objection, but I think he's answered this

19   question.  I'm not sure I'm going to allow --

20   you can kind of do one follow-up question.

21   Let's kind of conclude that -- and I do agree

22   that to get into kind of another wrong here is

23   probably not a profitable or an appropriate

24   pathway to take, but I'm going to overrule the

25   objection.  I think the questioning so far has

1    been appropriate.  I'll allow you to bring it

2    to kind of a close, and then we'll move on.

3              [IN OPEN COURT]

4         Q.    Let me just ask you.  When was it

5    you were terminated finally?

6         A.    Around November 16th, I believe,

7    was the last day that I was working.

8         Q.    Of '07?

9         A.    Yes, sir.

10        Q.    Do you know what day you testified

11   before the grand jury?

12        A.    It was back in October something

13   or another.

14        Q.    If I said your grand jury

15   testimony showed you testified on Thursday,

16   October 25, would that be about right?

17        A.    That's possible, probably, yes,

18   but I knowed it was -- it was in October, I

19   remember, you know.  I do remember it was in

20   October.

21             MR. TAYLOR:  And you were terminated

22   a few weeks later?  One moment.  I pass the

23   witness.

24             THE COURT:  Thank you, Mr. Taylor.

25   Mr. Westberry.

```
1                    CROSS-EXAMINATION

2          BY:  MR. WESTBERRY:

3          Q.      Afternoon, Mr. Bentley.  I've got

4    just a couple of questions for you today.  You

5    were asked a couple of questions a little while

6    ago, Mr. Bentley, about being laid off from

7    Knott County, the road department, correct?

8          A.      Yes.

9          Q.      I think the letter that you were

10   shown was dated end of December, December 20,

11   2006, correct?

12         A.      Yes.

13         Q.      Now, do you know who the treasurer

14   in Knott County is?

15         A.      No, not really.  It's either Byron

16   Jacobs or Darrell Madden.  I'm not sure, one

17   of the two probably.

18         Q.      You do know it's Byron Jacobs?

19         A.      Well, one of the two.  I wouldn't

20   ...

21         Q.      Do you know if Mr. Jacobs made any

22   recommendation on the financial conditions of

23   the county that they would have related to not

24   only your lay-off, but several of the others

25   that you were mentioning?
```

1      A.      That's what the -- that's what the

2      letter stated when I was laid off, that they,

3      you know ...

4      Q.      Right.  Now, you continued,

5      though, to work on the county road department

6      on through a period of time in '07; is that

7      correct?

8      A.      Yes.

9      Q.      And I didn't hear you a moment

10     ago.  Could you tell the jury just how long

11     you continued to work through the year, how

12     many months?

13     A.      Up until November the 16th, I

14     believe, was the last date.

15     Q.      So you continued to work for

16     another 11 months --

17     A.      Yes.

18     Q.      -- thereabouts through the year?

19     A.      Yes.

20     Q.      And then you moved on; is that

21     correct?

22     A.      Well, I was laid off.

23     Q.      The letter says, though, I will,

24     however, recommend you be rehired at an hourly

25     wage comparable to your current salary with

1    full benefits.  The letter did say that,

2    correct?

3        A.    Yeah.  You fellers -- that letter

4    that you've got there is of '06.

5           MR. WESTBERRY:  Yes, sir.

6        A.    I was laid off in '07 with a

7    different letter that I'm talking about now.

8           MR. WESTBERRY:  Excuse me.  I

9    misunderstood that.  I apologize.

10        A.    That letter was, you know, where I

11    switched -- where Randy switched me back as to

12    more or less working.

13        Q.    You supported Mike Hall in the

14    election, correct?

15        A.    Yes.

16        Q.    You don't have a problem with

17    fixing a bridge if there's an elderly person

18    or a person with a health condition living on

19    the other side of it, correct?

20        A.    No, sir.

21        Q.    That's part of what the government

22    should do, county government should do for its

23    citizens, correct?

24        A.    Yes, yes.

25        Q.    The best time to lay blacktop

1       would be when the weather was warm, correct?

2            A.      True, yes.

3            Q.      You can't do it in the wintertime,

4       correct?

5            A.      No.

6            Q.      Do you have to have about five

7       consecutive days of fairly warm weather before

8       the blacktop can be laid?  What do you know

9       about it?  You know more than I do.

10           A.      No, not really.  I've seen

11      blacktop laid, you know, when it's raining.  I

12      mean, people don't recommend it.  The state

13      don't want you to do it, but they've done it

14      for us at times.

15           Q.      But it's got to be fairly warm

16      weather?

17           A.      Well, if it's warmer, it'll stick

18      better.  It's common sense, you know.

19                   MR. WESTBERRY:  That's all we've

20      got.  Thank you, Mr. Bentley.

21                   THE COURT:  Thank you,

22      Mr. Westberry.  Mr. Webster.

23                   MR. WEBSTER:  Thank you.

24                        CROSS-EXAMINATION

25          BY:  MR. WEBSTER:

1      Q.      Mr. Bentley, you've worked for the
2    county for 14 years?
3      A.      Somewhere in that neighborhood,
4    maybe 13 to 14 years.
5      Q.      And five of those years you were
6    the county road foreman?
7      A.      Yes, more or less, you know,
8    around five years.
9      Q.      Sure, sure.  Up until the first of
10   the year following this time period that we're
11   in litigation about; is that right?  Well, put
12   it this way, you were the road foreman until
13   the last day of December, '06?
14     A.      Yes.
15     Q.      Now, you had been the road foreman
16   then through how many county judges, three?
17     A.      No, just Donnie, Donnie Newsome.
18   Donnie's the one that made me road foreman,
19   gave me the job.
20     Q.      All right.  Now, Donnie's -- and
21   then as road foreman, you had access to the
22   county attorney, if you needed legal advice?
23     A.      Yes.
24     Q.      You can read and write?
25     A.      Yes.

