```
 1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
 2                 SOUTHERN DIVISION
                     AT PIKEVILLE
 3
    UNITED STATES OF AMERICA,
 4                              No. 07-CR-35-GFVT
        PLAINTIFF,
 5                              Pikeville, Kentucky
                                June 17, 2008
 6                              9:01 a.m.
    VS.
 7
    RANDALL CLINTON THOMPSON,
 8  JOHN MAC COMBS,
    PHILLIP G. CHAMPION,
 9  RONNIE ADAMS,
10      DEFENDANTS.
11                   VOLUME III
                     JURY TRIAL
12
                * * * * * * * * * *
13
    APPEARANCES:
14
15  For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
    For the Defendant
19  Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876
```

APPEARANCES (Cont.)

For the Defendant
John Mac Combs:              Hon. Lawrence R. Webster
                            163 Main Street
                            Suite 2
                            Pikeville, Kentucky  41502
                            (606) 437-4029

For the Defendant
Phillip G. Champion:
                            Hon. Thomas L. Jensen
                            Jensen, Cessna, Benge & Webster
                            303 South Main Street
                            London, Kentucky  40741
                            (606) 878-8845

For the Defendant
Ronnie Adams:
                            Hon. Jason E. Williams
                            111 West 5th Street
                            London, Kentucky  40743-3199
                            (606) 877-5291

Court Reporter:             Sandy C. Wilder, RMR, CSR (IL)
                            8081 Perryville Road
                            Danville, Kentucky  40423-9713
                            (859) 516-4114
                            wildercaptions@kywimax.com

INDEX

Colloquy                                        6–10

Direct Examination of BOBBY REYNOLDS
     By:  Mr. Taylor                            10–21

Cross-examination
     By:  Mr. Westberry                         21–31

Cross-examination
     By:  Mr. Webster                           31–34

Cross-examination
     By:  Mr. Williams                          34–40

Redirect Examination
     By:  Mr. Taylor                            40–48

Direct Examination of BRANDON MOORE            48–53

Cross-examination
     By:  Mr. Westberry                         54–58

Cross-examination
     By:  Mr. Williams                          58–72

Direct Examination of JEREMY MORGAN
     By:  Mr. Taylor                            73–96

Cross-examination
     By:  Mr. Westberry                         96–100

Cross-examination
     By:  Mr. Webster                           100–105

Cross-examination
     By:  Mr. Williams                          106–126

Redirect Examination
     By:  Mr. Taylor                            126–136

Direct Examination of JEFF MORGAN
     By:  Mr. Taylor                            140–150

Cross-examination
     By:  Mr. Westberry                         150–154

1                    INDEX (Cont.)

2   Cross-examination
          By:  Mr. Williams                 154–167
3
    Redirect Examination
4         By:  Mr. Taylor                    167–172

5   Direct Examination of JERRY ROBINSON
          By:  Mr. Taylor                    174–185
6
    Cross-examination
7         By:  Mr. Westberry                 185–187

8   Cross-examination
          By:  Mr. Webster                   187–193
9
    Cross-examination
10        By:  Mr. Jensen                    193–196

11  Cross-examination
          By:  Mr. Williams                  196–198
12
    Redirect Examination
13        By:  Mr. Taylor                    198–201

14  Recross-examination
          By:  Mr. Webster                   202–203
15
    Redirect Examination
16        By:  Mr. Taylor                    204–205

17  Direct Examination
          By:  Mr. STANLEY STUMBO            205–212
18
    Cross-examination
19        By:  Mr. Westberry                 212–217

20  Redirect Examination
          By:  Mr. Taylor                    217–218
21
    Direct Examination of DANNY COMBS
22        By:  Mr. Taylor                    219–224

23  Cross-examination
          By:  Mr. Westberry                    225
24
    Cross-examination
25        By:  Mr. Webster                   225–227

INDEX (Cont.)

Cross-examination
    By:  Mr. Williams                    227-228

Redirect Examination
    By:  Mr. Taylor                      228-229

Direct Examination of KELLY HALL
    By:  Mr. Taylor                      231-240

Cross-examination
    By:  Mr. Westberry                   240-242

Cross-examination
    By:  Mr. Webster                     242

Cross-examination
    By:  Mr. Jensen                      243

Cross-examination
    By:  Mr. Williams                    244-245

Redirect Examination
    By:  Mr. Taylor                      245-246

Direct Examination of CHARLOTTE HALL
    By:  Mr. Taylor                      248-251

Cross-examination
    By:  Mr. Westberry                   252-253

Cross-examination
    By:  Mr. Williams                    254

Direct Examination of RONNIE CAMPBELL
    By:  Mr. Taylor                      260-265

Cross-examination
    By:  Mr. Webster                     269-271

Colloquy                                 271-275

Reporter's Certificate                   276

1          [IN OPEN COURT]

2          THE COURT:  Good morning, ladies and

3 gentlemen.  We've convened outside the presence

4 of the jury.  I understand Mr. Williams has an

5 evidentiary issue he'd like to raise before we

6 bring in the jury.

7          MR. WILLIAMS:  Thank you, Your Honor.

8          THE COURT:  Yes, sir.

9          MR. WILLIAMS:  In Jencks material

10 provided last night, it included a statement of

11 the witness the United States intended on

12 calling naming Ronnie Campbell, and it brings up

13 an issue we've already discussed in relation to

14 some testimony from Randy Campbell, and Ronnie

15 makes a statement in his grand jury testimony

16 that he heard from his brother Randy that

17 Orville Pratt said that Ronnie Adams said it was

18 okay to pave, and, of course, it being double

19 hearsay at this point, Your Honor, it's triple

20 hearsay.  And as we discussed earlier, the

21 omission on the party opponent rule requires the

22 person who actually heard the statement be

23 prepared to hear it from the person who made

24 it.  So we'd just ask for an admonition that

25 that witness not make those comments or

1    testimony from the stand.

2              THE COURT:  Mr. Taylor.

3              MR. TAYLOR:  Well, several responses.

4    First of all, there's absolutely no way that

5    that's not going to come out.  They're going to

6    attack both Campbells as being basically thieves

7    that had no authority to spread blacktop, so I'm

8    going to ask them on what authority did you

9    spread blacktop, and that's going to be their

10   response.  It's not being admitted for the truth

11   of the matter.  It's admitted as being as the

12   reason they spread blacktop, and they're

13   entitled to tell why they spread the blacktop.

14   Maybe they're lying, and they can cross-examine

15   him, and maybe Ronnie didn't say that to

16   Orville, or Orville didn't say that.  There are

17   any number of places along the line they could

18   be lying.  But the fact is, they're entitled to

19   give their explanation why they spread the

20   blacktop.

21             Another point is that the thing I need

22   to say is I've been told by Mr. Hopkins he went

23   back and reviewed Orville Pratt's statement, and

24   Orville Pratt does say Ronnie Adams told me to

25   tell them to spread blacktop, so I'm -- but

1    Orville may not even testify until Ronnie

2    Campbell testifies.  But I'll make the

3    representation that Orville, according to what

4    he's told the grand jury, backs that up.

5          THE COURT:  And that may be the best

6    way to get that testimony in.

7          MR. TAYLOR:  And the third thing I need

8    to say is the first level of hearsay in this

9    analysis is not hearsay at all; it's a command

10    or it's a direction.  It contains no assertion

11    of fact that needs to be tested by a jury.  It

12    is go blacktop those driveways.  That's not a

13    statement.  That is a verbal act, a command.

14          THE COURT:  Well, I'm not -- I think we

15    can see how this comes up in the context, and

16    we've addressed this issue.  This has kind of

17    been in front of us, and I think there is a fair

18    question about whether this really is more of

19    what I would consider a kind of state of mind

20    question in terms of the witness's state of

21    mind, rather than it being offered for the

22    truthfulness of those particular statements, so

23    I will not kind of pre-admonish the United

24    States on this particular point, but we can

25    raise it in the context of the testimony.  It

1    sounds like the Government has some decision to

2    make exactly where to elicit that testimony and

3    from what witness to elicit testimony.  We'll

4    wait until trial to address that and we can

5    certainly do, and do it promptly at the bench if

6    we need to.

7         Let me see if there are other matters

8    that we need to take up this morning.

9         MR. TAYLOR:  No, Your Honor.

10        MR. WESTBERRY:  No.

11        THE COURT:  All right.  Well, let me

12   see.  Is the jury ready?  We're just a few

13   minutes early, but why don't we have the jury

14   brought into courtroom and we'll recognize the

15   Government to call their next witness.

16        [JURY ENTERS COURTROOM]

17        THE COURT:  You may be seated.  Good

18   morning, ladies and gentlemen.  I hope everyone

19   had a good evening, and we've reconvened for the

20   continued presentation of the evidence in this

21   case.

22        At this time, I'll recognize Mr. Taylor

23   on behalf of the United States to call your next

24   witness.

25        MR. TAYLOR:  The United States calls

1    Bobby Reynolds.

2          THE COURT:  Mr. Reynolds is called on

3    behalf of the United States.

4          [WITNESS SWORN]

5                   DIRECT EXAMINATION

6    BY:  MR. TAYLOR:

7    Q.    Would you state for the record your

8    full name.

9    A.    Bobby Reynolds.

10   Q.    Mr. Reynolds, where do you live?

11   A.    184 Rooster Lane.

12   Q.    And do you work?

13   A.    No.

14   Q.    All right.  Are you disabled?

15   A.    Yeah.

16   Q.    Okay.  What did you formerly do

17   before you were disabled?

18   A.    Coal mining.

19   Q.    All right.  And how long have you

20   been disabled?

21   A.    Since '96.

22   Q.    Now, have you lived in Knott County

23   pretty much all your life?

24   A.    Yes.

25   Q.    And are you a registered voter?

1       A.     Yes.

2       Q.     I want to direct your attention to

3 the Summer and Fall of 2006 in Knott County.  Do

4 you remember the judge/executive race?

5       A.     Yes.

6       Q.     Did you live where you live today at

7 that time?

8       A.     Yes.

9       Q.     And what road is that on?

10      THE WITNESS:  Is what now?

11      Q.     What's the name of the road you live

12 on?

13      A.     Runnel's Branch.

14      Q.     Runnel's Branch?

15      A.     Yeah.

16      Q.     Okay.  Now, during that election, or

17 around the time of that election, did you have

18 occasion to receive some blacktop at your house?

19      A.     Yes.

20      Q.     Could you tell the jury how it was

21 that that came about?

22      A.     One day Ronnie Adams called me; it

23 was probably three or four weeks before the

24 election, asked me how I was doing.  I told him

25 I was doing okay.  And I asked how he was doing,

1    and he said he's been spreading blacktop.  And I

2    asked him —— and he asked me how's the election

3    going on around there where I lived, and I told

4    him I didn't know.  I hadn't got into it.

5         Q.    You said you hadn't got into it?

6         A.    Yeah.

7         Q.    And what did he say?

8         A.    I asked him could he spread some

9    blacktop up here where we live, get us out of

10   the mud and dust, and he said I might can get to

11   you before the election; it may be after.

12        Q.    Okay.  What else did he say?

13        A.    And he said that —— he said he would

14   talk to somebody and see if he could.  And after

15   that, about a couple of weeks before the

16   election, they blacktopped it.

17        Q.    Okay.  Did he say anything about

18   votes in connection with that blacktop?

19        A.    No.

20            MR. WILLIAMS:  Object to the leading,

21   Your Honor.

22        Q.    I want to direct your attention —— do

23   you recall testifying before the grand jury in

24   this case?

25        A.    Yeah.

1    Q.      And you testified before the grand

2    jury on October 25, 2007.  Do you recall that?

3    A.      Yeah.

4    Q.      And do you recall being asked this

5    question and giving this answer:  All right.

6    What happened, what did he say -- referring to

7    Ronnie Adams -- and you said, He just called me

8    and said -- asked me how I was doing, and I told

9    him I was doing all right.  Then he just asked

10   me what did I think about the election, and I

11   told him I hadn't really thought about it.  I

12   asked what he was doing, and he said he's down

13   blacktopping a lot.  He was for Randy Thompson,

14   and I told him, I said, Well, why don't you

15   bring some blacktop around here because he was

16   just up the road, you know, from us, and he

17   said, I'll try to before the election.  If I

18   can't, I'll get it after the election.  I said,

19   well, if you can do it before -- he asked me how

20   everybody'd vote up here -- he asked me how's

21   all my family going to vote, and I told him I

22   hadn't asked them, and he said, well, if I can

23   get it to you to get it -- to blacktop you

24   before the election, and I said, Well, if you

25   blacktop before the election, every one of them

1    in here will vote for Randy.  Do you recall that

2    conversation?

3           A.     That's correct.

4           Q.     Had you just forgotten that?

5           A.     Yeah.

6           Q.     Did that conversation occur?

7           A.     Yeah.

8           Q.     And you say the blacktopping

9    occurred when?

10          THE WITNESS:  Do what now?

11          Q.     When did the blacktopping occur?

12          A.     I believe about two weeks before the

13   election.

14          Q.     Now, I want to show you some

15   photographs, Exhibits 4A, B and C.  Do you

16   recognize those photographs?

17          A.     Yeah.

18          Q.     Are those fair and accurate

19   depictions of your house and surrounding area?

20          THE WITNESS:  Do what now?

21          Q.     Does that appear to be your house

22   and property?

23          A.     Yes.

24          MR. TAYLOR:  I want to move the

25   introduction of Government's 4A, B and C.

1          THE COURT:  Is there objection?

2          MR. WILLIAMS:  Your Honor, may we

3    approach?

4          THE COURT:  You may.

5          [CONFERENCE AT THE BENCH]

6          THE COURT:  Mr. Williams.

7          MR. WILLIAMS:  Just to the extent that

8    the question makes it appear that Mr. Reynolds

9    answered it yes, that the word property would

10   include everything in the photographs, and so I

11   would just object to the form of the question

12   that way and ask if he wants to clarify, if

13   that's his home in the pictures.

14         THE COURT:  Well, I'll allow Mr. Taylor

15   to qualify that to a certain extent.  You'll be,

16   of course, able to cross-examine.  Let me

17   mention the leading objection.  I think it's a

18   fair objection.

19         MR. WILLIAMS:  Given that the witness

20   answered no, I'll withdraw.

21         THE COURT:  Right, that's why I had to

22   interject.

23         [IN OPEN COURT]

24   Q.     Do you recognize those photographs?

25   A.     Yes.

1          MR. TAYLOR:  I think I moved the

2    introduction of them.

3          THE COURT:  I will grant the

4    Government's motion to have those entered as

5    exhibits.

6          MR. TAYLOR:  I'd like to put 4A on the

7    screen, if I could, please, and I'd like to

8    retrieve the originals from the witness, if I

9    could, please.  I think what I'm going to do is

10   use the Elmo on these because I need to point to

11   things on the photograph.

12         THE COURT:  You may do that.

13     Q.     Do you see your house?  Is that your

14   house there that's depicted in this photograph?

15     A.     No.

16     Q.     Whose house is this one right here?

17     A.     That's my girls.

18     Q.     Your girls?

19     A.     Yes.

20     Q.     Where does your property begin?

21     A.     On back down.

22     Q.     Down this way?

23     A.     Yeah, right on down that way.

24     Q.     Is this your property right here

25   that I'm pointing to?

1        A.      Yes.

2        Q.      And is this your garbage pile here,

3 or your children?

4        A.      Yes.

5        Q.      Is the main road down below this

6 photograph here, in this direction?

7        A.      Yes.

8        Q.      And whose driveway is this right

9 here, if anyone's?

10       A.      That's my son-in-law's, my girls.

11       Q.      And whose driveway is this right

12 here, if you know?

13       A.      That's mine.

14       Q.      Yours?

15       A.      Yes.

16       Q.      And where is your house, on up the

17 hill?

18       A.      I've got a trailer up there.

19       Q.      All right.  Do you know a Brandon

20 Moore?

21       A.      Yes.

22       Q.      And where does he live?  Does he

23 live up this hill?

24       A.      Yeah, he lives at the top.

25       Q.      All right.  Now, I want to put up

1    4B.   Is this below your house or above your

2    house?

3         A.      That's straight in front of my

4    house.

5         Q.      This is the public road?

6              THE WITNESS:  Do what now?

7         Q.      Is this a public road here?

8         A.      Private.

9         Q.      Okay.  Whose road is this?

10        A.      I built that road.

11        Q.      You built this road?

12        A.      Yeah.

13        Q.      Is this your house or is this your

14   house?

15        A.      No, that's mine over there.

16        Q.      Right here?

17        A.      No, that's my nephew.

18        Q.      Who is this?

19        A.      That's my wife's brother.

20        Q.      All right.  And where is your house

21   in relation to this?

22        A.      To the left there through the fence.

23        Q.      Right here?

24        A.      Yes.

25        Q.      Over in this direction?

1    A.    Yes.

2    Q.    And so this is -- this goes right up

3    to your house right here?

4    A.    Yeah, that's my driveway, but it

5    ain't blacktopped.

6    Q.    But you built this road?

7    A.    Yes.

8    Q.    And whose car is that?

9    A.    That's my brother's.

10   Q.    Okay.  So this is all your family

11   here; is that correct?

12   A.    Yes.

13   Q.    And is there a cemetery up this

14   road?

15   A.    Yes, back down.

16   Q.    Back down this way?

17   A.    Yes.

18   Q.    Okay.  So this is up beyond the

19   cemetery?

20   A.    No, that's not the road to the

21   cemetery.  The one below it is.

22   Q.    Okay.  Now, I want to put 4C up on

23   the screen.  Whose trailer is this?

24   A.    That's my brother.

25   Q.    All right.  We've already seen part

1    of that in the other picture, right?

2         A.    Yes.

3         Q.    And is this a continuation of that

4    road?

5         A.    Yeah.  It goes to the cemetery.

6         Q.    This goes to the cemetery?

7         A.    Yes.

8         Q.    Whose trailer is this?

9         A.    That's my dad's.

10        Q.    All right.  And your house is --

11   this is the front yard of your house?

12        A.    Yes.

13        Q.    Is this paving that we've been

14   seeing here the new paving you were referring to

15   earlier?

16        A.    Yes.

17        Q.    Is there anyone who lives on that

18   stretch of road we just looked at that is not in

19   your family?

20        A.    No.

21        Q.    Are the other members of your family

22   up in there registered voters?

23        A.    Yes.

24        Q.    How many votes are up your road?

25        A.    Probably 27 to 30.

1      Q.    Twenty-seven (27) to 30?

2      A.    Yeah, more or less -- well, it ain't
3  less than 27.

4      Q.    That cemetery up there, is that a
5  private cemetery or family cemetery, or can
6  anybody in the public buy a lot up there?

7      A.    It's -- no, it's family.

8      Q.    Family?

9      A.    Yeah.

10     Q.    Has this road and this cemetery been
11  in your family for a number of years?

12     A.    Yes.  There's two cemeteries up
13  there.

14         MR. TAYLOR:  One moment.  That's all
15  the questions I have.

16         THE COURT:  Thank you, Mr. Taylor.
17  Mr. Westberry.

18         MR. WESTBERRY:  Yes, judge, just one
19  second, please.

20            CROSS-EXAMINATION

21  BY:  MR. WESTBERRY:

22     Q.    Good morning, Mr. Reynolds.

23     A.    Good morning.

24     Q.    Good morning to you.  I represent
25  Randy Thompson.

1          THE WITNESS:  Do what?

2          Q.     Did you hear me okay, sir?  I

3     represent Randy Thompson.

4          A.     Oh, okay.  I'm hard -- I lost part

5     of my hearing.

6          Q.     I know you worked the coal mines; is

7     that correct?

8          A.     Yes.

9          Q.     I don't believe Randy Thompson ever

10    came up to your house to talk to you about any

11    of this stuff; is that right?

12         A.     I never did see Randy.

13         Q.     Now, you mentioned, Mr. Reynolds,

14    about two roads, Runnel's Branch and a Rooster

15    Lane; did I hear that right?

16         A.     Yeah.

17         Q.     Now, Runnel's Branch, just ballpark,

18    how many houses are on Runnel's Branch, just an

19    estimate?  Quite a few, I think, aren't there?

20         A.     Yeah, they a whole lot.  I may have

21    told -- Runnel's Branch, you know, but mine

22    comes up Rooster Lane.  Yeah, there's a lot of

23    homes in Runnel's Branch.

24         Q.     Right.  Ten or more?

25              THE WITNESS:  Do what now?

```
1          Q.      Ten or more homes?

2          A.      Oh, yes.

3          Q.      Okay.  Now, Runnel's Branch, that's

4    a county road, isn't it?

5          A.      Yes.

6          Q.      Okay.  Now, Rooster Lane is the road

7    that runs off of Runnel's Branch; do I have that

8    right?

9          A.      Yes.

10         Q.      Okay.  Now, leading up to the end of

11   Rooster Lane is the cemetery; is that right?

12         A.      That's right.

13         Q.      Now, your dad lives in a trailer up

14   just past your house; is that right?

15         A.      That's his rental property.  My dad

16   lives below.

17         Q.      That's right.  But your dad thinks

18   that that road --

19              MR. TAYLOR:  Objection to hearsay.

20              THE COURT:  I'll sustain that

21   objection.

22              MR. WEBSTER:  Your Honor, may we

23   approach the bench?

24              THE COURT:  You may.

25              [CONFERENCE AT THE BENCH]
```

1          MR. WEBSTER:  Reputation testimony as

2     to such matters is admissible.

3          MR. TAYLOR:  I'm not --

4          THE COURT:  In terms of the reputation

5     --

6          MR. WEBSTER:  Reputation testimony and

7     matters, this road, reputation, people say this

8     is a county road is admissible.  That's

9     reputation.  It's admissible in boundary cases

10     and cases like this.

11          THE COURT:  Yeah, I don't think the

12     Federal Rules of Evidence would allow for that.

13     I mean, that's really being offered for the

14     truth as if you want that witness to come in and

15     testify to the fact that I believe it's a, you

16     know, I always thought it was a public road.

17     Mr. Westberry, let me hear from you.

18          MR. WESTBERRY:  Yeah, what he testified

19     to in the grand jury under questioning from

20     Mr. Taylor, if I can just read it to you, it's

21     only a couple of sentences.

22          MR. TAYLOR:  Yeah.

23          THE COURT:  Are you talking about the

24     witness's?

25          MR. WESTBERRY:  Yes.  I'll read to you

what the witness testified to.  The question was
the cemetery, is that a public cemetery or a
private burial ground?  I guess it's private.
My son owns it.  Question:  That's not a public
road to the cemetery?  Answer:  I'm not for
sure.  My dad says it's a county road.  I don't
know.  I don't know when the county took it or,
you know, I don't know.

I want to impeach him because he's
already testified under direct examination from
the Government that he thinks that's private.

MR. WEBSTER:  Could you not know that a
road was a county road but by gathering it from
others?

MR. TAYLOR:  Put on hearsay as to the
status of roads?  I thought they were trying to
keep me from putting on hearsay.

THE COURT:  Yeah, I think you can, I
think you can ask, I think you can ask him, you
can, I think you can impeach him with this
testimony.  The problem is the hearsay here is
just that narrow bit which is, you know, it --
you know, is someone else thinking that it's
not, that it's not a -- that it is a county
road.  So I guess this is in some ways again the

1   -- kind of his statement basically, you know,

2   you're -- what you need to impeach him on is

3   that he's not sure, and why he's not sure is

4   that he's heard from others that maybe it is or

5   it isn't, but you can't -- where this was

6   seeming to head was just kind of getting into

7   testimony of someone else.

8           MR. WESTBERRY:  I was just trying to

9   lay the foundation before I got into this.  My

10  next line of questioning would be to impeach him

11  on his grand jury testimony.

12          THE COURT:  I think the more

13  appropriate, given this hearsay concern, is to

14  ask him a question about not the grand jury.

15  Well, you weren't sure, were you, about whether

16  this was a county road, as opposed to focusing

17  on the testimony of his father.

18          MR. WESTBERRY:  And if he says he's not

19  sure about what he testified about at the grand

20  jury, which could easily be the case; I think

21  Ken had a little trouble getting him to recall

22  certain things in the grand jury, then go into

23  the questioning from the grand jury.

24          THE COURT:  Mr. Taylor?

25          MR. TAYLOR:  Well, you know, if we're

going to get into this, it's going to have to

cut both ways, and I can ask people what they've

heard about this road.  There's plenty of

instances that go the other why.

          MR. WEBSTER:  I don't think I would

mind that.

          MR. WESTBERRY:  I don't either.

          MR. WEBSTER:  I don't see how you can

prove a character road which is to the public or

to a defendant or to those who are living there

it's a state of mind.  That state of mind comes

by reputation.

          MR. TAYLOR:  Well then, why weren't

there all these objections when these haulers

and graders who had an opinion that a road was

private based upon its reputation?

          MR. WEBSTER:  I've never heard you ask

such a question.

          MR. TAYLOR:  I didn't say reputation,

but I said did you believe it to be private?

          MR. WEBSTER:  What road did you ask

somebody about that?  I've not heard that.

          MR. TAYLOR:  They didn't know specific

roads.

          MR. WEBSTER:  Well, see, that's the

1    problem.

2          MR. TAYLOR:  They didn't pave -- that

3    didn't work because they didn't want to pave

4    private driveways.

5          THE COURT:  Hold on, don't argue

6    amongst yourself.  I'm going to allow you to

7    impeach this witness with that grand jury

8    testimony.  I'm going to allow you to, you know,

9    just read back the testimony, the impeachment,

10    here is this kind of I'm unsure and the reason

11    he's unsure is that there is different people

12    kind of think different things, and I'll allow

13    you to do that with that grand jury testimony.

14          MR. WESTBERRY:  I want to be clear.  I

15    don't want to have to keep running back up to

16    the Court.

17          THE COURT:  Right.

18          MR. WESTBERRY:  But I'm going to read

19    just those questions and answers.

20          THE COURT:  And you may, and I

21    understand with the response of the grand jury

22    was one of those questions was that someone else

23    thought it was his father.

24          MR. WESTBERRY:  Right.

25          THE COURT:  Okay.

1               [IN OPEN COURT]

2               MR. WESTBERRY:  We're back.

3               THE WITNESS:  Yeah, okay.

4     Q.     I was asking you about Rooster Lane

5   and what it leads up to at the top of the hill,

6   and I believe you testified there's a cemetery

7   up there?

8     A.     Yes.

9     Q.     Is there more than one cemetery?

10     A.     Yes.

11     Q.     Okay.  One cemetery belongs --

12   primarily plots for your family; is that

13   correct?

14     A.     That's correct.

15     Q.     Is the other cemetery, you know, is

16   a cemetery for other people, other families?

17     A.     Yeah, it belongs to the Seals

18   family.

19     Q.     Now, on the questioning from the

20   Government just a little while ago regarding

21   Rooster Lane Road, which leads up to the two

22   cemeteries, I think, if I heard you right, I

23   think I heard you tell the jury you thought that

24   road was private; is that correct?

25     A.     That's correct.

1    Q.    Okay.  Do you remember testifying in

2    the grand jury, oh, October of last year?

3    A.    Not the road going -- the road going

4    up my way's private --

5         MR. WESTBERRY:  Okay.

6    A.    -- but the road going to the

7    cemetery, my dad always told me it belonged to

8    the county.

9    Q.    There we go.  Okay.  There we go.

10   But this is all Rooster Lane; is that correct?

11   A.    Yes.

12        MR. WESTBERRY:  There we go.  Excuse

13   me.  I don't know that I need to impeach him.

14   Excuse me.  My partner has prompted me.

15   Q.    Who has maintained that road?  Has

16   the county maintained that road all those years?

17   A.    That's correct.

18   Q.    Long before Mr. Thompson was ever

19   county judge?

20   A.    That's correct.

21   Q.    Your dads's always thought that was

22   a county road; is that right?

23   A.    That's right.

24   Q.    How old is your father?

25   A.    He is 70.

1      Q.      Okay.  Your son lives on the

2   property, too; is that right?

3      A.      Yes.

4         MR. WESTBERRY:  Excuse me again,

5   Judge.  I'm sorry.

6         THE COURT:  Certainly.

7      Q.      On the pictures that the Government

8   introduced into evidence and had us look at the

9   property, it looked like the roads were paved,

10  the road itself, Rooster was paved, but the

11  driveways were not paved; is that correct?

12         THE WITNESS:  Like the driveways going

13  to your house?

14         MR. WESTBERRY:  Yeah.

15      A.      No, they wasn't paved.

16         MR. WESTBERRY:  Right.  That's all the

17  questions I have.  Thank you.  Thank you,

18  Mr. Reynolds.

19         THE COURT:  Mr. Webster.

20         THE WITNESS:  You're welcome.

21                   CROSS-EXAMINATION

22   BY:  MR. WEBSTER:

23      Q.      I won't bother you too much, Bobby,

24   but I've looked at those pictures and I had a

25   hard time understanding it.  The main creek up

1    through that there, what's the name of that, not

2    the holler that you --

3            THE WITNESS:  The main creek --

4            MR. WEBSTER:  Yeah.

5            THE WITNESS:  -- as you turn off of 160

6    is called Runnel's Branch.

7        Q.    All right.  And you live in a holler

8    off Runnel's Branch?

9        A.    Yeah, I live off the fork of it up

10   in the holler.

11           MR. WEBSTER:  I'm sorry?

12       A.    As you come up Runnel's Branch, I

13   live -- it forks off up Rooster Lane.

14       Q.    To the left?

15       A.    Yes.

16       Q.    As you're coming up?

17       A.    Yes.

18       Q.    Rooster Lane is that blacktop road

19   we saw --

20       A.    Yes.

21       Q.    -- on the pictures?

22       A.    Yeah, on them pictures.

23       Q.    And that's been graveled or

24   maintained by the county for more than 15 years?

25       A.    That's correct.

1      Q.      And now has been adopted into the

2    county road system?

3      A.      Well, I don't know.

4      Q.      Well, you said so in the -- in your

5    prior testimony --

6      A.      The one part --

7      Q.      -- in an interview?

8      MR. TAYLOR:  Objection on Mr. Webster

9    testifying.

10      THE COURT:  I'll sustain that

11    objection.

12      MR. WEBSTER:  Well, I'll be more

13    formal.

14      Q.      On May 8, '07, were you interviewed

15    by Officer Hopkins here?

16      A.      Yes.

17      Q.      And did you tell him Mr. Reynolds

18    made me aware that the county had been adopting

19    roads, and that they had adopted his road

20    without his permission; did you say that?

21      A.      The road I had built, they said that

22    the county adopted a road, and I didn't give

23    them permission, but the other road, I always

24    thought the county owned.  I don't know.

25      Q.      Okay.  Now, when you go up that

1 road, it forks off itself -- one fork goes to

2 the cemetery, right?

3   A.  That's correct.

4   Q.  And that's been graveled all these

5 years?

6   A.  Yes.

7   Q.  And the other fork goes to your

8 house and Brandon's house?

9   A.  Yes.

10   Q.  Okay.  And that house at the bottom

11 of the hill there with the pretty big house,

12 whose is that?

13   A.  That's my girls.

14   Q.  Okay.  And so there's three of you

15 that lives along that road?

16   A.  Yes, that's correct.

17   MR. WEBSTER:  That's all.  Thank you.

18   THE COURT:  Thank you, Mr. Webster.

19 Mr. Jensen.

20   MR. JENSEN:  I have no questions, Your

21 Honor.

22   THE COURT:  And, Mr. Williams.

23   MR. WILLIAMS:  Thank you, Your Honor.

24       CROSS-EXAMINATION

25  BY:  MR. WILLIAMS:

1       Q.      Mr. Reynolds, earlier, I think I may

2  have kind of objected over something that you

3  said.  I just want to make sure that I was clear

4  on what you had said earlier.  I think you

5  testified that Ronnie Adams never asked you for

6  a vote, did he?

7       A.      No.

8       Q.      Now, this has been a -- Rooster Lane

9  has been a public road for quite some time,

10  hasn't it?

11       A.      Yes.

12       Q.      And if I told you that Rooster Lane

13  appeared on county road lists from 1999 and

14  2006, you wouldn't have any reason to dispute

15  that, would you?

