1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
2                 SOUTHERN DIVISION
                  AT PIKEVILLE
3
UNITED STATES OF AMERICA,
4                              No. 07-CR-35-GFVT
     PLAINTIFF,
5                              Pikeville, Kentucky
                             June 18, 2008
6                              1:50 p.m.
VS.
7
RANDALL CLINTON THOMPSON,
8  JOHN MAC COMBS,
PHILLIP G. CHAMPION,
9  RONNIE ADAMS,

10      DEFENDANTS.

11           PARTIAL TRANSCRIPT OF JURY TRIAL
               TESTIMONY OF KENNY DUYER
12
                 * * * * * * * * *
13
APPEARANCES:
14

15  For the Plaintiff:
                         Hon. Kenneth Taylor
16                       110 West Vine Street
                         Suite 400
17                       Lexington, Kentucky  40507-1671
                         (859) 233-2661
18
For the Defendant
19  Randall Clinton Thompson:
                         Hon. R. Kent Westberry
20                       Hon. Kristin N. Logan
                         Landrum & Shouse, LLP
21                       220 West Main Street
                         Suite 1900
22                       Louisville, Kentucky  40202-1395
                         (502) 589-7616
23
                         Hon. Terry D. Jacobs
24                       P. O. Box 991
                         Hindman, Kentucky  41822
25                       (606) 785-9876

```
 1

 2

 3   APPEARANCES (Cont.)

 4   For the Defendant
     John Mac Combs:          Hon. Lawrence R. Webster
 5                            163 Main Street
                              Suite 2
 6                            Pikeville, Kentucky  41502
                              (606) 437-4029
 7
     For the Defendant
 8   Phillip G. Champion:
                              Hon. Thomas L. Jensen
 9                            Jensen, Cessna, Benge & Webster
                              303 South Main Street
10                            London, Kentucky  40741
                              (606) 878-8845
11
     For the Defendant
12   Ronnie Adams:
                              Hon. Jason E. Williams
13                            111 West 5th Street
                              London, Kentucky  40743-3199
14                            (606) 877-5291

15

16

17

18

19

20

21

22

23   Court Reporter:          Sandy C. Wilder, RMR, CSR (IL)
                              8081 Perryville Road
24                            Danville, Kentucky  40423-9713
                              (859) 516-4114
25                            wildercaptions@kywimax.com
```

INDEX


Direct Examination of KENNY DUYER
     By:  Mr. Taylor                    4-17

Cross-examination
     By:  Mr. Westberry                 17-19

Cross-examination
     By:  Mr. Jensen                    19-25

Cross-examination
     By:  Mr. Williams                  25-26

Redirect Examination
     By:  Mr. Taylor                    26-27

Reporter's Certificate                   28

1          THE COURT:  Mr. Taylor, you can call

2    your next witness, please.

3          MR. TAYLOR:  Call Kenny Duyer.

4          THE COURT:  Ms. Duyer.

5          MR. TAYLOR:  Kenny.

6          THE COURT:  Kenny Duyer, Mr. Kenny

7    Duyer.

8          [WITNESS SWORN]

9              DIRECT EXAMINATION

10         BY:  MR. TAYLOR:

11    Q.     Sir, would you state your name for

12    the record, please.

13    A.     Kenny Duyer.

14    Q.     And how do you spell your last

15    name?

16    A.     D-U-Y-E-R.

17    Q.     And where do you live, sir?

18    A.     In Hindman.

19    Q.     That's in Knott County?

20    A.     Yes, sir.

21    Q.     And how long have you lived there?

22    A.     All my life.

23    Q.     And how long is that?

24    A.     Forty-three (43) years.

25    Q.     Forty-three (43).  And where do

1    work?

2          A.      Knott Fiscal Court.

3          Q.      What do you do for them?

4          A.      I operate a backhoe.

5          Q.      All right.  How long have you

6    worked for Knott County?

7          A.      Twenty-two (22) years.

8          Q.      All right.  Are you related by

9    blood or marriage to any of the defendants in

10   this case?

11         A.      By marriage.

12         Q.      By marriage?  And who is that?

13         A.      Ronnie, Ronnie Adams.

14         Q.      And how are you related to Ronnie

15   Adams?

16         A.      Married his step-daughter.

17         Q.      His stepdaughter?  And what's her

18   name?

