1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF KENTUCKY
2            SOUTHERN DIVISION
              AT PIKEVILLE
3
UNITED STATES OF AMERICA,
4                            No. 07-CR-35-GFVT
        PLAINTIFF,
5                            Pikeville, Kentucky
                             June 18, 2008
6                            9:18 a.m.
VS.
7
RANDALL CLINTON THOMPSON,
8  JOHN MAC COMBS,
PHILLIP G. CHAMPION,
9  RONNIE ADAMS,

10      DEFENDANTS.

11        PARTIAL TRANSCRIPT OF JURY TRIAL
        TESTIMONY OF RALPH DYER AND TOM HAYS
12
               * * * * * * * * * *
13
APPEARANCES:
14

15  For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
For the Defendant
19  Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876

APPEARANCES (Cont.)

For the Defendant
John Mac Combs:            Hon. Lawrence R. Webster
                          163 Main Street
                          Suite 2
                          Pikeville, Kentucky  41502
                          (606) 437-4029

For the Defendant
Phillip G. Champion:
                          Hon. Thomas L. Jensen
                          Jensen, Cessna, Benge & Webster
                          303 South Main Street
                          London, Kentucky  40741
                          (606) 878-8845

For the Defendant
Ronnie Adams:
                          Hon. Jason E. Williams
                          111 West 5th Street
                          London, Kentucky  40743-3199
                          (606) 877-5291

Court Reporter:           Sandy C. Wilder, RMR, CSR (IL)
                          8081 Perryville Road
                          Danville, Kentucky  40423-9713
                          (859) 516-4114
                          wildercaptions@kywimax.com

INDEX

Direct Examination of RALPH DYER
      By:  Mr. Taylor                         4-28

Cross-examination
      By:  Mr. Westberry                      28-38

Cross-examination
      By:  Mr. Webster                        38-55

Cross-examination
      By:  Mr. Jensen                         56-75

Redirect Examination
      By:  Mr. Taylor                         76-79

Colloquy                                      79-85

Direct Examination of TOM HAYS
      By:  Mr. Taylor                         85-96

Cross-examination
      By:  Mr. Westberry                      96-99

Cross-examination
      By:  Mr. Webster                        99-102

Cross-examination
      By:  Mr. Jensen                        102-106

Redirect Examination
      By:  Mr. Taylor                        106-109

Reporter's Certificate                        111

1          THE COURT:  You may be seated.  Good

2     morning, ladies and gentlemen.  The record

3     will reflect that all the jurors have

4     returned.  That's always a good sign at this

5     point in the trial.  I hope you had a good

6     evening.  We are ready to continue with the

7     presentation of the evidence.

8          At this time, the United States will

9     be recognized to call their next witness.

10          MR. TAYLOR:  Call Ralph Dyer.

11          THE COURT:  Mr. Ralph Dyer.

12          [Witness sworn]

13               DIRECT EXAMINATION

14     BY:  MR. TAYLOR:

15     Q.     Sir, would you state your name for

16     the record, please.

17     A.     Ralph Bartley Dyer.

18     Q.     And how do you spell your last

19     name?

20     A.     D-Y-E-R.

21     Q.     Mr. Dyer, where do you live?

22     A.     Mallie, Kentucky.

23     Q.     And what county is that in?

24     A.     Knott.

25     Q.     And have you lived in Knott County

1    all your life?

2        A.    Yes.

3        Q.    And are you employed, sir?

4        A.    No, sir.

5        Q.    Okay.  How do you make a living?

6        A.    I don't.  My wife works.

7        Q.    Have you previously been employed?

8        A.    Yes.

9        Q.    And give us an idea of your work

10    history.

11        A.    I worked 17 years for Knott County

12    Fiscal Court before I was laid off on March

13    the 9th.

14        Q.    Of?

15        A.    2007.

16        Q.    2007?

17            MR. WESTBERRY:  Wait -- excuse me,

18    I'll withdraw it.  Pardon me.  I apologize,

19    Mr. Taylor.

20        Q.    Where did you work for Knott

21    County's Fiscal Court, what department?

22        A.    Road department.

23        Q.    All right.  And what did you do

24    for the road department?

25        A.    I drove a truck, gravel truck.

1    Q.    Gravel truck.  I want to direct

2  your attention back to the Summer and Fall of

3  2006.  Were you aware of the election that was

4  going on in Knott County at that time for

5  county judge/executive?

6    A.    Yes.

7    Q.    And who were the candidates?

8    A.    Randy Thompson and Mike Hall.

9    Q.    And were you driving a gravel

10  truck during that summer?

11    A.    Yes.

12    Q.    During that time period, did you

13  become aware of some activity regarding

14  blacktop and gravel that concerned you?

15    A.    Yes, I did.

16    Q.    And what did you become aware of?

17    A.    Well, we was blacktopping

18  driveways and graveling, hauling a lot of

19  gravel for driveways.

20    Q.    Is that private property?

21    A.    Yes.  It was -- it's like the road

22  was here, and then the driveway to the house

23  went this way to the house.

24    Q.    And did you observe the

25  blacktopping?

1      A.    Yeah, I seen some of it being

2  done, but I didn't stay and watch it; I just

3  passed by.

4      Q.    Okay.  And did you see the gravel

5  being delivered?

6      A.    I seen it done -- you know, I

7  didn't actually see it, you know, them dumping

8  it, but I seen it done.  I seen Kenneth

9  Amburgey's trucks hauling gravel.

10     Q.    Kenneth Amburgey?

11     A.    Yes.

12     Q.    Is he an employee?

13     A.    A contractor -- no, a contractor.

14     Q.    Who was doing the blacktopping?

15     A.    There were two or three different

16  companies.

17     Q.    And was that usual or unusual?

18     THE WITNESS:  For the contractors to

19  do?

20     MR. TAYLOR:  Yes.

21     A.    Yeah, it was unusual for the

22  contractors to be doing it.

23     Q.    Who usually did the blacktopping

24  for the county?

25     A.    Mountain Enterprise.

1    Q.    And was there a lot of it being

2    done in just a short period of time during

3    that time period?

4    A.    Yes.

5    Q.    Was that being done by those three

6    contractors?

7    A.    Yes, contractors done the biggest

8    part of the blacktopping.

9    Q.    Do you recall the names of any of

10   them?

11   A.    East Kentucky Paving and R & L.  I

12   can't remember the other one there.

13   Q.    You said you didn't stay and watch

14   the blacktopping.  Where were you?

15   A.    I was passing by.

16   Q.    Where were you working during that

17   period of time?

18   A.    Most of the time I was in –– from

19   around the first part of –– or October, I was

20   in the Quick Sand area of Knott County.

21   Q.    And who were you with in the Quick

22   Sand area?

23   A.    There were several of us over

24   there, Dean Bentley, I think Chris Conley,

25   Kenny Duyer, I think Don Judy was there some.

1      Q.      And why were you all there?

2      A.      Patching potholes.

3      Q.      And how long did you stay there?

4      A.      It seemed like for three, four or

5      five weeks.  I don't know.

6      Q.      While you all were doing that, was

7      that when the blacktopping was being done?

8      A.      Yes.

9      Q.      Was the blacktopping being done

10     by, to your knowledge, by any county

11     employees?

12     A.      No.

13     Q.      Who was your direct supervisor

14     during that period of time?

15     A.      Dean Bentley.

16     Q.      Was he taking orders from anyone

17     that you're aware of?

18     A.      Phillip Champion, I think, come to

19     the garage sometimes and ...

20     Q.      Do you know what Phillip

21     Champion's job was, what his title was?

22     A.      Not at the time I don't.  I don't

23     remember.

24     Q.      Well, what was he doing heading up

25     the road department?

1          THE WITNESS:  What would -- give me

2     that question again.

3          Q.     Was he a county employee?

4          A.     Yes, he was hired -- he was an

5     employee of the county in the judge's office.

6          Q.     What was his job title; do you

7     know?

8          A.     I think it was assistant judge.

9          Q.     Okay.  Did he exercise authority,

10     give orders and expect them to be complied

11     with?

12          A.     Yes.

13          MR. JENSEN:  Objection, Your Honor.

14          THE COURT:  Would you approach,

15     please.

16          [CONFERENCE AT THE BENCH]

17          MR. JENSEN:  Judge, I haven't

18     objected to the continual leading that's been

19     going on, but even now he's starting to ask

20     questions about what's in Phillip's mind,

21     asking witnesses to say what he expected or

22     thought in his mind and asking Mr. Dyer to

23     comment about that.

24          MR. TAYLOR:  Well, Your Honor, he's a

25     simple man and not very articulate, and if he

1　says, you know, he was the boss, I'm trying to

2　find out why he thinks that.

3　　　　　　THE COURT:  Well ...

4　　　　　　MR. JENSEN:  He can do that without

5　leading.

6　　　　　　THE COURT:  Yeah, I'd caution you

7　against the leading.  I think it's getting a

8　little bit over the line.  I think the last

9　question is appropriate.  He can answer it, if

10　he knows.  He may not know.  You can't pull it

11　out of him and see what he can testify to and

12　what he knows.

13　　　　　　MR. WEBSTER:  And he became the boss

14　by highly leading, suggestive questions.

15　　　　　　THE COURT:  Well, I've said I think

16　that's crossing the line.  I've cautioned

17　Mr. Taylor.

18　　　　　　[IN OPEN COURT]

19　　　　Q.　　What did Mr. Champion do each day

20　when you came to the garage?

21　　　　A.　　Well, I've seen him bring --

22　looked like a gravel list up there and write

23　it down there on another tablet there for the

24　truck drivers to haul.

25　　　　Q.　　And who would he give that list

1    to?

2    A.    It would just go onto the desk.

3    It would be the other truck drivers, you know,

4    was the only ones that could haul.  I wasn't

5    there.

6    Q.    And what would the truck drivers

7    do with the list?

8    A.    They would haul gravel from that

9    list.  But there would be other people call

10    in, too, that would be on the same list.

11    Q.    Each morning did you go to the

12    garage?

13    A.    Yes.

14    Q.    Did you then go to -- where did

15    you go after that?

16    A.    I usually went from, like, the

17    first of -- around the first of October, or

18    something like that, I was hauling blacktop to

19    patch potholes.  I usually went onto Mountain

20    Enterprise and got a load of blacktop.

21    Q.    Were you -- was that when you were

22    talking about being at Laurel Fork and Quick

23    Sand?

24    A.    Yes.

25    Q.    Now, I don't know if I asked you.

1    Did you put any gravel on private property?

2    A.    Some, not much.  I didn't get to

3    haul much gravel.  It was mostly ...

4    Q.    Why was that?

5    A.    I guess they really didn't want me

6    to haul gravel, you know, they didn't want me

7    to know where they was going, I guess.

8    MR. WEBSTER:  Objection, speculation.

9    MR. WESTBERRY:  Objection.

10    THE COURT:  I'll sustain that

11    objection.

12    Q.    All right.  Did you ever complain

13    or raise an issue about what you saw with

14    anyone?

15    A.    Not with no man in the

16    administration I didn't.

17    Q.    With whom did you do it?

18    A.    I called to the Attorney General's

19    Office back -- it was, I think, around the

20    middle of September or something like that,

21    and I'd give Heather McWilliams some

22    information.

23    Q.    Who's Heather McWilliams?

24    A.    She was at 36 News.

25    Q.    Now, after that, did you suffer

1    any repercussions because of that?

2        A.    I believed that was the reason I

3    got laid off.

4            MR. WESTBERRY:  Judge, I would

5    object.

6            THE COURT:  I'll overrule that

7    objection.  I think he can testify.

8            MR. WESTBERRY:  Yes, sir.

9            MR. TAYLOR:  Go ahead.

10       A.    I think that was the reason I got

11   laid off, you know.

12       Q.    When did you get laid off?

13       A.    March the 9th.  I was hired back

14   in October of 2007, and six weeks later, I was

15   laid off again.

16       Q.    Were you given any reason for

17   being laid off and then terminated?

18       A.    Well, on the second layoff it said

19   it was due to a short of funds.

20       Q.    Did you take off work any time

21   during the election cycle?

22       A.    I took off a half a day from

23   around the first of October all the way up

24   until the election.

25       Q.    Did you suffer any repercussions

1    as a result of that?

2         A.     Yes, I got a reprimand.  But I had

3    had my time scheduled off, though.  That's

4    what we was supposed to do.  All we had to do

5    was write it down on the calendar and, you

6    know, make it known that we was taking off.

7    And I did do that, but I still got a

8    reprimand.

