1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF KENTUCKY
2               SOUTHERN DIVISION
                  AT PIKEVILLE
3
UNITED STATES OF AMERICA,
4                              No. 07-CR-35-GFVT
      PLAINTIFF,
5                              Pikeville, Kentucky
                               June 17, 2008
6                              9:01 a.m.
VS.
7
RANDALL CLINTON THOMPSON,
8  JOHN MAC COMBS,
PHILLIP G. CHAMPION,
9  RONNIE ADAMS,

10      DEFENDANTS.

11          PARTIAL TRANSCRIPT OF JURY TRIAL
     TESTIMONY OF BOBBY REYNOLDS AND BRANDON MOORE
12
                 * * * * * * * * * *
13
APPEARANCES:
14

15  For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
For the Defendant
19  Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876

1

2

3   APPEARANCES (Cont.)

4   For the Defendant
    John Mac Combs:         Hon. Lawrence R. Webster
5                           163 Main Street
                            Suite 2
6                           Pikeville, Kentucky  41502
                            (606) 437-4029
7
    For the Defendant
8   Phillip G. Champion:
                            Hon. Thomas L. Jensen
9                           Jensen, Cessna, Benge & Webster
                            303 South Main Street
10                          London, Kentucky  40741
                            (606) 878-8845
11
    For the Defendant
12  Ronnie Adams:
                            Hon. Jason E. Williams
13                          111 West 5th Street
                            London, Kentucky  40743-3199
14                          (606) 877-5291

15

16

17

18

19

20

21

22

23  Court Reporter:         Sandy C. Wilder, RMR, CSR (IL)
                            8081 Perryville Road
24                          Danville, Kentucky  40423-9713
                            (859) 516-4114
25                          wildercaptions@kywimax.com

INDEX

Direct Examination of BOBBY REYNOLDS
    By:  Mr. Taylor                         4-15

Cross-examination
    By:  Mr. Westberry                      15-25

Cross-examination
    By:  Mr. Webster                        25-29

Cross-examination
    By:  Mr. Williams                       29-34

Redirect Examination
    By:  Mr. Taylor                         34-42

Direct Examination of BRANDON MOORE
    By:  Mr. Taylor                         42-48

Cross-examination
    By:  Mr. Westberry                      48-52

Redirect Examination
    By:  Mr. Taylor                          52

Cross-examination
    By:  Mr. Williams                       52-67

Reporter's Certificate                       68

```
 1            THE COURT:  At this time, I'll
 2    recognize Mr. Taylor on behalf of the United
 3    States to call your next witness.
 4            MR. TAYLOR:  The United States calls
 5    Bobby Reynolds.
 6            THE COURT:  Mr. Reynolds is called on
 7    behalf of the United States.
 8            [WITNESS SWORN]
 9                DIRECT EXAMINATION
10    BY:  MR. TAYLOR:
11        Q.    Would you state for the record your
12    full name.
13        A.    Bobby Reynolds.
14        Q.    Mr. Reynolds, where do you live?
15        A.    184 Rooster Lane.
16        Q.    And do you work?
17        A.    No.
18        Q.    All right.  Are you disabled?
19        A.    Yeah.
20        Q.    Okay.  What did you formerly do
21    before you were disabled?
22        A.    Coal mining.
23        Q.    All right.  And how long have you
24    been disabled?
25        A.    Since '96.
```

1      Q.      Now, have you lived in Knott County
2   pretty much all your life?
3      A.      Yes.
4      Q.      And are you a registered voter?
5      A.      Yes.
6      Q.      I want to direct your attention to
7   the Summer and Fall of 2006 in Knott County.  Do
8   you remember the judge/executive race?
9      A.      Yes.
10     Q.      Did you live where you live today at
11  that time?
12     A.      Yes.
13     Q.      And what road is that on?
14          THE WITNESS:  Is what now?
15     Q.      What's the name of the road you live
16  on?
17     A.      Runnel's Branch.
18     Q.      Runnel's Branch?
19     A.      Yeah.
20     Q.      Okay.  Now, during that election, or
21  around the time of that election, did you have
22  occasion to receive some blacktop at your house?
23     A.      Yes.
24     Q.      Could you tell the jury how it was
25  that that came about?

1    A.    One day Ronnie Adams called me; it
2    was probably three or four weeks before the
3    election, asked me how I was doing.  I told him
4    I was doing okay.  And I asked how he was doing,
5    and he said he's been spreading blacktop.  And I
6    asked him -- and he asked me how's the election
7    going on around there where I lived, and I told
8    him I didn't know.  I hadn't got into it.
9    Q.    You said you hadn't got into it?
10   A.    Yeah.
11   Q.    And what did he say?
12   A.    I asked him could he spread some
13   blacktop up here where we live, get us out of
14   the mud and dust, and he said I might can get to
15   you before the election; it may be after.
16   Q.    Okay.  What else did he say?
17   A.    And he said that -- he said he would
18   talk to somebody and see if he could.  And after
19   that, about a couple of weeks before the
20   election, they blacktopped it.
21   Q.    Okay.  Did he say anything about
22   votes in connection with that blacktop?
23   A.    No.
24        MR. WILLIAMS:  Object to the leading,
25   Your Honor.

Q.    I want to direct your attention -- do
you recall testifying before the grand jury in
this case?

A.    Yeah.

Q.    And you testified for the grand jury
on October 25, 2007.  Do you recall that?

A.    Yeah.

Q.    And do you recall being asked this
question and giving this answer:  All right.
What happened, what did he say -- referring to
Ronnie Adams -- and you said, He just called me
and said -- asked me how I was doing, and I told
him I was doing all right.  Then he just asked
me what did I think about the election, and I
told him I hadn't really thought about it.  I
asked what he was doing, and he said he's down
blacktopping a lot.  He was for Randy Thompson,
and I told him, I said, well, why don't you
bring some blacktop around here because he was
just up the road, you know, from us, and he
said, I'll try to before the election.  If I
can't, I'll get it after the election.  I said,
well, if you can do it before -- he asked me how
everybody'd vote up here -- he asked me how's
all my family going to vote, and I told him I

1  hadn't asked them, and he said, well, if I can

2  get it to you to get it -- to blacktop you

3  before the election, and I said, well, if you

4  blacktop before the election, every one of them

5  in here will vote for Randy.  Do you recall that

6  conversation?

7       A.     That's correct.

8       Q.     Had you just forgotten that?

9       A.     Yeah.

10      Q.     Did that conversation occur?

11      A.     Yeah.

12      Q.     And you say the blacktopping

13  occurred when?

14             THE WITNESS:  Do what now?

15      Q.     When did the blacktopping occur?

16      A.     I believe about two weeks before the

17  election.

18      Q.     Now, I want to show you some

19  photographs, Exhibits 4A, B and C.  Do you

20  recognize those photographs?

21      A.     Yeah.

22      Q.     Are those fair and accurate

23  depictions of your house and surrounding area?

24             THE WITNESS:  Do what now?

25      Q.     Does that appear to be your house

1    and property?

2         A.     Yes.

3              MR. TAYLOR:  I want to move the

4    introduction of Government's 4A, B and C.

5              THE COURT:  Is there objection?

6              MR. WILLIAMS:  Your Honor, may we

7    approach?

8              THE COURT:  You may.

9              [CONFERENCE AT THE BENCH]

10             THE COURT:  Mr. Williams.

11             MR. WILLIAMS:  Just to the extent that

12   the question makes it appear that Mr. Reynolds

13   answered it yes, that the word property would

14   include everything in the photographs, and so I

15   would just object to the form of the question

16   that way and ask if he wants to clarify, if

17   that's his home in the pictures.

18             THE COURT:  Well, I'll allow Mr. Taylor

19   to qualify that to a certain extent.  You'll be,

20   of course, able to cross-examine.  Let me

21   mention the leading objection.  I think it's a

22   fair objection.

23             MR. WILLIAMS:  Given that the witness

24   answered no, I'll withdraw.

