1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
2                  SOUTHERN DIVISION
                    AT PIKEVILLE
3
   UNITED STATES OF AMERICA,
4                              No. 07-CR-35-GFVT
        PLAINTIFF,
5                              Pikeville, Kentucky
                               June 23, 2008
6                              1:39 p.m.
   VS.
7
   RANDALL CLINTON THOMPSON,
8  JOHN MAC COMBS,
   PHILLIP G. CHAMPION,
9  RONNIE ADAMS,

10      DEFENDANTS.

11         PARTIAL TRANSCRIPT OF JURY TRIAL
              TESTIMONY OF ELDON HICKS
12
              * * * * * * * * * *
13
   APPEARANCES:
14

15 For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
   For the Defendant
19 Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876

```
 1

 2

 3    APPEARANCES (Cont.)

 4    For the Defendant
      John Mac Combs:          Hon. Lawrence R. Webster
 5                             163 Main Street
                               Suite 2
 6                             Pikeville, Kentucky  41502
                               (606) 437-4029
 7
      For the Defendant
 8    Phillip G. Champion:
                               Hon. Thomas L. Jensen
 9                             Jensen, Cessna, Benge & Webster
                               303 South Main Street
10                             London, Kentucky  40741
                               (606) 878-8845
11
      For the Defendant
12    Ronnie Adams:
                               Hon. Jason E. Williams
13                             111 West 5th Street
                               London, Kentucky  40743-3199
14                             (606) 877-5291

15

16

17

18

19

20

21

22

23    Court Reporter:          Sandy C. Wilder, RMR, CSR (IL)
                               8081 Perryville Road
24                             Danville, Kentucky  40423-9713
                               (859) 516-4114
25                             wildercaptions@kywimax.com
```

1

2

INDEX

3

4

Direct Examination of ELDON HICKS
     By:  Mr. Westberry                    4-14

Direct Examination
     By:  Mr. Jensen                      14-16

Direct Examination
     By:  Mr. Williams                    16-28

Cross-examination
     By:  Mr. Taylor                      28-49

Redirect Examination
     By:  Mr. Westberry                   49-51

Reporter's Certificate                      52

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    [IN OPEN COURT]

2    THE COURT:  I'm sorry, who is your

3  next witness?

4    MR. WESTBERRY:  Eldon Hicks, Judge.

5    THE COURT:  Mr. Eldon Hicks.

6    [WITNESS SWORN]

7             DIRECT EXAMINATION

8  BY:  MR. WESTBERRY:

9    Q.    Good afternoon, sir.

10   A.    Good afternoon.

11   Q.    Could you tell us your full name,

12 please, and spell your last name for our court

13 reporter.

14   A.    My name is Eldon Hicks, H-I-C-K-S.

15   Q.    And, Mr. Hicks, where do you live?

16   A.    I live on Montgomery Creek Road.

17   Q.    Is that in Knott County?

18   A.    Yes, it is.

19   Q.    How long have you lived on

20 Montgomery Creek Road?

21   A.    I have lived there 56 years.

22   Q.    Okay.  Do you currently hold any

23 elective office in Knott County?

24   A.    Yeah, at the current time, I'm --

25 I hold the post of jailer of Knott County.

1        MR. TAYLOR:  I didn't hear that.

2        MR. WESTBERRY:  You may want to speak

3    in that microphone in here.  The acoustics and

4    the -- thank you.  Appreciate that.

5        Q.      Montgomery Creek Road, is that

6    what you said?

7        A.      Yes.

8        Q.      What road does that run off of?

9        A.      Montgomery Creek Road starts off

10   of 550, coming from Clear Creek area, Carrie

11   area, it runs up, and approximately two, two

12   and a half miles, then it's cut in two by the

13   new Route 80.

14       Q.      I gotcha.  How long have you

15   served as jailor in Knott County, how many

16   years?

17       A.      I'm on the second term.  This will

18   make five and a half years.

19       Q.      So you've served in the

20   administrations previous to Randy Thompson's;

21   is that right?

22       A.      Yes.  I served under Donnie

23   Newsome's Administration.

24       Q.      Now, before you were elected

25   jailor of Knott County, Mr. Hicks, what did

1    you do for a living?

2         A.    I was a road supervisor for the

3    Knott Fiscal Court.

4         Q.    How many years did you do that?

5         A.    Four.  I started in January of '99

6    and through 2002.

7         Q.    Road supervisor?

8         A.    Yes, sir.

9         Q.    Can you tell the jury just what

10   road supervisor -- what your responsibilities

11   were.

12        A.    The road supervisor, mainly the

13   responsibility is, is taking care and

14   maintaining all the roads in the county.

15        Q.    Would that cause you to get around

16   the county on a pretty regular basis?

17        A.    Yes, it would.

18        Q.    Were you reasonably familiar with

19   the county roads during that period of time?

20        A.    Yes, I was.

21        Q.    Okay.  Before you were road

22   supervisor for Knott County, can you tell this

23   jury what you did for a job before that?

24        A.    I was in -- I worked, in my

25   younger years, as an operator for a coal

company over in Breathitt and Magoffin
County.  I worked there for 11 years.  And
then I went into business myself in which when
I got up there, I quit.

Q.     So from '99 to '04, you were road
supervisor?

A.     No, '02.

Q.     Excuse me.  I apologize.  During
the time that you worked as road supervisor,
Mr. Hicks, were you familiar with a road in
Knott County called Shade Mountain Road?

A.     Yes, I was.

Q.     Can you tell the jury just what
you know about it, who lives there, what part
of the county it's located on, that sort of
thing.

A.     Yes.  Shade Mountain Road is
located just below me, probably approximately
a mile, no longer than a mile and a quarter,
and it runs off of 550 on this side of Clear
Creek, and if you're going west, it would be
below Emmalena School on 550.  And I'm
familiar with that road because I was raised
up right in that vicinity.  And the road was
more or less in a real steep curve, and

1    eventually, they moved it on out past the

2    curve, and the road cuts back where it used to

3    go straight up the hill in the curve, but they

4    moved it around the curve in the straight-away

5    where they wouldn't be hit by vehicles that

6    come in there.

