```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
 2                 SOUTHERN DIVISION
                    AT PIKEVILLE
 3
    UNITED STATES OF AMERICA,
 4                             No. 07-CR-35-GFVT
         PLAINTIFF,
 5                             Pikeville, Kentucky
                               June 25, 2008
 6                             10:41 a.m.
    VS.
 7
    RANDALL CLINTON THOMPSON,
 8  JOHN MAC COMBS,
    PHILLIP G. CHAMPION,
 9  RONNIE ADAMS,

10       DEFENDANTS.

11
              PARTIAL TRANSCRIPT OF JURY TRIAL
12              GOVERNMENT'S CLOSING ARGUMENT

13            *  *  *  *  *  *  *  *  *  *
    APPEARANCES:
14

15  For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
    For the Defendant
19  Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876
```

APPEARANCES (Cont.)

For the Defendant
John Mac Combs:            Hon. Lawrence R. Webster
                          163 Main Street
                          Suite 2
                          Pikeville, Kentucky  41502
                          (606) 437-4029

For the Defendant
Phillip G. Champion:
                          Hon. Thomas L. Jensen
                          Jensen, Cessna, Benge & Webster
                          303 South Main Street
                          London, Kentucky  40741
                          (606) 878-8845

For the Defendant
Ronnie Adams:
                          Hon. Jason E. Williams
                          111 West 5th Street
                          London, Kentucky  40743-3199
                          (606) 877-5291

Court Reporter:           Sandy C. Wilder, RMR, CSR (IL)
                          8081 Perryville Road
                          Danville, Kentucky  40423-9713
                          (859) 516-4114
                          wildercaptions@kywimax.com

1          [IN OPEN COURT]

2          THE COURT:  Good morning, ladies and

3     gentlemen.  We have reconvened with the jury

4     present in the courtroom.  In a moment, we're

5     going to recognize the parties for their closing

6     statements.  I'd note for the court security

7     officer, as is my policy, of not allowing anyone

8     in the courtroom to leave or to enter once

9     closing statements have begun, and that's true

10    up until the next recess that we might take.

11         At this time, I'll recognize Mr. Taylor

12    for his closing on behalf of the Government.

13         MR. TAYLOR:  Could we have this screen

14    moved, Your Honor?

15         THE COURT:  Do you want it moved so

16    they can see it or ...

17         MR. TAYLOR:  No, out of the way.

18         THE COURT:  All right.  Do you intend

19    to reserve time, counsel, for rebuttal as well?

20         MR. TAYLOR:  Yes.

21         THE COURT:  Okay.

22         MR. TAYLOR:  Two-thirds.

23         THE COURT:  Okay.

24         MR. TAYLOR:  May it please the Court.

25         THE COURT:  Mr. Taylor.

1      MR. WESTBERRY:  Mr. Taylor.

2      MR. TAYLOR:  Good morning ladies and

3  gentlemen.  There's no two ways about it; this

4  is a very important case.  Public officials

5  watch cases like this to see whether they will

6  be held accountable, and how accountable.

7  Whether there are any lines that have to be

8  respected about how to handle the public's

9  money.  I told you at the beginning of the case

10  that this case was about accountability.  Being

11  a public official is different.  It is an

12  awesome responsibility to be elected by the

13  people to handle their affairs and their money,

14  and when you're a public official, you are

15  entrusted with the public purse.  It is a public

16  trust, and you have to be accountable, or that

17  trust is lost.  We, as citizens, have to demand

18  absolute accountability.  Public officials

19  represent all of the taxpayers, not just their

20  cronies, not just their friends, not just those

21  they would like to be their voters, but all the

22  people.  The power of the incumbency to run for

23  office while in office is an enormous

24  advantage.  And if you abuse your office and

25  treat your office as another resource and asset

for your re-election, then you're abusing your

power.  To make your office part of your

campaign finance is an abuse of your office.

When you step back from this case, back from the

forest, back from the individual trees, and look

at the forest, it's very clear.

