1              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
2                  SOUTHERN DIVISION
                   AT PIKEVILLE
3
UNITED STATES OF AMERICA,
4                            No. 07-CR-35-GFVT
      PLAINTIFF,
5                            Pikeville, Kentucky
                             June 25, 2008
6                            3:31 p.m.
VS.
7
RANDALL CLINTON THOMPSON,
8  JOHN MAC COMBS,
PHILLIP G. CHAMPION,
9  RONNIE ADAMS,

10      DEFENDANTS.

11          PARTIAL TRANSCRIPT OF JURY TRIAL
        GOVERNMENT'S REBUTTAL CLOSING ARGUMENT
12
                * * * * * * * * *
13
APPEARANCES:
14

15  For the Plaintiff:
                        Hon. Kenneth Taylor
16                      110 West Vine Street
                        Suite 400
17                      Lexington, Kentucky  40507-1671
                        (859) 233-2661
18
For the Defendant
19  Randall Clinton Thompson:
                        Hon. R. Kent Westberry
20                      Hon. Kristin N. Logan
                        Landrum & Shouse, LLP
21                      220 West Main Street
                        Suite 1900
22                      Louisville, Kentucky  40202-1395
                        (502) 589-7616
23
                        Hon. Terry D. Jacobs
24                      P. O. Box 991
                        Hindman, Kentucky  41822
25                      (606) 785-9876

APPEARANCES (Cont.)

For the Defendant
John Mac Combs:              Hon. Lawrence R. Webster
                            163 Main Street
                            Suite 2
                            Pikeville, Kentucky  41502
                            (606) 437-4029

For the Defendant
Phillip G. Champion:
                            Hon. Thomas L. Jensen
                            Jensen, Cessna, Benge & Webster
                            303 South Main Street
                            London, Kentucky  40741
                            (606) 878-8845

For the Defendant
Ronnie Adams:
                            Hon. Jason E. Williams
                            111 West 5th Street
                            London, Kentucky  40743-3199
                            (606) 877-5291

Court Reporter:             Sandy C. Wilder, RMR, CSR (IL)
                            8081 Perryville Road
                            Danville, Kentucky  40423-9713
                            (859) 516-4114
                            wildercaptions@kywimax.com

1          [IN OPEN COURT]

2          THE COURT:  We've reconvened in the

3    presence of the jury, and Mr. Taylor will be

4    recognized for the final closing statement for

5    the Government.

6          MR. TAYLOR:  Thank you.  May it

7    please the Court, Gentlemen.

8          THE COURT:  Mr. Taylor.

9          MR. WESTBERRY:  Mr. Taylor.

10          MR. TAYLOR:  Ladies and gentlemen, I

11    know you're ready to quit listening to lawyers

12    and go on with your deliberations, and I'm not

13    going to take as long as the time I'm

14    allotted, but I do want to address a few

15    points.  I'm not going to address every single

16    little point that I disagreed with because we

17    would be here all day, all night.  But I'll

18    address a few of those, but the main thing I

19    want to do is get back to the big picture.  I

20    told you in my initial opening when I went

21    through the basics of this case, things that

22    you can look at and they tell you what the

23    story of the case is, and what happened.  And

24    I told you what the defense would do

25    essentially, and that's gom, let's talk about

1    trees instead of the forest, and point to the

2    fungus on this tree, therefore, the forest is

3    no good, and talk about individual witnesses,

4    and a little -- an issue here and an issue

5    there, but not -- they won't look at the big

6    picture, and they'll compare apples and

7    oranges, and they'll try to make this into

8    something it's not, and try to make you

9    believe that there's all this doubt and

10   confusion.  And if you just back up and look

11   at it, it's not confusing at all.  You know, I

12   like to do MapQuest when I'm going somewhere.

13   And I'll pull up the place I'm going and I'll

14   try to get an idea of where it is in relation

15   to each other, things are.  And then you try

16   to get closer and closer to get more detail.

