UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 07-35-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| RANDALL THOMPSON, ET AL., | ) | **MEMORANDUM OPINION** |
| | ) | **AND** |
| Defendants. | ) | **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion for Judgment of Acquittal [R. 183] and the Motion for a New Trial [R. 184] filed by the Defendant Randall Clinton Thompson.[1] The United States has filed a response in opposition [R. 189], and Thompson has filed a reply [R. 193]. For the reasons set forth below, Thompson's Motions will be denied.[2]

**I.**

The four-count Indictment [R. 3] charged Thompson and his three co-defendants, John "Mac" Combs, Phillip Champion, and Ronnie Adams, as agents of the local Knott County government, with several counts of criminal wrongdoing related to the distribution of county-

---

[1]Thompson has also filed motions to join in the arguments raised by each of the other Defendants. [*See* R. 178, 182.] The Court will grant those motions and consider the other arguments as if raised by Thompson himself. However, to the extent that Thompson has adopted arguments not actually presented in his Motion, those arguments will be denied for the reasons set forth in the Orders addressing his co-Defendants' Motions.

[2]Prior to sentencing the Defendant on February 2, 2009, the Court noted on the record that the Defendants' post-trial motions would be denied by subsequent writing. This Memorandum Opinion and Order articulates the Court's reasoning and analysis supporting the denial of those motions.

purchased blacktop, gravel, and bridge-building materials as part of an attempt to influence the outcome of an election. The Indictment charged all four Defendants with conspiring to buy votes and misappropriate government property, in violation of 18 U.S.C. § 371. The Defendants were also collectively charged with aiding and abetting each other in the misappropriation of government property, in violation of 18 U.S.C. § 666, while Ronnie Adams was individually charged with two separate counts of vote buying, in violation of 42 U.S.C. § 1973i(c). Essentially, the Indictment alleged that the Defendants used materials purchased by the government to improve private property and that they did this, by agreement, in exchange for votes for Randy Thompson. As to Mr. Thompson, the jury returned guilty verdicts on both the conspiracy and misappropriation counts. [*See* R. 167.] Thompson now moves the Court for a Judgment of Acquittal, or in the alternative, a new trial.

## II.

### A.

A motion for acquittal pursuant to Fed. R. Crim. P. 29 takes the place of a motion for directed verdict and raises the question of whether the evidence is sufficient to support a verdict. *United States v. Cox*, 593 F.2d 46, 48 (6th Cir. 1979). "When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995) (citing *United States v. Riffe*, 28 F.3d 565, 567 (6th Cir. 1994)). There is a "strong presumption in favor of sustaining a jury conviction," *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994), and a defendant seeking a judicial reversal of a jury

determination of guilt bears a "very heavy" burden "because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005); *see also United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir.), *cert. denied*, 512 U.S. 1243 (1994).

**1.**

Thompson argues that the government failed to establish both the existence of a conspiracy to commit any crime and Thompson's membership in such a conspiracy. He contends that there was no evidence from which the jury could reasonably infer that two or more persons conspired to commit vote buying or intentional misapplication. Thompson also maintains that there is no evidence of an agreement or that he knowingly and voluntarily participated in an agreement to buy votes or do improper paving.

In this case, the government's proof of Thompson's involvement was largely circumstantial, a fact which the United States plainly concedes. That does not, however, mean that the evidence was insufficient to support the verdict. Indeed, "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Fortson*, 194 F.3d 730, 735 (6th Cir. 1999). Despite the circumstantial nature of a lot of the evidence, the government contends that a reasonable jury could have found the elements of the offenses beyond a reasonable doubt. The Court agrees.

There was no evidence that Thompson ever specifically directed anyone to gravel or blacktop a particular driveway or road. However, Randall Gayheart did testify that he built approximately twenty bridges for the county at the direction of Thompson and Phillip Champion.

3

It was his understanding that Judge Thompson had to approve the project before Champion could give Gayheart the go ahead. Mr. Gayheart testified that several of those bridges went to a single residence.

