1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2                   SOUTHERN DIVISION
                   AT PIKEVILLE
3         ***TRANSCRIPT HAS BEEN FILED ELECTRONICALLY***

4    UNITED STATES OF AMERICA,
                              No. 07-CR-35-GFVT
5         PLAINTIFF,
                              Pikeville, Kentucky
6                             February 2, 2009
                              10:23 a.m.
7    VS.

8    RANDALL CLINTON THOMPSON,
     JOHN MAC COMBS,
9    PHILLIP G. CHAMPION,
     RONNIE ADAMS,
10
          DEFENDANTS.
11
        TRANSCRIPT OF SENTENCING PROCEEDINGS BEFORE
12      U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE

13              * * * * * * * * * *

14
     APPEARANCES:
15

16   For the Plaintiff:
                         Hon. Kenneth Taylor
17                       110 West Vine Street
                         Suite 400
18                       Lexington, Kentucky  40507-1671
                         (859) 233-2661
19

20   For the Defendant
     Randall Clinton Thompson:
21                       Hon. R. Kent Westberry
                         Hon. Kristin N. Logan
22                       Landrum & Shouse, LLP
                         220 West Main Street
23                       Suite 1900
                         Louisville, Kentucky  40202-1395
24                       (502) 589-7616

25

1

2

APPEARANCES (Cont.)

3

For the Defendant
4  John Mac Combs:            Hon. Lawrence R. Webster
                             163 Main Street
5                            Suite 2
                             Pikeville, Kentucky  41502
6                            (606) 437-4029

7  For the Defendant
   Phillip G. Champion:
8                            Hon. Thomas L. Jensen
                             Jensen, Cessna, Benge & Webster
9                            303 South Main Street
                             London, Kentucky  40741
10                           (606) 878-8845

11 For the Defendant
   Ronnie Adams:
12                           Hon. Jason E. Williams
                             111 West 5th Street
13                           London, Kentucky  40743-3199
                             (606) 877-5291

14

15

16

17

18

19

20

21

22
   Court Reporter:           Sandy C. Wilder, RMR, CRR,
23                           United States Court Reporter
                             8081 Perryville Road
24                           Danville, Kentucky  40423-9713
                             (859) 516-4114

25

                              INDEX

Colloquy                                      4-135

Direct Examination of OLIVER COMBS
     By:  Mr. Westberry                135-142

Direct Examination of CHARLES CHILDERS
     By:  Mr. Westberry                142-146

Colloquy                              146-160

Sealed Bench Conference               161-162

Colloquy                              162-201

Reporter's Certificate                  202

1          [IN OPEN COURT]

2          THE COURT:  Thank you, sir.  Madam Clerk,

3    would you call the pending matter, please.

4          MADAM CLERK:  Yes, Your Honor.  Pikeville

5    Criminal Matter No. 07-CR-35, United States of

6    America versus Randall Clinton Thompson, John Mac

7    Combs, Phillip Champion, and Ronnie Adams, this

8    being called for sentencing, Your Honor.

9          THE COURT:  Thank you, ma'am.  Counsel,

10   would you state your appearances for the record.

11         MR. TAYLOR:  Good morning, Your Honor.

12   Ken Taylor for the United States.

13         THE COURT:  Good morning, Mr. Taylor.

14         MR. WESTBERRY:  Kent Westberry and Kristin

15   Logan for Randy Thompson.

16         THE COURT:  Mr. Westberry, and Ms. Logan.

17         MR. WEBSTER:  Mr. Webster for John Mac

18   Combs.

19         THE COURT:  Mr. Webster.

20         MR. JENSEN:  Good morning, Your Honor.

21   Tom Jensen for Mr. Phillip Champion.

22         THE COURT:  Mr. Jensen.

23         MR. WILLIAMS:  Morning, Your Honor.  I'm

24   Jason Williams on behalf of Ronnie Adams.

25         THE COURT:  Mr. Williams, good morning.

Ladies and gentlemen, this matter has been called
on my docket for the sentencing of the four
defendants in this case.

Let me just give you a sense of how I
think we'll proceed today.  And I have the day
blocked out to the extent that we need it in order
to hear testimony, consider the arguments that have
been made.  I've read all the briefing in this case
and the presentence investigation reports.

Let me say as a preliminary matter, that
the parties in this case, as expected, did in fact
file post-trial motions seeking a new trial.  And
by subsequent memorandum opinion, I will deny all
of those motions that have been filed.  I
anticipate that those opinions will be filed late
today.  And having reviewed those, they will be
denied by those subsequent memorandum opinions and
orders.

The purpose of today's proceeding is to
impose a sentence as it relates to the four
defendants.  And I anticipate, of course, that
we're going to first take up the objections that
have been raised to the presentence investigation
report.  We will focus, first of all, on the amount
of loss; it's an issue common to all four

1    defendants.  It's one that we need to spend a good

2    bit of time on in terms of making that

3    determination.

4         I anticipate that we'll go through the

5    lunch hour -- or we won't go through the lunch

6    hour -- we'll have the lunch hour; there will be a

7    recess.  After I've heard all argument as it

8    relates to the objections to the presentence

9    investigation report, I will return to the bench.

10   I'll rule on those objections, and then we'll hear

11   arguments as it relates to 3553(a) and those

12   factors, and then I will recess after those

13   arguments are made.

14        And then before imposing a sentence as it

15   relates to each of the defendants, their right to

16   allocution will be recognized.  We'll allow each

17   one of them to address the Court, if he chooses,

18   and then I'll impose a sentence as to each

19   individual.

20        Let me, first of all, just make sure the

21   record's complete.  We've had a number of delays in

22   the sentencing.  My sense is everybody's had plenty

23   of time.

24        Mr. Taylor, I assume the Government's

25   received the presentence investigation report and

1  has had a significant amount of time now.  Has the

2  Government had a sufficient amount of time to

3  review the report?

4          MR. TAYLOR:  We have, Your Honor, and

5  we've filed no objections.

6          THE COURT:  Okay.  And then,

7  Mr. Westberry, let me just, on behalf of your

8  client, and, Mr. Thompson, I'll just ask you

9  directly, sir, whether you feel like you've had a

10  sufficient amount of time to review the presentence

11  investigation report in this case?  And you've

12  raised a number of objections, I know.

13  Mr. Westberry, first of all.

14          MR. WESTBERRY:  I think we have, and we

15  have raised a number of objections with regard to

16  the 3553 arguments.  We've been getting letters,

17  Judge, even, I think, some as late as today.  I

18  apologize for the lateness of it, but we've

19  submitted a fair number of them to your chambers.

20  I think we filed a few, but otherwise, Judge, we've

21  had plenty of time to review the report.

22          THE COURT:  Okay.  Mr. Thompson, do you

23  agree; have you had a sufficient amount of time?

24          DEFENDANT THOMPSON:  Yes, sir.

25          THE COURT:  Okay.  All right.

1  Mr. Webster, on behalf of your client.

2       MR. WEBSTER:  We've had enough time.

3       THE COURT:  Okay.  Mr. Combs, do you feel

4  like you've had a sufficient amount of time?

5       DEFENDANT COMBS:  Yes.

6       THE COURT:  And, Mr. Jensen?

7       MR. JENSEN:  Yes, Your Honor, we've had a

8  sufficient amount.

9       THE COURT:  Okay.  Mr. Champion, do you

10  feel like you've had a sufficient amount of time to

11  review the presentence investigation report?

12       DEFENDANT CHAMPION:  (Nod affirmatively).

13       THE COURT:  Okay.  That's a yes?

14       DEFENDANT CHAMPION:  Yes.

15       THE COURT:  Okay.  All right.  And,

16  Mr. Williams?

17       MR. WILLIAMS:  Yes, Your Honor, we've had

18  a sufficient amount of time.

19       THE COURT:  Okay.  And, Mr. Adams, I'd

20  just ask you the same question:  Do you feel like

21  you've had a sufficient amount of time to review

22  this report with your lawyer and prepare for

23  today's sentencing?

24       DEFENDANT ADAMS:  Yes, Your Honor.

25       THE COURT:  Okay.  Thank you.  Let me say

1   a word about the letters that I've received.  To

2   the extent that you have additional letters, I

3   would like to have you tender those to me at some

4   point today; you don't have to do it right now, but

5   my practice is to read everything that is tendered

6   to me, and my practice is to file it in the

7   record.  And this is the file of all of the letters

8   so far.  I believe most of these were filed on

9   behalf of Mr. Thompson.  I believe there's some

10  materials in here filed on behalf of Mr. Combs as

11  well.  But to the extent that there are other

12  letters, and they're not required, but it is my

13  practice -- people take a good bit of time to write

14  them.  It's very important to them.  I feel like

15  it's important that I read them.  And I've read

16  everything submitted to me up to this point.  I

17  will direct that it be filed in the record.  And

18  then to the extent that throughout the day, if

19  there's other materials that I should read before I

20  impose a sentence, I will be pleased to do that.

21          Okay.  Well, there have, as I've

22  indicated, been numerous objections that have been

23  filed as it relates to the presentence

24  investigation report.  I'm required as a federal

25  judge to consider a number of factors under the

law, the statutory factors.  And one of the most
important, but not the only factor that I consider,
is the sentencing guideline, the recommended
sentence provided by the sentencing guidelines, the
policy statements of the United States Sentencing
Commission.

So we typically will spend a good bit of
time making sure that that calculation is correct,
and that the information that is used in making
that calculation, that there is a preponderance of
evidence behind that information which supports the
calculation that has been prepared by the United
States Probation Office.  So that's our first task
this morning.

And I'm going to begin with the overall
objection in terms of the amount in controversy.
And I'm going to turn in a moment to the United
States and ask you, Mr. Taylor, to make the
argument in favor of the recommended amount, which
is about three-quarters of a million dollars, which
is included in the presentence investigation
report.  And then I'll give, of course, every
defendant an opportunity to respond.  I've read all
of the objections that have been filed.  I've read
the information that's been provided by the United

States Probation Office, so we don't need, in great detail, to go through that information and those arguments, but I want to focus our attention on a number of issues today.

So first of all, with regard to the amount of loss, Mr. Taylor, let me hear first from the United States.

MR. TAYLOR: Well, Your Honor, let me begin by saying, I don't envy your job of trying to be precise about something that's not very precise.

THE COURT: Do I have to be precise?

MR. TAYLOR: No, you don't. I think there's a desire to be, but I don't think you have to. I think you have to have a reasonable estimate of the amount of loss.

The $780,000 figure comes from the auditor's report as being the undocumented or unsubstantiated expenditures that weren't backed up by itemized invoices as was required. That's only a starting point, and I'm not, by any means, led into that figure. I think --

THE COURT: But you don't object to that figure?

MR. TAYLOR: No, I don't object to it. I think the amount of loss could be higher; it could

be lower. We have some benchmarks. We know that
the $780,000 was undocumented, and that set the
stage for the misappropriation. But I don't
believe that every single dollar of that amount was
put on private property. Obviously, there was some
legitimate road paving. On the other hand, that
$780,000, I don't believe, includes all the gravel
that was put on private property, nor the -- all
the bridges.

        So the United States does not have a
particular figure in mind. We understand where the
probation officer got the $780,000 figure; we don't
object to that, but we don't oppose the Court
adopting some other figure, if the Court believes
that overstates the amount.

        THE COURT: Well, wouldn't you say that
you really have a burden, though, to show by a
preponderance of the evidence the loss here?

        MR. TAYLOR: Well, I think ultimately the
Court has the responsibility of making that
determination. I think we have the responsibility,
to the extent we can, to support the probation
officer. And I think what I'm saying is, that the
$780,000 is a, if the Court wants to adopt that, is
a reasonable figure.

1          THE COURT:  Now, it requires me to draw an
2     inference, though, and the inference is that that
3     amount of money reasonably estimates the amount of
4     money that was misappropriated and spent on private
5     driveways.
6          MR. TAYLOR:  Correct.
7          THE COURT:  And actually it doesn't
8     include the bridges; that's another number, but
9     that number was not used for public purposes, but
10    for the private purposes.
11         MR. TAYLOR:  That's correct.
12         THE COURT:  What is there, other than the
13    fact that it represents a number in which we don't
14    know because of the record-keeping, which one could
15    assume raises a presumption that there's something
16    wrong --
17         MR. TAYLOR:  Correct.
18         THE COURT:  -- but not necessarily?
19         MR. TAYLOR:  And I agree, wholeheartedly.
20         THE COURT:  And what else is there that
21    suggests that perhaps that entire number ought to
22    be applied as funds that were used on private
23    property?
24         MR. TAYLOR:  Well, if you're just looking
25    at the paving, the blacktopping, I would agree that

that number would probably overstate the amount
because it represents undocumented, unitemized
paving.  But we know some public paving occurred.
We know private paving occurred, but we also know
private driveways got gravel on them.  We also know
that a lot of bridges were built.  We also know
that there was use of government equipment, and the
employment of government employees' time to improve
private property.  All of that could have been
figured in.

So in a way, the $780,000 is somewhat
arbitrary.  It overstates the blacktopping, but it
doesn't include any of the other types of
misappropriations.

THE COURT:  Is there anything in the
record that itemizes the cost which relates to the
gravel?

MR. TAYLOR:  No, there wasn't.  And the
problem with that is, it wasn't in any way
invoiced, even when appropriately done, because the
government pre-purchases gravel and stockpiles it.
It isn't purchased as it is laid down.  So on a
particular day when gravel was distributed, they'd
go to the already-purchased gravel pile to pick up
a load of gravel and then spread it, so there's no

1    invoicing that's done on a purchase at that time.

2    And I don't know that there were any internal

3    controls within the county to show where gravel is

4    spread.  It's simply obtained on an as-needed basis

5    and distributed, so it's impossible to come up with

6    a precise figure on that.  We only know that it was

7    put on private property in this case by virtue of

8    testimony we had from haulers who said they dumped

9    on what appeared to be private property, all of

10   which arose in the context of this pre-election

11   flurry of activity that we have alleged was

12   designed to curry favor with voters.

13          So again, the Government just simply asks

14   the Court to come up with a reasonable estimate

15   considering gravel, bridges, and blacktop, and

16   applying whatever level within the guidelines the

17   Court deems appropriate, then choose the offense

18   level based upon that.

19          THE COURT:  Well, the defense is going to

20   argue that the appropriate number really is the

21   number proven at trial in terms of private drives

22   shown to be blacktopped at trial.  I mean, that's

23   the only thing we know with any kind of certainty

24   happened as it relates to the pavement of private

25   drives.

1          MR. TAYLOR:  Well, the problem with that

2     assumption is that the Government was able to find

3     100 percent of the private drives, and I don't

4     think that's a reasonable assumption.  I think this

5     all comes into context of again, this pre-election

6     flurry of activity that involved obtaining three --

7     we've used different adjectives -- jake-leg,

8     fly-by-night, whatever you want to call them, but

9     not as professional as the typical paver, people

10    who are not prepared to itemize and document, that

11    were brought in just at this time to spread

12    blacktop across the county to the tune of hundreds

13    of thousands of dollars.  And then it was done and

14    being supervised by some of the co-defendants who

15    really had no business being out on the road crews,

16    all in this political atmosphere.  And then we had

17    very specific testimony of private drives that were

18    being paved.

19          So again, investigating back from what we

20    know, we were able to find examples of what was

21    clearly happening, and we presented that evidence.

22    But that by no means is all of the private drives

23    that were paved.  That's just what we were able to

24    document that substantiated what was believed was

25    happening by the press and by the general public.

1        THE COURT:  There was a list in discovery
2   that was produced in this case --
3        MR. TAYLOR:  Right.
4        THE COURT:  -- that had a long list that
5   kind of targeted private roads and drives.  What if
6   that list was used and the assumption was made that
7   that reflects kind of the sum and total of the
8   private drives that may have been paved?  It
9   wouldn't be exact.  There would be drives that, you
10  know, were not itemized as part of that.  We'll
11  assume that some in that list may not have been
12  private, but would that give us a subset that would
13  then be fair to extrapolate from for the context of
14  sentencing?
15       MR. TAYLOR:  That would be a fair way to
16  do it.  Now, can I give you the exact amount of
17  that blacktop?  I don't know.  I could confer, and
18  maybe get a better estimate, but I don't know the
19  lengths of these different driveways, the thickness
20  of the blacktop.
21       THE COURT:  And again, for sentencing
22  purposes, the sentencing guidelines, in terms of
23  amount of loss, don't require some kind of
24  scientific --
25       MR. TAYLOR:  Exactly.

1    THE COURT:   -- certainty or --

2    MR. TAYLOR:   And let me say this, Your

3 Honor --

4    THE COURT:  -- facts?

5    MR. TAYLOR:  -- let me say this.  I firmly

6 believe that the battleground for this case at

7 sentencing is 3553.  I think those are the factors

8 that are going to weigh heavier with the Court than

9 the sentencing guidelines themselves.  And I think

10 it's for that reason the Government hasn't spent a

11 lot of time trying to document and be precise on

12 this loss figure.

13    THE COURT:  That's a, I think, a fair

14 assessment.

15    MR. TAYLOR:  It's just a -- it's a murky

16 area, so --

17    THE COURT:  Loss has a real impact for

18 these defendants in terms of the financial

19 repercussions, in terms of restitution in this

20 case; wouldn't you agree with that?

21    MR. TAYLOR:  It does that, yes --

22    THE COURT:  Yeah.

23    MR. TAYLOR:  -- it does.

24    THE COURT:  So we'll need to -- you know,

25 my intent is to come to a decision that tries to

1  fairly assess that, and we'll spend some time doing

2  that, largely for that reason.  And it may or may

3  not have an impact on the guidelines.  And I would

4  agree with you; I think your point is well-taken.

5  I think with this kind of case and these

6  defendants, those 3553(a) factors have been

7  prominent in my mind.

8          MR. TAYLOR:  All right.

9          THE COURT:  Well, I would ask to see if

10  the Government has in its possession any

11  information with regard to an estimate as it

12  relates to that long list, not what was proved at

13  trial, but that longer list, and would there be any

14  information that could be provided to the Court

15  that would reference that particular list?

16          MR. TAYLOR:  I will confer and get back

17  with the Court on that.

18          THE COURT:  Thank you, Mr. Taylor.

19  Mr. Westberry.

20          MR. WESTBERRY:  Thank you, Judge.

21          THE COURT:  Please -- this is an area

22  where it's a very complicated area.

23          MR. WESTBERRY:  It's a very complicated

24  area.

25          THE COURT:  We may need to take some time

today.  We're not going to rush through this.
We'll take whatever time either party needs, and
I'll take what time I need as well.

          MR. WESTBERRY:  Thank you, Judge.
Ms. Logan and I on behalf of Randy Thompson, I
think, Judge Van Tatenhove, we are all in agreement
that -- on a couple of things.  The United States
and the Court, and from at least where Ms. Logan
and I sit, it's the Government's burden to
establish this loss figure and ultimately whether
these roads were public or private by a
preponderance of the evidence.  You, in turn, if
they've satisfied any portion of that burden, we do
agree that the loss has got to be set on some sort
of a reasonable basis.  I think the guidelines are
pretty clear on that point.

          You spoke a minute ago, Judge, about a
list of roads that Mr. Taylor arrives at, and
bridges, and I can talk about bridges separately at
the appropriate time.  Mr. Taylor gave us, oh,
about a year ago actually in response to a
discovery request; it's attached as an exhibit to
some objections that Ms. Logan and I filed on
behalf of Mr. Thompson, private roads, properties
receiving county pavings.  It's a pretty good

list.  There's some private bridges down there as
well.  It is really, really difficult, Your Honor,
from the testimony that's been elicited to try to
put a dollar figure on that.

I would like to say this.  What we've done
in preparation for this sentencing hearing, we got
the trial transcripts.  I think we've got about 90
percent of all of it -- all of it?  Ms. Logan
corrected me.  We do have all of it.  We looked,
Judge Van Tatenhove, at the list that Mr. Taylor
provided a year ago in response to discovery, and
we compared that to what we heard at trial.  I
don't know how much detail you want to hear from
me.  I think I can go into a lot of detail, with
Ms. Logan's help, because these are mathematical
formulas that are sometimes more than my old brain
is capable of calculating.  But I think it's fair
to say -- I do think it's a very fair
representation of the list that Mr. Taylor
initially provided, when we actually heard the
trial testimony, you know, many of those roads
weren't even discussed at all at trial.

THE COURT:  And, of course, that would not
be surprising.  The Government would not, in a
conspiracy or an effort that is as broad as this is

in terms of the misappropriation of the funds to
pave these driveways, come in and spend weeks and
weeks and weeks proving up each one of those
driveways, to use that example.

MR. WESTBERRY:  Sure.

THE COURT:  That just would not happen in
the course of trial.  So really, that's a starting
place in terms of what happened at trial here.  But
at sentencing, as you know, Mr. Westberry, I'm
going to consider evidence and information that's
broader in scope than just simply what was brought
forward at trial.

MR. WESTBERRY:  But a good portion of
those roads at which there is no discussion, quite
frankly, has served as the basis for the loss
figure calculated in the auditor's report.  It was
Ms. Simon, I believe, the very first witness called
by the Government.  That's the only reason I just
reminded the Court of how we got to that
three-quarters of a million dollar figure.  It's
really in large part on the basis of roads that
were not even discussed at trial.

We had an exhibit, Judge Van Tatenhove; it
was attached right before the exhibit I mentioned
just a moment ago, Mr. Taylor's letter.  It was

kind of our own calculation on a couple of select
roads.  That form -- do you recall the testimony of
a Robert Graves of Mountain Enterprises?  Mountain
Enterprises is the well-known asphalt company here
in eastern Kentucky.  He was a witness called by
the Government.

THE COURT:  I do.

MR. WESTBERRY:  Yeah.  He came up with his
own calculation of how you might, you know,
reasonably calculate the, you know, the cost of
repairing or blacktopping a particular driveway.
We listed some of those as an exhibit.  Now, we're
not conceding anything, Judge Van Tatenhove, but
quite frankly, these are the ones that if the
Court -- we would think that the Court would want
to pay the most attention to in terms of what would
be an appropriate calculation.  I have all of these
in quite a bit of detail.  Shade Mountain Road.
You remember the Morgan brothers' drives?

THE COURT:  I do.

MR. WESTBERRY:  We've got measurement.
Shade Mountain Road that leads up to Jeff Morgan's,
25 ton.  According to Mr. Graves, $63.70 a ton.
That would be about $1,592.50.  He comes up with
another calculation for the brother Jeremy's road.

1          THE COURT:  And Mac Combs' driveway and

2     Tammy Brewer's and Hoey Dobson's and then the

3     Rooster Lane section as well.

4          MR. WESTBERRY:  Yes, sir.  Yes, sir.

5     Excuse me just a second.  She was just reminding me

6     again of the burden of proof that the United States

7     has with regard to proving what the loss figure

8     was.

9          THE COURT:  Well, and let me just ask.  I

10     mean, let's assume that these are fair loss figures

11     for those particular properties.  And I understand

12     your argument; that's kind of all we've got right

13     now.  But it can't be the case -- I mean, it would

14     be hard for me to conclude that that's the only

15     private paving they got done, and there was other

16     testimony, there's other information.  There's the

17     accounting report.  There's information that's come

18     up in the context of sentencing that would suggest

19     that those are not the only properties that were

20     done.  What I'm trying to find is a principled way

21     to extrapolate.  We cannot know, based on the

22     record, with any mathematical certainty, precisely

23     how much of product was misappropriated for these

24     private purposes; we can't.  But my job's not to

25     come up with that mathematical certainty.  It's to

1    be reasonable in terms of an assessment.

2         MR. WESTBERRY:  Let me answer you in part

3    this way, Judge.  You remember the testimony of

4    Ms. Simon?  I can't remember whether it was my

5    cross-examination question, perhaps it was one of

6    my co-defense counsel.  We asked her, Of all the

7    roads -- and I'm paraphrasing -- somebody correct

8    me if I'm wrong.  I'm talking about Lonesome Dove,

9    folks.  Of all the roads that she felt were the

10   most problematic, based on her audit report, her

11   accounting company's audit report, could you tell

12   us, could you pinpoint, you know, which road you

13   think is the most problematic?  And again, I think

14   because we've talked so much about the audit report

15   this morning, she said Lonesome Dove.  Now, Judge

16   we heard a lot of testimony in trial about Lonesome

17   Dove.  It's an easy -- you know, it's an easy name

18   to remember, for obvious reasons.  You recall, Your

19   Honor, that, you know, what the actual make-up of

20   that road was.  I can't -- who was the lady?  Nina

21   Hicks -- thank you -- that had lived on that road

22   with her family for many, many years, including a

23   time when it was called something else.  Oh, there

24   are, I'm thinking eight, nine, ten homes and

25   trailers, school buses travel that on a regular

basis.  That road had been maintained, you know,
many years before Randall Thompson served as county
judge/executive.