1      Q.      When you -- a road foreman is

2    charged by statute with what?  Tell the jury

3    what a road foreman's responsibilities are if

4    you are serving as the county road supervisor?

5      A.      Well, they was -- you know, I'd go

6    out and check the roads and stuff that people

7    called and, you know, had complaints and

8    stuff, I'd go out and fix the roads.  I mean

9    ...

10      Q.      Have you read the statute that

11    prescribes your duties?

12      A.      No, sir.

13          MR. WEBSTER:  Your Honor, may we put

14    this onto the ...

15          MR. TAYLOR:  I'll object, Your

16    Honor.  It's not relevant.  It's beyond the

17    scope of his knowledge.

18          THE COURT:  Why don't you approach.

19    Let's address the scope.

20          [CONFERENCE AT THE BENCH]

21          THE COURT:  State your objection

22    again, Mr. Taylor.

23          MR. TAYLOR:  Well, he doesn't know

24    the statute.  He can ask him what his general

25    understanding is, but to now put the statute

1      up when he says he hasn't read it ...

2              THE COURT:  I think it's pretty clear

3      he doesn't know it.

4              MR. WEBSTER:  But it spells out in

5      exact detail that everything that's complained

6      of here that others didn't do are his specific

7      duties.

8              THE COURT:  Right, but he's already

9      ...

10             MR. TAYLOR:  It's a county engineer.

11             MS. LOGAN:  There's another statute

12     --

13             MR. WEBSTER:  And it goes on to say

14     if there's no county engineer, then these

15     duties are vested in the county road

16     supervisor.

17             MR. TAYLOR:  I think what they're

18     talking about is a term of art.  County road

19     foreman is not his job.  This man serves at

20     the pleasure of the county judge/executive.

21     He can't overrule the county judge/executive.

22             THE COURT:  I think this would be

23     different, Mr. Webster, if he had expressed

24     some knowledge.  He said he doesn't understand

25     that.

1        Here's how I'm going to address

2    this.  I think the way to do it is I'm going

3    to allow you some questions based on the

4    statute that you have in front of you.  If you

5    want to do some follow-up question, I'm going

6    to allow you a little bit of leeway there.

7    We're not going -- we're going to kind of

8    establish that either he kind of understands

9    those duties or he doesn't, and once you've

10    established that, I'll ask you to move on.

11    And I don't think we need to publish that to

12    the jury.  I think that you can ask him

13    specific --

14        MR. TAYLOR:  Can I see it before you

15    --

16        THE COURT:  You may.

17        MR. WEBSTER:  It gives his duties in

18    exact great detail.

19        MR. TAYLOR:  This is so much

20    cover-up.

21        THE COURT:  I'm going to allow some

22    questions on it.  I'm going to allow you,

23    Mr. Webster, to ask some specific questions

24    and you can say -- you can refer very

25    specifically to the statute, read out of the

1    statute to a certain extent, but once it's

2    established that either he knows that or --

3           MR. TAYLOR:  I don't see that.

4           MR. WEBSTER:  Road supervisor.

5           MR. TAYLOR:  Temporary supervisor.

6    There's nothing in here about road foreman,

7    Your Honor.

8           MR. WEBSTER:  The road foreman is the

9    administrative person that takes this job when

10   there's no engineer available.

11          MR. TAYLOR:  They're talking apples

12   and oranges.

13          THE COURT:  I don't think you're

14   going to get very far with it.  Once he

15   establishes that he doesn't know it, we're

16   going to move on.

17          MR. WEBSTER:  We ask to instruct the

18   jury as to this law.

19          THE COURT:  I'm happy to take that --

20   I'm not going to instruct that, but I am happy

21   to take that up at jury instructions.  You can

22   submit a jury instruction.

23          [IN OPEN COURT]

24   Q.      Mr. Bentley, you said you have

25   never read the statute that imposes duties on

1    the person that the county judge employs to be

2    the supervisor over the county road system,

3    have you?

4         A.    No, sir.

5         Q.    So do you know, or did you know

6    that you would have had general charge of all

7    county roads and bridges within the county?

8         A.    I knowed, you know, that I should

9    be over the roads, but not the bridges.  I

10   mean, we had a bridge foreman and stuff that

11   done that.

12        Q.    Did you know that it was your duty

13   to inspect or cause to be inspected each

14   county road or bridge during its construction

15   or improvement and certify to the fiscal court

16   the progress of the work and whether or not

17   the work is being done according to the

18   contract, plans or specifications; did you

19   know that?

20        A.    Not to the extent of what you're

21   saying, but I do understand that's what -- I

22   mean, I got out and checked the roads.  If

23   somebody called that the roads was bad, I

24   would go and inspect them and, you know, fix

25   them most of the time.

1        Q.      This talks about going out and

2    inspecting each road or bridge while it is

3    being constructed or improved.  You made no

4    effort to do that?