16              THE WITNESS:  Do what now?

17       Q.      If I were to tell you that Rooster

18  Lane appears on county road lists dating back

19  from 1999 and 2006, you wouldn't dispute that,

20  would you?

21       A.      No.

22       Q.      Now, you were asked if anybody -- if

23  everybody that lives up that way was related to

24  you, and I think your answer was yes.  But if I

25  understand correctly, Brandon Moore is not kin

1    folk to you, is he?

2         A.    No, not Brandon Moore, no.

3         Q.    Okay.  He's a renter from you?

4         A.    Yeah, a renter, uh-huh

5    (affirmatively).

6         Q.    And he doesn't own anything up

7    Runnel's Branch or Rooster Lane, does he?

8         A.    That's correct.

9         Q.    Now, I think you testified there are

10   26 or 27 people that live up there as far as

11   you're aware?

12        A.    Yes.

13        Q.    And does the school bus run that

14   way?

15        A.    Yes.

16        Q.    Okay.  And the fact that that road

17   has been graveled and paved all this time has

18   been helpful to that, hasn't it?

19             MR. TAYLOR:  We object to the question,

20   it being paved all this time.  There's no

21   testimony to that effect.

22             THE COURT:  Well, I'll allow it.

23        Q.    I think, Mr. Reynolds, if I

24   understand you correctly, you've testified that

25   portions of Rooster Lane had been paved in the

past, haven't they?

    A.    Yes, it has.

    Q.    All right.  So we're talking in this case in the Fall, '06, and just to be clear, there were portions of Rooster Branch paved before that, weren't there?

    A.    Yes.

    Q.    And what administration paved that part of it, do you know?

    A.    Homer Sawyer.

    Q.    And how far back along has that been?

    A.    Oh, I don't know.  I guess the last time he was in, or the first term he was in.  I can't remember.

    Q.    And it was graveled by the county even long before that, wasn't it?

    A.    Yes.

    Q.    In fact, I think you've told folks that it's been graveled by the county back as long as you can remember?

    A.    As long as I've lived there.

    Q.    Now, you mentioned that there's a couple of cemeteries up there.  I think it's at the top of the hill?

1      A.      Yes.

2      Q.      And you've already admitted that one

3  of those cemeteries is not a family cemetery of

4  your all's?

5      A.      No.

6      Q.      Now, isn't it true that even when

7  there's been your family's funerals, that the

8  county has graveled the road up there to the

9  cemetery so folks can get in and out?

10     A.      That's correct.

11     Q.      And your family's even requested

12 that they do it before, haven't they?

13     A.      Yeah.

14     Q.      Now, when did -- you mentioned

15 Brandon Moore.  When did he start renting from

16 you?

17     A.      Let's see, probably 2004 or 2005,

18 2004.

19     Q.      He hadn't lived in there a long time

20 when the county paved back in the Fall, '06, had

21 he?

22     A.      Probably a couple of years.

23     Q.      All right.  Did he know very many

24 people back then?

25              THE WITNESS:  Did he know any?  Did he

1    know what?

2       Q.    Did he know very many people in

3    Knott County back at that time?

4       A.    Yeah, his wife -- not his wife, his

5    sister and stuff lived there.

6       Q.    Okay.  He knew his own family in the

7    county?

8       A.    Yeah.

9       Q.    All right.  Now, do you remember

10    talking to Agent Hopkins about Brandon Moore?

11           THE WITNESS:  Do I remember what?

12       Q.    Do you remember talking to Agent

13    Hopkins, the state policeman working for the

14    FBI, about Brandon Moore?

15           THE WITNESS:  Do I remember talking?

16       Q.    Do you remember talking to

17    Mr. Hopkins?

18           THE WITNESS:  Him?

19       Q.    About Brandon Moore?

20       A.    I just told him where Brandon lives

21    is all I told him.

22       Q.    All right.  Did you have any

23    questions in your own mind about how or why he

24    would even possibly know Ronnie Adams?

25       A.    I asked him who asked him who was up

1    there, Brandon.

2        Q.      You questioned in your own mind why

3    he would even know him, didn't you?

4        A.      Yeah.

5            MR. WILLIAMS:  Your Honor, may I have

6    just a minute, please?

7            THE COURT:  You may.

8            MR. WILLIAMS:  That's all I have, Your

9    Honor.

10           THE COURT:  Thank you, Mr. Williams.

11   Mr. Taylor, redirect?

12           MR. TAYLOR:  Yes.

13                    REDIRECT EXAMINATION

14   BY:  MR. TAYLOR:

15           MR. TAYLOR:  I am going to, if I can,

16   bring the easel out and draw a picture, because

17   I think we've confused the issue here a little

18   bit and I want to unconfuse it again.

19           MR. WESTBERRY:  Is that a question or a

20   statement?

21           THE COURT:  It's a request, and it will

22   be granted.  Counsel, if you'd like to move so

23   you can see the demonstrative, feel free to do

24   so.

25       Q.      Now, Mr. Reynolds, I'm going to try

1    to talk our way through this, and you correct me

2    if I do anything wrong here.  I'm going to draw

3    what appears to be Rooster Lane, which is part

4    -- as I understand, part private and part

5    public?

6         A.    Yes.

7         Q.    All right.  It comes up like this.

8    And is Brandon Moore's house at the very top of

9    -- or his trailer at the very top of that road?

10        A.    Yes.

11             MR. TAYLOR:  All right.  Now, so --

12   Your Honor, so that I'm not the one testifying,

13   could he come down and answer some questions and

14   mark some things on this?

15             THE COURT:  I'll allow him to do that.

16        Q.    All right.  Could you tell me -- if

17   you'll stand right over here -- could you tell

18   me where on this place your daughter's house --

19   how close up -- is she up the lane, too?

20        A.    Yes, she's about right in here.

21        Q.    About right in there?

22        A.    Yeah.

23        Q.    Right here?

24        A.    Yeah.

25        Q.    Is your daughter?

1    A.    Yes.

2    Q.    All right.  And where is your house

3    in relation to that?

4    A.    Right down here.

5    Q.    Well, now, if at some point --

6    A.    Our road starts like that.

7    Q.    I'm going to draw right here is

8    where it becomes public and private.  Now, where

9    would you be in relation to that?

10    A.    I would be -- my property starts

11    right there.

12    Q.    Okay.  Right here?

13    A.    Yeah.

14    Q.    And where does the road to the

15    cemetery branch off?  Is it below your house?

16    A.    Branch out right below my house,

17    right on up right there.

18    Q.    Like this?  If this is where -- if

19    this is where it had been public before, and

20    this is the private --

21        MR. WILLIAMS:  Objection, Your Honor.

22    May we approach?

23        THE COURT:  I'll sustain the objection.

24    Q.    Let me ask it this way.  How far

25    below -- you indicated Rooster Lane was

1   partially public and part -- and then -- where

2   does your property line start?

3       A.      Right at the blacktop, where it's

4   blacktopped years ago.

5       Q.      Okay.  So there was blacktop on

6   Rooster Lane, and then it stopped?

7       A.      And it stopped, and I built a road

8   from there up to the top of the hill to Brandon.

9       Q.      From this point on up here, you

10  built that road?

11      A.      Yes.

12      Q.      And when did you build that road?

13      A.      In '95 or '96.

14      Q.      And is this all your land here?

15      A.      Yes.

16      Q.      All right.  Now, judging by the end

17  of the blacktop, where does the road and the

18  cemetery begin?

19      A.      It starts right down this a-way and

20  goes up to the cemetery.

21      Q.      Goes up to the cemetery?

22      A.      Yeah.  My brother lives here.

23      Q.      Your brother lives there.  Okay.

24      A.      Okay.  And the rental property right

25  there.

1    Q.      Rental?

2    A.      Yeah.

3    Q.      And where's the cemetery?

4    A.      There's one cemetery on the right

5    there, and go on past on the other side is the

6    Seals Cemetery.

7    Q.      Is this your family cemetery, this

8    lower one?

9    A.      Yeah, the first one.

10   Q.      All right.  Now, when you were --

11   now, where does your brother live, your other --

12   oh, you've already said your brother lives

13   there?

14   A.      Yeah.  And my nephew's in the other

15   part through there.  Now, I don't own that.

16   Q.      Okay.  Now, earlier, when you said

17   that there had been some blacktop, or had been

18   some county maintenance on Rooster Lane, are you

19   talking about this section?

20   A.      The county has kept the road up,

21   that road, and that road.

22   Q.      But was there blacktop on this

23   before?

24   A.      No.

25   Q.      All right.  When was the first time

1    blacktop was put down on this road?

2         A.    In '06.

3         Q.    Blacktop?

4         A.    I guess so, whenever the election.

5         Q.    '06, I thought you said '96.  '06.

6    The election of '06 was the first time this got

7    blacktopped?

8         A.    Yeah.

9         Q.    Was that on your private property?

10        A.    Yeah.

11        Q.    Did you intend, by virtue of laying

12   the blacktop to your private property, to give

13   them that road?

14             THE WITNESS:  Did I intend to give them

15   the road?

16             MR. TAYLOR:  Yes.

17        A.    Well, much as they've kept it up, I

18   thought they really owned it.

19        Q.    That's not what you said before, is

20   it?

21        A.    As much as they've kept the road up.

22        Q.    This is the first time you've said

23   that, isn't it?

24        A.    They've took -- Marcus told me they

25   put it in the road plan, and he asked me could I

1    give it to them, and I said, Well, no.

2        Q.    Okay.  Didn't you tell Mr. Hopkins

3    that the county has been adopting roads and they

4    adopted his road without his permission?  You

5    stated you had constructed everything on your

6    property and you were not willing to deed

7    anything to the county, but they took it anyway;

8    did you say that?

9        A.    Yeah, I said that, yeah, I said the

10    county kept the road up.  I didn't know the

11    county had took the road.  Marcus told me about

12    that.

13        THE COURT:  I'm going to have the

14    witness go back to the witness stand.

15        MR. TAYLOR:  Go on back to the witness

16    stand.

17        THE COURT:  And I'm going to have

18    counsel go back to the counsel table.  And,

19    Mr. Taylor, whenever he's settled, you can

20    continue your questioning.

21        Q.    Now, earlier when you said that the

22    county -- your father had said something about

23    the cemetery road being public, you talking

24    about the road that branches off of Rooster

25    Lane?

```
 1       A.      Yeah.  That's the one that my dad
 2   said the county owned.
 3           MR. TAYLOR:  You weren't referring --
 4   if I could walk around it one second.
 5           THE COURT:  You may.
 6       Q.      When you said that, you weren't
 7   referring to this section right here, were you?
 8           THE WITNESS:  Do what, Ken?
 9       Q.      You weren't referring to this
10   section right here, were you?
11       A.      No, uh-uh.
12       Q.      And for the record, and, counsel, I
13   was pointing to --
14       A.      My dad said the county owns the one
15   going to the cemetery.
16       Q.      To the cemetery.  And you don't know
17   that for a fact?  You're just going by what your
18   dad said?
19       A.      I was just going by what my dad
20   always told me growing up.
21       Q.      In any event, Mr. Reynolds, when
22   that blacktop occurred in the Fall, 2006, did
23   you know you were part of any kind of road
24   improvement project, your lane?
25       A.      No.
```

```
 1              MR. TAYLOR:  That's all the questions I
 2    have.
 3              THE COURT:  Thank you.  Thank you,
 4    sir.  You may be excused from testifying.  May
 5    this witness be finally excused?
 6              MR. TAYLOR:  Yes, Your Honor.
 7              THE COURT:  All right.  You can be
 8    finally excused from any further testimony in
 9    this trial.  Appreciate you being here, sir.
10              THE WITNESS:  Thank you, all.
11              THE COURT:  The United States will call
12    your next witness, please.
13              MR. TAYLOR:  Call Brandon Moore.
14              THE COURT:  Brandon Moore will be
15    called as the next witness for the Government.
16              [WITNESS SWORN]
17                   DIRECT EXAMINATION
18        BY:  MR. TAYLOR:
19        Q.      Sir, would you state your full name
20    please.
21        A.      Brandon Bashon Moore.
22        Q.      And spell that middle name?
23        A.      B-A-S-H-O-N.
24        Q.      And where do you live, sir?
25        A.      Knott County.
```

1    Q.    All right.  Whereabouts in Knott
2  County?
3    A.    I live in Mallie now.  I used to
4  live in Littcarr.
5    Q.    Did you formerly live on some
6  property owned by Bobby Reynolds?
7    A.    Yes, sir.
8    Q.    Was that a trailer at the top of a
9  holler?
10    A.    Yes.
11    Q.    All right.  Are you a registered
12  voter in Knott County?
13    A.    Yes, sir.
14    Q.    And how long have you been a
15  registered voter?
16    A.    Three or four years.
17    Q.    I would direct your attention back
18  to the Fall of 2006.  Do you recall the election
19  for county judge?
20    A.    Yes, sir, I do.
21    Q.    Did you have a conversation with
22  someone about blacktopping near your home during
23  that election?
24    A.    Yes, sir, I did.
25    Q.    All right.  Would you tell the jury

1    the conversation and who you had it with.

2         A.     I was coming home from work one day,

3    and a guy was standing down there at Bobby's

4    talking to him.  I pulled up, and he asked me if

5    I'd like to have my hill blacktopped, and I

6    said, yeah, I said, but I couldn't afford it,

7    and he said it wouldn't cost me nothing but a

8    vote, and I'm pretty sure he said his name was

9    Ronnie Adams.  I think's what it was.

10        Q.     Okay.  Now, did you know this man at

11   the time?

12        A.     No, I hadn't ever met him before.

13        Q.     All right.  And how did you come to

14   learn who he was?

15        A.     Just through people talking.

16        Q.     Okay.  And at one time were you

17   shown a picture?

18        A.     Yes, sir, I was.

19        Q.     Was there a time that you said a

20   picture was not Ronnie Adams --

21        A.     Yes, the first picture.

22        Q.     -- or was not the man?

23        A.     Yes.

24        Q.     And did you later change that?

25        A.     Yes, sir, I did.

1     Q.     And do you know why that occurred?

2     A.     He looked different, had glasses on

3     and stuff in the second picture.

4     Q.     Can you give us an approximate date

5     when this conversation occurred?

6     A.     No, not right off the top of my

7     head.

8     Q.     Did he say who you would vote for?

9     A.     Yes, sir.

10    Q.     And who was that?

11    A.     Randy Thompson.

12    Q.     All right.  Now, had he already --

13    had there already been some blacktopping done

14    there?

15    A.     No, not there, not yet, not at the

16    time.

17    Q.     Okay.  Was there blacktopping done?

18    A.     Yeah.

19    Q.     How long after that conversation was

20    the blacktop brought in?

21    A.     About a month, month and a half, two

22    months, somewhere around in there.  It wasn't

23    long.

24    Q.     Okay.  Was the other part of Rooster

25    Lane blacktopped at the same time?

1      A.      Yes, sir, it was.

2          MR. TAYLOR:  At this time, I'd like to

3      put 4C on the screen -- I'm sorry, 4A.  If I

4      could get 4A, I want to put it on the Elmo

5      because I want to point to something.

6      Q.      Do you recognize this house in the

7      picture?

8      A.      Yes, sir, I do.

9      Q.      This one right here?  Whose house is

10     that?

11     A.      That's Nathan and Michelle Davis.

12     Q.      Is that Bobby Reynolds' daughter?

13     A.      Yes, sir.

14     Q.      And where in this picture would your

15     trailer be?

16     A.      Behind that house all the way up

17     that road there.

18     Q.      All the way up this road up in here?

19     A.      Yes, sir.

20     Q.      We don't see your trailer on that

21     photograph, do we?

22     A.      No, you can't see it for the house.

23     Q.      What was it that you had the

24     conversation about paving, starting where and

25     going to where?

```
 1        A.      Starting right there at the bottom
 2   of that hill where that garbage bin is that has
 3   the numbers on it.
 4        Q.      Right here?
 5        A.      Yeah.  From there, all the way to
 6   the top of the hill.
 7        Q.      All right.  And from this house on
 8   up the hill, how many houses are between this
 9   house and yours?
10        A.      None.
11        Q.      So you're the only house up that
12   hill?
13        A.      Yes, sir.
14        Q.      And what kind of surface was on that
15   road prior to that blacktop?
16        A.      The dirt, gravel.  Not much of one
17   when it rains.
18        Q.      Did you agree to vote for that
19   blacktop?
20        A.      Yes, sir, I did.
21             MR. TAYLOR:  That's all the questions I
22   have.
23             THE COURT:  Thank you, Mr. Taylor.
24   Mr. Westberry.
25             MR. WESTBERRY:  Yes, thank you.
```

1                    CROSS-EXAMINATION

2        BY:  MR. WESTBERRY:

3        Q.      Good morning, Mr. Moore.

4        A.      Morning.

5        Q.      My questions are brief.  Have you

6   ever met Randy Thompson personally?

7        A.      Never.

8        Q.      I think you testified about the road

9   that you used to live on, Rooster Lane?

10       A.      Yes.

11       Q.      And you said not much gravel left

12  when it rains --

13       A.      No.

14       Q.      -- is that correct?

15       A.      Yes, it is.

16       Q.      What, it just washes on down?

17       A.      Yeah, the road just about washes

18  completely out.

19       Q.      Does it get kind of dangerous at the

20  bottom sometimes when you're trying to stop?

21       A.      Yeah.

22       Q.      The Government asked you the

23  question, but he didn't ask you -- if you don't

24  mind, if this is personal you can -- I really

25  don't care.  Who did you vote for the county

1    judge/executive?

2            MR. TAYLOR:  Objection, irrelevant.

3            THE COURT:  I'm going to ask counsel to

4    approach.

5            [CONFERENCE AT THE BENCH]

6            MR. WESTBERRY:  I'll withdraw the

7    question.

8            MR. WEBSTER:  Let me answer for him.

9    It was asked people who appeared in front of the

10   grand jury.  It was deemed relevant by the

11   United States then.

12           THE COURT:  Well, this is not the grand

13   jury.

14           MR. WESTBERRY:  Agent Hopkins asked him

15   in the Jencks Act that we've been given how he

16   voted, and he said he voted for Mike Hall.

17           MR. TAYLOR:  It's not relevant, Your

18   Honor.  The crime is consummated by the offer

19   and the acceptance.  Sometimes we ask things in

20   grand jury that are irrelevant.  We continue

21   investigations and things of that nature, but

22   when you get to trial, the rules of relevance

23   control.

24           MR. WESTBERRY:  Excuse me.  I've

25   already asked the previous witness how they've

1    voted or supported.  For example, he was a Mike

2    Hall man; I didn't get an objection then.

3              THE COURT:  As I recall in your

4    opening, there was this issue of where the

5    political support was.

6              MR. WESTBERRY:  Yeah.

7              MR. TAYLOR:  But I never, ever said

8    that anyone took the money and then voted the

9    other side.  That's a whole different issue.

10             THE COURT:  Hold on, hold on.  One at a

11   time.  This is Mr. Westberry's question.  I'm

12   going to rely on him to respond to that.

13             MR. WESTBERRY:  I think the Government

14   in its opening statement, the Court, quite

15   frankly, has prompted my recollection.  Really,

16   Mr. Taylor said, and I'm paraphrasing, but I

17   think pretty accurate, there's no way Thompson

18   could have been elected to a full term had he

19   not, you know, engaged in the illegal activity

20   that he did.  I mean, he's placed the whole

21   issue of politics in his opening statement.  He

22   spoke first, and I think it goes to potential

23   bias of this witness to show that, that he in

24   fact, I think he will testify, if he's allowed

25   to be asked that, he voted for Mike Hall.

1          MR. TAYLOR:  Your Honor, the politics
2     that I referred to in my opening statement had
3     to do with the motive of someone to support
4     Thompson who was working for Thompson.  I didn't
5     touch the issue of anybody double-crossing the
6     vote buyers, and it's simply not relevant.  And
7     I did not say in my opening anything like he
8     just said.  I didn't touch that issue.
9          THE COURT:  Well, I'm going to -- your
10    argument is that the relevance of it goes to the
11    bias somehow.  Is it the credibility --
12          MR. WESTBERRY:  Credibility.
13          THE COURT:  -- of this particular
14    witness?
15          MR. WESTBERRY:  Bias and or
16    credibility, right.
17          THE COURT:  I am going to allow the
18    question to be asked and answered.
19          MR. WESTBERRY:  I'm not going to go
20    into it further.
21          THE COURT:  I wouldn't go -- yeah.
22          [IN OPEN COURT]
23    Q.      Who did you vote for in that county
24    judge's election?
25    A.      Mike Hall.

1     MR. WESTBERRY:  That's all I have.

2  Thank you, sir.

3          THE COURT:  Mr. Webster.

4          MR. WEBSTER:  No questions.

5          THE COURT:  Mr. Jensen.

6          MR. JENSEN:  Nothing, Your Honor.

7          THE COURT:  And then, Mr. Williams.

8          MR. WILLIAMS:  Thank you, Your Honor.

9               CROSS-EXAMINATION

10   BY:  MR. WILLIAMS:

11     Q.     Mr. Moore, good morning.  How long

12  have you known Bobby Reynolds?

13     A.     Eight to ten years.

14     Q.     Eighteen (18) years?

15     A.     Eight to ten years.

16     Q.     Eight to ten, I'm sorry.  Can you

17  get a little bit closer to the microphone so I

18  can hear you.  And would you consider him to be

19  a friend?

20     A.     Yeah.

21     Q.     Now, you mentioned, I think, when

22  you first had this encounter with who you said

23  was Ronnie Adams that you were coming home from

24  work; is that right?

25     A.     Yes, sir.

1  Q.  Where were you working at the time?

2  A.  Ameritech Security.

3  Q.  Did you ever work for Mr. Reynolds?

4  A.  No.

5  Q.  Okay.  Is he involved in the

6 block-laying business?

7  A.  Not as I know of.

8  Q.  You've never laid block with him?

9  A.  No, sir.

10  Q.  But now at this time, in the Fall of

11 '06, you had rented from Mr. Reynolds for how

12 long?

13  A.  About six years.

14  Q.  For six years there on Rooster Lane?

15  A.  Yeah.

16  Q.  Okay.  Now, during the time that you

17 had lived there, the county had graveled all the

18 way to the top of the road, hadn't they?

19  A.  Yes, sir.

20  Q.  And that was helpful, wasn't it?

21  A.  Yes.

22  Q.  And to your knowledge, Mr. Reynolds

23 or yourself, you never asked anyone to stop

24 graveling that road, did you?

25  A.  No.

1      Q.    They graveled it and graded it

2  before it was blacktopped?

3      A.    No, they didn't.

4      Q.    They graveled it?

5      A.    They wouldn't -- it hadn't been

6  graveled in a long time before they blacktopped

7  it.  They never did grade it.

8      Q.    All right.  But just so I

9  understand, you're saying the county had

10  graveled it before?

11      A.    Yeah.

12      Q.    So if Mr. Reynolds has testified

13  they took care of that road up to your house, he

14  would be correct as well?

15      A.    Yes.

16      Q.    All right.  And you never complained

17  about it?

18      A.    No.

19      Q.    And to your knowledge, Mr. Reynolds

20  never complained about it?

21      A.    Not to my knowledge.

22      Q.    And just to be clear, you've

23  testified that you rented from Mr. Reynolds,

24  correct?

25      A.    Yes, sir.

        Q.      You didn't own any property up
there?
        A.      No.
        Q.      And I think I also heard you say
that you were the only person that lived up that
fork of the road?
        A.      Yes.
        Q.      Doesn't Mr. Reynolds also live up
that fork?
        A.      He lives down below from down in
front of that house there.
        Q.      Okay.  But behind the house, is
there anyone else that's living up that road?
        A.      No.
        Q.      Does the school bus come up that
road?
        A.      Not all the way up to my house, no.
        Q.      But it comes up Rooster Lane?
        A.      Yeah.
        Q.      All right.  Now, do you remember
when you testified before the grand jury that
you didn't know this person who came up to you,
never seen him before --
        A.      Yeah.
        Q.      -- is that correct?

1     A.    Yes.

2     Q.    Okay.  So the person you're saying

3 is Ronnie Adams, you didn't know him before this

4 day you're saying you had this conversation with

5 at Mr. Reynolds' house?

6     A.    I had seen him before, but I had

7 never talked to him.

8     Q.    All right.  Now -- so, but you

9 didn't know what his name was, is that ...

10    A.    No.

11    Q.    All right.  So -- but you're

12 testifying that you had seen him before?

13    A.    Yeah.

14    Q.    Okay.  Do you remember testifying

15 before the grand jury that you'd said a guy that

16 I had never seen before?

17    A.    A guy I hadn't never talked to, a

18 guy I didn't know.

19    Q.    I'll direct you.  Do you remember

20 testifying before the grand jury, this was the

21 question that was asked on page three.  All

22 right.  Tell us how this all came about from the

23 very beginning, who approached you, what was

24 said, what did you agree, just tell it like

25 these people haven't heard before.  Answer:  I

was coming home from work one day and this guy I
hadn't never seen before in my life, I don't
know who he was.  Was that your testimony before
the grand jury?

A.      I didn't know who he was.

Q.      Was it your testimony that you had
never seen him before in your life?

A.      That might have been what I said,
but that ain't what I meant.

Q.      It wasn't what you meant?

A.      What I meant was that I hadn't never
talked to him.  I didn't know the guy.

Q.      Okay.  But you're -- you don't
dispute that your transcribed testimony from the
grand jury --

A.      Yeah.

Q.      -- is that you had never seen him
before in your life?

A.      Yeah.

Q.      All right.  Now, in fact, how did
you come about telling this to Agent Hopkins to
begin with?  How were you approached about that?

A.      He come up, was asking questions,
and he asked me, and I told him the truth.

Q.      All right.  Now, was Bobby Reynolds

1    there at that time?

2         A.     Yes.

3         Q.     All right.  Now, Bobby Reynolds had

4    questions about whether you had even knew this

5    guy, correct?

6         A.     I don't know.

7         Q.     All right.  Now, you've testified

8    that you'd seen this guy before --

9         A.     Yeah.

10        Q.     -- is that right?

11        A.     I've seen him out around town and

12   stuff, but I didn't know who he was.

13        Q.     But you've already testified here

14   today that you thought he said his name was

15   Ronnie Adams?

16        A.     No, I said people was telling me

17   that's who it was.

18        Q.     Okay.  Who are these people that

19   were telling you that his name was Ronnie Adams?

20        A.     Just different people, people from,

21   you know, from Littcarr, from Runnel's Branch,

22   just different people.

23        Q.     Okay.  They weren't there when you

24   had this conversation with him, were they?

25        A.     No.  They said that he talked to

1    them, to.

2         Q.    So did Agent Hopkins suggest to you

3    that his name might be Ronnie Adams?

4         A.    No.

5         Q.    Now, at some point you asked to see

6    a picture of this guy, right?

7         A.    Yes.

8         Q.    And you've described him as being in

9    his 30's or 40's?

10        A.    Well, late 30's, early 40's, yeah,

11   somewhere around there.

12        Q.    All right.  And would you be

13   surprised to learn that Mr. Adams is really in

14   his 60's?

15        A.    At this day and time, you can look

16   30 years old and be in your 70's.

17        Q.    All right.  Now, in fact, when Agent

18   Hopkins brought you a picture of Ronnie Adams to

19   show you, you said, That's not the guy, correct?

20        A.    Yeah, that's what I said.

21        Q.    Okay.  And then he later brought you

22   another picture, and you said that that is the

23   guy, right?

24        A.    Yep.

25        Q.    And that turned out to be a picture

1    of Randy Campbell; is that correct?

2    　　　A.　　　I told them -- I don't know who it

3    was.  I said that looks like the same guy.  That

4    was one of the guys I talked to, yes, it was.

5    　　　Q.　　　All right.  Just one guy talked to

6    you?

7    　　　A.　　　No, I'm talking about -- there was

8    two guys that talked to me.

9    　　　Q.　　　Two different guys talked to you?

10   　　　A.　　　One of them was the pavement guy

11   when he was up there paving, and the other one

12   was Ronnie Adams.

13   　　　Q.　　　All right.  But when you were shown

14   a picture of Mr. Adams, you said that's not the

15   guy?

16   　　　A.　　　It didn't look like him.  He didn't

17   have glasses on in that picture.

18   　　　Q.　　　All right.  Now, you were asked

19   earlier who you voted for, and I think your

20   testimony was Mike Hall --

21   　　　A.　　　Yes.

22   　　　Q.　　　-- is that correct?  Why did you

23   vote for Mr. Hall?

24   　　　MR. TAYLOR:  Objection, irrelevant.

25   　　　THE COURT:  I'll sustain that

1   objection.

2          MR. WILLIAMS:  Your Honor, may we

3   approach?

4          THE COURT:  You may.

5          [CONFERNCE AT THE BENCH]

6          THE COURT:  Kind of a follow-up to

7   Mr. Westberry who kind of agreed to not go into

8   any further questioning.  I understand you

9   didn't agree to it, but we're going to need to

10  establish why that's relevant.

11         MR. WILLIAMS:  Your Honor, I would just

12  say that it goes to this witness's credibility

13  and to his motive to tell a different story, and

14  frankly, to create this story.  And I think the

15  jury should be allowed to explore that.  There's

16  been much made about Mike Hall and the

17  competition in this race, and that the election

18  was stolen by the Thompson camp out of the

19  clutches of this Democratic county and so forth,

20  and I just think that it goes to his credibility

21  here as to whether he's a Hall supporter and why

22  he was.

23         THE COURT:  Well, he's testified as to

24  who he voted for.  I guess the question is why

25  he voted, what's the relevance of that?

1          MR. WILLIAMS:  Well, it may open the

2     door to other issues, Your Honor, that we

3     haven't explored, such as is he doing this at

4     the direction of Mr. Hall.

5          THE COURT:  But why is that relevant?

6     Think back in terms of kind of the charges here.

7          MR. WILLIAMS:  The motive to lying

8     against my client, make the story up.

9          MR. WESTBERRY:  Hearing this, I'm going

10    to understand that Mr. Adams' situation is

11    really different than that of Randy Thompson's.

12    We have a witness that has given significantly

13    inconsistent statements in identification.  I

14    didn't have anything quite like that with

15    Thompson, other than just the fact that I have

16    left alone, so I think I can distinguish where

17    Jason is coming from where I did.

18          THE COURT:  And I think we've fully

19    explored the inconsistent identification.  I

20    think this is a different issue.  Mr. Taylor.

21          MR. TAYLOR:  Well, it seems to me

22    inherently contradictory to elicit what they're

23    contending to be this truthful testimony about

24    Mike Hall to prove he's a liar.  If he were

25    lying about it, he would have said, I voted for

1   Randy Thompson, and sealed the deal, if he were

2   working for Mike Hall.  But this is just fishing

3   for some other collateral issue for the jury to

4   get confused by.  And it's not relevant to this

5   case who he voted for or why.

6           THE COURT:  I agree.  I mean, I think

7   I've allowed the testimony as to who this

8   particular witness voted for.  I think what I'm

9   going to do, though, is I'm going to allow you

10  to have an answer to the question that's on the

11  table right now.  He can -- we'll see if it kind

12  of echoes into an area that is relevant in some

13  way as relates to the credibility of this

14  witness, but I'm not going to let you kind of

15  explore it any further, why did you vote -- he

16  can kind of responds, and however he responds,

17  then you can move on.

18          MR. WILLIAMS:  May I ask one more

19  question just so I don't get myself in trouble?

20          THE COURT:  You may, sure.

21          MR. WILLIAMS:  And this really came out

22  in the Harold Dean Bentley testimony yesterday.

23  He admitted that he was a supporter of Mr. Hall

24  and that he went so far as he was promised a

25  job, and I just wonder if this is the type of

questions I wanted to be able to explore of this
witness, whether he's been promised anything as
a result of his testimony.

THE COURT:  Well, let's see when --
let's see what the answer is to that.  If it's
-- if, you know, if I thought it was a better
candidate, then we'll move along.  And to the
extent that you have further objections as this
unfolds, just state them.  We don't need to come
back up here.  I think I know what the issues
are and the scope of it.