19         A.      Robin Duyer.

20         Q.      Robin Duyer.  And how long have

21   you been his step -- I mean, his son-in-law?

22         A.      About eight or nine years.

23         Q.      Okay.  I want to direct your

24   attention to the period during the election

25   campaign in 2006 in Knott County for county

1    judge/executive.  Do you know the period I'm

2    talking about?

3          A.      Yes, sir.

4          Q.      Were you aware of a lot of

5    blacktopping that was done in the county at

6    that time?

7          A.      Yes, sir.

8          Q.      And how did you become aware of

9    it?

10         A.      Well, you could see it, and just

11   talk around the garage, you know.

12         Q.      Did you -- were you aware of some

13   different companies coming in to do the

14   blacktopping?

15         A.      Yes, sir.

16         Q.      And who would normally do the

17   blacktopping for the county?

18         A.      Contractors.

19         Q.      All right.  Was there one

20   particular contractor before 2006 that did the

21   work?

22         A.      I don't remember, sir.

23         Q.      Who were the companies that came

24   in to do the blacktopping in 2006; do you know

25   them?

1      A.    I don't remember them, sir.

2      Q.    Okay.  Now, did you become aware

3 of any private driveways being paved in 2006?

4      A.    You could see them.  You know, I

5 can't say who done them.

6      Q.    Did you receive any blacktop in

7 2006?

8      A.    Yes, sir.

9      Q.    And where was that?

10     A.    Combs Branch.

11     Q.    Is that your home?

12     A.    Yes, sir.

13     Q.    And how much blacktop did you

14 receive?

15     A.    The whole driveway.  I don't know

16 how much it was.

17     Q.    All right.  Did you pay for that?

18     A.    Yes, yes, sir.

19     Q.    How did you pay for that?

20     A.    Oh, no, I didn't pay for it.  I

21 misunderstood you.  Sorry.

22     Q.    You didn't pay for that?

23     A.    No.

24     Q.    Who paid for it?

25     A.    I guess fiscal court.

1    Q.    And why did you get it?

2    A.    I guess because it needed it.  I

3  asked.

4    Q.    You asked for it?

5    A.    Yeah.

6    Q.    I want to show you what's been

7  marked as Government's Exhibit 31.  Is that

8  the driveway you're referring to?

9    A.    Yes, sir.

10    MR. TAYLOR:  I'd move the

11  introduction of Exhibit 31.

12    THE COURT:  Is there any objection?

13    MR. WESTBERRY:  No.

14    THE COURT:  Without objection, it

15  will be entered as a Government's exhibit.

16  You may publish it if you choose, counsel.

17    MR. TAYLOR:  Oh, it's not scanned.

18  I'll have to use the Elmo.

19    THE COURT:  Could you retrieve the

20  exhibit, please.  Thank you, Mr. Pelfrey.

21    Q.    Is this the driveway you were

22  referring to?

23    A.    Yes, sir.

24    Q.    Is that your private property that

25  goes up the hill there?

1     A.     I just own one lot, sir.

2     Q.     You own one lot?

3     A.     Yes, sir.

4     Q.     Who owns this road right here?

5     A.     It's out in ours, you know, we

6  just got the road up the hill, but it's --

7  that road has been maintained for -- ever

8  since there's a house been there.

9     Q.     Has it had blacktop on it?

10     A.     Yes, sir.

11     Q.     When was blacktop put down on it?

12     A.     That was years ago.

13     Q.     How many -- well, was it

14  blacktopped in 2006?

15     A.     Yes, sir.

16     Q.     How many houses are up here?

17     A.     There's one there you see, but

18  there's one above that.

19     Q.     And whose house is that?

20     A.     That's my aunt's.

21     Q.     And is she any relation to Ronnie

22  Adams?

23     A.     No, sir.

24     Q.     Excuse me?

25     A.     No, sir.

1    Q.  She's your aunt?

2    A.  She's my aunt.

3    Q.  Who did you ask for blacktop?

4    A.  I just asked Phillip, you know, to

5  kind of help me out.  My road was --

6    Q.  Phillip?

7    A.  Champion, sir.

8    Q.  Phillip Champion?

9    A.  Yes, sir.

10    Q.  And why did you ask Phillip

11  Champion?

12    A.  Because the road is bad and I

13  guess he might would help me.