9         Q.     And when did that occur?

10        A.     After the election.

11        Q.     Okay.  I want to direct your

12   attention to an exhibit -- Government's

13   Exhibit 24A.  Do you recognize that letter?

14        A.     Yes.

15        Q.     Is that from your personnel file?

16        A.     Yeah.  They told me it was put in

17   my personnel file.  I got one like it, too.

18             MR. TAYLOR:  I'd like to move the

19   introduction of that exhibit.

20             THE COURT:  Is there an objection?

21             MR. WESTBERRY:  No objection.

22             THE COURT:  Without objection, it

23   will be entered as a Government exhibit.  You

24   may publish it, if you choose.

25             MR. TAYLOR:  I would like to publish

1  that to the jury.

2      MR. JENSEN:  Your Honor, our screen

3  is not working here.

4      THE COURT:  We'll take a look at

5  that.  Just a moment, Mr. Taylor.

6      Q.    Would you read that letter, please?

7      A.    I can't see it real good.  It says

8  here that it has been brought to my attention by

9  your supervisor that you failed to report to

10 work on various days from November the 1st to

11 the 6th without providing an authentic doctor's

12 excuse or without prior approval of taking

13 vacation time.  Therefore, consider this a

14 warning that will be placed in your personnel

15 file.  Please be advised three warnings of

16 inappropriate behavior, or something, I can't

17 read it, can result in termination of

18 employment.

19     Q.    Okay.  All right.  It says your

20 immediate supervisor, your supervisor in that

21 letter.  Who was your supervisor?

22     A.    Dean Bentley was the -- my

23 supervisor when this happened from the 1st to

24 the 6th, he was my supervisor.

25     Q.    Did he report you on that?

1   A.  I don't think he did.

2   Q.  Were others laid off when you were

3 laid off?

4     THE WITNESS:  At March the 9th?

5     MR. TAYLOR:  Yes.

6   A.  No, I was the only one.

7   Q.  Later, were others laid off?

8   A.  The second time, yes, there was 12,

9 13, something like that, laid off.

10   Q.  Was there any -- could you see any

11 consistency among those that were laid off, any

12 pattern?

13   A.  They were all for Mike Hall in the

14 election, the biggest part of them were, I

15 think.

16   Q.  During the period of time that you

17 were hauling gravel before you went to Laurel

18 Creek, who would ride, if anyone, in the gravel

19 trucks?

20   A.  Truck driver.

21   Q.  Anyone else?

22   A.  Well, no, some of the other truck --

23 one of the other truck drivers was complaining

24 to me about Mac riding in the truck with him.

25     MR. WEBSTER:  Objection, ask for an

1    admonition.

2            MR. WILLIAMS:  Objection, Your Honor.

3            THE COURT:  I think I'll allow that.

4    Under the Rules, I think it's allowed.

5        Q.    Who was Mac Combs?

6        A.    He was assistant judge, too.

7        Q.    And do you know Ronnie Adams?

8        A.    Yes, I know Ronnie.

9            MR. WILLIAMS:  Objection, Your Honor.

10           THE COURT:  Let's approach.  We'll kind

11   of address this line of questioning.

12           [CONFERENCE AT THE BENCH]

13           THE COURT:  Okay.  Who objected last,

14   Mr. Williams?

15           MR. WILLIAMS:  I did, Your Honor.  Your

16   Honor, backing up here, he asked him, did

17   anybody else ride in the trucks?  He then said

18   Mac Combs was the only name he gave.  Your

19   Honor's already overruled that I feel that was

20   based on a hearsay statement from other drivers.

21           MR. WEBSTER:  He said another driver

22   told me that Mac rode.

23           THE COURT:  I've read it.  That's

24   actually what he did testify to.

25           MR. WILLIAMS:  And, Your Honor, I'd

1   just object to the leading as applying

2   Mr. Adams' name and the only response was Mac

3   Combs.

4            MR. TAYLOR:  How do you know Ronnie

5   Adams, is leading?

6            THE COURT:  I don't think that's

7   necessarily the issue.  I think it's the hearsay

8   issue that we need to address.

9            MR. TAYLOR:  I didn't ask for a hearsay

10  response.

11           MR. WILLIAMS:  Well ...

12           MR. WEBSTER:  But you got one.

13           MR. TAYLOR:  I got one.

14           THE COURT:  Well, I've reread it in

15  terms of --

16           MR. JENSEN:  I would ask for the

17  admonition to the jury just to say that, you

18  know, everything that he's saying that other

19  people told him is hearsay and not being

20  considered.

21           THE COURT:  Are the defendants

22  comfortable with that?

23           MR. WEBSTER:  Yes.  And I'd like it to

24  be specific as to that question as regards to

25  that answer.  That's very powerfully --

1          MR. TAYLOR:  You're asking to be kind

2    of harmless.  In just a moment we're going to

3    have people say Mac Combs rode in the truck with

4    me, so it's not going to be a big deal.  It's

5    just going to be calling more attention to

6    what's going to be proven in just a moment.

7          THE COURT:  If everybody's in agreement

8    that that's the way you want it handled.  I

9    think Mr. Taylor makes a good point.

10          [IN OPEN COURT]

11          THE COURT:  Ladies and gentlemen of the

12    jury, we've addressed a matter in a bench

13    conference and I need to admonish you that when

14    a witness testifies to what someone else said,

15    that's sometimes considered hearsay.  You

16    probably heard that phrase before.  This witness

17    has testified that someone told him that

18    Mr. Combs, who's a defendant in this case, was

19    riding in a truck, and I'd just direct you to

20    disregard that response with this witness.

21    That's considered hearsay, and so you'll be

22    directed to disregard that particular response

23    from this witness.  Mr. Taylor.

24         Q.     I think the question was, do you

25    know Ronnie Adams?

1        A.     Yes.

2        Q.     And how do you know Ronnie Adams?

3        A.     He was a magistrate.

4        Q.     For the time period 2006?

5        A.     Yes.

6        Q.     Specifically during the period

7 between, say, July and November of 2006, what

8 was his position with the county?

9        A.     He was a magistrate.

10       Q.     Do you know of any responsibility he

11 had in the road department?

12       A.     He would call for gravel and stuff,

13 you know, for people.

14       Q.     Right now I'm not asking you what he

15 actually did.  I'm asking you, do you know of

16 any authority he had in the road department?

17       A.     No.

18       Q.     Or any position he had in the road

19 department?

20       A.     No.

21       Q.     Do you know of any authority he had

22 to determine where blacktop would be laid?

23       A.     No.

24       Q.     Now, Mr. Dyer, did you receive

25 another reprimand in your file in December,

1   2006?

2       A.      Was it in December?  I can't

3   remember the dates, but I got a ...

4           MR. TAYLOR:  Let me see if I can

5   refresh your memory and show you Exhibit 24B.

6           THE WITNESS:  You say December?

7       Q.      Just take a look at that.  Read

8   that and refresh your memory.

9       A.      Yes.

10      Q.      You recognize that letter?

11      A.      Yes.

12          MR. TAYLOR:  Move the introduction of

13  24B.

14          THE COURT:  Is there objection?

15  Without objection, it will be entered as a

16  Government exhibit.  You may publish it,

17  counsel.

18      Q.      I want you to read that for the

19  jury, please.  Wait, let's wait until it gets

20  blown up so they can follow along with it.

21  Would you read that, please.

22      A.      During various meetings and

23  conversations with different road department

24  employees from November the 6th, 2006 through

25  December 1st, 2006, it was brought to my

attention by the employees that Ralph Dyer had
called and/or personally asked them and other
employees not to show up to -- for work prior
to the November 7th election.  This type of
activity cannot be tolerated by employees.  I
sought the advice of an attorney from the
Governor's Office for Local Department and the
Kentucky Association of Counties who advised
that activity could qualify as organizing an
illegal strike that could be grounds for
dismissal.  I have decided not to take this
action, but to place the record of improper
activity in Mr. Dyer's personnel file.
Mr. Dyer's supervisor, Phillip Champion,
informed him of the reports and the action
taken December 19, 2006.

    Q.    Would you tell us what it was that
led to this report?

    A.    I didn't call anyone.  They were
-- we were all standing at the garage outside
one morning, and Craner Jacobs, the other
truck driver, was complaining about --

        MR. JENSEN:  Objection, Your Honor.

        MR. WILLIAMS:  Objection.

        MR. TAYLOR:  May we approach?

1    THE COURT:  You may.

2    [CONFERENCE AT THE BENCH]

3    MR. TAYLOR:  I assume the objection

4    is hearsay, and it's not admitted for the

5    truth of the matter but to show the

6    conversation which led to the statement that

7    led to the reprimand, and to show that there

8    was retribution for and to counter the

9    contention that this was some kind of purely a

10   Mike Hall strike versus a we don't want to

11   participate in illegal activity strike.

12   MR. WILLIAMS:  Your Honor, I just

13   anticipate the kind of thinking about then

14   Craner said such-and-such.

15   THE COURT:  Right.

16   MR. WILLIAMS:  And I think it can be

17   brought in without -- the point he was trying

18   to make that we had the point that we had a

19   conversation about that.  It could be said

20   that giving the details of what was said.

21   THE COURT:  Well, I think the

22   Government can ask the question about this

23   witness's, again, state of mind.  It's not

24   whether or not it was said or not.  This is

25   what this witness ...

1      MR. TAYLOR:  And I would expect an

2  admonition that they're not to consider it for

3  its truth, but only for what prompted him to

4  take any action that he took.

5      THE COURT:  Okay.

6      MR. WILLIAMS:  I think that is

7  inappropriate, Your Honor.

8      MR. TAYLOR:  And I'll also say in

9  terms of any error, that Craner Jacobs will be

10  testifying.

11      THE COURT:  Right.  Okay.  Well, at

12  the appropriate time, when you're done with

13  your questions, I'll be happy to give the

14  admonition at that time.  Sometimes a general

15  admonition's given, but it's usually at the

16  time the testimony is given.

17      [IN OPEN COURT]

18      Q.     Mr. Dyer, I was asking you what

19  led to this reprimand.  If you could just tell

20  us what it was that led you to do something

21  that led to this reprimand.

22      A.     I was at the garage one morning,

23  and I think it was just like on a Thursday or

24  Friday before the election; I think that's

25  about when it was.  It was -- and Craner

Jacobs was complaining about Mac going to have
to go to Lotts Creek to haul gravel, and he
said Mac was riding with him and he didn't
like it, and see, I was already taking off --

        MR. WEBSTER:  Your Honor --

        THE COURT:  Hold on, please, sir.
Mr. Webster?

        MR. WEBSTER:  It's the same objection
that I made just awhile ago about --

        THE COURT:  Thank you.  It's noted,
and we'll address that issue.  Thank you.
Mr. Taylor.

    Q.    All right.  So what did you say?

    A.    I asked him -- I told him to take
off like I was doing if he didn't like it.

    Q.    Take what?

    A.    Take off of work.

    Q.    Take off work?

    A.    Yes.

    Q.    If he didn't like it?

    A.    Yeah.

    Q.    All right.  Did you say anything
else?

    A.    One of them asked me there would
-- you reckon Mike would give our days back if

1    we'd take off, and I said he probably would.

2         Q.    Okay.  All right.  And do you

3    know -- if you know, you may not, how that got

4    back to Randy Thompson and Phillip Champion?

5              MR. JENSEN:  I'm going to object,

6    Your Honor.

7              MR. WESTBERRY:  Same objection.

8              MR. TAYLOR:  If you know.

9              THE COURT:  I'll allow the question.

10   You may answer.

11        A.    I think Craner Jacobs told him.

12        Q.    Do you know if some of those

13   individuals took your advice and took off

14   work?

15        A.    Not really, because a lot of them

16   took -- had their days already scheduled off

17   and was taking off for different reasons.

18        Q.    Are you aware of others who got

19   reprimands?

20        A.    All of them got reprimands that

21   was off, even though they had their days

22   scheduled off.

23             MR. TAYLOR:  One moment.  That's all

24   the questions I have.

25             THE COURT:  Mr. Westberry.

1      MR. WESTBERRY:  Yes.  Thank you.

2                    CROSS-EXAMINATION

3      BY:  MR. WESTBERRY:

4      Q.     Good morning, Mr. Dyer.  We can move

5  that back, deputy, if you don't mind.  How ya'

6  doing?

7      A.     All right.

8      Q.     I've got just a few questions for

9  you right now.  It won't take a whole long

10  period of time.  You were asked questions

11  about some reprimands and some layoffs, and I

12  wanted to start off by asking you just a few

13  questions to clarify a couple of things.  The

14  first reprimand you got was for some time you

15  took off, according to the letter, it said you

16  didn't have a proper note from the doctor or

17  an explanation from the doctor; is that right?