25             THE COURT:  Right, that's why I had to

```
1    interject.
2           [IN OPEN COURT]
3       Q.     Do you recognize those photographs?
4       A.     Yes.
5           MR. TAYLOR:  I think I moved the
6    introduction of them.
7           THE COURT:  I will grant the
8    Government's motion to have those entered as
9    exhibits.
10      Q.     I'd like to put 4A on the screen, if
11   I could, please, and I'd like to retrieve the
12   originals from the witness, if I could, please.
13   I think what I'm going to do is use the Elmo on
14   these because I need to point to things on the
15   photograph.
16          THE COURT:  You may do that.
17      Q.     Do you see your house?  Is that your
18   house there that's depicted in this photograph?
19      A.     No.
20      Q.     Whose house is this one right here?
21      A.     That's my girls.
22      Q.     Your girls?
23      A.     Yes.
24      Q.     Where does your property begin?
25      A.     On back down.
```

```
 1         Q.      Down this way?
 2         A.      Yeah, right on down that way.
 3         Q.      Is this your property right here
 4    that I'm pointing to?
 5         A.      Yes.
 6         Q.      And is this your garbage pile here,
 7    or your children?
 8         A.      Yes.
 9         Q.      Is the main road down below this
10    photograph here, in this direction?
11         A.      Yes.
12         Q.      And whose driveway is this right
13    here, if anyone's?
14         A.      That's my son-in-laws, my girls.
15         Q.      And whose driveway is this right
16    here, if you know?
17         A.      That's mine.
18         Q.      Yours?
19         A.      Yes.
20         Q.      And where is your house, on up the
21    hill?
22         A.      I've got a trailer up there.
23         Q.      All right.  Do you know a Brandon
24    Moore?
25         A.      Yes.
```

1    Q.    And where does he live?  Does he
2  live up this hill?
3    A.    Yeah, he lives at the top.
4    Q.    All right.  Now, I want to put up
5  4B.  Is this below your house or above your
6  house?
7    A.    That's straight in front of my
8  house.
9    Q.    This is the public road?
10         THE WITNESS:  Do what now?
11    Q.    Is this a public road here?
12    A.    Private.
13    Q.    Okay.  Whose road is this?
14    A.    I built that road.
15    Q.    You built this road?
16    A.    Yeah.
17    Q.    Is this your house or is this your
18  house?
19    A.    No, that's mine over there.
20    Q.    Right here?
21    A.    No, that's my nephew.
22    Q.    Who is this?
23    A.    That's my wife's brother.
24    Q.    All right.  And where is your house
25  in relation to this?

```
1          A.      To the left there through the fence.

2          Q.      Right here?

3          A.      Yes.

4          Q.      Over in this direction?

5          A.      Yes.

6          Q.      And so this is -- this goes right up

7    to your house right here?

8          A.      Yeah, that's my driveway, but it

9    ain't blacktopped.

10         Q.      But you built this road?

11         A.      Yes.

12         Q.      And whose car is that?

13         A.      That's my brother's.

14         Q.      Okay.  So this is all your family

15   here; is that correct?

16         A.      Yes.

17         Q.      And is there a cemetery up this

18   road?

19         A.      Yes, back down.

20         Q.      Back down this way?

21         A.      Yes.

22         Q.      Okay.  So this is up beyond the

23   cemetery?

24         A.      No, that's not the road to the

25   cemetery.  The one below it is.
```

```
1        Q.      Okay.  Now, I want to put 4C up on
2   the screen.  Whose trailer is this?
3        A.      That's my brother.
4        Q.      All right.  We've already seen part
5   of that in the other picture, right?
6        A.      Yes.
7        Q.      And is this a continuation of that
8   road?
9        A.      Yeah.  It goes to the cemetery.
10       Q.      This goes to the cemetery?
11       A.      Yes.
12       Q.      Whose trailer is this?
13       A.      That's my dad's.
14       Q.      All right.  And your house is --
15  this is the front yard of your house?
16       A.      Yes.
17       Q.      Is this paving that we've been
18  seeing here the new paving you were referring to
19  earlier?
20       A.      Yes.
21       Q.      Is there anyone who lives on that
22  stretch of road we just looked at that is not in
23  your family?
24       A.      No.
25       Q.      Are the other members of your family
```

1    up in there registered voters?

2         A.    Yes.

3         Q.    How many votes are up your road?

4         A.    Probably 27 to 30.

5         Q.    Twenty-seven (27) to 30?

6         A.    Yeah, more or less -- well, it ain't

7    less than 27.

8         Q.    That cemetery up there, is that a

9    private cemetery or family cemetery, or can

10   anybody in the public buy a lot up there?

11        A.    It's -- no, it's family.

12        Q.    Family?

13        A.    Yeah.

14        Q.    Has this road and this cemetery been

15   in your family for a number of years?

16        A.    Yes.  There's two cemeteries up

17   there.

18             MR. TAYLOR:  One moment.  That's all

19   the questions I have.

20             THE COURT:  Thank you, Mr. Taylor.

21   Mr. Westberry.

22             MR. WESTBERRY:  Yes, judge, just one

23   second, please.

24                  CROSS-EXAMINATION

25        BY:  MR. WESTBERRY:

```
 1          Q.      Good morning, Mr. Reynolds.

 2          A.      Good morning.

 3          Q.      Good morning to you.  I represent

 4     Randy Thompson.

 5               THE WITNESS:  Do what?

 6          Q.      Did you hear me okay, sir?  I

 7     represent Randy Thompson.

 8          A.      Oh, okay.  I'm hard -- I lost part

 9     of my hearing.

10          Q.      I know you worked the coal mines; is

11     that correct?

12          A.      Yes.

13          Q.      I don't believe Randy Thompson ever

14     came up to your house to talk to you about any

15     of this stuff; is that right?

16          A.      I never did see Randy.

17          Q.      Now, you mentioned, Mr. Reynolds,

18     about two roads, Runnel's Branch and a Rooster

19     Lane; did I hear that right?

20          A.      Yeah.

21          Q.      Now, Runnel's Branch, just ballpark,

22     how many houses are on Runnel's Branch, just an

23     estimate?  Quite a few, I think, aren't there?

24          A.      Yeah, they a whole lot.  I may have

25     told -- Runnel's Branch, you know, but mine
```

1     comes up Rooster Lane.  Yeah, there's a lot of

2     homes in Runnel's Branch.

3            Q.      Right.  Ten or more?

4                 THE WITNESS:  Do what now?

5            Q.      Ten or more homes?

6            A.      Oh, yes.

7            Q.      Okay.  Now, Runnel's Branch, that's

8     a county road, isn't it?

9            A.      Yes.

10           Q.      Okay.  Now, Rooster Lane is the road

11    that runs off of Runnel's Branch; do I have that

12    right?

13           A.      Yes.

14           Q.      Okay.  Now, leading up to the end of

15    Rooster Lane is the cemetery; is that right?

16           A.      That's right.

17           Q.      Now, your dad lives in a trailer up

18    just past your house; is that right?

19           A.      That's his rental property.  My dad

20    lives below.

21           Q.      That's right.  But your dad thinks

22    that that road --

23                 MR. TAYLOR:  Objection to hearsay.

24                 THE COURT:  I'll sustain that

25    objection.

 1          MR. WEBSTER:  Your Honor, may we

 2    approach the bench?

 3          THE COURT:  You may.

 4          [CONFERENCE AT THE BENCH]

 5          MR. WEBSTER:  Reputation testimony as

 6    to such matters is admissible.

 7          MR. TAYLOR:  I'm not --

 8          THE COURT:  In terms of the reputation

 9    --

10          MR. WEBSTER:  Reputation testimony and

11    matters, this road, reputation, people say this

12    is a county road is admissible.  That's

13    reputation.  It's admissible in boundary cases

14    and cases like this.

15          THE COURT:  Yeah, I don't think the

16    Federal Rules of Evidence would allow for that.

17    I mean, that's really being offered for the

18    truth as if you want that witness to come in and

19    testify to the fact that I believe it's a, you

20    know, I always thought it was a public road.