7         Q.    Who lives back on that road now

8    off of Shade Mountain Road?

9              THE WITNESS:  Pardon?

10        Q.    Who lives back there now on Shade

11   Mountain Road?

12        A.    The Morgans.

13        Q.    Is that Jeremy and Jeffrey Morgan?

14        A.    Yes, sir.

15        Q.    The two brothers that are lawyers?

16        A.    Yes, sir.

17        Q.    Just rough estimate, how long

18   have they lived there, just rough estimate, if

19   you know?

20        A.    I think back -- it was before '99.

21        Q.    Can you tell us, Mr. Hicks,

22   whether or not any part or portions of that

23   road of Shade Mountain have ever been

24   maintained by the county in the past years?

25        A.    Yeah, while I was supervisor of

1    the road department, we did go down and work

2    the road.

3         Q.    Tell the jury just what you would

4    do; how often it happened, the best of your

5    recollection.

6         A.    Well, this was -- I'm not really

7    sure right on the time line of when we did it,

8    but it was in -- between '99 and no later than

9    2000.  I came in work one morning, and the

10   magistrate of District 2, which was Ronnie

11   Adams at that time, and he asked me if I had a

12   grader and possibly a dump truck free that

13   morning, and I asked him what he was going to

14   do, and he told me that --

15        MR. WESTBERRY:  If you don't mind,

16   back up just a little bit.

17        THE COURT:  I've gotten you too close

18   now is the problem.  Back up just a little

19   bit.

20        MR. WESTBERRY:  Thank you.  Go ahead.

21        A.    Okay.  But Mr. Adams did ask me if

22   we had a grader free that day, and I told him

23   I'd have to look at the work log for that

24   particular day, and -- which took me probably,

25   approximately 30 to 45 minutes to get the

1  workers out that morning, and then I did tell

2  him that we could free the grader up to go

3  down there and work that particular road.

4      Q.      Is that a fairly steep drive as it

5  empties out into the main road?

6      A.      Yes, it is.  It's -- it comes off

7  of probably approximately I'm going to say

8  anywhere at a 30 to 45 percent grade on it.

9      Q.      Right.  What happens to gravel

10  when it washes -- when the hard rain comes on

11  a grade like that?

12      A.      Most likely, they would last just

13  a few days, and once it dries out, it's worser

14  than on the rainy part.

15      Q.      Right.  Is a curve pretty close to

16  that entryway on Shade Mountain; did I hear

17  that right?

18          THE WITNESS:  Pardon?

19      Q.      Is there a curve in the main road

20  pretty close to the Shade Mountain?

21      A.      There used to be on the older

22  road, but this is more or less where they

23  build where it would be a lot safer to pull

24  out on the main road.

25      Q.      You know, blacktop lasts longer

1    than gravel, doesn't it?

2              MR. TAYLOR:  Objection, leading.

3              THE COURT:  Rephrase the question,

4    counsel.

5         Q.     Do you believe, Mr. Hicks, that

6    blacktop has advantages on roads?

7         A.     Yes, mostly, I believe it does.

8         Q.     Go ahead.  Tell the jury why it

9    does.

10        A.     Well, blacktop, if you've got

11   blacktop on the -- especially a hillside road,

12   you probably would have to maintain several

13   times a year, you know, the fuel and there's

14   equipment and then the cost of the gravel and

15   stuff, it eventually adds up.  And if you got

16   blacktop, one time, and it's over with.

17        Q.     Right.  Are you familiar with a

18   road in Knott County called Lonesome Dove?

19        A.     Yes, I am.

20        Q.     Okay.  I know you've lived in

21   Knott County all your life pretty much.  Did

22   you ever have any -- can you recall any

23   occasion when you were road supervisor to go

24   out on Lonesome Dove for any reason?

25        A.     No, sir.

1      Q.      Okay.  What do you know -- or how

2   many houses are back Lonesome Dove, just a

3   rough estimate, if you know?

4      A.      Well, there's one house when you

5   first start up the first bend in the road, and

6   then I think there's something like five

7   trailers or something up there.

8      Q.      Right.  Do you have any idea how

9   long -- many years Lonesome Dove has been a

10  road back through there, if you know?

11     A.      No.  The only thing that we ever

12  did on the Lonesome Dove Road, back in '99,

13  the first week when I was appointed road

14  foreman, me and the Magistrate Ray Bowling,

15  which is sheriff of Knott County now,

16  Mr. Bolan asked me if I would go to that

17  particular road.  There was a huge, humongous

18  poplar tree that stood with a bad limb right

19  over a trailer, which was lived in by my

20  sister and brother-in-law, and Ray had asked

21  me if I'd go down there and try to remove that

22  tree for the safety of two families, in which

23  I told him I would.  And I'm personally the

24  person that sawed the tree up.  And as far as

25  me being -- that was the only thing that I did

1    on that road what time I was on Lonesome Dove.

2        Q.      When a poplar tree had fallen

3    across the road; did I hear that right?

4            THE WITNESS:  Pardon?

5        Q.       A tree had fallen across the

6    road?

7        A.       The tree was standing with limbs

8    out over my sister's home, and we tied a dozer

9    to it and kindly guided which way to pull the

10   tree, and I sawed the tree down for them.

11       Q.      And the county did that?

12       A.      Yes.

13       Q.      The county did that?

14       A.      Yes, yes.

15       Q.      Mr. Hicks, anybody ever ask you to

16   go out and take care of a road or do anything

17   in terms of maintaining a county road in

18   exchange for a vote or anything like that?

19       A.      No, sir.

20           MR. WESTBERRY:  That's all the

21   questions I have.  Thank you, Mr. Hicks.

22           THE WITNESS:  You're welcome.

23           THE COURT:  Thank you,

24   Mr. Westberry.  Mr. Webster?  Mr. Jensen?

25           MR. JENSEN:  Just a couple of

1   follow-up, Your Honor.