You know, in another case I had in

Pikeville that some of you -- I don't know --

some of your faces look familiar.  You may have

been on that, and I told you the same thing

then, and so bear with me if you've heard this

before, but we have co-counsel who's from this

area, Tony Skeans on that case, and I said,

Tony, what do I need to say to the people in

closing argument?  And he said, Well, we have a

word up here in the mountains.  It's called

gom.  People get things all gommed up.  And I

said, Well, what's that mean?  It means

confused, mucked up.  And the defense attorneys

in this trial have gommed up the evidence with

little twists and turns of the evidence and

trying to create confusion where things are

really clear.  He said, Just ungom it.  Tell

them in plain English what they did.  Well, I'm

going to do some ungomming here for a few

minutes.  I'm going to step back from all of
these little issues -- this is not a complicated
case.  But the defense would have you believe
that you don't know, or have the sense to know
the difference between a driveway and a highway,
that this is all some big legalistic question,
that your driveway isn't your driveway if rocks
run off of it when it rains.  That your driveway
isn't your driveway if one time there was a
truck that came across it going to an oil well
or something that has converted it into a public
road.  They want you to set aside your common
sense and look at this case for what it is not,
as a big entanglement of confusion and gray
areas.  This case is full of black and white
lines, and the defendants crossed those lines.

There's no question what happened
here.  The only question I have, and have ever
had, is whether you're going to do anything
about it.  I'll come back to that in a minute.
Here's what happened that we know happened.  All
of you know these -- the following things
happened.  We know that in the Spring of '06,
Randy Thompson became the Republican candidate
for county judge/executive in Knott County.  We

know that Mike Hall was the Democratic
opponent.  We know that two of Hall's primary
opponents, two of these defendants, Mr. Ronnie
Adams and Mr. Mac Combs, came over and supported
the other candidate, the other party, Randy
Thompson, and formed this coalition, along with
Phillip Champion, who had already been appointed
as deputy judge, and this foursome became a
campaign force for the election of Thompson.
And it was somewhat curious because none of
these individuals were in the road department,
but yet Phillip Champion became the de facto
road foreman.  Ronnie Adams began to act as a
road foreman.  One was a magistrate who had one
district, not the whole county, and Mac Combs,
we don't know what he was.  He was supposedly
resigned, but was still acting like he had
authority, and he was directing people where to
put gravel.  It was a very confusing situation.
We know that Ronnie Adams was a magistrate and
didn't technically have a position in any way
related to the road department.  No position in
the road department, but he was in the middle of
everything.  We know that this group had great
influence on the fiscal court with Walter Combs,

1    Keith Combs, Ronnie Adams, and Judge Thompson.

2    That coalition could control the expenditures of

3    funds during this period of time.  We know that

4    they voted to borrow $1.5 million of the

5    public's money to start a blacktop effort.  It

6    was no coincidence, the timing of the blacktop

7    effort.  We know that they brought in three

8    off-beat pavers who kept bad records, despite

9    being warned by the auditors in the previous

10   opening interview of the audit of '06, that

11   there had been problems with accountability in

12   the previous administration.  Please keep good

13   records, please let us have something with which

14   we can verify the expenditure of public funds.

15   But they brought in these three off-beat pavers,

16   who kept bad records, to do the paving.  That

17   was no coincidence.  That was no mistake.  We

18   know that these blacktoppers, these three

19   companies met with Thompson and Champion and

20   Adams when they obtained their contracts, and

21   were told by these individuals where to go.  No

22   one in the road department was involved in that,

23   but these individuals took over the road

24   department.  We know that at first, in the early

25   days of this blacktopping effort, Mountain

Enterprises, which is reputable, which keeps
good records that can be verified and audited,
began doing some of the paving.  We know that as
this went on for some time, Mountain Enterprise
backed off.  Now, I know they said they had
another job to go to, and I'm sure they would
like to keep Knott County's work in the future,
and they don't want to ruffle any feathers, but
we know that a Mountain Enterprise worker down
at the plant where they were loading the
blacktop told Jack Collier, Somebody's going to
get in trouble for what's going on there.
Mountain Enterprise got out because they didn't
want to be part and tarnish their reputation
with what was going on in Knott County.  We know
that Phillip Champion sent Bentley and the road
crew to the north country to get them out of the
way, so they wouldn't see what was going on.  We
know they did see enough of what was going on to
be very uncomfortable with it.  We know that
they complained about it.  We know that, for
instance, Tom Hays, as he testified, was -- saw
driveways graveled, saw the driveways being
paved.  And they thought, and as they told you,
you know, we've always done gravel, but this

1    group is taking it to -- they're kicking it up a

2    notch, as Emeril says. They're taking it to a

3    whole new level.  We've never done this, this

4    blacktopping.  This is Donnie Newsome on

5    steroids, this $1.5 million of blacktopping.

6    These men essentially protested, and they were

7    disciplined.  It appears from the evidence that

8    a couple of them were essentially laid off

9    because of their protest.  We know that Phillip

10   Champion was acting as the road foreman.  He

11   told the pavers where to pave, the gravelers

12   where to gravel.  He told Randall Gayheart which

13   bridges to build.  There was no plan.  There

14   were no bids.  There were no blueprints.  There

15   were no resolutions to the fiscal court.  There

16   were no particular roads designated.  There were

17   no particular bridges designated anywhere in

18   writing.  There was no oversight of who got what

19   and on what basis.  There was no inspection and

20   report back to the fiscal court.  There were no

21   records from these companies that would allow

22   any documentation of where this was going on.