17   Eventually you get so close, it doesn't really

18   mean anything to you because all you see is

19   this little line with maybe a name on it, and

20   it doesn't mean anything to you because you're

21   looking too close.  But if you back up and

22   zoom out and look at the big picture and see

23   where the different streets relate to each

24   other, you see the big picture.  You see the

25   city.  You see what you've got.  And it

becomes clear. So let me remind you what
we've got here. We don't have Congressman
Rogers building a parkway. That's a public
service parkway. That's for all citizens.
And it's bid on, and it's done months in
advance, and there are plans and there are
blueprints, and there's a right-of-way, and
private property is bought, and public money
is spent on public property. And we don't
have that here. We have a short period of
time right before election where a group of
people who have no relation to the road
department, but have every relation to the
defendant in an election, running the road
department, controlling the fiscal court,
getting $1.5 million that the entire tax base
has to pay back over years, $150,000 for the
next ten years; everybody has to pay it back.
They spend it on private property. Ask
yourself this: Was there any private property
approved? And every one of you will have to
say yes. Did it jump -- did that blacktop
jump out of that truck and lay itself? No.
These gentlemen put it there. And it was
planned. And they did this with off-beat

1   pavers with no track record.  They criticized

2   Randy Campbell and his testimony.  But who

3   hired Randy Campbell?  Who brought Randy

4   Campbell in and why did they bring him in,

5   this paver with a couple of trucks from Hazard

6   with no track history?  Why did they bring him

7   in, and why would he start submitting these

8   bad records?  Did they not question him?  And

9   we have this going on in a frenzy up until the

10  election, and then it stops.  That's not

11  Congressman Rogers building a parkway.  That's

12  Judge Thompson and his people paving

13  driveways.  They try to make apples look like

14  oranges.  Somebody on the defense said, Well,

15  they're not doing this for themselves.  The

16  heck they're not doing this for themselves.

17  In Knott County there's basically those two

18  factions that fight it out, like the Sunnis

19  and the Shiites in Iraq, and whoever's in

20  power, gets the goodies.  You don't think they

21  want that power and maintain that power for

22  the use of that office?  Of course, they do,

23  and did in this case.  They were doing this

24  for themselves.

25          I want to say something else.  They

kind of hit you with a guilt trip about waking
up in the middle of the night, regretted you
convicted someone.  Don't fall for that.  You
didn't do it.  You didn't do it.  You didn't
spend that money.  You aren't the one who was
unaccountable; they were.  It's no one's fault
but their own.  They try to make you think
that this Rooster Lane that was adopted in '99
is the Rooster Lane we're talking about here.
The Rooster Lane that was adopted in '99 just
went so far and stopped.  Bobby Reynolds told
you that.  It didn't include Bobby Reynolds
and his immediate neighbors and the house of
Brandon Moore.  Not at all.  Worst of all,
they try to make you believe, they insult your
intelligence and make you believe that Shade
Mountain Road, which is a driveway to the two
Morgans' house, that was put in there with
their bulldozer and kept up with their gravel,
never maintained by the county, always
maintained by the Morgans is now a
reconstituted road that was somewhere else.
Ladies and gentlemen, you will read these
instructions, and when it talks about once
public, always public, we're talking about a

right-of-way.  We're talking about a line on
the ground.  We're talking about the distance
between the left side of the road and the
right side of the road.  We're talking about a
specific place on the face of this earth.  And
when someone goes several feet down the road
and builds a new road to their house, that's
not the same road.  That's a different road.
And when they give it a new name, Shade
Mountain Lane, that's a new road.  And the
fact that some gas truck tries to go through
there and drives through their yard and they
run them off, doesn't make that a public
road.  Your driveway is your driveway, and the
road in front of your house is the road in
front of your house.  They're trying to gom
this up with some argument that you don't know
what a driveway is.  Jeff Morgan said, when
asked the question by the defense -- they
tried their best to get Jeff Morgan to say
there was some doubt about his road.  The
question:  The public could obviously come up
into that area?  Answer, They have, yes.  All
right.  More specifically he said -- he says,
No, this is no county road now.  He said,

1      Well, you've heard some people say it is

2      though, right?  Well, I don't know what you're

3      talking about.  Are you talking about 550's a

4      county road or state road, but my driveway is

5      not a county road.  I don't want it to be a

6      county road.  If it is a county road, then,

7      you know, somebody needs to pay me for it

8      because it's not a county road.  If it's

9      listed as a county road, nobody ever notified

10     me of that.  And I'm not being hateful with

11     you, but no, I've never told anybody that's a

12     county road.  But they want you to think

13     there's some doubt about that, that the

14     homeowner doesn't know his driveway.  Now, did

15     that blacktop on Shade Mountain Road jump up

16     out of the truck and lay itself there?  No.