Other evidence supporting Thompson's involvement in the conspiracy includes the alleged reason that Mountain Enterprises, Knott County's primary paving contractor, stopped providing that service shortly before the election. Although there was conflicting testimony, there was some evidence that Mountain Enterprises stopped paving in Knott County based on a belief that improper paving was occurring. Because the county's primary contractor was out of the picture, Thompson hired other contractors to do the work. Orvil Pratt testified that he introduced Randy Campbell, owner of East Kentucky Paving, to Judge Thompson. Mr. Pratt stated that he was present at a meeting with Campbell, Thompson, and Ronnie Adams, in which Campbell was effectively hired to do some paving work for Knott County.

According to Randy Campbell, the recently hired contractor, the meeting with Judge Thompson and the others occurred on a Friday, and they wanted him to begin working the following Monday. Campbell testified that, during his work for Knott County, he paved several private driveways at the direction of Mac Combs. In an effort to conceal this illegal activity, Combs subsequently directed Campbell to prepare fake receipts for those jobs even though he never received money from any of the individuals.

There was a variety of testimony from other county employees who were directed to spread gravel, pave roads, and/or build bridges that they were unsure of the particular job titles of the Defendants. Several witnesses testified that Adams and Combs rode along in their trucks and instructed them where to spread gravel. Nonetheless, despite not having actual positions at

the county garage, the Defendants' authority to direct such actions did not appear to be questioned. They appeared to have the implicit approval of Thompson.

In addition to the conspiracy and misappropriation charges, Adams was also convicted on one count of vote buying. The vote buying count involved Adams offering to pave the private driveway of Bobby Reynolds in exchange for his family voting for Thompson in the election. That Thompson was the ultimate beneficiary of such illegal activity cannot be overlooked. It could certainly be argued that Adams sought to buy votes for Thompson, without the approval or knowledge of his boss. However, as noted above, this type of circumstantial evidence need not remove every hypothesis except that of guilt. In fact, it is perhaps more likely that Adams did not engage in buying votes for his own benefit and without Thompson's knowledge. Thus, it is just as probable that Thompson knew about, if not directed, those actions.

That conclusion is supported at least circumstantially by Sheila Calhoun, who testified that she spoke to Thompson about getting her road paved. After confirming that her road was in the county rather the city, Thompson agreed to pave it but asked her how many votes it would get him. Because the road at issue was public, his statement did not amount to an attempt to buy votes. It is, however, arguably probative of his state of mind and provides an example of Thompson essentially offering to provide county resources in exchange for votes. Drawing all inferences in the government's favor, it is beyond coincidence that Adams offered and made precisely the same exchange, except that it was for a private driveway.

Finally, and perhaps most importantly, the evidence simply does not support the argument of Thompson's counsel that he was clueless about the criminal activities of his staff. Instead, there is evidence that Thompson was put on notice about improper paving and bridge

5

building. One example involves the testimony of Jeremy and Jeffrey Morgan. They were contacted by Ronnie Adams and asked if they wanted their driveway blacktopped. When they asked about the cost, Adams told them they could discuss that later. After receiving the blacktop but no bill, the Morgans eventually contacted Thompson's office to ask about payment. They never received a response or a bill.

While it can be argued that Thompson possibly did not receive the message from the Morgans, the same cannot be said about questions from a local reporter. Randy Walters testified that he went to multiple meetings of the Knott County Fiscal Court and asked questions about allegedly improper bridge-building and paving. Those questions were posed directly to Thompson. When Mr. Walters questioned Thompson about building bridges that served a single residence, Judge Thompson responded that they were saving money by having the county employees build the bridges. Mr. Walters further testified that he asked about the blacktopping of private driveways. According to Mr. Walters, Thompson denied that the county blacktopped private driveways. As a result of these allegations made at the Fiscal Court meetings, Byron Jacobs, the Knott County treasurer, testified that he subsequently requested Thompson to certify that certain expenditures were made for a public purpose. Thus, it is implausible to suggest that Thompson had no idea about the misappropriation of government property. Moreover, despite being placed on notice of possibly criminal activity by his employees, there was no evidence that Thompson ever took any action whatsoever. As such, drawing all inferences in favor of the government, the jury could reasonably find that Thompson joined the conspiracy and aided and abetted the misappropriation of government property.