My point is this.  That gives it all of
the characteristic of a public road.  And I'm not
picking on Ms. Simon.  I think, though, this is the
inherent problem.  If the Court is going to look at
the audit report -- let me -- I think I can
appreciate what I think I'm hearing from Mr. Taylor
here in terms of what he thinks is the appropriate
loss range.  I don't think he thinks it's anywhere
even close to that three-quarters of a million
dollars.  But I have to say, asking you to recall
Ms. Simon's testimony, and what I think was a
mistake on her part in terms of characterizing
Lonesome Dove as a private road, when in fact, it
had all of the characteristics of a public road; so
many people lived back there for so many years,
there is going to be an inherent flaw in looking at
the auditor's report.  We got a bunch of these
roads.  I mean, I can -- Delness Bowling Drive.
That's on Mr. Taylor's list; there was no testimony
about that at trial.  Mountain View, no testimony
about that road at trial.

THE COURT:  But again, you know,

obviously, for purposes of sentencing, the trial
testimony is helpful because it helps us get a
sense of what would be expended in a sample of
these private drives that would have been paved.
That's helpful, I think, in terms of making a loss
determination.  It doesn't suggest that that's the
precise amount that was used in every single
driveway, but we have that.  But I'm not inclined
to limit myself just to what was presented at
trial.  I think there's a loss here that is greater
than that, but is somewhat less than the $780,000,
which is the pool of possible loss.  We don't
know.  There's nothing to back up, so it's
possible, because we don't have any documentation,
that the loss is in that particular figure or
somewhere below it.

So we've got way down here on the low end
exactly what was proved up.  We have up here this
pool of possible losses that relates to the
pavement, and a fair number, it seems to me, is
between those at some point.  And so I don't know
that it would be unreasonable to look at that list
and say, "Well, what if we extrapolate at least a
portion of it out to that list?"  Now, some on that
list may have been found to be public roads.

1           MR. WESTBERRY:  Exactly.

2           THE COURT:  And some on that list would,

3   you know, there would be other roads that should

4   have been on the list that wasn't on the list.  You

5   know, is it fair for me to determine that that kind

6   of roughly comes out in a way that is reasonable

7   and fair for these particular defendants?

8           MR. WESTBERRY:  Let me ask the Court

9   this.  I appreciate you giving us an idea what

10  you're looking for, and that's really helpful.

11  Could we take a break so we can present -- we might

12  be able to present, I don't want to call it a

13  unified -- but there are four or five heads over

14  there a lot better than mine, now that I know what

15  the Court is asking for.  Someone may recall some

16  testimony, some part of the auditor's report, some

17  exhibit better than I, and I then can finish up,

18  Mr. Webster, Mr. Jensen, and Mr. Williams --

19          THE COURT:  And then, of course, all will

20  have an opportunity --

21          MR. WESTBERRY:  -- is that fair?

22          THE COURT:  Yes, sir.  I'd be happy to

23  grant that.  That would give the Government an

24  opportunity --

25          MR. WESTBERRY:  Ten or 15 minutes?

1       THE COURT:  You kind of have a sense at
2   what's required here.
3       I've looked carefully at kind of what my
4   responsibility here is.  We don't need to spend the
5   next five hours trying to re-litigate all of these
6   different roads.  But what I need is, I need some
7   principled reasons while there is a fair estimate.
8   That's all we can do, is provide a reasonable
9   estimate of what was lost and what these four
10  defendants should be responsible for.
11      MR. WESTBERRY:  Fifteen (15) minutes.
12  We'll go down --
13      THE COURT:  So we'll take a 15 minute
14  recess.  It's now about 10:55.  We'll reconvene at
15  11:10 to continue this hearing.
16      MR. WESTBERRY:  Thank you.
17      [RECESS – 10:55 a.m. – 11:16 a.m.]
18      THE COURT:  Sir, we've reconvened.  Let me
19  recognize Mr. Westberry.
20      MR. WESTBERRY:  Thank you.
21      THE COURT:  He solved the problem during
22  the recess, sir.
23      MR. WESTBERRY:  Well, it's complicated.
24  Thank you for the time.
25      THE COURT:  Yes, sir.

1          MR. WESTBERRY:  Just for the record, so

2     that I clearly don't waive anything that would not

3     be appropriate for me to waive, we do think it's

4     the United States' burden to prove by the

5     preponderance of the evidence --

6          THE COURT:  Yes.

7          MR. WESTBERRY:  -- which of these roads

8     would properly be characterized as private or

9     public.  And I'm not sure that they necessarily

10    have done that, but I understand that we're trying

11    to give the Court some help in coming up with a

12    reasonable approximation.

13         The first thing that we did, Judge Van

14    Tatenhove, was try to come up with a reasonable

15    estimate of what it would cost to pave a road or a

16    drive.  And what we did, we drew on the exhibit

17    that I mentioned earlier, the one where we listed,

18    oh, you know, the Shade Mountain, the Combs and the

19    Brewer.  That was -- those calculations, again,

20    were taken from Robert Graves' testimony.  If you

21    look just at the two Morgan brothers' roads, the

22    first one was almost $1,600; that was Jeffrey's.

23    The second one, Jeremy's, was approximately

24    $1,700.  You get an average of 16, 17, you know,

25    you could split the difference at $1,650.  And I

1   didn't have my calculator, so I can't do a precise

2   calculation, but we would ask you to consider that

3   as a starting point for a reasonable calculation of

4   what it would cost to pave the driveway.

5           Of the list that Mr. Taylor provided to us

6   in response to our bill of particulars, there were,

7   I think, 31 -- I think I've counted that right --

8   roads or drives that were listed.  Notwithstanding

9   our earlier objection, Judge, I -- you could argue,

10  I suppose, that out of that 31, there are about 13

11  or 14 of those where there was at least some

12  testimony at trial that would -- and I know

13  Mr. Webster in particular can actually identify

14  those 13 or 14 by name, if that would be helpful to

15  the Court.  That would at least give the Court some

16  help in determining whether they were private or

17  public.  I'm not talking about the bridges at this

18  point in time, Judge, just the roads, and I'm happy

19  to talk about the bridges at another time.

20          THE COURT:  Let's just focus on the roads

21  first.

22          MR. WESTBERRY:  Yes, sir.  Ms. Logan and I

23  -- would you like Mr. Webster maybe to give you the

24  --

25          THE COURT:  Well, I'll give him an

opportunity in a moment, as well as all the
defendants, to kind of add anything they'd like to
add as it relates to this.  But I think what you're
suggesting that you -- absent of what was kind of
presented at trial, the Government has not met its
burden beyond that, but if I were to extrapolate
further, I should not extrapolate beyond
approximately half of those listed on the larger
list produced in discovery and only should allocate
between $1,500 and $2,000 to that half.

        MR. WESTBERRY:  Per road?

        THE COURT:  Per road.

        MR. WESTBERRY:  Per road.  Yes, and we
didn't -- I think Ms. Logan's -- we did 13 or 14
times $1,600 is what we did, and we do have a
number, and that, of course, does not include the
bridges.

        THE COURT:  Right.

        MR. WESTBERRY:  So if this is --

        THE COURT:  Right.

        MR. WESTBERRY:  -- you know, I mean, we
can go road by road, and am happy to do that.

        THE COURT:  Right.  Well, I don't know --
given the fact that what we're looking at is
information and testimony at trial, and also

applying the preponderance standard, I don't know
that we need to go road by road because what I'm
trying to do is make a reasonable estimate in terms
of extrapolation --

MR. WESTBERRY:  I understand.

THE COURT:  -- and say, you know, this
fairly represents, based upon the testimony, based
on the preponderance of the evidence that I have,
that the loss to this community was in this -- kind
of in this neighborhood.

Okay.  Well, let me --

MR. WESTBERRY:  Thank you.  That's all I
have on that.

THE COURT:  -- let me hear from you then,
Mr. Webster.

MR. WEBSTER:  Mr. Taylor, may it please
the Court.

THE COURT:  Mr. Webster.

MR. WEBSTER:  It won't be much different
from what Mr. Westberry said.  There's four figures
in the evidence about the cost of the driveway,
$1,592 on one of the Morgan's; $1,700 on the other;
$1,340 on I forget if that's Hoey's or Mac's; and
$1,850 on the other.  That's an average of $15,
almost $16 -- that's $1,600 per driveway.  This

list of 31, and we tried very hard pre-trial to have these identified and got no more than a list of 31. Out of that 31, not of the 14 -- he says 13, I say 14. I'm giving them Lonesome Dove. There was testimony that Lonesome Dove was Baker Lane before. It was in fact the only road added to the county road list that fall. The auditor's report who said there was 550 driveways was just sloppy, and there was 14 -- there's 14 on here -- not -- and only about six of these, or seven was mentioned in the trial. But there are 14 on there that are arguably county. That is to say, a fact-finder, had there been evidence about them correctly, you could have found 14 of them, and that -- I want to list them quickly for the record about -- and we can talk about any individual one that the Court would like to hear. Shades Way times two, Shades Way and Shade Mountain, Stanley Stumbo, Orvil Pratt, Ronnie Campbell, Hillside Drive, Knott County Motorcycle Club. That probably shouldn't be on there because that -- that's an old county road that went over the mountain.

THE COURT: To the cemetery.

MR. WEBSTER: To the cemetery, right. Tammy Dobson, Hoey Dobson, John Mac Combs. Tammy,

Hoey, and John Mac's paving was done following the
conclusion of any conspiracy, but they're on here.
Gayheart, Lewis Allen, and Rooster Lane.  So we're
talking about 11 -- or 13 or 14 times about $1,600
apiece.  We agree that the -- it doesn't have to be
precise, but if preponderance of the evidence is by
its nature a finding that there is some evidence to
support what the Court's finding is, none of this
was submitted to a jury, and I don't suppose it
would have to be, but the difference between $1,600
times 13 or 14, and $780,000 is five or six years
in prison to these individuals, and it's very, very
important that there be something to back this up.
We tried awfully hard to get -- to have discovered
just what they thought were county roads, and
this -- the most we got was this list.  And then at
trial, we heard very little about any of that,
except five or six of them.  If the Court is going
to use the testimony that has been proven under
oath, there would be about six or seven of those
roads times $1,600.  If the Court wants to hear
additional testimony on any of these individual
roads, we can present it, but that would be
Mr. Combs' position.
            Now, the -- there's a couple of them on

1    this list that are the same road and there are

2    some -- and there's just a great many that there's

3    been nothing -- there's nothing in the record

4    whatsoever about.  And finally, this is a

5    reiteration of -- I told the Supreme Court one time

6    that -- I was arguing a case and wasn't doing any

7    good, and I told them that if my first three

8    arguments have not convinced you, I've got three

9    more just as good.

10         But the fact is, these -- I'm not sure

11    that any of these roads were proven to be private

12    by the common law standards by which private roads

13    are judged.  Thank you.

14         THE COURT:  Thank you, sir.  Mr. Jensen,

15    let me see if you have anything to add.  I'm sure

16    you do.  Actually, I'll look forward to hearing

17    what you have to add.

18         MR. JENSEN:  Your Honor, I have just a

19    slightly different take.  I don't -- I'm not

20    disputing anything that any one of my colleagues

21    have just said.  But I think I have to look at and

22    remind the Court, we weren't necessarily convicted

23    of conspiracy either, and in aiding and abetting,

24    there has to be some proof that what we either

25    specifically did or we aided and abetted to get

1    done, if it was an improper expenditure.

2         In addition to that, my client, at least

3    of the auditor's findings, the 18 months or so they

4    express in reviewing the books, my client wasn't

5    even an employee, but for approximately three and a

6    half months of that period of time.

7         To reasonably calculate these losses, if

8    you want to put a figure on it, I would maintain

9    that there was no evidence that my client directed

10   any paving whatsoever of any private drive, that he

11   did not participate in any private drive at all.

12   The evidence seemed to indicate that.  I don't

13   think you can hold him accountable for what other

14   people did under those -- under the circumstances

15   of what the jury found in this case.  So I'm not

16   disputing the amounts that have been put on there,

17   but I do not think they can be attributable to

18   Phillip Champion, Judge.

19        THE COURT:  So whatever amount is

20   determined to be the loss here, your argument is

21   that your client should not be jointly and

22   severally liable for that particular amount --

23        MR. JENSEN:  That's correct, Judge.

24        THE COURT:  -- because he was not

25   convicted of the conspiracy charge, although he was

1   convicted of the aiding and abetting?

2           MR. JENSEN:  That's correct.

3           THE COURT:  Okay.  Thank you.

4   Mr. Williams?

5           MR. WILLIAMS:  Your Honor, for limiting

6   our arguments at this point to the roads and not

7   the bridges, I won't go into that issue at this

8   time.  I would just like to say, Your Honor, as to

9   one of the roads that has been mentioned here this

10  morning, we tried in our presentence memorandum to

11  give the Court some idea of what we thought the

12  jury was thinking.  Of course, it's impossible to

13  do that exactly.  But the Court may also recall in

14  our instructions, we did pose the proposition of

15  having an itemized list of roads.  But I will say

16  as far as Rooster Lane goes, I have preserved that

17  issue with the Court and we have the split verdict

18  on Brandon Reynolds that Mr. —— good argument that

19  that's a county road, so —— but as far as the

20  averages that these gentlemen have talked to you

21  about, I think that they're reasonable preserving

22  those arguments.

23          THE COURT:  All right.  Thank you,

24  Mr. Williams.

25          Mr. Taylor, let me turn back to the

1   Government.  And the question here is, we're trying

2   to estimate -- we're trying to see if the record

3   includes some sense of perhaps the number of

4   driveways looking just at pavement that would have

5   been inappropriately paved during the relevant time

6   period.  We have numbered numbers to extrapolate

7   from.

8           Is there any information in possession of

9   the Government that suggests that that 31 is

10  somehow not all inclusive, or a pretty good

11  estimate of all of it?  And, of course, I'll allow

12  you to respond to the concept that perhaps even

13  that list of 31 isn't -- only about half of those

14  should be in the analysis, if that's being used as

15  a touchpoint to try to make a reasonable estimate.

16          MR. TAYLOR:  Well, I talked to Agent

17  Hopkins during the break about the 31, and the

18  criteria used for inclusion on that list was pretty

19  broad.  Some of it was visual observation, lack of

20  houses out on the road.  Some of it was these did

21  not appear to be in the county road system as

22  published.  So it was a broad list of roads.  The

23  lengths and depths of the blacktop would be

24  impossible to document here today.  So we don't

25  really believe the 31 is a very good basis for

estimating.  What we have decided to offer up to
the Court is a combination of thoughts leading to a
figure, and it's the best we can do.

First of all, some observations.  The
starting point for this analysis really is not
$780,000; it's $2 million.  And we say that because
that is the amount of money that the fiscal court,
led by Judge Thompson, decided to take out.  It was
debt incurred to the county in a form of bonds --

MR. WESTBERRY:  1.5.

MR. TAYLOR:  -- right as the election was
coming, in a very political atmosphere, in which a
customarily Democratic county was offering up a
Republican candidate, and some of the prominent
Democrats were coming over to the other side in
order to defeat a rival.  It was in that political
atmosphere that the fiscal court, led by Judge
Thompson, took out that $2 million, and a lot of
that $2 million was spent on public roadways, no
doubt.  We still think the intent was to curry
favor, but that's not necessarily illegal, maybe
irresponsible, but it's not necessarily illegal to
spend public money to curry favor.  And we can
debate whether that's a good use of the money in
incurring debt to the county.  But that portion of

the $2 million that arguably is legitimate was that which was put down on the public roads by Mountain Enterprises.

THE COURT:  Because we have the records to show those.

MR. TAYLOR:  We have records —

THE COURT:  Yeah, sure.

MR. TAYLOR:  — and it's documented, and it's the way it should be done.  And then Mountain Enterprises pulled out.  And I don't care what the person representing Mountain Enterprises said on the witness stand.  There's clearly inference here that they pulled out because they didn't like what was getting ready to happen or what was happening about where they were being told where to put blacktop.

Then the $780,000 was the little choppy jobs, not the long stretches of public road, but the little choppy jobs, up to cemeteries, to people's houses, places that hadn't been blacktopped before.  This was a whole — this was a different — this was a horse of a different color we're talking about, this $780,000, and it's no coincidence that it was being done by these individuals who did not keep records.  And there

1  was indication that after July, when the auditor's

2  report came out, but well before the election,

3  there was a warning to the county, Look, you've got

4  to document where this stuff is going.  I mean,

5  there was no documentation either then or

6  afterwards, despite the warning.  That's not a

7  coincidence.

8        So the defendants should not gain a

9  windfall by virtue of an intentional act of not

10  documenting where this stuff went.  And they want

11  us to give them a bill of particulars where it

12  went, when it was their lack of documentation which

13  makes that impossible.  So the $780,000 is what the

14  choppy jobs represent.  Now, can some of those

15  choppy jobs be defended?  I'm sure they can.  And

16  that gets back to my missing the forest for the

17  trees argument to the jury.  So the defendant picks

18  these little jobs and they say somebody used to

19  ride their horse over this mountain, therefore,

20  it's a public road.  Or somebody turns their bus

21  around there, it's a public road.  Or somebody

22  needs to run an ambulance over there, or there's

23  gravel washing off of it, so it's a public record.

24  You can make an argument on every one of these

25  little choppy jobs, but getting back from the trees

and look at the forest and see what was going on there, and you'll see that a lot of that $780,000 was the choppy jobs designed to essentially buy votes.

Now, is it still fair to then call the $780,000 the total amount? I'd say no because I think probably some of these were clearly defendable. And with regard to calling only in 11 examples, and I think the Court's point is well taken, and at some point, this becomes accumulative when you've proven with evidence on the ground that what you suspected is happening is happening, why prove every single instance of it? But we made a decision to call in clear-cut examples. There were, even at the grand jury, numerous individuals who had very questionable paving, but who had at least some fairly plausible reason why they could claim that that was at least a dual use stretch of road, and that they were entitled to have that done at the county expense. And we didn't call this gray area of people in here. We called the clear ones in.

But in any event, let me say this. Whatever portion of the $780,000, which was not documented by design, is a misappropriation. We

1  think it is at least a quarter of $780,000.  We

2  believe as relevant conduct there was significant,

3  though we can't be precise because there again,

4  it's not documented, by design, employee time that

5  was used, including overtime on the weekends to

6  spread gravel.  There's bridges that were built,

7  and I think there was testimony somewhere in the

8  neighborhood of ten bridges built.

9          MR. WESTBERRY:  Six, six.

10          MR. TAYLOR:   And I think they were --

11  well, there may have been six that were actually

12  testified to at the -- I'm responding to a comment.

13          MR. WESTBERRY:  I'm sorry.  My fault.

14  Excuse me.

15          THE COURT:  The record will reflect

16  Mr. Westberry is responding by gesturing.

17          MR. TAYLOR:  I heard him say six, but

18  anyway.  I think there's some ambiguity in the

19  record about that.  I think Gayheart used the

20  figure of ten or 11.  But in any event, you add the

21  bridges, and I know there was a lot of attempted

22  murkiness there with regard to whether an ambulance

23  can get across it or whether somebody had the

24  bridge built by the county before.  But the

25  majority of these were clearly private bridges, and

1   we had people testify -- I would have voted to have

2   my bridge built, too, but I built my own.  You had

3   not only the blacktop, but you had the gravel.  And

4   again, by design, it's not documented where all

5   that went.  We had testimony that it was being

6   spread willy-nilly around to curry favor.  And

7   again, some of it might have been spread by friends

8   of the opponent, Mike Hall.  I don't doubt that.

9   That's sort of the culture up there.  And while

10  Mike Hall may not have had the influence to get

11  blacktop, he may have had influence to get gravel,

12  and he may have done that.  But we know some of it

13  was being done at the request of the defendants.

14  And then there's the use of county equipment.

15          So by any stretch or twist of the

16  imagination, or estimation, is a better word, when

17  you look at the categories of loss of 2B1.1, you

18  get pretty quickly to some pretty broad

19  categories.  And the figure $670,000 was more than

20  $400 and less than $1 million, which added 14

21  levels.  We believe it is fair to give the

22  defendants the benefit of the doubt on some of that

23  and drop it down to the category more than

24  $200,000, but less than $400,000.  And so that's

25  what we would recommend to the Court as a fair

1 estimated amount.

2       And when it comes to restitution, again,

3 being as fair as possible, order the lower end of

4 that $200,000.  And I just think that's about all

5 that we can humanly do that's still fair to the

6 citizens of Knott County to the interest of justice

7 and to the defendants.

8       THE COURT:  Should Mr. Champion be jointly

9 and severally liable for the entire amount of

10 restitution?

11       MR. TAYLOR:  You know, I've been trying to

12 rationalize the jury's verdict, and I don't think

13 you have to rationalize it.  I'm trying to figure

14 out what they were thinking there when you aid and

15 abet somebody and don't convict them of a

16 conspiracy.  The best I can come up with is that

17 they probably believed that Phillip Champion didn't

18 direct Randall Gayheart to build some bridges, but

19 maybe not have done a whole lot else.  So if he's

20 not convicted of the conspiracy, it may -- I

21 haven't researched it, whether aiding and abetting

22 -- all the jury had to find was $5,000 in that

23 count.  I would just have to ask the Court for an

24 opportunity to research the issue of joint and

25 several liability.  I don't think that has to be

1 done right this moment, but I don't know the answer

2 to that question.

3    THE COURT:  Okay.  Thank you, Mr. Taylor.

4 Let me allow the defendants to address the bridge

5 issue.  We've not addressed that yet.  Mr. Taylor's

6 now kind of put that on the table, and I think

7 that's the one issue as relates to this that we

8 need to give you an opportunity to address.

9 Mr. Westberry.

10    MR. WESTBERRY:  One point of

11 clarification.  My colleagues told me that it was

12 $1.5 million was the amount appropriated -- or

13 apportioned, appropriated by the Knott Fiscal

14 Court, not $2 million.  I don't know that that

15 necessarily makes a difference in what we're doing

16 here today, but that was chimed along our table,

17 and I thought I would just at least put that on the

18 table.

19    THE COURT:  Let me just let Mr. Taylor

20 respond to that.

21    MR. TAYLOR:  Your Honor, the clarification

22 I just got from Mr. Hopkins is that they borrowed

23 the $1.5, but spent $2 million in this.

24    THE COURT:  But there seems to be an

25 agreement that we kind of know, absent the

1    $780,000, we know pretty much how the rest of it
2    was spent.
3              MR. TAYLOR:  Correct.
4              THE COURT:  Okay.  Thank you.
5              MR. WESTBERRY:  I want to talk just a
6    moment, Judge, about the bridges.  The response
7    that Mr. Taylor gave to us in the bill of
8    particulars listed six bridges.
9              You recall the testimony of the gentleman
10   named Randall Gayheart, long-time bridge builder in
11   Knott County.  I think that is six, Judge.  I see
12   you looking.  I'm pretty sure I've identified that
13   correctly on his letter to us of January 18 of last
14   year.  Yes, Patricia Slone, Jeff Messer, Winfred
15   Cornett, Napier, Slone, and Franklin.  I think I
16   count six correctly.  It's at the back of that
17   January 18 letter.  Randall Gayheart has been -- he
18   testified was called as a witness by the
19   Government, has been building bridges for many,
20   many years in Knott County, as I recall his
21   testimony.  He testified that of all of -- I won't
22   even get -- I don't think it can be in dispute,
23   based on the trial testimony, that the bridges were
24   all in pretty bad need of repair.  I think if we
25   proved anything at all, I don't think that could be

controverted.  He testified that he had -- and,
Guys, correct me if I'm saying this incorrectly --
of all of those six bridges, including all of the
bridges that he had ever built, he had built them
and constructed them before the people who lived at
the home were actually living there for previous
occupants at county expense.  And my point really
isn't very complicated.  That gives it all of the
characteristic of a, you know, of a public bridge.
And I'm sure somebody said, I'd like to have my
bridge fixed.  Whoever that somebody is, I don't
know what the characteristic of their bridge is,
whether they originally built it themselves or
not.  But Mr. Gayheart said he had built all of
these in years past at county expense, and, of
course, they were all in bad need of repair.

THE COURT:  This really goes to what the
Government calls that "gray area."  This is about
roads that had a dual use, roads that perhaps had,
kind of through tradition, become, or bridges that
through tradition had become a county
responsibility, even though they were going
privately to a residence, or the county felt like
there was a public safety reason because of the
person who lived in a residence and the need for an

1  ambulance to be able to get across a property.

2       So there's some component in this where

3  there are these bridges as well as these roads that

4  are in a gray area.  Is that a fair assessment?

5       MR. WESTBERRY:  That's the best argument I

6  think the Government can make, and I would simply

7  respond, I don't think that satisfies their burden

8  of a preponderance, by showing that these are

9  truly, you know, public properties that were

10  improperly taken care of and fixed.

11       THE COURT:  Now, in terms of the record in

12  front of me, there's really no record in terms of

13  materials as it relates to these bridges.  We're

14  talking about an amount in which there's some

15  evidence of the amount of money that would be --

16       MR. WESTBERRY:  Yes.

17       THE COURT:  -- expended after hours on

18  these private bridges.

19       MR. WESTBERRY:  Three thousand a bridge,

20  or if I recall Mr. Gayheart's testimony, I think

21  that's my best recollection, yes.