5        A.      I think you're wrong.  I mean, I

6    did go out and do my job to inspect the

7    roads.  I had a county vehicle that I checked

8    the roads.

9        Q.      In lieu of doing that, you went to

10   Quick Sand and hung out five or six weeks?

11       A.      I -- I done what I had to do with

12   over there.  I mean, like I said, sometimes

13   two, maybe three loads of blacktop's the most

14   we would get that day.

15       Q.      And you tried to drag that out,

16   didn't you?

17       A.      Yeah, I wasn't in no hurry.

18       Q.      It's not just that.  You tried to

19   drag it out and make it -- and stay over there

20   longer, didn't you?

21       A.      No, we -- eventually we got done.

22   I mean, I didn't try to drag it out no longer

23   than it took with what equipment we had.  We

24   just had one dump truck was all we ever had.

25       Q.      Do you remember testifying under

1    oath in front of the grand jury on October 25,

2    2007, that sometimes we got -- we didn't get

3    but a load or two -- a couple of loads a day,

4    sometimes three, and just had one little truck

5    over there, and that didn't bother me because

6    I wanted to drag it out, you know, stay there

7    as long as I could?  Did you swear that?

8         A.    Yes, I wasn't in no hurry to leave

9    from there.

10         Q.    And that's because you were very

11    much for Mike Hall in the election, and you

12    did not want to be associated with these road

13    improvements that were being made in other

14    portions of the county because you thought

15    that Mike Hall was going to win and you wanted

16    to stay on his good side, true or false?

17         A.    That's false.

18         Q.    Isn't it true that you testified

19    that Mike Hall offered a bunch of you telling

20    you, Stay at home, don't even come to work,

21    and when I get elected, I'll make up your lost

22    days?

23         A.    That -- I never did hear that

24    from -- I heard that was a rumor, but I never

25    did know that that was true.  I never missed a

1     day's work.

2     Q.    You didn't testify to that in

3     front of the grand jury either?

4     A.    Not that I -- you know, I had

5     heard that, it was a rumored around up there,

6     yes, but as far as me knowing that was true,

7     no, I did not.

8     Q.    Now, you, in lieu of inspecting

9     each and every construction project and

10    reporting irregularities to somebody, you went

11    to Quick Sand and hung out for five or six

12    weeks patching?

13    A.    I was told to go to Quick Sand and

14    patch Quick Sand roads.

15    Q.    Nobody told you to go over there

16    and drag it out, did they?

17    A.    No, sir.

18    Q.    Now, you stayed over there and

19    didn't see what was paved, did you?

20    A.    No, no, sir, not no more than, you

21    know, what we was paving, what we done.

22    Q.    You told the grand jury that when

23    you were road foreman, private driveways were

24    paved, with gravel, I'm sorry, gravel?

25    A.    Yeah, we've dumped gravel on

1     private drives before.

2          Q.     And that was not under Randy

3     Thompson?

4          A.     No, that's been done, you know,

5     since we was there -- since I've been there.

6          Q.     Now, if somebody's going to pave a

7     driveway that's already been graveled, could

8     they confidently rely on your gravel to know

9     where to pave?

10               THE WITNESS:  Repeat the question,

11     please.

12          Q.     Five years you ran the road system.

13     Somebody goes out today to pave a road, and if

14     it's one that you graveled during your five

15     years, is that -- could they rely on that?

16          A.     If there was a road to be paved, you

17     know, what I call a road, I would take the

18     Mountain Enterprise out, whoever they sent, and

19     show them that road, that we had gravel on it,

20     like you're saying, yes.

21          Q.     Right.  For a blacktopper, how is a

22     road marked?

23          A.     Well, like I said, when I dealt with

24     Mountain Enterprise, I would take -- they would

25     most of the time send somebody, and I would take

1          them out and they would know what we wanted

2          blacktopped.

3                 Q.      But that's in a general sense,

4          wasn't it?  Specifically, isn't it true that

5          they have to be graded?

6                 A.      Yes, sometimes.

7                 Q.      So the blacktopper just paves what

8          somebody has graded?

9                 A.      Yes, yes.

10                Q.      And who is the grader operator?

11                A.      Paul Slone.

12                Q.      If somebody went out and marked that

13         road that happened to be private, by the time

14         the blacktopper got there, it wouldn't be marked

15         anymore, would it; it would be graded?

16                A.      Yes, that's true.

17                Q.      And if I marked one today, I would

18         have no way of knowing, unless I went back,

19         whether they stopped at my orange paint or not,

20         would I?

21                A.      No, sir.

22                Q.      Did you gravel or pave Lonesome Dove

23         any?  Do you know where it's at?

24                A.      Not right offhand.

25                Q.      It's off of 80.  Lonesome Dove is --

1    it used to be called Baker Branch.  Does that

2    ring a bell?

3         A.     No, sir.

4         Q.     Okay.  You're not familiar with a

5    road with that name?

6         A.     The name is familiar, but I don't

7    remember, no, what you're saying.

8         Q.     Okay.  If you'd have been out there

9    and somebody told you to pave this road and

10   there was four or five residences on it and it

11   had been graveled in the past, would you be

12   nervous about it or would you go ahead and do

13   it?

14        A.     I wouldn't pave nothing, you know,

15   unless I was told to, I mean, unless -- even

16   when Donnie was there, it would come through the

17   judge's office, any blacktop did.  I mean, they

18   told me what, you know, if I had to go blacktop

19   a road, what should be blacktopped.