[IN OPEN COURT]

Q.     Mr. Moore, can you go ahead and
answer the question I asked previously.  Why was
it you voted for Mr. Hall?

A.     Because I've known him for awhile.

Q.     How have you known him?

A.     Through the Big Y Market and stuff.

Q.     I'm sorry?

A.     Big Y Market.

Q.     Were you involved in his campaign
any?

A.     No.

MR. TAYLOR:  Objection.

THE COURT:  The witness has answered,

1  so I'll overrule the objection, but ask counsel

2  to move on.

3          MR. WILLIAMS:  Your Honor, may we

4  approach on one other issue?

5          THE COURT:  You may.

6          [CONFERENCE AT THE BENCH]

7          THE COURT:  All right.

8          MR. WILLIAMS:  Just so I won't be

9  stumbling around, I had asked Mr. Taylor earlier

10  if I could just see the photograph that this

11  person was shown of Ronnie Adams, and I just

12  want to be clear and be careful about this.

13  I've been produced two photographs of Mr. Adams

14  that were shown to Brandon Moore, and in both of

15  them, he has his eyeglasses on.  And this

16  witness has testified that he didn't have

17  eyeglasses on in the photographs that he saw.

18  So I guess my question is, if Mr. Taylor has a

19  photograph of Mr. Adams without his glasses on,

20  I need to see it.

21          MR. TAYLOR:  You've got what I've got.

22          MR. WILLIAMS:  Okay.  May I have the

23  originals of those?  Do you have them?

24          MR. TAYLOR:  I have a copy.  I have

25  what's marked as exhibits.  Whether it's the

1  ultimate original, I don't know.

2      MR. WILLIAMS:  You just have black and

3  whites, too?

4      MR. TAYLOR:  I don't know what I've

5  got.

6      MR. WILLIAMS:  Okay.

7      [IN OPEN COURT]

8      Q.    Mr. Moore, if I understand your

9  testimony correctly, earlier you said you were

10 shown a photograph of Mr. Adams, that you said

11 it wasn't him because he didn't have his glasses

12 on; is that correct?

13     A.    Yes, sir.

14     Q.    All right.  I'm going to show you a

15 picture that's been given to me by the United

16 States as a picture you were shown.  Does

17 Mr. Adams have his glasses on in that picture?

18     A.    I can't see it from here.

19     THE COURT:  You can have that tendered

20 to the witness.

21     A.    In that picture he does.  But that

22 wasn't the picture I was shown the first time.

23     MR. WILLIAMS:  Thank you.  I have no

24 further questions.

25     THE COURT:  Mr. Taylor, on redirect?

1      MR. TAYLOR:  Nothing further, Your

2  Honor.

3      THE COURT:  Thank you.  May this

4  witness be finally excused?

5      MR. WESTBERRY:  Yes, Judge.

6      THE COURT:  Mr. Taylor, do you need to

7  recall this witness?

8      MR. TAYLOR:  No, Your Honor.

9      THE COURT:  Okay.  Thank you, sir.  You

10  may be finally excused from further testimony in

11  this trial.  Mr. Taylor, call your next witness.

12      MR. TAYLOR:  Call Jeffrey Morgan.

13      THE COURT:  Mr. Jeffrey Morgan called

14  as the next witness for the Government.

15      [WITNESS SWORN]

16      MR. TAYLOR:  Your Honor, this is not

17  Jeffrey Morgan.  I called Jeffrey Morgan.

18      MR. PELFREY:  He's not here.  He's on

19  his way.

20      THE COURT:  All right.  So --

21      MR. TAYLOR:  Well, we'll go with Jeremy

22  Morgan.

23      [WITNESS SWORN]

24              DIRECT EXAMINATION

25      BY:  MR. TAYLOR:

1      Q.      Sir, would you state your name for
2  the record, please.
3      A.      Jeremy Morgan.
4      Q.      Spell Jeremy for us.
5      A.      J-E-R-E-M-Y.
6      Q.      Mr. Morgan, where do you live?
7      A.      I live in Knott County, Emmalena,
8  Kentucky.
9      Q.      And where do you work?
10     A.      I'm a lawyer.  I work primarily in
11 Hazard.
12     Q.      And how long have you been a lawyer?
13     A.      Since '95, so 12 and a half years or
14 so.
15     Q.      You work with somebody?
16     A.      Yes.
17     Q.      Who is that?
18     A.      Oh.  I did.  I worked with my
19 brother and four other gentlemen.  I had a
20 partnership.
21     Q.      You said you did.  Have you broken
22 up with them?
23     A.      I have phased out, yes, to look at
24 some other employment opportunities.
25     Q.      Okay.  Is that a recent thing?

1    A.    Yeah, yeah, since the first of the
2    year.
3    Q.    Okay.  Now, you, I take it, live in
4    one county and work in another?
5    A.    That's right.
6    Q.    Where are you registered to vote?
7    A.    In Knott County.
8    Q.    And how long have you been
9    registered to vote there?
10    A.    Ever since I was 18.
11    Q.    Okay.  Now, how old are you now?
12    A.    I am 37.  I'll be 38 here in a few
13    days.
14    Q.    Let me ask you about your family.
15    Large family, small family?
16    A.    Well, I have my parents and I have
17    three brothers, so there's six of us.
18    Q.    Is your family involved in politics
19    in the Hindman area?
20    A.    Yeah.  My dad was, I guess
21    starting back in the '60's, he was county
22    attorney and then district judge when they
23    started, you know, when they first had that,
24    and then became circuit judge.
25    Q.    Are those elected positions?

1      A.     Yes, sir.

2      Q.     So your father used to run for

3 office?

4      A.     Yes.

5      Q.     Several times?

6      A.     Well, the -- when he became circuit

7 judge in 1983, I know that it's an eight-year

8 term, but yeah, multiple times, I guess.

9      Q.     Have you run for office?

10     A.     Yes.

11     Q.     And what office did you run for?

12     A.     In '96, when I first got out of law

13 school, I ran for state representative in a

14 three-county district that included Knott,

15 Magoffin and Wolfe.  And then I -- in 2002, I

16 believe, I ran for county attorney.

17     Q.     What about your brothers, have they

18 run for public office?

19     A.     No, sir.

20     Q.     Would you consider your family

21 somewhat influential in Knott County?

22     A.     That's a little hard to answer.  I

23 guess my dad, I feel like is one of the most

24 well-respected in his position.

25     Q.     Do people ask you or members of your

1  family who they should support in various

2  elections?

3      A.      Not really.  My father was -- that

4  was a nonpartisan position, so he really -- you

5  couldn't really take any part in, you know, most

6  races as a judge, so really not.

7      Q.      Now, I want to direct your attention

8  to the summer and fall of what I call the

9  election cycle of 2006, the fall primary --

10      A.      Uh-huh (affirmatively).

11      Q.      -- and the campaign leading up to

12  it.  Did you, during that period of time,

13  receive some blacktop at your house?

14      A.      I did.

15      Q.      Would you tell the jury how that

16  came about.

17      A.      I received a -- I was at my office

18  in Hazard and --

19      Q.      Can you give us an approximate date?

20      A.      Oh, okay.  It was sometime that

21  summer, I guess, you know, late summer or early

22  fall, I would say, maybe July, August, something

23  like that, but that's nothing but a guess

24  really.  I couldn't, you know -- but that's --

25  that's an approximate date.

```
1        Q.      Okay.  Go ahead.  What happened?

2        A.      Oh, I'm sorry.  I was at my office

3   in Hazard, received a phone call from my wife's

4   uncle about blacktopping the road.

5        Q.      Who's your wife's uncle?

6        A.      Ronnie Adams.

7        Q.      Do you see him today?

8        A.      Yes.

9        Q.      Point him out.

10        A.      He's over -- seated over there up

11   against the wall.

12        Q.      And what is he wearing?

13        A.      Like a -- he's got a sport coat and

14   a blue shirt.

15        Q.      Okay.  Now, did Ronnie Adams tell

16   you anyone else was with him?

17        A.      He -- if I -- my memory is correct,

18   he said that I believe Macarthur Combs was with

19   him.

20        Q.      Is that known as Mac Combs?

21        A.      Yes, sir.

22        Q.      And do you know Mac Combs?

23        A.      Yes.

24        Q.      Do you see him in here today?

25        A.      Yes.  He's seated behind the table
```

1    in a yellow shirt.

2              MR. TAYLOR:  Okay.  Let the record

3    reflect he's identified Mr. Combs.

4              THE COURT:  It will so reflect.

5         Q.     All right.  What did he -- describe

6    the conversation.

7         A.     Basically, he just asked something

8    like if we wanted to -- or wanted the road

9    blacktopped, and I said sure.  I think I asked

10   him something about, you know, what it would

11   cost, or that sort of thing, and he basically --

12   you know, I don't remember exactly the exact

13   words, but something like, Well, we'll take care

14   of that later.  Don't worry about that right

15   now, something to that effect.

16        Q.     Okay.  What else did you discuss?

17        A.     It's hard to remember.  He and I

18   don't -- because as I say, he's my wife's

19   uncle.  We really see each other rarely, see at

20   family, you know, gatherings, like holidays and

21   that sort of thing.  So I'm sure at some point

22   we did discuss politics because that's something

23   that we pretty much -- whenever we did see each

24   other, we usually would talk about that sort of

25   thing.

1     Q.     Well, did he tell you why he was

2 calling about blacktop?

3     A.     I don't think he really -- just

4 other than to ask if we wanted it.

5     Q.     Does he own a blacktop company?

6     A.     Not to my knowledge.

7     Q.     Well, what was his business calling

8 you about blacktop?

9          MR. WILLIAMS:  Objection.

10         THE COURT:  Well, I'll overrule the

11 objection.  He can answer, if he knows.

12    A.     I -- I mean, I really don't know,

13 other than he just was doing it -- or asked if

14 we wanted it done.  I don't know, as far as --

15 he didn't really give me a specific ...

16    Q.     Well, did it cross your mind, why is

17 this man asking me if I want blacktop?  What --

18 did you know what authority he had to give you

19 blacktop?

20    A.     I believe at the time that he was --

21 he had been a magistrate previously and -- but I

22 think at the time he was actually working in

23 some other capacity for the county, and I'm not

24 sure what his job was.

25    Q.     Well, did you ask him what this was

1    about?

2         A.     No, other than -- no, I mean, I just

3    ...

4         Q.     You didn't ask him, Why are you

5    asking me if I want blacktop?

6         A.     No, other than just that I said

7    sure, I wanted some, because my brother and I

8    had looked into blacktopping the road

9    previously, and had had some -- and the reason

10   we done that, the -- right as you come off the

11   highway on our road, it comes off and goes up a

12   little ways and splits to my house and his

13   house.  Down close to the highway, there had

14   been, in another place actually, we had had a

15   lot of problem with putting gravel on it, and it

16   just either -- down to the road it was kind of

17   steep, and it would wash out.

18        Q.     I guess what I'm asking you is, what

19   was your understanding of why Ronnie Adams

20   wanted to give you blacktop?

21        A.     I don't know if he -- well, as I

22   said, I asked at the time about what was it

23   going to cost, so I really don't know if he was

24   -- I don't guess I really took it as he was

25   giving it to me.  I know --

1      Q.      Did you negotiate a price with him?

2      A.      No, no, that's -- as I said, he had

3   said something to the effect that, you know,

4   like, we'll talk about that later, we'll take

5   care of that later, don't worry about that now,

6   something.  You know, that's the gist of it.

7      Q.      Did they blacktop?

8      A.      Yes.

9      Q.      How long after that did they

10  blacktop?

11     A.      I'm not exactly sure how long it

12  was, but it was relatively close in time, I

13  think.

14     Q.      And who blacktopped it?

15     A.      I don't really -- there was -- I

16  remember when I was either coming home from work

17  or leaving for work, there was -- I saw a name

18  on a truck that was like a -- like initials, and

19  I don't remember what they were, but it was

20  like, you know, A & B, but those weren't the two

21  initials, I don't believe.  It was something

22  else.

23     Q.      Well, did you all discuss the

24  election in connection with this blacktop?

25     A.      We probably, as I said, in the

1    conversation while we were on the phone, we

2    probably talked about politics.  I don't know

3    that -- specifically -- I know one of the

4    gentleman that I didn't like very much because I

5    thought he was a, you know, who was the

6    Democratic nominee at the time for county judge,

7    I thought he was a crook, so I didn't really --

8    I guess because I didn't like him, I would talk

9    about him with anybody that wanted to listen.

10        Q.      Well, did you in fact talk to him

11   about the election?

12        A.      Yeah, some, because as I said, we

13   usually talked about politics, and this was, you

14   know, a race that was coming up.

15        Q.      Did you make a connection between

16   the discussion of politics and getting the

17   blacktop?

18        A.      No, not really, because, as I said,

19   we discussed that about paying, and he said

20   they'd get back to me.  They, you know, they

21   didn't, but at that specific time, no.

22        Q.      So if I could reconstruct the

23   conversation.  Do you want blacktop, yes, some

24   discussion of election, and then they brought

25   you blacktop?

1      A.      And we probably discussed other

2   things, too.  I know sometime, and I can't

3   remember if it was before or after that, I had

4   an old pick-up truck that I sold him that, so --

5   but I don't know if that was discussed in this

6   particular conversation or not.  I can't

7   remember, but -- I mean, I'm sure there was

8   some, you know, chit-chat, small talk sort of

9   thing.

10      Q.      Was there any discussion about,

11   Well, we want to make your driveway safe or

12   anything like that?

13      A.      Not that I remember, no.

14      Q.      Can you give us any -- this jury any

15   indication of what the purpose was for this

16   blacktop being given to you?

17      A.      Not really.  I mean, other than I

18   assumed -- I know that they, you know, several

19   years before, we had -- my brother and I had

20   inquired about a road, not the road we live on,

21   but another road that our family owned.  We were

22   coming home, and there was a -- like a road

23   sign, a street sign, and we inquired with the

24   gentleman who was county judge at the time,

25   asked, and he had told us that, well, they were

1    -- and that road also had a problem with gravel

2    washing out, so they were doing some work for

3    911 purposes.  I, you know, I did not, about

4    this, didn't inquire.  I may have, you know,

5    assumed, something like that, but I didn't ask.

6        Q.     Where was Ronnie and Mac calling

7    from when they called you; did they say?

8            MR. WEBSTER:  Your Honor, I object to

9    the question.

10           THE COURT:  Will you approach,

11   Mr. Webster, along with other counsel.

12              [CONFERENCE AT THE BENCH]

13           MR. WEBSTER:  He said where was Ronnie

14   and Mac calling from.  That suggests that Mac

15   was calling him, and there's no proof of that.

16           MR. TAYLOR:  He said that they -- he

17   was with Mac Combs when the call was made.

18           MR. WEBSTER:  Well, I probably should

19   have objected because if Mr. Adams doesn't take

20   the stand now, then that's inadmissible

21   hearsay.  I thought it of so little probative

22   value.  When you get up here and reinforce it as

23   a fact, I object.

24           THE COURT:  Well, what's the prior

25   testimony, what was the prior testimony, they

1    called together, who testified to that?

2           MR. WEBSTER:  He testified that -- he

3    thought he remembered that Ronnie told him that

4    Macarthur Combs was there.  This is on the other

5    end of the telephone line.

6           THE COURT:  Right.  Well, I think if

7    he's testified to that, then you can ask the

8    question that you've asked.

9           MR. WEBSTER:  The question affirmed as

10   a fact when did Ronnie.

11          THE COURT:  You can just rephrase it.

12          MR. TAYLOR:  Yes, if I may.

13          THE COURT:  You can just rephrase the

14   question.

15          MR. WEBSTER:  It's certainly

16   argumentive.

17          THE COURT:  Just rephrase the question

18   and I'll allow the Government to ask him.

19          [IN OPEN COURT]

20   Q.     When this call came to you about the

21   blacktop, did Mr. Adams indicate where he was

22   standing at that time?

23   A.     It was my impression, I can't

24   remember if he said it specifically, but it was

25   my impression he was over there at -- where my

1    brother and I lived off, you know, I don't know

2    if he was on the highway or on our road or

3    where, but he was in that vicinity.

4        Q.    With regard to the blacktop that you

5    received, the location where it was put down,

6    whose property was that on?

7        A.    Part of it would have been my

8    property, part of it would have been my

9    brother's property.

10        Q.    Is any part of that public property?

11        A.    Not to my knowledge, except maybe

12    right down by the highway there might have been

13    some area, that -- but ...

14        Q.    Who built the road?

15        A.    Who built the road?  My brother had

16    that road built, the main part of it, and then I

17    had the part that goes over to my house built.

18        Q.    And how did you have it built?  Did

19    you hire a dozer?

20        A.    Yes.  I actually had a couple of

21    different guys who did that over different

22    times.

23        Q.    And when was that done?

24        A.    Probably, I'm going to guess around

25    2000, when I built the part that goes over to my

1    house.

2        Q.    Did you in any way intend for that

3    blacktop to signify that that was a public road?

4        A.    No.

5        Q.    To this day, does the public use

6    your road?

7        A.    No, not as far as -- they're not

8    supposed to, to my knowledge.

9        Q.    Is it a through road or does it stop

10    at the two houses?

11        A.    It -- his road stops at his house

12    and mine goes down there with -- there's an old

13    gas road, but it doesn't go anywhere, so that's

14    -- except up in that holler.

15        Q.    Does it connect up with what you

16    built?

17        THE WITNESS:  The old gas road?

18        MR. TAYLOR:  Yes.

19        A.    Not really.  You could drive to it,

20    you know, from the way that you come down the

21    hill to where I live, and there's a parking

22    area, and then an old gas road is kind of over

23    on that far, you know, far side on the other

24    side of the parking area.

25        Q.    The old gas road wasn't paved?

1      A.    No.

2      Q.    Now, I want to show you some

3 photographs, if I could, Government's Exhibit

4 5A, B, C and D, and I'll need those back. Do

5 you recognize those photographs?

6      A.    Yes, sir.

7      Q.    Are they photographs of your

8 property?

9      A.    And my brother's, yes, sir.

10      MR. TAYLOR:  At this time, I'd move the

11 introduction of those exhibits.

12      THE COURT:  Is there objection?

13      MR. WESTBERRY:  No objection.

14      THE COURT:  Without objection, they

15 will be entered as Government's exhibits.  You

16 may publish them, if you choose.

17      MR. TAYLOR:  I want to use the Elmo

18 with those, if I could, please.

19      THE COURT:  You may.

20      Q.    Let me start in a different order

21 here.  5D appears to be a photograph taken from

22 the inside of a vehicle.  Is this the turn off

23 the main road onto your driveway?

24      A.    Yes, sir.

25      Q.    What's the name of this road right

1    here?

2              THE WITNESS:  The highway?

3              MR. TAYLOR:  Yes.

4         A.    Is Kentucky 550.

5         Q.    And that's -- that is a county road?

6         A.    Or a state highway, I think.

7         Q.    State highway.  Whose property is

8    this right here?

9         A.    That would be -- belong to my

10   brother.

11        Q.    All right.  Is this further up the

12   same road, the same driveway?

13        A.    Yes, sir.

14        Q.    That's 550 down here?

15        A.    Uh-huh (affirmatively), yes.

16        Q.    And I believe a moment ago the

17   photograph would have been from a car parked

18   right about here, right?

19        A.    Yes.  You can actually see a little

20   bit of the sign post just next to the pin there.

21        Q.    Right here?

22        A.    Yes.

23        Q.    So all of this is your driveway?

24        A.    Yes.  That's the access to the drive

25   that actually goes over the hill to my house.

```
 1          Q.      Okay.  Is this part of what was
 2     paved --
 3          A.      Yes, sir.
 4          Q.      -- that we've been discussing?
 5          A.      Uh-huh (affirmatively), yes.
 6          Q.      Now, I want to look at 5B.  What is
 7     this road right here?
 8          A.      That's the same road, but ...
 9          Q.      In which direction is the highway,
10     this way or --
11          A.      Yes.
12          Q.      -- back this way?
13          A.      It's --
14          Q.      This way?
15          A.      Yes, it would be toward -- this
16     would be further up the road from the previous
17     two pictures that you've ...
18          Q.      So the last picture, the vehicle was
19     around this curve here?
20          A.      Approximately, yes.
21          Q.      Okay.  So we've seen one from down
22     here, here, and now we're coming up the road?
23          A.      Correct.
24          Q.      And what is this a photograph of?
25          A.      That's the -- where -- basically
```

1    where that previous picture was, that's if you

2    turned around and looked over the hill to where

3    I live.

4         Q.    As you come up the joint driveway

5    between you and your brother, the one you

6    jointly have, is his off to the right or is his

7    off to the left?

8              THE WITNESS:  Can you say that again?

9    I'm not sure I ...

10        Q.    If I turn off 550 and I'm coming up

11   the hill toward your house --

12        A.    Yes.

13        Q.    -- the road forks; does it not?

14        A.    Yes.

15        Q.    Do I go left to your house or right

16   to your house?

17        A.    Right.

18        Q.    Right.  And I would go left to your

19   brother's?

20        A.    Correct.

21        Q.    What is -- is this the fork to your

22   house?

23        A.    Yes.

24        Q.    And is this still part of the main

25   driveway right here?

1    A.    Yes.

2    Q.    Does your brother's house go up this

3    way?

4    A.    Yes, sir.

5    Q.    And you go this way?

6    A.    That's right.

7    Q.    Is this all part of what was paved

8    in the Fall of 2006?

9    A.    Yes, sir.

10   Q.    Do you know how many feet of

11   blacktop that was?

12   A.    Not really.  I'm going to say, like,

13   from the highway to the -- where you can see the

14   gravel lot down there, that that's maybe 75 or

15   100 yards, something like that, but that's

16   pretty much a guess.

17   Q.    And to this day, have you paid

18   anyone for blacktopping that?

19   A.    No, sir.

20   Q.    Do you know who paid for that?

21   A.    No.

22   Q.    Excuse me?

23   A.    No, sir.

24   Q.    You don't have any idea who paid for

25   that blacktop?

         A.      No.  As I said, we -- well, I don't

know if I said.  I asked at the time we inquired

after that, my brother and I both did, I

believe, and never were billed for the blacktop.

         Q.      Did you inquire about it?

         A.      Yes.

         Q.      Who did you inquire to?

         A.      I believe that I actually called

probably I think the county judge's office, but

I don't know if anybody was -- I didn't -- I

don't think I really talked to anybody, other

than maybe a secretary or something when I

called.

         Q.      Well, why wouldn't you want to talk

to someone?

         A.      Well, because they -- nobody was

there, I don't think.

         Q.      Excuse me?

         A.      I don't think anyone was there.  I

believe it was late in the day.

         Q.      You didn't ever follow up on it?

         A.      Well, as I said, I think my brother

also called, and -- at different times, I

believe, we both called.

         Q.      At any time has anyone given you or

1    -- let me just put it this way.  Has Ronnie

2    Adams given you any reason why he gave you the

3    blacktop?

4        A.     Not that I recall, no.

5          MR. TAYLOR:  That's all I have.

6          THE COURT:  Thank you, Mr. Taylor.

7    Mr. Westberry.

8          MR. WESTBERRY:  Thank you.  Ken, can I

9    use your photos?  May I use the Elmo on those?

10        THE COURT:  Certainly.  They're in

11    evidence.

12        MR. WESTBERRY:  Do you mind if I go

13    over there?

14        THE COURT:  No, you may.

15        MR. WESTBERRY:  Thank you.

16        MR. TAYLOR:  Your Honor, if I may, I

17    was just advised that I need to ask one question

18    that I forgot to ask.  May I do that?

19        MR. WESTBERRY:  As far as I'm

20    concerned, he can ask all the way, Judge.

21    Certainly.

22        THE COURT:  All right, Mr. Taylor.

23      Q.     After this blacktop was put down,

24    did a political sign get placed on your

25    property?

1     A.     At some point down -- one of those

2     pictures might help -- there was a -- I have a

3     garbage bin that sort of sits over the hill next

4     to the highway, and there was a sign that was

5     put up there.

6          Q.     And what sign was that?

7          THE WITNESS:  I'm sorry?

8          Q.     What sign was that?

9          A.     It was a sign for Judge Thompson.

10         Q.     Judge Thompson?

11         A.     Yeah.

12         MR. TAYLOR:  Okay.  That's all the

13    questions I have.

14         THE COURT:  Mr. Westberry.

15                CROSS-EXAMINATION

16    BY:  MR. WESTBERRY:

17         Q.     Mr. Morgan, I'm Kent Westberry, and

18    with my partner Kristin Logan, I represent Randy

19    Thompson.  I'll ask you just a couple of

20    questions before I go over to the Elmo.  My

21    questions will be short.  I don't believe you've

22    ever talked with Randy Thompson about the paving

23    of your road; is that correct?

24         A.     Not that I recall.

25         Q.     And he never asked you for a vote,

1    to try to talk about vote buying or anything

2    like that, did he, sir?

3        A.    No, sir.

4        Q.    Okay.  Let me show you a couple of

5    photos that were shown to you just a second ago,

6    and I hope I'm good with technology.  This is

7    Government Exhibit 5C.  You see that okay,

8    Mr. Morgan?

9        A.    Yes, sir.

10       Q.    Looking right here, that's the

11   driveway leading up to your all's house; is that

12   right?

13       A.    Yes.

14       Q.    Now, that looks to me, and you tell

15   me if you agree or disagree, that's a pretty

16   steep slope; is it not?

17       A.    Yes, sir.

18       Q.    You've testified earlier that you

19   and your brother have had problems before the

20   blacktop with gravel washing out in the main

21   road?

22       A.    Yes.  And you can't really see it in

23   this picture, but just as you come off the

24   highway, it's pretty steep, and the -- there's

25   not a lot of topsoil before you hit rock, so

1    it's -- as far as trying to, you know, just

2    level it out, it's -- so in -- over the years,

3    yeah, we have put gravel there, and when it

4    would, you know, come a big rain or something,

5    it would wash out into the highway.

6         Q.    All right.  Take a look at this

7    one.  This is 5D, and I think this shows the

8    bottom of the road area; is that right?

9         A.    Yes, yes.

10        Q.    What kind of problems does that

11   cause out on the main road, if any, with gravel

12   washing out into the main road?  Does it cause

13   any problems?

14        A.    Well, I mean ...

15        Q.    Hard to stop?

16        A.    Obvious problems, it's, you know ...

17        Q.    I don't mean -- sure, I know, but I

18   have to -- you're a lawyer, you know.

19        A.    Certainly.

20        Q.    Would you address to the members of

21   the jury, just tell them what kind of problems

22   in your experience have you seen with gravel and

23   dirt and all that stuff washing out in the main

24   road.

25        A.    Well, I mean, just like I said,

1    obvious problems, that if there's dirt and

2    gravel in the road and some -- you can't see it

3    here, but there's a curve back here, so, I mean,

4    obvious, when there's -- that's an obstruction

5    in the highway, I guess, is what, you know, is

6    what you would say.

7         Q.     Sure.  Okay.  Let me point to what

8    else is on 5D here.  It looks like a street

9    sign; is that right?

10        A.     Yes, sir.

11        Q.     And it says Shade Mountain; is that

12    correct?

13        A.     Uh-huh (affirmatively).

14        Q.     That's a county sign, isn't it?

15        A.     That's a -- I guess ultimately it

16    is.  It's a -- from -- we were contacted at

17    some point, I think I was already living

18    there, by the 911 coordinator when they were

19    first doing that and put that and asked us

20    what we wanted to name the road, and that's

21    what we told them.

22        Q.     Right.  And that sign was put up

23    there and you were contacted by the 911 system?

24        A.     Yes.

25        Q.     Some time before Randy Thompson was

1   county judge?

2       A.      Well, yeah, it was whenever they

3   were first implementing the 911 system.

4       Q.      How long ago was that; when was

5   that, just ballpark, Mr. Morgan, in late '06?

6   How much time before then?  Ballpark.

7       A.      Maybe a few years.  I don't know.

8           MR. WESTBERRY:  Exactly.  Can I have

9   just one second please, Judge?

10          THE COURT:  You may, sir.

11          MR. WESTBERRY:  Talk to my partner and

12  see.  Thank you, Mr. Morgan.  I appreciate your

13  courtesy.

14          THE COURT:  Thank you, Mr. Westberry.

15  Mr. Webster.

16                  CROSS-EXAMINATION

17  BY:  MR. WEBSTER:

18      Q.      Jeremy, you described to the grand

19  jury a past situation in which that the county

20  had put gravel on your roads and put a sign up

21  and you all were a little bit, I guess,

22  concerned that somebody -- that -- whether or

23  not it was going to be called a public road or

24  not; is that a fair assessment?

25      A.      Yeah.  There was a -- and it's not

shown in this picture, maybe a quarter mile or
something and back up 550, going toward Hindman,
there was a road, and that's what I referred to
earlier, that —— was a gravel road that had been
a coal haul road, and there was a mining
operation that we were actually having a dispute
with because the —— you would take that road and
it comes up and along to the ridge behind where
we live, and, yeah, we had —— driving home or
something and saw a sign that said —— I believe
it was Stillhouse Road, but like I said, so, you
know, we had inquired about that.  I think they
had put some gravel on that road, as a matter of
fact.

    Q.     And does that road connect with
these roads?

    A.     Not really.

    Q.     How did —— it's my understanding
that that first picture that shows that approach
down there, that you didn't always get in and
out of that holler that you live on that way?

    A.     That's right.

    Q.     How was the old —— where was the old
public road up in that holler?

    A.     You can —— it would be over —— and

it's kind of hard to describe it -- where you
could see the gravel parking area down there, it
would be on -- sort of at the far side of that,
and just kind of straight up the hollow there.

Q.     Towards your house?

A.     Well, no, on the other side of the
house.

Q.     I meant toward the -- what's his
name, Jeff's house?

A.     No -- well, if you -- I'm not sure I
understand.

Q.     That fork that we're looking at
there that stops to the left, goes up a holler
sort of, right?

A.     Yes, yes.

Q.     And the old road that went up that
holler was on the other side of that gravel top?

A.     Yes.

Q.     And that was a public road, as far
as you know?

A.     I don't know.  I mean, in my
lifetime -- of course, they didn't have 911 when
I was growing up and stuff because we didn't
have a 911 system, so I don't know that it was
ever a public road.  I don't remember anybody

1    ever saying it was or it wasn't.

2        Q.      There was more than one piece of

3    land up in there in the old days?

4        A.      Well, it was all part of one piece

5    of land, and my grandparents had it, and then

6    they divided it into somewhere I think where

7    that road was to my aunt, who's -- and then to

8    my father.  And then my brother Jeff ended up

9    getting both tracts and putting, you know, the

10   two tracts back together.

11       Q.      Okay.  So there had been what

12   appears to have been a public road up that

13   hollow?

14       A.      As I said, right where my house is

15   there used to be a little house there.  There

16   were, to my knowledge, in my lifetime, I don't

17   ever remember there ever being any houses up in

18   the hollow there.  As I said earlier, there's a

19   gas well back up in the hollow.

20       Q.      Is that how the gas company got

21   there before you all built this new place, new

22   road?

23       A.      Yes.

24       Q.      Okay.  Now, and then sometime, a few

25   years ago, you all relocated whatever road,

1    public or private there was to get in there and
2    put it to what we're looking at?
3         A.      I did because -- and you can kind of
4    see it there.  There's a fairly steep curve,
5    right there that's sort of behind where my house
6    is in this picture, and it was, I felt,
7    dangerous.  When I was first doing the work, you
8    know, I decided -- in fact, the only reason I
9    left it -- as soon as they moved everything and
10   got the work done because it was easier, I
11   guess, to get equipment in there, that sort of
12   thing, so as soon as that was done, I had them
13   just fill it in.
14        Q.      To make a long story short, and it
15   may already be too late for that, but there was
16   an old public -- there was a road that went up
17   this holler and it served at one time two
18   different places, and you all put them back
19   together, or your grandpa did, and then it
20   became two places again.  You thought it was too
21   dangerous to go out to the main road out that
22   little holler, and your brother's building a
23   nice house up in there, so you all put the --
24   your access road, public or private, where it is
25   now?