14    Q.  Well, was Phillip Champion in

15  charge of the county roads?

16    A.  Yes, sir, I guess so.

17    Q.  What was his title?

18    A.  I don't remember exactly what his

19  title is, sir.

20    Q.  Well, was he the county road

21  foreman?

22    A.  Sort of that, I guess.

23    Q.  Sort of that?  What gave you

24  reason to believe that he was over county

25  roads?

1      A.      Because he was out -- he was --

2   you know, he looked for them and he'd tell you

3   what to do, you know.

4           MR. TAYLOR:  I'm sorry.  Could you

5   raise up a little bit or turn this way a

6   little bit so I can ...

7           THE WITNESS:  Okay.

8           MR. TAYLOR:  I'm kind of hard of

9   hearing.  If I don't see your lips moving, I

10  can't tell what you're saying.

11      Q.      Again, what was it that made you

12  think he was in charge?

13      A.      That's the position he held, you

14  know, he was the boss.

15      Q.      Boss of what?

16      A.      The roads, of us.

17      Q.      Well, when did that start?

18      A.      Oh, whenever the judge took over.

19      Q.      And that was when?

20      A.      Whenever the election was.  I

21  can't remember the date.

22      Q.      Okay.  You talking about the

23  primary election or the general election?

24      A.      General.

25      Q.      All right.  So when was your road

1 paved?

2     A.    It was before that election.

3     Q.    Before the election?

4     A.    Yes, sir.

5     Q.    So you had asked Phillip Champion

6 before the election?

7     A.    Yes, sir.

8     Q.    Well, what was his position before

9 the election?

10     A.    I don't remember.

11     Q.    Well, there must have been

12 something that made you think that he's the

13 one to ask for the blacktop.

14     A.    I just don't remember, sir.  I

15 don't know the name of his position, I mean,

16 you know, what ...

17     Q.    Was he the only one you talked to?

18     A.    Yes, sir.

19     Q.    Were you aware of any county

20 officials riding in trucks with the gravel

21 trucks?

22     A.    I didn't see it, sir, but ...

23     Q.    Okay.  But don't tell us what you

24 heard, okay?

25     A.    Yeah.

1      Q.     Did you see any bridges being

2   built during that time?

3      A.     I knowed that there was, but I

4   didn't see any.

5      Q.     Did you see them after they were

6   built?

7      A.     Yes, sir.

8      Q.     I'll go back over here.  You

9   indicated that at some point, Phillip was

10   brought in with the road department.  Do you

11   know when that was?

12      A.     I can't remember the date, sir.

13      Q.     When he came in, was he the boss?

14      A.     Well, yeah.

15      Q.     Was he higher than Dean Bentley?

16      A.     Yes, sir.

17      Q.     Did he have authority to tell Dean

18   Bentley what to do?

19      A.     Yes, sir.

20      MR. WEBSTER:  May I approach, Your

21   Honor?

22      THE COURT:  You may.

23      [CONFERENCE AT THE BENCH]

24      MR. WEBSTER:  Whenever I asked the

25   witnesses about authority --

1           THE COURT:  This is the goose and

2      gander.

3           MR. WEBSTER:  This is the goose and

4      gander, and I don't want ...

5           THE COURT:  I think Mr. Webster's

6      correct.  This is a form of the question,

7      though.  You can certainly ask him another,

8      did you believe whether it's true or not, and

9      basically you can ask this witness whether he

10     believed that or not, and I think that would

11     address your concern; am I correct?

12          MR. WEBSTER:  Yes.

13          MR. TAYLOR:  I should have said

14     apparent authority.

15          MR. JENSEN:  Judge, while we're up

16     here, I'm going to cross-examine on all of

17     that, but on the 302, this is nothing what

18     he's testified to.  Is there something else?

19     This is all you got?

20          MR. TAYLOR:  Uh-huh (affirmatively).

21     That's not all.

22          MR. JENSEN:  But there's not what he

23     testified today on here.

24          [IN OPEN COURT]

25          Q.    You indicated earlier that this

1  road had been blacktopped before.  Who paid

2  when it was blacktopped before?