18      A.     That's what the paper said.

19      Q.     Sure.  Now, you later went back

20  and got a note or letter or something from the

21  doctor?

22      A.     No, no, no.

23      Q.     No?

24      A.     Uh-uh, not on the reprimand.  This

25  here was done during this election.

1   Q.   Did you ever get some kind of a

2   note or some kind of information that you

3   couldn't lift more than five pounds from the

4   doctor?

5   A.   I was injured in 2002, and I was

6   working under a doctor's orders.

7   Q.   Right.  So you had trouble

8   lifting; is that right?

9   A.   I had trouble lifting and bending.

10   Q.   Okay.  Did you provide that

11   information to the county?

12   THE WITNESS:  Did I do what?

13   Q.   Did you let the county know --

14   A.   Yes.

15   Q.   -- that you had trouble lifting?

16   A.   Yes, they knowed about it.  When I

17   started back to work, after I got able to go

18   back to work, they had a ...

19   Q.   Right.  Okay.  Now, the other

20   reprimand that came later, or, excuse me, the

21   other layoff, the layoff came a little bit

22   later.  We've heard other witnesses testify,

23   and I think I heard you say, Mr. Dyer, that

24   you were not the only person laid off; is that

25   right?

```
 1              THE WITNESS:  Back in November?
 2              MR. WESTBERRY:  Yes, sir.
 3         A.     Yeah.
 4         Q.     Okay.  I think there was some 10,
 5    11, 12, 13 people roughly that were laid off?
 6         A.     Yes.
 7         Q.     Now, do you know Dean Bentley?
 8         A.     Yes.
 9         Q.     Mr. Bentley testified yesterday
10    that in addition to people on your side of the
11    political side, there were others on Judge
12    Thompson's side that were laid off as well.
13    Do you have any reason to believe Mr. Bentley
14    may not be right?
15              THE WITNESS:  That there were other
16    people that was on the other side that was
17    laid off, too?
18         Q.     Yes, sir.  That's what Mr. Bentley
19    said.  Do you disagree with Mr. Bentley?
20         A.     Well, I don't know exactly who all
21    was laid off.
22         Q.     But there were well over -- there
23    were over ten people that were laid off?
24         A.     Well, yeah.
25         Q.     Let me just ask you.  You were for
```

1    Mike Hall in the election, correct?

2         A.    Yes, I did.

3         Q.    And you were a strong supporter of

4    his, correct?

5         A.    Yes, I was.

6         Q.    Do you know Orville Pratt?

7         A.    Yes, I do.

8         Q.    Now, would you tell the jury who

9    Orville Pratt is, please.

10              THE WITNESS:  Do you want me to tell

11   ya --

12        Q.    Just tell the jury just who he is,

13   what -- about -- we've heard his name.  I

14   think he lives in Knott County, but how do you

15   know him?

16        A.    He don't live in Knott County.  He

17   lives in Perry County.

18        Q.    Right, but he has property in

19   Knott County; is that right?

20        A.    Yes.

21        Q.    Have you ever received any

22   information from -- excuse me -- did

23   Mr. Pratt, to your knowledge, ever own East

24   Kentucky Paving?

25        A.    I think he did at one time, yes.

1       Q.      Right.  Some time ago; is that

2   right?

3       A.      Yeah.

4       Q.      Okay.  Did you ever provide the

5   Government any information about Mr. Pratt

6   taking from the county garage property, paving

7   equipment, stuff like that, blacktop that

8   belonged to the county?

9               MR. TAYLOR:  I want to object to

10  relevancy to this trial.

11              THE COURT:  Why don't you approach,

12  counsel.

13              [CONFERENCE AT THE BENCH]

14              THE COURT:  The Government has

15  objected on relevancy grounds.

16              MS. LOGAN:  And the relevance is

17  this.  Yesterday, Ronnie Campbell said the

18  county paved his road, and I believe it was

19  paved by East Kentucky Paving, which according

20  to Mr. Dyer's grand jury testimony, took

21  county materials from the county garage.  I

22  don't believe that was ever accounted for

23  either that -- I think it's relevant to show

24  that maybe the county wasn't the one that paid

25  for his driveway.  It's much like from the

garage according to Mr. Dyer.  He was also
using the county blacktop, but the paving was
paving driveway favors for his friends other
than orders of the county.

THE COURT:  Mr. Taylor.

MR. TAYLOR:  That just seems pretty
tenuous.  If he's -- I guess the argument is
if he stole from the garage, he probably stold
blacktop during the election.  And in a way,
it helps my case.  Orville Pratt's going to be
shown to be helping to spread this blacktop
around and brokered the deal with Randy
Campbell and Randy Thompson.

THE COURT:  The good news for you on
that front then is that I'm going to allow
it.  I think I can allow you a little bit of
leeway here.  If this gets into an area that
we're not anticipating, we'll address it, but
I'll allow it.

[IN OPEN COURT]

MR. WESTBERRY:  Excuse me just a
moment, Your Honor, we just got this material.

THE COURT:  Certainly.  No problem.

MR. WESTBERRY:  Thank you.

Q.     Do you remember the question just

1    a moment ago, Mr. Dyer?

2         A.    No, I don't.

3         Q.    Would you like for me to repeat it

4    again?

5         A.    Yes.

6         Q.    Did you ever tell the grand jury

7    that you had information or saw Orville Pratt

8    taking materials from the county garage there

9    in Knott County?

10             THE WITNESS:  Just material?

11        Q.    What did you see him, Mr. Pratt

12   take from the grand jury -- from the county

13   garage?  What did you tell the grand jury?

14        A.    They came up there and got some

15   tile once.

16        Q.    Yeah.  What kind of tile was it?

17   What's it used for?

18        A.    To go across creeks or across

19   ditch lines or something.

20        Q.    Yeah.  That was county property,

21   correct?

22        A.    Yes.

23        Q.    You said it happened once.  Did

24   you tell the grand jury that you saw it,

25   though, more than once?

1      A.      Well, yeah, I guess I have seen it

2  more than once.

3      Q.      Let's kind of lay it on out.

4  Isn't it a fact that you told the grand jury

5  that not just once, that you saw it happen

6  over an eight or nine year period, correct?

7      A.      Not Orville, I don't remember

8  saying that, that long.

9          MR. WESTBERRY:  Yeah.  Over a lengthy

10  period of time.  Do you have the grand jury

11  testimony?  Excuse me, I'm sorry.  We just got

12  this material and --

13          THE COURT:  No, that's fine.

14          MR. TAYLOR:  What page are you on?

15          MS. LOGAN:  Page 15.

16          MR. WESTBERRY:  Which line?

17          MS. LOGAN:  The first line.

18      Q.      It's at -- Mr. Taylor, page 15,

19  question begins line 24.  I'm going to read you

20  the question and answer, Mr. Dyer, and ask you

21  if this is your recollection.  Line 24, counsel,

22  page 20.  Question -- this was from

23  Mr. Taylor -- no, excuse me, by the grand jury.

24  I apologize.  During this campaign, can you give

25  us the names of any people that you know that

1    might have made a statement that -- oh, excuse

2    me -- Kristin, I'm --

3            MS. LOGAN:  It's stapled.

4            THE COURT:  It's all right.

5            MR. WESTBERRY:  They're not in the

6    order as we were given last night.

7            MS. LOGAN:  I think these are

8    backwards.

9            MR. WESTBERRY:  And I'm going to get

10    this right.  Just bear with me.

11            THE COURT:  Take your time, counsel.

12    That's fine.

13            MR. WESTBERRY:  My friend likes to

14    give me these sometimes in reverse order, I've

15    noticed.  Would you mind, if it would help if

16    Kristin helps out?

17            MS. LOGAN:  Good morning, Mr. Dyer.

18    My name is Kristin Logan.

19            THE COURT:  I'll recognize Ms. Logan.

20            MS. LOGAN:  The question was, And

21    what your knowledge, or what was the general

22    word about Orville in the county?  And he said

23    that he would do anything for a dollar if

24    that's what you want to hear.  And then you

25    were asked, well, whatever is the truth is

1    what we'll want to hear.  And your response

2    was, yeah, that's about it.  It's been going

3    on like this for nine years or eight years up

4    there at the garage, nine years now that

5    Orville would come up here and I -- I will be

6    a witness to that, that he would come up there

7    and load that tile and stuff himself and haul

8    it off.

9        A.    It didn't go on all the time, not,

10   you know, an everyday thing, just, you know,

11   when he wanted stuff, he'd come and get.

12         MS. LOGAN:  Over the course of eight

13   or nine years?

14       A.    Yeah, ever since Donnie Newsome

15   was judge.

16         MR. WESTBERRY:  Thank you for that

17   leeway, Judge.

18         THE COURT:  Yes, sir.

19         MR. WESTBERRY:  I'm looking at my

20   notes here.

21       Q.    Who is Larry Thacker?

22       A.    He used to be the road foreman at

23   the garage back in '98, I guess.

24       Q.    Who was county judge then with

25   Mr. Thacker?

1    A.    Homer Sawyer.

2    Q.    Did you ever take any direction

3  from Mr. Thacker?

4    A.    When he was --

5         MR. WESTBERRY:  Yes, sir.

6    A.    -- when he was road foreman?

7         MR. WESTBERRY:  Yes, sir.

8    A.    Yes.

9         MR. WESTBERRY:  I believe that's all

10  I have at this time.  Thank you, Judge.

11         THE COURT:  Thank you,

12  Mr. Westberry.  Mr. Webster.

13              CROSS-EXAMINATION

14    BY:  MR. WEBSTER:

15    Q.    Mr. Dyer, I'm number three on the

16  defense tag team here, and I have a few

17  questions for you.  Let's just try to set the

18  situation here.  The way county government

19  works, the decisions as to where to spend

20  county money, what roads to work on are made

21  by the county, the fiscal court or the county

22  judge, the executive department; is that

23  correct?

24    A.    Yes.

25    Q.    And the administration of those

```
1    projects are then delegated if it's a road

2    project to the road crew?

3         A.    Yes.

4         Q.    And the head of that in charge of

5    all of you and in charge of all of the county

6    road system and seeing that things are done

7    properly is and was, or was at this time,

8    Harold Dean Bentley, the county road foreman

9    supervisor?

10            MR. TAYLOR:  Your Honor, may we

11    approach?

12            THE COURT:  You may.

13            [CONFERENCE AT THE BENCH]

14            MR. TAYLOR:  Your Honor, I'm going to

15    object to what is essentially an argument at

16    the line of argument published through a

17    witness who has absolutely no ability to

18    distinguish the constitution or statutory

19    roles of officeholders, and that's all that

20    we've got here.  It goes back to his attempt

21    yesterday, or two days ago, to try to make a

22    road foreman a statutory officer, and it's not

23    the same thing.  It's apples and oranges.  And

24    now he's publishing his closing argument based

25    on law that's not applicable here through an
```

1   unsophisticated gravel truck driver.

2            THE COURT:  Mr. Webster.

3            MR. WEBSTER:  First of all,

4   Mr. Taylor's just as wrong as he can be when

5   he says that the county road foreman does not

6   have those statutory duties.

7            THE COURT:  Yeah, but you can't

8   testify to that.

9            MR. WEBSTER:  I'm asking him how

10  things were, and he hadn't said whether he

11  knows or not.  The county road foreman, we're

12  getting to the point -- he's trying to -- he's

13  got the guy saying that Phillip Champion is

14  directing things, if he knows that.

15           THE COURT:  Well, I think this line

16  of questioning is okay.  I do think I'm going

17  to sustain the objection about the question in

18  terms of characterizations.  There is this

19  fine line between your ability to actually

20  lead a witness on cross-examination and

21  testifying, in essence, kind of setting up

22  your closing argument and Mr. Taylor's

23  characterization in the form of your question,

24  so I'd caution you.  I mean, I can't directly

25  admonish particular words to use,

Mr. Webster.  I'll give you some discretion in

terms of responding to my ruling, but I do

think you've kind of crossed the line with the

way this is unfolding in this manner.

[IN OPEN COURT]

Q.      Harold Dean Bentley, you all call

him Dean, was the road foreman?

A.      Yes.

Q.      Your boss?

A.      Yes.

Q.      And in fact, he is the one who

sent you to Quick Sand, to Laurel Fork?

A.      He was the one that told us to go

to Quick Sand, but he had orders from Phillip.