21    Mr. Westberry, let me hear from you.

22          MR. WESTBERRY:  Yeah, what he testified

23    to in the grand jury under questioning from

24    Mr. Taylor, if I can just read it to you, it's

25    only a couple of sentences.

1          MR. TAYLOR:  Yeah.

2          THE COURT:  Are you talking about the

3   witnesses?

4          MR. WESTBERRY:  Yes.  I'll read to you

5   what the witness testified to.  The question was

6   the cemetery, is that a public cemetery or a

7   private burial ground?  I guess it's private.

8   My son owns it.  Question:  That's not a public

9   road to the cemetery?  Answer:  I'm not for

10  sure.  My dad says it's a county road.  I don't

11  know.  I don't know when the county took it or,

12  you know, I don't know.

13         I want to impeach him because he's

14  already testified under direct examination from

15  the Government that he thinks that's private.

16         MR. WEBSTER:  Could you not know that a

17  road was a county road but by gathering it from

18  others?

19         MR. TAYLOR:  Put on hearsay as to the

20  status of roads?  I thought they were trying to

21  keep me from putting on hearsay.

22         THE COURT:  Yeah, I think you can, I

23  think you can ask, I think you can ask him, you

24  can, I think you can impeach him with this

25  testimony.  The problem is the hearsay here is

1  just that narrow bit which is, you know, it --

2  you know, is someone else thinking that it's

3  not, that it's not a -- that it is a county

4  road.  So I guess this is in some ways again the

5  -- kind of his statement basically, you know,

6  you're -- what you need to impeach him on is

7  that he's not sure, and why he's not sure is

8  that he's heard from others that maybe it is or

9  it isn't, but you can't -- where this was

10  seeming to head was just kind of getting into

11  testimony of someone else.

12          MR. WESTBERRY:  I was just trying to

13  lay the foundation before I got into this.  My

14  next line of questioning would be to impeach him

15  on his grand jury testimony.

16          THE COURT:  I think the more

17  appropriate, given this hearsay concern is to

18  ask him a question about not the grand jury.

19  Well, you weren't sure, were you, about whether

20  this was a county road, as opposed to focusing

21  on the testimony of his father.

22          MR. WESTBERRY:  And if he says he's not

23  sure about what he testified about at the grand

24  jury, which could easily be the case; I think

25  Ken had a little trouble getting him to recall

1 certain things in the grand jury, then go into

2 the questioning from the grand jury.

3          THE COURT:  Mr. Taylor?

4          MR. TAYLOR:  Well, you know, if we're

5 going to get into this, it's going to have to

6 cut both ways, and I can ask people what they've

7 heard about this road.  There's plenty of

8 instances that go the other why.

9          MR. WEBSTER:  I don't think I would

10 mind that.

11          MR. WESTBERRY:  I don't either.

12          MR. WEBSTER:  I don't see how you can

13 prove a character road which is to the public or

14 to a defendant or to those who are living there

15 it's a state of mind.  That state of mind comes

16 by reputation.

17          MR. TAYLOR:  Well then why weren't

18 there all these objections when these haulers

19 and graders who had an opinion that a road was

20 private based upon its reputation?

21          MR. WEBSTER:  I've never heard you ask

22 such a question.

23          MR. TAYLOR:  I didn't say reputation,

24 but I said did you believe it to be private?

25          MR. WEBSTER:  What road did you ask

1    somebody about that?  I've not heard that.

2           MR. TAYLOR:  They didn't know specific

3    roads.

4           MR. WEBSTER:  Well, see, that's the

5    problem.

6           MR. TAYLOR:  They didn't pave -- that

7    didn't work because they didn't want to pave

8    private driveways.

9           THE COURT:  Hold on, don't argue

10   amongst yourself.  I'm going to allow you to

11   impeach this witness with that grand jury

12   testimony.  I'm going to allow you to, you know,

13   just read back the testimony, the impeachment,

14   here is this kind of I'm unsure and the reason

15   he's unsure is that there is different people

16   kind of think different things, and I'll allow

17   you to do that with that grand jury testimony.

18          MR. WESTBERRY:  I want to be clear.  I

19   don't want to have to keep running back up to

20   the Court.

21          THE COURT:  Right.

22          MR. WESTBERRY:  But I'm going to read

23   just those questions and answers.

24          THE COURT:  And you may, and I

25   understand with the response of the grand jury

1    was one of those questions was that someone else

2    thought it was his father.

3            MR. WESTBERRY:  Right.

4            THE COURT:  Okay.

5            [IN OPEN COURT]

6            MR. WESTBERRY:  We're back.

7            THE WITNESS:  Yeah, okay.

8        Q.    I was asking you about Rooster Lane

9    and what it leads up to at the top of the hill,

10   and I believe you testified there's a cemetery

11   up there?

12       A.    Yes.

13       Q.    Is there more than one cemetery?

14       A.    Yes.

15       Q.    Okay.  One cemetery belongs --

16   primarily plots for your family; is that

17   correct?

18       A.    That's correct.

19       Q.    Is the other cemetery, you know, a

20   cemetery for other people, other families?

21       A.    Yeah, it belongs to the Seals

22   family.

23       Q.    Now, on the questioning from the

24   Government just a little while ago regarding

25   Rooster Lane Road which leads up to the two

1    cemeteries, I think, if I heard you right, I
2    think I heard you tell the jury you thought that
3    road was private; is that correct?
4         A.    That's correct.
5         Q.    Okay.  Do you remember testifying in
6    the grand jury, oh, October of last year?
7         A.    Not the road going -- the road going
8    up my way's private --
9              MR. WESTBERRY:  Okay.
10        A.     -- but the road going to the
11   cemetery, my dad always told me it belonged to
12   the county.
13        Q.    There we go.  Okay.  There we go.
14   But this is all Rooster Lane; is that correct?
15        A.    Yes.
16             MR. WESTBERRY:  There we go.  Excuse
17   me.  I don't know that I need to impeach him.
18   Excuse me.  My partner has prompted me.
19        Q.    Who has maintained that road?  Has
20   the county maintained that road all those years?
21        A.    That's correct.
22        Q.    Long before Mr. Thompson was ever
23   county judge?
24        A.    That's correct.
25        Q.    Your dads's always thought that was

1   a county road; is that right?

2        A.      That's right.

3        Q.      How old is your father?

4        A.      He is 70.

5        Q.      Okay.  Your son lives on the

6   property, too; is that right?

7        A.      Yes.

8            MR. WESTBERRY:  Excuse me again,

9   Judge.  I'm sorry.

10           THE COURT:  Certainly.

11       Q.      On the pictures that the Government

12  introduced into evidence and had us look at the

13  property, it looked like the roads were paved,

14  the road itself, Rooster was paved, but the

15  driveways were not paved; is that correct?

16           THE WITNESS:  Like the driveways going

17  to your house?

18           MR. WESTBERRY:  Yeah.

19       A.      No, they wasn't paved.

20           MR. WESTBERRY:  Right.  That's all the

21  questions I have.  Thank you.  Thank you,

22  Mr. Reynolds.

23           THE COURT:  Mr. Webster.

24           THE WITNESS:  You're welcome.

25                     CROSS-EXAMINATION

1    BY:  MR. WEBSTER:

2        Q.    I won't bother you too much, Bobby,

3    but I've looked at those pictures and I had a

4    hard time understanding it.  The main creek up

5    through that there, what's the name of that, not

6    the holler that you --

7            THE WITNESS:  The main creek --

8            MR. WEBSTER:  Yeah.

9            THE WITNESS:  -- as you turn off of 160

10   is called Runnel's Branch.

11       Q.    All right.  And you live in a holler

12   off Runnel's Branch?

13       A.    Yeah, I live off the fork of it up

14   in the holler.

15           MR. WEBSTER:  I'm sorry.

16       A.    As you come up Runnel's Branch, I

17   live -- it forks off up Rooster Lane.