2           THE COURT:  Yes, sir.

3                   DIRECT EXAMINATION

4       BY:  MR. JENSEN:

5       Q.      Good afternoon, Mr. Hicks.  My

6   name is Tom Jensen.

7       A.      Morning to you.

8       Q.      You were road foreman for about

9   four years at the highway department at Knott

10  County?

11      A.      Yeah, I started in January of '99,

12  and it run through year 2000, which was four

13  years.

14      Q.      Okay.  Had you worked at the road

15  department before that time at all?

16      A.      No, sir, I hadn't.

17      Q.      Okay.  And County Judge Donnie

18  Newsome brought you into that position?

19      A.      Yes, he did.

20      Q.      At that particular time, did they

21  -- was there -- while you were road foreman,

22  was there a list kept there for people calling

23  in and needing gravel?

24      A.      We documented every call, sir.

25      Q.      Okay.  And was -- just citizens

1    out there requesting to have their drive

2    graveled and road graveled, and you wrote that

3    down?

4         A.    That's correct, sir.

5         Q.    Okay.  And did -- when graveling

6    the roads in the county, was that -- would you

7    work off that list?

8         A.    Yes, we would.

9         Q.    And do you know whether or not

10   that is the way it was done before you became

11   road foreman, or do you know?

12        A.    That's exactly the way it was

13   done.

14        Q.    Okay.  And as far as you know,

15   it's been done that way for --

16             MR. TAYLOR:  Objection to leading.

17             THE COURT:  I'll sustain the

18   objection.

19        Q.    Do you know how long it's been

20   done that way?

21        A.    Ever since I've lived in Knott

22   County.

23        Q.    How long that's been?

24        A.    I've lived there since -- for 56

25   years.

1    MR. JENSEN:  Okay.  Thank you.

2    THE COURT:  Mr. Williams.

3    DIRECT EXAMINATION

4    BY:  MR. WILLIAMS:

5    Q.    Good afternoon.

6    A.    Good afternoon, sir.

7    Q.    Sir, you have provided some

8    testimony about some of the graveling and

9    maintenance of the roads that's been done in

10   the past.  When you were county road

11   supervisor, did the county involve itself in

12   the building or maintaining any bridges?

13   A.    Yes, sir, they did.

14   Q.    All right.  And what would, back

15   at that time, what would the county do?

16   A.    Well, they had a -- I wasn't

17   exactly over the bridge department.  I was

18   just the county roads and took care of more or

19   less the roads, which they had hired a foreman

20   at the same time they did me.

21   Q.    Are you familiar with what the

22   bridges were made of back during that time?

23   A.    Yes, I do.

24   Q.    And what were they made of?

25   A.    There was just metal strands

1    across and rough lumber.

2         Q.      Rough lumber on top?

3         A.      Yes, sir.

4         Q.       Now, would the county ever act to

5    maintain the lumber on the bridges back at

6    that time?

7         A.      Yes, sir.

8         Q.      And do you know how the bridges

9    came about to begin with?

10        A.      Well, I guess they just needed the

11   bridge there across the creek, and the county

12   built it.

13        Q.      To your knowledge then, the county

14   built a lot of those bridges to begin with?

15            MR. TAYLOR:  Objection to leading.

16            THE COURT:  I'll sustain the

17   objection.

18        Q.      Do you know whether the county

19   built any of those bridges to begin with?

20        A.      I'd say they built approximately

21   99 percent of the bridges in the county, sir.

22        Q.      And you testified you've lived in

23   the county how long?

24        A.      I was born in '52, so I've been

25   there 56 years.

```
 1        Q.      During the time that you were
 2   county road supervisor, did the county replace
 3   any of the wood on the bridges?
 4        A.      Yes, we did.
 5        Q.      And why would the wood be
 6   replaced?
 7        A.      Well, it would break and it would
 8   be a danger to the automobile or the school
 9   bus or what have you that went across the
10   bridge, and a lot of times the families, they
11   really couldn't -- they couldn't buy
12   one-fourth of the lumber to replace the
13   bridge.
14        Q.      And so would you consider those
15   bridges to be a vital part of the county road
16   system?
17        A.      It's very vital.
18        Q.       Now, Mr. Westberry asked you a
19   question about whether there's an advantage of
20   blacktop over gravel.
21        A.      Yes, sir.
22        Q.      Are you familiar with the use of
23   concrete on any of these bridges?
24        A.      Yes, sir.
25        Q.      And do you have an opinion as to
```

whether concrete has an advantage over wood?

A.      Yes, sir.  I made a statement that
when we -- in our first meeting when I was
appointed road foreman, which the bridge
foreman, and magistrates and who you and local
government was there, and I said just go ahead
and concrete all the bridges and get rid of
the lumber, and in the long run, we'd save
money.

Q.      And when did you make that
recommendation, sir?

A.      In 1999, January.

Q.      And do you know if your
recommendation was implemented after that
time?

A.      Yes, it was.

Q.      And when did you end your term as
county road supervisor?

A.      2002.

Q.      And when did you begin?

A.      January, 1999.

Q.      So when you made your
recommendation in 1999 through the end of your
term in 2002, were the bridges concreted?

A.      Yes.  My end of it was -- when we

1      was allowed to use and could afford it, the

2      county budget, we did what we could.

3            Q.      Now, sir, Mr. Westberry asked you

4      a question or two about Shade Mountain Lane.

5      I think you indicated you were familiar with

6      that area?

7            A.      Yes, I was raised up down in

8      there.

9            Q.      Before the time that the Morgans

10     had their homes in there, are you familiar

11     with that area?

12           A.      Yes, I was.

13           Q.      And the road you've described that

14     came out in the steep curve, was it there

15     before the Morgans built their home?

16           A.      Yes, it was.

17           Q.      How long had it been there?

18           A.      Ever since I can remember.

19           Q.      Again, back 56 years?

20           A.      At least that long.

21           Q.      Do you know what the use of that

22     road was at that time?