23   We know that Byron Jacobs told Randy Thompson to

24   sign a letter stating this was for the public

25   purpose because he was concerned about how the

public money was being spent.  We know from this
evidence that they spent $1.5 million or more on
blacktop, and we know this was five times the
normal amount in a year for blacktop, and it was
more than two and a half times the prior two
years combined.  We know they hired a county
worker to build bridges in the evenings to the
tune of about $60,000, bridges that could have
been built during the day on his normal time.
There's a problem with that, though.  They
couldn't get done before the election if they
built bridges during the normal day.  We know he
built bridges in a frenzy, 20 something bridges
in a couple of months leading up to the
election, and then stopped.  This was no effort
to help the poor or the elderly, because the
poor and the elderly don't stop at election
date -- on election day.  They need help all
year-round.  But this was an election effort.
This was not a normal government program.  We
know that over $780,000 of blacktop went
unaccounted for.  The auditor said, We don't
know where it went.  We cannot verify that this
was properly spent because you didn't keep the
records.  This was despite the fact that while

1    it was going on as early as September, a

2    reporter pointedly and heatedly, from what we

3    heard, confronted Judge Thompson at the fiscal

4    court about accountability for this.  This is

5    despite the fact that these bills were coming

6    in, all during the fall from these companies

7    that were not itemized.  They knew there was

8    going to be this issue, and they took no

9    remedial action.  We know from the records that

10    these blacktoppers were very deficient in their

11    records.  We know that these blacktoppers put

12    blacktop on private drives.  I've indicated to

13    you that the defense will have you believe that

14    you can't tell what is a private drive in Knott

15    County.  Ladies and gentlemen, this is a private

16    drive.  This is not a public road.  This is a

17    private drive.  That's not a public road.  And

18    this is a private drive.  It's not public.  This

19    is a private drive.  That one up the hill is a

20    private drive.  And this is a private drive.

21    That's not a public road.  No one would say

22    that's a public road.  This is private.  That's

23    a private drive serving one house, one trailer.

24    That's a private drive.  That's not a public

25    road.  That's a private drive.  That's an

interesting one there.  That's Danny Combs'.
That's Walter Combs' son.  That's Hillside
Drive.  And after Hillside Drive was paved,
after this driveway was paved and they knew they
were going to have to account for it, they
adopted it into the county road system, because
they're on the fiscal court.  No notice in the
records of any hearing on this or any notice to
the landowner that we're taking your road.  They
just adopted it into county road system.  That's
a driveway.  That's not a road.  This right
here, Tammy Brewer's place.  That's a driveway,
ladies and gentlemen.  That's not a public
road.  This is not rocket science.  They will
have you believe that this is such a gray area
that these gentlemen could not determine what
was public and what was private.  This is the
big picture.  Based on all of this, you know
what was going on.  This big effort was not to
improve Knott County.  It was not to help poor
little old ladies.  It may have had some of that
effect; I'm not denying that people had better
driveways afterwards than they did before, but
that's not why it was done.  Why it was done was
to influence the outcome of the election, and

1    that's an abuse of power.

2           You remember I asked you a moment ago

3    that my only question is, are you going to do

4    anything about it?  There's been an undercurrent

5    of subtle messages that has been thrown at you

6    throughout this case, and that message is, Hey,

7    that's just the way we do it here.  That's

8    just -- you don't -- you flatlanders don't

9    understand.  That's the way we do it here.

10   Whoever's in office gets to use the office to

11   stay in office.  And when you finally win, to

12   the victor go the spoils.  That's just the way

13   they do it here.  Sometimes people get apathetic

14   when they see this goes on, and they say, Well,

15   it's the part of the system and you can't change

16   it.  We're just going to have to live with it.