17             Now, they try to confuse this case

18     with this idea that all they're doing is this

19     public service stuff, helping the invalid by

20     building the bridge, and concrete is better

21     than wood, and blacktop is better than gravel,

22     and this is safety, and children, and the bus,

23     and the water freezes over.  And they showed

24     you a picture of a road that wasn't even in

25     play in this case as being an example of

1    unsafe conditions.  Well, we've never said

2    blacktop is bad.  Blacktop is great.  I moved

3    out in the country and I have gravel.  I wish

4    I have blacktop right now.  I don't have

5    blacktop right now, and I'm not going to ask

6    the county to pay for it either.  Barely got

7    my road paved.  Helping old people and

8    invalids, that's great.  That's wonderful.

9    That's not what this case is about.  We've

10   never said that shouldn't be done.  The

11   question is, who does it, at whose expense,

12   with whose approval, and with whose

13   accountability?  If the county wants to pass

14   an ordinance for the relief of sickness and

15   poverty, they're free to do that.  They can do

16   anything they want, as long as it's approved

17   and taken care of with the light of day

18   shining on it and it's accountable to the

19   people.  But around election time when you

20   send the trucks out there and you kick it up a

21   notch over what Homer and the others did,

22   Donnie Newsome, who handed out gravel like it

23   was pizza, and you start doing blacktop,

24   that's wrong, and it's not Hal Rogers building

25   a parkway.  They say, Well, we were operating

in good faith. I don't recall hearing a
single word that they were operating in good
faith. Did you all hear any evidence that
they were operating in good faith? The
lawyers have said it, but that's not
evidence. Is good faith not having any
accountability with your records? Is good
faith answering a reporter about it by saying
it's not happening, when it is? Is good faith
trying to create this semantical confusion at
what's private to one person is public to
another? You just look at the things they did
and the sequence they did them, followed by
the denial, and the Monday morning cover-ups,
and it refutes any claim of good faith.
$780,000 unaccounted for. Now, Mr. Webster --
well, I want to make this point about the
$780,000. The point about the $780,000 is not
that we don't know what's spent or it's -- we
don't know what happened to it in terms of
where it is on the ground. We can't verify
it. We can't -- and that's what the auditor
was saying when she came in back in 2006 in
July, in -- toward the Fall of 2006, and it
continued on into 2007. We've got $780,000.

1    We don't know where that was spent.

2         Now, they talk about this Lonesome

3    Dove in connection with that as being the only

4    road that the auditors have talked about.

5    Well, that's very, very logical.  Here's what

6    happened.  The auditor comes in and says we

7    have $1.5 million for blacktop.  Now, let's

8    see if we can account for that.  Okay.

9    Mountain Enterprise receipt showed here's so

10   many tons on that road and that road is in the

11   county road system, and here's so many roads

12   with tonnage, and that's in the county road

13   system.  That's how much it cost.  When they

14   got done doing Mountain Enterprises, they had

15   about half of it, a little under half of it

16   accounted for on the ground with public

17   roads.  What they didn't have was one road,

18   Lonesome Dove, which was not in the county

19   road system.  Looking at this book from August

20   of 2006, Lonesome Dove is not a county road.

21   And so they wrote it up in their report,

22   Lonesome Dove is not a county road.  They

23   didn't go out and look at Rooster Lane.  They

24   didn't go out and look at Tammy and Hoey and

25   all these -- Hillside Drive and Shade Lane.