**2.**

Thompson next argues that the Court committed error by failing to identify whether or not any of the Defendants' conduct violated state law. He contends that the jury was required to determine whether a driveway or roadway was public or private. Thompson also suggests that the United States cited no authority for the proposition that it is illegal for county employees to pave private driveways or bridges.

Here, the jury was properly instructed on the law concerning the misappropriation charge. In order to find the Defendants guilty, Instruction No. 16 required the jury find that the Defendants "intentionally misapplied more than $5,000 of property *by causing paving contractors and county employees to spread gravel and/or blacktop on private drives and roadways and/or by causing county building materials to be used in the construction of private bridges*." [R. 162, Jury Instructions, p. 21 (emphasis added).] Contrary to the Defendant's arguments, this instruction does define the crime of misapplication. It explains what the jury is required to find in order to determine that the Defendant's conduct was illegal. The instruction characterizes the misapplication of property as the improper use of county materials on private property.

At the Defendants' request, this instruction also included a significant amount of information related to the public versus private distinction as well as ways in which the Defendants could permissibly use government property. For example, Instruction No. 16 goes on to note that placing or using county materials on county property is not a crime. The instruction also provides a description of several ways in which a road or bridge can be deemed public. Finally, the instruction includes a list of public functions that the fiscal court and/or

7

judge executive may perform, including the provision of ambulance service, the construction and maintenance of suitable areas for the safe turning around of school buses, and the provision of appropriate funds to keep all county roads in good repair and free from obstructions.

Despite the inclusion of the many of the Defendants' requested instructions, Thompson still suggests that the Court was required to describe a specific violation of state law in the instructions. However, there is no state law prohibiting every conceivable form of misappropriation by county officials. Thus, although there is no state law specifically prohibiting a county official from using county funds to buy himself a new boat, it is beyond cavil to suggest that such an action is not illegal. Indeed, the use of county purchased materials to improve private property is similarly illegal. Accordingly, because the jury instructions correctly defined the crime of misapplication, a new trial is not warranted.

**B.**

Alternatively, the Defendants contend that a new trial should be ordered pursuant to Fed. R. Crim. P. 33. Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." (emphasis added). The trial court "possesses 'wide discretion' in evaluating a Rule 33 motion and may independently evaluate witness credibility and the weight of the evidence offered at trial." *United States v. Roland*, 233 F. App'x 476, 482 (6th Cir. 2007) (citations omitted). Generally, motions for a new trial are disfavored and should be granted with caution. *See United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). Indeed, a new trial is appropriate "'only in the *extraordinary circumstances* where the evidence preponderates heavily against the verdict.'" *Roland*, 233 F. App'x at 482 (emphasis added) (citing *United States v. Ashworth*, 836 F .2d 260,

8

266 (6th Cir. 1988)).

**1.**

Thompson contends that a new trial is required due to prosecutorial misconduct. Thompson points to a statement made by the prosecutor during the testimony of Eldon Hicks concerning Donnie Newsome's conviction for vote buying and to a statement made during the government's closing urging the jury to "send a message" and "do its job."

Reviewing a claim of prosecutorial misconduct, the Court must determine whether the prosecutor's statements were both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 391, 412 (6th Cir. 2006). To determine flagrancy, the Court considers four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* (quoting *United Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 546 U.S. 865 (2005)). To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: (1) the proof of the defendant's guilt is not overwhelming; (2) the defense counsel objected; and (3) the trial court failed to cure the impropriety by failing to admonish the jury. *United States v. Tocco*, 200 F.3d 401, 420-21 (6th Cir.), *cert. denied*, 539 U.S. 926 (2003).

The Court should not, however, overturn a verdict "unless the prosecutorial misconduct is 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, . . . or so gross as probably to prejudice the defendant.'" *Id.* at 421 (quotation omitted). Indeed, the Supreme Court has cautioned that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed

9

in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985).