22       THE COURT:  Right.  Okay.

23       MR. WESTBERRY:  I think you know what I'm

24  saying.  I just --

25       THE COURT:  I do.

1          MR. WESTBERRY:  -- the history of those
2     bridges, if -- just looking at what their burden of
3     proof is, seems to indicate they're public.
4          THE COURT:  Okay.  Okay.  Thank you.
5          MR. WESTBERRY:  Thank you.
6          THE COURT:  Let me see if any of the other
7     defense counsel want to speak to bridges.
8          MR. JENSEN:  Judge, may I address just
9     real briefly?
10          THE COURT:  Yes, Mr. Jensen, please.
11          MR. JENSEN:  I think there was mention of
12     a list of six bridges we provided.  At trial, only
13     four bridges were talked about.  And none of
14     these -- the characterization of these are new
15     bridges wasn't true at all.  They were all being
16     repaired and substituted with concrete for wood for
17     longer lasting.  Now, the question of what was
18     public or private really was never pointed out in
19     court.  But even on the four, according to
20     Mr. Gayheart's testimony, is that he charged
21     roughly $3,000 for his labor and $1,500 for
22     materials, so $4,500 to buy those four bridges that
23     we're showing the Court would be $18,000, provided
24     that they were all private.  And there was no proof
25     whether they were private or public, other than

1  what Mr. Westberry pointed out.  Mr. Gayheart said

2  he'd been working on these bridges for 15, 20

3  years.  That's all I had, Judge.

4         THE COURT:  Okay.  All right.

5  Mr. Williams, anything additional to add?

6         MR. WILLIAMS:  Your Honor, may I just

7  stand here?

8         THE COURT:  You may, sure, particularly if

9  you're brief.

10         MR. WILLIAMS:  I will be brief, Your

11  Honor.  I had pointed out to the Court in that

12  memorandum already filed that there was testimony,

13  I think, from Eldon Hicks that -- the prior road

14  foreman -- that he had, even prior to

15  Mr. Thompson's administration, that he had made a

16  recommendation that those be paved or concreted,

17  and it goes to how long these have been in the

18  county system, and there have been improvements to

19  them over the years.

20         THE COURT:  Okay.  Thank you.

21         MR. WILLIAMS:  Thank you.

22         THE COURT:  Mr. Taylor, I'll give you the

23  final word, if there's anything additional you'd

24  like to add.

25         MR. TAYLOR:  I don't have anything to add.

1          THE COURT:  This has been very helpful,

2     Counsel.  I appreciate the argument on this.  I'll

3     take this under advisement.  And when I rule on all

4     of the objections, at that time I'll give you my

5     ruling as it relates to the amount of loss.

6          But the next adjustment that I'd like to

7     focus on is an adjustment for obstruction of

8     justice.  And I don't know that that applies to

9     every one of the defendants, but it is the next

10    area that I would like to hear argument on.

11         There is, you know, some indication of

12    falsified receipts in this particular case, but

13    it's not clear as it relates to Mr. Thompson, for

14    example, that that was at his specific direction,

15    and there was no testimony from the defendants at

16    trial.  The incident that I want to focus on in

17    terms of argument is this public adoption of the

18    roads as county roads paved during a meeting

19    following release of the auditor's report, and

20    whether or not that act rises to the level of

21    requiring an adjustment under the guidelines for

22    obstruction of justice.

23         And let me begin with you, Mr. Taylor, and

24    hear from the Government on that particular point,

25    and then from the appropriate defendants.

1    Mr. Taylor.

2           MR. TAYLOR:  Well, if the defendants

3    believed that the public inquiry by the auditors

4    could reasonably and foreseeably lead to a criminal

5    investigation, then I believe any act designed to

6    change the records after the fact would be

7    obstruction of justice.  So I think the

8    foreseeability of the criminal investigation is the

9    issue, and I think it is well-known that auditors'

10   reports that contain some indication of criminal

11   liability do lead to criminal investigations.  But

12   I recognize this is a close question.

13          THE COURT:  And why isn't this an effort

14   to do the right thing, as opposed to obstruction of

15   justice?  Why shouldn't this be viewed as these

16   officials saying, "Well, look, we -- clearly, we

17   need to adopt these roads that we think are in fact

18   public roads?  We haven't done it.  We're not going

19   to go -- we're not going to go falsify records to

20   do it.  We're not going to go sneak in and change

21   the list and add some lists in the dark of night.

22   We're going to go in the public -- open public and

23   we're going to vote on it and we're going to say,

24   "Yeah, we think these are public roads.'"

25          Now, as a political matter, you could come

back and say, Well, that's irresponsible or, you
know, they're acting in a manner that is reckless
and they ought to be voted out of office, but I'm
just -- whether that rises to the level of
obstruction of justice seems to be, I think you're
right, a close question.

　　　　MR. TAYLOR:　Well, I think the answer to
the question of why isn't it doing the right thing,
is that it's doing the wrong thing.　It's the
motive.　And when you have evidence of clear paving
of private driveways, such as the magistrate's son
Combs -- was it Danny Combs -- that long driveway
up to his house, was clearly not a public road when
it was paved, but it was shortly thereafter adopted
as that.　That clearly the motive for changing that
was not to document post facto what had been
established by adverse possession or usage that it
become public.　It was to try to give cover to what
was an illegal act.　And there's simply no evidence
that -- or not sufficient evidence that this was an
organized effort to pave truly public roads, and
then someone brought to their attention that the
county had never adopted these roads, and then they
went back and did what was right.　The evidence and
the inferences drawn from the evidence is that they

were doing something wrong, and then when they were
called on it, they went back and tried to provide
cover.  So the same evidence that got them
convicted by the jury is the evidence which tells
you that this was not doing the right thing, but
doing the wrong thing.

I think the better example, though, of
obstruction of justice is the false documentation
of receipts, and it was done by a co-conspirator.
And I think the Pinkerton Doctrine kicks in if that
act was foreseeable to the other defendants.  And
the -- there was certainly, when this came to
light, there was no effort to take any action
against any lone wolf out there.  In fact, there
was a kind of the silence by the county when some
of these improprieties were revealed.  And the
obvious cohesion of the defendants has been very
obvious, and it's been everybody all for one and
one for all, not the kind of activity -- I would
have loved to have heard each of the defendants'
version of how this all occurred.  And who knows,
if everybody had given their own account, this
thing might have shaken out differently, some more
culpable and some less culpable.  And they decided
to adopt this one for all and all for one position,

1  which they're entitled to do; I'm not saying

2  they're not, they're clearly entitled to do that

3  when it comes to certain ramifications, and the

4  Pinkerton Doctrine is one of those.  The question

5  is, was the act of Mac Combs' foreseeable to the

6  other defendants, and I submit in this climate it

7  was.

8        THE COURT:  Okay.  Thank you.

9  Mr. Westberry.

10       MR. WESTBERRY:  Judge, I'm only going to

11 address the obstruction reference regarding the

12 fiscal court meeting.  I'm just not in a position

13 to talk about the Pinkerton Doctrine, or I hadn't

14 thought about that doctrine in a good long while.

15       In our brief we argue -- and I think the

16 hypothetical question you posed to Mr. Taylor, what

17 about conducting a meeting in an acting resolution

18 such as this in its public fashion that would make

19 this obstruction?  That's precisely what they did.

20 Application note 1 of 3C1.1 states that obstructive

21 conduct that occurs prior to the start of the

22 investigation in the instant offense of conviction

23 may be covered if the conduct was purposefully

24 calculated and likely to thwart the investigation

25 or prosection of offense of the conviction.  And

1    all I would say is just back to the hypothetical
2    you posed to Mr. Taylor just a few moments ago.
3    You know, putting the politics of it aside, you
4    know, it does not -- it was not likely, you know,
5    given that they were doing it in a public meeting.
6    There was only a fraction of the roads that --
7    Larry's -- Mr. Webster's over there forcefully
8    nodding to me -- only one of those.  That was
9    Lonesome Dove -- thank you, Mr. Webster -- was
10   actually adopted at that meeting.  I mean, looking
11   at it in its totality, I don't see how the
12   Government could sustain its burden of showing that
13   that particular obstruction would apply in this
14   case.  And, Judge, that's really all I have to say
15   on that.  I'm sure my colleagues may say a few
16   additional things.
17          THE COURT:  Okay.  Mr. Webster.
18          MR. WEBSTER:  I keep talking about the
19   sloppy audit.  The worst part of it, the auditor
20   reported that 550 roads had been adopted in the
21   county road system, and that mistake occurred
22   because when Knott County adopts a new road into
23   the road system, they republish the entire prior
24   list with the new one on it.  The evidence in this
25   case was that Lonesome Dove by name was added to

the road list, but that it had in fact been a
public road for many years under the name of Baker
Lane.  I went back and looked at prior ordinances
adopting roads into the county road system, and
you'll find that they're just cumulatively done.
The second point -- so that is not any evidence of
anything at all, I don't believe.

Secondly, more tricky, is whether or not
the jury apparently believed that Mr. Combs'
receipts were contrived.  The case out of New York
holds that that guideline applies to attempt to
obstruct justice during the course of an
investigation.  Now, if -- acts that are -- if it
is a crime to give a fake receipt, then it is not
both a crime and an obstruction of justice.  You
could argue that running out of the bank after a
robbery would be an obstruction of justice because
it would potentially thwart capture.  But this
statute is designed for investigations that are
underway, and in the course of going on and
something does attempt to thwart those.  And I just
don't think it applies here.

But it -- and secondly, I want to -- this
is on the prior argument that -- let's get this
straight.  The bond issue was for $3 million.  The

county, Mr. Thompson, Judge Thompson only agreed to
spend $1.5 million of that.  There was not $2
million spent, and half of that bond issue went
unused, which is a substantive thing that has to do
with the fact that if somebody's out there trying
to borrow money to buy votes, why did they only
spend half of it?  But the $780,000 figure was
simply the amount of money for which invoices were
paid, but there wasn't a location of a road on
there.  Judge Thompson, when confronted by the
auditor, offered to go out and show them
everything, every road that had been paved, and do
that accounting, but they declined to do that.  But
obstruction of justice is an attempt to obstruct
during the course of an investigation, and there
was no investigation at the time.  The fact that
the conspiracy was over at the time Mr. Combs was
alleging to have done that, and there was no sign
of any investigation going on.

THE COURT:  Okay.  Thank you.  Mr. Taylor,
let me ask you to respond to that specific point as
it relates to Mr. Combs.  This is about a different
obstruction in that it has to do with the
falsifying receipts, and the argument's being made
that somehow that falls outside the time frame that

ought to be considered in terms of a guideline

calculation.

MR. TAYLOR: Well, I don't believe there

has to be an active investigation, and in fact, the

commentary indicates that the conduct before can be

if it's reasonably calculated to thwart an

investigation. And clearly, there was a lot of

public scrutiny leading up to this and there was,

by the Defendant Combs, an awareness that there's

going to be some questions, as there had already

been, about the propriety of a lot of these

driveways being paved. And here you had the

secretary of the county judge/executive with her

brand spanking new driveway, and Mac Combs himself,

and Hoey Dobson, who cleans the courthouse, and

there were going to be some questions raised, as

ultimately there were, about why they got this

paved, and the receipts were necessary. And the

only purpose for the receipts was to thwart, make

it go away, a very foreseeable criminal

investigation, so I think it applies there.

THE COURT: Okay. And then,

Mr. Westberry, I'd like for you to respond to

commentary application note number 9, 1.1, that

says that under this section, the defendant is

accountable for his own conduct and for conduct

that he aided or abetted, counseled, commanded,

induced, procured, or willfully caused.

Let's put aside the vote. Let's assume

that I do not consider that obstruction of justice,

but find that Mr. Combs' actions is obstruction of

justice. Shouldn't your client also be assigned an

adjustment because of commentary number 9?

MR. WESTBERRY: I don't -- I feel like in

all due respect, I'm caught a little off balance.

This was not an argument that I had been prepared

to address with any specificity. I'm not willing

-- I --

THE COURT: Well, take a look at that.

MR. WESTBERRY: Yeah.

THE COURT: We'll return to that in a

moment. And let me just see if Mr. Jensen wants to

talk generally about the obstruction of justice,

although I don't know that Mr. Champion was

assigned that.

MR. JENSEN: Mr. Champion wasn't assigned

that obstruction.

THE COURT: And then finally,

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

Your Honor, I won't belabor the public road issue,
except to say that I think I did hear Mr. Taylor
say they did this in an effort to change the
record, and I don't think there's any evidence in
this public meeting that occurred in April, 2007,
that they went back and said a record of the past
is now changed to reflect such-and-such.

I think the evidence is that as of April
2, 2007, they adopted the roads on that day.  It
wasn't a, you know, a clandestine meeting where
somebody tries to put an old record in that doesn't
exist might fit that description.  But this
certainly wasn't that.

The other thing I would say, Your Honor,
is that in the presentence investigation report it
makes it a point that Mr. Adams was a member of the
fiscal court when this vote occurred, and it
occurred in April, '07, and his tenure as a
magistrate ended December 31, '06, so he was not a
member of the fiscal court at that time, did not
vote on this ordinance for public road adoption.
And it's my understanding, Your Honor, that a
similar enhancement for Mr. Champion was removed on
objection for that same reason.  So we'd just ask
that the public nature of the vote, the fact that

Mr. Adams was not a magistrate at the time of the
vote and for consistency purposes, that removal for
Mr. Champion should also be one for Mr. Adams
because of the lack of ownership.

THE COURT: Okay. Thank you. All right.
Mr. Westberry.

MR. WESTBERRY: After talking, I just
don't think whatever it was that Mr. Combs did with
regard, so it's obvious that it's reasonably
foreseeable that Thompson should be held
accountable for that. There wasn't any testimony
at trial that I can think of that I can recall that
would have linked Randy Thompson with the invoices
that would have been exchanged with regard to Hoey
Dobson, Tammy Brewer, and that almost seemed
isolated within itself. He was not the only
defendant in this conspiracy. I think you can take
a real leap beyond the testimony that you heard at
trial to hold him accountable, Mr. Thompson
accountable for what may or may not have been done
with regard to those invoices.

THE COURT: Mr. Taylor, do you agree that
the Judge should not be held -- would it not have
been foreseeable to assume that these kinds of
invoices were being falsified, specifically as it

1    relates to Hoey Dobson and Tammy Brewer?

2              MR. TAYLOR:  I think they were clearly

3    foreseeable.  I think all the defendants had

4    knowledge of private paving, and I think it's

5    inferable that these receipts that were being

6    produced were false, and I don't think on the three

7    or four that were -- came out at trial were

8    necessarily all the receipts that were obtained and

9    submitted to authorities.  In fact, during the

10   investigation, there were several people who

11   presented questionable receipts, but the paver,

12   unlike Randy Campbell, would, in those instances,

13   vouch for their authenticity.  And so we did not

14   have a Randy Campbell to make a case with in that

15   instance.

16             THE COURT:  Okay.  Mr. Westberry, I'll

17   give you the final word.

18             MR. WESTBERRY:  I just, even for

19   argument's sake, and just for argument's sake that

20   these -- Mr. Thompson and others knew private

21   drives were being paved.  If I recall the testimony

22   correctly, this incident about the fraudulent fake

23   invoices was pretty isolated.  I don't think it was

24   a wide-spread occurrence with every drive, every

25   piece of property in Knott County that we heard

1    testimony about throughout the trial.  That's why I

2    don't think it's reasonably foreseeable, under the

3    facts that you have before you, to sort of tag this

4    difficult instruction on Mr. Thompson.  Thank you.

5            THE COURT:  Okay.  Thank you.  Well, I

6    want to turn next as it relates to the adjustments

7    to the issue of the role in the offense.  What I'd

8    like to do, to the extent that you'd like, Counsel,

9    I'm not necessarily suggesting you need to, but

10   give each of the defendants an opportunity to just

11   address that adjustment upward.  I think there were

12   four levels on behalf of Mr. Thompson, three levels

13   as it related to the other defendants in this

14   case.  And I'll turn to the defendants first just

15   to address that, and then allow the Government to

16   respond.  Mr. Westberry.

17           MR. WESTBERRY:  Thank you.  Judge, this is

18   one we feel pretty strongly about.  Reading the

19   PSR's recommendation that he be given this

20   four-level upward adjustment for leader organizer,

21   I'm paraphrasing, but I think I'm doing a pretty

22   good job, the PSR reads that it's reasonable to

23   infer that he would have benefited from vote buying

24   by virtue of his position as county judge/executive

25   in Knott County.  I have read the application notes

and the commentary of 3B1.1, which is the role of
the offense portion of the guidelines.  I can't see
the word "inference" being used.  I would also say
to you, Judge, whatever we didn't prove at trial,
in all due respect, I think I did a pretty good
job in showing through the witnesses that were
called, particularly Mr. Thompson, he didn't ask
anybody for a vote.  I mean, I asked that question
purposefully and pointedly, rather, that when these
witnesses were called, "Did you ever have any
contact, any communication with Randy Thompson
where he asked you for, you know, a vote or a
favor?"  Gosh, I must have asked it of probably
every fact witness that was called.  And I think to
a tee, all of them said no, which is my point
then.  You know, who then did he lead?  Who then
did he direct?  You know, who then did he order?
The county judge does not have the decision-making
authority in Knott County, or any other county that
I'm aware of, to actually decide which roads will
be paved or things will be fixed.  That's not the
county judge's prerogative or discretion.  That's
made by others.

        So I just think, Judge Van Tatenhove, I
think what the PSR has done is to do it simply on

1    the basis of inference, rather than any proof in

2    the record.  I don't think it's an appropriate --

3    it's a serious, severe adjustment.  I don't think

4    it's appropriate, given the factual record that we

5    have made.  I don't know of anything else I can say

6    about it, Judge, but it's one that I think you can

7    tell we feel strongly about.  Thank you, Judge.

8           THE COURT:  Thank you, Mr. Westberry,

9    sir.  Mr. Webster.

10          MR. WEBSTER:  The original presentence

11   investigation report indicated that John Mac Combs

12   was a member of the fiscal court.  He was never.

13   Paragraph 27 claims that he was a deputy

14   judge/executive at the time of this conduct.  He

15   was not.  He was a recreation director.  The only

16   testimony in this case about him was that he --

17   there's no testimony that he ever went with a

18   paver, other than his own home.  He went out -- the

19   entire testimony against Mac Combs was that he went

20   out for three or four hours with Thomas Hays,

21   didn't get out of the truck.  He went out for three

22   or four loads with Craner Jacobs, and went out one

23   Saturday with Paul Slone.  That's it.  Paul Slone

24   said he didn't know of any gravel being on private

25   roads.  Mr. Combs did not accompany a paver.  And

the only reason he was out there at all was because the road foreman went on a slow-down, I'll call it, on the other side of the county, for political reasons himself. And Mr. Combs, having been a prior judge/executive or deputy, was impressed in the service to point out that he was simply told to go out and show these people where these roads are.

The presentence investigation report claims that Mr. Combs went ahead of the blacktop crews and rendered decisions. There's no evidence of that. There's no evidence that he made any decisions or had any authority to. A lot of the presentence investigation report talks about evidence from people who didn't testify that way. There's no testimony that Mr. Combs instructed others where to lay blacktop. There's no testimony that he called anybody and told them where to send the road grader. There's a paragraph in there that said that Craner Jacobs testified that John Mac Combs rode with him for several days before the election. There just wasn't that -- that testimony wasn't the case. In fact, Mr. Jacobs testified that Mac took him for three or four loads and that was gravel.

1       There was -- and finally, one very crucial

2   error -- there is no evidence -- now, Mr. Taylor

3   announced it to the jury that John Mac Combs was at

4   a meeting in which Randy Campbell was introduced to

5   the Knott County folks and was hired.  There's no

6   testimony to that effect, so there's no indication

7   that he had decision-making authorities.  The

8   only -- what happened here was he was sent by his

9   boss to show the gravel truck people where the

10  gravel had been laid in the past.  And that he'd

11  never been in a position of authority or had

12  decision-making authority, and his role in the

13  offense consisted of a few hours of laying gravel

14  on places that all the witnesses testified gravel

15  had already been laid before.  So there should be

16  no enhancement here because he -- he should get a

17  downward departure of four points for a minor role

18  in the offense.  Thank you.

19       THE COURT:  Okay.  Thank you.

20  Mr. Jensen.

21       MR. JENSEN:  Your Honor, when I read 3B1.1

22  on what the Court should consider is the exercise

23  of decision-making authority, the nature of

24  participation in the commission of an offense, the

25  recruitment of accomplices, claimed right to a

larger share of fruits and the degree of
participation.  With respect to Phillip Champion, I
think it's undisputed that he was hired, as we
mentioned, April, 2006, and he was hired at the
pleasure of the county judge.  That's what deputy
judge/executive is, and that's the position that he
held.  The authority, and I think the prosecution
might try to maintain that he had authority to make
decisions with respect to roads or bridges or those
things, and just the contrary is true by the
evidence that was submitted in the case, Judge.  In
fact, Harold Bentley, Dean Bentley, when he
testified as foreman, he admitted at trial that
Phillip relayed information from the Judge's office
as to which roads were to be paved.  Ralph Dyer
testified Phillip would bring a list of roads from
the Judge's office would be graveled and for the
workers to work off of.  He never claimed that
Phillip had any authority.  Tom Hays testified that
Phillip was inexperienced and that Harold Dean
Bentley gave most of the orders.  Randall Gayheart
testified that Phillip gave the go-ahead on bridges
to be built.  But when asked if he had his own
authority, specifically when I asked Mr. Gayheart
recommended a bridge to be worked on, Mr. Champion

1   did not make a decision until after he went back to
2   the office, and then came back and told him what
3   the results were.

4          With respect to the other criteria that
5   falls under 3B1.1, besides decision-making, the
6   right to a larger share of the fruits.  Well, there
7   was no evidence that Phillip Champion received any
8   benefit from this at all, received no fruits from
9   it.  There was no evidence that he received any
10  paving to his driveway.  There was no evidence that
11  he had any paving done to any of his family's
12  driveways.  There was no evidence whatsoever.  In
13  fact, it was just the opposite, that he ever asked
14  anybody for a vote.  The evidence on most of this
15  is that the reliance was on the employees
16  themselves who had been doing this work for 15, 20,
17  30 years.  Matter of fact, they seemed to have
18  exemplary employees as far as the number of years
19  they stayed with the position.  And they were all
20  saying, "Well, these are roads we worked on in the
21  past.  These were drives we worked in the past, and
22  these were bridges we had done in the past," and
23  that's the evidence in this case, Judge.

24          THE COURT:  Thank you.  And then finally,
25  Mr. Williams.

1          MR. WILLIAMS:  Thank you, Your Honor.

2    We've made an objection to the three-level offense

3    for Mr. Adams, Your Honor.  The guidelines

4    specifically mention for that enhancement there has

5    to -- has to be evidence of five or more persons.

6    In this case, paragraph 162 and 168 of the

7    presentence investigation report indicate that this

8    writer is considering that the offense involved

9    Ronnie Adams getting instruction to many unknowing

10   outsiders, namely county employees and

11   contractors.  And there's -- we don't believe

12   there's simply not any evidence of him supervising

13   certainly that number of people as required by the

14   particular guidelines in the commentary.

15         THE COURT:  Does he have to supervise five

16   or more persons?

17         MR. WILLIAMS:  I believe, based on the

18   enhancement, it says, "If a defendant was manager

19   or supervisor and the criminal activity involved

20   five or more participants, or otherwise

21   extensively."

22         THE COURT:  I think under one reading of

23   that he could have been in charge of two

24   individuals out of five, supervised those two

25   individuals, and the enhancement would still apply.

1          MR. WILLIAMS:  I understand that position,

2     Your Honor.  I think, though, the evidence would

3     show that there's not even any evidence of those

4     two participants, as you've indicated, at least by

5     name or by direction, as far as I understand the

6     testimony.  You know, you have indications from the

7     testimony that Mr. Adams went up to Bobby Reynolds

8     or Brandon Moore, but they weren't participants in

9     what the Government's claiming was done here.  The

10    phone call was allegedly made to Mr. Morgan, but he

11    wasn't a participant in this if he just took a

12    phone call.  Certainly, Mr. Adams wasn't

13    supervising him.

14          As far as the fruits go, I'll speak

15    briefly, as did Mr. Jensen, is that Mr. Adams

16    didn't obtain the fruits of this.  He wasn't

17    running for office at the time, and he didn't have

18    his personal driveway paved, so we don't believe

19    that applies.  Thank you.

20          THE COURT:  Okay.  Thank you.

21    Mr. Taylor.

22          MR. TAYLOR:  Well, I think the probation

23    officer got it right.  All the inferences from the

24    evidence was that there was a concerted effort,

25    again, backing away from the individual trees and

1    looking at the forest, there was a concerted effort

2    to do all of this.  And I'm not going to repeat

3    what "all of this" is; I've said it several times,

4    and then they each went out and did their

5    respective duties.  And the inferences from the

6    evidence, and clearly by a preponderance and

7    beyond a reasonable doubt, according to the jury,

8    there was a cohesive effort.  There was a

9    conspiracy to do this together, and we can tell by

10   its implementation what the plan was.  And it was

11   for Mr. Adams and Mr. Champion and Mr. Combs to

12   direct the pavers and the gravelers and the bridge

13   builders where to go.