20        Q.     Sure.  But I'm talking about making

21   the decision as to whether or not this is one,

22   even though somebody told me to do it, we don't

23   need to be doing this one because there's

24   questions.  If you went out to a place that

25   four, five or six places that had a road sign on

1    it out on the four-lane that said Lonesome Dove,

2    and it had a bunch of houses, or trailers on it,

3    houses and trailers, you wouldn't worry too much

4    about that one, would you?

5        A.    No, not if it had a bunch of houses

6    on it, probably not.

7        Q.    Isn't this all a matter of somewhat

8    common sense when -- you make judgment calls on

9    whether they're private, don't you?

10       A.    In some cases, yes.

11       Q.    And you've made mistakes in the

12   past, innocent ones?

13       A.    Sure, yes.

14       Q.    And some not so innocent?

15       A.    Yeah, probably, yes.

16       Q.    Now, you were the road foreman

17   during all -- until after the election?

18       A.    Pretty much, yes.

19       Q.    Well, you either were or you

20   weren't?

21       A.    Well, up until, you know, December

22   of '06.

23       Q.    And the road foreman serves at the

24   pleasure of the county judge?

25       A.    Yes.  If the county judge wanted me

```
1     to do something, you know, they're the boss.

2     He's the boss.

3          Q.     And you were laid off at full

4     benefit, full salary, and worked several months

5     after that, or you were removed as road foreman

6     and kept on as I think team captain; is that

7     right?

8          A.     Yes, that's what -- yeah, yes.

9          Q.     Less duties, same pay?

10         A.     Yes -- well, yes, probably a little

11    less duties, yes.

12         Q.     Same pay?

13         A.     Same -- pretty much same pay.

14         Q.     And when you got laid off, there

15    were 13 or 14 laid off, many of which were Randy

16    Thompson's supporters, true?

17         A.     Yes, probably, yes.

18         Q.     Did Mr. -- you called him Marcus.

19    Do you know his last name?

20         A.     Hopkins, I believe, or something

21    like that.

22         Q.     Did he tell you he was an FBI agent?

23         A.     No.  I think he stated like he was

24    on a task team or something like that for the --

25         Q.     Well, you called him an FBI agent.
```

```
1          A.      I realize that, yes, I did, but he
2     didn't say that.
3          Q.      You told him -- you gave him some
4     opinions that were not based upon observation or
5     knowledge, true or false?
6          A.      That's false.  Everything that I
7     told Marcus was the truth.
8          Q.      Well, you've told us today that you
9     thought there was private roads being
10    blacktopped, but you were over on Quick Sand and
11    you didn't see any?
12         A.      That's true, but, you know, I've had
13    word of it, I mean, you know, the way that the
14    stuff gets around the county and stuff.
15         Q.      Okay.  So your testimony to the
16    grand jury was not based upon your personal
17    observations or your five senses, other than
18    your ears; you heard it?
19         A.      Pretty much, yes.
20         Q.      And when you, by mistake, paved
21    something that wasn't public, that wasn't for
22    political reasons, was it?
23              THE WITNESS:  Repeat the question.
24         Q.      If you made a mistake and paved a
25    road that shouldn't have been paved, it wasn't
```

1    for political reasons, was it?

2        A.    I don't understand where you're

3    coming -- I mean, the paving.  I didn't pave --

4    the roads I paved was in, like I said, Laurel

5    Fork.

6        Q.    Well, and I apologize.  That was my

7    fault.  I kept -- I'm getting gravelling and

8    paving mixed up.  And this time the gravelling

9    to me means new potatoes, and I can't get the

10   two straight.  You graveled roads that you

11   shouldn't have; is that right?

12       A.    We have put gravel on private

13   drives.

14       Q.    And that was by mistake and not

15   because you were trying to trade anything to

16   those people?

17       A.    No, it was never for no benefit,

18   I mean, none for no benefit.  If I thought

19   somebody, you know, they needed the gravel, most

20   of the time we took them a load of gravel.

21       Q.    Okay.  And would you just use your

22   best judgment about whether there's an

23   appropriate expenditure of public monies or not?

24       A.    Yes.

25            MR. WEBSTER:  Thank you.  That's all.

1          THE COURT:  Thank you, Mr. Webster.

2     Mr. Jensen.

3                    CROSS-EXAMINATION

4          BY:  MR. JENSEN:

5          Q.     Good afternoon, Mr. Bentley.

6          A.     Afternoon.

7          Q.     Let me see if I understand a little

8     bit of what you said.  You worked for Knott

9     County for 12 years, you think?

10         A.     No, it was between 13, 14 years.  It

11    was over 13 years.

12         Q.     Okay.  And the judges you worked for

13    was Judge Thompson and previously to that Judge

14    Newsome?

15         A.     Yes, and Homer Sawyer.  I was there

16    when Homer was there.

17         Q.     So you were there for all of them?

18         A.     Yes.

19         Q.     Always at the road department?

20         A.     No, when I first started, I worked

21    at the garbage system.  I hauled boxes to London

22    when I very first started.

23         Q.     I'm sorry, I didn't hear.  What did

24    you say?

25         A.     I hauled these garbage boxes --

1           MR. TAYLOR:  Could we ask him to speak

2      directly into the microphone.