1    A.    Yes.  He actually did that before --

2    he was doing that before I moved down there.

3    But yeah, we've -- since that time, we've both

4    done stuff to it.

5    Q.    You never spoke to John Mac Combs

6    about this at all?

7    A.    Not to my knowledge.

8    Q.    Never saw him?  I mean --

9    A.    Not connected with this.  I mean, I

10    probably did see him some places, but ...

11    Q.    I know you all do truck wrecks.  Do

12    you all -- you've litigated county road, public

13    road issues in your time?

14    A.    No.

15    Q.    Do you know enough from being a

16    lawyer in the Bar that it is difficult at times

17    to distinguish a public or private road?

18    A.    Sometimes I wonder how much I know

19    about a lot of things.  But, yeah, I know that

20    that's -- that there's, you know, frequently

21    litigation and things about that.

22        MR. WEBSTER:  Thank you.

23        THE COURT:  Thank you, Mr. Webster.

24    Mr. Jensen.

25        MR. JENSEN:  No questions on behalf of

1    Phillip Champion, Judge.

2              THE COURT:  And then Mr. Williams.

3                        CROSS-EXAMINATION

4         BY:  MR. WILLIAMS:

5         Q.      Good morning, Mr. Morgan.  I guess

6    maybe I'd like to show you a picture first so

7    that we could move that screen here in just a

8    second, if I may use the Elmo machine.  Can you

9    see that picture okay, Mr. Morgan?

10        A.      Yes, sir.

11        Q.      Do you recognize what's in that

12   photograph?

13        A.      Yes.  That is a view from right

14   around -- maybe sort of beside my brother's

15   house looking down the hill.

16        Q.      All right.  And you can tell from

17   the photograph there, there's no blacktop up to

18   your brother's house, is there?

19        A.      It does not appear that there's any

20   because you can actually, it looks like in the

21   middle of the road, see some grass, you know, in

22   between the two tracts going up through there.

23        Q.      Actually as you go downhill to your

24   brother's house, it's gravel way down before it

25   gets to be blacktop, isn't it?

1       A.    I think it is blacktop right around

2    where you see there's some hickory trees on each

3    side of the road there.  That -- I think it's

4    right around in there, if I'm not mistaken.

5         THE COURT:  Counsel, let me -- I don't

6    think the jury can see it.  I'm not sure this

7    picture is in evidence.

8         MADAM CLERK:  It's not.

9         THE COURT:  So we've not published this

10   to the jury yet.  You're welcome to try to move

11   it into evidence, if you like.

12        MR. WILLIAMS:  May we approach?

13        THE COURT:  You may approach.

14   [CONFERENCE AT THE BENCH]

15        THE COURT:  Mr. Williams.

16        MR. WILLIAMS:  Your Honor, this is one

17   of the photographs that Rob Miller took, and

18   it's been produced to the Government.  Not

19   knowing before trial what exactly photographs

20   we'd use, we'd just mark those as Exhibit 5, and

21   we would move for this to be 5, which would be

22   the next numbered exhibit on our photograph

23   list.  There's 400 some photographs.  We didn't

24   know what number to premark this one.

25        THE COURT:  Well, I think he's

1  identified it.  I don't think -- we just need to

2  be clear that we tender the photograph to the

3  witness once he's authenticated it and

4  identified it, and once it's identified, go

5  ahead and offer it into evidence.

6          MR. TAYLOR:  I don't know -- how long

7  you think you'll cross?

8          MR. WILLIAMS:  Your Honor, I'll

9  probably be maybe ten or 15 minutes, if the

10  Court would like to take a break.

11          THE COURT:  I think maybe what we'll do

12  is go ahead and take a break right now.  I was

13  trying to get this witness completed, but I

14  don't think we're going to do that.  So why

15  don't we take a break, allow you to complete

16  your cross, and then you can redirect, and then

17  you need to, of course, properly mark it and

18  kind of address that.  And you're not going to

19  have an objection to the particular photo; is

20  that right?

21          MR. TAYLOR:  No.

22          [IN OPEN COURT]

23          THE COURT:  Ladies and gentlemen of the

24  jury, we're going to go ahead and take a break.

25  We've been going for quite some time now.  It

1    seems like a pretty good stopping place.  I

2    remind you of admonitions I have given you

3    previously, but they continue to be in full

4    force.  We'll take about ten minutes, and then

5    we'll come back and I imagine we'll go to about

6    12:30 before we break for the lunch hour.  And

7    at this time, you may be excused.

8                    [JURY EXITS COURTROOM]

9                    THE COURT:  Okay.  You can be seated,

10   and the jury has exited the courtroom.  Let me

11   see if there are any matters we ought to take up

12   outside of the presence of the courtroom.  The

13   witness can be excused from the courtroom, and

14   we'll take about ten minutes.

15                    [RECESS – 10:53 a.m. – 11:10 a.m.]

16                    THE COURT:  All right.  We've

17   reconvened outside of the presence of the jury.

18   Let me see if there are any matters we need to

19   take up before we bring the jury in.

20                    MR. WEBSTER:  I looked it up, it may

21   come up again, 803.20 of the Federal Rules,

22   reputation in community as to boundaries or of

23   customs affecting lands in the community.

24                    THE COURT:  You're referring to

25   reputation concerning personal or family

```
1    history; is that right?
2            MR. WEBSTER:  The one under that –– the
3    next one.
4            THE COURT:  Boundaries or general
5    district.  Okay.  Well, we'll refer to that if
6    it comes up again, Mr. Webster.  Thank you.
7            MR. WEBSTER:  That is the obscure thing
8    that most of us ever deal with.  If you don't
9    practice law in the mountains, most people have
10   never heard of that.
11           MR. WESTBERRY:  He stumped me.  I
12   didn't know about it.
13           THE COURT:  Well, we'll address the
14   relevance of that particular rule to the
15   testimony at the time that it comes up.
16           MR. WESTBERRY:  I bet Mr. Taylor knew
17   that.
18           MR. TAYLOR:  Never heard of it.
19           THE COURT:  All right.  We're going to
20   bring the jury in.
21           We'll note that the witness has retaken
22   the witness stand, and you remain under oath,
23   Mr. Morgan.  Mr. Williams will continue
24   cross-examination, and bring the jury in.
25              [JURY ENTERS COURTROOM]
```

1          THE COURT:  Mr. Williams.

2          MR. WILLIAMS:  Thank you, Your Honor.

3    May I ask the witness be shown a photograph?

4          THE COURT:  You may.  That's a tendered

5    exhibit?

6          MR. WILLIAMS:  It's been previously

7    marked as Defendant's 5H.

8          THE COURT:  Okay.

9       Q.     Mr. Morgan, are you able to see that

10   photograph clearly?

11      A.     Yes, sir.

12      Q.     Can you describe for me what's in

13   the photograph?

14      A.     This is pretty much, I think, the

15   same one that I looked at a few minutes ago.

16   It's basically if you were standing up beside my

17   brother's house looking down the driveway

18   toward, you know, toward the -- where it would

19   intersect with mine.

20      Q.     And does it fairly and accurately

21   represent the view from your brother's home?

22      A.     Yes.

23          MR. WILLIAMS:  I move to publish that

24   to the jury.

25          THE COURT:  You seek to move it into

1    evidence?

2              MR. WILLIAMS:  Yes, Your Honor.

3              THE COURT:  Without objection, it will

4    be entered as a Defendant exhibit, and you may

5    publish it as you choose.

6              MR. WILLIAMS:  Thank you.

7         Q.    Mr. Morgan, can you see the

8    photograph now?

9         A.    Yes.

10             MR. WILLIAMS:  And is this being

11   published to the jury at this time?

12             THE COURT:  I think it is.  Can the

13   jury see that?  Yes, they can.

14             MR. WILLIAMS:  Thank you.

15        Q.    And as I understand your testimony,

16   Mr. Morgan, this is the view from your brother's

17   house down from the hill; is that correct?

18        A.    Yes.

19        Q.    And he has put gravel in the front

20   of the photograph; is that correct?

21        A.    Yes.

22        Q.    In other words, the blacktop that

23   was laid does not go all the way up to your

24   brother's home?

25        A.    No.

1     Q.     Thank you.  And Mr. Taylor asked you

2    some questions about your involvement and

3    knowledge of Knott County politics.  Do you

4    remember that?

5     A.     Yes, sir.

6     Q.     And tell me in the '06 election, you

7    didn't vote, did you?

8     A.     No, sir.

9     Q.     Given your knowledge of the Knott

10   County election and politics, as you've already

11   described, what do you attribute Judge

12   Thompson's victory to?

13        MR. TAYLOR:  Objection, relevance.

14        THE COURT:  I will overrule that

15   objection.

16     A.     Well, as I alluded to earlier, the

17   Democratic nominee was, I think, had –– he was

18   not very well –– not as well liked as he thought

19   he was is about the nicest way to say it.

20     Q.     I think, in fact, you described him

21   earlier as a crook, didn't you?

22     A.     That's my opinion.

23     Q.     That's your opinion.  Do you think

24   that that opinion was widely held in the county?

25     A.     I don't know.  I would think that it

1    probably is.  In my opinion, yes, that opinion

2    is widely held in the community.

3         Q.     Now, when did you move your home to

4    that area?

5         A.     I believe it was in October of 2001,

6    around that time, late '01, late '01.

7         Q.     Would it be fair to say that your

8    familiarity with what was going on in that area

9    insofar as the use of the road was probably

10   limited before that time?

11        A.     Well, yes.  You know, I grew up

12   maybe a mile up above that.  When I was younger,

13   my brother and I would go down there and hike.

14   We'd take our dogs down there and go up, you

15   know, up the old gas road, so, I mean, I knew

16   from childhood that there was that road there.

17        Q.     All right.  And you said you lived

18   about a mile up the road?

19        A.     Yes, toward Hindman.

20        Q.     Okay.  Is it fair to say that in the

21   country areas, it's hard to know what may be

22   going on down the road a mile on a day-to-day

23   basis?

24        A.     Yeah.  It's sometimes hard to know

25   what's going on right, you know, right next to

1    you some, but ...

2        Q.      Do you know that prior to 2001 when

3    you moved in there if the county maintained that

4    road through there?

5            THE WITNESS:  You mean the road that I

6    closed off when I moved there?

7            MR. WILLIAMS:  Yes, sir.

8        A.      No, I don't.

9            MR. WILLIAMS:  Pardon?

10       A.      No, I don't.  I don't ever remember

11   seeing anything, but I don't know.

12       Q.      You're not sure one way or the

13   other?

14       A.      That's right.

15       Q.      All right.  Now, have you heard of a

16   person named Cap Combs living on that road?

17       A.      No.

18       Q.      Now, is there an old homestead in

19   between your house and your brother's house

20   where somebody use to lived?

21       A.       There used to be.  There was an

22   old house that was really, you know, very

23   dilapidated, and when I had the site prepared,

24   I had it torn down.  No one was living there

25   at the time.

1     Q.      So obviously, someone before you

2     lived there, lived in that area, and had access

3     to that old homestead?

4     A.      Yes.

5     Q.      Now, can you tell me, before this

6     road was paved, how did it act in the winter and

7     the springtime?  Was it subject to --

8     A.      Well, we -- you know, I sort of

9     described already what happened down close to

10    the highway because it was steep.  It would get

11    muddy, and we'd have to put gravel on it.  Right

12    where the road separates, in that area there, we

13    had to put a lot of gravel in that area because

14    of the -- it just, you know, when it would thaw,

15    it would suck it -- the ground would suck the

16    gravel right ...

17    Q.      And would the gravel and mud wash

18    out onto the main roadway?

19    A.      Yes.

20    Q.      And would that create a hazardous

21    condition?

22    A.      I assume so.  It's sort of obvious

23    what that would create.

24    Q.      Do you know if the county ever acted

25    to clean up that type of situation before in the

1  past?

2     A.     I don't know.

3     Q.     Had they worked down closer to the

4  state highway to install water lines and so

5  forth?

6     A.     Yes.

7     Q.     And when did that occur?

8     A.     Well, it was before it was paved.

9  But as far as time frame, I don't know how soon

10 before that.

11    Q.     Now, you've already testified that

12 you didn't vote in this election, correct?

13    A.     That's right.

14    Q.     And my client Ronnie Adams never

15 offered to buy your vote, did he?

16    A.     No, sir.

17    Q.     And you've known Ronnie Adams how

18 long?

19    A.     Well, a long time, I guess.  I've

20 known all these fellows, you know, a long time.

21 Not -- you know, I can't tell you exactly how

22 long.

23    Q.     Is it fair to say that you and

24 Ronnie have had conversations, just passing

25 conversations on politics as long as you can

1   remember?

2       A.      As I've said earlier, that

3   generally, I'd see him at, like, holidays and

4   family gatherings, that sort of thing, and we

5   generally talked about politics and what was

6   going on in the county pretty much every time we

7   saw each other.

8       Q.      Would he joke with you sometimes

9   about what a die-hard Democrat you are?

10      A.      Yes.

11      Q.      All right.  Now, you've testified

12  previously about some folks that use this road

13  as it exists now with the pavement on it.  Does

14  a garbage truck come up that road?

15      A.      Yes.

16      Q.      All right.  And the garbage truck

17  goes on past your house down to a garbage bin?

18      A.      Okay.  When my garbage bin was

19  down -- I've moved it since to basically where

20  the road separates, I've put it up there, so it

21  goes there and then goes on up to my brother's

22  house.

23      Q.      At one time, though, the garbage

24  truck had to go on past your house down by the

25  old road to pick up the garbage?

1          A.      What they did was there's some
2    people who live across the road from the --
3    right across from where my garbage bin was, and
4    theirs was there.  So what they would do was
5    pull off in this sort of wide spot where these
6    other people live and just go across -- walk
7    across the road and get mine and take it.
8          Q.      Now, before you closed it off, there
9    was another entrance to the road; is that
10   correct?
11         A.      Yes.  I closed it off when I moved
12   there.
13         Q.      All right.  And that was off of 550?
14         A.      Yes.
15         Q.      And that's -- that's the road that
16   goes on up to the gas company's place?
17         A.      That's right.
18         Q.      And I think Kentucky Land Title
19   Company also uses that area up there, don't
20   they?
21         A.      I'm not -- I think I know what
22   you're asking, but I'm not familiar with a
23   company by that name.  There is Kentucky River
24   Coal Corporation has, I'm sure has used it some
25   in the past, if that's who you're referring to.

1       Q.      And they still use that to get to
2   their property up there, don't they?
3       A.      There actually is, I believe, a road
4   that comes down from the top of the hill that
5   they use more now.
6       Q.      But they have driven past your house
7   to get to their place?
8       A.      The gas company has.  And actually
9   I've told them, because I've got a small child,
10  and they -- a few times they came down there,
11  and if I had something parked, they would go
12  through my grass and things like that, so I told
13  them that they needed to use the road from the
14  top of the hill.
15      Q.      Okay.  So if I understand your
16  testimony correctly, this would be a connector
17  road?  You could get to the other side of the
18  mountain if you turned by your house and went on
19  up and come back up the other -- come over the
20  other way?
21      A.      Okay, I'm not sure I under -- I --
22  yeah, ask that again.  I'm not sure I understand
23  what you're saying.
24      Q.      It probably wasn't asked very well.
25  If I understand you correctly, you said the gas

1    company has property up above you?

2        A.     The property is owned by Kentucky

3    River Coal Corporation, who lease it to the gas

4    company.

5        Q.     All right.  And if I understand your

6    testimony correctly, they have, in the past,

7    driven by your home to get to that property?

8        A.     Yes, sir.

9        Q.     So they can access it that way?  I

10   mean, I understand you don't want them to

11   because of your child, but they can get through

12   that way?

13       A.     If I'm not home, they can.  I mean,

14   I've told them not to, and to my knowledge,

15   they've not done it, you know, really since we

16   had that conversation, but, you know, I'm not

17   there all the time.

18       Q.     If I understand your testimony

19   correctly, they could also come over the other

20   side of the mountain and go that way?

21       A.     Yes.

22       Q.     So they could also come down the

23   hill and come out by your house?

24       A.     Yes.  And as a matter of fact, as

25   I've said, you know, a couple of times, because

1    I, you know, it was hard to be there when they

2    would come and use that road.  And a few times

3    I've, like, put, you know, wood and, you know,

4    put a pile of wood in the road and parked my

5    truck there, that sort of thing, to keep them in

6    the -- that's what I said, usually they'd just

7    go around it and drive through my grass.

8         Q.    So they've driven around your

9    vehicles to get to wherever they need to?

10        A.    Yes.

11        Q.    And you've actually asked folks to

12   move their vehicles out of the road when

13   visiting you so that folks can get by?

14        A.    I'm not sure I follow what you're

15   saying.

16        Q.    Have you had occasion where folks

17   may have been visiting you at your home, they

18   parked on the road and they were asked to move

19   their vehicles so that someone else could get

20   by?

21        A.    I may have.  I mean, that's the

22   reason I said I'm not sure -- I don't

23   specifically recall that, but I'm sure if there

24   was somebody, you know, I would ask -- if I had

25   a guest that was in somebody's way, I'd ask them

1   to move.

2        Q.      Now, this -- do you remember this

3   road up on the mountain that you're talking

4   about?  Has been called the Forks Road?  Have

5   you ever heard it called that?

6        A.      I am familiar with in some old

7   deeds, things like that, the Road Fork, a

8   reference something like that.

9        Q.      The Road Fork.  I had the name

10  wrong.  And it's on some old maps, isn't it?

11       A.      Yeah, I think so.

12          MR. WILLIAMS:  Now, you've indicated --

13  I'll withdraw that question, Your Honor.  I

14  think that's all I have.  Thank you.

15          THE COURT:  Thank you, Mr. Williams.

16  Mr. Taylor, redirect.

17          MR. TAYLOR:  Again, I think I'm going

18  to draw a picture.  Could we get the easel out.

19          THE COURT:  You may.  Is there a

20  scenario, counsel, where you can use the Elmo to

21  do that?

22          MR. TAYLOR:  I guess we could.

23          THE COURT:  I'll let you choose your

24  preference.  It might logistically --

25          MR. TAYLOR:  We can do that and

1    everyone can see it.  If the witness could come

2    to the Elmo with me.

3            THE COURT:  I'll allow that, and that

4    would keep the lawyers from having to move over.

5            MR. TAYLOR:  Okay.  I'll need some

6    paper.  Bonnie, I need typing paper.

7            MR. WILLIAMS:  Your Honor, may we

8    approach briefly?

9            THE COURT:  You may.

10           [CONFERENCE AT THE BENCH]

11           MR. WILLIAMS:  I hope we get the same

12   concession Mr. Taylor did a minute ago.  I had

13   one other question I wanted to ask Mr. Morgan,

14   if I could.

15           THE COURT:  I think it would be fine.

16           MR. TAYLOR:  Even two, if he wants.

17           THE COURT:  Let me just say something.

18   To the extent that we can make this work, I'm

19   going to be much more comfortable with that

20   where we had all of you right there at the jury

21   box; you were wanting to visit with each other.

22           MR. TAYLOR:  Scared the heck out of my

23   witness, too.

24           MR. WESTBERRY:  You're a lot nicer than

25   Judge Forester was when we started doing that

Shalash trial.

THE COURT:  And I'm delighted to have on the record how much nicer I am than Judge Forester.  I'll get that printed up for you.

MR. TAYLOR:  I'll move to strike.

THE COURT:  I'll overrule that.  You're allowed to ask a couple of additional questions.  Go ahead.

[IN OPEN COURT]

THE COURT:  I'm going to recognize Mr. Williams for a couple of follow-up questions, sir, if you'll remain in the witness stand, and then we'll allow Mr. Taylor to redirect.

MR. WILLIAMS:  Mr. Morgan, a couple of questions that I forgot to ask you earlier.

Q.      Mr. Taylor asked you about this Judge Thompson sign that --

A.      Uh-huh (affirmatively), yes.

Q.      Was it down on the state right-of-way?

A.      It was down next to my garbage bin, in that area.  I don't know how far, you know, how much right-of-way they have there, but it was, you know, next to the highway.

          Q.      And you have absolutely no idea how
it got there?

          A.      No, sir.

          Q.      And would it be fair to say that
there were Judge Thompson signs all over Knott
County during that year?

          A.      There -- yes, there were signs a lot
of places, I guess.

               MR. WILLIAMS:  Thank you.

               THE COURT:  Okay.  Mr. Taylor.

                         REDIRECT EXAMINATION

          BY:  MR. TAYLOR:

               MR. TAYLOR:  May I have the witness
approach the Elmo?

               THE COURT:  You may.  Sir, you can go
there and ...

          Q.      All right.  Mr. Morgan, since you've
probably drawn stuff in court before, I want to
ask you to do that instead of me.  What I would
like for you to draw for the jury on this Elmo
here, and kind of think for a minute how you're
going to space some things out so you can get it
somewhat to scale.

          A.      Okay.

          Q.      I want to start at the bottom down

1   here with the Highway, is it 550?

2       A.    Yes, sir.

3       Q.    Okay.  Draw a line for 550, then

4   show your driveway coming off of it.  Show the

5   branch to your house, show the branch to your

6   brother's house, and leave enough room so you

7   can give the jury some idea of where this old

8   road that was blocked off was.  So consider all

9   that you're going to have to get on here and

10  kind of draw it to scale, and give us some idea

11  of how this all lays out.  We need -- another

12  marker is probably better.  That's 550?

13      A.    Yes, sir.

14      Q.    Okay.  Put 550 in there.  Okay.

15  Now, show us where your driveway -- your joint

16  driveway with your brother comes off that road.

17  Okay.  And would you draw a box for your house

18  and a box for your brother's house?

19      A.    It's square, but ...

20      Q.    Okay.  That's good enough.  No

21  geodesic dome or anything?

22      A.    No.

23      Q.    All right.  And just put -- so

24  you're both JM, so put Jeff and or Jer.  Okay.

25  Now, would you draw a line as to how far off the

highway the paving went on both.

A.     That's probably like that because he has a -- you come up here and he actually has concrete and a garage back in here where he parks, so ...

Q.     Okay.  Would you draw a little car where he parks and where you park.  You do good.  Detailed here.  You're going to put wheels on it and everything.  What kind of car is that?

A.     Those are the cars.

Q.     Now, those are the cars; that's where you park?

A.     Right.

Q.     Now, does the blacktop end where the black marker ends?

A.     Basically, yeah, it comes down here where it's gravel.

Q.     All right.  How many feet would you say it is from right here to right there?  Football field?

THE WITNESS:  From here to here?

MR. TAYLOR:  Yeah.

A.     Maybe 25, 50 yard maybe.  I don't know.

1       Q.     Half a football field?

2       A.     Half, and that would be on the high

3       --

4       Q.     High side?

5       A.     Probably.

6       Q.     Okay.  How far is it; have you ever

7      measured it?

8       A.     Maybe I -- from the bottom where it

9      ends up the hill would maybe be about the -- a

10    little longer than the length of the courtroom

11    probably.  Maybe, you know, to the curve there,

12    to where the road splits, so that's something

13    that I can look at that gives me a better ...

14      Q.     Gives you some perspective.  Have

15    you ever measured the distance with an odometer

16    from there to your brother's house?

17      A.     No.

18      Q.     Would you give an estimate?

19      A.     His -- from -- get exactly right,

20    from where the road splits up to his house would

21    probably be maybe about three times, three or

22    four times from there, you know, that part, so

23    ...

24      Q.     I take it when Mr. Williams was

25    asking you some questions about the gravel not

1    going to Jeff's house, he was talking about an
2    area right here?
3        A.     In those photos, you could see it
4    comes up and it's probably a little farther than
5    that.  It's probably like you come up and
6    there's two hickory trees on each side, and it
7    basically ends right there, and so there's --
8    that's probably a little closer to it.
9        Q.     Okay.  Now, could you place on here
10   the best you can where this little gas road was?
11       A.     It would have come somewhere like
12   right in here.  And this goes up the hill like
13   that.
14       Q.     Okay.  And did it come out back on
15   550?
16            THE WITNESS:  If you -- when you went
17   up there this way?
18            MR. TAYLOR:  Yes.
19       A.     No.
20       Q.     Does it dead-end up there?
21       A.     Yes.  I don't know if they -- when
22   they started coming from the top of the hill, if
23   that was something that was -- that they just,
24   you know, an old road that they cleaned out, or
25   if it's something that they built or what, but

1   it went up there, and that's the gas road.

2       Q.      Did I understand you to say you and

3   your brother built these roads?

4       A.      Yes.

5       Q.      Was it your intent to replace this

6   road?

7       A.      Yes, because when I -- well, he

8   built the first part of it, and then when I

9   built that, it was because -- coming -- going in

10  that way was not too bad, but when you pulled

11  out, you would have to actually stop and roll

12  your window down and try to listen to see if

13  there were cars coming.  It's very steep on this

14  side.

15      Q.      My question is, were you intending

16  to give the public or anybody a way to get to

17  the gas road?

18      A.      No.

19      Q.      What was your purpose of building

20  this?

21      A.      So I could get to my house.

22      Q.      All right.  Any other purpose?

23      A.      No.

24      Q.      All right.  And did you intend by

25  allowing this blacktop to be put down on your

1    driveway to confer any benefit on the public,

2    make that a public road?

3         A.    No.

4         Q.    You said you blocked off this road.

5    How did you block it off?

6         A.    When they were -- when this was

7    being built, they brought dirt, you know, pushed

8    dirt through that probably from up in here over

9    and just filled it in there, ditched it, and

10   then built that road.

11        Q.    When you indicated that there had

12   been some work down here on the highway as a

13   result of gravel, was that county or state that

14   did that?

15        A.    I don't know.  I don't know.  I have

16   no idea.

17             MR. TAYLOR:  All right.  That's all the

18   questions I have for you right now.  We can

19   leave that on.  I might have another question,

20   if you want to return to the witness box.

21             THE COURT:  Okay.  Thank you.

22             MR. TAYLOR:  Now, I have other

23   questions on other subjects.

24             THE COURT:  Yeah.

25        Q.    Now, in answer to a couple of

questions from various defense attorneys, or a
couple of them, you said that yes, you had a
steep slope coming down from your property,
actually more from your brother's or your joint
driveway, correct?

     A.     Yeah.

     Q.     And that sometimes when it rained
hard, the gravel would push out on the road; is
that correct?

     A.     Yes, sir.

     Q.     Are there a lot of people with steep
slopes in Knott County?

     A.     I would say that's a fair statement,
yes.

     Q.     Well, did -- and I assume some of
those were poor people and not lawyers, correct?

     A.     I'm sure, yeah.

     Q.     Did everybody in the county get
their steep slopes paved during this election?

          MR. WESTBERRY:  Objection.  I can't
imagine if he would know.

          THE COURT:  Well, he can answer if he
knows.  If he doesn't, he can respond.

     A.     I really don't know.

     Q.     Well, when you drive to work to

1    Hazard and you cut through Hindman, Knott

2    County, do you see other people with steep

3    slopes who didn't get theirs paved during the

4    election?

5         A.    Sure.

6         Q.    Okay.  Well, on what basis was

7    Ronnie Adams concerned about your steep slope

8    and that was his motive, if it were?  You said

9    you didn't know.  But if that were his concern,

10   how would he decide who gets their steep slopes

11   paved and who doesn't?

12        MR. WILLIAMS:  Objection, speculation.

13        MR. WESTBERRY:  Object to the form of

14   the question.

15        THE COURT:  I'd ask you to rephrase.

16        Q.    Did he tell you why he was paving

17   your steep slope?

18        A.    No, sir.

19        Q.    Did he even mention steep slope?

20        A.    Not that I recall.  Because I was at

21   work, I was kind of, you know, it's hectic, so I

22   don't recall that, anything like that, but ...

23        Q.    Is anyone in your house or your

24   brother's house gravely ill or in need of an

25   ambulance or anything?

1          A.          Not right now, thank God, no.

2          Q.          Did you have any question in your

3     mind but that Ronnie Adams was for Randy

4     Thompson?

5          A.          Well, he had, I think in the primary

6     had run for the Democratic nomination and hadn't

7     gotten it, so I assume he probably didn't like

8     the guy who did get the nomination very much at

9     the time.

10         Q.          When he called about the blacktop,

11    were you aware that he was for Randy Thompson?

12         A.          I don't know if he had ever -- if

13    he'd said that to me, or if anybody had.  Like I

14    say, I would assume that.

15         Q.          This garbage truck that comes and

16    picks up your garbage, is that a private service

17    or a public service?

18         A.          To be honest, I don't know.  I know

19    we pay, you know, it's, I believe, Rumpke or

20    some company, but ...

21         Q.          You pay a fee?

22         A.          Yes, sir.

23         Q.          Okay.  It's not part of your county

24    -- it's not a public service area of the City of

25    Hindman or anything, is it?

1      A.      No.  I know the county instituted

2   that many years ago, garbage pick-up, but yet

3   you have to pay a fee for it.  It's mandatory.

4      Q.      And if you don't want to use it, you

5   don't have to, correct?

6      A.      It's my understanding that you -- I

7   don't know, but it's my understanding that you

8   do.  But at least when they first put it in,

9   that it was a mandatory garbage pick-up, because

10  I remembered a lot of people complaining about

11  it at the time.  But that's been, you know, 15

12  years ago, probably longer than that.

13          MR. TAYLOR:  Okay.  One moment.  That's

14  all I have.

15          THE COURT:  Thank you, Mr. Morgan.

16          MR. WILLIAMS:  May we approach?

17          THE COURT:  You may.

18          [CONFERENCE AT THE BENCH]

19          THE COURT:  All right.  We're all here.

20          MR. WILLIAMS:  Your Honor, since

21  Mr. Taylor was allowed to use the Elmo and have

22  the drawing made during his redirect, would the

23  Court consider allowing us some recross?

24          THE COURT:  Well, I don't -- I need to

25  know kind of specifically what the subject was.

1    I mean, I think that goes directly to the issues

2    that were brought up in the cross-examination,

3    and I don't know that there's anything new that

4    --

5           MR. WILLIAMS:  Particularly, he was

6    allowed to show on the drawing where certain

7    things were, and I just want to ask him to show

8    us where the garbage bin was and about another

9    road that went through there.

10           THE COURT:  There's another road that's

11    not been previously testified about or ...

12           MR. WILLIAMS:  It's my understanding,

13    Your Honor, that there is a route that goes

14    towards Jeff's house that used to be access for

15    a logging company up that road.

16           THE COURT:  Mr. Taylor.

17           MR. TAYLOR:  I think it's beyond the --

18    that's the first I've heard of that.

19           THE COURT:  Yes, I think it is.

20           MR. WESTBERRY:  I thought there was

21    some testimony about the logging road.

22           MR. TAYLOR:  We were talking about that

23    road.

24           MR. WESTBERRY:  I think there's several

25    roads back there, and I know it gets -- I don't

1  have any questions, but I ...

2      THE COURT:  I don't think I'm going to

3  allow the recross as it relates to that.  I feel

4  like you've had fair opportunity to address

5  those issues, and did so on cross.  I don't

6  think there's any new roads or anything that's

7  come up within the context of the redirect

8  testimony, so we'll excuse this witness.  May he

9  be finally excused?

10      MR. TAYLOR:  Yes.

11      THE COURT:  Okay.

12      MR. WILLIAMS:  Subject to recall, Your

13  Honor.

14      [IN OPEN COURT]

15      THE COURT:  Mr. Morgan, you may be

16  excused, but you may be subject to recall in the

17  future.  Somebody will call you and let you

18  know.

19      MR. TAYLOR:  I would like to move the

20  introduction of that drawing as an exhibit.

21      THE COURT:  Is there objection?

22      MR. WILLIAMS:  Your Honor, may we

23  approach again?

24      THE COURT:  Yes, you may.

25      [CONFERENCE AT THE BENCH]

1          MR. WILLIAMS:  Your Honor, Ronnie Adams

2     would object just to the extent that I did ask

3     to be allowed recross on this particular drawing

4     and the Court denied that.