3       A.     I bought it off my uncle, and he

4  said that he paid for it his self.

5       Q.     And who's your uncle?

6       A.     Paul Duyer.

7       Q.     In 2006, did you pay for that

8  blacktop?

9       A.     No.

10       Q.     Did your uncle pay for that

11  blacktop?

12       A.     No.

13       Q.     Now, near the election time in

14  2006, did you take off some days from work?

15       A.     Yes, sir.

16       Q.     And why did you do that?

17       A.     Basically because I wanted to

18  really, you know ...

19       Q.     Just wanted to?  Wasn't any

20  particular reason?

21       A.     No.

22       Q.     Why then?

23       A.     I don't know.  We got days.

24       Q.     Excuse me?

25       A.     We have days.  We can take them

1    when we want.

2         Q.     Did you take off as part of a

3    group?

4         A.     Yes, sir.

5         Q.     And what was the purpose of the

6    group taking off?

7         A.     To not do much work.

8         Q.     And why was that?

9         A.     I don't know.  That's just all I

10   was told.

11        Q.     Did you get reprimanded for that?

12        A.     We got a mark against us, or

13   whatever you want to call it.

14        Q.     Something in your personnel file?

15        A.     Yes.

16        Q.     I want to go ahead and show you

17   Government's Exhibit 25.  Do you recognize

18   that?

19        A.     Yes, sir.

20             MR. TAYLOR:  Your Honor, I'd like to

21   move the introduction of 25.

22             THE COURT:  Is there objection?

23   Without objection, it may be entered as a

24   Government's exhibit.

25             MR. TAYLOR:  And I'll represent this

1    is like several others we've seen, so I'm not
2    going to publish it or ask that it be read.
3    That's all the questions that I have.
4              THE COURT:  All right.
5    Mr. Westberry.
6              MR. WESTBERRY:  Yes, thank you.
7                   CROSS-EXAMINATION
8        BY:  MR. WESTBERRY:
9        Q.     Good afternoon, Mr. Duyer.  I've
10   got just a couple of questions for you.  I
11   represent Randy Thompson.  I don't believe you
12   and I have ever met before?
13       A.     No, sir.
14       Q.     You were later promoted by Randy
15   Thompson to a team captain; is that correct?
16       A.     Yes, sir.
17       Q.      Did you get a raise?
18       A.     Yes, sir.
19       Q.     Could you explain that to the
20   jury, please.
21       A.     He promoted me to -- for crew
22   leader, to go out with the men and make sure
23   they do the work.  He raised me from I think
24   it was 9 something to, I don't know, 13, 13 or
25   14, somewhere in there.

1       Q.    And this was after the letter, the

2    incident involving the letter that you were

3    shown just a moment ago; is that right?  How

4    long ago -- when did you get the promotion;

5    how long ago?

6       A.    Oh, it was after this letter.

7       Q.    That's fine.  Thank you.  Your

8    driveway runs off Combs Branch; is that right?

9       A.    Yes, sir.

10       Q.    Now, Kelly Hall lives on Combs

11    Branch; is that correct?

12       A.    Yes, sir.

13       Q.    Is your house pretty close to his?

14    If not, I don't know, I've seen it.

15       A.    It's probably a quarter mile,

16    half-mile or something.

17       Q.    Cars up and down that road pretty

18    regularly?

19       A.    Yes, sir.

20       Q.    He said there were school busses

21    up and down and turning around that?

22       A.    Yes, sir.

23       Q.    Do you agree with that?

24       A.    Yes, sir.

25       MR. WESTBERRY:  Excuse me, Judge.

1      Q.    Combs Branch is a county road; is

2  that right?

3      A.    Yes, sir.

4      Q.    Your driveway fairly steep?

5      A.    Yes, sir.

6      MR. WESTBERRY:  Excuse me.  Bear with

7  us.

8      Q.    Last question.  I forgot.  I should

9  have.  Did you ever discuss the paving of your

10  road with Randy Thompson at all?

11      A.    No.

12      Q.    He never asked you for a vote or

13  anything like that?