Q.      You don't know what orders he had,

do you?

A.      Well, he told me that's where he

got his orders from.

Q.      He told you to go to Quick Sand;

is that right?

A.      Well, yeah.

Q.      And he told you when -- every day

whether to go to Quick Sand or not?

A.      Yes, that was the orders.

Q.      And kept you there longer than was

1    necessary?

2        A.      Nope.  We done our job over

3    there.  We had one truck and I had to go all

4    the way to Martin to get it.

5        Q.      Were you all trying to drag it out

6    over there?

7        A.      No, I wasn't, because I only could

8    work half-days when I was over there.

9        Q.      Now, let's set the stage here.

10   The county had passed a road bond issue; is

11   that right?

12       A.      Perhaps.  I don't know.

13       Q.      They had available the money to do

14   more blacktopping than had ever been done

15   before; is that right?

16       A.      They sure did.

17       Q.      And that needed to be done before

18   the blacktopping season ended?

19           THE WITNESS:  What are you asking

20   me?

21           MR. WESTBERRY:  Yes, sir.

22           THE WITNESS:  I don't get the

23   question.

24       Q.      What is the -- when does the

25   blacktopping season end?  When does it end?

1     A.     I really couldn't tell you.  I

2    thought we hauled all the way up into

3    November.

4     Q.     All right.  Sometime when it gets

5    too cold, you can't blacktop?

6     A.     Yeah.

7     Q.     And during a crucial time of that

8    implementing that bond project, you and

9    several others walked off the job?

10     A.     I didn't walk off.

11     Q.     How'd you -- what did you do then?

12     A.     I took off.

13     Q.     Well, you didn't -- the policy of

14    the county was to --

15     A.     I scheduled my time off.

16     Q.     How?

17     A.     We marked it down on the calendar,

18    and that was the process that we was supposed

19    to done, was marked our time on the calendar,

20    and we could take off, and that's what I done.

21     Q.     How many days before you took off

22    did you mark it?

23         THE WITNESS:  Give me the question

24    again.

25     Q.     How many days did you mark up to

1    take off before you did take off?

2        A.    Oh, it was probably around the 1st

3    of September when I started, you know,

4    scheduling my time off.

5        Q.    What do you mean started

6    scheduling your time off?

7        A.    I scheduled my time off back in

8    September like I was supposed to.  Prior

9    notice.

10       Q.    And when did you put on that

11   calendar you were going to take off?

12       A.    I think it was from around the

13   4th, 3rd, 4th or 5th of October all the way to

14   the election I took off a half a day each

15   day.  And then from, I think the Friday before

16   the election, I took off the whole day.

17       Q.    Did that have anything to do with

18   the election?

19          THE WITNESS:  Did it have anything to

20   do with it?

21          MR. WEBSTER:  Yes.

22       A.    Yeah, I didn't want to be involved

23   in what was being done.

24       Q.    You also wanted to campaign for

25   Mike Hall?

1    A.    I did campaign for Mike Hall.

2    Q.    And the day when you left the road

3    crew, you went out and campaigned?

4    A.    Yes, I did.

5    Q.    And when you called the Attorney

6    General, did you tell them that you had put

7    gravel on private driveways?

8         THE WITNESS:  Did I tell them?

9         MR. WEBSTER:  Yeah.

10    A.    No, I didn't tell them I was doing

11    it.

12    Q.    Huh?

13    A.    I didn't tell them I was doing it.

14    Q.    Well, you told us you had done

15    it.

16    A.    Well, I didn't tell them that I

17    had done it until I was told to do it.

18    Q.    Well, you had put gravel on

19    private driveways yourself?

20    A.    I said a couple of driveways,

21    yeah, some, not much.  I didn't haul much

22    gravel.

23    Q.    Now, once the -- after the --

24    Phillip Champion, as a part of the county

25    judge's office, would tell you all what roads

1    to work; is that right?

2         A.     He would tell Dean.

3         Q.     I'm sorry?

4         A.     He would tell Dean.

5         Q.     He would tell Dean?

6         A.     Yeah.

7         Q.     Now, now, after that information

8    is obtained, the road department takes it from

9    there?

10              THE WITNESS:  The road crew?

11              MR. WEBSTER:  Yeah.

12        A.     Yeah.

13        Q.     And when a blacktopper comes in to

14   pave, they are guided, are they not, by what

15   has been graded?

16              THE WITNESS:  What do you mean

17   graded?  The road's graded?

18        Q.     You have to grade everything you're

19   going to blacktop?

20        A.     Yeah.

21        Q.     And that's Paul Slone who did

22   that?

23        A.     Yes.

24        Q.     And do you know -- you don't know

25   personally whether or not Paul Slone graded

1    accurately or not, do you?

2              THE WITNESS:  What do you mean graded

3    accurately?

4         Q.    Did he grade things that shouldn't

5    have been paved?

6         A.    I really don't understand what

7    you're trying to ask me there.

8         Q.    What I'm trying to ask you, the

9    final person that marks a place to be

10   blacktopped is the grader operator?

11        A.    No, uh-uh.

12        Q.    Why not?

13        A.    He's just there to do what he's

14   told to do.

15        Q.    But he runs that grader to

16   wherever he decides to stop, doesn't he?

17        A.    No, uh-uh.  There was always a

18   mark with paint.

19        Q.    But you don't know whether he went

20   past that mark or not, do you?

21        A.    Do I?  No, I don't know if he went

22   past it or not.

23        Q.    If he testified in front of the

24   grand jury that he never marked any private

25   driveways, would you believe him?

1          THE WITNESS:  Marked them, to be

2     blacktopped?

3          Q.     Paved them or graded?

4          THE WITNESS:  Would I believe him

5     that he never graded any private driveways?

6          Q.     If he said that?

7          A.     No.

8          Q.     Now, you -- had you talked to Mike

9     Hall about all these people taking off?

10          A.     No, I didn't talk to Mike Hall

11     about it.

12          Q.     What gave you the confidence to

13     tell these workers that if they took off, that

14     Mike would probably, I think you said, make it

15     up?

16          A.     I just said it.

17          Q.     Well, I mean, did you --

18          A.     I hope he would because of the

19     things that they was doing, the things that

20     was going on in the county, you know, that ...

21          Q.     But you didn't see those things

22     going on?

23          A.     I seen a lot of it.

24          Q.     You told Craner to take off?

25          A.     Yeah.  There were several standing

1    around that heard it.  I don't know who all

2    was there.

3          Q.      Did you hope that would affect the

4    election?

5          A.      Well, no, I didn't hope it would.

6          Q.      Did you ever tell anybody in the

7    community that this -- what -- the work you

8    all were doing was courtesy of Mike Hall?

9          A.      No.

10         Q.      Did you hear of others telling

11   that?

12         A.      Not as I know of.

13         Q.      You say a lot of people took off

14   work a few days before the election?

15         A.      I don't know how many did, but I

16   think it was four, five, six, something like

17   that.

18         Q.      How many people were in the road

19   crew?

20         A.      I think it was about 13 or 14.

21         Q.      So maybe a little less than half

22   of the workers all took off the same time and

23   you say for different reasons?

24         A.      Yeah.  They had their time

25   scheduled off, too, some of them did.

1     Q.    You don't have that calendar to

2  show us?

3     A.    No.  It disappeared.

4     Q.    When you were testifying, and I

5  believe in front of the grand jury, Mr. Taylor

6  asked you about that East Kentucky Paving

7  bunch; do you remember that?

8     A.    I remember being asked about East

9  Kentucky Paving.

10     Q.    He called them that.  And do you

11  remember what you told him, or what you thought

12  about them?

13     A.    I don't know what you're trying to

14  ask me.

15     Q.    Did you tell the grand jury that

16  the East Kentucky Paving bunch was a bunch of

17  crooks?

18     A.    I don't remember saying that.

19     Q.    Well, do you believe that?

20     A.    Well, I really -- they was doing

21  some wrong things, I think.

22     Q.    Who were you referring to when you

23  used the word or phrase the bunch?  Were you

24  referring to Orville Pratt?

25       MR. TAYLOR:  Would you give me the

1    page numbers?

2         A.    Orville --

3         Q.    Page 6 on the grand jury, I

4    believe -- I'm sorry, page 7 on his interview.

5    I may have been mixed up.  I'm talking, I

6    believe, instead of the grand jury, of an

7    interview that you did with Officer Hopkins

8    here.  And on page 7 you were asked -- do you

9    remember being asked this?  Do you know anything

10   about this East Kentucky Paving bunch?  And you

11   said, ah, crooks.  Hopkins:  Are they?  Yeah.

12   Hopkins:  I know they -- don't they have a

13   Hazard address, or something like that?  And you

14   said, now, Orville Pratt, I think, is half

15   owners with it with his brother-in-law.  I don't

16   know his brother-in-law's name.  I think it's

17   Combs.  Who were you referring to as being a

18   bunch of crooks?

19        A.    I don't remember saying it that

20   a-way.  I swear I don't.

21        Q.    Well then, I'll ask you again.  Do

22   you now think that?

23        A.    I think they done some things

24   wrong, yeah, I do.

25        Q.    Were you referring to just Orville

1    or do you know this Randy Campbell guy?

2         A.    No, I don't know him.

3         Q.    If Orville testifies under oath,

4    would you believe him?

5         A.    I don't know him that well.

6         Q.    You knew him well enough to tell a

7    person you thought was an FBI agent that he

8    was a crook?

9              MR. TAYLOR:  Objection.

10        A.    Well, I said he'd done wrong

11   things.

12        Q.    When you made that interview, did

13   you know you were being taped?

14        A.    I think so.  I'm not for sure.  I

15   can't remember.

16        Q.    I represent Mac Combs.  He never

17   rode with you ever, did he?

18        A.    No.

19        Q.    You know nothing about him, other

20   than --

21        A.    He was assistant judge.

22        Q.    Huh?

23        A.    Other than he was assistant judge.

24        Q.    Well, he wasn't at the time of

25   this paving, was he?

1      A.      At the time of the paving?  Yeah,
2   I think he was.
3      Q.      You're -- I can understand why you
4   might be mistaken about that, but aren't you
5   aware that when he ran in the primary that
6   year --
7      A.      And he was hired back.
8      Q.      I'm sorry?
9      A.      And he was hired back.
10     Q.      Was that wrong?
11          THE WITNESS:  Do I think it's wrong?
12     Q.      To hire somebody back that has
13  worked for the county government most of the
14  time it takes to get their pension; is that
15  wrong?
16     A.      They didn't hire me back, and I
17  just lacked three years.
18     Q.      You organized a strike, though?
19     A.      No, I didn't organize no strike.
20     Q.      You encouraged and abetted workers
21  to take off during the busiest time that this
22  county had ever seen in the road department,
23  true or false?
24     A.      I didn't organize it, no, uh-uh.
25  I just asked them to take off.

1    Q.    You asked them to take off?

2    A.    Yeah.  You didn't see what was

3    going on over there at the county either.

4    Q.    Fact is, you wanted to slow down

5    the road improvements?

6    A.    I probably would have.  If I seen

7    it slowed down, it needed to be slowed down.

8    It wasn't improvements; they was doing

9    driveways.

10    Q.    You haven't identified a single

11    driveway.

12    A.    I can name you some driveways.

13    Q.    That you paved, that you graveled?

14    A.    No, that I paved?  I didn't pave

15    no driveways.

16    Q.    That you graveled?

17    A.    I can tell you, yes, there's one

18    over there in Salisbury where we put in some

19    tile.

20    Q.    I'm sorry?

21    A.    I can't name the names of the

22    driveways what I'm saying or the people, but

23    I know where they're at.

24    Q.    And when was that?

25    A.    It was back in 2006 -- or -- yeah.

```
1        Q.      Before you went to Quick Sand?

2        A.      Yeah.

3        Q.      And who was over your crew that

4   day?

5        A.      I think Dean was.  We was putting

6   in tile over there.

7        Q.      And you don't know who?

8               THE WITNESS:  Can I get some water,

9   please?  I can't hardly talk.

10              THE COURT:  We're going to take care

11  of you, sir.  Just one moment.

12              MR. WEBSTER:  I like that water

13  because it's stronger than my wife's coffee.

14              THE WITNESS:  Thank you, sir.

15       Q.      Who was in charge of the road

16  crew, Dean Bentley then when he did that?

17       A.      He was over there, yes.

18       Q.      Was that -- where was that?

19       A.      Salisbury.

20       Q.      Is that -- what country is that;

21  is that Mike Hall country?

22       A.      No, uh-uh.

23              MR. WEBSTER:  Thank you.

24              THE COURT:  Mr. Jensen.

25              MR. JENSEN:  Thank you, Your Honor.
```

1                    CROSS-EXAMINATION

2     BY:  MR. JENSEN:

3     Q.     Morning, Mr. Dyer.

4     A.     Morning.

5     Q.     I represent Phillip Champion, and

6 I've got a few questions for you.  How many

7 years did you say you worked at the road

8 department?