18       Q.    To the left?

19       A.    Yes.

20       Q.    As you're coming up?

21       A.    Yes.

22       Q.    Rooster Lane is that blacktop road

23   we saw?

24       A.    Yes.

25       Q.    On the pictures?

1      A.      Yeah, on them pictures.

2      Q.      And that's been graveled or

3 maintained by the county for more than 15 years?

4      A.      That's correct.

5      Q.      And now has been adopted into the

6 county road system?

7      A.      Well, I don't know.

8      Q.      Well, you said so in the -- in your

9 prior testimony --

10     A.      The one part --

11     Q.      -- in an interview?

12         MR. TAYLOR:  Objection on Mr. Webster

13 testifying.

14         THE COURT:  I'll sustain that

15 objection.

16         MR. WEBSTER:  Well, I'll be more

17 formal.

18     Q.      On May 8 '07, were you interviewed

19 by Officer Hopkins here?

20     A.      Yes.

21     Q.      And did you tell him Mr. Reynolds

22 made me aware that the county had been adopting

23 roads and that they had adopted his road without

24 his permission?  Did you say that?

25     A.      The road I had built, they said that

1    the county adopted a road, and I didn't give

2    them permission, but the other road, I always

3    thought the county owned.  I don't know.

4         Q.    Okay.  Now, when you go up that

5    road, it forks off itself -- one fork goes to

6    the cemetery, right?

7         A.    That's correct.

8         Q.    And that's been graveled all these

9    years?

10        A.    Yes.

11        Q.    And the other fork goes to your

12   house and Brandon's house?

13        A.    Yes.

14        Q.    Okay.  And that house at the bottom

15   of the hill there with the pretty big house,

16   whose is that?

17        A.    That's my girls.

18        Q.    Okay.  And so there's three of you

19   that lives along that road?

20        A.    Yes, that's correct.

21             MR. WEBSTER:  That's all.  Thank you.

22             THE COURT:  Thank you, Mr. Webster.

23   Mr. Jensen.

24             MR. JENSEN:  I have no questions, Your

25   Honor.

1          THE COURT:  And Mr. Williams?

2          MR. WILLIAMS:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4     BY:  MR. WILLIAMS:

5          Q.     Mr. Reynolds, earlier, I think I may

6     have kind of objected over something that you

7     said.  I just want to make sure that I was clear

8     on what you had said earlier.  I think you

9     testified that Ronnie Adams never asked you for

10    a vote, did he?

11         A.     No.

12         Q.     Now, this has been a -- Rooster Lane

13    has been a public road for quite some time,

14    hasn't it?

15         A.     Yes.

16         Q.     And if I told you that Rooster Lane

17    appeared on county road lists from 1999 and

18    2006, you wouldn't have any reason to dispute

19    that, would you?

20         THE WITNESS:  Do what now?

21         Q.     If I were to tell you that Rooster

22    Lane appears on county road lists dating back

23    from 1999 and 2006, you wouldn't dispute that,

24    would you?

25         A.     No.

1       Q.     Now, you were asked if anybody -- if

2 everybody that lives up that way was related to

3 you, and I think your answer was yes.  But if I

4 understand correctly, Brandon Moore is not kin

5 folk to you, is he?

6       A.     No, not Brandon Moore, no.

7       Q.     Okay.  He's a renter from you?

8       A.     Yeah, a renter, uh-huh

9 (affirmatively).

10      Q.     And he doesn't own anything up

11 Runnel's Branch or Rooster Lane, does he?

12      A.     That's correct.

13      Q.     Now, I think you testified there are

14 26 or 27 people that live up there as far as

15 you're aware?

16      A.     Yes.

17      Q.     And does the school bus run that

18 way?

19      A.     Yes.

20      Q.     Okay.  And the fact that that road

21 has been graveled and paved all this time has

22 been helpful to that, hasn't it?

23           MR. TAYLOR:  We object to the question,

24 it being paved all this time.  There's no

25 testimony to that effect.

 1            THE COURT:  Well, I'll allow it.

 2       Q.     I think, Mr. Reynolds, if I

 3   understand you correctly, you've testified that

 4   portions of Rooster Lane had been paved in the

 5   past, haven't they?

 6       A.     Yes, it has.

 7       Q.     All right.  So we're talking in this

 8   case in the Fall, '06, and just to be clear,

 9   there were portions of Rooster Branch paved

10   before that, weren't there?

11       A.     Yes.

12       Q.     And what administration paved that

13   part of it, do you know?

14       A.     Homer Sawyer.

15       Q.     And how far back along has that

16   been?

17       A.     Oh, I don't know.  I guess the last

18   time he was in, or the first term he was in.  I

19   can't remember.

20       Q.     And it was graveled by the county

21   even long before that, wasn't it?

22       A.     Yes.

23       Q.     In fact, I think you've told folks

24   that it's been graveled by the county back as

25   long as you can remember?

1    A.    As long as I've lived there.

2    Q.    Now, you mentioned that there's a

3    couple of cemeteries up there.  I think it's at

4    the top of the hill?

5    A.    Yes.

6    Q.    And you've already admitted that one

7    of those cemeteries is not a family cemetery of

8    your all's?

9    A.    No.

10    Q.    Now, isn't it true that even when

11    there's been your family's funerals, that the

12    county has graveled the road up there to the

13    cemetery so folks can get in and out?

14    A.    That's correct.

15    Q.    And your family's even requested

16    that they do it before, haven't they?

17    A.    Yeah.

18    Q.    Now, when did -- you mentioned

19    Brandon Moore.  When did he start renting from

20    you?

21    A.    Let's see, probably 2004 or 2005,

22    2004.

23    Q.    He hadn't lived in there a long time

24    when the county paved back in the Fall, '06, had

25    he?

```
1        A.      Probably a couple of years.

2        Q.      All right.  Did he know very many

3   people back then?

4           THE WITNESS:  Did he know any?  Did he

5   know what?

6        Q.      Did he know very many people in

7   Knott County back at that time?

8        A.      Yeah, his wife -- not his wife, his

9   sister and stuff lived there.

10       Q.      Okay.  He knew his own family in the

11  county?

12       A.      Yeah.

13       Q.      All right.  Now, do you remember

14  talking to Agent Hopkins about Brandon Moore?

15          THE WITNESS:  Do I remember what?

16       Q.      Do you remember talking to Agent

17  Hopkins, the state policeman working for the

18  FBI, about Brandon Moore?

19          THE WITNESS:  Do I remember talking?

20       Q.      Do you remember talking to

21  Mr. Hopkins?

22          THE WITNESS:  Him?

23       Q.      About Brandon Moore?

24       A.      I just told him where Brandon lives

25  is all I told him.
```

1     Q.    All right.  Did you have any

2    questions in your own mind about how or why he

3    would even possibly know Ronnie Adams?

4     A.    I asked him who asked him who was up

5    there, Brandon.

6     Q.    You questioned in your own mind why

7    he would even know him, didn't you?

8     A.    Yeah.

9        MR. WILLIAMS:  Your Honor, may I have

10   just a minute, please?

11       THE COURT:  You may.

12       MR. WILLIAMS:  That's all I have, Your

13   Honor.

14       THE COURT:  Thank you, Mr. Williams.

15   Mr. Taylor, redirect?

16       MR. TAYLOR:  Yes.

17          REDIRECT EXAMINATION

18   BY:  MR. TAYLOR:

19     Q.    I am going to, if I can, bring the

20   easel out and draw a picture, because I think

21   we've confused the issue here a little bit and I

22   want to unconfuse it again.

23       MR. WESTBERRY:  Is that a question or a

24   statement?

25       THE COURT:  It's a request, and it will

1    be granted.

2           THE COURT:  Counsel, if you'd like to

3    move so you can see the demonstrative, feel free

4    to do so.