23           A.      Well, I don't exactly know who

24     lived there at that time.  There used to be

25     some houses that sits directly in -- off of

1    550 there.

2          Q.      Now, 550, is that old East 80?

3          A.      Yes, it is.

4          Q.      And how many homes set back in

5    that area where the Morgans now live?

6                  THE WITNESS:  Where they now live?

7          Q.      In that area?

8          A.      There's at least two.

9          Q.      At least two homes back in there

10   at that time?

11         A.      Yes.

12         Q.      And do you know the names of the

13   folks who lived back there at that time?

14         A.      They're the Morgan boys, Jeremy

15   and Jeff.

16         Q.      And do you know if there was

17   anyone named Combs that lived there?

18         A.      There was some Combs that lived

19   there that I grew up with, used to play with

20   their children, and the lady's name was Gracie

21   Combs and Cordell Combs, which Cordell died

22   approximately early '80's or maybe late '70's,

23   or early '80's.

24         Q.      Does the homestead for that house

25   still exist?

1    A.    No, there's a house over where

2    that old house used to sit.

3    Q.    And whose house sits there now?

4    A.    The Morgans.

5    Q.    Now, do you know whether or not

6    any gas company or coal companies utilize that

7    road?

8    A.    No, I don't.

9    Q.    Do you know whether the old steep

10   entrance and exit as you've described it has

11   been closed off?

12   A.    Not -- you know, I don't notice a

13   lot of things like that, but, you know, I pass

14   by there frequently, and I saw that they had

15   built that other road and -- to take place of

16   that one.

17   Q.    Have you ever had occasion to

18   drive by that entrance that exists now where

19   there might be mud or gravel in the road?

20   A.    Yeah, you can clearly see the

21   entrance of the road now when you come around

22   up 550 from the Clear Creek way turning

23   towards Hindman, you can see approximately

24   three to maybe four hundred foot up the road.

25   Q.    Before that road became paved, did

1     gravel and mud wash down into 550?

2         A.     Yes, it did.

3         Q.     Is that a dangerous condition for

4     the county?

5         A.     Yes, it is, not just for the

6     county, but for the state, too.

7         Q.     Now, sir, are you familiar at all

8     with a road called Rooster Lane?

9         A.     Yes, I am.

10         Q.     And how are you familiar with

11     that?

12         A.     Probably back in the

13     administration of Homer Sawyer, I was in the

14     construction business, and I received a call

15     to come over there and look at the slip.  It

16     was for the FEMA, and the gentleman that

17     called me, it was Bobby Reynolds, and I went

18     over there and we give them a price on that --

19         MR. TAYLOR:  Object to hearsay.

20         THE COURT:  I'll sustain the

21     objection.

22         Q.     Sir, I don't want you to tell me

23     what somebody else said.  I just want you to

24     testify from your own observations.

25         A.     Okay, sir.

```
 1        Q.      You say there was some kind of
 2   slip there?
 3        A.      Yes, there was.
 4        Q.      Now, many of us aren't familiar
 5   with what that term means.  Could you describe
 6   a little bit about what a slip is?
 7        A.      Well, it was more to the left side
 8   of the road going up to the hill, and the
 9   mountain had just -- had too much water in
10   behind it and it slipped off and covered the
11   road in the ditch line.
12        Q.      And you said there was some kind
13   of FEMA project?
14        A.      Yes, there was.
15        Q.      Can you describe for the jury what
16   that is.
17        A.      FEMA is when you have a disaster,
18   like a flood or something like that, in which
19   they had a major flood, and that was in the
20   administration before I worked there, and
21   there was some -- District 2 was one of the
22   hardest hit districts in the county.
23        Q.      Back during the time that you were
24   road supervisor, was Rooster Lane maintained
25   by the county?
```

1       A.     Yes, it was.

2       Q.     And can you tell the jury what

3 maintenance the county did to Rooster Lane?

4       A.     Well, after I was appointed road

5 foreman in '99, just after that, there was

6 another major flood hit in the same holler, in

7 Runnel's Branch, and it had washed from the

8 top of the hill all the way down, including

9 the place where I just explained how it slid

10 and washed all that down and re-slid, and all

11 that mud and stuff and trees had washed down

12 behind the home, and it stopped up in all the

13 waterways for the water, and then it just got

14 up into the main road and past another home

15 with a family living in it, and directly over

16 the hill and cut out most of the blacktop.

17       Q.     And was that anywhere near where

18 Bobby Reynolds was?

19       A.     Yes, it was.

20       Q.     How close to his home was it?

21       A.     In fact, the water got into

22 Bobby's yard, but it didn't damage his place

23 as much as it did one of his rental places,

24 and his brother's place on -- below him, it

25 would be on the right-hand side of the road

1    coming out.

2        Q.    Now, are you familiar with where

3    Brandon Moore used to live?

4        A.    Yes, I am.

5        Q.    Is that the area you're referring

6    to?

7        A.    That's exactly the area I'm

8    referring to, sir.

9        Q.    And the county took action to

10    correct that situation at that time?

11        A.    We worked on it several times, and

12    it kept slipping, to maintain the road.

13        Q.    Did the county's actions in that

14    area make that safer for those folks?

15        A.    Yes, it did.

16        Q.    Do you know, was that done at

17    Mr. Reynolds' request?

18        A.    No, it wasn't.

19        Q.    Whose request was it done at, if

20    you know?

21        A.    Mine.

22        Q.    Sir, we've had some person's

23    testimony in this case about a road called

24    Gayheart Drive.  Are you familiar with

25    Gayheart Drive?

1    A.    Yes, I am.

2    Q.    Can you tell the jury how you're

3    familiar with it?

4    A.    Well, I forget exactly the -- it

5    was just before '99, somewhere in that

6    neighborhood, maybe in the middle of the

7    '90's, there was a boy -- actually two boys

8    that lives on Gayheart Drive that did work at

9    the county garage.

10    Q.    Has the county maintained that

11    road in past?

12    A.    Yes, we have, on the bridge, and

13    we helped on their road some.