17   We're just going to have to live with it.  It's

18   sort of the everyone does it defense.  Ladies

19   and gentlemen, it's wrong here, it's wrong in

20   Lexington, it's wrong in Louisville, and there's

21   no difference in the mountains than there is

22   anywhere else.  You don't by law get to use your

23   office to feather your nest, to help your

24   friends, and to buy votes.  It's illegal.  It's

25   wrong.  People like Orville Pratt said, Yeah, I

got free blacktop.  I asked for it.  Everybody
else was getting it, so I thought I would get me
some, too.  And you know what?  I think the
judge ought to have the right to pave
everybody's driveway.  If you just give him
time, he'll do the whole county.  That's an
attitude, and it's wrong.  The county cannot and
should not pave every driveway.  People like
Bobby Reynolds think they can call up and get
delivered their blacktop, like pizza, gravel
like pizza.  It's an attitude.  They -- Bobby
Reynolds said that Ronnie Adams called, What are
you doing?  Well, we're -- Ronnie says, We're
laying blacktop.  Well, why don't you bring me
some up in here and the whole family will vote
for you.  And so they brought the blacktop.
Brandon Moore agreed to vote for blacktop.  Now,
he didn't vote for him, he said, but the crime
is consummated.  The crime ends when the offer
is made and an agreement is made to vote for
something of value.  That's when the crime ends,
right there.  Whether you go through with it or
not is of no moment, is of no consequence to the
law.  The offer to pay for a vote constitutes
the crime standing alone.  People like Roger

1    Combs, when asked by the defense attorney, I

2    think he got an answer he didn't want.  He asked

3    him, Roger, all this time you've heard about

4    this gravel being handed out election day, that

5    wasn't for -- or right at election time.  That

6    wasn't really for elections, was it?  And Roger

7    said, Yep, ever since I was a little boy, that's

8    the way it's been done.  Gravel.  But now

9    they're kicking it up a notch and we're going to

10    blacktop.  It's an attitude, and it's wrong.

11          This is how it creeps out of control.

12    It starts little, and it gets bigger and bigger,

13    and each generation or each new county judge

14    wants to one up the one before it.  But we've

15    heard in this evidence some refreshing examples

16    of how it should be done.  There are some very

17    good people with some very good values who

18    testified, such as Betsy Fugate.  Strangely

19    enough, the defense brought her in here, but she

20    was -- when she took her oath, she belted it

21    out, she got up on the stand and she said, I

22    called Highland Paving.  They came and paved.  I

23    paid them, paid them with a check.  Here it is.

24    When I asked her, I said, Would you ever expect

25    the county to pave your driveway?  No,

absolutely not.  Absolutely not.  That's not --
that's not the county's job.  Carlos Ashley paid
for his own blacktop.  I asked him, Would you
ever think of the county paying for your
blacktop up this steep hill?  He had a hill that
gravel washed off of down into the road, and he
just put it back up on the road and then he paid
his bill.  Never crossed his mind to ask the
county to pay for it.  There are these kinds of
citizens who know better and do better.  They
don't have their hands out, and they take on
individual responsibility.  And these are the
people also that are wondering whether that
individual conscience makes a difference.  Or if
they should just throw up their hands and take
on the Orville Pratt school of government that,
let the county judge pave everyone's driveway.
But I bet you Mike Hall supporters didn't get
driveways.  When charged and when confronted
with these offenses, what did they come up with?
I mentioned in the opening statement, the phrase
I call the made-up cover-up, sort of what I call
the Monday morning cover-up.  You cover it up on
Monday morning what you did on Saturday night.
They come up with all these so-called reasons

and justifications for what they did.  And you can tell they're after the fact and they're designed to confuse and designed to make gray what is black and white.  The worst example, of course, are their fake receipts ordered up by Mac Combs, and we'll talk about that more in a moment.  But they say, Well, the real reason we were paving these roads and the real reason we were doing all this is to stop roads from washing out.  There was no evidence that there was any plan to do certain roads because of any danger, because of any problem, because of any safety factor, that there was no discussion in any fiscal court meetings that you've heard about, that this road, this road, this road's a problem, let's go take care of it.  Let's propose it.  What will it cost?  Get a proposal, and go do these roads.  None.  The evidence you heard was they were driving around, Would you like some blacktop?  Yes.  And it goes up.  Now, only on Monday morning do we start hearing the justification was public safety.  It wasn't public safety when it was put down.  It was influence the election when it was put down.  On Monday morning, it becomes, it was public

safety.  Did every steep hill in the county get
paved?  No.  Was there any plan?  They say,
Well, it was -- it was for 911.  We want to make
sure 911 can get wherever -- the ambulances and
fire can get wherever they need to get.  Well,
was there any plan at the fiscal court to
approve 911, and if there had been, would it not
be county-wide?  Would it be just from July to
November?  Are we only concerned about 911 in
the months leading up to the election?  Wouldn't
911 go all the time?  Wouldn't it be constantly
approved all year-round if it was 911?  Why this
big rush before the election?  Why hire someone
to do this at night, to get it done before the
election if it's 911?  It wasn't 911 when it was
put down.  That's Monday morning when it was
911.  They call experts in on Monday morning and
they call experts to tell you that when it rains
hard, gravel washes downhill.  Did they think
we're idiots?  They want you to think this is so
complicated that it takes an expert to come in
here and tell you what to believe, like you have
no common sense.  It should insult your
intelligence that they think this takes an
expert, like we don't know a driveway from a

parkway.