That fit in the category of $780,000
unaccounted for.  That's where that was.  The
only one they were saying was unaccounted for
was one Mountain Enterprises did, which was
Lonesome Dove.  Then when the criminal
investigation begins, Marc Hopkins goes out
and finds Shade Lane.  I keep calling it Shady
Lane.  It's Shade Mountain Road.  He finds
Tammy and Hoey and Hillside and all these
other places we've been talking about.  He
finds those because he put his boots on and
walked around.  The auditors just looked at
the books.  She wasn't saying that was the
only road.  That was the only one she could
find by sitting on her -- at her desk in the
office where she was doing the audit.

            Mr. Webster, for the life of me, and
I like Mr. Webster.  He's -- I read his column
in the paper, and I think he's a very funny
man, and -- but for the life of me, I cannot
understand the point he's trying to make about
Hoey Dobson not understanding anything.  Now,
let's think for a moment.  Hoey Dobson.  Let's
take the facts as Mr. Webster says they are.
And just for the sake of argument, I'm not

saying this is the truth; I'm saying the
opposite is true.  Let's just say for the sake
of argument that Hoey Dobson did get that
receipt, which is their version, he did get
that receipt from Campbell.  He did hand
Campbell $1,800.  That's what he's saying is
the truth, and he took that receipt and put it
in his house in a lock box.  That was in
November of 2006.  That's their version of the
truth.  And in 2007, in April, when questioned
about it, as I'm sure she knew she would be,
Tammy says, I've got a receipt, referring to
the receipt in the lock box.  Now, that's not
a receipt that hadn't been written yet, as
they're implicating, that Campbell didn't
write it out until he started looking for it.
It's in the lock box, according to their
version of the truth already.  Now, in July,
there's a search.  He says to her, Give me the
receipt.  So she goes home.  She doesn't bring
the original, but she brings a copy of that
receipt.  Now he's got that receipt.  Now we
get down into November when he's questioning
Hoey Dobson.  Hoey Dobson's sitting there
thinking, Okay, Tammy's been down to the grand

jury.  She's told them -- she's being
questioned about the receipt.  She tells them,
I told him about the receipt and, you know,
they want to know about it.  So he's sitting
there, and Hopkins says, I spoke with Tammy
several times.  She probably told you about
the receipt and she was questioned about the
receipt, and what do you know about the
receipt?  He says, I don't know much about it.
Now, how could he not know much about it if he
got it?  Who got the receipt?  Was it given to
you or was it given to her?  Heck, I don't
know.  Well, if he got it, he knew who got
it.  You don't know who it was given to?  How
did you get it, how did you come to get it?  I
don't even know that.  Well, did she get it or
did you get it?  I ain't never heard her say.
But he's supposed to have gotten it.  So
she -- the first time you saw it, she had it;
is that what you're saying?  No, not really.
I brought it.  Did she come in and get it from
you that day when she got it from you?  So all
this talk about the receipt that he's
supposedly, according to their version, got
from Campbell, he doesn't know anything about

the receipt.  He hasn't been told what to say
yet.  And so then they go on down to the
blacktop.  Now, he's supposedly paid for the
blacktop.  Question:  Who paid for the
blacktop?  I ain't got no idea.  Did you pay
for it?  Did you pay for blacktop?  No.  I
ain't got no idea who paid for that blacktop.
Now, supposedly he handed him $1,800.  Now, if
there's some confusion there, he doesn't make
it known there's some confusion.  I mean, does
he even say, Well, I gave $1,800, but I don't
know where he got it?  No.  He says, I don't
know who paid for it.  So you ain't got no
idea who paid for the blacktop, or do you know
who was up there, here when it was laid?  If
you can see any confusion between paying and
blacktopping, you're better than I am.
There's no confusion.  Hoey Dobson was not on
board at that time.  But within a few days
when the subpoena was served, he was on board,
and he lied.  And why did he lie?  He lied to
protect his daughter, he thought.  It didn't
work, but he thought it did.  He lied to
protect Mac Combs, just like his daughter did.
And they all lied because they were protecting