Here, on direct examination, Eldon Hicks, a road supervisor for Knott County Fiscal Court under the previous administration of Donnie Newsome, testified that the county had maintained many of the roads and bridges at issue for as long as he could remember. Mr. Hicks contended that those improvements made the roads and bridges much safer and actually saved the county money in the long run. He also testified that they kept a list of names at the county garage for citizens who called in to request that their driveways be graveled. Mr. Hicks stated that they would work from that list when they graveled roads and this had been the practice in Knott County for his entire life. On cross-examination, the government questioned Mr. Hicks regarding some of those past paving practices in Knott County. The government asked whether they gave away gravel, blacktop, and bridges at election time. When Mr. Hicks answered that he did not work for the county during election time, the prosecutor rhetorically asked whether Donnie Newsome was convicted of vote buying. Thompson objected, and the Court immediately admonished the jury that Newsome's conviction was not based on any conduct similar to the charges against these Defendants.

Considering the relevant factors, the Court finds that the prosecutor's comment, while improper, does not rise to the level of being flagrant. Here, the prosecutor's statement was misleading to the jury. Absent the admonition, the jury may have been left with the impression that the former Knott County Judge Executive was convicted of vote buying related to paving roads and building bridges. This, however, was an isolated statement and appears to have been made accidentally. In his Motion, Thompson even describes the prosecutor's statement as being

10

made "in an excited tone." In response to Mr. Hicks's testimony about how things had always been done in Knott County, the government sought to discredit him and the previous administration. Although the government crossed the line by asking about an irrelevant conviction, the prosecutor's statement did not seem deliberate. Finally, the Court notes that the evidence against Thompson, although not overwhelming, was strong. Thus, in light of the immediate admonition and viewed in context, the prosecutor's comment did not affect the fairness of the trial.

Thompson also argues that the prosecutor improperly urged the jury to send a message to other corrupt politicians. Specifically, Thompson points to the following statements:

> And it's hard sometimes to sit in judgment of decent people who have made mistakes. But our system won't work if we don't have jurors with the courage to do just that. Public officials watch these things, and they say, is there any line I have to watch for? Is there anything I can't do with these funds? Is anyone going to take me to task? Is anyone going to do anything more than audit me and give me a report and ask for my response to it? Or are there going to be any real repercussions if we don't do it right?

Thompson further contends that the government made a similar improper statement at the end of his closing, stating: "And that's why I asked you early on, and that's why I told you early on, there's no question what happened here. I've never had a question about what happened here. My only question is, are you going to do something about it?" Thus, Thompson asserts that these statements require a new trial.

Initially, the Court notes that Thompson did not object to any of the statements he now contends were improper and prejudicial. As such, reversal is not warranted unless those statements, considered in the context of the entire proceeding, were so egregious as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."

11

*Young*, 470 U.S. at 16.

Here, viewed in context, these statements did not render the trial unfair. The Sixth Circuit has held that, "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). In *Solivan*, the prosecutor urged the jury to tell the defendant, whom he called a wholesale drug distributor, "and all other drug dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky . . . ." *Id.* at 1148. The appellate court, after analyzing those statements against the backdrop of the "War on Drugs" and concluding that the prosecutor intended to inflame the jury's passions and accomplished this end, reversed.

Conversely, in *United States v. Alloway*, 397 F.2d 105, 113 (6th Cir. 1968), where the defendant was charged with armed robbery, the Sixth Circuit found permissible the following remarks by the prosectuor: "You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated." As noted in *Solivan*, unlike the War on Drugs, there was no national attention focused on armed robbery, and the prosecutor in *Alloway* "did not go beyond a mere allusion to the general need to convict guilty people." *Solivan*, 937 F.2d at 1154 (quoting *Alloway*, 397 F.2d at 113).