14           There's an irony floating around out here

15   right now where three of the individuals or Judge

16   Thompson who stayed back at the courthouse says, "I

17   didn't do any of this.  I was back at the

18   courthouse."  And the others were saying, "I only

19   did what Thompson told me to do."  They can't have

20   it both ways.  I mean, it is -- in fact, it is both

21   ways.  Thompson was telling them what to do, and

22   they were doing it, and I think they each knew

23   generally, but not specifically, what each other

24   was doing.  And they had separate roles.  And I

25   don't think it is a defense that some of these

individuals had no authority legally.  I think it's
incriminating that they had no authority legally to
do what they obviously were doing, directing
gravelers and bridge builders and pavers, riding
around in the trucks, giving the okay.  Two of the
individuals simply had no authority to be working
at all in the road department.  The regular road
foreman was temporarily sent on a "see no evil"
mission up the north side of the county, and they
basically became de facto road foreman.

I recall one of the borrowed gravel truck
drivers who came in just for a little while,
pointed out -- I didn't know his name -- but
pointed out in the courtroom the man he thought was
the road foreman, and it was Mr. Champion, because
he was exercising apparent authority.  He was
holding himself out as having that authority.  And
but for the actions of these individuals, this
would not have gotten done.  And my memory, and I
don't have the transcript in front of me, but my
memory is different, though, of Mr. Webster's.  I
believe that Mr. Campbell did say that Mac Combs
was present when he had the meeting with
Mr. Thompson.  It could be one of the other
defendants, but my memory was that it was Mac

Combs.  But I know there were other defendants
there at these meetings.

Now, with regard to Mr. Thompson's
argument that he was back at the office and didn't
direct any of this stuff, didn't ask for a single
vote, didn't direct any pavement to be done, didn't
direct any gravel to be done, there's again,
inferring from the evidence, there's this
organization.  He's the one that brought in the
pavers, the off-beat pavers, I think I called
them.  He's the one that instructed them on the
plan and told them, as I recall, that they would be
given further instructions as to where to put the
blacktop.  To the extent that there was any doubt
about his complicity before it happened, that doubt
is erased by his actions after it happened and
after there began to be questions raised at both
the meetings by the auditor.  Had he been an
unknowing, non-participant whose orders to do right
were being violated by people who were doing wrong,
you would have expected a whole lot different
reaction by him when this became public.  There
would have been an attempt to make it right at that
time.

But again, there became this stonewalling

and this ran -- it all ran together, and so there's
this ratification which helps by inference show
what the intent was at the beginning.  So we parse
this evidence on -- the defendants parsed this
evidence unnecessarily to make these arguments.
But if you just look at it as a whole, the plan was
clearly there and the execution was clearly there,
and I think that the probation officer has it right
in giving it a four to Mr. Thompson and the three
to the others.  This was activity which was
otherwise extensive.  It involved pavers,
gravelers, bridge builders, county employees.  All
of those people had to be involved in this activity
to get the job done.

     THE COURT:  Okay.  Thank you.
Mr. Westberry, one final point.

     MR. WESTBERRY:  Thank you.  And I know at
this point, just to remind the Court how the effort
to -- if you recall the testimony, the effort to
get this money appropriated to do this road in
Knott County started months and months and months
before the election.  Now, the United States is
trying to argue that all this happened right before
the election.  That's not the proper context.  I
recall that it was the winter before, if not sooner

1   or later, that they first started to make an effort

2   to get these monies appropriated to do this road

3   work.  Indeed, some of the road work fixing up

4   continued after the election was over.  It was a

5   continuing process that occurred over time.  And I

6   don't, Judge, we do not believe that this kind of

7   adjustment is improper, given that it's also proper

8   just on the basis of inference along that line.

9            THE COURT:  Well, and I would say, I'm not

10  sure that it is correct to draw an inference from

11  large amounts of activity just before the election

12  in order to curry favor with the voters.  It is the

13  case, I think, that in a representative democracy,

14  elected officials not only do, but should, make

15  decisions that curry favors with the voters.

16           MR. WESTBERRY:  Correct.

17           THE COURT:  That's precisely what happens

18  in a representative democracy, so -- now, can you

19  do what the jury concluded these defendants did?

20  No, of course not.  But -- and I understand

21  Mr. Taylor's argument about this flurry of activity

22  and -- but I don't draw many -- much of an

23  inference at all in terms of wrongdoing simply in

24  terms of the timing involved.

25           MR. WESTBERRY:  And I'm speaking with

1  regard to -- just in terms of this particular

2  upward adjustment that the PSR recommends.

3          THE COURT:  Sure.

4          MR. WESTBERRY:  I'm not trying to revisit

5  what the jury concluded or did not.

6          THE COURT:  No, I understand.

7          MR. WESTBERRY:  I'm just asking you to

8  consider what we said in light of what the

9  Government has argued.

10          THE COURT:  All right.  Okay.  Thank you.

11  All right.  Counsel, I'm going to do two more

12  things before we take a break for lunch, and we

13  will take a break for the lunch hour here in a few

14  minutes.

15          I have reviewed carefully all of the

16  factual objections that have been made by each of

17  the defendants, many, many factual objections to

18  specific factual information that's contained in

19  the PSR, and we don't need to argue every one of

20  those objections that have been raised.  I will

21  tell you that my concern, though, is over matters

22  that are simply incorrect.  And the extent to

23  whether they exist in the minds of any of the

24  defense counsel factual information in the PSR

25  that's just incorrect, and that would be akin to,

to use a hypothetical example, the defendant's car
is blue, and in fact it's red.  I think the
guidelines are very broad in terms of the
information that can be included in a presentence
investigation report, the source of that
information, and it's unlikely that I'll sustain
many of those objections.  But what I do want to do
is make sure that there does not remain -- there've
been corrections already made that in the minds of
any of the defense counsel, there does not remain
something that's just factually wrong.  This really
goes more to the -- none of this affects the
guideline calculation of the remaining factual
objections, as best I can tell, but this just goes
to the information I'm relying on in terms of
ultimately making the sentencing decision.

So, Mr. Westberry, I'm going to ask each
counsel to identify any of the objections that are
in that category.  We could revisit it again after
the lunch hour, now that you know what I'm looking
for, but I'd be inclined not to, but I'll give you
that opportunity to come back and say, "Well, there
is this one that we need to talk about."  But first
of all, Mr. Westberry.  You always get the
advantage of going first and --

1         MR. WESTBERRY:  Yeah, that's fine.  Thank
2    you.  I know that we pointed out several in our
3    objections to the presentence investigation report,
4    and these are, as you say, what we consider
5    mistakes that really don't have any bearing at all
6    on the guideline calculation.  You know, I'm just
7    -- I can't remember --
8         THE COURT:  Okay.
9         MR. WESTBERRY:  -- off the top of my head,
10   other than what we've already submitted to you in
11   writing.  Sorry.
12        THE COURT:  No, that's okay.  And defense
13   counsel very appropriately many, many times over
14   has said, "Well, the PSR contains this
15   representation about what somebody testified to or
16   information provided to an agent.  But what we know
17   is that there were other people who said something
18   different, or this particular individual testified
19   inconsistently."  Well, that's fine.  That's -- but
20   there's nothing factually wrong with the fact that
21   in the PSR there's a reference to information that
22   came from somewhere.  We can have a debate about
23   the importance that should be given to it, but
24   that's a different issue.  Mr. Webster.
25        MR. WEBSTER:  They don't have me listed as

1  counsel in the PSR, but that was probably a good

2  idea.

3          THE COURT:  Well, I can certainly take

4  judicial notice that you are indeed counsel.

5  Mr. Webster.

6          MR. WEBSTER:  I've already covered the new

7  road adoption.  I've covered some of the others,

8  some of the ones that are incorrect.  Paragraph 27

9  claims that Mr. Combs was the deputy

10 judge/executive under Mr. Thompson.  He was never.

11         THE COURT:  And that's not yet been

12 corrected.

13         MR. WEBSTER:  That's right.

14         THE COURT:  Okay.

15         MR. WEBSTER:  He -- and flowing from that

16 is that he did not have decision-making authority

17 at any level on this.  Paragraph 69 claims that he

18 rendered decisions as to paving.  He did not, could

19 not have, and there's no evidence that he did in

20 any way.  I've covered the inaccuracies about the

21 places he went and the things he's supposed to have

22 done.  Paragraph 169 is based upon my prior, that

23 supposes he was a manager or supervisor.  There's

24 no evidence of that.  Paragraph 171 declares that

25 he has inherently -- that he was in position of

1   public trust as defined by the regulations.  He

2   never fit the provisional regulation of that

3   Section 3B1.3.

4           THE COURT:  Which are really more in line

5   with kind of general arguments you've made as to

6   those issues, so I understand?

7           MR. WEBSTER:  That's correct.  And other

8   than my -- the presentence report is taken from

9   investigative reports, and quite frankly, we were

10  pleased at the trial when those people did not

11  testify the same way those reports indicated.  The

12  question is, can the Court give preponderance of

13  the evidence away to testimony that is contrary to

14  sworn testimony at trial.  Thank you.

15          THE COURT:  Well, I think the answer is at

16  sentencing that the investigative report

17  information that's in front of me simply is -- the

18  trial testimony is in front of me as well, and I'll

19  weigh that and as it is appropriately in front of

20  me at the sentencing stage.

21          Mr. Taylor, with regard to Mr. Webster's

22  representation that there was no evidence that

23  Mr. Combs was a member of the Knott County Fiscal

24  Court or deputy judge/executive at the time of the

25  offense, does the Government object to that

representation?

MR. TAYLOR:  One moment.  Mr. Combs'
status through all of this has been somewhat
difficult to define.  I know he was a deputy
judge/executive at one time, I think when he was
running for the primary, in the primary against
judge -- the other Democrats.  After he lost, he
was given some kind of carry-over position by Judge
Thompson, reportedly to allow him to obtain his
retirement, but I'm not sure exactly what that
position was.  When he was engaged in what we call
the conspiratorial activity in this case, I'm not
sure what his official position was.  I know the
jury asked for everybody's official position, but
it wasn't really very clear.  And then at some
point, he was appointed to run the sports complex
or something, recreation director, but he was
drawing pay, but it was not real clear what his
position was.  But he was at one time, and I can be
corrected if I'm wrong, deputy county
judge/executive.

THE COURT:  But you're not representing it
was necessarily at the time of the offense conduct
in terms of the time period charged in the
indictment?

1          MR. TAYLOR:  No.  Again, I don't know what

2     his official title was during that period of time.

3          THE COURT:  All right.  Okay.  Thank you.

4     Mr. Jensen.

5          MR. JENSEN:  Your Honor, if I may, I won't

6     have much to say, if I can just stand here.

7          THE COURT:  Absolutely.

8          MR. JENSEN:  I don't really -- anything

9     that affects the guidelines, I don't have a dispute

10     with.  The only thing I didn't argue before is the

11     two-level increase that probation put on --

12          THE COURT:  Yes, certainly.

13          MR. JENSEN:  -- for abuse of trust.  And

14     basically that requires a substantial discretionary

15     judgment.  And I would argue the same arguments I

16     made on the three-point increase as to this, Your

17     Honor, without belaboring the point any further.

18          THE COURT:  Okay.  Thank you.  And then

19     finally, Mr. Williams.

20          MR. WILLIAMS:  Your Honor, may I also

21     stand here?

22          THE COURT:  You may.

23          MR. WILLIAMS:  Your Honor, in the PSR

24     there are certain paragraphs that deal with the

25     issue of Mr. Adams' status as a member of the

fiscal court and the time frame that occurred.

I've already argued to the Court previously about

this, but his tenure ended on December 31, '06.

And when we brought this out in the subsequent

addendum to the PSR, it said, "Well, I think he's

still a member of the fiscal court."  And we just

object to that, Your Honor.  I think his tenure

ended under current law December 31, 2006.  He was

no longer a member.  So references to him being a

member after that time, we object to.

This issue also of what his role was after

that election of '06 occurred, though, also comes

into play.  There's references at certain points in

the PSR, Your Honor, about what Mr. Adams may have

said to a truck driver.  And this came up in trial

also, Your Honor.  But -- and it had to be

clarified on a couple of occasions that in January,

'07, Mr. Adams did become infrastructure director,

not road foreman, but that was his title,

infrastructure director.

So we've objected to references in the PSR

to things he may have said to a gravel truck driver

after he became infrastructure director in '07, and

after any of this activity that the Government

alleges was illegal is just confusing and was never

1    really pointed out when those statements were

2    supposed to have been made.  So we can't make any

3    argument about when it occurred and whether he was

4    a magistrate or not at the time.

5           Also, on the abuse of trust, Your Honor,

6    we haven't discussed that yet, but we discussed it

7    in our brief and we rely upon arguments in our

8    brief on that.  It doesn't affect the guidelines,

9    Your Honor, but we argue that Section 171 of the

10    Constitution of Kentucky doesn't specifically

11    prohibit what's indicated there.  There is a

12    reference at one point in the PSR, Your Honor, to

13    Mr. Adams being the owner/operator of a paving

14    company, and that's in paragraph 29.  He is not the

15    owner/operator of a paving company.  Never has

16    been.  There are a couple of references, Your

17    Honor, to Mr. Adams' activities as it relates to

18    Brandon Moore.  And to the extent that the jury

19    acquitted him of that conduct and there's been an

20    order of acquittal entered, we object to that

21    testimony, or that statements indicating that he

22    did those things, when in fact, the jury acquitted

23    him on those.  And I think that's it, Your Honor.

24    Thank you.

25           THE COURT:  Okay.  Thank you, Mr. Jensen.

Mr. Williams is done.  Okay.  And I think what I'm
going to give all counsel an opportunity to do is
to identify any specific arguments related to their
client as it relates to the guidelines calculation
that you'd just like to complete the record on that
may not apply to the other defendants.  I am aware
that we haven't talked about every single
adjustment, but I've pointed you in the direction
to the ones that I felt like oral argument would be
helpful to me on.

        And so, Mr. Westberry, let me just begin
with you to give you kind of a final word here.

        MR. WESTBERRY:  Thank you.  Regarding this
issue of trust, we would stand on our previously
filed objections.  I would like to talk to the
judge just a moment about the multi-count
adjustment that resulted in a one-level.

        THE COURT:  Yes, and that only applies to
your client, so I would like -- it makes a
difference only with regard to --

        MR. WESTBERRY:  Yeah.  What the PSR
recommends is essentially that he's been convicted
of two conspiracies.  But what the PSR does not
take into account and what we briefed to Your Honor
is application note 4.  And if I could --  it's not

1  very long, if I could just slowly read the relevant

2  portions of it.  It's 1B1.2.

3          With regard to this multi-count

4  adjustment, application note 4 says this:

5  "Particular care must be given in applying

6  sub-section D because there are cases --" and I'll

7  slow down, Judge, I know you're trying to --

8          THE COURT:  No, it's okay.  Go ahead.

9          MR. WESTBERRY:  "There are cases in which

10  the verdict does not establish which offense was

11  the object of the conspiracy.  In such cases, this

12  sub-section D should only be applied with respect

13  to an object offense that's alleged in the

14  conspiracy count if the Court where sitting as a

15  trier of fact, would convict the defendant of

16  conspiring to commit that object offense."

17          You will recall the verdict that was

18  returned was a general verdict in this case.  There

19  were two separate conspiracies, though, charged in

20  the indictment and submitted to the jury,

21  conspiracy to commit votes or conspiracy to

22  misappropriate.  And what I'm asking, if you would

23  consider the testimony that you heard as a trier of

24  fact.  I don't believe -- and I've alluded to this

25  in my earlier arguments to Your Honor -- I don't

believe with regard to Mr. Thompson that there's

just been any vote buying.  I recognized they

returned a verdict either/or.  It appears as though

it would be misappropriation among the two.  But I

don't think a reasonable trier of fact could have

listened to that testimony for two weeks that we

heard and come away with the belief that he was

convicted of a conspiracy to commit vote buying.

If you find that he was not, the one-level

enhancement for a multi-count adjustment would not

apply.

THE COURT:  Okay.

MR. WESTBERRY:  Thank you.

THE COURT:  Thank you.  Mr. Taylor, why

don't you just speak to the vote buying part of

that particular argument and whether or not you

believe, if I was the jury in this case, there was

sufficient evidence to convict Mr. Thompson of vote

buying.

MR. TAYLOR:  Well, clearly, there was a

motive for the misappropriation.  There's been no

evidence Judge Thompson had his driveway paved or

that he got paid any money for these driveways.  So

what was the motive for paving these private

driveways?  It was for votes.  The jury did

1    convict, was it one or two counts, of vote buying.

2            THE COURT:  Does there have to be

3    evidence, though, that Mr. -- we see the benefit

4    here, theoretically, the benefit to Mr. Thompson?

5    Does there have to be some evidence that would have

6    been presented however specific to him?  In other

7    words, a phone conversation, a, you know, some

8    evidence that he in fact was engaged in this direct

9    quid pro quo?

10           MR. TAYLOR:  I think it has to be

11    inferred, yes, that he conspired to do this with

12    others and had a general knowledge of the object of

13    the conspiracy, that he joined the conspiracy.  And

14    it's circumstantial certainly, it's inferential,

15    yes, but I believe when this scheme was hatched,

16    the scheme was, whether it was articulated in so

17    many words or not, but it was to trade blacktop for

18    votes, part of it.

19           THE COURT:  And the issue as it relates to

20    this adjustment is not whether -- really whether

21    he's directly guilty of the crime of --

22           MR. TAYLOR:  Of the substantive act.

23           THE COURT:  -- of vote buying.  It's

24    whether or not he's guilty of the conspiracy --

25           MR. TAYLOR:  Right.

1          THE COURT:  -- and so --

2          MR. TAYLOR:  Well, was the nature of the

3    agreement whether the agreement was expressed in

4    words or just implied or conferred, and I used the

5    term a wink or a nod or whatever it was, but was

6    there a general understanding among the

7    co-conspirators that this blacktop would be traded

8    for votes?

9          Now, a lot of this was not articulated.

10   The Morgans, for instance, it was not articulated

11   that they were expected to vote in a certain way.

12   It was certainly implied, and we didn't charge that

13   as vote buying.  But we charged some others as vote

14   buying, and the jury convicted on one.  And we

15   believe they acquitted on the other, not because

16   they didn't believe it was vote buying, but because

17   they weren't for sure because of the testimony that

18   the person that bought the vote was Ronnie Adams,

19   that -- that individual was a little -- while he

20   was clear that there was a quid pro quo for his

21   vote, his identification of the defendant was

22   somewhat equivocal.  And they convicted him of a

23   vote buying, which was a little less sure than the

24   one they acquitted on in terms of the actual

25   conduct.

1    So the jury clearly believed beyond a

2   reasonable doubt that within the parameters of this

3   over-ardent conspiracy, that there was actual vote

4   buying going on.  Well, Judge Thompson, not to be

5   in a conspiracy, one would have to believe that

6   these other individuals -- that the ones who did

7   buy the votes were acting totally on their own and

8   outside the scope of the original agreement.

9    THE COURT:  Okay.  All right.  Thank you.

10   Mr. Westberry, final word.

11    MR. WESTBERRY:  Well, in order to sustain

12   a conviction for vote buying, there must be some

13   quid pro quo.  I don't think any kind of quid pro

14   quo was shown with regard to Mr. Thompson.  And

15   again --

16    THE COURT:  What about by a co-conspirator

17   in terms of conspiracy?  In other words, I have to

18   agree with you, you have to show the quid pro quo

19   if we were charging Mr. Thompson directly with the

20   vote buying, but this is about whether he was part

21   of the criminal agreement.

22    MR. WESTBERRY:  Right.  One person,

23   Brandon Moore, testified to some quid pro quo with

24   another defendant.  I specifically asked Mr. Moore

25   on cross-examination, "Did Mr. Thompson at any time

1 ever approach you and ask --"

2 THE COURT: For purposes of argument,

3 let's say that Mr. Thompson did not engage any

4 direct, "Listen, we're going to come pave your

5 driveway, but I need you and your family to come

6 vote for me." Let's assume for argument that that

7 does not exist, but it does exist with regard to a

8 co-conspirator.

9 MR. WESTBERRY: Well, that's what the

10 application note 4 specifically addresses. In

11 situations like this where you have dual conspiracy

12 theories, vote buying misappropriating --

13 THE COURT: Right.

14 MR. WESTBERRY: -- special care must be

15 given.

16 THE COURT: Right. But my job is not to

17 determine whether he could have been convicted of

18 vote buying as a substantive count, but whether

19 conspiracy as to buy votes as a substantive count.

20 And so I agree with you; I need to make an

21 independent determination in terms of the

22 calculation that's taken place here.

23 MR. WESTBERRY: Right.

24 THE COURT: But it's not about whether or

25 not -- and it's really applying the conspiracy

criteria specifically to the vote buying, as
opposed to whether he would have been substantively
convicted himself of vote buying.  And as you know,
in the conspiracy, he would not have had to be the
person necessarily out there making the deal.

MR. WESTBERRY:  I just don't think on the
bare face of the record that's before you.  You're
in an awfully difficult position as a trier of fact
to know what you would have done under those
circumstances.  There's just a lot of proof in the
record that he was disassociated and far removed
from vote buying as a person could possibly be.  So
you have to choose in conspiracy to commit vote
buying, conspiracy to commit misappropriation.  I
just don't think the vote buying is satisfactory.

THE COURT:  That's fair.  All right.
Thank you.

MR. TAYLOR:  Can I state one thing that
just came to my mind?

THE COURT:  Yes, certainly.

MR. TAYLOR:  This goes to the issue of not
only the original intent of the conspiracy, but
Judge Thompson's personal state of mind during the
period of a conspiracy as to what his expectations
of the use of this blacktop was.  And I can't

1    remember her name, maybe the agent can, the lady

2    who came in, and while admittedly, she lived on a

3    public road, there was some issue as to whether or

4    not she should get blacktop on that road.  What's

5    her name?

6            MR. WESTBERRY:  Sheila Calhoun.

7            MR. TAYLOR:  Sheila Calhoun.  And she was

8    offended when she finally got it resolved that it

9    was the county and he would be paving it for her,

10   and he made the remark, "Now, how many votes will

11   this get me?"  And so that shows the -- while

12   that's not an instance of vote buying because there

13   was no private property improved for the vote, it

14   shows what his intentions were and the state of

15   mind was with regard to the use of this blacktop.

16   So I just wanted to add that to the mix when it

17   comes to the issue of the conspiracy.

18          THE COURT:  Well, but you're conceding

19   that he was looking to garner votes by doing

20   something that he legally could have done in terms

21   of providing service to the county.

22          MR. TAYLOR:  He could have legally paved

23   that road, yes.

24          THE COURT:  Yeah.  And that's what elected

25   officials should do.  We can have a debate about

1  whether what they're doing is good public policy,

2  but that's not an argument --

3       MR. TAYLOR:  I would not agree with the

4  Court that that's what they should do if the sole

5  purpose for doing it is to curry favor.  I think if

6  it needs to be done and that's an ancillary benefit

7  of doing it, then certainly.  But to allocate

8  government resources on the basis of votes and not

9  on need, true need, is -- I don't think is wise.

10  But again, that's -- we're not here to discuss

11  public policies.

12       THE COURT:  Do you think the sports

13  complex was an effort to curry votes?

14       MR. TAYLOR:  I would have to -- I don't

15  know enough about the politics of Knott County to

16  say what the climate was, whether that was a good

17  expenditure or not, but if it's a bad expenditure,

18  then --

19       THE COURT:  Voters can decide, though, is

20  the point I'm making.  Voters get to decide what's

21  a good expenditure and what's a bad expenditure.

22       MR. TAYLOR:  Yeah, ultimately, right.

23       THE COURT:  But the idea is that you're

24  making the kind of expenditures that the

25  individuals vote for you.

1        MR. TAYLOR:  To a certain extent, yes.

2        THE COURT:  All right.  Well, Counsel, let

3   me just -- I think you know the final thing that

4   I'd want, to the extent that you have a specific

5   issue, specific to your client that's not been

6   raised, and you want to make sure that the record's

7   clear on it.  I've looked at all the objections, so

8   I've read everything that's been filed as it

9   relates to these objections.  But Mr. Westberry had

10  one that was in terms of the way the guidelines are

11  calculated that are specific to Mr. Thompson.

12        So, Mr. Webster, you look anxious to stand

13  up and keep us all from our lunch, so I'll allow

14  you to do that, but I'm going to put the blame on

15  you, sir.

16        MR. WEBSTER:  I went to Danville the other

17  day to court and they didn't have electricity,

18  water or food, so I made it through that day.

19        There's no showing in this case of

20  economic loss to Knott County from hiring the

21  bridge foreman.  Such could only be shown if the

22  county got less than full value for that money.

23  The testimony in this case about valuing of losses,

24  the total testimony in this case about public funds

25  used --

1          THE COURT:  So are we back on the loss
2     now?
3          MR. WEBSTER:  Well, I want -- as I under
4     -- before Mr. Westberry got up the last time, I
5     thought we were talking about our specific
6     guideline ranges that you thought ought to apply to
7     our client, and that's what I was prepared to do.
8     Maybe I misunderstood you.
9          THE COURT:  You know, my only concern is,
10    I mean, I feel like I've fairly got before me the
11    arguments as relates to the loss, and that's
12    obviously going to have some impact on the
13    guideline calculation for everybody.  What I'm
14    focused on is whether there's any adjustment that's
15    specific to your client that we need to focus on.
16         MR. WEBSTER:  Specifically, I think
17    Mr. Combs is entitled to a four-point reduction for
18    the --
19         THE COURT:  For the mitigating role?
20         MR. WEBSTER:  -- for the minor role.
21         THE COURT:  Yeah, the minor role.
22         MR. WEBSTER:  The guidelines talk about
23    being among the least culpable for the group.  And
24    certainly, you can argue and have argued that
25    there's no testimony of culpability here.  But to

go out a few hours with the gravel truck is the
only thing they have shown here. They've not shown
that he had any association or meeting with
anybody. And when Mr. Taylor says it's hard to
figure out what this guy's job was, that's all a
matter of public record. People get hired for jobs
on the minutes of fiscal court. That would be
fairly easy for him to have determined.