3           A.      I hauled these garbage boxes into

4      London when I first started.  The county had the

5      garbage system, and I started for them for the

6      very first, you know, when I very first started.

7           Q.      When you first started working for

8      Judge Sawyer --

9           A.      Yes.

10           Q.      -- you would haul things to London?

11           A.      Yeah, you know, trash, haul trash

12      down to the landfill down there.

13           Q.      Oh, all right.  And when did you go

14      to the road department?

15           A.      I worked there like that about a

16      year, and they sold the garbage system out and

17      then moved to the road department.

18           Q.      So for the last 13 years or so,

19      you've worked for the county road department up

20      to the point you got laid off?

21           A.      Yes.

22           Q.      I mean, you worked in the road

23      department, right?

24           A.      Yes.

25           Q.      And what was your first duties

1      there; what did you do?

2          A.     I drove a roll-off truck when I

3      first come up there.

4          Q.     Drove a what?

5          A.     Roll-off truck.  That's what we

6      hauled the stuff to London in, and then, you

7      know, they brought the truck up there.

8          Q.     Would you haul equipment on that

9      truck?

10         A.     Yes, you could haul equipment on it.

11         Q.     Did you haul gravel at some point;

12     did you do that, too?

13         A.     We would haul rock, gravel,

14     different, you know, stuff at different times.

15         Q.     I'm talking about you specifically.

16     You were a truck driver and hauled these

17     yourself?

18         A.     Yeah, I moved equipment for myself.

19         Q.     Did you haul blacktop on occasion?

20         A.     I probably, you know, through the 13

21     years, I mean, I probably have went and got some

22     blacktop in dump trucks and patched holes or

23     something, yes, I probably done that.

24         Q.     Did you run a grader on occasion?

25         A.     Yes, yes.

1      Q.      What other duties did you have

2   besides being road foreman?

3      A.      Well, you know, before I become road

4   foreman, I'd done more or less like you said.  I

5   could run everything they had there.

6      Q.      Run any equipment they had?

7      A.      Yes, yes.  I run track loader,

8   backhoes and ...

9      Q.      Okay.  And now you said that you

10   know that there was gravel you put on private

11   drives?

12      A.      Yes, at times we probably -- yeah,

13   we did.

14      Q.      Was that under Judge Sawyer?

15      A.      At times, yes.

16      Q.      Did he direct you to do that?

17      A.      Well, no -- well, the road foreman,

18   you know, told me.  At that time I wasn't road

19   foreman.

20      Q.      Who was the road foreman?

21      A.      Edsel Sparkman was the road foreman.

22      Q.      And he told you to go put gravel on

23   somebody's drive?

24      A.      Yes, he'd send us, you know, tell us

25   where to go.

1        Q.      And you'd put it on the road?

2        A.      Yes.

3        Q.      And then who was the road foreman

4    after him?

5        A.      I believe Larry Thacker was.

6        Q.      Did he ask you to go do that, too,

7    spread gravel on somebody's drive?

8        A.      Yeah, we basically gravel -- yeah,

9    done the same thing we've always done.

10       Q.      Same way it's always been done?

11       A.      Yes.

12       Q.      So when you were foreman, that's the

13   way you do it, too?

14       A.      Well, more or less, yes.

15       Q.      You directed people out to put

16   gravel on somebody's private drive?

17       A.      Yes.

18       Q.      You made those decisions yourself as

19   road foreman?

20       A.      Well, you know, they would come from

21   the judge's office a lot of times as to how, you

22   know --

23       Q.      Well, I'm not talking about a lot of

24   times.  You just said that you would decide that

25   yourself as road foreman.

1     A.      Yeah, at times, yes, but if, you

2  know, the judge called, I mean, Donnie or Randy

3  or whoever, and they wanted me to take gravel to

4  so-and-so, I would take it.

5     Q.      But there were times you'd just --

6  you'd make up your mind, somebody came and said

7  to you, I need some gravel out here on my drive,

8  you'd just send somebody out there to do it?

9     A.      Yes.

10    Q.      Not a problem?

11    A.      No.  If I thought they needed it,

12 you know, I'd give them a load of gravel.

13 They'd get a load of gravel.

14    Q.      Did that -- now, were you road

15 foreman when Donnie Newsome was judge?

16    A.      Yeah, on his last term.

17    Q.      In his last term?

18    A.      Yes.

19    Q.      The full term?

20    A.      Well, until Randy took over, you

21 know, until Randy was appointed the last year or

22 so.

23    Q.      So for three years or so, you were

24 road foreman under Donnie Newsome, you think?

25    A.      That's pretty well right, probably.

1        Q.     And during that period of time under

2   Donnie Newsome, you were making the decisions as

3   road foreman?

4        A.     Yes.

5        Q.     Okay.  Now, you said that Phillip

6   Champion came on under Judge Thompson; is that

7   right?

8        A.     Yes.

9        Q.     And he came down to the highway

10   department?

11        A.     Yes.  That's where Randy brought him

12   up there that morning when he hired him.

13        Q.     And he was telling you what the

14   judge told him that he wanted you to do or ...

15        A.     Well, at times he would say, you

16   know, Randy wants us to do this.

17        Q.     But did you think he was stepping on

18   your toes, that he was taking over your position

19   as road foreman?

20        A.     Well, sure, yes.

21        Q.     What were your duties as road

22   foreman besides putting gravel out here on

23   peoples' drives; what else did you decide as

24   road foreman?