5          THE COURT:  Counsel, any other

6     objections to that?

7          MR. WESTBERRY:  Does he want to just

8     draw in the other road that you're asking

9     about?

10          MR. WILLIAMS:  I was going to ask him

11     if he could show us where the other garbage bin

12     used to be where this road used to connect to

13     550.  He's already testified to that.

14          MR. WESTBERRY:  He could do that on

15     just a -- if he's held to that one question.

16          THE COURT:  Yeah, I mean, we have a

17     witness who's been excused.  But do you intend

18     to call Mr. Morgan's brother?

19          MR. WESTBERRY:  Yeah.

20          THE COURT:  I'm not going to allow the

21     introduction of the demonstrative at this time.

22     To be honest with you, I'm a little

23     comfortable -- I think it's a good demonstrative

24     and it's not to scale, and I suppose the point

25     has been made to the jury.

1          MR. TAYLOR:  But the car's so small.

2          THE COURT:  Let's do this.  I'm not

3     going to allow that it be entered at this time,

4     but we'll allow it for the brother's testimony

5     that could testify to that.  You'll have an

6     opportunity at that point.

7               [IN OPEN COURT]

8          THE COURT:  Okay.  Mr. Taylor, you'll

9     be recognized to call your next witness, please.

10          MR. TAYLOR:  Call Jeff Morgan.

11          THE COURT:  Mr. Jeff Morgan will be

12     called as the next witness for the Government.

13               [WITNESS SWORN]

14                    DIRECT EXAMINATION

15     BY:  MR. TAYLOR:

16          Q.     Sir, would you state your name,

17     please.

18          A.     Jeffrey Morgan.

19          Q.     Mr. Morgan, where do you live?

20          A.     Emmalena, Kentucky.

21          Q.     And how are you employed?

22          A.     I'm an attorney.

23          Q.     And where do you practice?

24          A.     My main office is in Hazard.

25          Q.     And who do you practice with?

1      A.      I've got five partners.

2      Q.      Okay.  Was one of your partners

3  Jeremy Morgan?

4      A.      He was, but he went on to bigger and

5  better things.  He quit.

6      Q.      And you come from -- do you come

7  from a family that has been in Knott County for

8  a number of years?

9      A.      Yes, before Knott County was Knott

10  County, as I understand it.

11      Q.      We just heard from your brother, did

12  we not, that just walked out the door?

13      A.      I didn't see him.

14      Q.      Oh, you didn't see him?  Okay.  In

15  the year 2006, were you and have you, since

16  you've been of age to do it, been a registered

17  voter in Knott County?

18      A.      I have, yes.

19      Q.      Now, in the Fall of 2006, did you

20  receive some free blacktop at your house?

21      A.      They put some blacktop on my road,

22  yes, but I -- after we talked, I checked on that

23  and I think it was actually in the late part of

24  July because I think I just got back from New

25  York on a -- I had gone to take some

depositions.  That's my memory.  I verified my
records.  I think that's when it was, late July.

Q.      Do you know who blacktopped it?

A.      I do not.

Q.      Okay.  Tell us how that came about.

A.      I came home from -- I'd been out of
town.  I came home.  It was 11, 11:30 at night,
and when I pulled off the road -- it had been
raining pretty hard, and when I pulled off the
road, there was blacktop on the driveway.  And
my brother and I had talked about, for a long
time, about having it blacktopped, so I just
thought, well, what's he got me into here.  He's
decided to go ahead and blacktop it, and what's
this going to cost me.  It was late.  I didn't
talk to him that night.  That's pretty much the
way I discovered it.

Q.      How long had you been out of town?

A.      Overnight.  I left the day before,
as I remember.

Q.      And there wasn't anything telling
you that you couldn't drive on it or ...

A.      Oh, no, no, no.

Q.      Was it already set up pretty good?

A.      No.  As a matter of fact, I made an

awful mess because right by the road, it was --
they had not blacktopped it.  It started about
ten feet up the driveway, and the mud from the
heavy rain we had, I made -- I made an awful
mess going up the -- I muddied the new blacktop.

Q.    Okay.  So the blacktop had not come
all the way out to the road?

A.    No, it was ten feet from -- that's
just an estimate.  It was close, but, I mean, it
wasn't right down to the highway yet.

Q.    Were you still getting some washing
gravel down there?

A.    I don't -- I think the gravel pretty
much all washed off by that point, to tell you
the truth about it, but that's possible.

Q.    All right.  Let's continue on.  So
what did you do at that point?

A.    Went home -- went on up to my house,
went to bed.  The next morning -- my wife's a
schoolteacher; she gets up early, and so I
didn't talk to her the next morning.  When I got
up to go to work, they were there working.  And
they were people that I didn't know, and there
was nobody that I saw from the county, nothing
that said that.  There were people there

1    blacktopping.

2         Q.      These weren't -- you didn't see

3    these to be Knott County employees?

4         A.      I don't know.  I didn't -- I don't

5    know.  If they -- I mean, I don't know who they

6    were.

7         Q.      What happened next?

8         A.      There was a guy, as I told you

9    before, there was a guy that I call was driving

10   the -- I know it's not a steam roller, but

11   that's what I always called it.  It's the little

12   roller that they use on blacktop, and I asked

13   him how much this was going to cost me, and he

14   said if there was a bill, that I would get one

15   or, you know, they'd notify me.  And I went on

16   and went to work.

17        Q.      All right.  What happened next?

18   What was your next inquiry as relates to this

19   blacktop?

20        A.      I don't remember if I talked to my

21   brother that day, the next day, because we're

22   going in different directions, but at some point

23   we talked about it.  I'm not really sure what

24   you mean.  That's all -- from what -- we talked

25   about the blacktop in the next day or two is

what I would say.  And then I was worried,
afraid that -- I don't want this to be a county
road.  You know, this has never been a county
road in my mind, and that's -- that was actually
at that time that was my main concern, that --
because I'm gone a lot, and it's only 50 feet to
my house from the end of this road, and I live
off the road, and I didn't want somebody to be
able to just pull up in my, what I considered my
driveway.

    Q.    Okay.  Did you inquire with anyone
with the county or with a paving company?

    A.    Well, other than what I told you,
about asking that guy that.  At some point, I
did call the county judge's office.  I didn't
speak with the judge or anybody like that.  I
spoke with a lady, and asked her if there was a
bill, and she said she didn't know.  She'd check
on it and get back to me.  And as I told you
before, during this time, my wife was going
through breast cancer, chemotherapy, radiation,
and to tell you the truth about it, it didn't
really -- it was not something that was on the
front burner for me.  Maybe it should have been,
but it was not.

1          Q.       Okay.  To this day, have you ever
2     received a bill for it?
3          A.       No.
4          Q.       You never --
5          A.       But I would be glad to pay for it
6     rather than be here today.  I promise you.  But
7     I knew when I contacted -- when I contacted the
8     investigator, I knew I'd end up here probably,
9     but ...
10         Q.       You're the one that contacted the
11    investigator?
12         A.       Yes, yes.
13         Q.       And what prompted you to do that?
14         A.       At some point, I was gone.  He came
15    by my house, and my wife told me about it, and
16    then I contacted him.  But at one point, one
17    thing -- at some point, and I don't know if this
18    was told to me or if I read this, there was
19    something about a 911 road, if there's two
20    residences on a 911 road, and that was told to
21    me at some time, or I read that.  I don't really
22    remember which.
23         Q.       Prior to the blacktopping, did you
24    have any notice that it was going to be done?
25         A.       No, no.

1    Q.      Are you aware of other people

2    similar to yours in Knott County that didn't

3    receive blacktop?

4    A.      Yeah, I guess, yeah.

5    Q.      I want to put on the Elmo --

6    A.      That's not really something that

7    I thought a lot about, so ...

8         MR. TAYLOR:  I want to put on the Elmo,

9    if I could, a diagram.

10        THE WITNESS:  I like this.  This is

11   nice.  I wish we had this.

12        MR. TAYLOR:  I can't claim credit.

13   Your brother did this.

14        THE WITNESS:  No, I'm talking about the

15   technology is nice.

16        MR. TAYLOR:  Oh, the technology.  I

17   thought you were admiring your brother's artwork

18   here.

19        THE WITNESS:  Well, he's a better

20   artist than me, but ...

21   Q.      This has been described as a kind of

22   just a real rough diagram as the layout to your

23   house and your brother's.  Do you agree this is

24   a rough facsimile of that?

25   A.      Yes, yes.

1     Q.    All right.  And could you tell us

2 from your memory what -- where the blacktop

3 began and ended on this diagram here?

4     THE WITNESS:  You mean the first time I

5 saw it or ...

6     Q.    Yeah.  When you first got home at

7 night, where was it?

8     A.    It probably started somewhere around

9 --

10     MR. TAYLOR:  Can he come around here?

11     THE COURT:  Why don't you just have him

12 describe it.  You just point to it there,

13 counsel, and if you need him to go into more

14 detail on that, I'll have him --

15     A.    Okay.  Right here where you got the

16 first curve at the bottom.

17     Q.    Right here?

18     A.    Yeah, right here.  I would say right

19 at the start of that curve, a little back this

20 way would have been where the blacktop first

21 started, a little bit back over here.  No, the

22 other way.

23     Q.    Right here?

24     A.    Yeah, about right in there

25 somewhere.  Yeah -- no, a little bit further up.

1    That's a bit difficult.

2         Q.      Right here?

3         A.      No, it's on further up the road

4    there.  You all can see where I'm pointing at.

5    Just right there approximately as it went off

6    the road.  I'd say it was ten feet.  Maybe it's

7    15.  You know, I didn't measure it or anything,

8    but it was -- you could have seen it from the

9    road if you had been, you know, looking, but I

10   was not expecting it, so it was a surprise to

11   me.

12        Q.      How far up towards your house did it

13   go?

14        A.      That day, it was patchy that day

15   because I remember I went through -- went -- hit

16   the blacktop first, and then I went into the

17   dirt, the mud, and then there was some -- I

18   couldn't tell you.  The next morning they were

19   already up to where you've got up near my house

20   where the two little trees are that he's drawn.

21   It was up there about where that line is.  I

22   assume he means that's where the blacktop

23   stops.  They were working there.  That's where I

24   talked to the guy.

25        Q.      Had they paved this section up to

1    your brother's house, up at that point?

2         A.    I don't know, that night.  The next

3    morning, yes, I believe it was the next morning,

4    or -- yeah, I believe it was, I mean, partially

5    anyway, yeah.

6         Q.    Do you recall who you've inquired of

7    about paying for it?  You said the lady at the

8    office.  Anyone else?

9         A.    Not that I can remember, no, other

10   than a guy driving the steamroller thing, you

11   know.

12        Q.    Do you consider this property, this

13   pavement that we've been talking about, just

14   these two driveways, the one to your house and

15   one at your brother's to be your private

16   driveway?

17        A.    I have always, correct, yes.

18             MR. TAYLOR:  That's all I have.

19             THE COURT:  Thank you, Mr. Taylor.

20   Mr. Westberry.

21                   CROSS-EXAMINATION

22   BY:  MR. WESTBERRY:

23        Q.    Mr. Morgan, still good morning.  I

24   represent Randy Thompson and I have one question

25   over here.  Mr. Morgan, looking at the picture

1   that your brother drew that has been introduced

2   into evidence -- I'm going to point.  This is --

3   when you first drove up, that little area that

4   I'm pointing to generally, is that about where

5   the blacktop --

6          A.      Yes, yes, yeah.

7          Q.      And just so -- it's all the way down

8   to 550 now; is that right, the blacktop, as they

9   finished out the blacktop?

10         A.      Yes.

11         Q.      Mr. Morgan, did you ever, prior to

12  this blacktopping taking place, did you ever

13  have any conversations or talks with Randy

14  Thompson about your driveway, about the

15  blacktop?

16         A.      No.  And that's one thing that I

17  would like to add, and that is this.  Nobody --

18  I never, even at that point, thought anything

19  about the election because I'm a Democrat, and

20  no offense to the judge because he's done a

21  pretty good job for the Republicans, but I

22  wouldn't want to vote for him anyway.  I mean,

23  he -- I mean, I just didn't vote.

24         Q.      You're a good Democrat, right?

25         A.      Maybe too good a Democrat.  Maybe to

1    the point I might not be a very good citizen

2    because I just didn't vote.  The Democrat

3    candidate was a crook in my mind, and while I

4    knew his father-in-law, I didn't know him that

5    well, you know.  I mean, I knew who he was, but

6    I didn't know him that well, but he was

7    registered as a Republican, and I just didn't

8    vote.

9        Q.    Randy Thompson never asked you for a

10   vote or anything like that?

11       A.    I don't even believe that Randy

12   Thompson and I spoke probably ten times in my

13   lifetime.

14       Q.    But you said the other fellow was a

15   crook?

16           MR. TAYLOR:  Objection.

17       A.    Oh, yeah, he's a big crook, yeah.

18           THE COURT:  I'm going to -- I'd ask you

19   to move on.  The witness has answered the

20   question.  I'll overrule the objection to that

21   question, but I'll ask you to move on.

22           MR. WESTBERRY:  Sure.  I'm looking at

23   my notes.  Excuse me.  Let me ask Ms. Logan if

24   ...

25           THE COURT:  All right.  You may.

1          THE WITNESS:  And I sure would rather
2     be anywhere but here right now, too.  I'm sure
3     you all would, too.
4          MR. WESTBERRY:  One more question for
5     you, sir.
6          Q.     Would you look at your brother's
7     picture again.  Can you just give us an
8     estimate, Mr. Morgan, right where I'm pointing
9     right where the blacktop starts to where your
10    car is parked and ballpark how far is that, just
11    ...
12         A.     I'd say to the edge of my house it's
13    -- I'd say it's no more than ten yards, but, I
14    mean, it may be more or less, but it's not very
15    far.  It's close enough to where I was not
16    comfortable with it being that close.
17         Q.     And finally, I think you testified
18    just a little while ago that your wife was
19    having some health issues during that period of
20    time, and because of that maybe just business,
21    law practice --
22         A.     Yeah, we discovered she had breast
23    cancer in December of 2005.  She had surgery in
24    January.  She went through chemotherapy up until
25    late June of ...

1  Q. I don't need to pry about that. I

2  appreciate you volunteering that. You said you

3  might have made a call into the judge's office,

4  but you never followed up after that?

5  A. I did not, no.

6  MR. WESTBERRY: Okay. That's all I

7  have. Thank you, sir, for your courtesy.

8  THE COURT: Thank you. Mr. Webster.

9  MR. WEBSTER: No questions.

10  THE COURT: Mr. Jensen.

11  MR. JENSEN: Nothing for Phillip

12  Champion, Judge.

13  THE COURT: Mr. Williams.

14  MR. WILLIAMS: May I start off by using

15  the Elmo?

16  THE COURT: You may.

17                    CROSS-EXAMINATION

18  BY: MR. WILLIAMS:

19  Q. Mr. Morgan, how are you today?

20  A. I'd rather be somewhere else, quite

21  frankly, but, I mean, you know, all things

22  considered, I think I'm doing pretty well.

23  Q. I won't take too long with you. Can

24  you see my pen here?

25  A. I can.

Q.     Down here on Highway 550, is this a
newer entrance than used to be to come up into
this area?

A.     Yes, there used to be an entrance
over here where Jeremy's got his house and his
car drawn.  I imagine that that's what this line
up here indicates.  There used to be a gas road
that went up that -- that entered the property
from the highway.

Q.     And Jeremy closed that off; did he
not?

A.     Yes, he did.

Q.     And about when did he close that
off?

A.     I don't know.  Almost as soon as he
moved there.  It was a problem, people just
walking up the road and stuff.  I mean, it was
-- it might have been when he was getting ready
to put his house there.  I don't know.

Q.     But before he closed it off, I think
he built it in 2001 or so in there; is that
about right?

A.     I can barely remember when I got
married, so, I mean, that's not really, you know
...

1      Q.      The public could obviously come up

2  into that area?

3      A.      They have, yes.

4      Q.      All right.  And this line --

5      A.      Trespassing though.

6      Q.      -- this line is coming up the hill

7  here, that goes to the old gas road?

8      A.      It goes to an old gas well, and

9  there's -- it goes up there and it splits at

10  some point and goes out to a silt pond.

11      Q.      And the gas company still uses your

12  all's road to get up through there, doesn't it?

13      A.      They try to, and we try to not let

14  them.

15      Q.      You all have had a little bit of a

16  dispute about letting them use it; is that

17  right?

18      A.      Yes.

19      Q.      But they still do?

20      A.      I've not seen them in awhile, so

21  maybe we won that one.  I don't know.

22      Q.      How about the Land Title Company; do

23  they go up through there, too?

24           THE WITNESS:  Who?

25      Q.      The Land Holding Company?  Kentucky

1    River Coal Company?

2         A.    I don't think so.

3         Q.    Now --

4         A.    They may when I'm not there, but I

5    -- I mean, they wouldn't when I was.

6         Q.    Do you remember when Jeremy used to

7    have his trash bins?

8         A.    Yeah, I think it's the same place it

9    is now.

10        Q.    It used to be down here by where the

11   old entrance used to be?

12        A.    I would say that if you took that

13   where he blocked it, the trash bin would be

14   probably within that road somewhere.  If you

15   took away the dirt that he put in there, it

16   would be -- or close to it.

17        Q.    Now, when did you build your home up

18   here on the hill?

19        A.    I don't know.  I really don't know.

20   I mean, I guess that's kind of bad to say, but I

21   don't know.  I know I'm still paying for it's

22   all I know.  I mean, it was a -- I guess we

23   built on it for several years.  You know, we

24   didn't just like go out here and get this piece

25   of property and then just build a house on it.

1    You know, we got the piece of property, we did

2    things as we could, we built the road, we did

3    things like that, cleared the site, built a

4    foundation, you know, we did it kind of over a

5    period of time, so it was a several years

6    ongoing thing, so I couldn't tell you exactly

7    when I started it.  You could probably look at

8    the deed to the property and about that same

9    time was when I would have started it.

10        Q.     When you built your house up here on

11   the hill, was there an old road that went up

12   here to some logging area at that time?

13        A.     There's logging roads all over, you

14   know.  That's how I actually got back there was

15   a logging road initially, yeah, back on past --

16   on past -- I traded some guy some trees to build

17   this -- to give me this entrance here.

18        Q.     Are you talking about right here, or

19   up here?

20        A.     Yeah, yeah, right where you were

21   pointing right there, yeah, but there was a

22   logging road, and there's still a logging road

23   that goes on up the hill up behind the house.

24   But the answer is yes, yeah, there were a

25   logging road there.

1      Q.      So up here, if I can point up above

2    your house kind of off the screen, there's still

3    a logging road that goes up through there?

4      A.      I assume it's a logging road.  It's

5    a -- there's some kind of old road there, but

6    it's -- it is -- well, if you'd see it, it's not

7    a road you could drive a car on because I've

8    tried to drive a truck up it and you couldn't do

9    that, but, I mean, there is an old road going up

10   the hill there, yeah.

11     Q.      So we've got the gas company used

12   the road here and old logging road over here; is

13   that fair?

14     A.      Well, I'm not so sure -- I think

15   that logging road -- I don't know when that

16   logging road was built.  I think that that might

17   have been before they brought some trees out of

18   there when I got that property, if I'm not

19   mistaken, so it wouldn't be that old, but ...

20     Q.      But you're not sure one way or the

21   other?

22     A.      I don't know if there was an old

23   road there.  I know they've brought trees out of

24   there.  I could show you the stumps and what

25   they left, but, I mean, they brought trees out

1    that road.  Whether there was a logging road

2    there before, I don't know.  You know, these are

3    things that you don't take special note of when

4    you're, you know, when you're -- when you grow

5    up where I grew up.  There's logging roads a lot

6    of places.

7         Q.      I think you testified at the grand

8    jury you thought there was some question about

9    this being a county road; is that fair?

10        A.      No, this is no county road now.

11        Q.      You've heard some people say that it

12   is, though, right?

13        A.      Well, I don't know who -- no, no,

14   there's -- where you talking about?  Are you

15   talking about -- 550's a county road, or a state

16   road, but my driveway is not a county road.  I

17   don't want it to be a county road.  If it is a

18   county road, then, you know, somebody needs to

19   pay me for it because it's not a county road.

20   If it's listed as a county road, nobody ever

21   notified me of that.  And I'm not being hateful

22   with you, but no, I've never told anybody that's

23   a county road.

24        Q.      You've never testified before that

25   there had been some question about whether this

1    was a county road or not?

2        A.    No, I have not.  I have never

3    testified that I had a question that it was a

4    county road, to the best of my knowledge.  If I

5    did, I was mistaken.  I think what I testified

6    to was I didn't want this to be a county road.

7    It was not a county road.  It was my position it

8    never was a county road, and that I built this

9    road.  I built this -- where you're talking

10    about from this curve up to where the split is

11    at least, I built that.

12        Q.    I'm just asking.  Do you recall

13    testifying at the grand jury that there's some

14    talk about this being a county road?

15        MR. TAYLOR:  Could I have a page

16    number, please?

17        MR. WILLIAMS:  Oh, I'm sorry.  Page 5

18    there at the bottom.

19        MR. TAYLOR:  5?

20        A.    Well, I just heard you talk about

21    it, but you asked me if I was confused about

22    it.  No, I'm not.

23        MR. WILLIAMS:  I'll rephrase the

24    question.  I apologize for that.

25        Q.    Have you heard there's some talk

1    about this being a county road?

2        A.      Well, since this has happened, I've

3    heard that, yes.

4        Q.      All right.  And you remember

5    testifying to that fact at the grand jury?

6        A.      If you want -- I don't remember

7    exactly what I testified to.  If you want to,

8    you know, if you want to show me my testimony,

9    I'll explain it to you the best I can.  But all

10   I can tell you is, is from the Highway 550 to my

11   house, I have never considered it to be a county

12   road, and I would argue with anybody that said

13   it was.  Now, if they showed me something

14   otherwise, I would agree with that.

15       Q.      Well, let me just ask you.  Do you

16   remember speaking with our investigator, Mr. Rob

17   Miller?

18       A.      I do.

19       Q.      And you told Mr. Miller that up at

20   the top of the hill there's a -- what's called

21   the Forks Road or ...

22       A.      No, Road Point.  There is a -- on

23   some of the old deeds and old maps that I've

24   seen these land companies have, there is a

25   reference to that that's referred to in the

1    deeds as the Road Fork or the Road Point,

2    something like that.

3         Q.       And to get up there, you would have

4    to use this gas company road; is that right?

5         A.       I wouldn't -- no, it doesn't go that

6    far.  I wouldn't -- I don't know how you got up

7    there.  You've got to understand, you know, this

8    was many years ago.  I don't know how you got up

9    there.  Is there old roads over that hill?  Yes,

10   there are old logging roads, old mining roads,

11   and things like that.  There's even old cars on

12   top of the hill that -- for some reason.

13   I don't know how they got them there.  I don't

14   know if they got them up that way or if they got

15   them around the top of mountain.  I don't know

16   how they got them there.  All I know is since

17   I've owned the property, nobody has come up that

18   gas company road with my consent.  And this road

19   here right off Highway 550 that we're talking

20   about here, that road definitely, I built that

21   road.  Now, were there other roads on the

22   property?  I've not owned the property but for,

23   oh, gosh, time flies, 10, 15 years at most, you

24   know.

25        Q.       So you wouldn't have any knowledge

1    of what was going on in there prior to that

2    time?

3        A.    Only by looking at old deeds and

4    what people would, you know, told me.  I know

5    there was some mining back on the hill because

6    there's a permit boundary back there.

7        Q.    In fact, there's an old homestead on

8    the place there in between you and Jeremy, isn't

9    there?

10        A.    About where Jeremy lives.

11        Q.    Right down in here?

12        A.    Yeah, about right where Jeremy's

13    house is there, there was an old house when I

14    bought that property, just a rough lumber

15    house.  There was an old house there.

16        Q.    Do you remember who lived in it?

17        A.    Orlenie Begley.

18        Q.    Mr. Begley?

19        A.    Orlenie Begley.

20            MR. WILLIAMS:  Thank you, sir.

21        A.    After she got divorced from General

22    Lee, he deeded her the property.  She got it

23    from her mommy and daddy, John Begley.

24        Q.    It goes back that far?

25        A.    Yeah.  Do you want to know where

1    they got it?  I mean, I can tell you that, too.

2            MR. WILLIAMS:  No.  That's all right.

3    Probably from General Washington.

4        A.    No, they got it from Shade Combs'

5    heirs.

6            MR. WILLIAMS:  May I have just a

7    minute, Your Honor?

8            THE COURT:  You may.

9        A.    But there was a rock quarry back in

10   the holler.  There was a rock quarry back there,

11   too, at one point.

12           MR. WILLIAMS:  Your Honor, I just have

13   one other question that I wanted to ask.  May I

14   go to the podium?

15           THE COURT:  You may.

16       Q.    Mr. Morgan, you gave some testimony

17   here today on direct examination about Mike

18   Hall, Mr. Thompson's opponent?

19       A.    I didn't say Mike Hall, but yes,

20   that's who it is, Mike Hall.

21       Q.    All right.  Do you happen to know

22   Bobby Reynolds?

23       A.    I do.

24       Q.    How do you know him?

25       A.    I just know him from -- he's one of

1    -- well ...

2              MR. TAYLOR:  May we approach, Your

3    Honor.

4              THE COURT:  You may.

5              [CONFERENCE AT THE BENCH]

6              THE COURT:  Mr. Taylor.

7              MR. TAYLOR:  Based on some reverse

8    Jencks, as I call it, that I've gotten from

9    defendants, I have reason to believe he's going

10   to go into something to attempt to cast

11   dispersions on the credibility of Bobby

12   Reynolds, things he didn't ask Bobby Reynolds

13   about when he was here and could answer them,

14   such as I think he allegedly bought votes from

15   Mike Hall.  First of all, I don't think that's

16   impeachment to the extent that it could have

17   been -- it's a specific act of -- a specific

18   act, and under Rule 608, it can only be inquired

19   in to vile a witness, and he hasn't done that,

20   and when he brings in a third party to attempt

21   to establish that with extrinsic evidence, and

22   that's not right.

23             MR. WILLIAMS:  I'll withdraw the

24   question, Your Honor.

25             THE COURT:  Okay.

1            [IN OPEN COURT]

2            THE COURT:  Mr. Williams, have you

3     concluded your questions?

4            MR. WILLIAMS:  No, nothing further,

5     Your Honor.

6            THE COURT:  Okay.  Thank you.

7     Mr. Taylor on redirect.

8            MR. TAYLOR:  One minute.

9                  REDIRECT EXAMINATION

10        BY: MR. TAYLOR:

11           MR. TAYLOR:  Your Honor, I neglectfully

12    failed to have him introduce four photographs.

13    I'd like to do that, if I could, please.

14           THE COURT:  Would you like to tender

15    those to this witness or ...

16           MR. TAYLOR:  I'd just like to move them

17    into evidence.

18           MR. WESTBERRY:  These are ones we've

19    already seen?

20           MR. TAYLOR:  No, these are different

21    photographs.

22           THE COURT:  Why don't you tender those

23    to the witness and you can ask your questions

24    about that, and then we'll ...

25           MR. TAYLOR:  5E, F, G and H.

1           THE COURT:  Okay.

2           THE WITNESS:  Put my glasses on here.

3           MR. TAYLOR:  Okay.  At this time I'd

4    like to just publish -- well, I move them into

5    evidence.

6           THE COURT:  Is there objection?

7           MR. WESTBERRY:  None.

8           THE COURT:  Without objection, they'll

9    be entered as Government exhibits.  You may

10   publish them as you choose.

11          MR. TAYLOR:  Let's put the first one

12   up, if we could, please.

13          THE COURT:  Are you going to use the

14   Elmo?

15          MR. TAYLOR:  I guess we'll have to use

16   it.  We came unplugged, unglued.

17          THE COURT:  All right.  Okay.

18          MR. TAYLOR:  We'll figure it out at

19   lunch.  We'll use the Elmo.  If I may retrieve

20   those.

21       Q.     Mr. Morgan, I'm going to put on the

22   screen here Exhibit 5E --

23          MR. JACOBS:  Your Honor, we object at

24   this time and ask to approach the bench.

25          THE COURT:  You may.

1           [CONFERENCE AT THE BENCH]

2           THE COURT:  Yes, sir.

3           MR. JACOBS:  Yes, thank you, Your

4    Honor.   The basis of my objection is that

5    basically what's happened here, and I'm -- I

6    guess I'm anticipating what the evidence that's

7    being presented, which is new evidence, so

8    basically what's happening, the Government is

9    allowed to bring in new evidence on redirect and

10   we're not having the opportunity to cross.  I

11   think they should be prohibited.  We're into new

12   evidence here.

13          THE COURT:  I'd hold that objection.

14   Let's see what the evidence is.  We can decide,

15   and I'll make the determination on that later.

16          [IN OPEN COURT]

17          Q.     Do you recognize the view that's

18   portrayed here?

19          A.     Yes.

20          Q.     And is this the end of the blacktop

21   that was depicted on the diagram right here?

22          A.     Yes, that's the view you would be

23   looking from my house down the road.

24          Q.     And what is this a view of?

25          A.     Same road as it goes on down through

1    the trees and then it comes out.

2        Q.    And is 550 down here?

3        A.    Yeah, 550 is down there, yes.

4        Q.    And what is this a view of?

5        A.    That is where the road splits,

6    where our driveway splits and Jeremy's house

7    is --

8        Q.    Is that right here?

9        A.    Yes.

10       Q.    And Jeremy's over here, house?

11       A.    Yes.

12       Q.    And what's this a view of?

13       A.    That's a view of where you would

14   turn to go up to my house, and that sign is

15   something that this guy was working for me put

16   up.  He put up both those signs, the only trash

17   litters and Shades Way.

18       Q.    Now, you were asked some questions

19   about whether or not you felt there was an issue

20   about there being a county road.  I'd like to

21   read what was asked and answered and let you

22   explain that, if I could, please.

23       A.    That's fine.

24       Q.    Question -- this is at the grand

25   jury at your appearance there.  Question:  Did

1　　you create the drive, did you and your brother

2　　create the drive?  Answer:  I did.  I did before

3　　he moved there.  I -- actually, when we bought

4　　the property, there was no road on it, and I

5　　traded some trees to a couple of gentlemen to

6　　build me a road up to where I was going to

7　　eventually build a house, and that was several

8　　years before I did, you know.  We just did it as

9　　we could.  Question:  Is there any doubt in your

10　　mind that that is your property?  Answer:  Well,

11　　there wasn't until, and there's still not, but

12　　there's some talk about this being a county road

13　　or that they were trying to adopt it into the

14　　program.  And I don't mean anything, but I don't

15　　want it to be a county road, never did want it

16　　to be a county road.  As far as I know, they've

17　　not -- they've never had my permission to adopt

18　　it into the system.  Now, what did you mean

19　　there?

20　　　　A.　　I think it's pretty obvious what I

21　　mean.  I didn't want it to be a county road.  If

22　　it's adopted into the system, I didn't know it.

23　　If it's a county road, I didn't know it.

24　　　　Q.　　Prior to this blacktop being laid

25　　down there, were you aware of any controversy

about whether or not your driveway was a public
road?

    A.    The only controversy at all
regarding that road that had anything to do with
it being a county road was it seems like every
time we put new gravel down, it would come a
deluge of rain storm or a downpour and it'd wash
the gravel out into the road.  And that's the
only thing -- and they did -- you know, they
would be down there cleaning that gravel up
sometime and shoveling it back over in the ditch
line, but, I mean ...

    Q.    Who is they?

    A.    I don't know who it was.  I don't
know if it was the state, county or -- I don't
know who it was.

        MR. TAYLOR:  That's all the questions I
have.

        THE COURT:  Thank you.  All right,
sir.  You can be excused from testifying.  May
this witness be finally excused?

        MR. TAYLOR:  Yes, Your Honor.

        MR. WESTBERRY:  Sure.