14      A.    No, sir, not the first time.  And

15  I consider him my friend.  This has been hard

16  on me.  It's causing my family and me to be --

17  putting me through this down here, you know,

18  it's been real hard.

19      MR. WESTBERRY:  I understand.  Thank

20  you for your courtesy.

21      THE COURT:  Mr. Webster.

22      MR. WEBSTER:  None.

23      THE COURT:  Mr. Jensen.

24             CROSS-EXAMINATION

25  BY:  MR. JENSEN:

1          Q.      Mr. Duyer, I'm Tom Jensen.  I

2     represent Phillip Champion.  Let me kind of

3     work a little backwards with you.  Are you

4     related to Ralph Duyer?

5          A.      Yes, sir.

6          Q.      How are you related to him?

7          A.      My dad's brother.

8          Q.      Is he the one that got you the job

9     with the county to begin with?

10         A.      No, I was there before he was.

11         Q.      Did you help him get the job then?

12         A.      No.

13         Q.      Okay.  Now, during and right

14    before November, 2006, Ralph Duyer was

15    promoting Mike Hall at the garage, wasn't he,

16    for judge?

17         A.      Yes, sir.

18         Q.      I mean, openly doing that, talking

19    to everybody?

20         A.      Yes, sir.

21         Q.      And he convinced you to be for Mike

22    Hall, too, didn't he?

23         A.      Yes, sir.

24         Q.      And the reason you took off that

25    last week is because your uncle asked you to

1    take off so that no work would be done that
2    week; isn't that right?
3           A.     Basically, sir.
4           Q.     Yeah.  So trying to hurt Judge
5    Thompson's effort on getting things done;
6    isn't that correct?
7           A.     Basically, sir.
8           Q.     Okay.  Now, you're saying who's
9    the boss and all those things.  Of course, you
10   worked for the -- you worked for the fiscal
11   court, right?
12          A.     Yes, sir.
13          Q.     And do you know who comprises the
14   Knott County Fiscal Court; do you know who
15   makes up the court?
16          A.     Magistrates and the judge.
17          Q.     Okay.  So they're your top boss,
18   right?
19          A.     Yes, sir.
20          Q.     Right.  And then over at the
21   garage you've got a foreman, right?
22          A.     Yes, sir.
23          Q.     Do you know who the foreman is?
24          A.     Ronnie Adams.
25          Q.     Well, who was the foreman back in

1    2006?

2    A.    Dean Bentley.

3    Q.    Okay.  And how long had Dean

4    Bentley been foreman there at that time; do

5    you know?

6    A.    Not right off, sir.

7    Q.    Well, he was sworn in even under

8    Donnie Newsome, wasn't he, when Donnie Newsome

9    was judge?

10   A.    Yes, sir.

11   Q.    Okay.  Now, the road you're talking

12   about being blacktopped, wasn't that blacktopped

13   in Homer Sawyer's day when he was judge?

14   A.    Yes, sir.

15   Q.    And it was blacktopped by the

16   county then, right?

17   A.    Yes, sir.

18   Q.    Okay.  I mean, nobody's ever paid

19   for it to be blacktopped, other than the

20   county?

21   A.    Well, when I bought it, my uncle

22   said that he paid for it because I paid for

23   what he said he done.

24   Q.    You're going by what your uncle

25   told you?

1      A.    Yes, sir.

2      Q.    Which uncle is that?

3      A.    Paul Duyer.

4      Q.    Okay.  So he got some extra money

5 out of it?

6      A.    Yes, sir.

7      Q.    Which -- have you found out since

8 then that it was the county that did it and

9 Homer Sawyer had ordered it?

10     A.    No.

11     Q.    So you don't know any different?

12 You don't know one way or the other?

13     A.    No, sir.

14     Q.    You just know that blacktop had

15 been down a long time?

16     A.    Yes, sir.

17     Q.    Now, when you say Phillip Champion

18 was the boss, did Phillip ever come to you and

19 say, I'm the boss?

20     A.    No.

21     Q.    Did judge ever come to you and say

22 Phillip's the boss over there?

23     A.    No.

24     Q.    Did Phillip ever boss you anywhere

25 to do anything?

1      A.      Yes, sir.

2      Q.      What did he tell you to do?

3      A.      Oh, we was in Beaver putting some

4  tile in, you know, and he just come over there

5  and showed me what to do and where to put the

6  tile and stuff.