9     A.     Seventeen (17).

10     Q.     So that would have been through

11 the administration of Donnie Newsome and also

12 Homer Sawyer?

13     A.     Yes.

14     Q.     Did you work for any other county

15 judge before that time or is that -- did that

16 --

17     A.     I was hurt back in 1990, March of

18 1990.

19     Q.     Who was judge then?

20     A.     Homer Sawyer.

21     Q.     Okay.  Now, during that period of

22 time, did you always haul gravel?

23          THE WITNESS:  Pardon me?

24     Q.     Have you always just hauled

25 gravel?

1      A.    I run a weed cutter for awhile. I

2    hauled equipment for awhile. I done several

3    things.

4      Q.    Well, let me ask primarily, was

5    that your job being a truck driver hauling

6    gravel?

7      A.    Yes.

8      Q.    For all three judges you worked

9    for?

10      A.    Yes.

11      Q.    Now, isn't it true that in the

12    garage at least for the past eight or nine

13    years, there was a list hanging up that people

14    would call in and say, I need gravel. Do you

15    recall that list?

16      A.    It didn't -- it wasn't hanging

17    up. It was always on the desk.

18      Q.    Okay. So there's a list on the

19    desk that people just called in and said, I

20    need gravel?

21      A.    Yes.

22      Q.    Now, did that start in Homer

23    Sawyer's Administration or was it Donnie

24    Newsome's?

25      A.    Mostly when -- from 1990 to '98,

1    they did do some graveling of driveways, but

2    nothing like what went on past, like you say,

3    from Donnie's on up.

4        Q.    So you -- you graveled private

5    drives even though under Homer Sawyer?

6        A.    Yes, we did.

7        Q.    Okay.  And then you say when

8    Donnie Newsome came in, you started doing

9    more?

10       A.    Uh --

11           MR. TAYLOR:  May I approach, Your

12   Honor?

13           THE COURT:  You may.

14           [CONFERENCE AT THE BENCH]

15           THE COURT:  Mr. Taylor.

16           MR. TAYLOR:  I think both sides had

17   an objection related to this kind of testimony

18   that we're going to now.  They don't want me

19   to argue a history of corruption that needs to

20   be addressed, and I don't want them to say

21   everybody does it.  It's been going on.

22   That's the way we do things.  If that's the

23   argument he's setting up, then he's setting me

24   up, too, for my argument, and I just want -- I

25   guess -- I guess I just need a proffer of

1  where we're going with this.

2  MR. JENSEN:  Judge, what I guess what

3  we're trying to establish here is what gave

4  the authority for this administration to work

5  on these roads.  Some of it we're going to

6  show that this is the way they've always done

7  it in that county, that my people, when they

8  came in brand new to this, they don't want,

9  relying somewhat on these employees, to say

10 where are these county -- county roads that

11 they've been working on.  And they've

12 established this through maybe 15 years, which

13 goes into the argument that it becomes a

14 public easement at that point in time if the

15 county has maintained it, taken care of it, it

16 becomes a county's property, then they're

17 responsible.

18 THE COURT:  The argument, to be

19 precise, is not -- they were graveling and

20 paving private roads, so we thought it was

21 okay.  The argument is they were paving and

22 graveling private roads, so we thought they

23 were public?

24 MR. JENSEN:  Right.

25 MR. TAYLOR:  Well, if he opens the

1    door to this history of corruption as though

2    it makes it right, I'm going to remind the

3    jury and flesh out the evidence to show that

4    it wasn't right.

5          THE COURT:  Well, Mr. Jensen's

6    identified a pretty narrow area.  I'm going to

7    certainly allow you to question on that

8    particular area.  There may be some leeway

9    that the Government would get depending upon

10    where this goes, but I think you --

11          MR. JENSEN:  I'm not going to slam

12    Homer Sawyer or Donnie Newsome.  I'm just

13    going to establish the history of how it's

14    came about when this administration came on.

15          THE COURT:  Well, you need to be

16    specific as it relates to the question's going

17    to the past activity really made this

18    administration believe what was a public road

19    for some reason.  That's really the narrow

20    issue.

21          MR. JENSEN:  Do you want me to ask

22    him that?

23          THE COURT:  Well, I'm not going to --

24          MR. JENSEN:  I know.

25          THE COURT:  You can make your own

1      decisions on that.

2              MR. JENSEN:  I mean, that's where

3      we're going with it, but I didn't intend to

4      ask him that question.

5              THE COURT:  Okay.  That's your call.

6      But anyway, I think you understand the

7      parameters.

8              MR. JENSEN:  Yes, sir.

9              THE COURT:  Thank you.

10             [IN OPEN COURT]

11      Q.      Mr. Dyer, before I go back on

12     that, how old are you?

13      A.      Forty-seven (47).

14      Q.      And have you always lived in Knott

15     County?

16      A.      Yeah.

17      Q.      Now, let me go back to this.  In

18     the past when would you gravel what you're

19     saying was private or whatever, graveling a

20     road, was that sometimes just requested by the

21     citizens of the county?

22      A.      We mostly worked the roads, the

23     county roads.

24      Q.      Who was the county road foreman

25     when Donnie Newsome was there?

A.     Let's see, when he first took
office, there were two of them.  Randall Smith
and Eldon Hicks.  And then Randall quit and
then Eldon Hicks was just the only one then.

Q.     Wasn't Dean Bentley also road
foreman some period of time while Newsome was
...

A.     Yeah, I think he took over
after -- I can't remember when, it was maybe a
couple of years, something like that, maybe.

Q.     I'm trying to understand this list
that was kept, though.  Somebody -- well,
actually somebody calls in?

A.     Yes.  People will call in and
report stuff, yeah.

Q.     They need gravel and you write --
somebody would write it down, whoever would
answer the phone?

A.     Secretary mostly.

Q.     Okay.  And then did you all as
drivers just look on that list and go get a
load of gravel and take it to them or how --
how did you gravel a road?

A.     Most of the time when the grader
was out, we would go behind the grader.  But,

1    like, if somebody call in and want gravel,

2    they would tell us to take it or something,

3    you know.

4         Q.     Now, who would tell you under

5    Donnie Newsome's Administration?

6         A.     It was Eldon Hicks.

7         Q.     Okay.  And he'd tell you to go do

8    it.  And in your opinion, were some of those

9    private drives?

10        A.     Yes.

11        Q.     And under Homer Bradford's

12   Administration?

13             THE WITNESS:  Who?

14        Q.     I'm sorry.  Homer Sawyer's

15   Administration.  Did you gravel private drives

16   back then?

17        A.     Very few, but we did, yes.

18        Q.     Then when it came to Donnie

19   Newsome's, were you keeping those drives up;

20   were you maintaining them, the ones you done

21   under Homer Sawyer's?

22        A.     It's practically, you know, the

23   same ones, yeah.

24        Q.     Okay.  So that had been going on

25   for a number of years?

1    A.    Yeah, but not like this, you know,

2    not like -- it got out of hand and stuff.

3    Q.    Were you grading, though, and

4    graveling certain private -- what you thought

5    were private drives the county had been doing

6    for years on several of them?

7    A.    Back since Donnie was judge, yes.

8    Q.    Now, let me talk a little bit

9    about this Quick Sand area.  When you went

10   down there to work, what were your duties for

11   that job, to haul gravel?

12       THE WITNESS:  Mine?

13       MR. JENSEN:  Yes, yours

14   specifically.

15   A.    I would just go to Mountain

16   Enterprise and get blacktop and take it and

17   dump it for them.

18   Q.    And you were patching jobs down

19   there?  You were patching up holes, is that

20   what you were doing in that area?

21   A.    Yes, yes.

22   Q.    You weren't blacktopping the whole

23   road, you were just fixing potholes?

24   A.    Bad places, yeah.

25   Q.    Okay.  And Dean Bentley was there?

1        A.       Yes.

2        Q.       And he was directing you what to

3   fix?

4        A.       We knowed what to fix, the bad

5   places.  But he was there, yeah.

6        Q.       Okay.  He was down in there that

7   whole time, too?

8        A.       As far as I can remember, yes.

9        Q.       Okay.  And you were taking off a

10  half-day during that period of time?

11       A.       Yes.

12       Q.       And your purpose for taking off

13  that half-day was to campaign?

14       A.       No.

15       Q.       I thought you just said that you

16  were campaigning for Mike Hall during those

17  times?

18       A.       I did say that, but that wasn't

19  the purpose I was taking off.

20       Q.       Okay.  But you did take off a

21  half-day, and then you campaigned for Mike

22  Hall that half-day?

23       A.       Yes, I did.

24       Q.       Do you have a bad back?  Do you

25  have a bad back?

1    A.    I sure do.

2    Q.    You've got restrictions?

3    A.    Yes, I had restrictions, yes.

4    Q.    Okay.  Now, in doing your job as a

5    truck driver, is there certain things that you

6    couldn't lift or do or weren't supposed to do?

7    A.    I wasn't supposed to pick up

8    nothing heavy or bend over a lot.  I thought I

9    was doing a pretty good job driving a truck.

10    Q.    Was there any -- what was your

11    limitation on your back, five pounds?

12    A.    I think so.  I'm not for sure.

13    Q.    Were you, while you were working,

14    were you lifting up things more than five

15    pounds?

16    A.    I usually drove a truck's all I'd

17    ever done.

18    Q.    Well, doing -- working your truck,

19    did you have to lift up more than five pounds?

20    A.    No, not as I know of.

21    Q.    And then the week directly before

22    the election, you took off also, the week?

23    A.    Not the whole -- not the whole --

24    Q.    From the 1st to the 6th of

25    November?

1    A.    I can't remember, but there was a

2    couple of days there, three, that I took off

3    the whole day before the election.  I can't

4    remember.  I think it was Friday, Monday and

5    Tuesday, the day of the election.  I'm not for

6    sure about that, but I took off the whole day

7    then.

8    Q.    Your letter of reprimand that came

9    in I believe says November 1st through the

10   6th.  Do you recall taking off then?

11   A.    Yeah, but I -- it wasn't -- I

12   didn't take off the whole day, just two or

13   three of them.

14   Q.    Well, immediately prior to that,

15   you were taking off a half-day for 30 days,

16   weren't you?

17   A.    Yeah.  But now I had it wrote down

18   and I had it approved.  There ain't nobody

19   ever said nothing about it.  You know, I had

20   it wrote down on the calendar.

21   Q.    You also were asking people at

22   work to go -- to support Mike Hall?

23   A.    Not on county time.  It was either

24   at lunchtime or before work.

25   Q.    Okay.  And that before work when

1    you met at the county garage?

2         A.      Yes.

3         Q.      So while you're at the county

4    garage, either at lunch time or before, you're

5    asking people to support Mike Hall?

6         A.      Not just the workers.

7         Q.      Were there other workers in the road

8    department?

9         A.      Yeah.  They was all for him anyway.

10        Q.      They all were?

11        A.      Practically, yes.

12        Q.      Okay.  And you asked them to take

13   off that last week?

14        A.      I didn't ask them to take off the

15   whole week, no.  It happened a couple of days

16   before the election.

17        Q.      You told them Mike Hall would make

18   that up to them --

19        A.      I told them --

20        Q.      -- if he was elected?

21        A.      I told them he probably would.

22        Q.      What did Mike Hall promise you to be

23   for him?

24        A.      Not a thing.

25        Q.      You just, out of the kindness of

1   your heart, voted for him?

2      A.      Yes.  I think he's a pretty good

3   feller.

4      Q.      Have you heard other people describe

5   him as a crook?

6      A.      I heard it on the radio this

7   morning.

8      Q.      Do you know Jeremy Morgan or Jeffrey

9   Morgan?

10     A.      I know of them, yes.

11     Q.      When you were hauling gravel to some

12  places, didn't you tell some people that that

13  was compliments of Mike Hall?

14     A.      Not as I can remember, no, sir.

15     Q.      You don't believe you told anyone

16  that?

17     A.      No, sir, not as I can remember.

18     Q.      So if witnesses come in here and say

19  that about you, you're saying that's not true?

20     A.      I don't think it's true.

21     Q.      When you say I don't think it's

22  true, what do you mean by that?  You don't know

23  whether you did it?