5        Q.    Now, Mr. Reynolds, I'm going to try

6    to talk our way through this, and you correct me

7    if I do anything wrong here.  I'm going to draw

8    what appears to be Rooster Lane, which is part

9    -- as I understand, part private and part

10   public?

11       A.    Yes.

12       Q.    All right.  It comes up like this.

13   And is Brandon Moore's house at the very top of

14   -- or his trailer at the very top of that road?

15       A.    Yes.

16           MR. TAYLOR:  All right.  Now, so --

17   Your Honor, so that I'm not the one testifying,

18   could he come down and answer some questions and

19   mark some things on this?

20           THE COURT:  I'll allow him to do that.

21       Q.    All right.  Could you tell me -- if

22   you'll stand right over here -- could you tell

23   me where on this place your daughter's house --

24   how close up -- is she up the lane, too?

25       A.    Yes, she's about right in here.

```
 1        Q.      About right in there?

 2        A.      Yeah.

 3        Q.      Right here?

 4        A.      Yeah.

 5        Q.      Is your daughter?

 6        A.      Yes.

 7        Q.      All right.  And where is your house

 8   in relation to that?

 9        A.      Right down here.

10        Q.      Well, now, if at some point --

11        A.      Our road starts like that.

12        Q.      I'm going to draw right here is

13   where it becomes public and private.  Now, where

14   would you be in relation to that?

15        A.      I would be -- my property starts

16   right there.

17        Q.      Okay.  Right here?

18        A.      Yeah.

19        Q.      And where does the road to the

20   cemetery branch off?  Is it below your house?

21        A.      Branch out right below my house,

22   right on up right there.

23        Q.      Like this?  If this is where -- if

24   this is where it had been public before, and

25   this is the private --
```

1          MR. WILLIAMS:  Objection, Your Honor.

2    May we approach?

3          THE COURT:  I'll sustain the objection.

4     Q.     Let me ask it this way.  How far

5    below -- you indicated Rooster Lane was

6    partially public and part -- and then -- where

7    does your property line start?

8     A.     Right at the blacktop, where it's

9    blacktopped years ago.

10     Q.     Okay.  So there was blacktop on

11    Rooster Lane, and then it stopped?

12     A.     And it stopped, and I built a road

13    from there up to the top of the hill to Brandon.

14     Q.     From this point on up here, you

15    built that road?

16     A.     Yes.

17     Q.     And when did you build that road?

18     A.     In '95 or '96.

19     Q.     And is this all your land here?

20     A.     Yes.

21     Q.     All right.  Now, judging by the end

22    of the blacktop, where does the road and the

23    cemetery begin?

24     A.     It starts right down this a-way and

25    goes up to the cemetery.

1        Q.      Goes up to the cemetery?

2        A.      Yeah.  My brother lives here.

3        Q.      Your brother lives there.  Okay.

4        A.      Okay.  And the rental property right

5    there.

6        Q.      Rental?

7        A.      Yeah.

8        Q.      And where's the cemetery?

9        A.      There's one cemetery on the right

10   there, and go on past on the other side is the

11   Seals Cemetery.

12       Q.      Is this your family cemetery, this

13   lower one?

14       A.      Yeah, the first one.

15       Q.      All right.  Now, when you were --

16   now, where does your brother live, your other --

17   oh, you've already said your brother lives

18   there?

19       A.      Yeah.  And my nephew's in the other

20   part through there.  Now, I don't own that.

21       Q.      Okay.  Now, earlier, when you said

22   that there had been some blacktop, or had been

23   some county maintenance on Rooster Lane, are you

24   talking about this section?

25       A.      The county has kept the road up,

1      that road, and that road.

2          Q.      But was there blacktop on this

3      before?

4          A.      No.

5          Q.      All right.  When was the first time

6      blacktop was put down on this road?

7          A.      In '06.

8          Q.      Blacktop?

9          A.      I guess so, whenever the election.

10         Q.      '06, I thought you said '96.  '06.

11     The election of '06 was the first time this got

12     blacktopped?

13         A.      Yeah.

14         Q.      Was that on your private property?

15         A.      Yeah.

16         Q.      Did you intend by virtue of laying

17     the blacktop to your private property to give

18     them that road?

19             THE WITNESS:  Did I intend to give them

20     the road?

21             MR. TAYLOR:  Yes.

22         A.      Well, much as they've kept it up, I

23     thought they really owned it.

24         Q.      That's not what you said before, is

25     it?

1       A.      As much as they've kept the road up.

2       Q.      This is the first time you've said

3    that, isn't it?

4       A.      They've took -- Marcus told me they

5    put it in the road plan, and he asked me could I

6    give it to them, and I said, Well, no.

7       Q.      Okay.  Didn't you tell Mr. Hopkins

8    that the county has been adopting roads and they

9    adopted his road without his permission, you

10   stated you had constructed everything on your

11   property and you were not willing to deed

12   anything to the county, but they took it anyway;

13   did you say that?

14      A.      Yeah, I said that, yeah, I said the

15   county kept the road up.  I didn't know the

16   county had took the road.  Marcus told me about

17   that.

18           THE COURT:  I'm going to have the

19   witness go back to the witness stand.

20           MR. TAYLOR:  Go on back to the witness

21   stand.

22           THE COURT:  And I'm going to have

23   counsel go back to the counsel table.  And,

24   Mr. Taylor, whenever he's settled, you can

25   continue your questioning.

1      Q.      Now, earlier when you said that the
2  county -- your father had said something about
3  the cemetery road being public, you talking
4  about the road that branches off of Rooster
5  Lane?
6      A.      Yeah.  That's the one that my dad
7  said the county owned.
8      Q.      You weren't referring -- if I could
9  walk around it one second.
10          THE COURT:  You may.
11     Q.      When you said that, you weren't
12  referring to this section right here, were you?
13          THE WITNESS:  Do what, Ken?
14     Q.      You weren't referring to this
15  section right here, were you?
16     A.      No, uh-uh.
17     Q.      And for the record, and, counsel, I
18  was pointing to --
19     A.      My dad said the county owns the one
20  going to the cemetery.
21     Q.      To the cemetery.  And you don't know
22  that for a fact?  You're just going by what your
23  dad said?
24     A.      I was just going by what my dad
25  always told me growing up.

1      Q.      In any event, Mr. Reynolds, when
2   that blacktop occurred in the Fall, 2006, did
3   you know you were part of any kind of road
4   improvement project, your lane?
5      A.      No.
6           MR. TAYLOR:  That's all the questions I
7   have.
8           THE COURT:  Thank you.  Thank you,
9   sir.  You may be excused from testifying.  May
10  this witness be finally excused?
11          MR. TAYLOR:  Yes, Your Honor.
12          THE COURT:  All right.  You can be
13  finally excused from any further testimony in
14  this trial.  Appreciate you being here, sir.
15          THE WITNESS:  Thank you, all.
16          THE COURT:  The United States will call
17  your next witness, please.
18          MR. TAYLOR:  Call Brandon Moore.
19          THE COURT:  Brandon Moore will be
20  called as the next witness for the Government.
21          [WITNESS SWORN]
22               DIRECT EXAMINATION
23     BY:  MR. TAYLOR:
24     Q.      Sir, would you state your full name
25  please?

```
1        A.      Brandon Bashon Moore.

2        Q.      And spell that middle name?

3        A.      B-A-S-H-O-N.

4        Q.      And where do you live, sir?

5        A.      Knott County.

6        Q.      All right.  Whereabouts in Knott

7   County?

8        A.      I live in Mallie now.  I used to

9   live in Littcarr.

10        Q.      Did you formerly live on some

11   property owned by Bobby Reynolds?

12        A.      Yes, sir.

13        Q.      Was that a trailer at the top of a

14   holler?

15        A.      Yes.

16        Q.      All right.  Are you a registered

17   voter in Knott County?

18        A.      Yes, sir.

19        Q.      And how long have you been a

20   registered voter?

21        A.      Three or four years.

22        Q.      I would direct your attention back

23   to the Fall of 2006.  Do you recall the election

24   for county judge?

25        A.      Yes, sir, I do.
```

1      Q.    Did you have a conversation with

2   someone about blacktopping near your home during

3   that election?