14    Q.    What kind of maintenance did the

15    county do during your time there?

16    A.    In my time we fixed the ditch line

17    and graveled road, and like I said, built the

18    bridge there.

19    Q.    Now, are you familiar with the

20    area where the Knott County Motorcycle Club

21    is?

22    A.    I've never been back there, but I

23    know exactly where it's at, sir.

24    Q.    Do you know whether or not there

25    are any cemeteries at the top of that?

1    A.    Yeah, there's several cemeteries
2    back there.
3    Q.    And are they public cemeteries, to
4    your knowledge?
5    A.    Yes.
6    Q.    Has the county ever maintained the
7    road up to those cemeteries, to your
8    knowledge?
9    A.    We maintained that road, but as
10   far as me going back to the cemeteries, I
11   didn't.
12   Q.    Do you know what the county did to
13   maintain the road up to those cemeteries?
14   A.    They graded and patched with
15   gravel.
16       MR. WILLIAMS:  Sir, that's all my
17   questions.  Thank you.
18       THE WITNESS:  Thank you.
19       THE COURT:  Mr. Taylor,
20   cross-examination.
21                CROSS-EXAMINATION
22   BY:  MR. TAYLOR:
23   Q.    Mr. Hicks, you've indicated that
24   you were first road foreman under Donnie
25   Newsome?

```
 1          A.     Yes, sir.

 2          Q.     And he picked you for that job?

 3                 THE WITNESS:  Pardon?

 4          Q.     He picked you for that job?

 5          A.     Yes, he did.

 6          Q.     And was that a political

 7   appointment?

 8          A.     No, it wasn't.

 9          Q.     Well, you supported Donnie

10   Newsome?

11          A.     I sure did.

12          Q.     And Donnie Newsome in this last

13   election supported Judge Thompson?

14          A.     I don't know that for sure, sir.

15          Q.     You don't know that?

16          A.     No, sir.

17          Q.     You never heard Donnie Newsome was

18   behind Thompson against Mike Hall?

19          A.     I'm an elected official and I

20   didn't get into any politics.

21                 MR. WESTBERRY:  Objection.

22                 THE COURT:  I'll overrule the

23   objection.

24          Q.     Wasn't Mike Hall an opponent of

25   Donnie Newsome?
```

1        A.        Yes, he was.

2        Q.        And in this last election, '06,

3    Donnie Newsome came out and supported the

4    Republican Thompson?

5        A.        He might have, sir, but ...

6        Q.        And you supported Thompson?

7            THE WITNESS:  Pardon?

8        Q.        You supported Thompson?

9            MR. JENSEN:  I'm going to object,

10    Your Honor.

11           THE COURT:  I'll overrule the

12    objection.  The witness may answer.

13       Q.        You supported Thompson?

14       A.        No, sir, I didn't.

15       Q.        You didn't contribute to Thompson?

16       A.        No, sir, I didn't.

17       Q.        You didn't support him in any way?

18       A.        No, sir, I didn't.

19       Q.        And basically what you're saying

20    is that Newsome was doing the same stuff back

21    in his administration that's been done now?

22    You all gave away gravel and blacktop and

23    bridges at election time, didn't you?

24       A.        No, sir, I wasn't there in

25    election time.

1          Q.     Was Donnie Newsome convicted of

2     vote buying?

3               MR. WESTBERRY:  Objection, Judge.

4               THE COURT:  Why don't you approach,

5     counsel.

6               [CONFERENCE AT THE BENCH]

7               MR. WESTBERRY:  Donnie Newsome's

8     conviction bears absolutely no relevance to

9     what we're determining in this case.  It's not

10    even a very subtle attempt to inject some

11    fairly extreme prejudice into this record that

12    I think adds nothing to what the jury is going

13    to be asked to consider.  What, you know,

14    Newsome's conviction, whatever happened to him

15    after that is so wildly prejudicial that I

16    can't imagine that it's been asked about for

17    any reason other than to appeal to the jury's

18    raw prejudice.

19               MR. TAYLOR:  They have opened this

20    door wide open.  I've cautioned about this is

21    the way we do business up here defense, and

22    they're playing that card big time through

23    this guy.  They're wanting to make it sound

24    like Donnie Newsome was fine and dandy, and

25    that's the way we do it, and this guy's done

1    nothing different; this is just a time-honored

2    way, and I have a right to show it was wrong

3    then, just like it's wrong now.

4            MR. WESTBERRY:  That's not what

5    Newsome was prosecuted for.

6            THE COURT:  I think that's the

7    concern I have is that, you know, we're not

8    going to get into a mini-trial on exactly, you

9    know, what Donnie Newsome was convicted of.

10   I'm concerned about the prejudicial effect of,

11   well, of a prior judge/executive was convicted

12   of vote buying, and that's what this case is

13   about as well.  I mean, it is generally -- I'm

14   quite familiar with the prior case, and this

15   is a different, you know, kind of factual

16   predicate.

17           MR. TAYLOR:  But they have elicited

18   from this witness that the other

19   administrations built bridges for citizens.

20   He's even said 99 percent of the bridges in

21   the county were built by the county, and

22   that's -- I hope we're going be able to find a

23   witness to say that's patently untrue.  He's

24   trying to make it sound like the county had

25   the perfect right to come in and build

 1    bridges, gravel and blacktop virtually at
 2    their whim if they could just simply
 3    articulate some kind of improvement, and I
 4    need to be able to challenge his credibility
 5    on these points.
 6              THE COURT:  Mr. Westberry.
 7              MR. WESTBERRY:  I wasn't involved in
 8    the Newsome case.  I know Kent was.  But if I
 9    recall correctly, Newsome was convicted for
10    exchanging money, giving money in exchanges
11    for votes, not fixing bridges, spreading
12    gravel or blacktopping.  What the Government
13    is trying to do through this question, and I
14    think it's quite clear, is to try to create
15    the impression that Newsome had been convicted
16    for, you know, spreading blacktop and gravel
17    and fixing bridges in exchange for votes, and
18    that just was not the case.  That's what's
19    prejudicial.
20              MR. WILLIAMS:  May I add?  We've
21    addressed this before, but I think it's
22    appropriate at this time also to say that we
23    believe at some point this jury will be
24    instructed that prior maintenance by county
25    means something and so there's a reason for

1  putting in evidence of prior maintenance of

2  these roads that goes to the issue of whether

3  they are public in nature and how they are

4  being used.  And so as Your Honor's well

5  aware, evidence can be put in for one reason

6  that's totally unrelated to the other.  And,

7  Your Honor, I would also say -- I would move

8  this Court to give this jury an admonition

9  that Donnie Newsome was not convicted of

10  paving roads and bridges, because I think at

11  this point, based on what Mr. Taylor said,

12  they may have some confusion as to that

13  issue.