I submit to you, ladies and gentlemen, there's not a road in this county -- in Knott County they couldn't on Monday morning somehow find a justification for having paved. But when it was put down, and you know and I know what it was for. It was to influence the election, period, end of subject. What did Thompson say when confronted at the fiscal court about this? Well, what is private to one may not be private to another. What did he say to the reporter when asked about this when confronted? Well, you know, if I'm putting it down for you, of course, it's public and you're entitled to it, but if I put it down for this guy over here, you're going to say it's private; that's just politics. That's Monday morning. When it was put down, there was no confusion about what was private or what was public. It was clear. They say, Well, being held accountable is a political witch hunt. Having to tell the public, all the taxpayers where the blacktop went is a witch hunt. It's political ambush if you have to account for something. Trust us. Trust us. The four of us can get together. We can get the

fiscal court to do our bidding, and you'll just
have to trust us with your money.  They didn't
listen to the auditors when the auditors told
them to be accountable.  They didn't do anything
about it.  Well, ladies and gentlemen, there's a
new sheriff in town, and they have to be
accountable.  How hard is it to set up rules on
the expenditure of public funds to have some
guidance as to what you can and can't spend
money on?  Why should we trust Phillip Champion
and Ronnie Adams, who aren't even the road
department, to ride around in gravel trucks and
tell the drivers where to put the stuff?  Oh, to
be sure, to be sure, no question, there are a
lot of people who like Randy Thompson.  Yeah.
Like Randall Gayheart likes Randy Thompson, who
got the $60,000 on the side to build the bridges
and who kept -- still got his salary and who got
Gayheart Drive blacktopped where all his family
lived.  Yeah, everybody that got blacktop loves
Randy Thompson.  Yeah, he's got supporters.  No
question about it.  And he can fill a courtroom
with supporters every day of the trial.  There's
people that love Randy Thompson because he
feathered their nest.  They're on his team.  And

he'll stay in power in Knott County by using his
office that way.

There were a lot of witnesses.  I told
you about them at the beginning of the trial who
we called who are in a tough spot.  They still
have jobs with the county.  They saw things that
weren't right.  You can tell they were reluctant
to tell it on the witness stand.  Had to pull it
out of them.  Some of them we had to ask them,
Didn't you say something different earlier?
Yeah.  But you could tell they were reluctant to
sit here across the room from Mr. Thompson,
their employer, and tell him and tell you what
went on.  That's the power.

Now, having talked about the forest for
awhile, let me back up here -- or let's zoom in,
so to speak, and look at some of the instances,
some of the trees in the forest now.  Keep in
mind, these are representative of the trees in
the forest.  This isn't the forest.  These are
trees in the forest.  Number 1, we know that
Ronnie Adams agreed to take Bobby Reynolds
blacktop for votes for the people in his
holler.  Bobby Reynolds said that at the grand
jury when he got on the witness stand in front

of you, in front of the defendants, he tried to
back off.  When I read him his grand jury
testimony, he agreed that's what happened.  Then
he tried to say, Well, I thought they should
take my road anyway because of the upkeep over
the years.  But back when it happened, Bobby
Reynolds was saying, Bring the blacktop to my
road and our family will vote for you.  And it
was brought.  That's an agreement.  That's a
vote buying situation.  Brandon Moore, number
two, specifically agreed to vote for blacktop.
This consummates the crime, as I've indicated.
At no time in that discussion with Brandon Moore
and Ronnie Adams was there any discussion of
well, you know, your road is a public road
because it's been graveled in the past, in a
past administration, and it's got a little slope
on it and we need it to be public safety.
Brandon Moore was way back up the road.  It
wasn't a public safety issue.  It was a vote
issue with Brandon Moore.  Number three, Ronnie
Adams called Jeremy Morgan, asked him if he
wanted blacktop.  Now, Jeremy was an interesting
witness on the witness stand.  You'll recall, he
couldn't remember what the conversation was when

1  he was called about the blacktop.  Yeah, we

2  might have talked about the election and because

3  that's the kind of thing we usually talk about,

4  but I can't really be specific.  Then why was he

5  offering you blacktop?  I really don't know why

6  he was offering me blacktop.  There was no

7  mention at all.  Jeremy, you need blacktop

8  because your gravel is creating a hazard on our

9  road, and so we're going to blacktop all the way

10  back to your house.  Let me -- let's take a look

11  at Jeremy's road here a second.  And their

12  expert said he went up there.  Well, let me ask

13  you about this, if I can find his particular

14  drive.  It is kind of humorous.  Here's Jeremy's

15  house right there.  Now, the road's on this

16  other end down here.  This is where the split is

17  in the road, and the road's on down here.  They

18  had a little problem with gravel down on this

19  end of the road going out onto the highway.