each other because they were in on the
distribution of the public funds. And the
fact that Mac Combs is in that loop tells you
something about Mac Combs as he sits there
today. As he sits there, he knows he did
that, and he knows he asked two people to go
to the grand jury and swear falsely for him.
And he knows that. And that tells you
something about his participation in this
case, if he's willing to do that. To send his
friends down to perjure for him, that tells
you something about the man. Mr. Webster says
don't turn this conduct into a crime. You're
not turning this conduct into a crime. This
conduct is a crime. And again, we did hear
from Mr. Webster and from others that, yeah,
we do do things different up here. Well, if
you do things different up here that are a
crime, you shouldn't be doing them up here.
That shouldn't be a defense. Do you like that
stereotype, that you're just different up
here? Is that what Mr. Webster's saying, that
you don't think the laws apply to the people
here? I don't think you think that. I think
you reject that. I think you know some people

think that, but I don't believe you do.  You
know, Mr. Webster was right about one thing.
I was taken out of context very, very bad in
this very court several years ago.  Kind of a
funny story.  It wasn't funny at the time.
It's kind of funny now.  I had actually moved
this Court to transfer a case that was going
to be tried here because the defendant was
well known in this county, and it had received
a lot of publicity, and I asked the Court to
move it because, and I regret saying this,
but -- because it was taken out of context,
but I said, Your Honor, after we strike
everyone who hasn't read, heard, talked about
this case, the only people we'll have left in
the jury pool will be illiterate cave
dwellers.  And somebody told the press, and
the press was all over that saying, Taylor's
calling the people of this county illiterate
cave dwellers.  And that wasn't what I was
saying at all.  I was saying -- I would say
that in New York City, I would say that in
Philadelphia, I would say it in Miami.  What I
was saying is, if you hadn't read about this
case, you're living in a cave somewhere,

1   you're not reading the paper and you're not
2   listening to the TV or radio.  That's the only
3   point I was trying to make.  But someone, and
4   I didn't realize this was a sensitive issue,
5   some people said the reference to cave
6   dwellers was a reference to coal mining, and I
7   didn't make that connection.  And somebody
8   said, Well, the illiterate part was just
9   saying people can't hear and read, and it just
10  got blown up out of proportion.  And in
11  conjunction to that, because it was a motion
12  to change the venue, somebody wrote that
13  Taylor thinks the people of Pike County and
14  the people of this area can't be trusted to
15  handle a political corruption case, which that
16  was.  Now, Taylor thinks that we just have
17  different standards up here and we won't apply
18  the law up here.  And we need to send a
19  message to Taylor that that's not true, that
20  we will follow the law up here.  And Taylor
21  needs to quit making those motions to move
22  cases from Pike County, because we can enforce
23  the law up here.  We're here.  Here we are.
24  And like I told you before, there's no
25  question about what happened.  I just hope

1    there's no question about you doing something

2    about it.  I know it's hard, probably one of

3    the hardest things you'll ever have to do.

4    But when you look at that evidence, step back

5    from it and look at it, you'll see that

6    picture crystal clear, and I ask you to hold

7    the defendants accountable, to do something

8    about it.  If you don't do it, nobody else

9    will.  You have a choice.  You can tell the

10   defendants this is okay, Knott County, keep on

11   going, keep on trucking, next year, come up

12   with something better, or you can say it stops

13   now.  No more.  I ask you to hold them

14   accountable.  Thank you.

15           THE COURT:  Thank you, Mr. Taylor.

16   Members of the jury, now, it's time for me to

17   instruct you about the law that you must

18   follow in deciding this case.

19           [END OF REQUESTED PROCEEDINGS]

20

21

22

23

24

25

1　　　　　　The undersigned Court Reporter hereby

2　　certifies that:　(1), The foregoing 20 pages

3　　represent an accurate and complete

4　　transcription of a portion of the record of

5　　the proceedings before the United States

6　　District Court for the Eastern District of

7　　Kentucky at Pikeville, before the Honorable

8　　Gregory F. Van Tatenhove, presiding, in the

9　　matter of United States of America vs. Randall

10　　Clinton Thompson, John Mac Combs, Phillip G.

11　　Champion, and Ronnie Adams, and (2), these

12　　pages constitute an original of the transcript

13　　of the proceeding.

14

15

16　　　　　　　　*/s/ Sandy C. Wilder, CRR, RMR,*

17　　　　　　　　COURT REPORTER

18

19

20

21

22

23

24

25