In this case, the government's statements urging the jury to do its job do not warrant a new trial. Those comments came as part of a broader discussion in which the government noted the often difficult task of being a juror and sitting in judgment of decent people who make mistakes. Moreover, the prosecutor did not explicitly implore the jury to send a message. While

he did note that other public officials watch these trials, his statements were more akin to a general appeal to convict guilty people. The prosecutor's statements about what could be done with public funds and whether there was a line that to be crossed seem to generally refer to criminal conduct. Essentially, the prosecutor asked whether the jury would punish the guilty people responsible for the criminal conduct at issue. These statements were also in direct response to the testimony about things had always been done in Knott County. Viewed in context, these statements were neither calculated to inflame nor so inherently prejudicial as to compromise the integrity of the verdict.

**2.**

Thompson further argues that he is entitled to a new trial because the Court erred by admitted a television news clip containing statements made by Thompson. He contends that the admission of the video tape violated the rule of completeness. His argument is without merit.

In this case, the government notified the Court and defense counsel of its intention to play a news clip which aired on television in which Thompson was interviewed by a reporter. As with virtually all news stories, this one was clearly edited. According to Thompson's counsel, the original interview lasted almost thirty minutes. The news clip at issue, however, was only about thirty seconds. Thompson essentially argued that the rule of completeness barred the admission of the news clip because the other portions of it were unavailable.

Rule 106 of the Federal Rules of Evidence directs that "[w]hen a writing or recorded statement . . . is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." At trial, after hearing argument from counsel, the Court

13

ultimately concluded that the rule of completeness was inapplicable. This was not a situation where the government read a portion of a deposition and the Defendants then sought admission of the entire deposition in order to put the other portion in appropriate context. Although the news clip had been pared down, the government was not in possession of the entire interview. That he may have said something else during the interview does not implicate Fed. R. Evid. 106.

Having concluded that the rule of completeness was inapplicable, the Court determined that the news clip was admissible as a statement of a party opponent. There was no dispute that the statements were made by Thompson. The Court found that the statements, on their face, were not confusing. Further, the Court concluded that the admission of these statements were not unduly prejudicial. In fact, the Court specifically noted that one of the statements appeared to be consistent with Thompson's theory of the case. As the Court also noted, the Defendants were free to ask questions about the editing process and the existence of other portions of the interview on cross-examination. Accordingly, consistent with its rulings at trial, the Court finds that the admission of the television news clips was not error.

**3.**

Adopting the arguments of his co-defendants, Thompson maintains that he is entitled to a judgment of acquittal and/or a new trial because the worst evidence against him was totally inadmissible. He asserts that the tape recorded grand jury testimony of Tammy Brewer, a secretary in the Knott County Judge Executive's office, and her father, Hoey Dobson, as well as prior tape recordings made by Detective Marcus Hopkins were inadmissible because neither Brewer nor Dobson testified at trial and no valid exception to the hearsay rule exists. He specifically argues that the statements are not admissible pursuant to the co-conspirator

14

exception to the hearsay rule.

During the relevant investigation, Detective Hopkins interviewed both Ms. Brewer and Mr. Dobson and recorded those conversations. He questioned them about their recently paved driveways. Ms. Brewer advised Agent Hopkins that her father, Hoey Dobson, had paid for the paving and that she had a receipt to prove it. Detective Hopkins subsequently questioned Mr. Dobson, who seemed to have no knowledge about who paved the driveways or who paid for it. Testifying before the grand jury, Ms. Brewer essentially reiterated her prior statements. Mr. Dobson's memory improved significantly from the time he was first interviewed to when he appeared at the grand jury. His testimony to the grand jury was virtually identical to that of his daughter.

At the trial in this case, the government presented the testimony of Randy Campbell, the man who paved Ms. Brewer's driveway. Campbell testified that he did not receive payment from either Ms. Brewer or Mr. Dobson. He also stated that he was directed to use county materials to pave that driveway and that the receipt, produced at the direction of John "Mac" Combs, was not legitimate. Based in part on the testimony of Campbell, Ms. Brewer and Mr. Dobson were convicted of perjury in a separate case prior to the trial in the instant matter. *See* London Criminal No. 6:07-cr-112-GFVT (E.D. Ky.).