So we think the -- there should be a
four-point reduction for minor role, and we think
the total economic loss in this case is clearly
less than $120,000, and that would get us down into
a more sensible guideline range. Thank you.

THE COURT: Okay. Thank you.

MR. WESTBERRY: Are you going to do
downward departures after lunch?

THE COURT: Yes, absolutely. Yes. Okay.
Mr. Taylor, let me let you respond to that to the
extent that you wish.

MR. TAYLOR: I think I've already covered
all of that. I think Mr. Combs had an equal role.

THE COURT: Thank you. And then
Mr. Jensen.

MR. JENSEN: Nothing further, Your Honor.

THE COURT: And, Mr. Williams?

1      MR. WILLIAMS: Your Honor, I don't have

2  any further argument, other than what Mr. Westberry

3  made, but I had that same objection to the PSR as

4  reference to Mr. Adams on 1B1.2, and I'll just rely

5  on my written arguments there.

6      THE COURT: Okay.

7      MR. WILLIAMS: And if it please, I do have

8  some letters written on Mr. Adams' behalf that I

9  forwarded to Mr. Hall in October that I would like

10  to tender to the Court.

11      THE COURT: All right. Do I have copies

12  of those already?

13      MR. WILLIAMS: You had indicated earlier

14  that you had letters on behalf of Judge Thompson

15  and Mr. Combs.

16      THE COURT: It may have been Mr. Adams

17  that I had received letters on. But please tender

18  those so we can make sure the record's complete.

19      MR. WILLIAMS: Thank you.

20      THE COURT: Okay. Well, let me talk a

21  little bit about where we'll go after the break.

22  I'm going to, when we reconvene, rule on the

23  objections that have been made to the presentence

24  investigation reports as to each particular

25  defendant, and I'll state my rulings on the record

1    at that time.  And then we'll state, to the extent

2    that the calculation and changes in terms of

3    recommended sentence, we'll state that as well.

4         Now, that's only one factor that I

5    consider.  I'm required as a federal judge to make

6    sure that that recommended sentence is correct in

7    terms of the way it's been calculated and the

8    information that's been used, and so we've spent a

9    good bit of time to do that.  But we will turn then

10   to the 3553(c) factors this afternoon and focus

11   more specifically on those other factors that I

12   should consider as a federal judge in making this

13   particular determination.

14        Let me get a sense from, first of all,

15   you, Mr. Taylor, the amount of time you think

16   you're going to need to address those factors and

17   whether you anticipate calling any witnesses.

18        MR. TAYLOR:  I don't intend on calling any

19   witnesses, and I don't need a lot of time; 15

20   minutes should cover it.

21        THE COURT:  Okay.  And, of course, I've

22   read the memorandums that have been filed on behalf

23   of every defendant.  This is mostly a question

24   about whether there will be any testimony or

25   witnesses that the individuals will want to call.

1    So, Mr. Westberry, let me recognize you.

2              MR. WESTBERRY:  We'd like an opportunity

3    to consider, with your permission, to calling two,

4    at most, witnesses.

5              THE COURT:  Okay.  Okay.

6              MR. WESTBERRY:  And it will be short.

7              THE COURT:  Okay.  Mr. Webster?

8              MR. WEBSTER:  Doubt that we would call

9    any.

10             THE COURT:  Okay.  Mr. Jensen?

11             MR. JENSEN:  I don't have any witnesses,

12   Your Honor.

13             THE COURT:  And then finally,

14   Mr. Williams?

15             MR. WILLIAMS:  No, Your Honor, no live

16   witnesses.

17             THE COURT:  Okay.  Well, we will turn to

18   that.  There will be a brief recess once the

19   arguments have been made to the 3553(a) factors,

20   and then we will impose the sentences in this

21   particular case.

22             All right.  Let me see if there are any

23   matters we need to take up before we break for the

24   noon recess, now the 1:00 recess.

25             I'd ask the parties be ready to reconvene

1    at 2:15, and we'll reconvene for the afternoon

2    session.  We'll stand in recess.

3              [RECESS – 12:58 p.m. – 2:47 p.m.]

4              THE COURT:  All right.  Well, thank you

5    for your patience.  I've spent the recess

6    considering the arguments that counsel have made

7    and reviewing the objections that have been made to

8    various provisions of the guidelines calculation.

9              Before I talk about that, though, I want

10   to indicate that I also used the recess to read the

11   letters that had been tendered to me by

12   Mr. Williams on behalf of his client by Mr. Adams,

13   and I'll direct that those be filed in the record.

14             Well, we need to begin in terms of

15   correctly calculating the guidelines with correctly

16   estimating the loss that is at issue in this

17   particular case.  This affects the guideline

18   calculation as it relates to each defendant, so I'm

19   going to begin there.

20             We know from the record that the Kentucky

21   Auditor of Public Accounts, after the audit was

22   conducted by that institution, found that in the

23   words of the audit that the risk of fraud with

24   regard to the matters that have been looked into it

25   was too high.  That found as well that there were

serious weaknesses in the design of internal
controls within the county, and that some internal
controls were actually overridden.  It then
determined that there was an amount rounded here at
$780,814 that in its term could not be validated.
In other words, it may or may not have been used
for appropriate purposes.  But unlike the remainder
of the $1.5 million, or perhaps $2 million, if you
use some old year funds or some funds that were
already available, that particular amount could not
be validated, and so that's where we begin; we
start there.

There does seem to be an agreement by both
the Government and certainly by the defendants that
that amount overstates a loss that's here.  It's
not the end of the analysis, because my job is to
make a reasonable assessment of what portion of
that amount of money should be reasonably allocated
as the loss that the county faced, and also as it
relates to restitution in this particular case.

The defendants argue that I really only
should limit my consideration to those specific
instances that the Government chose to focus on at
trial and bring forth specific evidence with regard
to driveways, for example, that were clearly

private driveways, and that evidence was brought
forth.  But there's a reasonable inference in my
judgment that there were other roads, perhaps
dozens of other roads.

I've noted the audit, which I think raises
a concern about those funds generally.  I've noted
in my -- in the argument that took place earlier,
the discovery list that lists somewhere between 14
and 31 private roads that perhaps could be
considered as well.

The Government correctly points out that
there was testimony at trial that suggested that
Mountain Enterprises left the county.  There was
conflicting evidence about the reason it left the
county.  But there was some evidence to suggest
that they were concerned with regard to the work
that was about to take place, all of which, it
seems to me, serves to provide a group of data that
in essence, is a sampling; it's not a scientific
sampling, but at least is some touchpoints of data
to suggest the scope of the problem and the scope
in terms of the work that was performed and the
scope of that $780,814 that could be considered.

Now, the Government uses the phrase "dual
use roads," and the phrase that these fall into a

"gray area," and, of course, we all recall, that
was kind of a fundamental issue at trial in this
particular case.  Various defendants argued -- all
defendants argued fairly forcefully that there were
certainly roads that it was not clear at all, that
they weren't public roads.  There was a fair
argument to be made as to what is -- what
constitutes a public road.  And I do think that
this is a case, after listening to the testimony at
trial and the Government's concession, that it only
brought the clear-cut examples forward to suggest
that the vast majority of that $780,814 should not
be included in an assessment of the loss to the
county.  That these dual use roads, for example, I
don't think it's appropriate or reasonable to
include those in terms of some estimation as to how
much of that loss should be allocated.

        And after considering the arguments that
have been made here today and reviewing the
information provided to me in the presentence
investigation report and recalling the testimony at
trial, I think a reasonable estimate of that loss,
as it relates to the paving of the roads, is the 25
percent figure which the Government has identified
as its position in terms of assessing what that

loss should be.  That's $195,203.50.

Now, what about the bridges?  We know that there were a number of bridges constructed during this particular period.  There were 23 bridges constructed, the evidence indicates, and there is evidence that anywhere from four to six of these bridges were perhaps private and would have fallen out of -- there may have been others; we don't know for sure -- but it seems like a reasonable estimate in terms of a loss should center on that much smaller figure out of the 23, and centers specifically on the middle number, which is five bridges.  So in terms of trying to find a reasonable estimate here, I've determined that there were at least five bridges, and that's the number that I'm going to assign in terms of the loss that were private bridges, and so the county should not have been expending funds on those particular bridges.

There's some evidence at paragraph 32 of Mr. Combs' presentence report, some evidence that a Ms. Cornett was offered a bridge or asked whether she would pay $3,000 for a bridge in her particular property.  There was some representation that perhaps the bridge cost was somewhere in the

neighborhood of $4,500 in order to provide the
materials for a new bridge.  I've used the figure
$3,700, and applied it to those five bridges and
come up with $18,500 in terms of the cost of a
bridge.

Now, there is the suggestion that also the
inappropriate use of the funds related to a foreman
who was paid to build bridges during the day, being
paid again to build bridges at night, which, of
course, is fine, as long as they're not working on
bridges that are private bridges.  That total
amount of funding was $69,411.  And again,
consistent with my reasonable estimate in this
case, I believe that amount should be $15,089.

There was also some testimony there was at
least one other employee that was being paid for
work in the evening, and I've not calculated any
figure with regard to that employee because I
didn't find sufficient evidence to suggest that
that work related to bridges that were
inappropriately being constructed.

Now, there is gravel, there's other costs
that very well could have, for this proportionate
assessment, could have amounted to tens of
thousands of dollars, but I think it's reasonable

1    to add another $10,000 to this figure to relate to

2    the testimony related to the amount of gravel that

3    was put down on private roads and other costs

4    relating to personnel and other costs throughout

5    the county.

6            If my math is correct then, that $195,204,

7    to round it up, $18,500, $15,089, and $10,000 is a

8    total of $238,793. So it will be my finding that

9    the loss in this case is that amount.

10           Okay. What I want to do now is for each

11   defendant just go through the objections to the PSR

12   that have been identified and create the record

13   with regard to those objections. So just take a

14   few minutes. We're going to go through those, and

15   I'll rule on the other objections as well.

16           I'll begin with Mr. Thompson's

17   objections. And I will deny Mr. Thompson's

18   objections in Objection No. 1, No. 2, No. 3, No. 4,

19   No. 5. I will deny in part and grant in part,

20   consistent with my ruling as it relates to the loss

21   in this particular case. With regard to the

22   objection regarding obstruction of justice, which

23   is Objection No. 6, I do believe that to the extent

24   that the obstruction of justice enhancement was

25   added to the presentence investigation report and

the guideline calculation, based on the vote taken
by the Knott County Fiscal Court, that is not an
appropriate enhancement as it relates to
obstruction of justice.  If there had been some
evidence, for example, that they -- the Knott
County Fiscal Court had pre-dated or had tried to
falsify the date prior to the work taking place,
rather than coming subsequent to the work, then I
think it could have perhaps risen to that
particular level.

Second, although there was this wholesale
adoption, the record doesn't indicate that the vast
majority of those were new roads being adopted in
the plan.  In fact, it was kind of a re-adoption of
all of the roads with perhaps a few additional
roads coming into the plan, and clearly, I think
the fiscal court, trying to act in a way that was
consistent with prior decisions that could have
been made.  It was made in a vote that was not --
you know, was in regular course of their business
and the regular course of order.  It may have
been -- could have been characterized in some ways
to have been correcting a problem that they saw,
and I recognize that the Government has a more
pejorative description of that, but in terms of

1  that particular enhancement, I will grant the

2  objection at Objection No. 6, and will not include

3  that enhancement for obstruction of justice on

4  behalf of Defendant Thompson.

5       Now, as to Objection 7, which is the role,

6  I'm going to deny that motion.  And I'll just say

7  I'm going to deny as it relates to each of the

8  defendants in this particular case.  I believe that

9  with regard to Mr. Thompson, his role as it relates

10  to his position in the county and his benefit that

11  he would receive as the person who would be

12  re-elected in the county in the event that the

13  conspiracy, in essence, was successful, is

14  sufficient to grant the enhancement for his

15  particular role in the instant offense.  There's no

16  question that one of the persons that would have

17  stood the benefit from success of the conspiracy

18  most would have been Judge Thompson.  And so I

19  think that increase is appropriate in this

20  particular case.

21       I would say a word about the pseudo-count

22  in this particular case and arguments that had been

23  made with regard to that count.  And I do think it

24  is my responsibility to determine whether or not if

25  I had been the trier of fact, that I could have

found the defendant guilty as it relates to the conspiracy to commit the vote buying. I think the evidence is certainly sufficient on the misappropriation of funds, but what about the vote buying?

I note just for the record, going back to the basic elements of conspiracy, which is Instruction No. 11 in the instructions given in this particular case, that you had to have first, two or more persons who conspired or agreed to commit the crime of paying or offering to pay persons for voting in an election held in part to elect a member of the United States House of Representatives, and the second part of that was for misapplication. That the defendant knowingly and voluntarily joined that conspiracy, and that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

The parties will recall the instruction as well and the defendants' connection to the conspiracy in which the jury was told, "If you are convinced that there was a criminal agreement, then you have to decide whether the defendants knowingly and voluntarily joined that agreement," and that's

1     what would have to be shown in this particular case

2     with Mr. Thompson.  The jury was instructed to

3     convict any defendant.  "The Government must prove

4     that he knew of the conspiracy's main purpose, and

5     that he voluntarily joined in it intending to help

6     advance or achieve its goals."  The instruction

7     goes on specifically to say that, "This does not

8     require proof that a defendant knew everything

9     about the conspiracy or everyone else involved, or

10     that he was a member of it from the beginning, nor

11     does it require proof the defendant played a major

12     role in the conspiracy, but that his connection to

13     it was substantial.  A slight role or connection

14     may be enough."  "What the Government must prove,"

15     going on later in the instruction, "is that the

16     defendant knew the conspiracy's main purpose and

17     that he voluntarily joined it intending to help

18     advance or achieve its goals."  This is essential,

19     and as I think relates to the pseudo-count that it

20     could in fact, and if I were the trier of fact,

21     that I could have reached that conclusion as it

22     relates to that count.  For that reason, I will

23     deny Objection No. 8.

24          Now, let me just say a word about the

25     factual objections with regard to each of the

1    defendants.  There's a large number of objections,

2    numbers 1 to 24, as it relates -- or 25 -- as it

3    relates to Mr. Thompson.  18 United States

4    Sentencing Guideline, Section 3661 and Section

5    1B1.4 indicates that no limitation shall be placed

6    on the information concerning the background,

7    character, and conduct of a person convicted of an

8    offense which the Court may receive and consider

9    for the purpose of imposing an appropriate

10   sentence.  So while I have considered the arguments

11   that have been made as part of those particular

12   objections, I'll deny those objections to the

13   extent that they would require an amendment to the

14   presentence investigation report.

15            Okay.  Having ruled as relates to

16   Mr. Thompson, let me now indicate the change that

17   takes place as it relates to the guidelines in this

18   particular case.  Mr. Thompson's offense level

19   consistent with my rulings is now at 25, instead of

20   a 29.  He's a criminal history category of 1, and

21   the guideline range in terms of any fine in this

22   case is $10,000 to $477,586, with a total offense

23   level of 25, no criminal history at all.  The

24   recommended range of imprisonment for Mr. Thompson

25   is now 57 to 71 months.

1    Okay.  I'll note again any of the other
2  objections that have already been raised.  Let me
3  see, Mr. Westberry, if there are any matters or any
4  questions you have about my rulings with regard to
5  the presentence investigation report for
6  Mr. Thompson.
7    MR. WESTBERRY:  None other than me
8  preserving our objections that we briefed and
9  argued earlier, Your Honor.
10    THE COURT:  Thank you, Mr. Westberry.  As
11  to Mr. Combs, I would just note and incorporate by
12  reference my rulings as relates to the loss in this
13  case and grant in part and deny in part Objection
14  No. 1 and No. 2 as it relates to the loss
15  consistent with my ruling.  As it relates to the
16  aggravating role in the adjustment, I do recognize
17  that there is some question about nomenclature, and
18  I will grant the request to the extent that it was
19  raised in objection to indicate that there was no
20  evidence that John Combs was a member of the Knott
21  County Fiscal Court or deputy judge/executive at
22  the time of offense.  But I'm going to deny the
23  objections beyond that as it relates to a request
24  that there be no aggravating role adjustment.
25  Again, this is a case in which there was a

1    conspiracy that had more than five people involved

2    in it, whether they knew about the criminal conduct

3    or not.  And each of these defendants had some kind

4    of role in which they were directing, they were

5    providing some leadership role as it related to the

6    effectuation of this particular conspiracy, and

7    they may have had different extents, and there's a

8    different extent as it relates to Mr. Thompson

9    versus the other three defendants, but I do believe

10   that the aggravating enhancement is appropriate.

11   It's a three-level enhancement for Mr. Combs.

12           Having so ruled, I would then

13   correspondingly deny Objection No. 1 as it relates

14   to a mitigating role and not grant a decrease for a

15   mitigating role in this case.  As it relates to

16   obstruction of justice on Mr. Combs, I am going to

17   deny that objection, Objection No. 1, as it relates

18   to obstruction of justice.  I do believe that

19   Mr. Campbell's testimony, that he was approached by

20   Mr. Combs with the request, that Mr. Campbell

21   manufactured a receipt for blacktopping work

22   conducted on private driveways, is the kind of

23   behavior identified in the 3C1.1 guideline as

24   obstructive conduct, and so I think that that's

25   appropriate, and so I'll deny that particular

1    objection.

2            There's an objection which as best I can

3    tell, really addresses whether or not the jury in

4    this case needs to find the actual loss amount or

5    facts that support the actual loss amount, much

6    like it does in a drug case in which they're trying

7    to find a drug quantity, but I do not believe that

8    the computation of loss in this case must be shown

9    through evidence presented at trial under *Apprendi*

10   or *Booker* or *Fanfan*, so I will deny that

11   objection.

12           And then as related otherwise, except as

13   noted, I will deny the objections which are

14   factual, for the same reasons.  It's not that there

15   may not be some disagreement as it relates to the

16   characterization of the various representations in

17   the presentence investigation report; I've

18   certainly considered that, but it doesn't make it

19   inappropriate to include it in a presentence

20   investigation report with regard to Sentencing

21   Guideline 1B1.4.

22           All right.  Then as to Mr. John Mac Combs,

23   his offense level is now a 26, criminal history

24   category of 1.  His guideline range is $12,500 to

25   $477,586, with a total offense level of 26.  His

1    guideline range is now 63 to 78 months.  And the

2    presentence investigation report will be so

3    modified.

4         Mr. Webster, other than the objections

5    you've already stated, do you have any other

6    matters with regard to your client and the

7    guideline calculation that I need to address?

8         MR. WEBSTER:  I'm not sure that I'm

9    entitled to ask the Court to state on the record

10   the basis of its 25 percent allocation, but I do

11   hereby request that.

12        THE COURT:  Well, I think I have kind of

13   indicated on the record as it relates to the

14   reasonable assessment and the inferences that have

15   been drawn from the audit report that took place,

16   and as well as reviewing all of the evidence that

17   related to actual work that had taken place.  So

18   I'll just stand on the record that I've completed

19   with regard to that.

20        Okay.  Well, with regard then to

21   Mr. Champion, again, with regard to his Objections

22   No. 1, No. 2, I will just simply note that I will

23   deny those objections and grant them, consistent

24   with my ruling as it relates to the amount of loss

25   in this case as I'm granting these requests.  It's

1    to grant a reduction from the amount listed in the

2    presentence investigation report.  I've granted

3    that, but I'm denying the request with regard to

4    each defendant in terms of the actual amount to be

5    identified as it relates to the loss in this case.

6    And I do think that the aggravating role continues

7    to be appropriate as it relates to Mr. Champion.

8            Again, there's a lot of emphasis, it seems

9    like, on what title someone had, but in terms of

10   the aggravating role, I don't put a lot of weight

11   on what particular title.  I want to know what kind

12   of position -- what kind of representation that

13   they were putting forth in terms of this

14   conspiracy, which they've been found to be a part

15   of, or the aiding and abetting, which the defendant

16   Mr. Champion has been found to have been involved

17   with, and so I have looked again at the specific

18   facts and the testimony.  There does seem to be, at

19   least by a preponderance of the evidence in this

20   case, testimony that each of these defendants had

21   an aggravating role when you consider all of those

22   that would have been involved in providing and

23   misappropriating these particular funds, or the

24   involvement in terms of the vote buying.

25           And then finally with the abuse of

1  position of trust consistent with my ruling as to

2  the other defendants, I will deny that objection as

3  well.  I do believe that each of these defendants,

4  regardless of the title that you give to these

5  defendants, were in positions in which they did

6  have positions of trust.  They were public

7  servants, and consequently, the abuse of that

8  position, I think, is set forth clearly in the

9  record, and so I'll deny that particular

10  objection.

11       There was no obstruction of justice

12  enhancement as it relates to Mr. Champion.  And for

13  the reasons I've stated previously, I'll just

14  generally deny the objections as relates to the

15  factual objections.  Again, I've reviewed every one

16  of those that have been made, but find that the

17  information included in the presentence

18  investigation report, which includes a lot of

19  information.  It's one of the reasons that that's

20  kept under seal; it's not a public document, is

21  appropriate for -- to be included.

22       Mr. Champion, consequently, his offense

23  level goes down to 23.  He's a criminal history

24  category 1.  No criminal history.  His fine range

25  is $10,000 to $477,586.  At a 23, his range of

imprisonment recommended range is now 46 to 57
months.

Again, other than the objections that have
already been made, Mr. Jensen, are there any
matters that need to be addressed with regard to
Mr. Champion's PSR?

MR. JENSEN:  No, nothing, Your Honor, no.

THE COURT:  Okay.  And then finally with
regard to Mr. Adams.  I will deny the general
objection Mr. Williams makes.  He has two general
objections that will be denied because I think
they're more -- they're kind of a combination of
going to the particular loss, which is at issue
here, as well with some 3553(a) factors, and so
I'll deal with those separately and deny those
general objections and then deny and grant -- deny
in part and grant in part the objection that deals
with loss and restitution, for the reasons that
I've already stated on the record.

There were several objections, Objections
1, 2, 3, 4, 5, 6, 7, which dealt with that loss and
restitution issue.  Again, as it relates to the
aggravating role, there's a three-level increase.
I'll deny the objection for the reasons that I've
stated already on the record as it relates to the

other defendants.  I think they're equally
applicable to Mr. Adams as well and will deny
that.  And then will deny the objection as it
relates to the abuse of position of trust.  Again,
I find all of these defendants were in the kind of
public role in which they abused their trust.

And then finally with regard to
obstruction of justice, that I will grant that
particular objection for the reasons that I've
stated on the record with regard to the vote that
took place.

I've, with regard to the pseudo-count, I
will deny those objections for the reasons that
I've already stated on the record, and have set
forth those reasons as it relates to the evidence
that was presented in terms of the role that
co-conspirators must have in order to find them
guilty of a conspiracy.  I think if I was sitting
as a juror as relates to a conspiracy count, as
opposed to a direct substantive count that I indeed
could have found the defendant guilty of vote
buying.  Again, with regard to the factual
objections, I've reviewed them all.  I find that
those factual objections Number 1 to 42 will be
denied.  I won't find that information is

inappropriately included in the presentence

investigation report, but have noted the arguments

made by counsel.

So, Mr. Williams, let me see then, first

of all, let me give you the calculation.  Mr. Adams

moves from a 28 down to a 24, criminal history

category of 1.  There is a fine range of $10,000 to

$477,586.  The offense level at 24.  That puts a

recommended sentence of 51 to 63 months in terms of

a recommended sentence of incarceration.

All right.  Let me see if there are any

particular matters that would need to be addressed,

Mr. Williams, other than the objections you've

already indicated?

MR. WILLIAMS:  Only preserve those as I

indicated.

THE COURT:  Yes, indeed.  Okay.  And then,

Mr. Taylor, anything on behalf of the Government?

MR. TAYLOR:  No, Your Honor.

THE COURT:  Let me inquire from the United

States Probation Office whether there's any

information which needs to be added as relates to

the guideline calculations?

MR. HALL:  I don't believe so, Your Honor.

THE COURT:  Thank you, sir.  Well, I will

1    hereby adopt and accept the findings contained in

2    the presentence investigation reports, including

3    the guideline calculations consistent with my

4    rulings this afternoon from the bench.  I'm going

5    to direct that they be placed in the record.  And

6    as I indicated to the defendants, these are all

7    placed under seal.  They will be available to the

8    Sixth Circuit Court of Appeals.  They'll be

9    available to the parties and the lawyers in the

10   event there will be an appeal in this particular

11   case, but this is not information that's available

12   to the public generally.

13          All right.  With that in mind, let me see

14   if there are any motions that the Government has

15   regarding these particular defendants.

16          MR. TAYLOR:  No, Your Honor.

17          THE COURT:  Okay.  Well, let me indicate

18   again how we're going to proceed.  I'm going to

19   first turn to the Government and Mr. Taylor to

20   argue the 3553(a) factors, and I'd ask you to argue

21   those factors on behalf of each defendant.  You can

22   do so in turn, if you'd like to, Counsel, however

23   you want to organize, that's fine, but to make your

24   argument, and then each defendant will have an

25   opportunity -- counsel will have an opportunity to

1  respond.  We'll take a brief recess after that, and

2  then we'll allow each of the defendants to address

3  the Court, if they choose, before I finally impose

4  a sentence in this case.

5          First of all, Mr. Taylor.

6          MR. TAYLOR:  Thank you.  May it please the

7  Court --

8          THE COURT:  Mr. Taylor.

9          MR. TAYLOR:   -- gentlemen for the

10  defense.  I want to begin, Your Honor, with kind of

11  an over-ardent argument that applies to every

12  defendant, and to the extent I think it's

13  applicable, and make some specific comments, and

14  this is going to be a little like deja vu for the

15  Court because you've heard me argue 3553 in public

16  corruption cases before on several different

17  occasions.  And -- but I think it needs to be said

18  again, and we all need to be reminded of the

19  importance of these cases.  And while I don't know

20  a lot about each of these defendants, nor have I

21  read in detail the specifics of the letters that

22  have been sent to the Court, and I'm not unmindful

23  of some good deeds and some good works by different

24  ones of these individuals, it is my job as the

25  prosecutor to advocate for the people generally,

1   the United States, the Government, the taxpayer,

2   and to point out why it is I believe that these are

3   serious offenses.  And I'm specifically addressing

4   3553(a)(1) and (a)(2)(A), and those are the nature

5   and circumstances of the offense first, and the

6   need for the sentence imposed to reflect the

7   seriousness of the offense and to promote respect

8   for the law and to provide just punishment for the

9   offense.  Those are the areas I focus on.  I know

10   the Court has a broader responsibility, and I'm

11   sure it will exercise that responsibility

12   judiciously.  But I want to focus on these other

13   circumstances.

14         Public corruption is an area of focus and

15   emphasis for the Department of Justice.  And I

16   don't want to beat up my home state more than I

17   need to, but we need to, to a certain extent,

18   constantly be mindful of some of the culture, some

19   of the history of political corruption, especially

20   in certain areas of eastern Kentucky.  And I can

21   say that because I've been prosecuting it.  And

22   sometimes it is flagrant, it is mind-boggling, it

23   is inexplicable, unless you're part of that

24   culture.  And then when you are part of that

25   culture, it seems like what's inexplicable and

mind-boggling in some instances is the fact of the prosecution. It's almost a "How dare you? This is the way we do business." What sounds so egregious to people not a part of the culture sounds like no big deal, no -- yesterday's news to people who are part of the culture. And so what's needed is a cultural change, and part of the cultural changes will come out of sentencings like this. And I know it's -- the culture is not absolutely endemic and it's not unanimous because we have 12 people, 12 good people hear this evidence and say, "No, this isn't right," and they said it unambiguously. But we've also seen the editorials and the letters, and a lot of people just express an incredulity that we even bring this prosecution. And the defense in the case, part of the good faith defense was, and what I tried to avoid the jury buying into, was this idea that this is the way you have to play the political game in certain counties. And Knott County has a history of playing that political game. And so the nature and circumstance of the offense is serious. There needs to be general deterrence with regard to future candidates, future races.

I want to say one other thing, and this

goes more to the history and characteristics of the
defendants.  Again, I acknowledge a lot of good
deeds and a lot of good things that have been done
by some of these individuals, and I've said
publicly, and I've said to the jury, these are not
inherently evil people.  They're not rotten to the
core.  In fact, they have some very redeeming
qualities.  But one thing I have noticed that has
bothered me, and I think it should bother the Court
some, is at least personally, we've never heard a
word of contrition from any defendant.  Maybe we
will today, I don't know, for the first time.

I don't doubt for a moment that these
individuals have different levels of culpability on
this that we didn't get to hear at any time.
Again, Constitutional right.  I'm not criticizing
the exercise of it, a strategy decision, but I
think there was a lot we could have known about
this case and who bore more or less responsibility
if each and every defendant had explained
themself.  But we didn't, and so we go with the
evidence we have.  But still, it bothers me, and
I'm sure a lot of citizens, that, you know, while
through counsel they explained this as being good
faith, we didn't hear it from any defendant that

1  it's good faith, or why it's good faith.  Again,

2  maybe we will hear that today.  But I also know

3  that when these individuals were arrested some time

4  ago, there was almost a mocking attitude about it

5  and some -- a lot of mirth and humor about it,

6  being arrested.  This is just a political witch

7  hunt, and joking around about it.  That offended me

8  then and it offends me today.  It's not a joking

9  matter, and it's not a political witch hunt.  It

10  doesn't have anything to do with Democrats or

11  Republicans; I've prosecuted both.  And whether you

12  believe you acted in good faith or not, it's simply

13  not a joking matter.  I have the same reaction as

14  when I hear somebody like Governor Blagojevich just

15  blow off the process as some kind of witch hunt,

16  and it's clearly not.

17          I think that the law abiding good citizens

18  of Knott County deserve more, and they do not

19  deserve the Orvil Pratt theory of government that

20  if you just give the judge enough time and enough

21  races, he'll eventually get to everybody's

22  driveway.  That's not the purpose of government,

23  and it certainly in these trying times shouldn't be

24  the purpose of government.

25          And so superimposed on all of my remarks

1    about any defendant is this general need for

2    general deterrence, and to send a message with the

3    verdict that public corruption cannot be tolerated,

4    that those accountable for public funds, those who

5    are running for public office, regardless of the

6    culture in which you find yourself, must, must be

7    accountable for their actions.

8         With regard to specific defendants, Your

9    Honor, I don't have a lot of specifics, but I will

10   say this with regard to the nature and

11   circumstances of the offense.  And in a way, this

12   is reflected in the offense level.  But I'll point

13   it out again and also an aggravating factor related

14   to it.  With regard to Defendant Combs and the

15   bogus receipts, I think that is a character of

16   dishonesty that is above anything else any of the

17   other defendants did.  But more importantly and

18   troublesome is the fact that in my opinion and in

19   the opinion of another jury in another county, Mac

20   Combs brought two people into this.  Now, they

21   could have extricated themselves, but I think they

22   did his bidding, and that's Tammy Brewer and Hoey

23   Dobson.  And it's troublesome to me that he would

24   let that happen, that he would let them even

25   volunteer to do that for him, and I just think

1  that's a level of, and it says something about

2  character.  I don't know.  Maybe it's -- maybe

3  that's culture, too; all for one and one for all.

4  We all go down, we all hang together, or we'll all

5  hang separately.  Maybe that's the culture, too.  I

6  don't know.  But it -- that's troublesome.

7          Something about all the evidence in the

8  case leads me to believe that Phillip Champion is

9  not as involved quite to the same extent as some of

10  the others in terms of planning and

11  implementation.  I'll just make that passing

12  comment.  His role seemed to be more restricted to

13  bridge building up in the one area of the county.

14          Again, with regard to the overall

15  culpability for the conspiracy and the planning, I

16  do think Judge Thompson bears as much

17  responsibility as anyone, even though he didn't do

18  some of the dirty work out in the county.  With

19  regard to the actual dirty work out in the county,

20  I think the most culpable is obviously Ronnie Adams

21  with regard to the actual brokering of the deals

22  and with the Morgans and Reynolds and Moore and

23  Orvil Pratt and Ronnie Campbell and -- it was

24  always Ronnie Adams who seemed to be on the cusp of

25  that.

1        That's about all I wish to say at this

2   time, Your Honor.  And none of this is meant to say

3   that any of the facts that they bring up are in any

4   way diminished, but I think the Court should start

5   with the proposition that this is a serious case

6   and abuse of the public trust, and with an eye

7   toward the need for general deterrence.  Thank you.

8        THE COURT:  Thank you, Mr. Taylor.

9   Mr. Westberry, on behalf of Mr. Thompson.

10        MR. WESTBERRY:  Thank you, Judge.  I don't

11   want to re-argue, of course, the case at this

12   point.  But under 3553, one of the factors that we

13   would like to bring to your attention is his civic

14   and charitable good deeds.  There have been a

15   number of letters written, and I could talk to some

16   of those in just a moment.  I would ask permission

17   to call a witness to testify in support of that.

18   He has not written a letter, I don't believe, and

19   -- Mr. Combs, Oliver Combs.

20        THE COURT:  I'll grant your request.

21   Mr. Combs will be called.

22        MR. WESTBERRY:  I'm happy to go get him.

23   He's just right outside.

24        THE COURT:  That will be fine.  Take a

25   moment.

1          [WITNESS WAS SWORN]

2          THE COURT:  Mr. Westberry.

3          MR. WESTBERRY:  Thank you, Judge.

4                    DIRECT EXAMINATION

5     BY:  MR. WESTBERRY:

6     Q.      Could you state your name for the

7     record, please.

8     A.      Oliver Combs.

9     Q.      Mr. Combs, where do you live?

10    A.      I live at Carrie in Knott County.

11    Q.      How long have you lived in Knott

12    County?

13    A.      Basically all my life.

14    Q.      Now, I understand, are you retired now?

15    A.      Yes, I am.  I retired --

16          MR. WESTBERRY:  Go ahead.  I'm sorry.

17    A.      I retired in '93 from the Kentucky

18    State Police after 34 years.

19    Q.      Yes.  You've been retired since '93,

20    did I hear you say that correctly, about 16 years,

21    thereabouts?

22    A.      Yes, sir.

23    Q.      Okay.  What did you do with the KSP?

24    A.      I was a detective sergeant at the

25    Hazard Post.

1     Q.     Okay.  How long were you in the KSP?

2  How many years did you serve as a trooper?

3     A.     I retired with 34 years.

4     Q.     All right.  Do you know Randy Thompson?

5     A.     Yes, I do.

6     Q.     Okay.  How long have you known Randy

7  Thompson?

8     A.     Well, basically known Randy for about

9  ten, 12 years.  Known him well since he's been in

10  as Judge.

11     Q.     All right.  But you did know him before

12  he became county judge/executive?

13     A.     I knew him, but as far as any

14  association, I had none.

15     Q.     Okay.  Could you tell Judge Van

16  Tatenhove whether or not Randy Thompson has made

17  any contributions to Knott County, civic,

18  charitable, however you want to characterize it,

19  that you would consider to be significant that the

20  Judge ought to know about?  If you could address

21  the Judge please.

22     A.     Well, actually, Judge Thompson's made

23  enormous contribution to the county.  Basically the

24  county was kind of one of these little counties

25  that didn't have anything where the kids said, "We

don't have anything to do."  Since Judge Thompson

got in, him and his staff has done an enormous

amount of good to the county, something we'd never

seen before, and actually never dreamed of.

Q.     Can you give some examples of what some

of those things are?

A.     We've got a new water plant right now

at Carr Creek Lake that will go on line to serve

the total county, which our county's like every

other county in eastern Kentucky.  Since the mining

industry's got really active, most of the water

wells are not all that great.  But this one will

serve all of Knott County, plus probably some to

Letcher, Floyd and maybe even Perry.  It will be

going on line sometime this spring.

We've built a sportsplex over there that

is kind of the envy of the -- maybe the rest of the

state.  It has -- in fact, this past weekend, they

had a basketball tournament that had 40 teams in it

from all over the southeastern, plus to the middle

part of the state.  They come far away as I know of

from Somerset and Powell County, Clay City, down in

that area.  But that sportsplex has five basketball

courts, three baseball fields, a soccer field, all

the exercise equipment.  It's an area that can have

1    just about anything, any kind of a meeting, or

2    whatever.  We have an ATV and ATV center and

3    several, I don't know how many miles, hundreds of

4    miles there or so of trails that we host a horse

5    trail ride and an ATV ride in the spring and in the

6    fall of the year, plus anyone that wants to can

7    ride there year-round.  The last horse trail ride

8    in the fall probably somewhere from eight to 10,000

9    people.

10          And the pool that was put in by a prior

11   county judge wasn't completed.  They've completed

12   the pool, and plus a skate park next to the pool.

13   We got community centers in just about every

14   community in the county.  And as far as county

15   parks, they're in about every community in the

16   county.  We had actually never seen anything like

17   that in the past, and I guess we didn't expect it

18   because we got used to it.  But he's done a lot of

19   amazing things for the county.

20        Q.     Was Mr. Thompson instrumental -- let's

21   start -- you talked about the sewer and the water

22   project that's recently been brought to Knott

23   County.  And I think if I heard you right,

24   Mr. Combs, you all never had that kind of quality

25   sewer and water treatment before in Knott County;

1    is that correct?

2        A.    No.  Actually, prior county judges had

3    worked on it to some extent, but it had never been

4    in the shape that we could have it --

5        Q.    What did Randy Thompson do, if

6    anything, to help kind of bring it over, you know,

7    get it accomplished?  If you can tell Judge Van

8    Tatenhove.

9        A.    Well, he was constantly going to

10   Frankfort, obtaining money for the county for a lot

11   of different projects.  I don't know exactly

12   whether this was a federal grant or what it was on

13   the water project, but the deal was made to build

14   the water intake system on Carr Creek Lake, which

15   is a great water supply, and that's almost

16   completed at this time.

17       Q.    This sportsplex, can you tell Judge Van

18   Tatenhove whether Randy Thompson had personal

19   involvement in getting that sportsplex developed

20   and built to the state that it's in today.

21       A.    Well, he's probably totally

22   responsible.  He's always been involved in sports,

23   even though I didn't know him that well prior to

24   him being county judge.  He's always supported the

25   kids in the county and the baseball fields and all

that. He had -- got them in shape, even prior to the time he became county judge.

Q. Trail riding, you mentioned trail riding. Apparently, that's become quite a big thing over in Knott County.

A. Well, we've got the only ATV training center in Kentucky, and one of only eight in the whole nation. They train the four-wheeler riders and the motorcycle riders at this place, plus, like I said, this is where the horse trail ride is held. And we've had people as far as away as Canada and California come to the horse trail rides.

Q. Has that all meant positive economic benefits for Knott County?

A. It's been a big positive. Every business in the county has probably benefited in some way. What few restaurants we have, have greatly benefited. The groceries all have benefited, the gas stations. Basically, it's run a lot of money into Knott County.

Q. Has there ever been a county judge -- you've said you've lived in Knott County for many, many years, if I remember correctly. Can you recall there ever being either a judge/executive or

1   any elected official that you can recall that has

2   done as much for Knott County, along the lines that

3   you've been testifying to, as Randy Thompson?

4        A.     No, I cannot.  I really can't.  I don't

5   recall it.  But both of my grandfathers were county

6   judges in the county, and I really don't know what

7   all they did, but no county judge has ever done

8   what he's done.

9        Q.     All right.  And I'm concluding here.

10  Was Randy Thompson active in civic or charitable or

11  community efforts, to your knowledge, before he was

12  elected county judge/executive?

13       A.     Yes, he was.  He had the -- I believe

14  he had the Little League baseball teams going at

15  that time.  He always had an interest in the kids,

16  and he done his best to see that they had something

17  to do in the county.

18            MR. WESTBERRY:  Okay.  I believe that's

19  all the questions I have of Mr. Combs.  Thank you,

20  sir.  Extend the same courtesy and answer

21  Mr. Taylor's questions, if he has any.

22            THE COURT:  Mr. Taylor?

23            MR. TAYLOR:  I don't have any questions,

24  Your Honor.

25            THE COURT:  Thank you, Mr. Combs.  Thank

1   you for being here.

2           THE WITNESS:  Thank you.

3           THE COURT:  Mr. Westberry.

4           MR. WESTBERRY:  Very briefly, Billy

5   Childers.

6           THE COURT:  Mr. Childers will be called.

7           MR. WESTBERRY:  Yes.

8           [WITNESS WAS SWORN]

9                   DIRECT EXAMINATION

10      BY:  MR. WESTBERRY:

11      Q.      Could you state your full name,

12  please.

13      A.      Charles William Childers.

14      Q.      You go by Billy Childers?

15      A.      That's correct.

16      Q.      Where do you live, Mr. Childers?

17      A.      I live in Hindman, Kentucky.

18      Q.      How long have you lived in Hindman?

19      A.      I've lived there my lifetime of 48

20  years.

21      Q.      Okay.  Could you tell Judge Van

22  Tatenhove, over your left shoulder, could you tell

23  him what your business is, if you are employed or

24  own your own business; what do you do?

25      A.      I'm a self-employed businessman.  I

have several businesses in the Hindman area, such
as the car wash and storage units.

Q.      Do you know Randy Thompson?

A.      Yes, sir.

Q.      Can you tell Judge Van Tatenhove how
long have you known Randy Thompson?

A.      I've known Randy Thompson since he came
to Knott County, probably 25 years.

Q.      Okay.  Is he a friend of yours?

A.      Yes, he is.

Q.      Okay.  Can you tell the Judge whether
or not Randy Thompson has made any positive
contributions or improvements to Knott County
during the time that he has served as county
judge/executive, and including any time before he
became county judge/executive.

A.      Certainly.  Before he became the
judge/executive in Knott County, he was a very --
he was the president of the Knott County Chamber of
Commerce, which I was involved in also, probably
five -- four or five years he was in there.  He was
involved with the student or child, I don't know
the correct name of it, the Knott County Youth
Organization.  He was involved with that, in which
really got -- the Knott County sportsplex was the

1    result of that.  He started it then before he's

2    ever involved in this, you know, politics at all.

3            Since he has become the judge/executive,

4    you know, numerous, numerous things, such as the

5    sports project, the sports complex became a

6    reality, miles and miles of water lines that we've

7    finally got in Knott County.  We have a

8    multi-million dollar water plant at the lake over

9    there.  The ATV center has become a reality, the

10   ATV training center.  The events such as the

11   horse -- trail rides that they have with the

12   horses.  You know, the American Legion building was

13   revamped, and the whole field down there, and that

14   was part of the Knott County Youth Organization

15   that they fixed all that up so they have a place to

16   play ball.  The park system, the community parks

17   that's the old grade school and things they

18   converted over, community parks.  Numerous and

19   numerous things that has been positive has come out

20   of his result of him being Knott County

21   Judge/Executive.

22       Q.     Has Knott County been a better place in

23   your observation because of this activity on Randy

24   Thompson's part?

25       A.     Absolutely.  It's all been positive.

You know, I've raised two sons in Knott County, and
it's all been very positive.  They -- my sons are
now like 20, 22 years old, and they still use the
sports complex.  They still use the -- they still
go to the horse rides.  They go to the ATV
centers.  So yes, it's very positive for, you know,
very young, youth to adults.

    Q.    Can you ever -- you've lived in Knott
County many years?

    A.    Yes.

    Q.    All of your 48 years?

    A.    All my life.

    Q.    Yes.  I mean, is there any -- can you
point to any person -- point the Court to any
person that has ever done as much for Knott County
as Randy Thompson, any other elected official,
civic leader, anybody that you can think of?

    A.    We have talked about this before with
guys that are older than I am, and as far as I can
remember, no judge has ever done as much positive
for our county as Judge Thompson.  Older people
than me, such as my next door neighbor, who is 80
years old, said he's been the most positive judge
that we've ever had, and that's way beyond that,
and he's 80 years old.

1    Q.    Sure.  And was Randy Thompson active in

2  these kind of civic affairs before he got appointed

3  and elected county judge/executive?

4    A.    Oh, yes.  Like I said, the Knott County

5  Youth Organization was a result of Randy getting

6  these things started.  He had younger kids, and he

7  coaches basketball teams and Little League baseball

8  teams and things he coaches, and he's been -- yeah,

9  he's been involved even before politics was ever

10  even mentioned in it anyway or ever come around.

11          MR. WESTBERRY:  Okay.  That's all the

12  questions I have of Mr. Childers.  Extend the same

13  courtesy, please, and answer Mr. Taylor's question.

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Taylor?

16          MR. TAYLOR:  No questions.

17          THE COURT:  Mr. Childers, thank you for

18  being here, sir.  You can step down.

19          THE WITNESS:  Thank you.

20          THE COURT:  Mr. Westberry.

21          MR. WESTBERRY:  Thank you, Judge.  There

22  are an awful lot of letters in your file, and they

23  are largely repetitive, for lack of a better word,

24  of the testimony that you've heard over the last

25  few minutes.  I don't think it can be overstated

1    that -- and I'm not here to argue -- I'm not

2    rearguing the conviction or the facts that led up

3    to his, but he has made as positive set of

4    improvements in this county as anybody has ever

5    done.  And that's significant, given the county

6    that we're talking about.  One of the greatest

7    respects -- I've been over there.  I've gotten to

8    know people.  It's certainly not one of the

9    wealthiest counties in Kentucky.  The idea, for

10   example, that they could have a sportsplex along

11   the lines that they have that has become a regional

12   gathering center among other counties, I've been

13   told and I've come to believe that it's an envy of

14   a lot of more populated counties, perhaps of Pike,

15   of Floyd, communities considerably larger and more

16   prosperous perhaps than Knott.  Those kinds of

17   positive charitable civic contributions are

18   extraordinary.

19           Under the guidelines before *Booker* and

20   *Fanfan,* in order to get a downward departure for

21   that kind of activity, it had to be truly

22   exceptional or extraordinary.  That's now changed,

23   of course, in lieu of the litany of cases that we

24   were discussing here today.  Under 3553, it's one

25   factor that you may consider when you impose a

1    sentence.  However, I would simply say this.  Even

2    if the old system were still in place, even if it

3    still had to be shown to be extraordinary or

4    exceptional before you would grant a downward

5    departure for a civic or charitable contribution,

6    Randy Thompson has met that standard.  Nobody has

7    done as much for that community as he, certainly in

8    recent memory or any of his predecessors that --

9    who were named throughout the trial.  I would

10   suggest, Judge Van Tatenhove, that at a minimum, at

11   least a four-level reduction under whatever

12   guideline sentence that you ultimately impose would

13   be appropriate for those civic and charitable

14   contributions.

15          We raised additionally, Your Honor, in our

16   sentencing memorandum, we talked about disparity in

17   sentencing.  I practice occasionally in the Eastern

18   District.  I have had some, I'll call it,

19   peripheral involvement in some of the vote buying

20   cases that have -- if they've not come directly

21   before Your Honor, I think some of your colleagues

22   on the bench have tried several of them.  I would

23   simply ask you to consider -- and I'm not

24   diminishing the impact of the jury verdict,

25   whatever need -- or whatever message needs to be

sent to the community in terms of a deterrent
value, but a sentence that's in the range of what
we're at least talking about here is significantly
higher than what I recall was imposed by
Mr. Thompson's immediate predecessor, where you had
a situation where he was convicted of outright vote
buying.  I wasn't involved in that case, but I've
tried to do a little reading as to the sentence
that was imposed, talked to my colleagues.  This is
significantly higher.  Not to diminish the impact,
but nobody, Judge Van Tatenhove, nobody lined their
pockets directly with the situation.  I'm not
asking you to draw any conclusions other than that,
but in so many vote buying cases we're involved
with fact situations so vastly different than we
are here.

I'd ask you consider at least a four-level
downward departure from whatever guideline range
you imposed because of these extraordinary civic
activities on his part.  I would ask you to
sentence him at the low end of whatever guideline
range that you decide to impose.  He will make a
few remarks during allocution when we get to that
point before the sentence is imposed.  I understand
we're going to have a break before that happens.

1          THE COURT:  We are.

2          MR. WESTBERRY:  And beyond that, Judge,

3     recognizing the severity of the conviction that

4     brought us here to your Court today, I would just

5     simply ask you to look at his background as all --

6     everything that he's done for that community,

7     almost all of which has been uniformly positive,

8     when you decide to impose the sentence that you

9     think is appropriate in this case.

10          THE COURT:  Thank you, Mr. Westberry.

11          MR. WESTBERRY:  Thank you, Judge.

12          THE COURT:  Thank you, sir.  Mr. Webster.

13          MR. WEBSTER:  May it please the Court,

14     Mr. Taylor.  I guess if this case demonstrates

15     anything, it demonstrates just how easy it is to

16     get in trouble.

17          I'm representing a man here today who sat

18     through a trial and the only -- the evidence

19     against him was that he took three different gravel

20     truck drivers out and showed them places that had

21     been graveled before.  Why did he not take the

22     stand?  Because the United States had no proof of

23     even a conversation between him and any of these

24     other people, nor a meeting.  Does he take the

25     stand and supply that for the Commonwealth -- for

the United States?  Does he take the stand and tell
the truth, and then if the jury -- if the jury's
going to be willing to convict him in the absence
of any direct evidence of conspiracy, is it going
to do him any good to get up and deny it and say,
"No," and then face a certain three-point
enhancement for perjury, the difference -- 30
months difference in his sentence?  It is
Mr. Taylor's method of proving these cases is to
prove that there is a culture and then to say that
these people worked within that culture, so,
therefore, we can all assume that they did these
things.

John Mac Combs is 67 years of age and he's
spent 40 or more years of his life climbing up and
down power poles.  That was far -- apparently far
safer work than being the person who took over the
management of Knott County Government when another
county judge got in trouble.  But despite two or
three years of investigation, despite the fact that
Mr. Combs attended the trial of Hoey Dobson in
London and was there waiving any privilege against
self-incrimination and was not called to the stand,
despite their conviction and an enormous pressure
being put on them to tell things that will hurt

other people, they don't have anything to tell the
Government other than the truth, and neither did
he.  And I've told Mac, I said, "When you get
convicted, the Court wants contrition and they want
somebody to accept some sense of -- sense of
responsibility for it."  But there's no tougher
place to be than to be at sentencing when you
believe yourself to be innocent.

I never heard of John Mac Combs when he
came to hire me.  And the information I got about
this case I got it the same place the jury got it.
And with all respect to their decision, I did not
hear evidence that John Mac Combs was a
conspirator.  Having said that, he has been found
to be so, and we must proceed from that basis.

Here's a man who has had a good marriage
for 45 years.  His children are well-educated.  He
was educated.  The presentence report identifies
the kind of person he's been in the community and
what he's done to help other people, and the
positive reputation he has in the community as a
hard-working individual, and the shock that this
conviction came to the members of the community.

Mr. Combs is 67 years of age.  The
guideline range that the Court found today is well,

well into his life expectancy on the charts.

I don't think Mr. Taylor's prosecution has been fair.  Do I say that now and make the Court mad at me and get him in worse trouble?  I don't think so.  I hope not.  This prosecution is based upon this idea that we got this big problem in eastern Kentucky, and all we got to do is show that some of these people are such -- in such position that they might have done these things.  I think going to prison for a minimum of 57, or was it 51 months, should be from sterner stuff, to borrow from Marc Antony's funeral speech.

So we ask you to weigh this man, 67-year-old man who's been a solid citizen of this community and against whom the evidence in this case was minimal, and against whom here's a man who held a receipt for work he hired done just exactly like other people.  What is the difference between John Mac Combs and members of the fiscal court who voted for this bond issue?  What evidence shows that his -- and who weren't indicted?  What has he done in this case any differently from others who were not charged?  This is dangerous.  The conviction on a major criminal offense is based upon inference piled upon inference piled upon

1  inference, until you have a pyramid of inferences

2  is dangerous.  And all we ask you to do is temper

3  that danger with mercy toward my client,

4  Mr. Combs.  Thank you.

5          THE COURT:  Thank you, Mr. Webster.

6  Mr. Jensen.

7          MR. JENSEN:  Your Honor, it's been a long

8  day and I'll try to --

9          THE COURT:  Yes.

10         MR. JENSEN:  -- I'll try to be as brief as

11  I can.

12         THE COURT:  Take as much time as you need.

13         MR. JENSEN:  I have visited the

14  sportsplex.  Matter of fact, when I first met my

15  client and came over to Knott County, that was the

16  pride and joy that he wanted to show me of the

17  accomplishments they had made.  And if this Court

18  hasn't had an opportunity to look at it, you might

19  want to go by and see it, because it is the envy, I

20  think, of the state of Kentucky.  The only

21  facilities that might be comparable is in

22  Louisville or Lexington.  I don't think you'll find

23  that in any other county in the state.  It's a

24  remarkable achievement for a small county.  And my

25  first thought was like when I saw the convention

center you have right here in Pikeville, could you
pay -- could they pay for it?  And so far, they've
been able to keep the doors open and pay for it,
which is another accomplishment.

      THE COURT:  I've read several articles
about the sports complex, of course.

      MR. JENSEN:  And they've made things come
due.  They had natural gas on the facility.  They
use that for their heat, and they get it for free.
So they've thought it out pretty thoroughly on how
to make a good facility for kids, and I think
that's always very important.

      As this Court knows, and have seen before
in your Court before, I represent people a lot of
times of a different ilk than what's here.  The
gentleman I've represented here, I'm proud to
represent.  I've been proud to be associated with
him, and I'm very proud to represent Phillip
Champion.  And I do agree with Mr. Taylor, that
Phillip is maybe the least culpable person here
that went on trial.  The consideration of the
factors when I look at 3553 and what this Court is
to consider in the deterrent and protect the public
and so forth, I would argue in favor, if you're
strictly considering that and the evidence that's

been presented and the character of Phillip
Champion that leniency is required.

Phillip Champion is a long-time Knott
County resident.  He has strong ties to his family
in the community here.  His father died as a result
of a shooting when he was a child.  His father was
a state trooper.  Phillip was raised alone with his
sisters by his mom, and his mother still is a Knott
County resident.  She's 81 years of age, and he
still visits with her and helps her and assists
her.  Phillip's sisters still reside here.  He had
a brother that passed away.  And if you'll go in
the sportsplex, you'll notice that there's a
picture of his brother there.  It's sort of
dedicated to the work that he did in bringing the
sportsplex to Knott County.  I've met Phillip's
wife Linda and his two children Hannah and Haley,
and I looked them in the eye and watched them as
they sat through this trial, particularly the
verdict, and it certainly had an impact on me on
how it's going to affect them.

I'll tell you a little bit about Phillip
that I think is reflected in the presentence
report.  But he graduated from high school when he
started to work and herniated his disk; he had a

bad back, and what ultimately led to a surgery in
1998.  At that time -- and I think this shows the
character of Phillip Champion -- he was awarded
Social Security disability benefits.  And with that
money that he got, Judge, he went back to college
and went to a community college to try to learn
some trade or a business to better himself for
himself and his family.  At that time in -- when
2006 came along, he was offered a job by Judge
Thompson to come on board as a deputy county
judge/executive.  And he accepted that position.
And what's particularly relevant about that is he
notified the Social Security office that he was
taking a job, and they still kept sending him
checks.  Our government seems to be broken anymore;
they can't seem to get it straight.  And they kept
sending him checks after checks after checks, and
he never cashed one.  When this has all come up,
he's turned all those checks back in.  None of them
were ever cashed.  There's no problem there;
there's no criminal activity, and I think that
shows the character of Mr. Champion.  He has not
done anything wrong.  He had no criminal history,
as this Court well noted.  And when an opportunity
arose that he could even take some money, he

didn't.  He went on and he worked his job.

Phillip's sister told the probation officer when she talked to him that Phillip actually delayed the start of his family to help her with her family because she had become divorced and she had children, and Phillip was there to help her.

I think this Court has taken into account that Phillip had not been employed by the county too long when all this came down, but he had no prior experience in any of this.  He knew nothing about politics.  Phillip is really active in what his main concern is his family, but church, too.  And talking to him in a period of time what I recognized about him is -- and if Phillip had one fault, it was that he wanted to help the poor and needy, even in the government realm, and there's a line there; it's a blur, and I don't know exactly where that is either.  When you're dealing with public dollars, how much do you help out the poor and needy?  Government, over the years, has gotten blurred in this area.  But Phillip had that belief that that's where you should work, and that had a lot to do with his feelings about the work that should be done in this county.

1       I think you'll see -- you heard in the

2  testimony that a lot of the bridges that were built

3  or worked on here, and maybe even the driveways,

4  were for poor people who couldn't afford it.  As a

5  matter of fact, some of the testimony was that

6  blacktop was put up a certain part of the hill, at

7  least to the crest of that hill so that gravel

8  wouldn't run down on the roads and make it --

9  extended it up to make it safer.  Those were people

10  that probably couldn't afford to do it, and whose

11  decision that was, was part of this case.

12       I understand that there's some limitations

13  to that, but the final analysis in this case is and

14  where I think that Phillip deserves a lot of

15  leniency is he never got anything out of it.  There

16  was no evidence here, there was nothing, and I

17  specifically asked about every witness that came up

18  here.  "Did he ask you to vote for him?  But did he

19  get anything?  Did he get gravel for his place?

20  Did he get blacktop for his place?  Did he get any

21  road money for his place?"  Nothing like that.  He

22  worked the best he could at a new job with what

23  ability he had.

24       This case here, if you probate him, it's

25  catastrophic to his family still.  The financial

1  burden of even restitution without a job is going

2  to be just devastating to him.

3          Judge, I'm not going to propose any

4  specific reduction to you.  I agree with

5  Mr. Taylor; I think that Mr. Champion does deserve

6  at least the lower end of it, and you've done that

7  on your accounts.  But I would ask you to be more

8  lenient with him.  He's been a good man for a lot

9  of years.  He's 46 years old.  No history of

10  crime.  He had an opportunity to even take some

11  money, and didn't.  He's worked at a job that he

12  didn't have a lot of experience in or knowledge

13  about, but he's tried to better himself.  He's

14  tried to take care of his family.  And I would ask

15  for this Court for as much leniency as you can

16  grant him.  Thank you, Judge.

17          THE COURT:  Thank you, Mr. Jensen.

18  Mr. Williams.

19          MR. WILLIAMS:  Thank you, Your Honor.  May

20  it please the Court --

21          THE COURT:  Mr. Williams.

22          MR. WILLIAMS:  Mr. Taylor --

23          MR. TAYLOR:  Mr. Williams.

24          MR. WILLIAMS:  -- Your Honor, before I

25  begin argument, may I request the Court to approach

1   the bench with Mr. Taylor?

2           THE COURT:  You may.

3           [SEALED CONFERENCE AT THE BENCH]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          [IN OPEN COURT]

22          THE COURT:  Mr. Williams.

23          MR. WILLIAMS:  Your Honor, thank you.

24   Your Honor, I've been struck by the kind comments

25   that have been made by my co-defendants here this

afternoon, and this is Mr. Adams' opportunity to
address these issues.  I will bring out that
instead of calling live witnesses, we did submit
letters from Judith Reynolds, Randy Lovelace, and
Ms. Irvine Hail, or Hall.  All of these folks talk
about in their letters to the Court, Your Honor,
that Mr. Adams is an asset to the community, that
he's been involved in the county for several years,
and that he's been cooperative with any program in
the county.  Specifically, they make praises of him
working, picking up trash, helping with the salting
of roads, helping to load and bring wood to those
folks who aren't able to do it for themselves.  So
this gives you an idea of the type of person that
Ronnie Adams is outside of the courtroom.

This is the type of case, Your Honor, that
I think *Booker* and *Fanfan* were kind of made for,
giving the Court discretion to consider going
outside those guidelines based upon the facts and
circumstances of the case.  Because the Court's
familiar that the criminal record of these
gentlemen and my client is non-existent.  When you
talk about the deterrence effect of the sentence,
any -- any sentence, whatever Your Honor decides in
this case would be -- would have that deterrent

1  effect, and it would be devastating to them.  And I

2  know Your Honor has to do something, and I know you

3  will do that, but I encourage you to be as lenient

4  as you can because these men have not been in your

5  courtroom before, and that factor of criminal

6  history that you have to so often look at with

7  criminal defendants is not something you've had to

8  spend time with these gentlemen on.

9        The jury obviously felt that something was

10  done wrong here.  And I'm not going to re-argue or

11  rehash that, but Mr. Jensen did touch on some of

12  those points, especially the fact that in this

13  case, a lot of these projects, as the Court's

14  already indicated, have kind of a gray area, and

15  did help people.  I think that was -- these men

16  would say that that was the intent of doing the

17  things that were done.  As it is in Mr. Adams'

18  case, there's also no evidence that he made any

19  personal gain or received any monetary reward as a

20  result of this.  And because of that, the

21  guidelines, when it comes to the amount of loss in

22  this case, are especially egregious as it relates

23  to the amounts, why those amounts Your Honor has

24  determined were extended on a reasonable basis

25  based upon what you've calculated.  And although we

1   disagree with that, in this case it represents more

2   than these men actually were responsible for

3   personally.  There's no evidence that they took

4   that money and put it into their own pockets, is

5   the point I was trying to make.

6          As relates to Mr. Adams, he also was

7   recently involved in an automobile accident back in

8   August, '08.  He sustained fairly substantial

9   injuries, including those to his back and spine.

10  He had a broken right kneecap and a left facial

11  injury that has healed.  These are injures, Your

12  Honor, that require ongoing treatment.  He had an

13  MRI that determined that he suffered from

14  exacerbation of degenerative changes, and that he

15  currently, Your Honor, he has that with him today,

16  an E-stimulator that stimulates the nerve and spine

17  to relieve the back pain.  He has foregone the use

18  of narcotic medications, and currently needs

19  assistance with that cane.  He also is currently

20  attending physical therapy three times a week, and

21  he's also been recently diagnosed with Crohn's

22  disease.

23         There are a number options Your Honor has

24  in relation to sentencing.  We'd ask Your Honor to

25  be as lenient as you can be under these

circumstances.  I recommend a sentence no greater
than 20 months in this case.  And certainly that
would be sufficient in this case, Your Honor, to
have a deterrent effect for Mr. Adams.  So we
appreciate your consideration on that, Your Honor.

THE COURT:  Thank you, Mr. Williams.
Mr. Taylor, let me ask whether or not the
Government believes that a below guideline or an
above guideline sentence is appropriate in this
case, whether you may want to speak specifically as
it relates to specific defendants, or you may want
to just speak generally.

MR. TAYLOR:  I was hoping you wouldn't ask
me that.  And one of the reasons is, there's
sometimes a dichotomy between what I might feel
personally if I was a judge and what I am as a
representative of the Department of Justice am
supposed to say.  And you used to tell me I should
do what the Department of Justice says I should
say.

THE COURT:  Well, and just so the record's
clear, I am the Judge and you are the Assistant
United States Attorney.

MR. WESTBERRY:  I'm glad you reminded him
of that, Judge.

1          MR. TAYLOR:  Well, as a representative of

2    the Department of Justice, our position is the

3    guidelines still are preeminent, that they were

4    given a lot of thought by the Sentencing

5    Commission, and that they should be followed,

6    absent extraordinary circumstances.  And I'm

7    reluctant to go further than say that because since

8    I don't have the ultimate sentencing

9    responsibility, I didn't spend a lot of time

10   adjusting all the mitigating things that were

11   submitted.  And I didn't go to visit the sportsplex

12   and I didn't interview people, nor did I go out and

13   look for people who could contradict any of that

14   and put their enemies on the stand or anything like

15   that.  I see my role as focusing on the conduct and

16   the deterrent value of a substantial sentence.  So

17   I know I'm sounding like a politician waffling here

18   all around the question, but it's because of that

19   conflict I find myself in.  I realize there are a

20   lot of factors in this case besides the sentencing

21   guidelines, but as a representative of the

22   Department of Justice, we believe that a guideline

23   sentence is appropriate.

24          THE COURT:  Thank you, Mr. Taylor.  Thank

25   you, ladies and gentlemen.  We're going to take a

1  very brief recess.  We're not going to take a long

2  time.  I'm going to ask that we'll take about a ten

3  minute recess, and then we'll reconvene.  And when

4  we reconvene, I'll in turn ask each of the

5  defendants whether they want to add anything, then

6  we'll impose the sentencing in this case.  We'll

7  stand in recess for ten minutes.

8           [RECESS – 4:24 p.m. – 4:46 p.m.]

9           THE COURT:  Okay.  At this time, I'll

10  recognize the defendant Mr. Thompson.  I'll require

11  each defendant, if they're able, to come to the

12  podium, and you can be accompanied by your lawyer,

13  if you choose, and then I'll ask you to remain

14  there for sentencing.  Sir?

15          DEFENDANT THOMPSON:  Thank you, Judge.  I

16  just want to say I or we never set out to do

17  anything wrong.  It's quite to the contrary.  All I

18  wanted to do was make a positive difference for the

19  people of Knott County.  Now, if I've made

20  mistakes, I'm truly sorry for that.  I'd never do

21  anything to intentionally hurt my family, friends,

22  neighbors, or embarrass the people of Knott

23  County.

24          Your Honor, this is a tough job as

25  judge/executive.  I'm not complaining; I asked for

it.  I want to give you an example.  This weekend I
was coaching my son's basketball team at the
sportsplex.  I'm sitting on the bench, and my cell
phone rings.  It was an elderly lady calling me;
she was crying, and asked me if there was any way
that we could pay for a family member's funeral.
Someone in her family had just passed away.  She
obviously didn't have the resources.  And I want
you to know, Your Honor, it broke my heart to have
to tell that lady that, "No, we can't do that."  I
receive requests like this nearly every week.

I want to thank you for your careful
consideration and for the courtesy that you've
shown me.  I ask on behalf of my family that you
impose a fair sentence.  Thank you, sir.

THE COURT:  Thank you, Judge.  I'd ask you
to remain at the podium, and you can remain with
your counsel, and I'm going to discuss the factors
that I've considered with regard to your sentence
in this particular case.

There's a sense in which this case I think
I'm —— as regard to every one of the defendants,
raises one of the more difficult decisions for any
judge in imposing a sentence, and that is this:
What is fair when good people do a bad thing?  And

1   that's really what I have before me today in court,

2   is a group of good people; I don't doubt it.  I

3   don't doubt it for a minute as relates to each

4   individual defendant in this courtroom who are

5   surrounded by people who love them and care for

6   them.  But a jury has determined that they have

7   done something that's criminal.  And so the

8   sentence I impose has to first of all, reflect the

9   seriousness of that particular offense.  It has to

10  be a sentence that will promote respect for the law

11  in this particular area.  It has to be just.  And

12  I've always interpreted that in large measure as

13  making sure that I consider a sentence with regard

14  to individuals, not simply a category.  And I've

15  tried hard to do that in this particular case.

16          This crime for which the defendants have

17  been convicted in various forms I do think is a

18  very serious one in the life of our community.  I'm

19  familiar with those who argue that it is kind of

20  part of our culture.  I'm familiar with the

21  arguments that had been made that are policy-based

22  arguments really about whether this should be a

23  crime.  I'll leave for other branches and other

24  days, that determination.  What I know is, is that

25  the law concludes that it is.  And like you, I'm

sworn to uphold that particular law.

I do think that whatever sentence I impose will not only provide adequate deterrence to each of the defendants here. And I don't believe an unusually long period of incarceration is needed to do that, but also has the advantage of making sure that those who come after you and in other areas understand the seriousness of the consequences when the public's interest is abused in this particular way. My sentence is not about, for any of you and for you, Judge Thompson, certainly, related to a need to protect the public from any future crimes. Often it is, but this is that interesting situation in which I believe, and believe strongly, that any period that you are removed from the community and removed from your family will be a period of time in which you could not be benefiting the community in which you have, and have done so in past.

This is not a situation where I need to provide vocational training or medical care or corrective treatment to you as defendants, but it is a punishment that I'm going to met out today that will focus on what I believe is a very serious crime. I've noted in other contexts a theory that relates to what happens when we allow the small

1    things in our community, the so-called broken

2    windows of our communities, to go uncared for, and

3    there's a sense in which that's what is happening

4    here, is the four of you will be held accountable

5    to something perhaps you don't believe has an

6    insidious impact of other crimes.  And yet, when we

7    leave this one uncared for, it can have a long

8    range of effect in terms of the public's confidence

9    in the political process.

10           I've created an extensive and detailed

11   record with regard to the guidelines, and so I will

12   just reference that and let the parties know that

13   I've considered them carefully, the policy

14   statements that have been made by the United States

15   Sentencing Commission.

16           So that brings me finally to the nature

17   and circumstances of this offense and the history

18   and characteristics of this defendant.  It is rare

19   for me to conclude that the sentencing range

20   provided by the guidelines does not fairly

21   represent a just range for individual defendants,

22   but I'm going to conclude that today.  I do not

23   believe that an in guideline sentence would be fair

24   or just with regard to any of the defendants in

25   court here today.  And so for that reason, I will

1   depart below the guidelines for a sentence that I

2   believe is fair, and reflects the nature and

3   circumstances of this offense and the history and

4   characteristics of the defendant.

5          Judge Thompson, I have read every letter

6   that has been sent to me.  There's no requirement

7   that I do so, but it's part of my practice.  And

8   there is no question that you have a record of

9   accomplishment that you ought to be very proud of.

10  I see an elected official who rolled his sleeves up

11  aggressively, dreamed big for a county that had not

12  always benefited from that kind of vision, and

13  sometimes perhaps cutting through bureaucratic red

14  tape or what some might think as cutting corners,

15  you tried to get some things done for your county

16  with a sense of urgency that comes sometimes for

17  elected officials, and I think you did so in a way

18  that's commendable.  Nothing that happens here

19  today, nothing about the bad decisions that you

20  make will undo any of that for your county.  And

21  you ought to be proud of that.  And I think that

22  kind of extraordinary service is fair for me to

23  consider in terms of a sentence that departs below

24  the guidelines.

25         Secondly, there is a sense in which there

is no evidence in this case that any of the
defendants have used their public service as a way
to feather their own nest, a term that's sometimes
used.  There's been no evidence in this case that
monies were funneled into private bank accounts or
that funds were used for personal gain, with some
limited exceptions, beyond the factual allegations
that are here in court today.  But given that
finding, there are two caveats, if you will, that I
need to put on the record.  Number one, there is
something to be gained when an elected official
misappropriates funds in an effort to gain votes,
and that, of course, is re-election, and that is
the maintenance of a politically-appointed position
into the future.  That's not a small thing in a
rural county.  It's not a small thing in an urban
county, and certainly, it's something that has some
personal benefit.  So it's not entirely accurate
with regard to all of the defendants to conclude
that there hasn't been some personal benefit
involved in that salary that's going to continue to
come if one gains that political position, and the
power that comes with that.

          And then there's this, and then I'll
impose your sentence.  My career has been entirely

in public service, and I've tried to get it right.

I may not have always made the decisions in

retrospect that I wish I had, but it -- I am

offended when the good guys make bad decisions.

One of the things that I think is important to

consider is the level of cynicism that occurs --

and this goes to the seriousness of this offense --

when the good guys, the ones that are doing it

right 95 percent of the time, then make a bad

decision and do something that is criminal.  There

is a sense in which the level of cynicism rises

when that happens.  The expectations for you and

the other defendants here were so high coming in.

They have maintained a certain expectation based on

your private accomplishments, and you ought to be

proud of those accomplishments.  But in the end, I

cannot overlook what happens to kind of the fabric

of our communities when the good guys make a bad

decision and do something wrong.  My job is to look

at that and to hold you accountable for that, and

my sentence will attempt to do that in a just way.

I have, just so the record's complete,

also considered the need for unwarranted

disparities.  I've considered it carefully in terms

of co-defendants in this case.  I've considered it

1   as it relates to the broader argument about the

2   sentences imposed on those that face similar kinds

3   of public corruption charges, and I've referenced

4   to guideline calculations in terms of my sentence,

5   even though it will be below the range.

6          So I'm going to state your sentence now,

7   and if there's no objection, other than already

8   been stated, it will be imposed as stated.

9   Pursuant to the Sentencing Reform Act of 1984, as

10  modified by the *Booker* and *Fanfan* decisions, the

11  Court finds the following sentence is sufficient,

12  but not greater than necessary, to comply with the

13  purposes of 18 United States Code, Section

14  3553(a).  Accordingly, it's the judgment of the

15  Court that the defendant Randall Clinton Thompson

16  is hereby committed to the custody of the Bureau of

17  Prisons to be imprisoned for a term of 40 months on

18  each of Counts 1 and 2, to run concurrently for a

19  total of 40 months.  Upon release from

20  imprisonment, the defendant shall be placed on

21  supervised release for a term of three years on

22  each of Counts 1 and 2 to run concurrently for a

23  total of three years.  Within 72 hours of release

24  from the custody of the Bureau of Prisons, the

25  defendant shall report in person to the probation

```
 1    office in the district to which the defendant is
 2    released.  And while on supervised release, the
 3    defendant shall not commit another federal, state,
 4    or local crime, shall comply with the standard
 5    conditions that have been adopted by this Court,
 6    and shall comply with the following additional
 7    conditions:  Mr. Thompson shall not possess a
 8    firearm, destructive device, ammunition, or
 9    dangerous weapon.  The drug testing condition
10    required by 18 United States Code, Section 3563(a)
11    is suspended, based on my determination that the
12    defendant poses a low risk of future substance
13    abuse.  In addition, the defendant shall comply
14    with the following special conditions:  He shall
15    provide the probation officer with access to any
16    requested financial information.  He shall not
17    incur any credit charges or open additional lines
18    of credit, without the approval of the probation
19    officer, unless he is in compliance with the
20    installment payment schedule.  The defendant shall
21    not become a candidate for any public office, nor
22    shall he perform any duties on another individual's
23    campaign for such a position or title.  The Court
24    imposes this occupational restriction in accordance
25    with United States Sentencing Guidelines, Section
```

1    5F1.5.

2         It's further ordered that the defendant

3    shall pay to the United States a special assessment

4    of $200, which shall be due immediately.  I do find

5    that the Knott County Fiscal Court has suffered

6    injury compensable under the Mandatory Restitution

7    Act in the amount of $238,793.  As this is to be a

8    joint and several obligation, it is further ordered

9    that the defendants shall make restitution of

10   $238,793, except no further payment shall be

11   required after the sum of the amounts actually paid

12   by all the defendants, including Mr. Thompson,

13   Mr. Combs, Mr. Champion, and Mr. Adams, has fully

14   recovered the compensable injury.  The lump sum

15   payment of $238,793 shall be paid towards the

16   criminal monetary penalties set out in this

17   judgment.  Such lump sum shall be due immediately.

18   Any outstanding balance owed upon commencement of

19   incarceration shall be paid in minimum quarterly

20   installments of $25, unless the defendant is

21   employed by Federal Prison Industries, in which

22   case, the defendant's quarterly installments shall

23   not be less than $60.  Any outstanding balance owed

24   upon commencement of the supervision shall be paid

25   in minimum monthly installments of $100, pending

1  subsequent orders of the Court.

2      I find that the defendant does not have

3  the ability to pay a fine or to pay interest, and

4  it's ordered that the interest requirement is

5  waived, and the fine is waived in this case as

6  well.

7      Mr. Thompson, I'll note, maintains all of

8  his appellate rights.  Let me see, other than the

9  reasons already articulated, if there's any reason

10  why this sentence should not be imposed as stated?

11      MR. WESTBERRY:  No additional reasons,

12  Your Honor.

13      THE COURT:  All right.  The Court hereby

14  orders the sentence imposed.

15      My requirement, Mr. Thompson, is to notify

16  you in writing of your appeal rights.  It's a

17  requirement of the Rules.  We're going to do that

18  at this time.  We're going to take a moment with

19  your counsel to discuss that, and then sign that

20  after you've had a chance to do that.  Tender that,

21  please, to Mr. Thompson.

22      Okay.  The record will reflect that the

23  defendant has signed the notice of appeal rights.

24  I'll further order that a judgment of the

25  conviction be prepared and entered in the record,

1    and we'll certainly do that promptly.

2            I do believe that all defendants are

3    candidates for self-surrender, and so,

4    Mr. Thompson, you will be continued on his bond,

5    pending designation, but I am going to also set a

6    report date.  Now, I understand that some counsel

7    and --

8            MR. WESTBERRY:  Yes.

9            THE COURT:  -- may want to file

10   appropriate motions with regarding to maintaining

11   their release status pending appeal in this case.

12   I'll certainly address those, and address them

13   promptly.  I think there's at least one pending

14   before the report date, but otherwise, the report

15   date is set for Monday, March 23, 2008.

16           MR. WESTBERRY:  '09.

17           THE COURT:  '09.

18           MR. WESTBERRY:  Thank you, Judge.

19           THE COURT:  Thank you.  Okay.  Any other

20   matters, Mr. Westberry?

21           MR. WESTBERRY:  Not at this time, Your

22   Honor.

23           THE COURT:  Okay.  Thank you,

24   Mr. Thompson.  You may be seated.

25           Mr. Combs, if you'll come around to the

1  podium, please.  Okay.  Sir, again, there's no

2  requirement that you address the Court, but if

3  you'd like to do so, I'd be pleased to hear from

4  you at this time.

5        THE DEFENDANT:  No.

6        MR. WEBSTER:  He doesn't have anything to

7  add, Your Honor.

8        THE COURT:  Okay.  That's fine.  There's

9  no penalty for not adding anything.  You've been

10 very ably represented, sir.

11       I will impose your sentence at this time.

12 And then if there's no further objection, it will

13 be imposed as stated.  Pursuant to the Sentencing

14 Reform Act of 1984 as modified by the *Booker* and

15 *Fanfan* decisions, and let me just say further on

16 the record as it relates to you, and just to make

17 sure that the record's complete, I'd incorporate

18 what I said previously as it relates to all

19 defendants, Mr. Combs, and I'm not going to kind of

20 person after person articulate the same thoughts

21 because I think they'd apply equally.

22       I would note I've looked at your

23 presentence investigation report, and you haven't

24 been in any -- the kind of position that

25 Mr. Thompson has been in in your community, but I

1    have a great deal of respect for the role that
2    you've had in the community as well.  And the
3    presentence investigation report identified a
4    number of instances in which you had been of
5    assistance and a great contributor to the community
6    which you've been a part of, and I've said that on
7    behalf of all of the defendants.
8          The second thing I'd just note for the
9    record again, is I don't think the guideline
10   sentence adequately reflects this particular case,
11   and I'd just identify two different issues.  One is
12   the issue that relates to the fact that nobody's
13   pockets were unduly feathered here.  This is not a
14   case in which there was large amounts of money
15   being funneled into private funds -- private
16   accounts or peoples, with the exception of some
17   blacktop issues.  There's no evidence in the record
18   that private -- or public monies were being used in
19   a way that was of great personal benefit, other
20   than what I have said as it relates to the benefit
21   that comes from staying in power.  I mean, there is
22   a certain benefit that comes with that.
23         And I just finally say as it relates to
24   you specifically as well.  My sentence does
25   reference the guidelines, which I do think fairly

takes into account the issues with regard to
obstruction of justice in this particular case.
But I don't think that guideline sentence takes
fairly into account kind of the broader issues in
this particular case as it relates to the nature of
the atmosphere and the environment and the culture
and the work that was taking place in Knott
County.  There is an extent which I have taken into
account this long tradition that is taking place
and the fact that it was part of the culture.  It
doesn't excuse it.  You're going to be held
accountable for it, but I do think the guidelines
don't fairly take that into account.

So as I was saying, pursuant to the
Sentencing Reform Act of 1984, as modified by the
*Booker* and *Fanfan* decisions, I do find the
following sentence is sufficient, but not greater
than necessary, to comply with the purposes of 18
United States Code, Section 3553(a).  Accordingly,
it's the judgment of the Court that the defendant
John Mac Combs is hereby committed to the custody
of the Bureau of Prisons to be imprisoned for a
term of 36 months on each of Counts 1 and 2 to run
concurrently for a total of 36 months.

Upon release from imprisonment, the

1    defendant shall be placed on supervised release for
2    a term of three years on each of Counts 1 and 2, to
3    run concurrently for a total of three years, and
4    within 72 hours of release from the custody of the
5    Bureau of Prisons, the defendant shall report in
6    person to the probation office in the district to
7    which the defendant is released.  While on
8    supervised release, the defendant shall not commit
9    another federal, state, or local crime, shall
10   comply with the standard conditions that have been
11   adopted by this Court, and will comply with the
12   following additional conditions:  He shall not
13   possess a firearm, destructive device, ammunition,
14   or dangerous weapon.  I will suspend the drug test
15   required by 18 United States Code, Section
16   3563(a)(5) because I do not believe that the
17   defendant poses a risk for future substance abuse.
18   He poses a very low risk, in fact.
19          And in addition, I'm going to ask that he
20   comply with the following special conditions:  He
21   should provide the probation officer access to any
22   financial information, and shall not incur new
23   credit charges or open additional lines of credit
24   without the approval of the probation officer,
25   unless he's in compliance with the installment

payment schedule. And he shall not become a candidate for any public office, nor shall he perform any duties for another individual's campaign for such a position or title. This is imposed again, based in accordance with the United States Sentencing Guideline, Section 5F1.5.

It's further ordered that the defendant shall pay to the United States a special assessment of $200, which shall be due immediately. As I've indicated, I've found that the Knott County Fiscal Court has suffered injury compensable under the Mandatory Restitution Act. I'm required to impose restitution in this case. I would do so in the amount of $238,793. As I've indicated, it's a joint and several obligation, so it's further ordered that the defendant shall make this restitution of $238,793, except that no further payment shall be required after the sum of the amount's actually paid by all defendants as fully covered for the compensable injury. So, therefore, the lump sum payment of $238,793, shall be made towards the criminal monetary penalty set out in the judgment. Such lump sum shall be due immediately, and any outstanding balance owed upon commencement of incarceration shall be paid in

1    minimum quarterly installments of $25, unless the

2    defendant is employed by Federal Prison Industries,

3    in which case the defendant's quarterly

4    installments shall be no less than $60, and the

5    outstanding balance owed upon commencement of

6    supervision shall be paid in minimum monthly

7    installments of $100, and any subsequent orders of

8    the Court.

9          I do not believe that the defendant has an

10    ability to pay interest.  I will waive interest in

11    this case, nor do I believe that the defendant has

12    an ability to pay a fine, so I will waive the fine

13    in this case as well.

14          Other than the objections already stated,

15    let me see if either party has any objections to

16    the sentence as imposed.

17          MR. WEBSTER:  No, Your Honor.

18          MR. TAYLOR:  No, Your Honor.

19          THE COURT:  Okay.  Well, I will order that

20    the sentence be imposed as stated.  And again, I'd

21    ask to have the notice of appeal rights tendered to

22    Mr. Combs.  You've maintained all of your appellate

23    rights.  Mr. Combs, I'd ask for you to spend a

24    moment with Mr. Webster to go over those

25    documents.

1           The record will reflect that Mr. Combs has

2    signed the notice of appeal rights.  I'll further

3    order a judgment of the conviction be prepared and

4    entered in the record, and that will certainly be

5    done shortly.  Mr. Combs will be continued on

6    bond.  He'll have the same report date as

7    Mr. Thompson, which is Monday, March 23, 2009.

8           MR. WEBSTER:  Is there a time on that?

9           THE COURT:  Typically, we -- I think we

10   say 2:00.

11          MR. HALL:  That's correct, Your Honor.

12          THE COURT:  And that will be true for both

13   defendants.  I think we -- just come back at 2:00,

14   and there will be a notice as to where the

15   defendants are to report.

16          MR. WEBSTER:  Okay.

17          THE COURT:  Okay.  Mr. Champion.  Okay.

18   Sir, again, I will take whatever time you'd like.

19   I'd be happy to hear any additional remarks that

20   you have, and you may do so at this time.

21          DEFENDANT CHAMPION:  Well, Your Honor, I

22   accepted my position with the thoughts that I could

23   help my community.  I think it's our Christian duty

24   to get involved with local, state, and national

25   politics.  It's kind of like hiding a light under a

bush if you don't.  And anything that I know of
that we did during my -- I would go out and gather
information, talk it over with the judge, and
explain the situation.  Normally, it was somebody
that couldn't afford to help themselves.  I'd talk
to the employees that had been there 20 some
years.  They would say that they had worked the
roads for several years, or the bridge, the bridge
had been built by the county in the past, and we
were merely maintaining that.  The judge would then
tell me to go back and do it.  And I'm sorry if we
had some procedural errors.  I'm sorry -- well, I'm
sorry to be here as much -- I really believe that
it takes a toll on you having to do this as much as
from watching your facial expression and all,
but -- and I'm sorry.  I knew when I took the
position that I might be now standing up, but I
didn't know what it would do to my family and my
wife and my two pre-teen daughters and my aging
mother.  But all I can say is I didn't knowingly
violate any laws, and I'm sorry if we did and --
but our ultimate goal was to help people, and
that's what I was trying to do.

THE COURT:  All right, sir.  Let me have
you stay there, and I would just adopt by reference

the comments I've made in kind of these acts
generally and the seriousness of this particular
offense.  And as I've said, as relates to all of
you, I don't think a particularly long sentence is
needed to provide deterrence for any future
criminal conduct that you might commit, but there
is a sense in which these sentences are imposed and
provided as options for judges by Congress in order
that they'll have a general deterrent effect in the
community.

Mr. Champion, I want to say, and I'll just
say as is true with Mr. Combs and Mr. Thompson,
and, of course, Mr. Adams as well, there's no need
to protect the public from future crimes that you
might commit; I want to make that clear on the
record, nor is this a case in which we need to
provide you with additional training or drug
rehabilitation.  That's not this kind of sentence.
I've put on the record, as I have for all the
defendants, the guideline calculations, but I do
find here that this -- again, the guideline range
doesn't provide for a just punishment.  I think a
departure below that range is important.  And I'll
-- I'm going to depart in your case for the exact
same reasons I've departed in the other cases.

1    I'm not going to repeat them, except to

2  say as it relates to your contribution to the

3  community, to your contribution to your church, to

4  your contribution to your family, I have great

5  respect for it.  I don't find fault with it.  I

6  think it's admirable that you want to be involved

7  in public life.  And it's regretful to find someone

8  who has found themselves now having to accept some

9  accountability for some bad decisions that were

10  made.  I do think you came a little bit late to

11  this in terms of public service.  I do think your

12  culpability, to use the phrase of the Government,

13  is probably as less here as any of the defendants

14  that are here, and my sentence will reflect my

15  judgment that that is the case.

16    And finally, I would just say this.

17  You're right, Mr. Champion, this is the hardest

18  thing that I do.  I don't take any pleasure in it.

19  I'm honored to serve in this role and consider it a

20  high honor to do it, but it's a responsibility I

21  have and it's one that I carry out willing, and

22  with a grave understanding of the impact it has on

23  your life and your family's life and your friends

24  as well.

25    So I'm going to impose the sentence in

this case, and if there's no objection, it will be imposed as stated.  Pursuant to the Sentencing Reform Act of 1948, as modified by the *Booker* and *Fanfan* decisions, I find that the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 United States Code, Section 3553(a).  Accordingly, it's the judgment of the Court, the defendant Phillip G. Champion is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 18 months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he's released. While on supervised release, he shall not commit another federal, state, or local crime, shall comply with the standard conditions that have been adopted by this Court, and shall comply with the following additional conditions:  He shall not possess a firearm, destructive device, ammunition, or dangerous weapon.  I think you're a low risk, though, for substance abuse, so I'm going to

1    suspend the drug testing requirement of 18 United

2    States Code, Section 3563(a)(5), and I'm going to

3    impose some special conditions:  Number 1,

4    Mr. Champion, that you provide the probation

5    officer with access to any financial information.

6    Secondly, that you not incur any credit charges or

7    open additional lines of credit without the

8    approval of the probation officer, unless he's in

9    compliance with the installment payment schedule.

10   And that you not become a candidate for any public

11   office, nor shall he perform any duties on another

12   individual's campaign for such a position or

13   title.  I impose this occupational restriction in

14   accordance with United States Sentencing Guideline,

15   Section 5F1.5.

16          You'll owe a special assessment payable to

17   the United States today of $100.  And as I've

18   indicated, I've have found the Knott County Fiscal

19   Court has suffered compensable injuries pursuant to

20   the Mandatory Restitution Act in the amount of

21   $238,793.  I'm required under the law to impose

22   restitution, and I'm finding that it's a joint and

23   several obligation.  And so you shall make

24   restitution in that amount, $238,793, except that

25   no further payment shall be required after the sum

1    of the amount's actually paid by all defendants in

2    this case has fully covered the compensable

3    injury.  The defendant shall make a lump sum

4    payment of $238,793, which the criminal monetary

5    penalty set out in the judgment.  Such lump sum

6    shall be due immediately, and any outstanding

7    balance owed upon the commencement of incarceration

8    shall be paid in minimum quarterly installments of

9    $25, unless the defendant's employed by Federal

10   Prison Industries, in which case, the defendant's

11   quarterly installments shall be no less than $60.

12   Any outstanding balance owed upon commencement of

13   supervision shall be paid in minimum monthly

14   installments of $100, pending subsequent orders of

15   the Court.

16          I find that you do not have the ability to

17   pay interest, so I'm going to waive any interest

18   requirement.  I find that you do not have the

19   ability to pay a fine.  I'll waive the fine in this

20   particular case.

21          Let me see if either side has any

22   objection to the sentence imposed as stated?

23          MR. TAYLOR:  No, Your Honor.

24          MR. JENSEN:  No, Your Honor.

25          THE COURT:  The sentence will be imposed.

1 And you have maintained all of your appeal rights,

2 and so I will provide at this time the notice of

3 appeal rights to the defendant.

4        MR. JENSEN:  Thank you, Your Honor.

5        DEFENDANT CHAMPION:  Thank you.

6        THE COURT:  I'll further order that the

7 judgment of the conviction be prepared and entered

8 in the record, and that will be done certainly

9 promptly.  Of course, Mr. Champion you'll be

10 continued on bond pending the report date of

11 Monday, March 23, 2009, 2:00 p.m.  Thank you.

12        Mr. Adams, are you able to come to the

13 podium and stand?

14        DEFENDANT ADAMS:  Yes, sir.

15        THE COURT:  Okay.  I'd ask you to do that,

16 then.  Again, I don't want to belabor the points

17 that I've already made, Mr. Adams.  I want to give

18 you an opportunity, though, to address me; that's

19 your right.  Again, you're not required to,

20 though.  I'll give you the opportunity to do that

21 at this time.

22        DEFENDANT ADAMS:  All right.  Thank you,

23 Your Honor.  In Knott County, we have a unique

24 county because there's no industry in Knott County

25 other than coal mining, and her only tax base that

1    we can probably keep our county going on would be

2    like a bedroom community, you know, from these

3    people that live there.  And a lot of people live

4    in Knott County, but they transfer to another

5    county to work and stuff.  And I've always took it

6    into consideration the roads has to be there for us

7    to survive, and I've always worked hard to do

8    that.  And I've tried my best to make Knott County

9    better, not worse, better.  Thank you.

10            THE COURT:  Well, and as I've indicated, I

11   think you and all the defendants have done that.  I

12   mean, there's much in your record, and I've looked

13   at it carefully, the presentence investigation

14   report, and looked at the letters that have been

15   sent on your behalf.  And I will say to you the

16   same thing I said to Mr. Thompson, say to all the

17   defendants here.  There's nothing about what

18   happens here today that takes away that good work

19   you've done on behalf of Knott County.  I think you

20   have done a lot of work.  I'm again, not going to

21   go through all the factors.  I've considered them

22   all with you as well, and for reasons that I've

23   articulated already, I am going to depart below the

24   range that's recommended.  You have a sentence

25   that's below what's been recommended based on the

1  guideline calculations that were reduced earlier

2  today.  And I do think it's because of this lack of

3  personal gain.  Perhaps there was a sense in the

4  end of justifying the means here, and I'll have to

5  hold you accountable for that like I've done the

6  other defendants.  But I think the intention

7  largely was a good intention.  I don't think the

8  guideline calculations take into account here the

9  lack of personal benefit that the defendants

10  received in all of this.  Although I've noted, I do

11  think that there's the benefit that comes with kind

12  of retaining power.  It's a benefit that I know you

13  understand, and you've seen administrations come

14  and go.  And I think further, that the guidelines

15  do not take into account the decisions that were

16  made in this particular culture.  It doesn't excuse

17  them, but I think a just punishment is best found

18  below the guideline range, so I'm going to impose

19  your sentence now, Mr. Adams.  If there's no

20  objection, other than what's already been stated,

21  it will be imposed.

22          Pursuant to the Sentencing Reform Act of

23  1984, as modified by the *Booker* and *Fanfan*

24  decisions, I find that the following sentence is

25  sufficient, but not greater than necessary, to

comply with the purposes of 18 United States Code,
Section 3553(a).  Accordingly, it's the judgment of
the Court, the defendant Ronnie Adams is hereby
committed to the custody of the Bureau of Prisons
to be imprisoned for a term of 32 months on each of
Counts 1, 2 and 3, to run concurrently for a total
sentence of 32 months.  Upon release from
imprisonment, the defendant shall be placed on
supervised release for a term of three years on
each of Counts 1, 2 and 3, to run concurrently for
a total of three years.  Within 72 hours of release
from the custody of the BOP, the defendant shall
report in person to the probation office in the
district to which the defendant is released.  While
on supervised release, the defendant shall not
commit another federal, state, or local crime,
shall comply with the standard conditions that have
been adopted, and shall comply with the following
additional conditions:  He shall not possess a
firearm, destructive device, ammunition, or
dangerous weapon.  The drug testing condition
required by 18 United States Code, Section
3563(a)(5) is going to be suspended.  I believe
Mr. Adams is a low risk of future substance abuse.
And I will impose these special conditions as

1    well:  You shall provide the probation officer with

2    access to any requested financial information.  You

3    shall not incur new credit charges or open

4    additional lines of credit without the approval of

5    the probation office, unless you're in compliance

6    with the installment payment schedule, and you

7    shall not become a candidate for any public office,

8    nor shall you perform any duties on another

9    individual's campaign for such a position or title

10   imposing a restriction pursuant to the occupational

11   restriction found in United States Sentencing

12   Guideline, Section 5F1.5.

13           Your special assessment, Mr. Adams, is

14   $300.  It's due immediately to the United States.

15   It's $100 per count.  And as I've indicated, the

16   Knott County Fiscal Court has suffered an injury

17   here.  It's compensable under the Mandatory

18   Restitution Act.  I'm required to impose

19   restitution.  I'll do so here in the amount of

20   $238,793.  The defendant's ordered to make

21   restitution in that amount, but it's a joint and

22   several obligation.  So no further payment will be

23   required after the sum of the amount's actually

24   paid by all the defendants has fully covered the

25   compensable injury.  So you shall make a lump sum

1  payment of $238,793 towards these monetary

2  penalties that will be set out in the judgment.

3  And such lump sum shall be due immediately.  Any

4  outstanding balance owed upon commencement of

5  incarceration shall be paid in minimum quarterly

6  installments of $25, unless the defendant's

7  employed by Federal Prison Industries, in which

8  case, the quarterly installment shall be no less

9  than $60.  Any outstanding balance owed upon

10  commencement of supervision shall be paid in

11  minimum monthly installments of $100, pending

12  subsequent orders of the Court.

13       Again, I find that the defendant does not

14  have the ability to pay interest, and I'm going to

15  order that the interest requirement be waived, as

16  well as the ability to pay a fine, I don't believe

17  is here, so I'm going to waive the fine in this

18  case as well.

19       Mr. Adams, you, too, have maintained all

20  of your appeal rights in this case, so I'll ask

21  that you review the document, which is about to be

22  tendered to you, which is a written notice of those

23  rights.

24       Okay.  The record will reflect that the

25  defendant has signed the notice of appeal rights.

1    Let me see if either party has any objection to the

2    sentence as it relates to Mr. Adams, other than

3    what's already been stated?

4              MR. TAYLOR:  No, Your Honor.

5              MR. WILLIAMS:  Nothing other than already

6    been stated, Your Honor.  Thank you.

7              THE COURT:  Well, I'll further order a

8    judgment of conviction be prepared and entered in

9    the record.  It will be done promptly, and the

10   defendant will be continued on bond, pending the

11   report date of Monday, March 23, 2009, at 2:00 p.m.

12   Thank you, Mr. Adams.

13             DEFENDANT ADAMS:  Thank you.

14             THE COURT:  Let me ask you, Mr. Taylor,

15   whether you have any objection to the process

16   that's been used in this sentencing today.

17             MR. TAYLOR:  No, Your Honor.

18             THE COURT:  And I'd ask each defendant's

19   counsel whether there's any objection to the

20   procedure that's been used in imposing this

21   particular sentence?

22             MR. WILLIAMS:  No, Your Honor.

23             THE COURT:  Mr. Westberry?

24             MR. WESTBERRY:  No, none.

25             MR. JENSEN:  No, Your Honor.

```
 1          THE COURT:  Mr. Webster?

 2          MR. WEBSTER:  None.

 3          THE COURT:  Okay.  And I think I heard no

 4   from --

 5          MR. WILLIAMS:  No, Your Honor.

 6          THE COURT:  Okay.  All right.  Counsel,

 7   let me see if there are any other matters that I

 8   need to address before we stand in adjournment.

 9          MR. TAYLOR:  My memory is that there is a

10   motion for appellate bond pending.

11          MR. WESTBERRY:  There are two of them.  Do

12   you want to handle them or ...

13          THE COURT:  There are.  I will take those

14   under advisement.  As I've indicated, I want all

15   counsel to have an opportunity to file those, if

16   they choose, and then we'll ask that you -- if you

17   have not filed one, I'd ask that you file them

18   promptly.  Has the Government filed a response?

19          MR. TAYLOR:  No, we haven't.

20          THE COURT:  Okay.  I'd ask you to file a

21   response to those.  We'll not address those right

22   now, Counsel, but we'll do that promptly, and I'll

23   certainly address them promptly, given the fact

24   that we have a reporting date in March.

25          MR. WEBSTER:  Is the special assessment,
```

1  can it be paid at the moment, or do we have to come

2  back tomorrow?  Is the clerk's office open?

3        THE COURT:  Okay.  We can take that.  I

4  have no objection, if the Government doesn't have

5  any objection, to that being made tomorrow.  We can

6  accept it if someone wants to go ahead and take

7  care of that obligation.  You'd receive a

8  handwritten receipt with tomorrow's date on it.

9        MR. WEBSTER:  We'll just wait.

10       THE COURT:  So I'll ask that you, within

11  24 hours, make those arrangements.

12       MR. WILLIAMS:  I think the clerk's office

13  is closed anyway.

14       THE COURT:  I think they may be.  Any

15  other matters that we need to address?

16       MR. WESTBERRY:  No, Your Honor.

17       THE COURT:  We will stand in adjournment.

18       MR. WESTBERRY:  Thank you, Your Honor.

19       [END OF PROCEEDINGS – 5:35 p.m.]

20              *  *  *  *  *

21

22

23

24

25

1          The undersigned Court Reporter hereby

2    certifies that:  (1) The foregoing 202 pages

3    represent an accurate and complete transcription of

4    the record of the proceedings before the United

5    States District Court for the Eastern District of

6    Kentucky at Pikeville before the Honorable Gregory

7    F. Van Tatenhove, presiding, in the matter of

8    United States of America vs. Randall Clinton

9    Johnson, John Mac Combs, Phillip G. Champion, and

10   Ronnie Adams, and (2), these pages constitute an

11   original of the transcript of the proceeding.

12

13          */s/ Sandy C. Wilder*

14          SANDY C. WILDER, RMR, CRR

15          COURT REPORTER

16

17   ***TRANSCRIPT HAS BEEN FILED ELECTRONICALLY***

18

19

20

21

22

23

24

25