25        A.     We would fix breaks in the road

1    like, you know, people would call in and we

2    would have a list, you know, of stuff that was

3    wrong with the roads or something and, you know,

4    we would go fix them, if we could.

5         Q.      Who would give you that list?

6         A.      The list was in the office.  The

7    secretary kept it all the time.

8         Q.      And was that a list that you made?

9         A.      No, she just, you know, jot it down

10   as the calls come in.

11        Q.      Somebody call and said, My road

12   needs repaired -- to be repaired; is that what

13   you're saying?

14        A.      Needs graded or something, yeah, or

15   something to that effect.

16        Q.      And then you would decide from that

17   to go grade it, go gravel it, go blacktop it, go

18   patch it, those kind of things?

19        A.      Well, go gravel it.  The blacktop,

20   you know, I had nothing over that.

21        Q.      And those were your decisions?

22        A.      Well, up to a certain point they was

23   mostly my decisions.

24        Q.      You weren't -- no one was telling

25   you before that, other than you got calls in

1      about work that needed to be done, no one was

2      sitting there saying, You can't do this one, you

3      can do this one, you can't do that one?

4           A.      No, no.

5           Q.      You were making that decision on

6      your own?

7           A.      Yeah, we done what roads -- you

8      know, like I said, it came from the judge's

9      office.

10          Q.      How many employees did you have

11     working at the road department when you were

12     foreman?

13          A.      Sixteen (16), 17, 18, somewhere in

14     that area.

15          Q.      Did you keep up with them; were you

16     directing them where to go?

17          A.      Yes.

18          Q.      So you told them what jobs to work

19     on?

20          A.      Yes.

21          Q.      Did you keep records if they didn't

22     show up for work?

23          A.      Well, you know, if they wasn't at

24     work and we realize they wasn't at work, I mean,

25     the secretary would keep down if they wasn't at

1    work.

2         Q.      Did you just make that decision

3    daily, though, based on who showed up that day,

4    who was going to do what?

5         A.      Well, yeah, I mean, you had to work

6    with whoever was there.  If there was certain

7    people that wasn't there, there may be certain

8    things that you couldn't do that day.

9         Q.      Let me talk to you right before the

10   election in November, 2006.  Did you have some

11   of your road department employees just not show

12   up for work the last week?

13        A.      Yes, there was some of them that

14   didn't come to work.

15        Q.      And did you know that there was a

16   concerted effort by some of those employees to

17   do that to make Judge Thompson look bad?

18        A.      I figured that, yes.

19        Q.      Did you reprimand these workers that

20   are under your control?  You're road foreman;

21   did you say anything, Hey, you guys need to come

22   in here and work?

23        A.      No, sir.

24        Q.      So were you letting them play

25   politics with that job?

1      A.      I don't know, you know, what reason
2   they took off.
3      Q.      Did you go to the county judge and
4   say -- or to Phillip Champion and say, These
5   guys are taking off, and I heard a rumor they're
6   taking off because they want to make the judge
7   look bad?
8      A.      No, no, sir, because Phillip already
9   knowed that.
10     Q.      You discussed that with Phillip?
11     A.      No, I never did discuss it with
12  Phillip.
13     Q.      But you know -- well, are you
14  clairvoyant?  How did you know Phillip already
15  knew it?  Did you talk to him about it?
16     A.      I just assumed he knew it.  No, we
17  never spoke about it.
18     Q.      And you made no effort to alert this
19  administration of this conduct being done by
20  employees under your control?
21     A.      No, no.
22     Q.      Now, you say right before the
23  election you went down to Quick Sand area to do
24  some patching.  Was that -- how long did you
25  stay down there?

1      A.      A month or so, maybe five or six

2  weeks, somewhere in that area.

3      Q.      And you admit you were there just

4  trying to drag your feet a little bit?

5      A.      Yeah, I wanted to be out of the

6  way.

7      Q.      And did you all lay about 800 tons

8  of blacktop down there patching?

9      A.      I don't know the exact.  I

10  wouldn't think it would be that much, but I

11  don't know the exact tonnage.

12      Q.      Do you know how much?

13      A.      When I first went down there and

14  me and Phillip first discussed it, and I had

15  been over there before, I do remember saying

16  it would probably take around 500 ton, but --

17  that I remember, I think it took a little bit

18  more.  I don't think it took it --

19      Q.      More than 500 tons?

20      A.      A little bit more.  I don't think

21  it went as much as 600 ton, if I remember

22  right.

23      Q.      How many truckloads would that be?

24      A.      Well, the little truck probably

25  haul ten ton.  We get 20 ton a day.  A whole

1      lot, I mean, but if that's what you're

2      figuring out, I could figure it out.

3            Q.      Fifty (50), 60, 70 truckload

4      you're saying?

5            A.      Probably somewhere in that area.

6            Q.      And how many truckloads did you

7      get a day, did you say?

8            A.      Sometimes we got two, sometimes

9      three loads.  Most of the time two loads a day

10     is what they got.

11           Q.      Okay.  So, while you were down

12     there, this was just patching?

13           A.      Yes.

14           Q.      You were working on county roads

15     down there?

16           A.      We worked -- that was a county

17     road, Laurel Fork.

18           Q.      And you didn't go off -- you

19     didn't go out there and just start paving

20     private drives, did you?

21           A.      No, sir, no.

22           Q.      Now, you said all the -- I think

23     you said all the blacktop came -- was told

24     where to go through the judge's office; isn't

25     that what you said?

1        A.      The blacktop that the contractors

2     was doing come through the judge's office.  We

3     had a PO.

4        Q.      The blacktop you all were putting

5     down was based on the decision over in that

6     area to patch up some work; is that right, to

7     do some patch work?

8        A.      Yes.  That road was real bad

9     through there.

10       Q.      Okay.  Now, these other companies

11    are -- you're not trying to tell this jury

12    that they weren't qualified to lay blacktop,

13    were you?

14       A.      No, no, I'm not saying that.

15       Q.      You don't know anything about

16    them, do you?

17       A.      No, no, sir.

18       Q.      Do you know whether or not Ralph

19    Dyer and Don Fugate both got letters of

20    reprimand also?

21       A.      I don't know for sure.  I think

22    they did, but I don't know for sure.

23       Q.      Do you know Danny Seals?

24       A.      Yes.

25       Q.      Did he work with you?

```
1        A.      Yes, he's a mechanic.

2        Q.      He what?

3        A.      He was a mechanic at the garage.

4        Q.      Do you know Allen Amburgey?

5        A.      Yes.

6        Q.      Did you get along with those guys?

7        A.      Yes.

8             MR. JENSEN:  I believe that's all I

9    have, Your Honor.

10            THE COURT:  Thank you, Mr. Jensen.

11   Mr. Williams.

12            MR. WILLIAMS:  Thank you, Your

13   Honor.

14                 CROSS-EXAMINATION

15      BY:  MR. WILLIAMS:

16      Q.      Sir, I know you've answered a lot

17   of questions.  I just have a few follow-up.  You

18   mentioned earlier some phone calls you received,

19   and I just wondered if after you became involved

20   in this investigation, or even before, did you

21   receive any phone calls from Mike Hall?

22      A.      No, not that I remember, no, sir.

23      Q.      So it's your testimony today that

24   you've never discussed these issues in this

25   case with Mike Hall?
```

1       A.      No, sir.

2       Q.      You do know Ralph Dyer, correct?

3       A.      Yes.

4       Q.      How do you know Ralph?

5       A.      He was, you know, an employee

6    there.  He worked there, you know, he worked

7    with me.

8       Q.      Now, I'm sorry.  He's also a big

9    supporter of Mike Hall's; is that correct?

10      A.      Yes, yes, sir.

11      Q.      Now, you've already admitted to

12   supporting Mr. Hall in the election?

13      A.      Yes.

14      Q.      How were you involved in his

15   campaign?

16      A.      Mike come and talked to me, and

17   then he did say, you know, that he would let

18   me keep my job if I --

19          MR. TAYLOR:  I can't hear the

20   witness.

21      A.      Mike did come and talk to me and

22   said that he would let me keep my job, you

23   know, if I was for him.

24      Q.      So he assured you if he won the

25   election, you would be keeping your job?

```
 1          A.      Yes, sir.

 2          Q.      Do you know if he assured other

 3     people in the road department that if they voted

 4     for him, they would keep their job?

 5          A.      You know, I have no way of

 6     knowing.  I don't know.

 7          Q.      But Mr. Hall indicated to you that

 8     if you would support him and vote for him in

 9     the election, that you would have a job after

10     the election?

11          A.      Yes, sir.

12          Q.      Did you feel like Mr. Hall was

13     trying to buy your vote when he did that?

14          A.      No, not really.  I mean, I didn't

15     look at it like that.  I didn't think about it

16     like that.

17          Q.      Weren't you exchanging your vote

18     and your support for insurance in a job after

19     the election?

20          A.      Well, yes.

21          Q.      Now, Mr. Dyer is also a supporter

22     of Mr. Hall's; is that correct?

23          A.      Yes.

24          Q.      How was he involved in Mr. Hall's

25     campaign?
```

```
 1          A.      Well, you know, he'd go out and

 2     campaign for Mike.  I would think he did.

 3          Q.      Now, you've already indicated some

 4     familiar -- being somewhat familiar with a

 5     rumor that supporters of Mr. Hall were asked

 6     to take off at the time of the election to

 7     damage Mr. Thompson's campaign?

 8          A.      Yes, I guess.

 9          Q.      Did you ever discuss that matter

10     personally with Ralph Dyer or Brandon Jacobs?

11          A.      No, sir.

12          Q.      Are you aware that Brandon Jacobs

13     has already told investigators that that in

14     fact wasn't true?

15          A.      I don't know.

16          Q.      And if the purpose of it was to

17     damage Mr. Thompson's administration?

18          A.      Yes, that's what he said.

19          Q.      Does that sound like something

20     that those guys would do?

21          A.      Well, possible, yes.

22          Q.      Now, you also have indicated that

23     you knew Danny Seals; is that correct?

24          A.      Yes, I know Danny.

25          Q.      Did you ever send him as a
```

1    mechanic on county road department time to

2    work on a private dozer during county hours?

3         A.    No, sir, not to my knowledge.

4         Q.    Does the name Harold Nichols ring

5    any bells?

6         A.    Yes, yes.

7         Q.    Did you send Mr. Seals to work on

8    Harold Nichols' bulldozer during county hours?

9              MR. TAYLOR:  I object on relevance.

10             THE COURT:  I'm going to allow the

11   question.

12        A.    We did go work on Harold's dozer,

13   I do remember it now after you mentioned

14   Harold's name.  I don't remember what we done,

15   but we did go over there and, you know,

16   Harold's dozer was broke down, and let Danny

17   look at it to see if he knowed what was wrong

18   with it.

19             MR. WILLIAMS:  Your Honor, I do have

20   one photograph that I'd like to show to the

21   witness.

22             THE COURT:  You may tender it to the

23   witness.

24        Q.    Mr. Bentley, if you'd just let me

25   know when you've had a chance to look at

1    that.

2         A.     I see it, yes.

3         Q.     Can you tell the jury what that's

4    a picture of?

5         A.     There's some trees, and I really

6    don't know what the board part is, or whatever

7    that is there.

8         Q.     Does it appear to be a bridge in

9    the picture?

10        A.     You could call it a walk bridge or

11   something maybe, a walking bridge.

12        Q.     Is that a bridge that you

13   constructed yourself?

14        A.     No, sir.

15        MR. WILLIAMS:  No further questions,

16   Your Honor.

17        THE COURT:  Mr. Taylor.

18             REDIRECT EXAMINATION

19   BY:  MR. TAYLOR:

20        Q.     Mr. Bentley, in response to a couple

21   of Mr. Webster's questions when he was asking

22   you about what you said to the grand jury some

23   time ago, I believe his question was along the

24   line, Didn't you go over there -- didn't you

25   tell the grand jury you went over there to Quick

1    Sand and hung out and tried to delay it?  I

2    believe you acknowledged you did.  I want to put

3    that in its full context.  And I believe this

4    same quote will go to another question by

5    Mr. Webster, which was to the effect that you

6    didn't tell the grand jury that you saw any

7    private drives.  Let me ask you this.  Did you

8    not say the following in answer to a question

9    about whether you felt like you were being put

10   in the Quick Sand area to be away from the

11   paving.  You said, Well, in a way, but in a way

12   I was glad to be there, you know, when my part.

13   Question --

14         MR. WESTBERRY:  Object to form.  He's

15   rehabilitating his own witness.

16         MR. TAYLOR:  There's no prohibition

17   on that.

18         THE COURT:  I think he can do that

19   actually, so I'll overrule the objection.

20   Q.     The question was -- you said,

21   Well, in a way, but in a way I was glad to be

22   there, you know, my part.  Question:  Why was

23   that?  Did you say, Well, because I or -- you

24   know, I know they had a bunch of paving

25   contractors in there paving, you know,

1    driveways and stuff.  Question:  How did you

2    know that?  Answer:  Well, dude, I mean, it's

3    plain as the nose on your face.  I mean,

4    everybody could see that.  They didn't hide it

5    is what I'm trying to say.  They didn't hide

6    it.

7         A.      That's true.

8         Q.      After the election, did you see

9    what you thought was confirmation of what you

10   believed was going on?

11        A.      I ran up on places that I thought,

12   you know, shouldn't have been blacktopped.

13        Q.      You were asked by someone if you

14   didn't make innocent mistakes at times when

15   you were dumping gravel or deciding what to

16   repair.  Do you, based on what you observed,

17   believe that these three blacktop companies

18   were brought into the county to make innocent

19   mistakes?

20        A.      No, no, sir.

21        Q.      When you were road foreman, did

22   the magistrates ride around with you and tell

23   you where to put stuff?

24        A.      Sometimes.  You know, they would

25   ask you to come and ask me, you know, stuff to

1    do and, you know, we would ride around and

2    they would look at whatever they wanted to do,

3    whatever.

4         Q.    Do you know of any reason why

5    during the Summer and Fall of 2006, Mac Combs

6    would have had any reason to ride around in

7    the dump trucks with the gravel?

8         A.    No, sir.

9         Q.    And when did you say Ronnie Adams

10   became road foreman?

11        A.    It was of '07, in January, the 1st

12   of January.

13        Q.    Do you know of any reason why in

14   July, August, September, and October he would

15   have had any reason to go around and ask

16   people if they wanted blacktop?

17        A.    No.

18             MR. WILLIAMS:  Object to the form.

19             MR. TAYLOR:  That's all the questions

20   I have.

21             THE COURT:  I'll overrule the

22   objection.  The witness was allowed to

23   respond, and you may be excused, sir.  Let me

24   ask whether he will be finally excused from

25   any further testimony.

1          MR. TAYLOR:  Yes, Your Honor.

2          THE COURT:  Is there an objection to

3     finally excusing this witness?

4          MR. WEBSTER:  No.

5          THE COURT:  Okay.  Without objection,

6     you may be finally excused from any further

7     testimony in this case, sir.  Thank you.

8               [END OF REQUESTED TESTIMONY]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The undersigned Court Reporter hereby

2     certifies that:  (1) The foregoing 67 pages

3     represent an accurate and complete transcription

4     of a portion of the record of the proceedings

5     before the United States District Court for the

6     Eastern District of Kentucky at Pikeville before

7     the Honorable Gregory F. Van Tatenhove,

8     presiding, in the matter of United States of

9     America vs. Randall Clinton Thompson, John Mac

10    Combs, Phillip G. Champion, and Ronnie Adams,

11    and (2) these pages constitute a copy of the

12    transcript of the proceeding.

13

14          _____

15          SANDY C. WILDER, RMR, CSR (IL),

16          COURT REPORTER

17

18

19

20

21

22

23

24

25