        THE COURT:  All right, sir.  Thank
you.  You may be finally excused from further

```
 1    testimony at this trial.  All right.  I think
 2    we're going to go ahead and break for our lunch
 3    hour at this time.
 4            And, ladies and gentlemen, I'd remind
 5    you of those admonitions I've given to you, and
 6    they're particularly important over the lunch
 7    hour when you're going to be out and about, and
 8    just remind you of those.  I won't repeat them
 9    at this time.  We're going to break until 1:45,
10    and I'd ask you to be ready to be back to try to
11    be prompt to begin at 1:45 and be back in the
12    witness box, and the Government will be
13    recognized to continue to present their evidence
14    at the time.  And the jury would be excused from
15    the courtroom.
16            [JURY EXITS COURTROOM]
17            THE COURT:  Okay.  You can be seated.
18    And the record will reflect that the jury has
19    exited the courtroom.  Let me see if there are
20    any matters we ought to take up outside of the
21    presence of the jury before we recess.  Let me
22    indicate to you, Mr. Taylor, this would be a
23    good time to notify the Court or the other
24    parties if there's any change in terms of your
25    expectation of how the case is going, whether
```

1    you feel like you're in essence on track.

2           MR. TAYLOR:  Yeah, I think so.  I think

3    my witnesses coming up soon will be pretty much

4    more of a quick hit type of witness than we've

5    had.  We won't have as much explanation about

6    setting and all that to do, so I think it will

7    move a lot quicker hopefully.

8           THE COURT:  Okay.  All right.  If there

9    are no other matters we need to take up, we'll

10   stand in recess until 1:45.

11          [RECESS – 12:24 p.m. – 1:50 p.m.]

12          THE COURT:  The jury is back in the box

13   after having returned from lunch.  The United

14   States is recognized to call its next witness.

15          MR. TAYLOR:  We call Jerry Robinson.

16          THE COURT:  Mr. Jerry Robinson.

17       [WITNESS SWORN]

18                  DIRECT EXAMINATION

19     BY:  MR. TAYLOR:

20     Q.     Sir, would you state your name,

21   please.

22     A.     Jerry Robinson.

23     Q.     Mr. Robinson, where do you live?

24     A.     903 Steer Fork Road, Mallie,

25   Kentucky.

1    Q.    Is that in Knott County?

2    A.    Yes, sir.

3    Q.    And how long have you lived there?

4    A.    I think about three year now.

5    Q.    Okay.  Were you living at that same

6    place in 2006?

7    A.    Yes.

8    Q.    Are you a -- were you a registered

9    voter in 2006 in Knott County?

10   A.    Yes, I was.

11   Q.    And did you -- are you employed now?

12         THE WITNESS:  Am I what?

13   Q.    Employed?  Do you work?

14   A.    Oh.  No, no, I'm disabled.

15   Q.    Disabled.  In 2006, did you -- were

16   you aware of the election for county judge in

17   Knott County?

18   A.    Yes.

19   Q.    Was it a hotly contested election?

20   A.    Oh, I know now it was hotly

21   contested.

22   Q.    Did you receive some blacktop at

23   your house?

24   A.    Yes, I did.

25   Q.    Tell us -- the jury how that came

1    about.

2        A.    Well, my wife and I, she'd taken me

3    to the doctor, and we came home --

4        Q.    Before you go any further, could

5    I ask you to give us an approximate date that

6    you're referring to?

7        A.    I couldn't tell you.

8        Q.    Was it during the election campaign?

9        A.    Yes, it was before the election.

10       Q.    Okay.  Tell us what happened.

11       A.    Well, when I got home, there was --

12   when you turn up my driveway, you go by my house

13   and you keep going up the same driveway to the

14   top of the hill, and my father-in-law has a

15   place up there.

16            MR. TAYLOR:  Okay.

17       A.    And so --

18       Q.    What I want to do -- I want to hand

19   you a couple of photographs and see if you can

20   identify these properties on here.

21       A.    Okay.

22            MR. TAYLOR:  I show you Exhibit 6A and

23   B.

24       A.    That's my house and that's my

25   father-in-law's trailer up on above it there.

1          MR. TAYLOR:  I move the introduction of
2     those exhibits.
3          THE COURT:  Is there objection?
4          MR. WESTBERRY:  No, no.
5          THE COURT:  Without objection, they
6     will be entered as Government's exhibits.  You
7     may publish them as you choose.
8          MR. TAYLOR:  We'll put them up on the
9     screen here.  The jury's got it now.
10     Q.     The house that we see on the screen,
11     do you see that screen there in front of you,
12     Mr. Robinson, over here to your left?
13     A.     Oh.  Yes, yeah, I see it, uh-huh
14     (affirmatively).
15     Q.     That house there, is that your
16     house?
17     A.     Yes, sir.
18     Q.     I think we see a trailer in the
19     background.  Is that your --
20     A.     That's the one I'm referring to,
21     belongs to my father-in-law now.
22     Q.     Who is your father-in-law?
23     A.     Orville Pratt.
24     Q.     Orville Pratt.  Now, in the fall
25     election, 2006, was Orville Pratt campaigning

for someone?

    A.    Now, I don't know if he was
campaigning.  He wasn't campaigning to me, but
he was there when I came home when they was
laying that blacktop.

    Q.    And who was laying the blacktop?

    A.    I don't know none of them people.  I
know some names now, but -- I know one of them,
the guy that owned it was -- I'd been introduced
to him, but I don't know him, and I'm pretty --
he lives in Perry County and Orville lives in
Perry County.  He put that trailer there and he
said for him and his wife and the grand kids was
going to come over sometime and use it, and so
they come occasionally, but they live in Perry
County.  Now, that fence right there, I can see
better on this one, but -- or this 6B, but my
property line --

        MR. TAYLOR:  Okay.  Hold on just a
second now.  Let me ask you some questions.

        THE WITNESS:  Okay.

        MR. TAYLOR:  Let's go to 6B.

        THE WITNESS:  Yes.

    Q.    You see 6B on the screen now?

    A.    Yes.

1   Q.  Is that a continuation of the same

2 road on back to the trailer?

3   A.  Yes.

4   Q.  All right.  Now, the blacktop that

5 we see, is that the blacktop you were talking

6 about that was being put down?

7   A.  Yeah -- well, that was already

8 blacktopped by the time I got back.  They

9 started at the top, and when I got there, they

10 were back over here on -- well, on 6B.  Let's

11 see.

12   Q.  Now, is that trailer there the last

13 house on that road?

14   A.  Yes, that ends right -- right there.

15   Q.  And is that road leading up to that

16 trailer private property?

17   A.  Yeah, yeah.

18   Q.  Is that a driveway?

19   A.  It's a driveway.  Now, that trailer

20 wasn't there when I moved there.

21   Q.  Who put that road in?

22   A.  I wasn't there when the road was put

23 in, but I'd say it was Orville.  You know, the

24 whole property belonged to him at that time.

25 Now, what I bought --

1     Q.    Mr. Robinson, let me ask the

2    question and you give me an answer, okay?

3     A.    All right.

4     Q.    All right.  Let me ask you this.

5    What was your understanding as to why you were

6    getting this blacktop?

7     A.    I didn't have an understanding of

8    it.

9     Q.    Did you pay for it?

10     A.    No, I never ordered it.

11     Q.    Well, do you recall testifying at

12    the grand jury in this case?

13     A.    I remember being in London, yes,

14    sir.

15     Q.    Thursday, November 29th of 2007

16    sound about right?

17     A.    Now, if you say.  I don't remember

18    dates.

19     Q.    Let me see if this refreshes your

20    recollection, if you were asked this question

21    and gave this answer.

22         MR. WESTBERRY:  Can you give page and

23    line, please, counsel?

24         MR. TAYLOR:  Page 5, starting at line

25    3.

1     Q.    Okay.  The question is, Why do you

2  think they were blacktopping peoples' driveways?

3  Answer:  I thought it was politics, political,

4  which I don't know anything about politics, but

5  it was election time, or close to it, so I

6  thought that's what it was.

7     A.    Yeah.  I still think that's what it

8  was.

9     Q.    All right.  Do you know -- well, let

10  me ask you, and were you asked, Is this

11  something that's happened before?  Have you seen

12  it?  And you answered, Since I was a boy, I've

13  seen, you know, some people will vote for a

14  half-pint of liquor and some people it takes

15  $50.

16         MR. WILLIAMS:  Can we approach, Your

17  Honor.

18         MR. WESTBERRY:  Objection.

19         THE COURT:  Yeah.  I'll sustain the

20  objection.

21     A.    I did say that.

22     Q.    To this day, do you believe that was

23  the purpose of the blacktop?

24     A.    I didn't say that was the purpose of

25  the blacktop.

1      Q.      Is that -- was that your perception

2   of it?

3              THE WITNESS:  Huh?

4      Q.      Was that your perception of it?

5      A.      I thought it was because of politics

6   and ...

7      Q.      Did you order that blacktop?

8      A.      No, I did not.

9      Q.      And did you pay for it?

10     A.      No.

11     Q.      To this day, has it -- do you know

12  who paid for it?

13     A.      No, I don't know.

14     Q.      Did you tell the grand jury you

15  thought the county paid for it?

16     A.      I may have.

17     Q.      Was that true?

18     A.      I'm not sure.  I didn't see where

19  nobody paid for it.

20     Q.      Are you aware of anyone else in

21  Knott County who got free blacktop?

22     A.      Yes.

23     Q.      Who else got free blacktop?

24     A.      John Taylor, lives beside of him.

25     Q.      Who else?

```
 1        A.     I don't know anybody by name, but if
 2   you drive up Steer Fork, there's some more
 3   blacktop up there.  I don't know.  I know one
 4   guy pretty good works on my car, but I don't --
 5        MR. JENSEN:  Judge, I'm going to
 6   object.
 7        A.     -- I don't know those people that
 8   good.
 9        THE COURT:  Well, why don't you
10   approach and state the basis of the objection.
11             [CONFERENCE AT THE BENCH]
12        MR. JENSEN:  Your Honor, just so this
13   doesn't continue and Mr. Taylor asked do you
14   know of anybody else that got free blacktop.
15   The only way anyone would know is if someone
16   told him that, which is strictly hearsay.  He
17   can ask if anyone got blacktop and -- but I
18   don't think he can characterize it as free.
19   That's the way he characterized it.
20        THE COURT:  Mr. Taylor.
21        MR. TAYLOR:  Some things are kind of in
22   the public domain after a certain point, you
23   know.  There's an effort to get the blacktop
24   out, it becomes part of the conventional
25   knowledge of -- in the community.
```

1          THE COURT:  There's actually two ways I

2    guess he could know about this.  He could

3    actually know on his personal knowledge, he

4    could have neighbors, and he could see it, and,

5    you know, have kind of have some personal

6    knowledge of it.  There is -- I suppose he could

7    be told by people, and that would be a hearsay

8    issue.

9          MR. JENSEN:  Judge, I don't have any

10   problem him saying he observed people getting

11   blacktop put down, but I think to characterize

12   it as free blacktop, the only way he can know

13   that is if the owner himself said I didn't pay

14   for this because there is going to be --

15         MR. TAYLOR:  I can ask him.

16         THE COURT:  I think it's a form of the

17   question kind of issue and there are ways you

18   can address that concern.

19         [IN OPEN COURT]

20   Q.    Now, on that first picture that we

21   saw, 6A, will you put it back up.  Where does

22   the private road begin?  Can you see that in the

23   picture?

24         THE WITNESS:  Where does the private

25   road end?

1     Q.     Where does it begin?  Is it in the

2  picture or is it beyond the picture?

3     A.     It's -- that -- that vehicle might

4  be off the end of it.  That's real close.  That

5  mud there goes to another house, and that's the

6  main road.  That's right at the edge of it there

7  right at the bottom of the picture.

8     Q.     Did some people get blacktop and

9  some people didn't get blacktop?

10     A.     Well, yeah, there's some that's not

11  blacktop.  There's some that was already

12  blacktop.

13     Q.     Do you have any idea how it was

14  determined who got blacktop and who didn't?

15     A.     I don't know.

16     MR. TAYLOR:  That's all the questions I

17  have.

18     THE COURT:  Thank you, Mr. Taylor.

19  Mr. Westberry.

20     MR. WESTBERRY:  Thank you, Judge.

21          CROSS-EXAMINATION

22  BY:  MR. WESTBERRY:

23     Q.     Good afternoon, Mr. Robinson.

24     A.     Hi.

25     Q.     Appreciate you being here.  I've got

1    just a couple of questions for you.  We can move

2    that, if the Court -- if you'd like.  Thank

3    you.

4         Mr. Robinson, did anybody ever ask you

5    to vote for them in exchange for putting down

6    blacktop or anything like that?

7         A.    No.  There's people asked me, you

8    know, that, campaigning, they came by and had

9    cards.  I don't even know who they were, but

10   somebody was running for magistrate gave me a

11   card.  But no, nobody came by and offered to

12   give me something to vote for them, no.

13        Q.    Do you even know Randy Johnson?

14        A.    No.

15        Q.    Do you know who I'm talking about

16   when I mention the name Randy Johnson?

17        A.    Oh, I do now; he's the judge, but I

18   didn't before, no.

19        Q.    But you had never met him before,

20   have you?

21        A.    No, still haven't.

22        MR. WESTBERRY:  Okay.  Thank you, sir.

23   Appreciate your courtesy.

24        THE COURT:  Mr. Webster.

25                CROSS-EXAMINATION

```
 1        BY:  MR. WEBSTER:

 2        Q.      You are Orville Pratt's son-in-law?

 3        A.      Yes, sir.

 4        Q.      About how old of a fellow is

 5   Orville?

 6             THE WITNESS:  How old?

 7        Q.      Yeah, about how old.

 8        A.      Sixty-seven (67), 68.

 9        Q.      Does he still work in the

10   blacktopping business?

11        A.      No.

12        Q.      He did own East Kentucky Paving,

13   didn't he?

14        A.      Well, now, I don't know.  That was

15   before my time.  I knowed that his son owned it.

16        Q.      That would be Chris?

17        A.      Yes.

18        Q.      Up until when?

19        A.      I don't know.

20        Q.      Does Chris still work in that

21   company?

22        A.      No.

23        Q.      Does Orville?

24        A.      No.

25        Q.      Do any of the Pratts work for the
```

1  blacktopping company?

2      A.      Now, I sure don't know all the

3  Pratts, but I don't know of any.

4      Q.      Okay.  Did Orville -- you don't know

5  how come the blacktopping company to be out

6  there, who got them out there?

7          THE WITNESS:  Who got -- I didn't

8  understand you.

9      Q.      You come home and there was paving

10 going on?

11     A.      Yes.

12     Q.      You don't know how come they to be

13 there?

14     A.      No.

15     Q.      You don't know who sent them or

16 nothing like that?

17     A.      No, no, no, I don't, I don't.

18     Q.      Do you know James Randy Campbell,

19 the owner of East Kentucky Paving?

20     A.      I've been introduced to him.  I

21 don't know him.

22     Q.      What was the occasion?

23     A.      That I was introduced to him?  He

24 was sitting with Orville on that bench there on

25 picture 6A when I got home, and I went over

1    there and sat down with him.

2          MR. WEBSTER:  Okay.

3          A.     And I may have been introduced to

4    him before because he lives in Perry County, up

5    there close to Orville somewhere, but I'm not

6    positive of that.  I don't -- like I say, I

7    don't know him.  I wouldn't recognize him if I

8    saw him, but I have been introduced to him.

9          Q.     Now, is that holler you live on

10   called Steer Fork or is that a holler that's off

11   of Steer Fork?

12         A.     It's Steer Fork is a holler.

13         Q.     That's main Steer Folk there that

14   goes by you?

15         A.     Yeah.

16         Q.     So as you're facing your house, it's

17   on the right in that picture?

18         A.     No.  You're facing my house, that's

19   the driveway.  Steer Fork is right -- where my

20   front porch is right straight down in front of

21   me.

22         Q.     But that looks like a holler going

23   up through there toward --

24         A.     Well, that's just the driveway.  It

25   goes all the way up past my house and it goes on

1  up to Orville's there.

2      Q.      How long has Orville had a place up

3  there?

4      A.      He's owned a lot of property up

5  there before I knowed him.  He's sold a whole

6  bunch of that property.

7      Q.      How many different people owns up in

8  there?

9      A.      Oh, I wouldn't have an idea.  I

10  wouldn't even know how to guess how many people

11  owns it.

12      Q.      Are there others that live up

13  through there?

14      A.      Oh, yeah.

15      Q.      How many lives up in there?

16      A.      Don't know.

17      Q.      Past Orville?

18          THE WITNESS:  Oh, up this road here?

19          MR. WEBSTER:  Yeah.

20      A.      No, that's the last -- just me and

21  Orville live on that road.  Now, on Steer Fork,

22  other people live there.

23      Q.      I was trying not to talk about Steer

24  Fork.  I was trying to talk about that --

25      A.      All right.  That's it.  My house and

1   that trailer.  That's all.

2       Q.      All right.  Now, when was there a

3   road put up through there for the first time?

4       A.      I don't know.

5       Q.      Before you come?

6       A.      Yes.

7       Q.      How long have you owned the place?

8       A.      About three years, maybe four.

9       Q.      Okay.  What kind of road was there

10  before they owned it?

11      A.      A gravel road without a whole lot of

12  gravel on it, holes and it -- it was just a dirt

13  road, but it had some gravels on it.

14      Q.      Where that mud was, there's a -- who

15  lives there on that?

16      A.      His first name is George.  I don't

17  know his last name.

18      Q.      Is any houses below there before you

19  get out to Steer Fork?

20          THE WITNESS:  Below George's?

21          MR. WEBSTER:  Yeah.

22      A.      Yeah, I'm below him and -- I live

23  one mile up Steer Fork and there's houses all

24  the way up through there.

25      Q.      So you're saying you're on the main

```
 1    creek?

 2         A.      Yeah.

 3         Q.      The main road don't go by your

 4    holler; it stops right there?

 5         A.      The main road goes on by my house,

 6    Steer Fork.  It keeps on going.  That driveway

 7    don't have a name that I know of.

 8         Q.      But there's three people lives up

 9    that driveway --

10         A.      No --

11         Q.      -- or that --

12         A.      -- just two.

13         Q.      Well, you said that mud went to one?

14         A.      Well, yeah, it crosses across the

15    bottom of it to get to his house, yeah.

16         Q.      That's one, and then you and

17    Orville?

18         A.      Well, yeah.

19         Q.      Where does that road go to when you

20    go over the end of that holler?

21         A.      Well, just the other side of his

22    trailer is the mountain.

23         Q.      Is that road over the mountain?

24         A.      No.

25         Q.      You know of no road?
```

1        A.      I know there's not a road up there.

2    I mean, you know, you could climb a mountain,

3    but there ain't no road.

4        Q.      Had the county ever worked that road

5    by your house during the time you've been there,

6    before this hearing?

7        A.      I never seen them.

8        Q.      You don't know who put that gravel

9    down?

10       A.      No, no, I don't.

11           MR. WEBSTER:  That's all.

12           THE COURT:  Thank you, Mr. Webster.

13    Mr. Jensen.

14           MR. JENSEN:  Yes, I'll have just a

15    couple of questions, Judge.

16           THE COURT:  Yes.

17                    CROSS-EXAMINATION

18    BY:  MR. JENSEN:

19       Q.      Good afternoon, Mr. Robinson.

20       A.      Hi.

21       Q.      The road you live on, do you know

22    who paved that road or drive, whichever one you

23    want to call it?

24       A.      Not for sure, no, I don't.

25       Q.      Okay.  Did your father-in-law own

1    that property before you moved out there?

2        A.      Did he own it?  Yes.

3        Q.      Okay.  This is Orville Pratt we're

4    talking about?

5        A.      Yes.

6        Q.      So he owned even where your house

7    is?

8        A.      He, at one time, yes.

9        Q.      Okay.  And he owned -- he also owned

10   at one time East Kentucky Paving?

11       A.      I don't know.

12       Q.      You don't know that he owned the

13   same company that ...

14       A.      No.  I know for sure that his son

15   did.  Now, I don't know that -- I don't know

16   that he didn't.  I don't know that he did.

17       Q.      Okay.  Who was out, when you saw

18   them paving your drive to Orville's place, what

19   company was doing that?  Was that East Kentucky

20   Paving?

21       A.      I think that's what they called

22   theirselves.

23       Q.      Do you know whether your

24   brother-in-law or your father-in-law, or, I

25   mean, I'm sorry, your father, or you said his

1  son --

2      A.      Yes.

3      Q.      -- Orville Pratt's son, they owned

4  the company?  Do you know whether or not --

5      A.      They didn't own it then, no.

6      Q.      Okay.  Do you know whether they've

7  still got a special relationship with that

8  company?

9          THE WITNESS:  Like, do they get any

10  money from that company or they still involved

11  with the company, is that what you ...

12     Q.      Do you know if they are?

13     A.      I don't think they are.  I couldn't

14  say I know, but I don't think they have anything

15  to do with it.

16     Q.      Did Orville -- is he the one that

17  requested the blacktop there?

18     A.      I don't know that.  I just know I

19  didn't.  He asked me how I liked it, but he

20  didn't ask me if I wanted it.

21     Q.      Do you know whether or not the

22  relationship the Pratts have with East Kentucky

23  Paving, they can get a discount on work they've

24  done there?

25     A.      I don't know.  I don't know.

1    MR. JENSEN:  Okay.  That's all I have.

2    THE COURT:  Thank you, Mr. Jensen.

3 Mr. Williams.

4    MR. WILLIAMS:  Thank you, Your Honor.

5    THE COURT:  Yes, sir.

6              CROSS-EXAMINATION

7 BY:  MR. WILLIAMS:

8    Q.    Good afternoon, Mr. Robinson.  Can

9 you hear me okay?

10    A.    Yeah.

11    Q.    Sir, when this blacktop was being

12 laid, I think you said you came in while they

13 were doing it; is that right?

14    A.    Uh-huh (affirmatively).

15    Q.    There hadn't been a grader in there

16 to your knowledge, had there?

17    A.    No, I never saw a grader.

18    Q.    All right.  And do you know when

19 Orville sold his house to his son-in-law?

20    THE WITNESS:  You talking about me?

21    Q.    You're his son-in-law, right?

22    A.    I'm his son-in-law.

23    Q.    Do you know when he sold it to you?

24    A.    He told that to some government

25 outfit and my wife bought the property from

1  them, and then she had the house built about a

2  year before I came there.  I was in Florida for

3  about 17, 18 years, and that's where I met my

4  wife, but she -- she already had that house for

5  about a year, I guess, when I came back.

6      Q.      So did he sell it to her or ...

7      A.      No, he sold it to -- I don't know

8  who they are.  They had something to do with the

9  government.

10      Q.      Has it ever been transferred to you?

11  Do you have a deed to it?

12      A.      Well, I don't know if it's just in

13  my wife's name or my wife and me.  I don't know

14  if she changed that or -- she was supposed to

15  change it, but I don't know if she ever got

16  around to it or not.

17      Q.      You haven't seen the deed one way or

18  the other?

19      A.      Yeah, I've seen the deed.

20      Q.      Did Mr. Pratt keep you on the

21  right-of-way in that deed?

22      A.      Yeah, they have to -- well, all I

23  know is what my wife told me, that --

24          MR. TAYLOR:  Objection, hearsay.

25          THE COURT:  I would sustain that.

1     A.      -- he owned this property above me.

2          THE COURT:  Sir, sir, let me just have

3     you respond directly to Mr. Williams'

4     questions.  He's going to ask you a different

5     question than the one he just asked you.  I

6     apologize for interrupting you.

7          A.      I didn't -- okay.

8          Q.      Mr. Robinson, I don't want you to

9     tell me what someone else told you.  I'm asking

10    you, do you have any personal knowledge about

11    whether a right-of-way was kept out?

12         A.      I don't exactly know how to answer

13    that question the way you want me to.  I guess

14    I'll say no.

15         MR. WILLIAMS:  Thank you, sir.

16         THE WITNESS:  Okay.

17         THE COURT:  All right.  Mr. Taylor, on

18    redirect.

19                REDIRECT EXAMINATION

20    BY:  MR. TAYLOR:

21         Q.      I want to draw a little picture over

22    here, if I could.  Mr. Robinson, I want you to

23    look at that screen.  I'm going to draw a

24    picture on it, okay, and you tell me if I'm

25    doing it right.  First of all, I want to draw

1    what I'm going to call Steer Fork Road going

2    across here, okay?

3         A.    Suits me.

4         Q.    All right.  We'll call it Steer

5    Fork.  And I'm going to draw the road that goes

6    up by your house and up to the trailer.  And

7    tell me if this is about right, okay?  Would

8    your house be about right here; is that about

9    right?

10        A.    I'd be up a little further than

11   that.

12        Q.    Up a little further?

13        A.    Yeah, about up right over the other

14   side of that hump there, yeah, right there.

15        Q.    Right here?

16        A.    Yeah.

17        Q.    And up here, which side of the road

18   is the trailer on?

19        A.    It's on the same side my house is.

20        Q.    Okay.  So is the trailer up here?

21        A.    Yeah.

22        Q.    All right.  Now, this -- we'll say

23   this is Jerry's house and this is Orville's

24   trailer?

25        A.    Yeah.  It's actually down too far

1   now.  That driveway stops before it gets to his

2   trailer.  It stops right at the top of the hill

3   there, right where that --

4        Q.      Down here somewhere?

5        A.      Well, on up there -- like, where the

6   corner of the trailer is, the back corner is --

7             MR. TAYLOR:  Yeah.

8        A.      -- right along there, yeah.

9        Q.      It goes further or not as far?

10       A.      Not as far.  About right along there

11  where your pen's at.

12       Q.      Right here?

13       A.      Yeah, and it's gravel on up in

14  there.

15       Q.      Gravel the rest of the way?

16       A.      Yeah.

17       Q.      So this is what got blacktop, right

18  what I'm tracing now?

19       A.      Yes, yes.

20       Q.      Now, a moment ago when Mr. Webster

21  was asking you some questions and you said

22  there's some other people that lives on up in

23  there, were you talking about Steer Fork?

24       A.      You misunderstood me because --

25  yeah, I was talking about on up Steer Fork, yes,

1    sir.

2         Q.      Up this way?

3         A.      Yes.

4         Q.      So the others are up here, they're

5    not up here?

6         A.      Not up there, no, that's just a

7    hill.

8         Q.      Is this where you said the mountain

9    was up here?

10        A.      Yes, sir.

11        Q.      All right.  And if I understood

12   correctly, the first part of the road was built

13   before the second part of the road?

14        A.      The road -- I think the road's been

15   there since I've been there, but in blacktop.

16   They started blacktopping at the top and come

17   down.  The original old road, I don't know.

18             MR. TAYLOR:  That's all I have.

19             THE COURT:  Thank you.  Mr. Robinson,

20   you can be excused from testifying.

21             MR. WEBSTER:  Your Honor, may I ask him

22   one question?

23             THE COURT:  You can approach and we'll

24   see.

25             [CONFERENCE AT THE BENCH]

1          THE COURT:  Mr. Webster.

2          MR. WEBSTER:  I wanted to get that

3     sketch complete.  He doesn't have that third

4     driveway on there where the mud was.  That's all

5     I was trying to do.  That's demonstrative

6     evidence that's remarkably 66 percent of houses.

7          THE COURT:  I'll allow you to ask

8     that.  I think that's clear from the

9     photographs, but if you want to complete that,

10    it's not been moved into evidence.  It's just a

11    demonstrative.

12         MR. JENSEN:  We have a diagram that

13    hasn't been introduced, as I recall, and then

14    rather than jurors, let them take peaks at those

15    things, I think it should be covered up.

16         THE COURT:  That's fine.  I'm going to

17    have Brian remove that and hand it back to the

18    Government.

19         MR. WEBSTER:  We move that it be burned

20    in the presence of the jury.

21         [IN OPEN COURT]

22                   RECROSS-EXAMINATION

23    BY:  MR. WEBSTER:

24    Q.     Now, let's see, tell me where to put

25    that driveway that had the mud coming out the

1    road. About right there?

2      A.    No, on down towards Steer Fork

3    there. On down. Right there, at the very most.

4      Q.    And it crosses and goes out some

5    way?

6      A.    Well, that's not even that high.

7    Yeah, right there, and his house would be --

8    yeah, right -- yeah.

9      Q.    And that where that mud come from

10   this, is there a ditch or a drain there?

11      A.    Yeah, there's a ditch line down

12   there and a drain.

13      Q.    What's that guy's name?

14      A.    George.

15      Q.    So George is up, number 1 up that

16   holler, and Jerry would be 2, and Orville would

17   be number 3; is that right?

18      A.    Yeah. I never counted as George

19   being up there, but it sure looks that way.

20      Q.    The mud told it, didn't it?

21      A.    Yeah.

22      Q.    It's hard to deny that mud?

23      A.    Yeah. He does go across the bottom

24   of the driveway there to get into his place,

25   yes, sir.

```
 1              MR. WEBSTER:  That's all.

 2              THE WITNESS:  Okay.

 3              THE COURT:  Thank you.

 4              MR. TAYLOR:  I have a follow-up on

 5     that.

 6              THE COURT:  Mr. Taylor can have the

 7     last word.

 8              MR. WEBSTER:  And his pen.

 9                  REDIRECT EXAMINATION

10        BY:  MR. TAYLOR:

11        Q.      Mr. Robinson, I believe you just

12     indicated that you never considered George to be

13     on this -- on your right right here, didn't you?

14        A.      Yeah.

15        Q.      Isn't it true that you consider him

16     to have his entrance off Steer Fork like this?

17        A.      Yeah, yes, sir.

18        Q.      And when he pulls out of his

19     driveway, he just barely crosses your driveway?

20        A.      He does hit my driveway right on the

21     bottom of it.

22        Q.      But you don't consider him dumping

23     out on your driveway?

24        A.      No, unless he shoots firecrackers

25     and leaves a mess there I got to clean up.
```

```
1            MR. TAYLOR:  All right.  That's all.

2            THE COURT:  All right.  Mr. Robinson,

3    thank you, sir, for appearing today.  You can be

4    excused.  May this witness be finally excused

5    from any further testimony?

6            MR. TAYLOR:  Yes.

7            MR. WESTBERRY:  Yes.

8            THE COURT:  You can be finally excused

9    from further testimony.

10           THE WITNESS:  I'm done?  Thank you very

11   much.

12           THE COURT:  Take some time and care

13   there moving off the stairs.  Okay.  The United

14   States can call their next witness.

15           MR. TAYLOR:  Stanley Stumbo.

16           THE COURT:  Mr. Stanley Stumbo is the

17   next witness for the Government.

18           [WITNESS SWORN]

19           THE COURT:  Mr. Taylor.

20                  DIRECT EXAMINATION

21   BY:  MR. TAYLOR:

22   Q.      Sir, would you state your name,

23   please.

24   A.      Stanley Stumbo.

25   Q.      Spell your last name.
```

```
1        A.      S-T-U-M-B-O.

2        Q.      Mr. Stumbo, where do you live?

3        A.      Hindman, Kentucky.

4        Q.      And how long have you lived there?

5        A.      Eight years.

6        Q.      And are you employed?

7        A.      Yes.

8        Q.      And where do you work?

9        A.      Hindman Pro Mart.

10       Q.      Is that a private firm?

11       A.      Yes.

12       Q.      And what do you do?

13       A.      I'm the manager.

14       Q.      And what does Proform do?

15            THE WITNESS:  Do what?

16       Q.      What does your company do?

17       A.      We sell home building materials.

18       Q.      Okay.  Now, are you a registered

19   voter in Knott County?

20       A.      Yes, I am.

21       Q.      And have you been for some time?

22       A.      Yes.

23       Q.      I want to direct your attention to

24   the Summer and Fall of 2006, and ask you if you

25   recall the county judge race during that period
```

1   of time?

2      A.     Yes.

3      Q.     Okay. Sir, did you receive, on some

4   private property of yours, some blacktop during

5   that campaign?

6      A.     I received some, but I don't know

7   exactly. It was before the campaign.

8      Q.     Well, can you give us an approximate

9   date when you received it?

10      A.     I can't remember exactly when it

11   was.

12      Q.     Who paved it?

13      A.     I don't know who. The county's the

14   one that had it done, but I don't know who the

15   contractor was.

16      Q.     The county had it done?

17      A.     Uh-huh (affirmatively).

18      Q.     Did you pay for it?

19      A.     No.

20      Q.     How much blacktop did you receive?

21      A.     Approximately 5, 600 feet, something

22   like that.

23      Q.     Five hundred (500) feet?

24      A.     Uh-huh (affirmatively).

25      Q.     All right. I want to show you this

1    photograph, show you Government's Exhibits A, B

2    and C, and ask you if this is -- if these

3    photographs together depict the blacktop that

4    we're talking about.

5            THE COURT:  Just for identification

6    purposes, is there a number in front of those A,

7    B and C?  5A or ...

8            MR. TAYLOR:  Oh, did I not give a --

9    yeah, there is, 7A, B and C.

10            THE COURT:  7A, B and C?

11       A.      Yeah, that's it.

12       Q.      Do you recognize those photographs?

13       A.      Uh-huh (affirmatively).

14            MR. TAYLOR:  I move for introduction at

15    this time.

16            THE COURT:  Is there objection?  And

17    without objection, they will be entered as

18    Government's exhibits.  You can publish them as

19    you choose.

20       Q.      Put 7A on.  Now, do you see those,

21    looks like two different roads there; do you see

22    those?

23       A.      Yes, sir.

24       Q.      Do you see the divided highway down

25    at the -- or at the top of the photograph?

```
1         A.      Yes.

2         Q.      What highway is that?

3         A.      Kentucky 7.

4         Q.      Kentucky 7?

5         A.      Uh-huh (affirmatively).

6         Q.      Is that a state road?

7         A.      State road, uh-huh (affirmatively).

8         Q.      All right.  And the other

9   blacktopped area, can you tell us what property

10  that is?

11        A.      That belongs to my wife and my

12  children.  It's in my name.

13        Q.      And your what?

14        A.      It's in my name.  They inherited it.

15        Q.      Okay.  And is that what you just

16  told us was blacktopped?

17        A.      Yes.

18        Q.      And does that go down and intersect

19  that state highway?

20        A.      Yes.

21        Q.      And let's go to Exhibit 7B.  And

22  what does that show?

23        A.      That's where it ended at, at the top

24  of the hill.

25        Q.      And what's the structure on the left
```

1    there?

2        A.      That's an apartment building that my

3    children lives in.

4        Q.      Okay.  And let's go to 7C, and what

5    is that?

6        A.      That's the same road.

7        Q.      Is that sort of between the first

8    picture and the second one?

9        A.      Yes, that's about 20 feet from the

10   end of the blacktop down to the Kentucky 7.

11       Q.      So if you put the three pictures

12   together, you're seeing almost all of the

13   blacktop?

14       A.      Yeah, yeah.

15       Q.      Except for the part that joins the

16   road?

17       A.      Yes.

18       Q.      Now, is this a private driveway to

19   those, that structure?

20       A.      Yes.  Although, I will say that the

21   county's took care of it for the last three

22   administrations.  They graded it and graveled

23   it.

24       Q.      When you say took care of it, they

25   put gravel on it?

1      A.      Yeah, and graded it.

2      Q.      All right.  Did you intend to

3   donate that driveway to the county?

4      A.      I'd mentioned it to them before.

5      Q.      Oh, you have?

6      A.      Not the present judge, but the

7   others, I had told them that since they was

8   taking care of it, they could, you know, put it

9   in the road system because there's three

10   families lives up there.

11      Q.      In the election of 2006, was that in

12   the county road system?

13      A.      No.

14         MR. TAYLOR:  One moment.

15      Q.      Was that road there when you

16   purchased the property?

17      A.      Yes.

18      Q.      It was?

19      A.      Uh-huh (affirmatively).

20      Q.      But it was a gravel road?

21      A.      Yes.

22         MR. TAYLOR:  Okay.  That's all the

23   questions I have.

24         THE COURT:  Thank you, Mr. Taylor.

25   Mr. Westberry.

1          MR. WESTBERRY:  Thank you, Judge.

2                    CROSS-EXAMINATION

3     BY:  MR. WESTBERRY:

4     Q.        Good afternoon, Mr. Stumbo.

5     A.        Good afternoon.

6     Q.        I represent Randy Thompson, and I've

7     got just a few questions.  I'll start out by

8     asking just a couple of questions.  You said the

9     past three administrations had regularly put

10    gravel on that road; is that correct?

11    A.        Yes, yes.

12    Q.        Matter of fact, you had asked them

13    in the past if they would blacktop it; is that

14    correct?

15    A.        I'd mentioned it before.

16    Q.        And nobody had ever done it before;

17    is that correct?

18    A.        No.

19    Q.        Now, the new judge, Mr. Thompson,

20    wanted to -- wanted to put blacktop so it

21    wouldn't be used for political purposes every

22    time -- each election year; is that your

23    recollection?

24          MR. TAYLOR:  Objection to knowledge.

25    A.        That's --

1          THE COURT:  I'll sustain the objection

2     to the form of the question.  Rephrase the

3     question, counselor.

4          Q.    Okay.  What was your understanding

5     as to why the new judge wanted to put blacktop

6     down?

7               MR. TAYLOR:  Can we approach?

8               THE COURT:  You may

9               [CONFERENCE AT THE BENCH]

10               MR. TAYLOR:  It calls for a hearsay

11     response to what the judge has said.  I think

12     what he's going to refer to is something, Judge,

13     he thinks he read a newspaper article in which

14     the judge said, and I just don't think that's

15     the substitute for the judge testifying in this

16     case.

17               MR. WESTBERRY:  We have -- here's the

18     questioning from the grand jury as we got in

19     Jencks questioning.  Why do you think it was

20     paved?  Well, the past three administrations had

21     been graveling it and grading it, and I've read

22     about it in the paper, and he said that was

23     going to start -- the new judge said he was

24     going to start blacktopping them so they

25     wouldn't be using it for political, you know,

1   the gravel thing every year, every time they

2   have an election.  Not offered for the truth of

3   the matter asserted, just offered for what his

4   state of mind is.

5           THE COURT:  And why is his state of

6   mind even relevant?

7           MR. WESTBERRY:  Well, I'm going to

8   follow it up with the question that did he ever

9   ask you for a vote.

10          MR. TAYLOR:  He can ask that, but he

11  doesn't need to follow it up with a hearsay

12  statement.  I think Judge Thompson ought to be

13  the one to put the reasoning in the case, not a

14  witness.

15          MR. WEBSTER:  Your Honor, Mr. Taylor

16  has been routinely asking people why they think

17  they got the blacktop, why it was put down.  I

18  mean, that sauce is good for both sides.

19          THE COURT:  Yeah, I think you can ask

20  that question.  You know, why do you think you

21  got the blacktop, and if he, you know, has some,

22  you know, state of mind kind of response.

23          MR. WESTBERRY:  I won't go far with it.

24          THE COURT:  Yeah.  I'll allow that.

25          [IN OPEN COURT]

1       Q.     Why do you think you got the

2  blacktop, Mr. Stumbo?

3       A.     I just assumed where they had been

4  grading it all the time where it was on a hill

5  like that, I just assumed they was doing it to

6  cut down the cost.

7       Q.     Okay.  How far did blacktop actually

8  go?  How far did it reach up to that property to

9  that road?

10      A.     To the top of the hill.

11      Q.     Now, there are two residences on the

12  whole road; is that right?

13      A.     Yeah.  Well, there's an apartment

14  that has two different apartments and a

15  double-wide.

16      Q.     Now, that road is pretty steep; is

17  that correct?

18      A.     Yes, uh-huh (affirmatively).

19      Q.     The gravel which had been put by the

20  previous administrations in the past, when a

21  hard rain come, and we've talked a lot about

22  this to the jury.  Could you tell the jury what

23  would happen to that gravel when the hard rain

24  would come?

25      A.     It would end up down on Kentucky 7.

1       Q.     And does that pose a problem or is

2 it a hazard of any kind?

3       A.     Yes.

4       Q.     Could you explain.

5       A.     Well, it would wash out on the road

6 and then the traffic would have to slow down or

7 go around it until they'd come and clean it up

8 again.

9       Q.     Right.  Would they have to come and

10 clean it up periodically?

11      A.     Yes.

12      Q.     About how often would they, sir?

13      A.     Well, every time we had a downpour.

14      Q.     So the county road crew in previous

15 administrations would be out there pretty much

16 every time they had a downpour?

17      A.     Lots of times it was the state

18 highway department, yeah.

19      Q.     Yeah.  True.  What were the names of

20 previous administrations?  It was Mr. Newsome,

21 Mr. Sawyer, and is it Mr. Houston, is that a

22 name, too?  Do I have that name right?

23      A.     No.  Sawyer and the Newsome was the

24 two before that.

25      Q.     Anybody ever ask you for a vote,

1   Mr. Stumbo?

2        A.    No, no, nobody's ever asked me.

3             MR. WESTBERRY:  Thank you for your

4   courtesy.  Appreciate that.

5             THE COURT:  Mr. Webster.

6             MR. WEBSTER:  No questions.

7             THE COURT:  Thank you.  Mr. Jensen.

8             MR. JENSEN:  No questions on behalf of

9   Mr. Champion.

10            THE COURT:  Mr. Williams.

11            MR. WILLIAMS:  No questions, Your

12  Honor.

13            THE COURT:  Mr. Taylor.

14            MR. TAYLOR:  Just briefly.

15                 REDIRECT EXAMINATION

16  BY:  MR. TAYLOR:

17       Q.    Mr. Stumbo, you were asked some

18  questions about why you got blacktop.  Let me

19  ask you this.  Besides yourself, are there a lot

20  of other people in Knott County who have steep

21  driveways?

22       A.    Yeah, uh-huh (affirmatively).

23       Q.    And during the Fall of 2006, did

24  every one of those people get blacktop on their

25  driveways?

1      A.     I didn't get out and look.

2      Q.     Well, do you know why some would get

3  it and some wouldn't?

4      A.     No.  I do know that there was a

5  school bus come up on the hill to pick my

6  grandchildren up.  I thought that that might

7  have been the reason they done it.

8      Q.     Do you know if every steep driveway

9  that has a school bus on it got blacktop?

10     A.     I don't know.

11     Q.     Now, the people who lived up on the

12  hill were all your family?

13     A.     Yes.

14     Q.     It wasn't multiple families up this

15  road?

16     A.     No, my children.

17     Q.     And you considered that your

18  driveway?

19     A.     It was their driveway.

20     Q.     Their driveway?

21     A.     Yeah.

22         MR. TAYLOR:  That's all thank you.

23         THE COURT:  Thank you.  May this

24  witness be finally excused?

25         MR. TAYLOR:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you, sir.  You

2     may be finally excused for further testimony in

3     this trial.  Mr. Taylor, you may call your next

4     witness.

5          MR. TAYLOR:  Call Danny Combs.

6          THE COURT:  Mr. Danny Combs.

7     [WITNESS SWORN]

8              DIRECT EXAMINATION

9     BY:  MR. TAYLOR:

10     Q.     Sir, would you mind doing me a favor

11     and moving that?

12          THE COURT:  Scoot right up to that

13     microphone, sir.  It's a little awkward, we

14     know, but thank you very much.

15     Q.     Would you state for the record,

16     please, your full name.

17     A.     Danny Combs.

18     Q.     And, Mr. Combs, where do you live?

19     A.     On Possum Trot Road in Knott County.

20     Q.     And have you lived in Knott County

21     all your life?

22     A.     Yes.

23     Q.     How old are you?

24     A.     I'll be 40 year old next month.

25     Q.     And are you a registered voter?

1          A.      Yes.

2          Q.      And have you been for some time?

3          A.      Yeah.

4          Q.      And I'm going to direct your

5    attention back to the fall election of 2006.  Do

6    you recall that?

7          A.      Yes.

8          Q.      Did you receive some blacktop at

9    your home?

10         A.      Yes.

11         Q.      And did you pay for that blacktop?

12         A.      No, sir, I didn't.

13         Q.      It was on your private drive?

14         A.      Sir, I don't -- I live there, but I

15   don't own the property which the blacktop's on.

16         Q.      Was it a private drive though?

17         A.      Yeah.

18         Q.      It wasn't a public road?

19         A.      No.

20         Q.      I want to show you some photographs,

21   8A and 8B.  Do you recognize those photographs?

22         A.      Yes, uh-huh (affirmatively).

23              MR. TAYLOR:  All right.  I'd like to

24   move their introduction at this time.

25              MR. WESTBERRY:  No objection.

1           THE COURT:  Is there objection?

2    Without objection, it will be entered as

3    Government's exhibits.

4           Q.     Look at 8A first on the screen

5    there.  It's going to come up there in a

6    minute.  Is that a photograph of your home?

7           A.     Yes, uh-huh (affirmatively).

8           Q.     Is that the blacktop that we see

9    leading up to the trailer?  Is that the blacktop

10   that you referred to?

11          A.     Yes.

12          Q.     Can you tell us how it was that you

13   came to get this blacktop?

14          A.     Really, I think in the past, maybe

15   my driveway -- my dad was magistrate, he had

16   maybe asked for, you know, the road maybe to get

17   graded or something, and I --

18          Q.     Well, who is your dad?

19          A.     Walter Combs.

20          Q.     When this was put down, was he a

21   magistrate?

22          A.     Yes.

23          Q.     Okay.  And what district was he a

24   magistrate in?

25          A.     District 1.

1      Q.      Excuse me?

2      A.      District 1.

3      Q.      District 1?

4      A.      Yeah.

5      Q.      And would he have been one of the

6   magistrates that voted for the funding to get

7   all the blacktop laid in the county?

8      A.      He probably would have.  I'm not

9   familiar.  I've never been to a fiscal court

10  meeting or anything, how that works, but

11  probably so.

12     Q.      Okay.  Do you know who laid that

13  down there?

14     A.      I think it was -- I guess it was R &

15  L, I think, Paving Company.

16     Q.      All right.  Were you somewhat

17  surprised when the blacktop came?

18     A.      Yeah, in a way.  I didn't, you know,

19  like I say, I didn't know I was getting

20  blacktop.

21     Q.      Excuse me?

22     A.      I didn't know I was getting

23  blacktop, no, it's -- I was a little surprised.

24     Q.      Did you see other private drives get

25  blacktop?

A.      No, I think, you know, some of my
family, they paid for their blacktop, some of
them got it, but I wasn't aware, you know, of
it.

Q.      Well, why would others in your
family pay for it and you get it free?

A.      I don't know.

Q.      Who do you think paid for your
blacktop?

A.      I couldn't tell you because I never
did see anybody go work on it.  I don't know.

Q.      But you recall telling the grand
jury that you figured the county paid for it?

A.      I suppose they would have, yeah.

Q.      And the people that were
blacktopping, where were they from; do you know?

A.      I think they were from Johnson
County, I think, Paintsville.

Q.      How do you know your father or other
members of the family paid for their blacktop?

A.      They have the receipts on them,
which I was there when they actually paid for
theirs also.

Q.      You saw them pay for it?

A.      Yes, I saw payment.

1    Q.  Did they pay R & L?

2    A.  Yes.

3    Q.  Did you see them give the money or

4 just get the receipt?

5    A.  I saw them pay the money and get the

6 receipt also.  I didn't see how much money was

7 involved, but I did see money change hands and a

8 receipt.

9    MR. TAYLOR:  One moment.

10    Q.  Do you have an approximate date when

11 this was blacktopped?

12    A.  No, sir, I honestly don't.

13    Q.  Do you recall it being sometime in

14 2006?

15    A.  Yeah, sometime, I think, during the

16 summer or during the warm months maybe.

17    Q.  And if we knew generally when R & L

18 was blacktopping in the county, would be when R

19 & L would be blacktopping in the county?

20    A.  Probably would, yeah, I'm sure.

21    MR. TAYLOR:  No further questioning.

22    THE COURT:  Mr. Westberry.

23        CROSS-EXAMINATION

24 BY:  MR. WESTBERRY:

25    Q.  Good afternoon, Mr. Combs.  One

1     question.  Did anybody ever ask you for a vote

2     in exchange for any blacktop?

3         A.     No.

4         Q.     Never, nobody?

5         A.     Never.

6         Q.     You never had a conversation with

7     Randy Thompson about anything like that?

8         A.     No, never.

9          MR. WESTBERRY:  Thank you.  Appreciate

10    your courtesy.

11          THE COURT:  Mr. Webster.

12             CROSS-EXAMINATION

13    BY:  MR. WEBSTER:

14         Q.     Are there two different places

15    served by that road that we saw in this picture?

16          THE WITNESS:  Pardon?

17         Q.     Does Jake Huff's people have a place

18    up there?

19         A.     Yeah, that's what they own.  Jake

20    Huff's family owns the -- that -- actually the

21    whole property that the trailer's even sitting

22    on, they own it also.

23         Q.     So you live on Jake's property?

24         A.     Right.

25          MR. WEBSTER:  I see.

1       A.      Right.

2       Q.      So I was thinking two different

3   residences there -- well, there is another

4   residence there --

5       A.      Yeah --

6       Q.      -- of Jake's?

7       A.      -- and they are getting ready to be

8   another place built to the right of this trailer

9   right now also.

10      Q.      On Jake's place?

11      A.      Yeah, yeah.

12      Q.      And you own your place?

13      A.      Yeah, I own the trailer, yeah.

14      Q.      So your place and Jake's place, two

15  separate tracts of land?

16      A.      Right.  Well, I don't actually -- I

17  don't own any of the land that the trailer's

18  silting on.  What it was is years ago, an

19  agreement, Jake, before he passed away, had an

20  agreement with my family that -- they were real

21  close friends, and that the trailer could remain

22  there as long as anybody wanted to occupy it, on

23  his land.

24      Q.      Your sisters first had it, then your

25  mom and daddy had it awhile, and then you and

1  your wife?

2      A.    Right.

3      Q.    So that's one family.  And Jake has

4  a place where he's got where his people live,

5  and there's another one going in there, a third

6  place?

7      A.    Right, yeah.

8          MR. WEBSTER:  All right.

9          THE COURT:  Thank you, Mr. Webster.

10  Mr. Jensen.

11          MR. JENSEN:  No questions.

12          THE COURT:  And Mr. Williams.

13          MR. WILLIAMS:  Just one, Your Honor.

14          THE COURT:  Yes, sir.

15                  CROSS-EXAMINATION

16  BY:  MR. WILLIAMS:

17      Q.    Sir, do you know whether the road

18  there has a sign at the bottom?

19      A.    Yes, sir.

20      Q.    And can you tell the jury what the

21  name of that road is?

22      A.    Hillside Drive.

23      Q.    Do you know when that sign was put

24  up?

25      A.    I can't honestly remember if it was

1    before the blacktop was put down or after.  I

2    don't remember.  I think it may have been put

3    down before.  I don't know.

4        Q.    Do you know anything about 911

5    putting any signs up through there?

6        A.    Yeah, that's -- that was -- 911 was

7    the people that put the sign up.

8        Q.    Do you think it probably dates back

9    to when 911 put it up?

10       A.    Somewhere around that time area

11   through there.

12      Q.    I'm sorry, you said, is it Hillside?

13      A.    Yeah.

14      Q.    Do you know whether or not it's ever

15   been adopted into the county road system?

16      A.    I have no idea, sir.  Like I say, I

17   don't own the property.  I don't know.

18          MR. WILLIAMS:  Thank you.

19          THE COURT:  Mr. Taylor.

20          MR. TAYLOR:  Just real briefly.

21            REDIRECT EXAMINATION

22    BY:  MR. TAYLOR:

23      Q.    Mr. Combs, you're aware that 911

24   sign doesn't have anything to do with whether

25   it's private or public?

1    A.    I didn't -- I didn't know.

2    Q.    But the signs just show the

3  ambulance where -- or the police where you live,

4  where that road is?

5    A.    Okay.

6           MR. TAYLOR:  That's all I have.

7           THE COURT:  Thank you, Mr. Taylor.  May

8  Mr. Combs be finally excused?  All right, sir.

9  You may be finally excused from further

10  testimony in this case.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  Tender those to the court

13  security officer, and please watch your step.

14  Thank you.  The United States is recognized to

15  call their next witness.

16          MR. TAYLOR:  Kelly Hall.

17          THE COURT:  Kelly Hall is called as the

18  Government's next witness.

19          [WITNESS SWORN]

20          THE COURT:  Counsel, would you approach

21  briefly, please.

22          [CONFERENCE AT THE BENCH]

23          THE COURT:  I believe Mr. Hall's wife

24  came into the courtroom with him, and I just

25  wanted to make sure -- he was accompanied by

 1     somebody; I don't know if it's his wife that

 2     came in, and I just wanted to make you aware

 3     that somebody accompanied him into the

 4     courtroom.

 5              MR. TAYLOR:  Is in here now?

 6              THE COURT:  Is in here and sitting back

 7     there.

 8              MR. WESTBERRY:  Did they listen to any

 9     testimony, Judge?

10              THE COURT:  No, they've just come in

11     just now with this particular witness.  I was

12     just flagging that for you, Mr. Taylor.

13              MR. TAYLOR:  I've got a Charlotte Hall

14     on my witness list, but I don't know that

15     they're related.

16              THE COURT:  Well, that's what flagged

17     it for me, and so it may not be, and that's

18     really, in terms of the exclusion of witnesses,

19     of course, it's your responsibility to kind of

20     police that, and since you've not been able to

21     see that, I thought I would bring it your

22     attention.

23              MR. TAYLOR:  I'll ask the agent if he

24     knows that's Charlotte Hall, but I don't.

25              MR. WEBSTER:  Quite possibly he would

1    know if that's his wife or not.

2              THE COURT:  Well, they may not be

3    related obviously, so I'll let you kind of

4    follow up on that.  Thank you.

5              MR. TAYLOR:  It is his wife, but that's

6    not Charlotte Hall.

7              [IN OPEN COURT]

8              THE COURT:  Mr. Taylor.

9              MR. TAYLOR:  Thank you.

10                   DIRECT EXAMINATION

11    BY:  MR. TAYLOR:

12         Q.    Sir, would you state your name,

13    please.

14         A.    Kelly Hall.

15         Q.    Spell your first name, please.

16         A.    Kelly Hall.

17         Q.    How do you spell Kelly?

18         A.    K-E-L-L-Y.

19         Q.    Mr. Hall, where do you live?

20         A.    Hindman, Kentucky.

21         Q.    Where at in Hindman?

22         A.    Combs Branch Road, about two miles,

23    I guess, from town.

24         Q.    All right.  And are you a long-time

25    resident of Knott County?

1    A.    Well, yeah.  I lived -- I've lived

2    here, but I lived in Cleveland, Ohio for about

3    24 years, and the rest of the time in Knott

4    County, so I'm getting up in age.  I'm 70 year

5    old now.

6    Q.    Well, you don't look it.

7    A.    Well.

8    Q.    Let me ask you.  When did you move

9    back to Knott County?

10    A.    It was in '81.  I went there in '57

11    and in '81, moved back.

12    Q.    You've lived in Knott County since

13    '81?

14    A.    Yeah.

15    Q.    And are you a registered voter

16    there?

17    A.    Yeah.

18    Q.    And I'm going to direct your

19    attention back to the Fall, 2006 general

20    election and the months leading up to that.  Do

21    you recall the county judge/executive race then?

22    A.    Yeah.

23    Q.    Did you, around that time, receive

24    some blacktop at your home?

25    THE WITNESS:  Received what now?

1            MR. TAYLOR:  Blacktop.

2      A.     Yeah, we -- yeah, we got repaved,

3   yeah.

4      Q.     Excuse me?

5      A.     We got it repaved, the road, yeah.

6   But now the road hadn't been there for, like,

7   that was the third time it was repaved.  It

8   hadn't been paved until before that, though.

9      Q.     Did you order that blacktop?

10         THE WITNESS:  Do what?

11      Q.     Did you order that blacktop?

12      A.     No.

13      Q.     Did you know that it was coming?

14      A.     I didn't -- I didn't know exactly if

15   it's coming -- they said, hearsay, thinks that

16   it was coming, you know, but I didn't know.

17   They said that they sent a letter or something

18   out.

19         MR. TAYLOR:  We don't want to go into

20   what other people said.

21      A.     Yeah.  But they did send a, like a

22   letter out saying that our road was on the list

23   to be paved, you know, but they didn't say when

24   or where, you know.

25      Q.     Did you pay for the blacktop?

1   A.  No, I didn't pay for any, no.

2   Q.  I want to show you some pictures and

3 ask you if you can identify them.  We've got

4 Government's Exhibit 9A and B.  Do you recognize

5 those?

6   A.  Yes.

7   MR. TAYLOR:  I would move the

8 introduction of A and B.

9   THE COURT:  Is there objection?

10   MR. WESTBERRY:  No objection.

11   THE COURT:  Without objection, they

12 will be entered.  You may publish them as you

13 choose.

14   MR. TAYLOR:  Publish 9A to the jury.

15   Q.  Now, I can anticipate we're going to

16 have some topography issues here, so I'm going

17 to, if I can draw the picture while we're

18 looking at this photograph or actually -- I

19 guess I'll have to in a moment -- well, let me

20 ask some questions about the photograph and then

21 I'll draw a picture.  We can't do both at the

22 same time.  We can't look at the same screen.

23 There appears to be a house there.  Is that your

24 house?

25   A.  Yes, sir, it is.

1      Q.      There appears to be two shades of

2   blacktop, a light shade and a dark shade.  Do

3   you see that?

4           THE WITNESS:  You mean on the

5   pavement?

6      Q.      Yeah, two different colors of

7   pavement there.  Do you see that?

8      A.      Yeah, yeah.

9      Q.      And is the dark blacktop new paving?

10     A.      Yeah, this one on -- yeah, I guess

11  it would be, yeah.

12     Q.      All right.  Now, there's a road

13  there, Beulah Road, is that the road to your

14  house?

15     A.      Yeah, but now, it's not that close

16  to my house.  It's probably 150 feet from -- I

17  got like a gravel driveway there, and then I got

18  a cement driveway from my house.  It's probably

19  approximately 150 feet of gravel and a cement

20  driveway in front of my house to the -- it don't

21  look like it here, but it's about that much,

22  about -- close to 150 feet.  It's not like it's

23  right up to the house.  It looks like it's up to

24  the house here, but it's not.

25     Q.      Okay.  What is -- where in that

1    picture is Beulah Lane?

2         A.    Well, that's a private road that

3    goes to the house on up above me.  It's probably

4    about, oh, 1,500 feet from me, or something like

5    that.  That's a private -- he owns that.  He put

6    the blacktop down his self.

7         Q.    So Beulah Lane is then the light

8    colored black --

9         A.    Yeah, is that what you're talking

10   about?  Yeah, okay.  That's the one that goes to

11   -- Randy Combs lives there, yeah.

12        Q.    Randy Combs?

13        A.    Yeah.

14        Q.    That light colored blacktop is

15   Beulah Lane going to Randy Combs' place?

16        A.    Yeah, right.

17        Q.    And that's a private road?

18        A.    Yeah.

19        Q.    And the dark colored blacktop going

20   to your house --

21        A.    Yeah.

22        Q.    -- is your driveway --

23        A.    Yeah.

24        Q.    -- is that correct?

25        A.    Yeah.

1      Q.     Is that a public road?

2        THE WITNESS:  Is that what?

3      Q.     A public road?

4      A.     Well, they've used it -- that used

5   to be the end of the -- before this -- Randy put

6   his'n up there, it used to be the end of the

7   road.  They used to turn, use it for buses

8   because there's no place to turn down here.

9   They used to turn -- they use my front driveway

10   to turn.

11      Q.     Now, today, do the buses go up to

12   your house?

13      A.     Well, they have been, yeah.

14      Q.     For what?

15      A.     Pick up kids.  They turn there.  One

16   of the smaller buses turn there.

17      Q.     Do you have children?

18        THE WITNESS:  Pardon?

19      Q.     Do you have children?

20      A.     No, I don't have any.  I got

21   neighbors back in there, they have two little

22   boys.  They pick them up and they turn.  They

23   can't turn on the hill.  This road don't show

24   it, but the rest of the road is up a mountain,

25   like a hill.

1      Q.      Let's look at the next picture.

2 Now, what are we looking at here?

3            THE WITNESS:  Do what now?

4      Q.      What are we looking at there?

5      A.      Well, it looks like from the end of

6 my graveled driveway there it goes down towards

7 where the Thackers live, up on the hill.

8      Q.      This is looking from your front

9 porch, so to speak?

10           THE WITNESS:  Do what know?

11     Q.      This is like looking from your front

12 porch?

13           THE WITNESS:  I still didn't understand

14 you.

15     Q.      This picture, is this the view you

16 would have if you were standing on your front

17 porch?

18     A.      No, that's standing on the gravels.

19     Q.      In front of your house?

20     A.      Yeah, yeah.  Yeah, that's probably

21 50 foot of gravel there or something like that,

22 driveway.

23           MR. TAYLOR:  Let me retrieve the

24 photographs and put them on the Elmo and ask

25 some more questions.

```
 1        A.     Yeah.  But like I said, from that

 2   blacktop there to my house would be probably

 3   150 feet or something like that.  I got a

 4   cement driveway and blacktop.

 5        Q.     Now, the person taking this

 6   photograph right here, do you see where I'm

 7   pointing?

 8        A.     Yeah.

 9        Q.     Was standing right here, correct?

10        A.     Yeah.

11        Q.     And they were looking back this

12   way; is that correct?

13        A.     I guess, yeah.  But the way you

14   got the picture made there looks like it's

15   right up to the house, but it's not.  There's

16   like, I got a 100 foot cement driveway, and

17   then I've got about 50 foot of gravel in

18   between it.  It don't look like it the way

19   that picture's took, though.

20        Q.     And this sign that you can barely

21   see right here --

22        A.     Yeah, I see it, yeah.

23        Q.     -- is this sign right here --

24        A.     Yeah.

25        Q.     -- right?
```

1    A.    It's about 100 foot probably up on

2    it, or something like that.

3    Q.    Okay.  Now, were there other

4    people up in your area who did not receive

5    blacktop during that period of time?

6    A.    Well, I don't -- the one boy that

7    come down there, he asked them if they could

8    blacktop his road and he'd pay them, but I

9    don't -- he never got no blacktop, he'd never

10   got back up with him.  I don't know.

11   Q.    Do you know why it determined why

12   some people got blacktop and some didn't?

13   A.    No, I don't.

14        MR. TAYLOR:  That's all the questions

15   I have.

16        THE COURT:  Mr. Westberry.

17             CROSS-EXAMINATION

18   BY:  MR. WESTBERRY:

19   Q.    Mr. Hall, good afternoon.  I've got

20   just a couple of questions for you.

21   A.    Okay.

22   Q.    Back where the blacktop ended,

23   Mr. Hall, did it end where it always had in

24   the past?

25   A.    Yeah, but like I said this before,

1    they paved it three times, you know, the last

2    time was the third time, and it always come

3    right at the end where it was.

4         Q.    And when we say they, are we

5    talking about previous administrations?

6         A.    Yeah.

7         Q.    Did anybody ever ask you for a

8    vote in exchange for blacktop?

9         A.    Well, not on -- you talking about

10   on Randy's?

11        Q.    Yeah.  How about Randy himself,

12   did they ever ask you for a vote?

13        A.    Well, no, they never did come by

14   the house and not one time never asked and

15   nobody come to the house on the -- Randy's, on

16   that.  But now, the ones on the opposite that

17   was running, which was Mike Hall, they did

18   come in there and ask me to vote for them, you

19   know.  But now on Randy's, they never was

20   there.  Nobody was there.  They never come and

21   said nothing about voting.

22        Q.    What did the Hall people ask you?

23             THE WITNESS:  Do what?

24        Q.    What did the Hall people ask you?

25        A.    Well, he asked me if I'd vote for

him, and said they could fix my road or
something to words like that they used.

Q.     The Hall people did?

A.     Yeah.

MR. WESTBERRY:  Okay.  Thank you,
sir.  That's all.

THE COURT:  Mr. Webster.

CROSS-EXAMINATION

BY:  MR. WEBSTER:

Q.     You pointed there to the gravel at
the end of the blacktop?

A.     Yeah.

Q.     One hundred (100) something feet
in front of your property?

A.     Yeah.

Q.     Is that where the school bus
turns?

A.     Yeah.

MR. WEBSTER:  That's all.

THE COURT:  Mr. Jensen.

MR. JENSEN:  Just a couple, Your
Honor.

CROSS-EXAMINATION

BY:  MR. JENSEN:

Q.     Mr. Hall, I know you've said that

1    this has been blacktopped three times, or

2    resurfaced a couple of times?

3        A.    Yeah, resurfaced, yeah, yes.

4        Q.    When was it first blacktopped, if

5    you know?

6        A.    Well, I'm not for sure, but it was

7    when Homer Sawyer was in as judge.  I don't

8    know.  They'd have to look it up in the

9    courthouse.  It's probably been there at least

10    15 -- probably around 15 years or more.  I

11    ain't for sure, you know.

12            MR. JENSEN:  That's all I have.

13            THE COURT:  Mr. Williams.

14            MR. WILLIAMS:  Your Honor, may I show

15    the witness a photograph?

16            THE COURT:  You may.  Is that a

17    photograph?

18            MR. WILLIAMS:  It is, Your Honor.

19            THE COURT:  Tender it to the witness.

20            MR. WILLIAMS:  Marked Defendant's 5I.

21            THE COURT:  Tender it to the witness,

22    please.

23            THE WITNESS:  Yeah, you can see the

24    layers of it there then.

25                CROSS-EXAMINATION

1          BY:  MR. WILLIAMS:

2          Q.     Sir, can you tell what that's a

3     photograph of in front of you?

4          A.     Well, it looks like the blacktop

5     where it shows the surface like three times,

6     three layers of it that's been blacktopped

7     there.

8          Q.     Does that fairly and accurately

9     represent the three layers of blacktop?

10         A.     Yeah, because that's about the

11    only place you could see where you get a good

12    view of it.  I've actually looked at it there

13    and seen it.

14              MR. WILLIAMS:  Move for the

15    introduction and publish that to the jury.

16              THE COURT:  Is there objection?

17              MR. TAYLOR:  No objection.

18              THE COURT:  Without objection, it

19    will be introduced as a Defendant's exhibit,

20    and you can publish it as you wish.  Go

21    ahead.  And you can -- would you like that

22    published to the jury?

23              MR. WILLIAMS:  I would, Your Honor.

24              MR. WESTBERRY:  Hold it up.

25              MR. WILLIAMS:  Thank you, Your

1    Honor.  I have no further questions.

2            THE COURT:  Take a moment, allow the

3    jurors to see that.  Mr. Taylor on redirect.

4                    REDIRECT EXAMINATION

5        BY:  MR. TAYLOR:

6        Q.     Mr. Hall, you've indicated a

7    moment ago that you got a visit from Mike

8    Hall?

9            THE WITNESS:  Do what now?

10       Q.     You got a visit from Mike Hall?

11       A.     Yeah, and some of his helpers,

12   yeah.

13       Q.     All right.  Now, they said they

14   were going to fix your road?

15       A.     Well, words sort of like that,

16   yeah.  They said they could fix a road for us.

17       Q.     Does he have a paving company?

18       A.     I don't think so.  I don't know

19   for sure.

20       Q.     How was he going to fix your road?

21       A.     I don't know.

22       Q.     Well, why didn't he fix your road?

23       A.     Well, he didn't get in.  He got

24   beat.

25       Q.     So the one that won fixed your

1    road?

2          THE WITNESS:  Do what now?

3       Q.    The one that won fixed your road?

4       A.    Yeah.  He was the one a-running

5    against the opposite of Randy.  They were

6    running against each other.

7       Q.    So Mike Hall would say he would

8    fix your road if he got in?

9       A.    Yeah.

10      Q.    But you got your road fixed; is

11   that right?

12      A.    I think so, yeah.

13          MR. TAYLOR:  That's all the questions

14   I have.

15          MR. WESTBERRY:  Nothing further.

16          THE COURT:  May this witness be

17   finally excused?

18          MR. WESTBERRY:  Sure.

19          THE COURT:  Thank you, sir.

20   Mr. Hall, we appreciate you being here, and

21   you may be finally excused from further

22   testimony in this trial.

23          THE WITNESS:  Okay.

24          THE COURT:  Ladies and gentlemen of

25   the jury, we're going to take a brief recess

at this time.  I'd remind you of the
admonitions I've given to you previously.  I
didn't notify you at lunch that we'd go late
because we're not.  We're going -- I expect
we'll finish the testimony today after 4:00,
but before 5:00, so just so you know, you
don't have to make any special arrangements,
and we'll take about a ten minute recess at
this time.  You can be excused from the
courtroom.

[JURY EXITS COURTROOM]

THE COURT:  You can be seated.  And
let me just indicate to counsel that I do have
another proceeding that's scheduled for 4:00
or later this afternoon, and that what I will
do is I expect to kind of allow whatever
witness is on the stand at the 4:00 hour to
finish, and it probably -- we'll go ahead and
recess at that point.  It won't matter to me
if we go a little later, and I will have the
other proceeding wait, and I probably won't
want them waiting much more than 4:30, but
we'll keep with our typical schedule.  If we
need to, after that very brief proceeding, if
we need to reconvene to handle some matters

1    outside of the presence of the jury, I'd be

2    pleased to do that as late in the evening as

3    we need to.  We'll stand in recess for ten

4    minutes.

5              [RECESS – 3:10 p.m. – 3:27 p.m.]

6              THE COURT:  Mr. Taylor, call your

7    next witness.  The jury has returned to the

8    courtroom.

9              MR. TAYLOR:  Call Charlotte Hall.

10             THE COURT:  Ms. Charlotte Hall called

11   as the Government's next witness.

12             [WITNESS SWORN]

13             THE COURT:  Mr. Taylor.

14                  DIRECT EXAMINATION

15      BY:  MR. TAYLOR:

16      Q.      Ma'am, would you state your name,

17   please.

18      A.      Charlotte Hall.

19      Q.      Ms. Hall, where do you live?

20      A.      Runnel's Branch at Littcarr,

21   Kentucky.

22      Q.      Is that in Knott County?

23      A.      Yes.

24      Q.      And how long have you lived in

25   Knott County?

1     A.     About 15 or 20 years.

2     Q.     Fifteen (15) or 20?

3     A.     Yeah, probably.

4     Q.     Okay.  And have you always lived

5     out at Littcarr?

6     A.     Yes.

7     Q.     Are you a registered voter?

8     A.     Yes.

9     Q.     In Knott County?

10     A.     Yes.

11     Q.     All right.  I want to direct your

12     attention back to the Summer or Fall of 2006.

13     Were you aware of a race for county

14     judge/executive in Knott County?

15     A.     Yes.

16     Q.     Back during that period of time,

17     did you notice that there was a lot of

18     blacktopping being done out in the county?

19     A.     Yes.

20     Q.     And did the road out by your house

21     get blacktopped?

22     A.     Yes.

23     Q.     Did you notice some private

24     driveways getting blacktopped?

25     A.     Yes.

1       Q.      Did everybody's driveway get
2   blacktopped?
3       A.      No.
4       Q.      Did yours?
5       A.      No.
6       Q.      Do you know why some got blacktop
7   and some didn't?
8       A.      No.
9       Q.      Did you, and during that period of
10  time, have any conversations with Judge Randy
11  Thompson about blacktop?
12      A.      He came to my house and said he
13  was just going to blacktop or finish the road,
14  to blacktopping the road, and he said help me
15  if you can.
16      Q.      Help you if you can?
17      A.      Yeah.  He said help me if you can.
18      Q.      Did you associate the blacktopping
19  with help me if you can?
20      A.      No.
21      Q.      Was there blacktopping put out
22  there?
23      A.      There were, but, you know, you
24  know, he didn't ask me to vote for him or
25  anything.  You know, that's just all that was

said.

Q.     Do you know who put the blacktop down out there?

A.     No, I do not know.  They were out of Hazard, I believe, is what I understood them to say.  I don't know.

Q.     And how long before the election was the blacktopping done?

A.     About a week or so.

Q.     A week or so?  Do you know the names of any of those people who had their driveways paved?

A.     Well, Carlos Ashley got his'n paved, but they told me that --

MR. WESTBERRY:  Objection.

MR. TAYLOR:  We can't go into what they told you.

THE WITNESS:  Okay.

MR. TAYLOR:  That's all the questions I have.

THE COURT:  Thank you, Mr. Taylor. Mr. Westberry.

CROSS-EXAMINATION

BY:  MR. WESTBERRY:

Q.     Good afternoon, Ms. Hall.  I

1    represent Randy Thompson.  I've got just a

2    couple of questions for you.

3         A.    Yes.

4         Q.    You live on Runnel's Branch Road;

5    is that right?

6         A.    Yes.

7         Q.    Now, you tell me if I'm wrong.

8    The main branch of Runnel's Branch Road or the

9    main road, I think, has more than 20 houses on

10   it; is that correct?

11        A.    I'd say so.

12        Q.    Now, do you live on the left fork?

13        A.    Yes, I live on the left fork, the

14   last house up in there.

15        Q.    The very last house.  The road

16   just dumps right out in your yard?

17        A.    Yeah, right in front of my house.

18        Q.    But there are, I think, seven

19   houses thereabouts on the left fork; do I have

20   that right?

21        A.    I think so.

22        Q.    Yeah.  So all together, both the

23   main branch of Runnel's Fork Road into the

24   left fork, you've got a little over 30 houses

25   or thereabouts?

1   A.    I think so.

2   Q.    That's quite a few homes?

3   A.    Yeah, there are quite a few up in

4   there.

5   Q.    And the road had been maintained

6   in the past; is that right?

7   A.    From the forks in the road up

8   toward my house hasn't been, but it was not

9   blacktopped until then.

10        MR. WESTBERRY:  Right.

11  A.    But the other road had been

12  blacktopped.

13  Q.    That was back in the Homer Sawyer

14  day?

15  A.    Yeah, I think so.

16        MR. WESTBERRY: Thank you, ma'am.

17  Appreciate your courtesy.

18        THE COURT:  Mr. Webster.

19        MR. WEBSTER:  No questions.

20        THE COURT:  Mr. Jensen.

21        MR. JENSEN:  No, nothing, Your Honor.

22        THE COURT:  And, Mr. Williams.

23        MR. WILLIAMS:  Just one.

24              CROSS-EXAMINATION

25  BY:  MR. WILLIAMS:

1          Q.      Ma'am, I'm not sure I heard you,

2     but I want to make sure.  Did you say that

3     Carlos Ashley has his receipt?

4          A.      I do not know.

5          Q.      You heard that or seen that?

6          A.      I heard that, but I do not know.

7               MR. TAYLOR:  Objection to hearsay.

8               THE COURT:  I'll sustain that

9     objection, and the jury will be admonished to

10    ignore the response that was just given by the

11    witness.  Mr. Taylor, you can be recognized

12    for redirect.

13              MR. TAYLOR:  One moment.  Nothing

14    further.

15              THE COURT:  Thank you.  May this

16    witness be finally excused?

17              MR. TAYLOR:  Yes, Your Honor.

18              THE COURT:  Ma'am, thank you very

19    much.  You may be finally excused from further

20    testimony in this case.  Mr. Taylor, you may

21    call your next witness for the United States.

22              MR. TAYLOR:  Call Ronnie Campbell.

23              THE COURT:  Mr. Ronnie Campbell.

24              MR. WILLIAMS:  Your Honor, may we

25    approach?

1     THE COURT:  You may.

2         [CONFERENCE AT THE BENCH]

3     MR. WILLIAMS:  Your Honor, this was

4  discussed briefly this morning disclosing

5  Jencks material, the triple hearsay question,

6  and if I understand the Court correctly, you

7  indicated that it should probably be put in

8  through Mr. Pratt, and I understood you to say

9  you weren't going to admonish him not to do

10  it, but I wanted to raise it before it got

11  started.

12     THE COURT:  I think that's an

13  appropriate way to do it.  I mean, as I've

14  given this some thought, I think Mr. Taylor is

15  correct in terms of the definition of a

16  statement under the hearsay rules with regard

17  to the directive.  This came up in another

18  hearing, a related trial, Mr. Webster sat

19  through much of that trial in which I ruled

20  that that was not a statement within the

21  hearsay rules as directed paved that

22  driveway.  So I think Mr. Taylor's correct as

23  it relates to the statement of Mr. Adams to

24  Mr. Pratt because I understand the witness is

25  expected to testify Pratt told me that the

1    defendant told him to have that driveway

2    paved.  Is that fair?

3            MR. WILLIAMS:  Well, Your Honor, if I

4    may, there's one other step in it and this is

5    this witness would say my brother Ronnie

6    Campbell told me that Orville Pratt said that

7    Ronnie Adams said.

8            MR. TAYLOR:  My brother Randy

9    Campbell?

10            MR. WILLIAMS:  Randy Campbell, I'm

11    sorry.

12            THE COURT:  So there is kind of not

13    that third level of hearsay based on that, but

14    there is, I guess, two levels if it's being

15    offered for the truth of that.

16            MR. TAYLOR:  Right.  And my point is

17    that we're not offering it for the truth.  We

18    think the truth of that will be brought in

19    through other witnesses, but only as it

20    relates to his state of mind as to his

21    understanding when he accepted the blacktop.

22            THE COURT:  Right, so it doesn't

23    really matter whether it's true or not.  It's

24    really whether it's this witness, what he

25    thought of at that particular time.

1          MR. WEBSTER:  It doesn't really

2     matter whether Ronnie Adams said in that case

3     it could be.  The problem with these mixed

4     things is that the admonitions there simply

5     doesn't cure the problem, that it will be used

6     as a -- if this witness is going to say

7     somebody told me that I -- that they had

8     authority to do it, that would be a lot less.

9          MR. WILLIAMS:  I'm sorry.

10          THE COURT:  Go ahead.

11          MR. WILLIAMS:  I was just going to

12     say if this person wasn't directly given the

13     order, how can it be, I mean, how can it be

14     something that created an impression on him?

15     His testimony is that --

16          MR. TAYLOR:  Well, wait a minute.

17     Whatever Pratt said to him.

18          THE COURT:  Would have created some

19     impression, kind of created the basis of

20     Pratt's information, whatever information was

21     received by Pratt is going to have some impact

22     on his state of mind.

23          MR. WILLIAMS:  Well, Your Honor, I

24     understood it to be that they believed that

25     Pratt somehow got direction from my client.

1    In other words, it's Pratt that did -- would

2    have created an impression off Pratt perhaps,

3    but not Ronnie Campbell.

4          THE COURT:  Yeah, and I think we can

5    address this by asking the Government.  I

6    think you have indicated you are going to call

7    Mr. Pratt?

8          MR. TAYLOR:  Uh-huh (affirmatively).

9          THE COURT:  And so I think it

10    probably would -- I will address this mixed

11    question that Mr. Webster has identified by

12    simply asking this witness.  This witness

13    doesn't need to go back to Ronnie Adams, I

14    guess, is the point I'm making and can respond

15    to the question just generally and can

16    establish the state of mind as it relates to

17    that question without having to go through

18    those three different layers.  Now,

19    Mr. Pratt, I think, can testify -- will be

20    able to testify more directly to that.

21          MR. TAYLOR:  Well, I mean, I don't

22    know how to avoid it.  The facts are the

23    facts.  If you asked him how -- what his

24    understanding was as to why he was getting

25    blacktop, he's going to say my brother said

1       that Randy said or Ronnie said it was okay.

2            MR. WEBSTER:  I would not object to a

3       leading question which included, were you told

4       by whoever told them that it -- someone with

5       authority to authorize it had authorized it.

6       That's a little bit of a leading question, but

7       it would cure the problem.

8            THE COURT:  I think that -- I

9       absolutely think that addresses that, and if

10      it's really about state of mind, that will

11      address that particular issue, and I think

12      with Mr. Pratt it's a different analysis.

13            MR. WILLIAMS:  Okay.

14            MR. TAYLOR:  I can try that.

15            THE COURT:  That's the best way to do

16      it.  And there is some ability to cure this.

17      I think you need to lead along the lines

18      Mr. Webster has identified, but there could be

19      a limiting instruction.  And despite the

20      practical concerns about that, you know, the

21      law's pretty clear that that's viewed as

22      addressing these particular situations.  Thank

23      you, counsel.

24            [IN OPEN COURT]

25            [WITNESS SWORN]

```
 1              THE COURT:  Mr. Taylor.
 2                   DIRECT EXAMINATION
 3         BY:  MR. TAYLOR:
 4         Q.      Sir, would you state your name,
 5    please.
 6         A.      Ronnie Campbell.
 7         Q.      Mr. Campbell, where do you live?
 8         A.      Steer Fork, Knott County.
 9         Q.      And have you lived in Knott County
10    for a number of years now?
11         A.      About seven years.
12         Q.      All right.  Are you a registered
13    voter?
14         A.      No, sir.
15         Q.      You're not registered in that
16    county?
17         A.      No.
18         Q.      Are you registered anywhere?
19         A.      No, sir.
20         Q.      I want to direct your attention
21    back to Fall of 2006.  You lived on Steer Fork
22    at that time?
23         A.      Yes, sir.
24         Q.      Did you receive some blacktop
25    during that period of time?
```

1       A.     Yes, sir.

2       Q.     And you received it at your home?

3       A.     Yes, sir.

4       Q.     I want to show you what's been

5  marked as Government's Exhibits 10A, B, C, D,

6  E and F.  Now, do you recognize those

7  photographs?

8       A.     Yes, sir, I do.

9       Q.     And is that -- or are those

10  photographs of your property?

11       A.     Yes, sir.

12       MR. TAYLOR:  At this time, I'd like

13  to move the introduction of those exhibits.

14       THE COURT:  Is there objection?

15       MR. WESTBERRY:  No.

16       THE COURT:  Without objection, they

17  will be entered as Government's exhibits.  You

18  may publish them as you choose.

19       MR. WESTBERRY:  What number are they,

20  please?

21       MR. TAYLOR:  10.

22       MR. WESTBERRY:  Thank you.

23       Q.     If you'll look at that screen

24  there, is that a picture of your -- is that a

25  trailer of yours?

1     A.     Yes, sir, trailer.

2     Q.     And do we see any of the blacktop

3 that you're referring to in that picture?

4     THE WITNESS:  See what, sir?

5     Q.     Any of the blacktop that you

6 referred to in this picture?

7     A.     This blacktop here --

8     MR. TAYLOR:  Yeah.

9     A.     -- I done this probably a year

10 before.

11     Q.     All right.  Let's go to the next

12 picture.

13     A.     Maybe two years before.

14     Q.     What is this?

15     A.     This stuff is left-over blacktop

16 dumped out.

17     Q.     Is this a little farther away from

18 your house right there?

19     A.     It's in front of it, yeah.

20     Q.     Let's go to the next picture.

21 Now, what is this?

22     A.     This is still in the level part.

23 This is --

24     Q.     Let's go to the next picture.  All

25 right.  Is this on down the road from your

1    house?

2         A.      Yes.

3         Q.      Now, this road, is it the -- are

4    you the only house on this road?

5         A.      On this road, yeah.

6         Q.      All right.  And what does it

7    connect to?

8         A.      The county road.

9         Q.      What county road is that?

10        A.      Steer Fork.

11        Q.      All right.  Is this new blacktop

12   put down in 2006?

13        A.      Most of it, yeah.

14        Q.      What do you mean, most of it?

15        A.      Well, there was a little bit I put

16   on it before that was put on, you know, a

17   base.

18        Q.      Okay.  Let's go on down a little

19   further.

20        A.      Probably a year before.

21        Q.      Is this on down your road, too?

22        A.      Yeah.

23        Q.      Let's go a little further.  Is

24   that where your road hits the county road?

25        A.      Right.

```
 1          Q.      Do you own that property that
 2     blacktop is on?
 3          A.      Yes, sir.
 4          Q.      And did you pay for that blacktop?
 5          A.      No, sir.
 6          Q.      You didn't?
 7          A.      Not this part.
 8          Q.      Okay.  At one time when you were
 9     first interviewed about that blacktop, you
10     didn't tell the truth, did you?
11          A.      No, I didn't.
12          Q.      You said you had paid for it,
13     didn't you?
14          A.      Well, where we was sitting, that's
15     where I thought he was talking about on the
16     level.
17          Q.      But later, you admitted you didn't
18     pay for that, didn't you?
19          A.      That's right.
20          Q.      Are you aware of other people who
21     got their driveways paved up in your area?
22               THE WITNESS:  Say again.
23          Q.      Do you know of other people up in
24     the area who got their driveways paved?
25          A.      Yes, sir.
```

1     Q.     And who else got their driveways

2 paved?

3     A.     I know Orville Pratt, for one.

4     Q.     And who is Orville Pratt to you?

5     A.     Just a neighbor.

6     Q.     All right.  Who else got their

7 driveway paved?

8     A.     His granddaughter.

9     Q.     And what's her name?

10     A.     Taneel.

11     Q.     Now, do you know if these people

12 paid for theirs?

13     A.     I do not know.

14          MR. TAYLOR:  One moment.  That's all

15 the questions I have.

16          THE COURT:  Thank you, Mr. Taylor

17 Mr. Westberry.

18          MR. WESTBERRY:  I don't have any

19 questions.

20          MR. WILLIAMS:  Your Honor, may we

21 approach?

22          THE COURT:  You may.

23          [CONFERENCE AT THE BENCH]

24          THE COURT:  Mr. Williams.

25          MR. WILLIAMS:  Your Honor, just prior

1    to this witness's testimony they're handed a new

2    Jencks material on this witness and haven't had

3    time to review it during Mr. Taylor's direct

4    examination.  So I think in fairness, Your

5    Honor, and given the fact that you were

6    considering a 4:00 break anyway, I would just

7    ask for --

8            MR. TAYLOR:  I thought it was based on

9    Jencks that you raised the issue this morning at

10   the beginning of the --

11           MR. WILLIAMS:  You give us new Jencks

12   from November 29, or a different --

13           MR. WESTBERRY:  Or is this new Jencks,

14   because that's what Ms. Logan is reading.

15           MR. TAYLOR:  This has been to the grand

16   jury once.

17           THE COURT:  I'll --

18           MR. WILLIAMS:  No, there's no November

19   versus a --

20           MR. WESTBERRY:  I'm sorry.  That's

21   right, yes.  I just found that out.  All we got,

22   Ken, is --

23           MR. TAYLOR:  Well, you should have had

24   it all.

25           MR. WESTBERRY:  I'm not implying bad

faith.  I'm just saying we haven't --

MR. TAYLOR:  I'm not either.  I think that's right.  I thought they had it.

MR. WILLIAMS:  Mr. Taylor, we have one grand jury and there's just another one that we were just handed.

THE COURT:  How long is the grand jury testimony?

MR. WILLIAMS:  It's about 13 pages it looks like, Your Honor.

THE COURT:  And do you have it now; you've just been handed it?

MR. WILLIAMS:  During the last break, Your Honor.

MR. JENSEN:  I just noticed it myself.

MR. WEBSTER:  I got mine this morning.

THE COURT:  Yet you've had it today?

MR. WEBSTER:  I've had it today, but I felt uncomfortable trying to read it and listen at the same time.

THE COURT:  No, I understand that.

MR. WESTBERRY:  Would you consider breaking?  How long is that testimony?

MR. TAYLOR:  It's 13 pages.

THE COURT:  Why don't we take a 15

1    minute recess and have an opportunity to read

2    that grand jury testimony.  I'd like to be able

3    to at least finish this witness today.

4            MR. WESTBERRY:  If there's a real

5    legitimate issue --

6            THE COURT:  If there's a legitimate

7    issue, bring it before me, but let's try to get

8    done with this witness today.

9            [IN OPEN COURT]

10           THE COURT:  Ladies and gentlemen, we're

11   going to take a brief recess, and rather than

12   have you sit here for a brief period of time, it

13   shouldn't be more than 10 or 15 minutes.  I

14   don't think it's going to, and I expect we'll

15   finish with this witness and you'll be released

16   for the evening, so it's a little bit more up

17   and down this way, but I think it's more

18   uncomfortable than to make you sit in here, to

19   allow you to stretch your legs.  Again, so I'll

20   remind you of the admonitions I've given to you

21   at this time.

22           [JURY EXITS COURTROOM]

23           THE COURT:  You can be seated, and the

24   record will reflect that the jury's left the

25   courtroom.  Counsel, we'll recess for about 15

minutes.  At about 5:05, I would expect that we
could reconvene.  If you need to address some
issues outside of the presence of the jury, I'd
suggest we do it at the bench.  Have the jury
brought back in and have them in the courtroom
ready to go, or either release them for the
evening or we'll be able to address those issues
at the bench.  Any other matters we need to take
up outside of the presence of the jury?  If
there are none, we'll stand in recess.

             [RECESS – 3:51 p.m. – 4:08 p.m.]

             [JURY ENTERS COURTROOM]

             THE COURT:  Okay.  We'll proceed with
questioning this witness.

             MR. WESTBERRY:  Thank you, Judge.  No
questions, Judge.  Thank you, sir.

             THE COURT:  Thank you, Mr. Westberry.
Mr. Webster.

                   CROSS-EXAMINATION

     BY:  MR. WEBSTER:

     Q.      Mr. Campbell, when you appeared in
front of the grand jury, at that time you had
admitted to receiving illegal blacktop and also
lying about it to an agent; is that true?

     A.      Yes, sir.

1      Q.      You were granted immediate

2   immunity.  That is to say, they said, We're not

3   going to prosecute you?

4      A.      Yeah.

5      Q.      Now, is it true that your brother,

6   after the agents threatened you with

7   prosecutions for those crimes, changed his

8   version of what had happened, your brother James

9   Randy Campbell?

10     A.      James Campbell, yes.

11     Q.      He did?

12     A.       I'm hard of hearing.  Would you

13  mind talking up.

14     Q.      Did your brother change his story?

15     A.      I don't think so.

16     Q.      Well, do you know he was interviewed

17  four or five different times and eventually he

18  ended up telling something exactly opposite from

19  what he started?  You don't know that?

20     A.      We don't really talk about it

21  anymore.

22     Q.      Did your brother ever tell you that

23  he had talked to the FBI agent or Mr. Hopkins

24  about what you had said and the trouble you were

25  in?

1   A.  He mentioned it, yeah.

2   Q.  Did he tell you that he had asked

3 Agent Hopkins what did you need to say?

4   A.  No.

5   Q.  Did he tell you what you needed to

6 say?

7   A.  No.

8     MR. WEBSTER:  Thank you.

9     THE COURT:  Mr. Jensen.

10    MR. JENSEN:  No questions, Your Honor.

11    THE COURT:  And then Mr. Williams.

12    MR. WILLIAMS:  No questions, Your

13 Honor.

14    THE COURT:  Thank you.  Mr. Taylor on

15 redirect.

16    MR. TAYLOR:  No questions.

17    THE COURT:  Sir, thank you very much.

18 May this witness be finally excused?

19    MR. TAYLOR:  Yes, Your Honor.

20    MR. WESTBERRY:  Yes.

21    THE COURT:  You may be finally excused

22 from further testimony, sir.  Thank you for

23 appearing.  Mr. Taylor, I'm going to assume that

24 we probably cannot get another witness in in the

25 next 20 minutes, so I think what I would --

1      MR. TAYLOR:  Yeah, that's probably -- I

2  don't know if I've got somebody here that's real

3  short or not.

4      THE COURT:  If you feel like we're

5  relatively on schedule, we can go ahead and

6  recess with a -- or if you have one that --

7      MR. TAYLOR:  Sometimes there's lots of

8  cross and sometimes there's not, so it's hard

9  for me to predict how long a witness is going to

10  be on the stand.  I can't assure you that I can.

11      THE COURT:  Well, why don't we go ahead

12  and I'm going to release you, ladies and

13  gentlemen of the jury, for the evening, and, you

14  know, when I can get you out of here, you know,

15  close to 4:00, I will, and maybe another evening

16  we'll have to stay a little bit later, but we'll

17  try to, again, be respectful of your evening

18  schedules.  We'll remind you to just leave your

19  notebooks right there in the chair where you're

20  sitting and not take those with you.  And it's

21  my practice to remind you of those admonitions

22  that I've given to you previously, and I do so

23  specifically right before the evening recess.

24  As the trial unfolds, as it increasingly becomes

25  tempting to want to start talking about the

1    case, but you all know I know that you're not to

2    do that.  You're directly admonished not to

3    discuss this case amongst yourself.  Friends,

4    family, those you see over the course of the

5    evening recess, the curiosity's going to build

6    about the service that you're providing in this

7    trial, but you're directly admonished not to

8    speak to them about the case as well.  You're

9    not to try to gather any information.  Again,

10   something today and, boy, I wish I knew the

11   definition of that word, or maybe if I did a

12   little Internet search, I could get more

13   information and it would be helpful, but it

14   would also be wrong; it would be a violation of

15   your oath.  You're only to consider the

16   information that's provided in court.  This is a

17   case that is the subject of some media attention

18   that you're directly admonished not to view

19   anything on television, not to listen to any

20   radio reports.  Have your family put aside

21   newspaper reports.  You're welcome to look at

22   them once this case is over, but you're not to

23   read them over the course of the case.  Again,

24   it goes to that very strict requirement that you

25   only consider the evidence that is before you

1    and presented in court.  Finally, you should

2    not -- if you are contacted by someone or

3    someone tries to contact you and tries to engage

4    you about the case, that's information that

5    would be important for us to know.  You would

6    report that to the court security officer or

7    directly to me, if you felt more comfortable

8    doing that.  We're going to be on the same

9    schedule tomorrow.  I'm going to ask you to

10   arrive at the courthouse the same time you've

11   been directed to so far this week, and we'll

12   try, as we did today, to begin the presentation

13   of evidence as close to 9:00 a.m. as we possibly

14   can.  I'm pleased that I'm able to release you

15   into a gorgeous summer evening, as opposed to

16   the circumstance we found ourself in last night,

17   but nevertheless, please be careful going home.

18   And at this time, you may be released from the

19   courtroom.

20               [JURY EXITS COURTROOM]

21               THE COURT:  You can be seated, and the

22   record will reflect that the jury has left the

23   courtroom.  Counsel, let me see if there are any

24   matters that I need to take up this evening

25   outside of the presence of the jury.  All

```
1    right.  And I will note again, I'll try to be

2    available around 8:30.  If you'll send word to

3    chambers if there are matters that we need take

4    up before we begin the presentation of evidence

5    that will allow us to begin the presentation to

6    the jury as close to 9:00 a.m. as we possibly

7    can.  As I've noted, you're welcome to leave

8    your things in the courtroom.  The courthouse is

9    locked and it's under security over the course

10   of the evening, so you're free to do that, but I

11   do have one fairly quick civil matter that I

12   need to address in a few moments, so I'll just

13   let you know that, and we'll take a brief recess

14   in order to prepare for the next proceeding.

15   We'll stand in recess.

16            [RECESS - 4:15 p.m.]

17

18

19

20

21

22

23

24

25
```

1          The undersigned Court Reporter hereby

2     certifies that:  (1) The foregoing 275 pages

3     represent an accurate and complete transcription

4     of a portion of the record of the proceedings

5     before the United States District Court for the

6     Eastern District of Kentucky at Pikeville before

7     the Honorable Gregory F. Van Tatenhove,

8     presiding, in the matter of United States of

9     America vs. Randall Clinton Thompson, John Mac

10    Combs, Phillip G. Champion, and Ronnie Adams,

11    and (2), these pages constitute a copy of the

12    transcript of the proceeding.

13

14          _____

15               SANDY C. WILDER, RMR, CSR(IL),

16               COURT REPORTER

17

18

19

20

21

22

23

24

25