7      Q.      And you just did that?

8      A.      Yes, sir.

9      Q.      Most of the time was it Dean Bentley

10  telling you what to do?

11      A.      Yes, sir, a lot of the times.

12      Q.      Now, you don't know who authorized

13  to blacktop your road, do you?

14      A.      No.

15      Q.      I mean, you know, you asked

16  Phillip?

17      A.      Yes, sir.

18      Q.      But you don't know who authorized

19  it, do you?

20      A.      No, sir.

21      Q.      Do you consider that a county

22  road?

23      A.      It's been maintained, you know.  I

24  mean, if it snows, they usually scrape it.

25      Q.      Has it been maintained for more

1    than 15 years?

2         A.    I can't remember how long.  I'd

3    say so, yeah.

4         Q.    Maintained as long as you know --

5         A.    Yes, sir.

6              MR. JENSEN:  -- or are aware?  I

7    believe that's all I have, Judge.

8              THE COURT:  Thank you, Mr. Jensen.

9    Mr. Williams.

10             MR. WILLIAMS:  Just a couple, Your

11   Honor.

12                  CROSS-EXAMINATION

13        BY:  MR. WILLIAMS:

14        Q.    Sir, do you know approximately

15   when the paving occurred that you've been

16   discussing here today?

17        A.    No, sir.

18        Q.    It was sometime in the Summer of

19   '06; does that sound right?

20        A.    Yes, sir.

21        Q.    Do you know whether or not

22   Mountain Enterprises did that paving?

23        A.    I have no idea.

24             MR. WILLIAMS:  Thank you.

25        A.    I don't know who it was.

1          MR. WILLIAMS:  Thank you.

2          THE COURT:  Mr. Taylor, on redirect.

3                  REDIRECT EXAMINATION

4      BY:  MR. TAYLOR:

5          Q.      Mr. Duyer, when you took off work

6      at the request of your uncle, was it not to

7      stop Thompson from spreading the gravel and

8      the blacktop?

9          MR. JENSEN:  Judge, I'm going to

10     object to that.  That's not what he --

11         THE COURT:  Would you approach.

12         [CONFERENCE AT THE BENCH]

13         MR. JENSEN:  Judge, he just testified

14     that he didn't.  It was done to hurt Randy

15     Thompson's efforts to get things done on.

16         MR. TAYLOR:  That's what I'm

17     following up on, his efforts to spread gravel.

18         THE COURT:  I think that he can ask

19     that question and respond to it once he's

20     allowed to probe on that a little bit.

21         [IN OPEN COURT]

22         Q.      Mr. Duyer, wasn't that work

23     stoppage that we've been referring to so that

24     you wouldn't be involved in spreading the

25     gravel and the blacktop for Thompson?

1     A.    I didn't spread no blacktop, but
2    that was the word anyway.
3     Q.    Okay.  And when Phillip Champion
4    came down to the garage, did Dean Bentley take
5    orders from Champion?
6     A.    Yes, sir.
7        MR. TAYLOR:  That's all the questions
8    I have.
9        THE COURT:  Thank you, Mr. Duyer.
10   You can be excused from testimony.  And may
11   this witness be finally excused?
12       MR. TAYLOR:  Yes.
13       THE COURT:  You may be finally
14   excused from any further testimony in this
15   trial.
16       THE WITNESS:  Thank you.
17       [END OF REQUESTED PROCEEDINGS]
18
19
20
21
22
23
24
25

1        The undersigned Court Reporter hereby

2  certifies that: (1) The foregoing 27 pages

3  represent an accurate and complete transcription

4  of a portion of the record of the proceedings

5  before the United States District Court for the

6  Eastern District of Kentucky at Pikeville before

7  the Honorable Gregory F. Van Tatenhove,

8  presiding, in the matter of United States of

9  America vs. Randall Clinton Thompson, John Mac

10  Combs, Phillip G. Champion, and Ronnie Adams,

11  and (2), these pages constitute a copy of the

12  transcript of the proceeding.

13

14               _____

15               SANDY C. WILDER, RMR, CSR(IL),

16               COURT REPORTER

17

18

19

20

21

22

23

24

25