24     A.       It's not true because I didn't do

25  it.

Q.      Huh?

A.      I didn't do it.

Q.      But you're a little bit vague about it.  You're saying, I don't think I did, or you don't recall you it?

A.      Well, it's a long time ago.  No, I don't think I done it.  I know I didn't do it.  If somebody comes in here and says I done it, they got something out of it.

Q.      You don't like Judge Thompson, do you?

THE WITNESS:  Huh?

Q.      You don't like Judge Thompson, do you?

A.      Got nothing against him whatsoever.

Q.      You've actually got a vendetta against him, don't you?

A.      No.

Q.      You not only have been a witness in this case, you've actually gone and started doing some investigation on your own, haven't you?

A.      To try to get my job back.

Q.      Well, you got a civil suit for that, don't you?

1      A.     Yes.

2      Q.     But you've gone out on this criminal

3 matter and contacted the detective here and

4 given him information and gone around and as

5 much as you can snooping around, trying to find

6 out whatever information you can, haven't you?

7      A.     Why, yeah.

8      Q.     Are you being paid to do that?

9      A.     No.

10     Q.     You're just out to get the judge,

11 aren't you?

12     A.     No.

13     Q.     And you don't like Phillip Champion

14 either, do you?

15     A.     Me and Phillip went to school

16 together.

17     Q.     You didn't like him being down there

18 at the garage, did you?

19     A.     I didn't mind it.

20     Q.     Okay.  Did you resent him like Dean

21 did?

22           THE WITNESS:  Do what?

23     Q.     Did you resent him being down there

24 put in charge of the garage?

25     A.     Why, no.

1      Q.     Did you feel like he was in charge?

2      A.     Yeah.

3      Q.     Did he give you orders?

4      A.     No, not as I can remember.

5      Q.     Did you hear him give any orders

6 down there?

7      A.     No.

8      Q.     And you're saying Dean, I can't

9 think of his last name.

10     A.     Bentley.

11     Q.     Dean what?

12     A.     Bentley.

13     Q.     Bentley.  He was the foreman there,

14 wasn't he?

15     A.     Yeah.

16     Q.     He was the one that gave you the

17 orders what to do?

18     A.     Yeah.

19     Q.     Did he tell you every day what you

20 do or did you do things on your own?

21     A.     No, we always done what he told to

22 us do.

23     Q.     Okay.  And on this list of gravel

24 that you were hauling, did you just pick up some

25 people there and say I'm going to go haul them

1    some gravel or did Dean tell you what to do?

2        A.    Like I said, I didn't haul that many

3    gravel.

4        Q.    You didn't haul gravel?

5        A.    I said I didn't haul that many

6    gravel during the election.  The most of the

7    gravel I hauled was on -- over tiles and stuff

8    that they was putting in.

9        Q.    Did Dean tell you to do that?

10       A.    Dean was there with us, yeah.

11       Q.    Did Dean tell you every load that

12   you made, did he tell you to go do that or were

13   you doing things on your own?

14       A.    No, he always went and got the list

15   and told us what to do.

16       Q.    Did he do that with every driver, as

17   far as you know?

18       A.    Yeah, for awhile, yeah, I think he

19   did, yeah.

20       Q.    So you're saying if some drivers

21   went out and put gravel on private drives, Dean

22   Bentley told them to do that?

23       A.    No, I'm not saying that, no.  Dean

24   was probably doing what he was told to do, too.

25       Q.    You didn't hear anybody tell Dean?

1          THE WITNESS:  Huh?

2      Q.      You didn't hear anybody tell Dean

3  what to do, did you?

4      A.      No, not really.

5      Q.      Okay.  So you don't know what Dean

6  was deciding on his own?

7      A.      What Dean -- well, Dean was with me

8  most of the time, with all of us over in Quick

9  Sand, so we don't really know what was going on

10  at the time.

11      Q.      You say we don't, you don't?  You

12  can't speak for everybody that was over there,

13  do you?

14      A.      I don't.  I don't.  I don't know

15  what went on at the garage after we left.

16          MR. JENSEN:  Now, just a second, Judge.

17      Q.      Have you ever asked anyone at the

18  road department to do something unlawful?

19          THE WITNESS:  Like what?

20      Q.      Like asking an employee to go work

21  on company -- on the county's time to go work on

22  other people's vehicles or equipment?

23      A.      No.

24      Q.      You know Danny Seals?

25      A.      Yes.

```
1        Q.      Does he work at the highway
2    department?
3        A.      Yes.
4        Q.      What is his job there?
5        A.      Mechanic.
6        Q.      Did you ever ask him to do work on
7    equipment or people's vehicles that were not
8    owned by the county?
9        A.      Not as I can remember, no, sir, I
10   don't.
11       Q.      Did Phillip Champion ever come to
12   you and say I want you to vote for Randy
13   Thompson?
14       A.      No, he didn't.
15       Q.      Did you hear him say that to anyone?
16       A.      No.
17       Q.      Are you -- do you know of any work
18   that the county did for Phillip personally at
19   his home or his relatives' home, blacktop or
20   gravel?
21       A.      No, not as I can ...
22            MR. JENSEN:  That's all I have.
23            THE COURT:  Thank you, Mr. Jensen.
24   Mr. Williams.
25            MR. WILLIAMS:  Your Honor, I have no
```

1   questions.

2            THE COURT:  Mr. Taylor on redirect.

3            MR. TAYLOR:  Yes, Your Honor.

4                    REDIRECT EXAMINATION

5       BY:  MR. TAYLOR:

6       Q.      Mr. Dyer, I need to be cleared up on

7   one thing.  I may even misheard you initially.

8   I thought when I asked you questions the first

9   time around that you said that on the November

10  layoff, you were the only one.  But then later,

11  there were 13 or 14 that were laid off with

12  you.  But then I thought I heard you say on

13  cross that there were 13 or 14 the first time?

14      A.      No, I didn't say that.

15      Q.      Tell us what the truth is here.

16      A.      March 9th, I was the only one laid

17  off.  At November, it was the second week in

18  November, there were several of us laid off.

19      Q.      Now, was that November of '06 or

20  November of '07?

21      A.      '07.  It all happened in '07, March

22  of '07.

23      Q.      That was the first time you were

24  laid off, March of '07?

25      A.      The first time, yeah.

1     Q.     And you were the only one laid off?

2     A.     Yes.

3     Q.     And what was the reason for your

4 layoff then?

5     A.     The layoff slip said it was due to

6 my illness.

7     Q.     That you couldn't perform your job?

8     A.     Yeah.

9     Q.     Were you having any trouble

10 performing your job?

11     A.     No.  I had a -- the truck driver was

12 the easiest job.  When I went back, I had to

13 catch dogs and lift them up in the back of the

14 truck, and it was harder than driving a truck.

15     Q.     All right.  You were asked some

16 questions about Orville Pratt and whether or not

17 you believed him and whether or not he was a

18 crook or bad person and all that.  Let me ask

19 you.  Who was Orville Pratt campaigning for

20 during the election?

21     A.     Randy Thompson.

22     Q.     And did Orville Pratt help bring in

23 the blacktoppers for Thompson?

24     A.     I think he did.

25     Q.     You were asked some questions about

1    the Newsome Administration doing some things.

2    Who was the Newsome faction for in this

3    election?

4         A.    Randy.

5         Q.    Thompson?

6         A.    Yes.

7         Q.    And who hired Eastern Kentucky

8    Paving to come in and do the paving?

9         A.    I guess the --

10             MR. JENSEN:  Objection, Your Honor.

11   He's guessing.

12             THE COURT:  Well, he can answer if he

13   knows.  If he doesn't know, he can state that.

14        Q.    Well, was it -- let me ask it this

15   way.  Did Mike Hall hire Eastern Kentucky Paving

16   Company?

17        A.    No, sir.

18        Q.    You mentioned that you first heard

19   about Mike Hall being a crook on the radio this

20   morning?

21        A.    Yeah.

22        Q.    And was that a report from this

23   trial about testimony from the trial?

24        A.    Yes.

25        Q.    And whose radio station was that?

1          A.          Randy Thompson's.

2                    MR. TAYLOR:  That's all the questions I

3     have.

4                    THE COURT:  Counsel, would you

5     approach, please, before I excuse this witness.

6                    [CONFERENCE AT THE BENCH]

7                    THE COURT:  I wanted to address the

8     issue of the admonition to the jury before I

9     excuse this witness.  I think we have an

10    agreement for a request, and I'd like to give a

11    further admonishment as it relates to the

12    testimony that was offered to the state of mind

13    of this particular witness as opposed to the

14    truthfulness of what someone else said.  I can

15    give a general admonition to that effect as it

16    relates to this witness, but I will entertain a

17    more specific one for specific testimony you

18    want me to address.  We did in one instance, but

19    I wanted to be clear on what the request is, and

20    that's really the request from defense counsel.

21    I haven't heard if anybody wants to speak to

22    that.

23                   MR. TAYLOR:  I think a general one is

24    fine.

25                   MR. WESTBERRY:  Sure.

1          THE COURT:  My intent would be to

2    provide an admonishment to simply say something

3    along these lines.  Ladies and gentlemen of the

4    jury, sometimes a witness is allowed to testify

5    as to what other people say.  You should not

6    consider what other people say for the truth or

7    falsity of that, simply as to the state of mind

8    to this particular witness.

9          MR. TAYLOR:  No objection.

10          THE COURT:  Objection?

11          MR. WESTBERRY:  No objection.

12          THE COURT:  Now, did you have a matter

13    you wanted to raise?

14          MR. WESTBERRY:  Well, I was thinking

15    about asking if I could ask one more question,

16    but don't think so after the circumstances.  Are

17    we about ready for a morning break?

18          THE COURT:  Definitely, yeah.

19          MR. WEBSTER:  What's the difference

20    between an admonishment and an admonition?

21          THE COURT:  You know, we have to look

22    that up.

23          MR. WESTBERRY:  There is a word smith,

24    so ...

25          MR. TAYLOR:  It's sort of like the

difference between inflammable and flammable.
There is one.

[IN OPEN COURT]

THE COURT:  Okay.  Ladies and gentlemen of the jury, before I excuse this witness, let me just give you a general admonishment and remind you again that sometimes a witness is allowed to testify as to what someone else said, and that's for the purpose of the witness's state of mind in terms of the testimony that the -- that they're providing, but not the truth or falsity of something someone else said.  So you're not to consider what someone else said for the truth or falsity for that particular testimony.

At this time, we are going to take our morning break.  Before I do that, let me excuse the witness.  Sir, you may be excused from testifying.  May this witness be finally excused?

MR. TAYLOR:  Yes, Your Honor.

THE COURT:  Then you may be finally excused from further testimony in this case.  You can exit the courtroom at this time, sir.  And then ladies and gentlemen of the jury, we're

1    going to take our morning break, take about 10

2    or 15 minutes.  I'll remind you of those

3    admonishments that I've given to you before, and

4    those continue to apply, of course, and we will

5    return to the courtroom in about ten to 15

6    minutes to continue with the presentation of

7    evidence.  You may be excused from the

8    courtroom.

9             [JURY EXITED COURTROOM]

10          THE COURT:  You can be seated.  And the

11   record will reflect that the jury has exited the

12   courtroom.  Let me see if there are any matters

13   we need to take up outside of the presence of

14   the jury?

15         MR. WESTBERRY:  Very quick.  But in

16   lieu of what we talked about in terms of the

17   radio station broadcast, we're going to take

18   steps to address that.  And I didn't object to

19   the Government's question of this particular

20   witness a moment ago.  Quite frankly, it

21   happened so quick.

22         THE COURT:  Yes.

23         MR. WESTBERRY:  And the witness

24   responded so quickly, I think an objection would

25   be pointless, but I can't see the point of

1    questioning of these witnesses.  If nothing

2    else, it gets that information in front of the

3    jury, which I'm thinking would be of most

4    concern, so I'm simply raising that issue up in

5    front of the Court.

6            THE COURT:  Mr. Taylor, I don't know if

7    you want to comment on that.  That seems to be a

8    fairly discrete circumstance rather than ...

9            MR. TAYLOR:  Well, I had planned to use

10   that as a source of questioning for

11   cross-examination of Mr. Thompson, if he took

12   the stand, because I, quite frankly, I think it

13   shows a level of, I won't say consciousness of

14   guilt, but a certain attempt to influence the

15   outcome of the case that goes to -- that goes to

16   his credibility, and I think the jury should

17   know that.

18           THE COURT:  Well, we don't have to

19   reach that issue yet.

20           MR. TAYLOR:  Right.

21           THE COURT:  But we need to hear from

22   both sides on that before that testimony were to

23   be elicited, and I'll address it more

24   specifically in the event that Mr. Thompson

25   chooses to take the stand.

1          MR. WESTBERRY:  I'm more concerned

2     about remaining witnesses other than

3     Mr. Thompson, if this is going to be the line of

4     questioning.

5          MR. TAYLOR:  Well, if you'll recall,

6     though, the thing about him having heard that

7     Mike Hall is a crook, they keep going down that

8     road, and it's because of airwaves have been

9     polluted with this kind of reporting.  Yeah, I'm

10    going to ask them where they got this

11    information, and it wasn't from an unbiased

12    source.

13         MR. WESTBERRY:  Well, it came from

14    Morgan yesterday, the two attorneys, quite

15    frankly, the grand jury, that's where we got

16    word of questioning.

17         THE COURT:  Right.

18         MR. WESTBERRY:  I just can't see the

19    continuing relevance of what have you heard on

20    the radio.

21         MR. TAYLOR:  I didn't ask the question.

22         THE COURT:  Well, I think that's an

23    important distinction the way this came up is

24    reactionary in terms of your follow-up

25    questions.  And it sounds like, Mr. Taylor,

1    you're not intending to now have you been

2    listening to defendant's radio station kind of

3    proactively, and I think that's your point,

4    Mr. Westberry.

5              MR. WESTBERRY:  That's all.

6              THE COURT:  And I think it's a good

7    one.  Let me see if there are other matters. If

8    not, we'll stand in recess for about ten

9    minutes.

10             [RECESS – 10:47 a.m. – 11:06 a.m.]

11             THE COURT:  Thank you.  The record will

12   reflect the jury has returned to the courtroom.

13   Mr. Taylor is recognized to call the next

14   witness for the United States.

15             MR. TAYLOR:  Tom Hays.

16             THE COURT:  Mr. Tom Hays.

17        [WITNESS SWORN]

18                  DIRECT EXAMINATION

19      BY:  MR. TAYLOR:

20      Q.    Could you state your name, please.

21      A.    Tom Hays.

22             MR. TAYLOR:  Mr. Hays, could you scoot

23   a little that way so I can see you.

24             THE WITNESS:  Is that better?

25      Q.    Is that Hays with an E in it or not?

```
 1      A.      No, just S.

 2      Q.      H-A-Y-S?

 3      A.      Yes.

 4      Q.      Okay.  Mr. Hays, where do you live?

 5              THE WITNESS:  Do what?

 6      Q.      Where do you live?

 7      A.      Burgeys Creek in Mallie, Kentucky.

 8      Q.      That's in Knott County?

 9      A.      Knott County.

10      Q.      And how long have you lived there?

11      A.      Fifteen (15) years.

12      Q.      And are -- did you live and work in

13   Knott County in 2006?

14      A.      Yes.

15      Q.      And where did you work?

16      A.      Knott County Fiscal Court.

17      Q.      And what do you do for them?

18      A.      Truck driver.

19      Q.      How long have you done that?

20      A.      Well, that's what I was hired for.

21              MR. TAYLOR:  Excuse me?

22      A.      Ever since I started in '86.

23      Q.      '86.  So almost 22 years?

24      A.      Twenty-two (22) years.

25      Q.      Do you still work there now?
```

```
 1        A.      Yes.
 2        Q.      I want to direct your attention now
 3   to the 2006 Summer and Fall, and you're aware of
 4   the election cycle that was going on at that
 5   time?
 6        A.      There was an election.
 7        Q.      And was there a major campaign for
 8   county judge then?
 9        A.      Well, they had candidates running.
10        Q.      During that summer or fall, did you
11   notice -- gravel and blacktop being distributed
12   around the county?
13        A.      We hauled gravel just like we always
14   did.
15        Q.      And what do you mean like we always
16   did?
17        A.      Well, wherever we was told to take
18   them, that's where we took them.
19        Q.      Did you take -- during that Fall of
20   2006, did you take gravel to private property?
21        A.      I don't know what's private.
22        Q.      Did you put it on driveways?
23        A.      We've done that ever since I
24   started.
25        Q.      Well, my question is, did you put
```

1    gravel on driveways?

2        A.     I -- yes.

3        Q.     Now -- and who told you to do that?

4        A.     At the time, it was Phillip Champion

5    and Dean Bentley.

6        Q.     And who?

7        A.     Dean Bentley.  I need to make a

8    correction there.  I said Ronnie Adams and

9    Phillip Champion, but it was Dean and Phillip

10   Champion.

11        Q.     Phillip Champion?

12        A.     Yeah.  That was my testimony at

13   London.

14        Q.     And how many private driveways do

15   you think you put gravel on?

16        A.     I mean, wherever we was told to

17   take a load of gravel, we took them.

18        Q.     When you did this, did anybody drive

19   in the truck with you?

20        A.     One time on a Saturday, yes, I had a

21   rider.

22        Q.     Who rode with you?

23        A.     Mac Combs.

24        Q.     Mac Combs.  Now, who was Mac Combs

25   then?

```
 1          A.      I don't know.  He's stepped down --
 2    I don't know if he's assistant judge or what he
 3    was at the time.
 4          Q.      Well, did you know who this person
 5    was?
 6          A.      He worked in the courthouse.
 7          Q.      He worked in the courthouse?
 8          A.      Yes.
 9          Q.      Well, did he -- did you believe him
10    to have authority to tell you where to put the
11    gravel?
12          A.      I believe so, yes.
13          Q.      Excuse me?
14          A.      Yes.
15          Q.      All right.  And what did you base
16    that on?
17          A.      He was just to tell us -- show us
18    where to take them and where to put them.
19          Q.      Who said he was to tell you that;
20    how do you know he was?
21          A.      Well, let's see, it was either Dean
22    or Phillip said Mac would go with you and show
23    you where to put them.
24          Q.      Well, what was your understanding of
25    what his position was with the road department?
```

1     A.     I don't know.  I mean, I don't know.

2     Q.     I guess what I'm asking you, if I

3 were driving a truck and someone got in with me

4 and started telling me what to do, I'd wonder

5 what their authority was to tell me what to do.

6     A.     Well, if my boss told me that Mac

7 would go and show you where to put them, take

8 them, then that's all I needed.

9     Q.     Are you aware of any position Mac

10 Combs had with the road department that would

11 allow him to tell you where to dump the gravel?

12     A.     He used to be assistant judge.

13     Q.     All right.  Did assistant judges

14 ride around the county telling people where to

15 dump gravel?

16     A.     Not all the time.

17     Q.     Did you find that unusual?

18     A.     I never thought nothing about it.

19     Q.     You didn't think anything about it?

20     A.     No.

21     Q.     And how many -- how many times did

22 he ride in the truck with you?

23     A.     Well, that one Saturday, and we took

24 a load to Lotts Creek.  He called from the

25 courthouse and said stop and pick him up at the

1    courthouse and he'd take me and show me where to
2    put them.
3        Q.    Okay.  So how many times did he ride
4    in the truck with you?
5        A.    Twice.
6        Q.    Twice?  And on a Saturday?
7        A.    Once on a Saturday and once through
8    the work week.
9        Q.    And how many times did you work on
10   Saturday?
11       A.    Well, I would -- used to work when
12   he let me work.  I hadn't worked that much.
13   That's the reason I volunteered to work that
14   one.
15       Q.    Did you ever refuse to work on
16   Saturday?
17       A.    Well, if I had something come up,
18   you know, yes, I probably would have.
19       Q.    I mean, during this election cycle,
20   did you --
21       A.    I just worked one.
22       Q.    Did you refuse to work a second one?
23       A.    Oh, I was -- yes, I did.
24       Q.    And why did you refuse to do that?
25       A.    I just -- I don't remember now,

1    just -- probably something come up that I

2    couldn't work.

3        Q.      Let me ask you about -- do you

4    recall testifying before the grand jury on

5    Thursday, October 25, 2007?

6            THE WITNESS:  In London?

7            MR. TAYLOR:  Yes.

8        A.      Yes.

9        Q.      Let me ask you if you were asked

10   these questions and gave these answers.  Well,

11   first let me ask it this way.  Do you recall

12   telling Mark Hopkins that you refused to work a

13   second Saturday because you did not want to

14   participate in what was going on?  Do you recall

15   saying that?

16       A.      I may have told that, but I don't

17   remember it.  I can't remember everything.

18       Q.      Well --

19       A.      Which I worked one Saturday and I

20   didn't work the second.  Somebody else worked

21   the next Saturday.

22       Q.      Well, what was going on that you

23   didn't want to participate in?

24       A.      I can't remember.

25       Q.      Well, let me ask you about your

grand jury testimony.  Were you asked the
question, What was going on that you didn't want
to participate in?  Answer:  Well, the election,
I guess.  I mean -- The election?  Yeah, he was
getting votes, right?  Answer:  When he was on
them, when I worked on that one Saturday.  Well,
what did your work have to do with the
election?  Answer:  Just hauling gravel.  What's
that got to do with the election?  I guess you
could take a load of gravel and people will, you
know, haul them a load of travel and they'll
probably vote for you.  I don't know.

    A.     I don't remember saying that.

    Q.     You don't remember saying that to
the grand jury?

    A.     I don't remember saying that.  I'm
under oath, and I'm not going to sit here and
lie.

    Q.     If I represent to you I have a
transcript of your testimony, you don't doubt
that, do you?

        THE WITNESS:  Huh?

    Q.     You don't doubt that, do you --

    A.     No.

    Q.     -- that this is a transcript of your

1    testimony?

2         A.    No.

3         Q.    Do you recall me being there?

4         A.    Yes.

5         Q.    Do you recall me asking these

6    questions?

7         A.    Yes.

8         Q.    My question to you now, sir, is what

9    has made you change your testimony between now

10   and then?

11        A.    I don't -- I haven't changed it.

12   I'm answering to the best of my knowledge.

13        Q.    Has someone gotten to you?

14        A.    No.

15        Q.    Has someone approached you?

16        A.    No.

17        Q.    Well, let me ask you now.

18   Regardless of whether you said it to the grand

19   jury, today I'm asking you, did you take off

20   because you didn't want to participate in what

21   was going on?

22             THE WITNESS:  Are you talking about

23   during the election?

24             MR. TAYLOR:  Uh-huh.

25        A.    I took off because I was sick.

1    Q.    So you're -- did you lie to the
2  grand jury when you told them this?
3    A.    No, I did not.
4    Q.    Then why did you say this?
5    A.    I just don't remember saying that to
6  them.
7    Q.    Why would you have said it, if you
8  did?
9    A.    I don't know.
10   Q.    Is it true?
11   A.    No.
12   Q.    Then if you said it, you told a lie?
13   A.    I took off -- I worked and I took
14  off one day during the election.
15   Q.    My question, if you said this, if I
16  have a tape of you saying this, are you telling
17  me now you lied to the grand jury?
18   A.    If you've got a tape of me a-saying
19  it, then I said it, but I just don't remember
20  it.
21   Q.    And if you said it, was it a lie?
22   A.    No.  I have never lied to neither
23  one of you.
24   Q.    I'm going to ask you, did you take
25  off because you didn't want to participate in

1    spreading gravel for votes?

2         A.    No.

3         Q.    Then why did you tell the grand jury

4    that?

5         A.    I don't know.  I didn't -- I just

6    don't remember saying that.

7         Q.    Mr. Hays, and I can understand if

8    it's true, but are you afraid of losing your job

9    if you testify the same as you did in the grand

10   jury?

11        A.    No, in no way.

12        Q.    Are you afraid of retaliation in

13   some way on your work site?

14        A.    No way.

15        MR. TAYLOR:  One moment.  That's all I

16   have of this witness.

17        THE COURT:  Thank you.  Mr. Westberry.

18                CROSS-EXAMINATION

19   BY:  MR. WESTBERRY:

20        Q.    Good morning, Mr. Hays.

21        A.    Good morning.

22        Q.    I represent Randy Thompson.  I've

23   got just a couple of questions for you.  Randy

24   Thompson never personally told you where to

25   spread gravel, did he?

1    A.    No.

2    Q.    Now, the gravel that -- the gravel

3    on a lot of these driveways, when it rains hard

4    in Knott County, is it common or frequent that

5    the gravel will wash off the driveway into the

6    road?

7    A.    Yes.

8    Q.    I mean, has that always happened?

9    A.    That's always happened.

10   Q.    Have you -- I think when the

11   Government asked you questions, you said you

12   worked on the road crew 22 years?

13   A.    Twenty-two (22) years.

14   Q.    Yeah.  Have you worked under a lot

15   of administrations?

16   A.    Yes.

17   Q.    It's always been commonplace that

18   you all have put gravel back when the hard rains

19   come and clean up the roads?

20   A.    Yes, we have.

21   Q.    Why do you clean up the roads?

22         THE WITNESS:  Why would they clean the

23   roads?

24   Q.    Sure.  Maybe for you it's probably a

25   dumb question, but if you could just ...

1      A.      Because that's our jobs.  We work

2  for the road department.

3      Q.      Do you know where Owens Branch is in

4  Knott County?

5      A.      Yes.

6      Q.      What part of the county's that in,

7  Mr. Hays?

8      A.      That's in Hindman.

9      Q.      Okay.  Was there a time that you

10  recall when an older woman was living there and

11  complained about the condition of a road going

12  up on a hill that you recall?

13      A.      Yes.

14      Q.      You and I have never talked before,

15  have we, sir?

16      A.      No.

17      Q.      Tell the jury what that complaint

18  was about and what you all did.

19      A.      That was -- she's a -- like you

20  said, an elderly woman, sick, the ambulance had

21  to back up the hill to get her, and all of the

22  gravel had washed down in the main road.

23      Q.      Okay.  And what did you all do?

24      A.      They -- I loaded blacktop in a

25  spreader so they could go so far up to where

they could get to her house. But there's a
house there, a house above it. It just didn't
go to one house.

    Q.    But was the ambulance having trouble
getting up there to her?

    A.    Oh, yeah. It would wash out in big
gullies down the road.

    Q.    And she had called and complained
about it?

    A.    Several times.

    Q.    Is that fairly typical of the kind
of calls that you would get for the road
department?

    A.    We answer calls like that all the
time.

    Q.    And whether it was Randy Thompson's
Administration or other administrations?

    A.    From the day I started.

        MR. WESTBERRY:  Okay. Thank you. I
appreciate your courtesy.

            THE WITNESS:  You're welcome.

            THE COURT:  Mr. Webster.

                    CROSS-EXAMINATION

    BY:  MR. WEBSTER:

    Q.    Mr. Hays, I represent Mac. He rode

1    with you on a Saturday?

2        A.    Yes.

3        Q.    Generally, what were you all -- you

4    were spreading gravel that day on county roads?

5        A.    We spread it on county roads and

6    lanes, yes.

7        Q.    And he -- you've put some gravel on

8    Owens Branch that he talked about, that old

9    woman?

10       A.    Yes.

11       Q.    And you put some on the top of Dix

12    Fork Hill; do you remember that?

13       A.    I don't know.  Yes, yes.

14       Q.    Would there -- how many houses were

15    there?

16       A.    I imagine probably four, at least.

17       Q.    Did Mac ever get out of the truck on

18    that day?

19       A.    Mac never got out of the truck.

20       Q.    Did he tell you to pave private

21    driveways anywhere?

22       A.    No.

23       Q.    Did you pave -- I'm sorry, I get --

24    I've screwed up 14 times confusing graveling and

25    paving or graveling private driveways.  What you

1    were doing there that day was graveling, right?

2         A.    Yes.

3         Q.    And when Mr. Taylor said he rode

4    with you, that doesn't mean that he assisted you

5    or directed you to do private driveways, does

6    it?

7         A.    Well, I mean, he went with me and he

8    was to show me where to put them, yes, yes.

9         Q.    But that doesn't necessarily mean it

10   was private or not private, does it?

11        A.    Well, see, we don't know what's

12   private because we're working the same roads now

13   that we started working back in '86.

14        Q.    Did you work any that Saturday that

15   you knew, that hadn't been worked before?

16        A.    Well, I don't know in each

17   individual house, you know, with the road

18   because there's some roads I hadn't been on in

19   the other driveways and stuff.

20        Q.    When you were in front of the grand

21   jury, were you under pressure?

22        A.    Yes.

23        Q.    Was Mr. Taylor asking you what

24   lawyers call leading questions?  That's

25   questions that kind of suggest what the answer

1    ought to be.

2         A.    I don't remember the questions, you

3    know, I just can't.

4              MR. WEBSTER:  Thank you.

5              THE COURT:  Thank you, Mr. Webster.

6    Mr. Jensen.

7              MR. JENSEN:  Yes, Your Honor.

8                   CROSS-EXAMINATION

9    BY:  MR. JENSEN:

10        Q.    Good morning, Mr. Hays.

11        A.    Good morning.

12        Q.    I'm Tom Jensen.  I represent Phillip

13   Champion in this matter.  You and I have talked

14   before, haven't we?

15        A.    Yes, yes,

16        Q.    Remember, I came over there and

17   talked to you at the garage?

18        A.    Yes.

19        Q.    As I understand it, what you all --

20   or what you've done over these years is haul

21   gravel?

22        A.    Haul gravel, yes.

23        Q.    And how many years have you been

24   there?

25        A.    Twenty-two (22).

1    Q.    Twenty-two (22) years.  Now, at the
2    time that Phillip Champion started, do you
3    remember when that was in proximity to the
4    election that everybody's talking about?
5    A.    No, I can't remember dates like
6    that.
7    Q.    Was it just a matter of a few months
8    before?
9    A.    Yes.
10   Q.    At the time of the election, Phillip
11   Champion hadn't been at the road department very
12   long?
13   A.    Not very long, no.
14   Q.    And was he, in your opinion, when
15   you were observing him, did he -- was he pretty
16   new to the whole idea of --
17   A.    Yeah, yeah, he was.
18   Q.    -- the road department?  Yeah.  So
19   he was just inexperienced at that time?
20   A.    Yes.
21   Q.    And at that time, Dean Bentley, was
22   that your foreman?
23   A.    Yeah, road foreman.
24   Q.    Road foreman.  And was he the one
25   pretty much giving you orders what to do?

1    A.    Yes, yes.

2    Q.    Did Phillip Champion sometimes tell

3    you what to do or was it always Dean?

4    A.    Well, Phillip might, you know, said

5    to take a load of gravel somewhere, but, you

6    know ...

7    Q.    Okay.  Did Phillip ever ask you to

8    gravel a private drive?

9    A.    There we go again.  I don't know

10   what's private.

11   Q.    Okay.  I know you said you don't

12   know what's a private road or a private drive,

13   you don't know either one.  Are you kind of

14   saying those could be the same thing?

15   A.    Could be.

16   Q.    Did Phillip or Dean ever ask you to

17   gravel a place that you hadn't been graveling

18   for the 20 years or so you've been there?

19   A.    No, it's just like going around in a

20   circle.  That's the way it is from the time I

21   started.

22   Q.    Everybody in this administration and

23   all the judges you worked for, they pretty well

24   directed you to gravel the same places you did?

25   A.    Same places, same old places.

1     Q.     Did Phillip Champion ever come in

2    and ask you to vote for Randy Thompson?

3     A.     Never.

4     Q.     Did Randy Thompson ever ask you to

5    vote for him?

6     A.     No.

7     Q.     He's running for office and he never

8    even came in and asked you to vote for him?

9     A.     He may have been at the garage

10   twice.

11     Q.     Okay.  All right.  Did you ever

12   gravel Phillip Champion around his home?

13     A.     I have at the house.

14     Q.     Before he lived there?

15     A.     Before he got his job, I took him

16   gravel before he got the job.

17     Q.     So some administration previously

18   had sent you over there to gravel around his

19   home?

20     A.     Yes, they have.

21     Q.     But he's never asked you to do that?

22     A.     No.

23     Q.     And he's never -- and Dean Bentley,

24   since he's been there, has never asked you to

25   that?

1    A.    No.

2         MR. JENSEN:  That's all.

3         THE COURT:  Thank you.  Mr. Jensen.

4         MR. WILLIAMS:  Your Honor, I have no

5    questions for this witness.

6         THE COURT:  Thank you, sir.

7    Mr. Taylor, on redirect.

8                   REDIRECT EXAMINATION

9    BY:  MR. TAYLOR:

10    Q.    Mr. Hays, you were asked by

11    Mr. Webster if you were under pressure and if I

12    was leading you in the grand jury.  I think

13    we'll hear the grand jury later, but let me ask

14    you this.  Were you under pressure when you

15    talked to Mark Hopkins here sometime before the

16    grand jury?

17    A.    Anything like this would make me

18    nervous, yes.

19    Q.    Well, did you tell Mr. Hopkins the

20    truth?

21    A.    Yes, I did, to the best of my

22    knowledge.

23    Q.    Did you tell him that Mac Combs

24    pointed out the driveways but never got out of

25    the truck?

1       A.      Well, that was the purpose of Mac.

2  Mac's the one to show us where to put the

3  gravel.

4       Q.      Right.  Did you tell Mr. Hopkins

5  that it was his understanding, your

6  understanding that the dirty work happened the

7  night before the election?  Did you tell him

8  that?

9       A.      Well, it always does.

10      Q.      Did you tell him you do not recall

11  any of the names of those that received gravel,

12  but remembered going to some in the Ashby and

13  Dix Fork area?

14      A.      That's on top of the hill on Dix

15  Fork?  That's where the four or five houses is.

16      Q.      Did you tell him anyone who wants

17  gravel could come to the garage and get whatever

18  they want or just call and get put on the list,

19  and the county will bring it?

20      A.      It used to be that way, yes.

21      Q.      Did you say the ones that come to

22  the garage would need to see the boss?

23             MR. WILLIAMS:  Objection, Your Honor.

24             MR. WESTBERRY:  This is not proper

25  redirect, any of this.  He's just literally

1    testified.

2         THE COURT:  I'm going to allow the

3    Government to go a little bit further on this.

4    I'll overrule the objection.  Mr. Taylor.

5         MR. WESTBERRY:  Thank you.

6    Q.    Did you say to Mr. Hopkins, people

7    know when to ask for things.  This

8    administration was worse than Donnie Newsome's

9    was?

10   A.    No, I don't remember saying that.

11   Q.    And if we have a tape recording of

12   you saying that, did you admit you said it?

13   A.    If it's on the tape, if you've got a

14   tape on it and if it's me, I said it, but I

15   don't remember saying that.

16   Q.    Is it true?

17   A.    No, this administration ain't the

18   worst than the rest of them.

19   Q.    Then why did you tell Mark Hopkins

20   that?

21   A.    I don't remember telling that.

22   Q.    Is it true, if you said it?

23   A.    I don't -- like I said, I don't

24   remember telling it.

25   Q.    Is it my understanding from your

1  testimony you don't know the difference between
2  a road and a driveway?
3      A.     A road's a road.  A gravel road's a
4  gravel road to me.
5      Q.     Do you have a house?
6      A.     I've got a -- yes.
7      Q.     Does it have a driveway?
8      A.     Yes.
9      Q.     Is that a road?
10      A.     It is to me.  It's mine, the one I
11  travel.
12      Q.     It's yours?  It's not a public road,
13  is it?
14      A.     Well, no, I'd say not a public.
15      Q.     Do your neighbors have driveways?
16      A.     Yes.
17      Q.     You know the difference between a
18  driveway and a road, don't you, sir?
19      A.     I just take them where they tell me.
20      Q.     You take it where they tell you?
21      A.     Yeah.
22          MR. TAYLOR:  That's all the questions I
23  have.
24          THE COURT:  Thank you, Mr. Hays.  You
25  may be excused.  May he be finally excused?

1          MR. WILLIAMS:  Subject to recall.

2          MR. TAYLOR:  No, Your Honor, not

3    finally.  I'll ask the Court for something

4    regarding this witness.

5          THE COURT:  All right.  And, Mr. Hays,

6    you can be excused from testifying right now,

7    but you are subject to recall in the future.

8    Someone will contact you.  All right.

9          [END OF REQUESTED PROCEEDINGS]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The undersigned Court Reporter hereby

2  certifies that:  (1) The foregoing 110 pages

3  represent an accurate and complete transcription

4  of a portion of the record of the proceedings

5  before the United States District Court for the

6  Eastern District of Kentucky at Pikeville before

7  the Honorable Gregory F. Van Tatenhove,

8  presiding, in the matter of United States of

9  America vs. Randall Clinton Thompson, John Mac

10  Combs, Phillip G. Champion, and Ronnie Adams,

11  and (2), these pages constitute a copy of the

12  transcript of the proceeding.

13

14    _____

15    SANDY C. WILDER, RMR, CSR(IL),

16    COURT REPORTER

17

18

19

20

21

22

23

24

25