4      A.    Yes, sir, I did.

5      Q.    All right.  Would you tell the jury

6   the conversation and who you had it with?

7      A.    I was coming home from work one day,

8   and a guy was standing down there at Bobby's

9   talking to him.  I pulled up, and he asked me if

10   I'd like to have my hill blacktopped, and I said

11   yeah, I said, but I couldn't afford it, and he

12   said it wouldn't cost me nothing but a vote, and

13   I'm pretty sure he said his name was Ronnie

14   Adams, I think's what it was.

15      Q.    Okay.  Now, did you know this man at

16   the time?

17      A.    No, I hadn't ever met him before.

18      Q.    All right.  And how did you come to

19   learn who he was?

20      A.    Just through people talking.

21      Q.    Okay.  And at one time were you

22   shown a picture?

23      A.    Yes, sir, I was.

24      Q.    Was there a time that you said a

25   picture was not Ronnie Adams --

1      A.      Yes, the first picture.

2      Q.      -- or was not the man?

3      A.      Yes.

4      Q.      And did you later change that?

5      A.      Yes, sir, I did.

6      Q.      And do you know why that occurred?

7      A.      He looked different, had glasses on

8    and stuff in the second picture.

9      Q.      Can you give us an approximate date

10   when this conversation occurred?

11     A.      No, not right off the top of my

12   head.

13     Q.      Did he say who you would vote for?

14     A.      Yes, sir.

15     Q.      And who was that?

16     A.      Randy Thompson.

17     Q.      All right.  Now, had he already --

18   had there already been some blacktopping done

19   there?

20     A.      No, not there, not yet, not at the

21   time.

22     Q.      Okay.  Was there blacktopping done?

23     A.      Yeah.

24     Q.      How long after that conversation was

25   the blacktop brought in?

SANDY C. WILDER, RMR, OFFICIAL COURT REPORTER
(859) 516-4114

1          A.       About a month, month and a half, two

2      months, somewhere around in there.  It wasn't

3      long.

4          Q.       Okay.  Was the other part of Rooster

5      Lane blacktopped at the same time?

6          A.       Yes, sir, it was.

7               MR. TAYLOR:  At this time, I'd like to

8      put 4C on the screen -- I'm sorry, 4A.  If I

9      could get 4A, I want to put it on the Elmo

10     because I want to point to something.

11         Q.       Do you recognize this house in the

12     picture?

13         A.       Yes, sir, I do.

14         Q.       This one right here?  Whose house is

15     that?

16         A.       That's Nathan and Michelle Davis.

17         Q.       Is that Bobby Reynolds' daughter?

18         A.       Yes, sir.

19         Q.       And where in this picture would your

20     trailer be?

21         A.       Behind that house all the way up

22     that road there.

23         Q.       All the way up this road up in here?

24         A.       Yes, sir.

25         Q.       We don't see your trailer on that

1      photograph, do we?

2          A.     No, you can't see it for the house.

3          Q.     What was it that you had the

4      conversation about paving, starting where and

5      going to where?

6          A.     Starting right there at the bottom

7      of that hill where that garbage bin is that has

8      the numbers on it.

9          Q.     Right here?

10          A.     Yeah.  From there all the way to the

11      top of the hill.

12          Q.     All right.  And from this house on

13      up the hill, how many houses are between this

14      house and yours?

15          A.     None.

16          Q.     So you're the only house up that

17      hill?

18          A.     Yes, sir.

19          Q.     And what kind of surface was on that

20      road prior to that blacktop?

21          A.     The dirt, gravel.  Not much of one

22      when it rains.

23          Q.     Did you agree to vote for that

24      blacktop?

25          A.     Yes, sir, I did.

1          MR. TAYLOR:  That's all the questions I
2    have.
3          THE COURT:  Thank you, Mr. Taylor.
4    Mr. Westberry.
5          MR. WESTBERRY:  Yes, thank you.
6                    CROSS-EXAMINATION
7    BY:  MR. WESTBERRY:
8       Q.     Good morning, Mr. Moore.
9       A.     Morning.
10      Q.     My questions are brief.  Have you
11   ever met Randy Thompson personally?
12      A.     Never.
13      Q.     I think you testified about the road
14   that you used to live on Rooster Lane?
15      A.     Yes.
16      Q.     And you said not much gravel left
17   when it rains --
18      A.     No.
19      Q.     -- is that correct?
20      A.     Yes, it is.
21      Q.     What, it just washes on down?
22      A.     Yeah, the road just about washes
23   completely out.
24      Q.     Does it get kind of dangerous at the
25   bottom sometimes when you're trying to stop?

```
1              A.      Yeah.
2              Q.      The Government asked you the
3      question but he didn't ask you -- if you don't
4      mind, if this is personal you can -- I really
5      don't care.  Who did you vote for the county
6      judge/executive?
7                   MR. TAYLOR:  Objection, irrelevant.
8                   THE COURT:  I'm going to ask counsel to
9      approach.
10                  [CONFERENCE AT THE BENCH]
11                  MR. WESTBERRY:  I'll withdraw the
12     question.
13                  MR. WEBSTER:  Let me answer for him.
14     It was asked people who appeared in front of the
15     grand jury.  It was deemed relevant by the
16     United States then.
17                  THE COURT:  Well, that's not the grand
18     jury.
19                  MR. WESTBERRY:  Agent Hopkins asked him
20     in the Jencks Act that we've been given how he
21     voted, and he said he voted for Mike Hall.
22                  MR. TAYLOR:  It's not relevant, Your
23     Honor.  The crime is consummated by the offer
24     and the acceptance.  Sometimes we ask things in
25     grand jury that are irrelevant.  We continue
```

1  investigations and things of that nature, but
2  when you get to trial, the rules of relevance
3  control.
4          MR. WESTBERRY:  Excuse me.  I've
5  already asked the previous witness how they've
6  voted or supported.  For example, he was a Mike
7  Hall man; I didn't get an objection then.
8          THE COURT:  As I recall in your
9  opening, there was this issue of where the
10  political support was.
11          MR. WESTBERRY:  Yeah.
12          MR. TAYLOR:  But I never, ever said
13  that anyone took the money and then voted the
14  other side.  That's a whole different issue.
15          THE COURT:  Hold on, hold on.  One at a
16  time.  This is Mr. Westberry's question.  I'm
17  going to rely on him to respond to that.
18          MR. WESTBERRY:  I think the Government
19  in its opening statement, the Court, quite
20  frankly, has prompted my recollection.  Really,
21  Mr. Taylor said, and I'm paraphrasing, but I
22  think pretty accurate, there's no way Thompson
23  could have been elected to a full term had he
24  not, you know, engaged in the illegal activity
25  that he did.  I mean, he's placed the whole

1    issue of politics in his opening statement.  He

2    spoke first, and I think if it goes to potential

3    bias of this witness to show that, that he in

4    fact, I think he will testify, if he's allowed

5    to be asked that, he voted for Mike Hall.

6         MR. TAYLOR:  Your Honor, the politics

7    that I referred to in my opening statement had

8    to do with the motive of someone to support

9    Thompson who was working for Thompson.  I didn't

10   touch the issue of anybody double-crossing the

11   vote buyers, and it's simply not relevant.  And

12   I did not say in my opening anything like he

13   just said.  I didn't touch that issue.

14        THE COURT:  Well, I'm going to your

15   argument is that the relevance of it goes to the

16   bias somehow is it the credibility --

17        MR. WESTBERRY:  Credibility.

18        THE COURT:  -- of this particular

19   witness.

20        MR. WESTBERRY:  Bias and or

21   credibility, right.

22        THE COURT:  I am going to allow the

23   question to be asked and answered.

24        MR. WESTBERRY:  I'm not going to go

25   into it further.

1           THE COURT:  I wouldn't go -- yeah.

2           [IN OPEN COURT]

3      Q.     Who did you vote for in that county

4   judge's election?

5      A.     Mike Hall.

6           MR. WESTBERRY:  That's all I have.

7   Thank you, sir.

8           THE COURT:  Mr. Webster?

9           MR. WEBSTER:  No questions.

10          THE COURT:  Mr. Jensen?

11          MR. JENSEN:  Nothing, Your Honor.

12          THE COURT:  And then, Mr. Williams?

13          MR. WILLIAMS:  Thank you, Your Honor.

14                  CROSS-EXAMINATION

15     BY:  MR. WILLIAMS:

16     Q.     Mr. Moore, good morning.  How long

17  have you known Bobby Reynolds?

18     A.     Eight to ten years.

19     Q.     Eighteen (18) years?

20     A.     Eight to ten years.

21     Q.     Eight to ten, I'm sorry.  Can you

22  get a little bit closer to the microphone so I

23  can hear you.  And would you consider him to be

24  a friend?

25     A.     Yeah.

```
1        Q.      Now, you mentioned I think when you
2    first had this encounter with who you said was
3    Ronnie Adams that you were coming home from
4    work; is that right?
5        A.      Yes, sir.
6        Q.      Where were you working at the time?
7        A.      Ameritech Security.
8        Q.      Did you ever work for Mr. Reynolds?
9        A.      No.
10       Q.      Okay.  Is he involved in the
11   block-laying business?
12       A.      Not as I know of.
13       Q.      You've never laid block with him?
14       A.      No, sir.
15       Q.      But now at this time, in the Fall of
16   '06, you had rented from Mr. Reynolds for how
17   long?
18       A.      About six years.
19       Q.      For six years there on Rooster Lane?
20       A.      Yeah.
21       Q.      Okay.  Now, during the time that you
22   had lived there, the county had graveled all the
23   way to the top of the road, hadn't they?
24       A.      Yes, sir.
25       Q.      And that was helpful, wasn't it?
```

1        A.      Yes.

2        Q.      And to your knowledge, Mr. Reynolds

3    or yourself, you never asked anyone to stop

4    graveling that road, did you?

5        A.      No.

6        Q.      They graveled it and graded it

7    before it was blacktopped?

8        A.      No, they didn't.

9        Q.      They graveled it?

10       A.      They wouldn't -- it hadn't been

11   graveled in a long time before they blacktopped

12   it.  They never did grade it.

13       Q.      All right.  But just so I

14   understand, you're saying the county had

15   graveled it before?

16       A.      Yeah.

17       Q.      So if Mr. Reynolds has testified

18   they took care of that road up to your house, he

19   would be correct as well?

20       A.      Yes.

21       Q.      All right.  And you never complained

22   about it?

23       A.      No.

24       Q.      And to your knowledge, Mr. Reynolds

25   never complained about it?

```
1          A.      Not to my knowledge.

2          Q.      And just to be clear, you've

3   testified that you rented from Mr. Reynolds,

4   correct?

5          A.      Yes, sir.

6          Q.      You didn't own any property up

7   there?

8          A.      No.

9          Q.      And I think I also heard you say

10  that you were the only person that lived up that

11  fork of the road?

12         A.      Yes.

13         Q.      Doesn't Mr. Reynolds also live up

14  that fork?

15         A.      He lives down below from down in

16  front of that house there.

17         Q.      Okay.  But behind the house, is

18  there anyone else that's living up that road?

19         A.      No.

20         Q.      Does the school bus come up that

21  road?

22         A.      Not all the way up to my house, no.

23         Q.      But it comes up Rooster Lane?

24         A.      Yeah.

25         Q.      All right.  Now, do you remember
```

1    when you testified before the grand jury that

2    you didn't know this person who came up to you,

3    never seen him before --

4         A.    Yeah.

5         Q.    -- is that correct?

6         A.    Yes.

7         Q.    Okay.  So the person you're saying

8    is Ronnie Adams, you didn't know him before this

9    day you're saying you had this conversation with

10   at Mr. Reynolds' house?

11        A.    I had seen him before, but I had

12   never talked to him.

13        Q.    All right.  Now -- so, but you

14   didn't know what his name was, is that?

15        A.    No.

16        Q.    All right.  So, but you're

17   testifying that you had seen him before?

18        A.    Yeah.

19        Q.    Okay.  Do you remember testifying

20   before the grand jury that you'd said a guy that

21   I had never seen before?

22        A.    A guy I hadn't never talked to, a

23   guy I didn't know.

24        Q.    I'll direct you.  Do you remember

25   testifying before the grand jury, this was the

1    question that was asked on page three.  All

2    right.  Tell us how this all came about from the

3    very beginning, who approached you, what was

4    said, what did you agree, just tell it like

5    these people haven't heard before.  Answer:  I

6    was coming home from work one day and this guy I

7    hadn't never seen before in my life, I don't

8    know who he was.  Was that your testimony before

9    the grand jury?

10          A.      I didn't know who he was.

11          Q.      Was it your testimony that you had

12    never seen him before in your life?

13          A.      That might have been what I said,

14    but that ain't what I meant.

15          Q.      It wasn't what you meant?

16          A.      What I meant was that I hadn't never

17    talked to him.  I didn't know the guy.

18          Q.      Okay.  But you're -- you don't

19    dispute that your transcribed testimony from the

20    grand jury --

21          A.      Yeah.

22          Q.      -- is that you had never seen him

23    before in your life?

24          A.      Yeah.

25          Q.      All right.  Now, in fact, how did

1     you come about telling this to Agent Hopkins to

2     begin with?  How were you approached about that?

3          A.     He come up, was asking questions,

4     and he asked me, and I told him the truth.

5          Q.     All right.  Now, was Bobby Reynolds

6     there at that time?

7          A.     Yes.

8          Q.     All right.  Now, Bobby Reynolds had

9     questions about whether you had even knew this

10    guy, correct?

11         A.     I don't know.

12         Q.     All right.  Now, you've testified

13    that you'd seen this guy before --

14         A.     Yeah.

15         Q.     -- is that right?

16         A.     I've seen him out around town and

17    stuff, but I didn't know who he was.

18         Q.     But you've already testified here

19    today that you thought he said his name was

20    Ronnie Adams?

21         A.     No, I said people was telling me

22    that's who it was.

23         Q.     Okay.  Who are these people that

24    were telling you that his name was Ronnie Adams?

25         A.     Just different people, people from,

1    you know, from Littcarr, from Runnel's Branch,
2    just different people.
3         Q.    Okay.  They weren't there when you
4    had this conversation with him, were they?
5         A.    No.  They said that he talked to
6    them, to.
7         Q.    So did Agent Hopkins suggest to you
8    that his name might be Ronnie Adams?
9         A.    No.
10        Q.    Now, at some point you asked to see
11   a picture of this guy, right?
12        A.    Yes.
13        Q.    And you've described him as being in
14   his 30's or 40's?
15        A.    Well, late 30's, early 40's, yeah,
16   somewhere around there.
17        Q.    All right.  And would you be
18   surprised to learn that Mr. Adams is really in
19   his 60's?
20        A.    At this day and time, you can look
21   30 years old and be in your 70's.
22        Q.    All right.  Now, in fact, when Agent
23   Hopkins brought you a picture of Ronnie Adams to
24   show you, you said that's not the guy, correct?
25        A.    Yeah, that's what I said.

1     Q.     Okay.  And then he later brought you
2  another picture, and you said that that is the
3  guy, right?
4     A.     Yep.
5     Q.     And that turned out to be a picture
6  of Randy Campbell; is that correct?
7     A.     I told them -- I don't know who it
8  was.  I said that looks like the same guy.  That
9  was one of the guys I talked to, yes, it was.
10     Q.     All right.  Just one guy talked to
11  you?
12     A.     No, I'm talking about -- there was
13  two guys that talked to me.
14     Q.     Two different guys talked to you?
15     A.     One of them was the pavement guy
16  when he was up there paving, and the other one
17  was Ronnie Adams.
18     Q.     All right.  But when you were shown
19  a picture of Mr. Adams, you said that's not the
20  guy?
21     A.     It didn't look like him.  He didn't
22  have glasses on in that picture.
23     Q.     All right.  Now, you were asked
24  earlier who you voted for, and I think your
25  testimony was Mike Hall --

```
1        A.      Yes.
2        Q.      -- is that correct?  Why did you
3   vote for Mr. Hall?
4            MR. TAYLOR:  Objection, irrelevant.
5            THE COURT:  I'll sustain that
6   objection.
7            MR. WILLIAMS:  Your Honor, may we
8   approach?
9            THE COURT:  You may.
10           [CONFERNCE AT THE BENCH]
11           THE COURT:  Kind of a follow-up to
12   Mr. Westberry who kind of agreed to not go into
13   any further questioning.  I understand you
14   didn't agree to it, but we're going to need to
15   establish why that's relevant.
16           MR. WILLIAMS:  Your Honor, I would just
17   say that it goes to this witness's credibility
18   and to his motive to tell a different story, and
19   frankly, to create this story.  And I think the
20   jury should be allowed to explore that.  There's
21   been much made about Mike Hall and the
22   competition in this race, and that the election
23   was stolen by the Thompson camp out of the
24   clutches of this Democratic county and so forth,
25   and I just think that it goes to his credibility
```

1  here as to whether he's a Hall supporter and why

2  he was.

3        THE COURT:  Well, he's testified as to

4  who he voted for.  I guess the question is why

5  he voted, what's the relevance of that?

6        MR. WILLIAMS:  Well, it may open the

7  door to other issues, Your Honor, that we

8  haven't explored, such as is he doing this at

9  the direction of Mr. Hall.

10        THE COURT:  But why is that relevant?

11  Think back in terms of kind of the charges here.

12        MR. WILLIAMS:  The motive to lying

13  against my client, make the story up.

14        MR. WESTBERRY:  Hearing this, I'm going

15  to understand that Mr. Adams' situation is

16  really different than that of Randy Thompson's.

17  We have a witness that has given significantly

18  inconsistent statements and identification.  I

19  didn't have anything quite like that with

20  Thompson, other than just the fact that I have

21  left alone, so I think I can distinguish where

22  Jason is coming from where I did.

23        THE COURT:  And I think we've fully

24  explored the inconsistent identification.  I

25  think this is a different issue.  Mr. Taylor.

1           MR. TAYLOR:  Well, it seems to me
2      inherently contradictory to elicit what they're
3      contending to be this truthful testimony about
4      Mike Hall to prove he's a liar.  If he were
5      lying about it, he would have said I voted for
6      Randy Thompson and sealed the deal, if he were
7      working for Mike Hall.  But this is just fishing
8      for some other collateral issue for the jury to
9      get confused by.  And it's not relevant to this
10     case who he voted for or why.
11          THE COURT:  I agree.  I mean, I think
12     I've allowed the testimony as to who this
13     particular witness voted for.  I think what I'm
14     going to do, though, is I'm going to allow you
15     to have an answer to the question that's on the
16     table right now.  He can -- we'll see if it kind
17     of echoes into an area that is relevant in some
18     way as relates to the credibility of this
19     witness, but I'm not going to let you kind of
20     explore it any further, why did you vote.  He
21     can kind of respond and however he responds,
22     then you can move on.
23          MR. WILLIAMS:  May I ask one more
24     question just so I don't get myself in trouble?
25          THE COURT:  You may, sure.

1          MR. WILLIAMS:  And this really came out

2     in the Harold Dean Bentley testimony yesterday.

3     He admitted that he was a supporter of Mr. Hall

4     and that he went so far as he was promised a

5     job, and I just wonder if this is the type of

6     questions I wanted to be able to explore of this

7     witness, whether he's been promised anything as

8     a result of his testimony.

9          THE COURT:  Well, let's see when --

10     let's see what the answer is to that.  If it's

11     -- if, you know, if I thought it was a better

12     candidate, then we'll move along, and to the

13     extent that you have further objections as this

14     unfolds, just state them.  We don't need to come

15     back up here.  I think I know what the issues

16     are and the scope of it.

17          [IN OPEN COURT]

18     Q.     Mr. Moore, can you go ahead and

19     answer the question I asked previously.  Why was

20     it you voted for Mr. Hall?

21     A.     Because I've known him for awhile.

22     Q.     How have you known him?

23     A.     Through the Big Y Market and stuff.

24     Q.     I'm sorry?

25     A.     Big Y Market.

Q.      Were you involved in his campaign
any?

A.      No.

MR. TAYLOR:  Objection.

THE COURT:  The witness has answered,
so I'll overrule the objection, but ask counsel
to move on.

MR. WILLIAMS:  Your Honor, may we
approach on one other issue?

THE COURT:  You may.

[CONFERENCE AT THE BENCH]

THE COURT:  All right.

MR. WILLIAMS:  Just so I won't be
stumbling around, I had asked Mr. Taylor earlier
if I could just see the photograph that this
person was shown of Ronnie Adams, and I just
want to be clear and be careful about this.
I've been produced two photographs of Mr. Adams
that were shown to Brandon Moore, and in both of
them he has his eyeglasses on.  And this witness
has testified that he didn't have eyeglasses on
in the photographs that he saw.  So I guess my
question is if Mr. Taylor has a photograph of
Mr. Adams without his glasses on, I need to see
it.

1          MR. TAYLOR:  You've got what I've got.

2          MR. WILLIAMS:  Okay.  May I have the

3    originals of those?  Do you have them?

4          MR. TAYLOR:  I have a copy.  I have

5    what's marked as exhibits.  Whether it's the

6    ultimate original, I don't know.

7          MR. WILLIAMS:  You just have black and

8    whites, too?

9          MR. TAYLOR:  I don't know what I've

10   got.

11         MR. WILLIAMS:  Okay.

12         [IN OPEN COURT]

13   Q.      Mr. Moore, if I understand your

14   testimony correctly, earlier you said you were

15   shown a photograph of Mr. Adams that you said it

16   wasn't him because he didn't have his glasses

17   on; is that correct?

18   A.      Yes, sir.

19   Q.      All right.  I'm going to show you a

20   picture that's been given to me by the United

21   States as a picture you were shown.  Does

22   Mr. Adams have his glasses on in that picture?

23   A.      I can't see it from here.

24         THE COURT:  You can have that tendered

25   to the witness.

1          A.      In that picture he does.  But that
2    wasn't the picture I was shown the first time.
3               MR. WILLIAMS:  Thank you.  I have no
4    further questions.
5               THE COURT:  Mr. Taylor, on redirect?
6               MR. TAYLOR:  Nothing further, Your
7    Honor.
8               THE COURT:  Thank you.  May this
9    witness be finally excused?
10               MR. WESTBERRY:  Yes, Judge.
11               THE COURT:  Mr. Taylor, do you need to
12    recall this witness?
13               MR. TAYLOR:  No, Your Honor.
14               THE COURT:  Okay.  Thank you, sir.  You
15    may be finally excused from further testimony in
16    this trial.
17               [END OF REQUESTED PROCEEDINGS]
18
19
20
21
22
23
24
25

1    The undersigned Court Reporter hereby

2    certifies that:  (1) The foregoing 67 pages

3    represent an accurate and complete transcription

4    of a portion of the record of the proceedings

5    before the United States District Court for the

6    Eastern District of Kentucky at Pikeville before

7    the Honorable Gregory F. Van Tatenhove,

8    presiding, in the matter of United States of

9    America vs. Randall Clinton Thompson, John Mac

10   Combs, Phillip G. Champion, and Ronnie Adams,

11   and (2), these pages constitute a copy of the

12   transcript of the proceeding.

13

14                    _____

15                    SANDY C. WILDER, RMR, CSR(IL),

16                    COURT REPORTER

17

18

19

20

21

22

23

24

25