14          MR. WESTBERRY:  I would agree with

15  that, Judge.

16          THE COURT:  Well --

17          MR. TAYLOR:  My point was simply

18  saying they went beyond saying Shade's Lane

19  was improved.  They went beyond Rooster Lane.

20  They went to a general overall, we used to

21  build bridges.  We built 99 percent of the

22  bridges in the county.  We graveled, we

23  blacktopped at our total discretion, and

24  that's what I need to challenge him on.

25          THE COURT:  Well, I'm going to give

1    you some leeway to challenge him on that, but

2    I am concerned about kind of interjecting this

3    prior conviction.  I'm not saying at some

4    point in the future it might not -- the door

5    might not be opened, but as it relates to this

6    witness, I think that the, you know, the jury

7    is left with the impression perhaps that, you

8    know, the prior county judge has been

9    convicted for the same type of offense.  So I

10   think the admonition that I would suggest

11   giving is something along the lines of, ladies

12   and gentlemen of the jury, for a reference to

13   a prior conviction of a prior county judge

14   Donnie Newsome, you are instructed that that

15   conviction did not include as facts relevant

16   to it the construction of bridges or the

17   paving of driveways.

18            MR. WESTBERRY:  Yes, sir, Your Honor.

19            THE COURT:  Any objection?

20            MR. TAYLOR:  As long as it doesn't

21   challenge the factual basis, you're not

22   instructing them he wasn't convicted because

23   that is factual?

24            THE COURT:  Precisely, precisely.

25            MR. TAYLOR:  That conviction did not

1    include.  Right.

2          THE COURT:  That's right.

3          [IN OPEN COURT]

4          THE COURT:  Ladies and gentlemen of

5    the jury, before we go on, let me provide an

6    instruction to you and simply to note that a

7    reference was just made to the prior

8    conviction of a prior county judge in Knott

9    County by the name of Donnie Newsome.  You are

10   instructed, and the parties have agreed, that

11   that conviction did not include as a factual

12   basis the paving of bridges -- I'm sorry --

13   the building of bridges or the paving of

14   roads.  Mr. Taylor.

15         MR. TAYLOR:  Thank you.

16         Q.     Now, when you indicated that you

17   did certain maintenance work between '99 and

18   '02 for Donnie Newsome, did most of that occur

19   around the time of the election?

20         A.     No, sir, it didn't.

21         Q.     Now, you knew that in 2006,

22   Phillip Champion, during the election period,

23   was in fact acting like he was in charge of

24   the road department?

25         A.     I don't know that, sir.

1       Q.     Okay.  Mac Combs was also in the

2   Newsome Administration; is that correct?

3       A.     Yes, Mac Combs was involved in it,

4   too.

5       Q.     And he was a deputy

6   judge/executive?

7       A.     Yes, I think so.

8       Q.     I want to show you what we've

9   been -- what has been identified in this case

10   as Shade Mountain Road.  If I could put those

11   up on the screen at this time.  Is that what

12   you're referring to as Shade Mountain Road?

13       A.     Yes, it is.

14       Q.     And you're saying that back in the

15   '50's and '60's, you drove on that road?

16            THE WITNESS:  Pardon?

17       Q.     I believe you testified that

18   road's been there for years?

19       A.     No, sir, I didn't testify to

20   that.  I said the old road was there for

21   years.

22       Q.     Yeah.  The old road is not the new

23   road, is it?

24       A.     No, sir, it isn't.

25       Q.     And that road was built by the

1    Morgans, wasn't it?

2        A.      I don't know exactly who built it

3    for them, but somebody done it.

4        Q.      When you said a moment ago that

5    they moved the old road to the new road, were

6    you trying to imply that the county moved the

7    county road?

8        A.      No, I wasn't trying to imply

9    anything, sir.

10       Q.      In fact, the Morgans came in there

11   and this was old family property, and they

12   built driveways, didn't they?

13       A.      They built that road somewhere.

14       Q.      That's not the old road.  That's a

15   driveway, isn't it, sir?

16       A.      That's the driveway they use now,

17   sir.

18       Q.      Well, they never used the other

19   one as a driveway, did they?

20       A.      I couldn't answer that

21   truthfully.  I don't know.

22       Q.      And are you saying you personally

23   have been out there on that road paving this

24   road right here?

25              THE WITNESS:  Pardon?

1       Q.    Are you saying you paved this road

2  right here?

3       A.    No, sir, I did not pave it.

4       Q.    Well, you said one day you said

5  something and somebody wanted you to go out

6  there and pave or not pave but to grade, and

7  you went out and graded or something?

8       A.    Yes.

9       Q.    This road?

10      A.    We graded it back in '99 or early

11  2000.

12      Q.    This road right here?

13      A.    Yes, sir.

14      Q.    The road up to Jeff Morgan's

15  house?

16      A.    Yes, sir.

17      Q.    Both of them?  Did you talk to

18  both Morgans about it?

19      A.    No, I didn't.

20      Q.    You just went out and graded their

21  driveway?

22      A.    They called in and asked the

23  magistrate to put -- they talked to Ronnie

24  Adams.

25      Q.    Who called in and asked for him?

1       A.     I guess they did, sir.

2       Q.     The Morgans did?

3       A.     (Nod affirmatively).

4       Q.     Would it surprise you if Jeff

5  Morgan said there's never been any grading

6  done on his road by the county?

7       A.     He probably wasn't home or wasn't

8  aware of it.  I don't know why he wouldn't,

9  because I sent the grader and a load of

10  gravels down there for them to.

11       Q.     Why would he not know that he had

12  called and asked the county or his brother had

13  asked the county to grade his road or his

14  driveway?

15       A.     I don't know.

16       Q.     When was that?  Can you give me an

17  approximate date?

18       A.     It was approximately somewhere in

19  '99 or early 2000.  No later than 2000.

20       Q.     Was Jeff Morgan living back there

21  then?

22       A.     Yes, he was.

23       Q.     Did you talk to him that day?

24       A.     No, I didn't, sir.

25       Q.     Did you talk to any owner back

1    there that day?

2         A.    No, I didn't.

3         Q.    What time of year was it?

4         A.    I couldn't answer that would be

5    correct.  It could have been fall.  I know it

6    wasn't raining or anything or cold weather.

7    It was somewhere in the fall, or maybe summer.

8         Q.    You're not contending that's a

9    county road, are you, sir?

10             THE WITNESS:  Pardon?

11        Q.    You're not saying that's a county

12    road out there?

13        A.    Well, there's two homes out there.

14        Q.    You're saying if I buy a piece of

15    Knott County property and I take me a dozer

16    and I build me a driveway, you're going to

17    call that a county road?

18        A.    Yes.  If you needed help -- if I'd

19    have been the road foreman, I would have

20    helped you, sir.

21        Q.    Isn't it true, sir, that ever

22    since Newsome, Thompson and whoever's in power

23    gets to pave the driveways of their friends

24    and anyone they want to vote for them?

25        A.    I wouldn't say that, sir.

1    MR. JENSEN:  Objection.

2    THE COURT:  I'll overrule the

3  objection.

4    Q.    Sir, not every driveway and every

5  hill gets blacktopped in Knott County, does

6  it?

7    A.    No, sir, it don't.

8    Q.    Who gets to decide which people

9  get it and which people don't?

10   A.    I would think it would be left up

11  to the people that's elected in the county.

12   Q.    Left up to who?

13   A.    The people that's elected in the

14  county.  It sure wasn't left up to me.

15   Q.    With regard to Rooster Lane,

16  you're aware that the first blacktop put past

17  Bobby Reynolds' house was in 2006, correct?

18   THE WITNESS:  In Bobby's house?

19   MR. TAYLOR:  Yes.

20   A.    No, that road was blacktopped

21  almost to his house.  In fact, just before you

22  turn in somewhere between his brother's and

23  his driveway back in -- under Homer Sawyer's

24  Administration.  That's been back in the late

25  '90's.

1       Q.     You're aware that in 2006, Bobby

2 Reynolds told Ronnie Adams to bring some

3 blacktop up in there and that his family would

4 vote for him?

5       A.     Sir, I don't who told what, but I

6 wasn't at the road department after 2000 -- in

7 January of 2003.

8       Q.     You said 99 percent of the bridges

9 in Knott County were built by the county; did

10 I hear that?

11       A.     I would say that would be pretty

12 close.

13       Q.     Where do you get that estimate?

14       A.     Well, just based on how many

15 bridges that was done the time I was there and

16 over the years seeing them built.  People just

17 have no income to build a bridge.

18       Q.     Let me put on the screen the

19 driveway of Hoey Dobson.  Do you see that

20 blacktop running up to Hoey Dobson's drive,

21 house?

22       A.     Yes, sir.

23       Q.     Do you consider that a public

24 road?

25       A.     Well, it wasn't left up to me,

1    like I said awhile ago, to determine it

2    because I quit the road department in 2003,

3    sir.

4         Q.    Do you think there might be an

5    argument that's a county road?

6              THE WITNESS:  Pardon?

7         Q.    Do you think that might be an

8    argument that that's a county road?

9         A.    Well, it could be.

10        Q.    It's a county road if you say it's

11   a county road?

12        A.    No.  When I was foreman of the

13   road department and that road come up to be

14   blacktopped in '99 through 2002, I probably

15   wouldn't have blacktopped it, if it was left

16   up to me.  But like I said, I wasn't -- I

17   didn't make no determination where the

18   blacktop went.

19        Q.    Put up Danny Combs' blacktop.  Do

20   you see that blacktop up to that trailer?

21        A.    Yes, I do.

22        Q.    Now, you know that to be Danny

23   Combs' house?

24        A.    I don't know where that's at,

25   sir.

1     Q.     If I told you we've heard

2     testimony that that was Danny Combs' house,

3     he's the son of Walter Combs, the magistrate,

4     you wouldn't dispute that, would you?

5     A.     Yes, I do know where it's at now.

6     Q.     Is that a county road?

7     A.     It might not be a county road.  I

8     don't know.  I don't know -- I don't see no

9     sign of any kind indicating that, but I did

10    grade that road before.

11    Q.     Do you think you could call that a

12    county road?

13    A.     I don't know, sir.  Like I say, I

14    wouldn't have blacktopped it if it was left up

15    to me.

16    Q.     Put the Ronnie Adams driveway up.

17    I mean, Campbell, Ronnie Campbell.  Do you see

18    that blacktop there, those other pictures were

19    related to it?  Is that a county road leading

20    up to Ronnie Adams' house?

21         MR. WILLIAMS:  Objection, Your Honor.

22         THE COURT:  Would you approach.

23         [CONFERENCE AT THE BENCH]

24         MR. WILLIAMS:  I've got to assume

25    that Mr. Taylor's not doing this

1    intentionally, but he keeps referring to

2    Ronnie Adams.  It's Ronnie Campbell.  And I

3    don't want the jury to get confused about

4    this.

5            THE COURT:  You've caught yourself

6    once.  Just make sure you clarify it.

7            MR. TAYLOR:  Okay.

8            MR. WILLIAMS:  Thank you.

9            [IN OPEN COURT]

10        Q.     Sir, do you consider this road up

11    to Ronnie Campbell's trailer to be a county

12    road?

13        A.     I don't know Ronnie Campbell, I

14    don't think.  I don't know where that's

15    located.

16        Q.     Well, let's go to a related one.

17    Let's go to Orville Pratt's house.  Do you see

18    a road up to Mr. Robinson's house and then on

19    back to that trailer where Orville Pratt stays

20    on the weekends?  Do you see that?  You've

21    seen that before, haven't you?

22        A.     Yes, I have.

23        Q.     Would you consider that to be a

24    county road?

25        A.     Well, there's two homes there.

1    Q.    So if I have my son or my

2    father-in-law on the same road, that becomes a

3    county road, even if I built it?

4    A.    Yes.

5    Q.    So that's your definition?

6    A.    That would be my definition of it.

7    Q.    Then why is it that every driveway

8    in the county isn't paved?

9    A.    Sir, I couldn't answer that.

10    Q.    Well, who -- when you were road

11    foreman, who decided whose got paved and whose

12    didn't?

13    A.    I guess the judge and the

14    magistrates.

15    Q.    You said something about FEMA.

16    You did some things with FEMA money, right?

17    A.    Back in that administration, yes,

18    I did.

19    Q.    And you're aware that FEMA is

20    different than county roads funds, aren't you?

21    A.    I sure am.

22    Q.    Excuse me?

23    A.    Yes, sir.

24    Q.    And FEMA's designed for disaster

25    relief?

1    A.    That's correct.

2    Q.    And it can be done even on private

3 property?

4    A.    That's correct.

5    Q.    Such as if someone's home is

6 flooded, you can spend FEMA money for that

7 person's recovery?

8    A.    That's correct.

9    Q.    You've heard about FEMA trailers

10 being put on property during hurricane season?

11    A.    That's correct.

12    Q.    And that has nothing do with

13 blacktopping county funds in a normal year,

14 does it?

15    A.    The only time you could blacktop

16 with FEMA money if a road was tore up so bad,

17 you had to redo that road, and it called for

18 -- FEMA would tell you if that road should be

19 reblacktopped and they'd appropriate the money

20 for it, sir.

21    Q.    The road up to the Motorcycle Club

22 that we talked about; do you recall that?

23    A.    Yes, I remember him asking that.

24    Q.    If that was a public county road

25 that the public used to get to a cemetery, why

1    would it be blocked off with a fence and a no

2    trespassing sign?

3         A.    I couldn't answer that.  I don't

4    know.

5              MR. TAYLOR:  That's all.

6              THE COURT:  Thank you, Mr. Taylor.

7    Mr. Westberry.

8              MR. WESTBERRY:  Yes, just something

9    brief.

10                 REDIRECT EXAMINATION

11    BY:  MR. WESTBERRY:

12         Q.    Mr. Hicks, my questioning is just

13    to be real quick.  And I'm asking you, on all

14    of the years that you worked for the county on

15    roads, was it common for citizens in Knott

16    County to call in to the county if they needed

17    a road or a bridge fixed?

18         A.    Yes, it was.

19         Q.    And if you know, in your

20    experience, when someone called in and asked

21    that their road -- you know, they had trouble

22    with their road, rain, or a hard rain, or the

23    bridge was almost torn up, is that how the

24    county would make a determination where to

25    fix, where to go?

1    A.    Yes, it is.  If it was an

2    emergency, we'd go out that particular day,

3    and if it wasn't, we'd put them on the log for

4    -- until we worked our way up to them.

5    Q.    Now, I know you've been out of the

6    county roads since 2002; is that right?

7    A.    That's correct.

8    Q.    Let me ask you.  In all of the

9    years you've been there, has politics ever

10   been a consideration, to your knowledge, in

11   terms of whoever got a road fixed or a bridge

12   fixed, or anything like that?

13   A.    Sir, when I was there, we helped

14   everyone, whether they voted against Donnie

15   Newsome or for him, we was there for them, and

16   I know that to be a fact.  I helped a lot of

17   people, and I talked to Donnie and he helped

18   people, and that's what we did.

19   Q.    Has Randy Thompson ever asked you

20   to do anything that you might consider

21   improper?

22   A.    I have never worked under Randy

23   Thompson, sir.

24   Q.    But he's never asked you to do

25   anything wrong?

1    A.    Absolutely not.

2           MR. WESTBERRY:  That is all the

3    questions I have.  Thank you.

4           THE COURT:  Thank you.  Mr. Webster.

5           MR. WEBSTER:  No questions, Your

6    Honor.

7           THE COURT:  Mr. Jensen.

8           MR. JENSEN:  Could I have just one

9    moment, Judge, please?

10          THE COURT:  Okay.

11          MR. JENSEN:  Nothing, Your Honor.

12          THE COURT:  Mr. Williams.

13          MR. WILLIAMS:  Nothing further, Your

14   Honor.

15          THE COURT:  All right.  May this

16   witness be finally excused?

17          MR. WESTBERRY:  Yes, Judge.

18          THE COURT:  You may be excused from

19   any further testimony.

20          THE WITNESS:  May I go home?

21          THE COURT:  You may be excused.

22   Thank you, sir.

23          [END OF REQUESTED PROCEEDINGS]

24

25

1        The undersigned Court Reporter hereby

2     certifies that:  (1) The foregoing 51 pages

3     represent an accurate and complete

4     transcription of a portion of the record of

5     the proceedings before the United States

6     District Court for the Eastern District of

7     Kentucky at Pikeville before the Honorable

8     Gregory F. Van Tatenhove, presiding, in the

9     matter of United States of America vs. Randall

10    Clinton Thompson, John Mac Combs, Phillip G.

11    Champion, and Ronnie Adams, and (2), these

12    pages constitute a copy of the transcript of

13    the proceeding.

14

15                     _____

16                     SANDY C. WILDER, RMR, CSR(IL),

17                     COURT REPORTER

18

19

20

21

22

23

24

25