20  This is hundreds of feet away from that, and it

21  slopes away from the county road towards

22  Jeremy's house.  Now, what's the public safety

23  issue there?  This is Monday morning cover-up.

24  They pave all the way up to Jeremy's house, and

25  there's no issue of gravel out on the drive.

1    They're going to tell you now, Oh, that's --

2    they moved a county road.  That's Monday

3    morning, make-it-up cover-up.  That's not their

4    driveway.  Oh, that's a moved county road.  You

5    see, there used to be a logging road up there on

6    the hill somewhere, and when they plowed and

7    built their driveway, we're going to say that's

8    the same road that used to be the logging road.

9    That insults your intelligence.  That's Monday

10   morning make-it-up.  You know on the stand

11   Jeremy was holding back.  You know there was a

12   discussion about politics.  You know there was a

13   discussion about Randy Thompson and the blacktop

14   and the vote, and I don't know how specific it

15   got, and I haven't -- in this indictment we're

16   not asking you to make it a vote buying

17   situation because we simply don't know what was

18   said.  But we know it was more than just, Would

19   you like to have your road blacktopped?  Yeah.

20   You know there was more to that conversation

21   than that.  That's a lot of blacktop.  You know

22   there was linkage between that blacktop and the

23   election.

24        Next incident, Ronnie Adams told

25   Orville to blacktop that road.  And that's

interesting, too, because there was kind of a
change in the defense during the trial. You'll
recall early on, they questioned Orville's
credibility, wherever they could. Orville must
be lying was the message they were sending, that
Ronnie really didn't authorize this. Then they
kind of backed off that and now it's, Well, it
was needed, the blacktop was needed there.
Probably a lot of places in Knott County need
blacktop, but Orville said the reason it was
brought is he asked Ronnie, everybody else is
getting it, can I get some, too, and Ronnie
said, Yes. Do yours, do Ronnie Adams -- do
Ronnie Campbell, and your daughter, and he did.
Orville said nothing about public safety. He
just said, Others get it, I should too.

Next incident, Mac Combs asked Campbell
to pave his, Hoey's and Tammy's driveway. Tammy
was the judge's secretary. Hoey was her dad,
and he cleaned the courthouse. Tammy Brewer was
an insider. We know that Mac asked for fake
receipts. I want to explore that incident
because it's very telling, and I've always said
that the only thing worse for a defendant
accused of a crime of not -- the only thing

worse than not having an alibi that proves you
didn't do it, is to make up a fake alibi.
Because that shows you're conscious of your
guilt when you make up fake alibis.  And
providing a fake receipt is a fake alibi, is a
fake explanation, and it shows your
consciousness of your guilt.  So this is a very
important incident.  Well, let's review that
evidence because it's so crucial to the case.
If you believe Mac Combs provided fake receipts,
it cinches the deal for his knowledge of his
culpability for his criminal conduct.  You start
with Randy Campbell, and I say you start there
because you certainly don't finish there.  And
they're going to talk to you a lot about Randy
Campbell and why he can't be believed.  That's
only the starting point.  This case doesn't end
with Randy Campbell.  It only begins with Randy
Campbell, this issue with Mac Combs.  First of
all, Randy Campbell had no motive to lie.  He
had no -- he had a motive to lie about his own
misconduct at the beginning, and his brother's,
but once he decided he was going to come clean,
he had no motive to implicate innocent people.
Tammy and Hoey were not targets of the

investigation.  In fact, they were told if they
would just tell the truth, they wouldn't be
prosecuted.  The same thing Randy Campbell was
told.  He had no reason to throw them under the
bus, so to speak.  He just said, Yeah, you're
right, I did pave driveways.  My brother was one
of them.  If he's told you he's paying for it,
he's lying.  Mac Combs asked me for fake
receipts.  After he looked at some paving, he
said now, these are the places he wanted to
cover with receipts, that happened to be Tammy,
Hoey and Mac Combs, and that's what happened.
He had nothing to gain by saying this happened
if it did not happen.  Why did he need to say
the receipt was fake?  If the receipt was real,
he's not in any trouble.  Saying it's fake
doesn't make him any less in trouble.  If he
hadn't even -- if they were fake and he hadn't
even mentioned he'd done that, no one would ever
know.  He had absolutely no motive to lie about
innocent people.  All he got for admitting what
he did was a lot of grief when he was called
into court.  Campbell's testimony is backed up
by that receipt book itself.  If you'll look in
the receipt book, remember Campbell's testimony

is, Here's the three roads that I -- or
driveways that I paved, and here's the fake
receipt. Eventually, he finds -- he didn't find
the receipt at first. That came in later. He
was going by memory at first, and as he saw
different things, it jogged his memory. But
when the receipt was found, or when it was
presented, he said, Yeah, that's -- I believe
that to be one of the ones that Mac Combs asked
me for. Lo and behold in his book side-by-side
are the Mac Combs, Hoey Dobson receipts. You'll
note on the tape that we played for you, Tammy
and Hoey indicated that they negotiated with
Campbell individually, that Mac Combs didn't
broker this deal. They individually brokered
their own deal for blacktop. So according to
them, there was no connection between the two
different blacktoppings. But Campbell said
there was, and in his book those two receipts
are side-by-side. But then you have other
evidence that corroborates it. Tammy and Mac,
knowing that they were going to be questioned by
people about this private blacktop got Mac to
issue these fake receipts, got Campbell to.
Initially, he went along with the scheme. But

1    when he said they were fake, when he finally

2    came forward and said they were fake, everything

3    was too far along to back off now.  In November,

4    when you get the blacktop, which is when Tammy

5    got her blacktop, when Mac got his blacktop,

6    this was after the election.  This was after the

7    fiscal court meetings where there had been

8    allegations about all this.  This issue was out

9    there percolating.  People were talking about

10   private blacktop.  Now, your -- Mac Combs is a

11   public official, you're Tammy Brewer, the

12   judge's secretary, and you're getting your

13   driveways blacktopped.  Are you going to pay

14   with cash?  Or are you going to do what

15   Ms. Fugate did and pay with a check?  So there's

16   no question when the check clears your account,

17   that you paid for it.  Now, Tammy and Hoey were

18   told if they told the truth, they would not be

19   prosecuted.  But Tammy had a problem.  Tammy was

20   an insider.  She was in the judge's office.  She

21   knew about the misuse of public monies and

22   properties.  She was in a vice, and she decided

23   to stick with the plan, the Monday morning

24   cover-up.  She told Marc Hopkins in April, I

25   paid for the blacktop and I have a receipt.

1    Then she tells him in July, Here is the receipt,

2    and that receipt said Hoey Dobson.  She said,

3    That's a family member.  She came to the grand

4    jury in the fall.  She was called into a

5    separate room and she was warned that there was

6    problems with her story, warned about committing

7    perjury in the grand jury.  She went back out

8    into the room and she huddled with who?  Mac

9    Combs.  And then she went into the grand jury,

10   after conferring with Mac Combs, and she told

11   her story.  She says in the grand jury, My dad

12   actually paid for it and he got the receipt; I

13   didn't, the first time that the authorities --

14   Marc had heard anything about the father getting

15   the receipt.  So he goes out in November and

16   interviews Hoey at his house, and I'm going to

17   read the transcript of a portion of that.  Said,

18   I've spoke with Tammy several times.  She's

19   probably told you about the receipt that she was

20   questioned about.  What do you know about the

21   receipt?  And Hoey says, Yeah, I wouldn't have

22   to -- really, I don't know much about it.  Who

23   got the receipt?  Was it given to you or was it

24   given to her?  Heck, I don't know.  You don't

25   know who it was given to?  How did you get it?

1  How did you come to get it?  I don't even know
2  that.  Well, did she get it or did you get it?
3  I ain't never heard her say.  So the first time
4  you saw it, she had it, is that what you're
5  saying?  No, not really.  I ... Did she come in
6  and get that from you that day that she brought
7  it to me?  I wasn't even here.  What I'm saying
8  about it is it was in the safe deposit box.  The
9  receipt was in the safe deposit box?  Yeah.  How
10  did it get there?  Me or my wife, one, had to
11  put it in there because we're the only ones
12  that's got a key.  What's that all about?  Well,
13  we were wondering about the receipt, and
14  Tammy -- and I don't know what Tammy exactly all
15  told the grand jury or whatever, but evidently
16  they've got questions about where this receipt
17  came from.  Evidently she had said that it was
18  given to her.  Evidently it's come through
19  somebody.  We're just tracking back to see who
20  it came through.  We need to know, you know, who
21  paid for the blacktop, number one.  Who paid for
22  the blacktop?  I ain't got no idea.  Did you pay
23  for it?  Did you pay for the blacktop?  No.  I
24  ain't got no idea who paid for that blacktop.
25  Do you think, Mr. Dobson, that the county paid

for that blacktop?  I'd be afraid to even think
anything.  So you ain't got no idea who paid for
that blacktop, or do you know who paid it?  Who
was up here when it was laid?  Really, I don't
know what this is all about, and I don't want to
tell you nothing wrong.  I understand.  A few
days later he was served with a subpoena and he
says to Agent Hopkins, Oh, about that blacktop.
Yeah, I paid for it.  Tammy brought money down,
and I paid for mine, and I gave it to this guy,
and he gave me a receipt.  Suddenly, a few days
later, a perfect memory about what happened, and
it just happens to match Tammy's.  And when he
comes to the grand jury and he gets in there and
he says, That's my story and I'm sticking with
it, baby.  He's on board now.  He's on board.
He's on the team.

        Well, I'm going to quit right now.
I've covered enough of it, obviously not
everything, but enough to get the flavor.  But I
want to leave you with just a couple of words.
It's not easy, I know, to be a juror in any
case.  It's probably especially hard in a case
like this.  You know, you're not dealing with,
like I told you in opening statement, vile,

1  despicable people who have murdered and raped

2  and pillaged, and as long as you are convinced

3  they did it, it's easy to convict those kind of

4  people.  It's easy, because you don't like

5  them.  You think they're evil.  Nobody questions

6  did they do it.  But here you've got people that

7  aren't evil and vile people.  They're public

8  officials who did wrong.  They're not any less

9  accountable, though.  You know, you don't get to

10  be a public official by being evil and vile

11  generally.  Maybe in some rare occasions, but

12  not generally.  Generally, people in public

13  office who handle our trust, our money are

14  decent people, but they're corrupted by power.

15  And its hard sometimes to sit in judgment of

16  decent people who have made mistakes.  But our

17  system won't work if we don't have jurors with

18  the courage to do just that.  Public officials

19  watch these things, and they say, Is there any

20  line I have to watch for?  Is there anything I

21  can't do with these funds?  Is anyone going to

22  call me to task?  Is anyone going to do anything

23  more than audit me and give me a report and ask

24  for my response to it?  Or are there going to be

25  any real repercussions if we don't do it right?

1    I say in a lot of cases that there's only two
2    things in this country that your government can
3    call you, draft you to do against your will.  In
4    other words, you can't refuse; by law, you have
5    to do it.  Some people find ways to get out of
6    it, whether it's -- and those two things are
7    military and jury duty.  And people try to get
8    out of both different ways.  You all have passed
9    the first test.  You haven't tried to get out of
10   it; you've accepted your duty.  You've accepted
11   that.  You've acknowledged that we have to have
12   people like you to come in, give of your time,
13   and sit in these chairs, give up weeks, cramp
14   your style, cramp your schedules.  You've passed
15   that first test, the willingness to serve test.
16   Now you have to have what our military people
17   have, and that's courage to do the job.  Just
18   like the military, it's not enough to sign up;
19   you've got to fight.  And if you are not going
20   to fight, you might as well not have signed up.
21   You might as well been a draft dodger.  You now
22   have a tough duty, and that's to pronounce
23   decent people guilty for doing wrong, for
24   holding them accountable for the public trust.
25   Our system, our judicial system and our

1   political system can't work if that doesn't

2   happen.  And that's why I asked you early on,

3   and that's why I told you early on, there's no

4   question what happened here.  I've never had a

5   question about what happened here.  My only

6   question is, are you going to do something about

7   it?  And I ask you to hold the defendants

8   accountable.  Thank you.

9                [END OF REQUESTED PROCEEDINGS]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The undersigned Court Reporter hereby

2     certifies that:  (1), The foregoing 36 pages

3     represent an accurate and complete

4     transcription of a portion of the record of

5     the proceedings before the United States

6     District Court for the Eastern District of

7     Kentucky at Pikeville, before the Honorable

8     Gregory F. Van Tatenhove, presiding, in the

9     matter of United States of America vs. Randall

10    Clinton Thompson, John Mac Combs, Phillip G.

11    Champion, and Ronnie Adams, and (2), these

12    pages constitute an original of the transcript

13    of the proceeding.

14

15

16                    */s/ Sandy C. Wilder, CRR, RMR,*

17                    COURT REPORTER

18

19

20

21

22

23

24

25