Here, Thompson presents a lengthy argument that these statements were inadmissible absent an opportunity for cross-examination. He argues that the Court committed error by admitting the recorded statements and testimony of Ms. Brewer and Mr. Dobson under Rule 801(d)(2)(E), the coconspirator exception to the hearsay rule. His argument is factually misplaced.

15

The Federal Rules of Evidence define hearsay as an out of court statement offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). However, as the Court noted at trial in ruling on the Defendants' objections to the admission these statements, the out-of-court testimony at issue was not offered for its truth. In fact, the point of the government's offering Ms. Brewer's and Mr. Dobson's statements was simply to prove that those statements were made so as to establish a foundation for later showing, through other admissible evidence and testimony, that they were false. *See United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986). In *Hathaway*, the Sixth Circuit concluded that:

> When statements are offered to prove the falsity of the matter asserted, there is no need to assess the credibility of the declarant. Since there is no need to assess the credibility of the declarant of a false statement, we know of no purpose which would be served by extending the definition of hearsay to cover statements offered for the falsity of the matter asserted.

*Hathaway*, 798 F.2d at 905 (citations omitted). Similarly, in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court specifically acknowledged that the Sixth Amendment "does not bar the use of testimonial statements for purposes *other than* establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59, n.9 (emphasis added) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Thus, when an out-of-court statement is not offered to prove the truth of the matter asserted, as with Brewer's and Dobson's statements, the Confrontation Clause is not implicated. *See Street*, 471 U.S. at 413; *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990).

The Court further notes that the admission of these statements was not inherently prejudicial to the Defendants. On their face, these statements did not implicate any of the Defendants in any criminal wrongdoing. Rather, they appear to be efforts by Ms. Brewer and

16

Mr. Dobson to escape or limit their own criminal liability. As noted by the government, the relevance of false exculpatory statements generally relates to a consciousness of guilt. The falsity of these particular statements, as established by the testimony of Randy Campbell, provided evidence that county-purchased materials were being used to improve private property. Accordingly, because these statements were properly admitted into evidence, Thompson is not entitled to a new trial.

**4.**

Finally, Thompson argues that Sheila Calhoun's testimony was irrelevant and should have been excluded. At trial, Ms. Calhoun testified that she visited Judge Thompson in an effort to get her road paved. After convincing him that her road was in the county, Thompson agreed to have it blacktopped. However, as she was getting ready to leave, Thompson reportedly said, "Now, how many votes will that get me?" Thompson argues that because it was undisputed that Ms. Calhoun lives on a county road, any conversation about paving her road cannot constitute vote buying and is irrelevant.

All relevant evidence is admissible, *see* Fed. R. Evid. 402, and relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In this case, it is true that Thompson's statement is insufficient by itself to support a conviction for vote buying because the road at issue was a county road. As the Court noted in ruling on the parties' pretrial motions, paving a public road does not confer a pecuniary benefit on a private citizen and therefore cannot constitute part of the requisite quid pro quo. This does

not, however, mean that his statement is not relevant. The government argued at trial that Thompson's statement demonstrated that his blacktopping efforts were geared toward winning votes and the election. While Thompson's statement alone cannot prove a crime, it is probative of his state of mind. Arguably, it shows that Thompson equated blacktopping roads with receiving votes. The Defendants were certainly free to, and did, characterize this evidence differently. Their characterization, however, does not change the relevance of the statement. Therefore, the Court finds that Sheila Calhoun's testimony was relevant and admissible.

In sum, the Court has reviewed the entire record as well as all of the arguments raised by the Defendants and considered them under both standards of review. Having considered witness credibility and the weight of the evidence offered at trial, the Court, in its discretion, finds that this is not an extraordinary circumstance where the evidence preponderates heavily against the verdict. Therefore, the interest of justice does not require granting the Defendants a new trial.

### III.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Thompson's Motions for Joinder [R. 178, 182] are **GRANTED**;

2. Thompson's Motions for Judgment of Acquittal [R. 183] and New Trial [R. 184] are **DENIED**.

This the 9th day of February, 2009.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge