UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 07-35-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| RANDALL THOMPSON, ET AL., | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| Defendants. | ) | |

*** *** *** ***

The Defendants all want a new trial.[1]  In one form or another, they claim the government failed to tell them about its grants of immunity to over twenty witnesses; or, if it did, it was too late to be effectively used.  This is odd since they did not challenge a single witness at trial with the immunity agreements they did know about.

In any event, the Defendants will not get their wish.  After an exhaustive review of the record, it is clear that not all of the witnesses received immunity and many of those that did were made known to the Defendants in a permissive manner.  As for the few immunity agreements that were not disclosed, there is no reasonable probability that had the Defendants possessed this information and decided to use it to attack the credibility of those witnesses, the outcome of the trial would have been different.  So, as explained more fully below, a new trial is not required.

---

[1]Defendant Randall C. Thompson has filed a Motion for New Trial Based on *Brady/Giglio* Violation.  [R. 289.]  Defendant Ronnie Adams has filed a similar Motion for New Trial [R. 293], and the remaining Defendants, John "Mac" Combs and Phillip G. Champion, have joined in those motions.  The United States has filed a response in opposition [R. 303], and the Defendants have filed replies [R. 304, 306, 308].

# I.

The four-count Indictment [R. 3] charged the Defendants, as agents of the local Knott County government, with several counts of criminal wrongdoing related to the distribution of county-purchased blacktop, gravel, and bridge-building materials as part of an attempt to influence the outcome of an election. The Indictment alleged that all four Defendants conspired to buy votes and misappropriate government property, in violation of 18 U.S.C. § 371. The Defendants were also collectively charged with aiding and abetting each other in the misappropriation of government property, in violation of 18 U.S.C. § 666, while Ronnie Adams was individually charged with two separate counts of vote buying, in violation of 42 U.S.C. § 1973i(c). Essentially, the Indictment alleged that the Defendants used materials purchased by the government to improve private property and that they did this, by agreement, in exchange for votes for Randy Thompson.

Following a jury trial, the Defendants were all convicted of misappropriating government property. [*See* R. 165, 166, 167, 168.] Thompson, Combs, and Adams were also convicted of the conspiracy count. The jury acquitted Champion on the conspiracy charge, and Adams was convicted of one of the vote buying counts and acquitted on the other. The Defendants all filed motions for judgment of acquittal and for new trial [R. 174, 177, 181, 183], which were subsequently denied [R. 237, 238, 239, 240]. The Court sentenced the Defendants on February 2, 2009. [*See* R. 242, 243, 244, 245.] They promptly appealed their convictions to the Sixth Circuit Court of Appeals [R. 246, 251, 252, 257], and the Court granted the Defendants' motions for release pending appeal [R. 274].

The defense now alleges that the United States failed to disclose evidence, as required

2

under *Brady* and *Giglio*, that it offered several of its witnesses transactional immunity against state or federal charges.  Upon motion from the Defendants, the Sixth Circuit held the appellate briefing schedule in abeyance pending this Court's resolution of the motions for new trial.  [R. 301.]  The Court, based on the stay of the appeal, directed further briefing on the motion and subsequently conducted an evidentiary hearing.  [R. 324.]  At that hearing, the Court heard testimony from several witnesses as well as argument from the parties.  Following the hearing, the Court invited the parties to submit supplemental briefing.  Thompson, Combs, and Adams elected to file post-hearing briefs.  [R. 327, 329, 331.]  And, although the United States did not file a supplemental brief, it did submit additional transcripts of grand jury and trial testimony.  [R. 325, 326.]

## II.

The due process clause requires the government to disclose favorable evidence to the defendant.  *Brady v. Maryland*, 373 U.S. 83 (1963).  In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  Thus, there are three components of a true *Brady* violation:  the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  *Strickler v. Green*, 527 U.S. 263, 281-82 (1999); *see also Akrawi v. Booker*, 572 F.3d 252, 262 (6th Cir. 2009) (internal citations and quotation marks omitted).  A defendant is prejudiced when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

At issue here are the United States' promises not to prosecute several witnesses in return for their truthful testimony. The United States, through the prosecutor in this case, Assistant United States Attorney Ken Taylor, advised many of its witnesses at the outset of their grand jury testimony that it had no interest in prosecuting them if they told the truth.[2] [R. 303, Ex. D, Taylor Aff. at ¶¶1-3.] The majority of these informal assurances were made at two grand jury sessions, in October and November of 2007. At the October grand jury, AUSA Taylor offered such an assurance collectively to a group of approximately ten witnesses gathered in a break room. He then repeated similar assurances for each witness on the record at the outset of the witness' testimony. [*See, e.g.*, R. 303, Ex. C; R. 325.] Although AUSA Taylor originally indicated that he provided a similar collective assurance for the November grand jury, he testified at the evidentiary hearing that he believes he conferred immunity en masse only at the October

---

[2]For example, after AUSA Taylor asked Jerry Robinson his name and informed him of the purpose of the investigation, the following colloquy occurred:

> TAYLOR: And we've heard that you were one of the people that got some blacktop on your private drive. We're not interested in prosecuting people who received blacktop provided they are completely honest about the circumstances, okay?
>
> ROBINSON: Okay.
>
> TAYLOR: So if you are completely honest with us today, you will not be prosecuted even if technically you got something you weren't supposed to get. However, if you lie to us, then that's a different story, you understand that?
>
> ROBINSON: I got no reason not to.

[R. 303, Ex. C, pp. 5-6.]

grand jury session.  [R. 328, Hrg. Tr. 17-18, 21-22.]

Also at issue are statements made to potential witnesses by Marcus Hopkins, the lead investigator in the case.  Detective Hopkins is employed by the Kentucky State Police and also serves as a Task Force Officer of the Federal Bureau of Investigation.  [*Id.* at 10-12, 58-59; R. 303, Ex. E, Hopkins Aff. at ¶1.]  During the course of the investigation, AUSA Taylor advised Detective Hopkins that he could assure the recipients of free gravel and/or blacktop that they would not be prosecuted if they were truthful.  [*Id.* at ¶4; *see also* R. 303, Ex. D, Taylor Aff. at ¶1.]  Detective Hopkins recorded most of his interviews and summarized some in an FBI 302.

 The Defendants' initial motion focused on the immunity agreement of one particular witness, Randy Campbell.  However, they now argue that the United States either belatedly disclosed or completely failed to disclose informal immunity agreements with several of its witnesses.  They contend that these informal assurances conferred both state and federal immunity.  Such agreements, although not exculpatory, do constitute impeachment material.  And "*Brady* recognizes no distinction between evidence which serves to impeach a government witness' credibility and evidence which is directly exculpatory of the defendant.  Both are 'evidence favorable to the accused' and must be disclosed."  *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994).  It is well established that an express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady*.  *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  It is equally true, however, that the existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate.  *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir.) (en banc), *cert. denied*, 129 S. Ct. 114 (2008) (citing *Wisehart v. Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005)).

On December 19, 2007, the defense appropriately requested that the government disclose any *Giglio* material in its possession. [R. 289, Ex. A at ¶3.] Specifically, Defendant Thompson requested disclosure of "[t]he nature and substance of any agreement, immunity promise or understanding between the government and any agent thereof, and any witness, relating to the witness' expected testimony, including but not limited to, understandings or agreements, relating to pending or potential prosecutions." [*Id.*] The government did not respond. Thompson's counsel reiterated his request for disclosure of *Brady* and *Giglio* material on March 27, 2008. [Hrg. Ex. 2.] In a letter dated April 2, AUSA Taylor wrote that he "d[id]n't know of anything that is *Brady* or *Giglio* material" but that he would provide them with "witness statements" approximately two weeks before trial which they could evaluate for themselves. [R. 289, Ex. B.]

Although it is not entirely clear, it appears that part of the confusion surrounding these disclosures stemmed from AUSA Taylor's mischaracterization of the evidence as Jencks Act [3] material rather than *Brady* or *Giglio* material. In fact, when AUSA Taylor made certain disclosures on June 5, 2008, he indicated that the materials, including the grand jury transcripts of several witnesses, were being provided "[p]ursuant to the Jencks Act." [R. 289, Ex. C.] To be sure, the bulk of the grand jury transcripts are in fact witness statements for which the timing of disclosure is governed by the Jencks Act. And it is true that the Jencks Act overrides *Brady* with respect to the timing of disclosure. *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988) ("the government may not be compelled to disclose Jencks Act material before trial"). Thus,

---

[3]The Jencks Act provides that "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a).

evidence properly disclosed after testimony at trial pursuant to the Jencks Act cannot be subject to earlier disclosure under *Brady*. *Id.*

But that is not the case for the prosecutor's assurances to witnesses that they would not be prosecuted if they testified truthfully. Those informal immunity agreements are not "witness statements" as AUSA Taylor described them in his letter, but rather evidence favorable to the defendants which may be used to impeach the credibility of the government's witnesses. As the United States now recognizes [*see* R. 303, Ex. D, Taylor Aff. at ¶6], this evidence falls under *Brady*'s disclosure requirements instead of the later timing set forth in the Jencks Act. Consistent with *Brady* and *Giglio*, the prosecutor was required to disclose those agreements to the defense in time for their "effective use at trial." *Presser*, 844 F.2d at 1283.

In response to the present motions, the government stated that these assurances of non-prosecution were "so informal, so routine, and so well-known" that they did not immediately strike the prosecutor as being *Giglio* material that needed specific disclosure. [R. 303 at 3.] While it is true that the government does not have to disclose material readily available from another source, *see United States v. Clark*, 928 F.2d 733, 738 (6th Cir.) ("No *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to defendant from another source.") (citations omitted), *cert. denied*, 502 U.S. 846 (1991), merely suggesting that their immunity agreements were common knowledge does not satisfy the government's obligations under *Brady*. AUSA Taylor also notes that he made no effort to conceal these

agreements.[4]  But that argument misses the point entirely.  Not trying to hide something is not the same as disclosing it.  *Brady* does not simply forbid the government from attempting to hide evidence favorable to a defendant; it compels disclosure.  That is, *Brady* imposes an affirmative duty on the United States to disclose favorable evidence that it possesses to the defendant.

Here, the United States possessed evidence favorable to the Defendants.  That evidence consists of informal immunity[5] assurances orally made to several of the government's witnesses.  The first prong of a *Brady* violation is therefore established.[6]  The Court must next determine whether this evidence was suppressed by the United States and, if so, whether the Defendants were prejudiced by that.  The Defendants' claims encompass three categories of information:  (1) *Brady* material provided shortly before trial; (2) *Brady* material provided during trial; and (3) *Brady* material that the government never disclosed.  Because there are factual findings that must be made as to each group, the Court will address the different categories of disclosures separately.

## A.

Eight days before trial, on June 5, 2008, the government provided the defense with grand

---

[4]This statement also seems to suggest an absence of bad faith on the part of the government.  However, although the defense does not allege, and the Court finds no evidence, that the United States acted in bad faith, "[t]he good or bad faith of the government is irrelevant in a *Brady* analysis."  *Brady*, 373 U.S. at 87; *see also United States v. Agurs*, 427 U.S. 97, 112 (1976) ("Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor."); *United States v. White*, 492 F.3d 380, 409 (6th Cir. 2007) ("It matters little whether the government suppresses the evidence out of oversight or guile.").

[5]Except where otherwise noted, references to these immunity agreements concern federal rather than state immunity.

[6]This is not the case, however, for the Defendants' claims about undisclosed agreements.  For those claims, the Defendants must first establish the existence of the immunity agreements.

jury transcripts for the following witnesses: Harold Dean Bentley, Danny Combs, Byron Jacobs[7], Brandon Moore, Jeremy Morgan, Jeffrey Morgan, Bobby Reynolds, Jerry Robinson, Stanley Stumbo, and Roger Thornsbury[8]. [R. 289, Ex. C.] With the exception of Harold Dean Bentley and Bobby Reynolds[9], these transcripts accurately reflect the United States' informal assurance that the witnesses would not be prosecuted if they testified truthfully.

The Defendants concede that they did in fact receive these transcripts prior to trial. They also acknowledge that the assurances of non-prosecution are set out in those transcripts. However, the Defendants argue that they relied on AUSA Taylor's statement almost two months earlier that he was unaware of any *Brady* or *Giglio* material. [*See* R. 289, Ex. B.] That statement, according to the defense, misled counsel into believing that no such material existed. In essence, they argue that AUSA Taylor's statement so clouded their reading of the transcripts that they did not recognize or comprehend these informal non-prosecution assurances.

Before turning to the timing of these disclosures, the Court must address the Defendants'

---

[7]Byron Jacobs's grand jury testimony does not appear in the record. A review of his trial testimony, however, establishes that he is a Certified Public Accountant who worked for the Bank of Hindman and served as the Knott County Treasurer during the relevant time period of this case. Because nothing in his testimony suggests that he was exposed to any potential criminal liability, it is highly unlikely that the government offered him immunity. Regardless, the Defendants do not contend that Jacobs was given such an assurance or that it was suppressed in any way.

[8]Thornsbury did not testify at trial. Therefore, even if the government made the same informal assurance of non-prosecution to him, there was no opportunity or need to impeach him at trial.

[9]Because the transcripts do not reflect the prosecutor's assurances, to the extent that such assurances were made, to either Bentley or Reynolds, the government's disclosure of those transcripts cannot satisfy its obligation under *Brady*. The Defendants' arguments concerning the alleged immunity agreements for Bentley and Reynolds will therefore be discussed in a separate portion of this opinion.

argument about their effectiveness in the context of Mr. Taylor's statement that he "d[id]n't know of anything that is *Brady* or *Giglio* material." [R. 289, Ex. B.] That statement could reasonably be interpreted as meaning that no such material existed; and to that extent, it was made in error, a fact the government now admits. The defense, citing cases from other circuits, suggests that the practice of entering into oral immunity agreements with witnesses has been widely criticized by courts. *See, e.g.*, *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002) (noting difficulty with interpretation and enforcement); *United States v. Harvey*, 869 F.3d 1439, 1443 (11th Cir. 1989) (en banc) ("As long as prosecutors continue the practice of unwritten grants of immunity, they open the door for subsequent litigation such as this, and for adverse decisions as well.").

There is little doubt that AUSA Taylor's statement, coupled with the lack of written agreements, complicates matters. However, the Court declines to issue a blanket condemnation of informal immunity agreements. Indeed, the Sixth Circuit has upheld the practice, noting that [i]n order to secure an individual's cooperation, the government may *informally* grant the individual immunity in exchange for his cooperation." *United States v. Fitch*, 964 F.2d 571, 574 (6th Cir. 1992) (emphasis added); *see also United States v. Turner*, 936 F.3d 221, 223 (6th Cir. 1991) (describing informal immunity as arising "by way of assurances by prosecutors, either orally or by letter, to a potential grand jury witness that he will be immune from prosecution based upon that testimony").

What can be criticized though, and what is particularly problematic in this case, is the complete lack of record keeping related to these informal immunity agreements. The absence of a written record of any kind, other than what is transcribed at a grand jury session or recorded

during a field interview, makes reviewing any claims about such agreements, like the instant ones, exceedingly more difficult. Whenever subsequent issues or claims arise, it necessitates combing through numerous transcripts and listening to recorded interviews. And it is likely that most, if not all, of the present claims could have been prevented with some minimum level of record keeping. A simple log or list naming all of the witnesses who were extended immunity, either formally or informally, in return for the their statements or testimony, may have kept AUSA Taylor from overlooking these agreements when responding to the Defendants' request for *Giglio* material.

To be sure, AUSA Taylor should have recognized the informal immunity agreements as *Giglio* material and provided it to the Defendants upon their request. But in the end, both sides share some of the responsibility. And the prosecutor's misstatement does not relieve the Defendants' obligation to exercise due diligence. The defense cannot simply bury its head in the sand after the prosecutor says he is unaware of any *Brady* or *Giglio* material. This is particularly true when the prosecutor simultaneously cautions that they should evaluate the statements for themselves. Such a statement may not comport with the spirit of *Brady*, but it at least arguably reduces the reasonableness of the defense's almost blind reliance on the first part of Mr. Taylor's statement. The Court is cognizant of the significant demands of an active law practice on counsel particularly in the context of gearing up for a complex trial. But being busy with trial preparation cannot be an excuse for failing to recognize the very impeachment evidence the Defendants now contend warrants a new trial.

A review of the grand jury transcripts provided to the defense eight days before trial plainly reveals the prosecutor's assurances to the witnesses. Those assurances almost universally

appear at or near the beginning of each witness' testimony and within the first two pages of the transcripts. They are not buried deep within pages and pages of voluminous testimony. And, perhaps more importantly, these virtually identical assurances appear in the transcripts for six of the witnesses whose grand jury testimony was disclosed. That means that the entire defense, collectively employing five attorneys with significant criminal trial experience, failed to notice six separate immunity agreements provided to prosecution witnesses within the context of their grand jury testimony. Thus, just as AUSA Taylor can be held responsible for his oversight, so too should the Defendants.

The Sixth Circuit has noted that "the *Brady* doctrine requires only the production of material in time for its effective use at trial." *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995) (citing *Presser*, 844 F.2d 1275 (6th Cir. 1988)). Accordingly, as "long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (citation omitted).

Here, it is undisputed that the United States, despite AUSA Taylor's misstatement, nonetheless provided the defense with the grand jury testimony for the following witnesses: Danny Combs, Brandon Moore, Jeremy Morgan, Jeffrey Morgan, Jerry Robinson, and Stanley Stumbo. It also undisputed that those transcripts, which were provided approximately eight days before trial, contained impeachment evidence in the form of informal assurances of non-prosecution. The record establishes the defense made repeated references to other aspects of these witnesses' grand jury testimony. [*See, e.g.*, R. 211, Trial Tr., Vol. 3, at 61-63, 100-101, 160-62, 214.] The Defendants' ability to ask these witnesses specific questions about their grand

jury testimony demonstrates that this material was disclosed in time for its effective use at trial. The government, therefore, complied with *Brady*'s disclosure requirements and there can be no resulting prejudice.

## B.

The second category of material involves the evidence provided to the defense during trial. On several occasions during the trial, typically either the night before or the morning of a witness's testimony, the government gave the Defendants copies of that witness's grand jury testimony.[10] Like the preceding group, these transcripts also included the government's assurance to each witness that it had no desire to prosecute the witness if he or she testified truthfully. The witnesses falling in this category include Randy and Ronnie Campbell, Jack Collier, Randy Gayheart, Orvil Pratt, Kelly Hall, Tommy Hays, and Craner Jacobs.[11]

As with the previous group, the facts surrounding the disclosures of these grand jury transcripts are not in dispute. The Defendants admit they received the transcripts, typically prior to each witness's testimony at trial, and that those transcripts accurately reflected the prosecutor's immunity assurances. The Defendants, however, reiterate their arguments that the hectic pace of trial coupled with AUSA Taylor's letter essentially prevented them from making "effective use" of the immunity agreements at trial.

---

[10]Again, the timing of these disclosures further supports the theory that AUSA Taylor simply treated the grand jury transcripts as Jencks material.

[11]In addition to the other witnesses noted above, the United States provided a transcript of Ralph Dyer's grand jury testimony during the trial. That transcript reflects that the United States did not offer Mr. Dyer immunity for his testimony because the government did not believe that Mr. Dyer faced any potential criminal liability. [*See* R. 325, Ex. A, pp. 12-13.] Absent such an agreement, there was obviously nothing for the United States to disclose and therefore no *Brady* violation.

"In general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir.), *cert. denied*, 525 U.S. 935 (1998) (citation omitted). Indeed, "[i]f previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *Id.* (quoting *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied*, 480 U.S. 922 (1987)); *see also United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995) ("Delay only violates *Brady* when the delay itself causes prejudice.") (quotation marks and citation omitted).

Here, the delayed disclosure of the grand jury transcripts containing the immunity assurances did not prejudice the Defendants for two basic reasons: (1) they did make effective use of some information in those transcripts and did not seek continuances to review the material; and (2) the impeachment value of the immunity agreements was minimized if not negated by their trial strategy.

The government, as noted above, provided this impeachment material to the defense prior to these witnesses testifying at trial. At the evidentiary hearing, the Defendants contended that "effective use" should be equated to their ability to prepare for trial. They argued that they were prejudiced by the disclosures because they were unable to reference the immunity agreements in their openings.[12] The Sixth Circuit, however, has not adopted such a formulation. Instead, it has

---

[12]It is worth noting that the attorneys for Defendants Mac Combs and Ronnie Adams both implied or alluded to the fact that Randy Campbell received immunity in their opening statements. [*See* R. 210, Trial Tr., Vol. 2 at 70 (Combs's counsel suggesting that Campbell "is being let off the hook for seven or eight felonies"); 88 (Adams's counsel asserting that although Campbell was exposed to criminal liability for paving his and his brother's driveways with county blacktop, "he was not indicted. So his – listen carefully to his testimony. You'll understand his motive as you listen to that.").

"expressly recognized the Supreme Court's explicit rejection of the argument that 'the [materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial.'" *Joseph v. Coyle*, 469 F.3d 441, 473 n.23 (6th Cir. 2006) (quoting *Agurs*, 427 U.S. at 112 n.20)); *see also Bencs*, 28 F.3d at 560 (materiality for purposes of a *Brady* violation does not pertain "to the defendant's ability to prepare for trial.").

But regardless of the specific timing of those disclosures, "[a]ny disadvantage that a defendant might suffer because of the tardiness of impeachment material can be cured by asking for a recess." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (citing *Presser*, 844 F.2d at 1283-84). The Defendants do not cite any instances in the record in which they requested a continuance to digest the disclosed material. Nor, more importantly, do they point to any times when the Court denied such a request. *See United States v. Holloway*, 740 F.2d 1373, 1281 (6th Cir.) ("[C]ounsel for [the defendant] made no request for . . . a continuance. In such a circumstance, we conclude that the timing of the disclosure did not prejudice [the defendant]."), *cert. denied*, 469 U.S. 1021 (1984).

The lack of prejudice from these delayed disclosures is further demonstrated when viewed in the context of the Defendants' trial strategy. As the Sixth Circuit has noted, "the question of whether a delay causes prejudice is really just a type of inquiry into materiality." *Coyle*, 469 F.3d at 472 n.21 (citing *Norris*, 146 F.3d at 334). And the minimal materiality of the non-prosecution assurances is evidenced by the strategy employed by the defense.

The Court presided over a two week trial in this case. The primary defense strategy was apparent from very early on. At the core of that strategy was the defense's attempt to demonstrate that the roads at issue, i.e., the ones that received county-purchased gravel and/or

15

blacktop, were public rather than private.  As county officials, the argument goes, they were simply doing their jobs by improving the roads and bridges in the community.  The defense sought to support this theory in two primary ways.  They elicited testimony and offered evidence that certain roads had previously been paved by the county and/or that the roads served multiple houses and/or were used by county vehicles, including school buses and ambulances.  If the jury found that such roads were public, then improving them with county materials was an appropriate use of government materials and could not be considered criminal.[13]

This strategy, though, was at least partially at odds with credibility attacks related to offers of immunity.  Inherent in impeaching the credibility of witnesses based on immunity agreements is the underlying and unavoidable fact that those individuals broke the law—and thus the need for immunity.  Pursuing this line of questioning would necessarily elicit testimony from the witness that he or she wrongly accepted county blacktop and/or gravel on his or her private property.  And that is precisely the type of testimony the defense seemingly attempted to avoid. In other words, by highlighting the immunity agreements, the defense would simultaneously highlight the very acts of wrongdoing they were accused of orchestrating.  So, the Defendants instead argued that there was no wrongdoing at all.  It was their theory that the roads that were paved and graveled belonged to the county.  To their credit, the defense was able to get several witnesses to admit that their "roads" had previously been maintained by the county.  And the

---

[13]This point actually played out at trial through the testimony of Sheila Calhoun.  [R. 213, Trial Tr., Vol. 5, 169-173.]  Ms. Calhoun testified that she contacted Judge Thompson and asked him to pave the road in front of her house.  The road was public and there was no contention otherwise.  After Judge Thompson was convinced that the road was the county's responsibility, Thompson agreed to pave it and then asked how many votes that would get him.  Such a statement, while arguably probative of Thompson's state of mind, has no criminal implications.

Defendants' ability to elicit such favorable testimony from many of the government's witnesses further removed the incentive to attack their credibility.

The Defendants' handling of Randy Campbell is illustrative of their strategy. Campbell was the owner of East Kentucky Paving, one of the companies hired by Knott County to lay blacktop during the fall of 2006, and a key government witness. The crux of Campbell's testimony was that he paved several private driveways, at the direction of Mac Combs and Ronnie Adams, with blacktop purchased by the county. According to Campbell, Combs, in an effort to conceal this illegal activity, later directed Campbell to prepare fake receipts for those jobs even though he never received money from any of the individuals.

Campbell, like many of the other witnesses in this case, was informally offered immunity in the context of his grand jury testimony. The Court has already found that the Defendants were not prejudiced by the belated disclosure of the transcripts, including Campbell's, provided during the course of the trial. Nonetheless, the Court also finds that the Defendants knew, or should have known, *prior to trial* that Campbell received immunity in exchange for his testimony. The primary basis for that knowledge stems from Campbell's testimony in a related criminal trial.

On April 8, 2008, Campbell testified for the government in a perjury case that spun off from the investigation of the present case. [*See United States v. Brewer*, 6:07-cr-112-GFVT (E.D. Ky.).] During its investigation, the government obtained evidence that Tammy Brewer and her father, Hoey Dobson, had received free blacktop on their driveways. Both Brewer and Dobson appeared before the grand jury and were offered the same informal immunity assurances as many other similarly situated witnesses had received. Under questioning at the grand jury, Brewer and Dobson maintained that they had paid to have their driveways paved and could

produce receipts.  The government, however, ultimately concluded that Brewer and Dobson were being untruthful and initiated a separate prosecution for perjury.

At that trial, Randy Campbell testified, as he did in this trial, that Mac Combs directed him to pave certain private driveways, including Brewer's and Dobson's.  He further stated that Combs directed him to prepare fake receipts for the jobs, which he did.  According to Campbell, neither Brewer nor Dobson paid him for the blacktop he laid on their driveways.  Naturally, as the government's lead witness in the case, Campbell was cross-examined extensively by the attorneys representing Brewer and Dobson.  And, more importantly, critical portions of that cross-examination focused on Campbell's immunity agreement with the government.  The government, in a supplemental notice after the evidentiary hearing, filed the relevant portions of Campbell's testimony, including the multiple references to his immunity agreement and his grand jury testimony, from the Brewer trial in the record in this case.  [*See* R. 326.]

Those excerpts contain the following exchanges:

AUSA TAYLOR:  Did they tell you that they weren't interested in prosecuting you if you told the truth?

CAMPBELL:  Yes.

TAYLOR:  And did you then tell the truth?

CAMPBELL:  Yes.

[*Id.*; *see also* Brewer Trial Tr., R. 88 at 37.]

WILLIS COFFEY (Counsel for Tammy Brewer):  Paving private drives with the county blacktop is that wrong?

CAMPBELL:  Yes.

COFFEY:  Did you do that?

CAMPBELL:  Yes.

COFFEY:  So you did something wrong?

CAMPBELL:  Yeah.

COFFEY:  But now you ain't in any trouble, are you?

CAMPBELL:  Nope.

COFFEY:  Why not?

[After an objection for an unresponsive answer]

CAMPBELL:  I don't know.

COFFEY:  They granted you immunity –

CAMPBELL:  Oh.

COFFEY:  – correct?

CAMPBELL:  Yes.

COFFEY:  You ain't in any trouble, are you?

CAMPBELL:  No.

[*Id.*; *see also* Brewer Trial Tr., R. 88 at 65-66.]

COFFEY:  When you testified before the grand jury –

CAMPBELL:  Yes.

COFFEY:  – one of the first things the Government did was give you immunity; is that correct?

CAMPBELL:  Yes.

COFFEY:  And we've already talked about that.  That means that you're not going to be prosecuted for any of these crimes that you say you committed, correct?

CAMPBELL:  I didn't say I committed any.

19

[*Id.*; *see also* Brewer Trial Tr., R. 88 at 72-73.]

> JAMES HIBBARD (Counsel for Hoey Dobson): You were asked by Mr. Coffey, I believe, that you can say anything because you have immunity and you're not going to get in trouble?

> CAMPBELL: That's right.

[*Id.*; *see also* Brewer Trial Tr., R. 88 at 110.]

> COFFEY (on recross-examination): Mr. Campbell in response to Mr. Taylor's question, I have just a couple follow-up questions for you. He asked you that even though you have immunity, you have no reason to lie about his folks?

> CAMPBELL: That's right.

[*Id.*; *see also* Brewer Trial Tr., R. 88 at 118.]

The import of Campbell's testimony and the fact that he was almost guaranteed to be a witness in the upcoming trial was not lost on counsel in this case. At least two of the attorneys, Kristin Logan, co-counsel for Randy Thompson, and Larry Webster representing Mac Combs, observed a significant portion of the Brewer trial and had the opportunity to hear firsthand all of the immunity references cited above. [*See* R. 303, Ex. D, Taylor Aff. at ¶ 5.] Ms. Logan testified at the evidentiary hearing that she missed a portion of Campbell's testimony. [R. 328 at 105.] But whether or not Ms. Logan actually observed all of Campbell's testimony matters little as she admits that she ultimately obtained a transcript of his testimony.[14] [*Id.*] She maintains, however, that "[n]othing in her review of that testimony raised any red flags . . . that Campbell had immunity . . . ." [R. 329 at 7; R. 328, Hrg. Tr. 113-14.] A third attorney, Jason Williams, counsel for Ronnie Adams, apparently ordered the entire trial transcript from the Brewer case.

---

[14]Ms. Logan stated that she did not recall how she obtained the transcript of Campbell's testimony at the Brewer trial. [R. 328, Hrg. Tr. 105.] However, Mr. Webster advised the Court at the evidentiary hearing that he had provided Ms. Logan with that transcript. [*Id.* at 167.]

[*See United States v. Brewer*, 6:07-cr-112-GFVT, R. 88, 89 (Docket entry notes dated 5/27/08 indicating that transcripts were ordered by Jason Williams, a non-case participant).][15]  The record further establishes not only that three of the Defendants possessed the transcript of Randy Campbell's testimony from the Brewer trial, but also that they had Campbell's testimony well before their own trial commenced.  [*See* R. 329, at 7 (Thompson's counsel admitting she obtained Campbell's testimony prior to this trial).]  Removing any doubt about the availability of this impeachment evidence, Mr. Webster actually admits that he knew, prior to the Thompson trial, that Campbell had been granted federal immunity.  [R. 328, Hrg. Tr. 167; R. 327 at 2.]

Because the Defendants knew or should have known about Campbell's immunity agreement, their trial strategy, evidenced in part by their cross-examinations, takes on added importance in determining materiality.  It is clear that Campbell's testimony was most damaging to Mac Combs and Ronnie Adams.  As the only Defendants directly implicated in any wrongdoing, Combs and Adams thus had the strongest incentive of all the Defendants to attack Campbell's credibility.  And on cross-examination, Mr. Webster did exactly that–he impeached Randy Campbell with prior inconsistent statements and got him to admit that he previously lied to investigators and likely committed various other offenses.  Yet despite knowing that Campbell had been given federal immunity, Mr. Webster never directly confronted Campbell with the immunity agreement discussed at the outset of his grand jury testimony nor with his trial testimony in *Brewer*.  In fact, the closest he came to even referencing the immunity agreement

---

[15]These attorneys also would have heard testimony about both Brewer and Dobson being given the same informal immunity assurances before the grand jury.  While certainly not as directly relevant to their case as knowing about Campbell's immunity, counsel arguably could be put on notice that the government was routinely offering immunity to many of its grand jury witnesses.

was when he insinuated that Campbell, after telling the prosecutor what he wanted to hear at the grand jury and despite admitting to various crimes, "walked out of there with a get out of jail free card." [R. 213, Trial Tr., Vol. 5 at 27.]

Mr. Williams, Ronnie Adams's counsel, took a similar approach. He, too, impeached Randy Campbell with prior inconsistent statements and focused on his initial untruthful statements to law enforcement officers. [*Id.* at 44-45.] And near the end of his cross-examination, Mr. Williams asked Campbell, "you knew that these crimes that you had already committed were going to be held over your head if you didn't come up with a new story, didn't you?" [*Id.* at 45.] But he did not ask any questions after that. Mr. Williams, despite possessing both the Brewer trial transcript and Campbell's grand jury testimony, never questioned Campbell about his immunity agreement.

None of this is meant to suggest that counsel performed deficiently in any way. To the contrary, these were effective cross-examinations. But counsel simply cannot claim prejudice because they chose, for whatever reason, not to explore the parameters of the immunity agreement that they knew about prior to trial. The defense now contends that Campbell's immunity agreement was broader, in that it also included state immunity, than counsel initially realized. Even if that is true, that is precisely what cross-examination is for. And the first step toward establishing what conduct an immunity agreement covers would be confronting the witness with the existence of that agreement–something they did not do. Ultimately, what matters, and what cannot be disputed, is that counsel possessed the relevant impeachment evidence in time to use it effectively at trial.

The other Defendants, Thompson and Champion, despite contending that Campbell's

credibility was critically important to this case, made no effort whatsoever to impeach Campbell. This is most likely because Campbell did not directly implicate either of them in any wrongdoing. Thompson's counsel asked Campbell a total of five questions, all of which basically confirmed that Thompson did not direct Campbell to do anything illegal. [*See* R. 212, Trial Tr., Vol. 4 at 259.] Not one of those questions attempted to impeach Campbell in any way. And Champion's counsel declined to ask even a single question. [*See* R. 213, Trial Tr., Vol. 5 at 29.] Again, this is not a criticism of counsel's performance but rather an observation about their strategy. Neither Thompson nor Champion had any reason to attack Campbell's credibility. Under these circumstances, it is difficult to see how the Defendants were prejudiced by the delayed disclosures.

One final word about Randy Campbell's testimony. As noted above, his grand jury transcript was one of several provided to the defense during the course of the trial. Despite that belated disclosure, both Mr. Webster and Mr. Williams asked Campbell specific questions about his grand jury testimony. [*See id.* at 26, 44.] That they incorporated such questions into their cross-examinations undermines the Defendants' argument that these materials were not provided in time for their effective use at trial. And if Mr. Webster and Mr. Williams were able to do that, there is no reason that the other Defendants could not. Further, that they did not ask any specific questions concerning Campbell's immunity agreement simply reinforces the idea that this was part of a deliberate strategic choice.

The Sixth Circuit has held that in order "[t]o demonstrate the type of materiality, and, thus, prejudice necessary to establish a *Brady* violation based upon delayed disclosure, a defendant must show what he would have done differently had he been given more time to

address the *Brady* evidence, and specifically how, had the evidence been given to the defendant earlier, a reasonable probability exists that the result of the defendant's trial would have been different." *United States v. Spry*, 238 F. App'x 142, 148 (6th Cir. 2007) (unpublished) (citing *Farrell v. United States*, 162 F. App'x 419, 424 (6th Cir. 2006); *United States v. Delgado*, 350 F.3d 520, 527 n.10 (6th Cir. 2003); *United States v. Blackwell*, 459 F.3d 739, 759 (6th Cir. 2006)).

These Defendants have failed to demonstrate what they would have done differently if they had been given more time to review the belated disclosures. In fact, they almost uniformly declined to request additional time to do so during the trial. Nonetheless, two of the Defendants specifically referenced at least some of this impeachment material in their cross-examinations. That half of the defense made effective use of these disclosures undermines their prejudice arguments. And, in light of their trial strategy, an earlier disclosure would likely have been irrelevant, as even the Defendant who admits knowing about the immunity agreement prior to trial chose not to impeach based on that fact. Thus, no reasonable probability exists that the result of the Defendants' trial would have been different had this evidence been provided earlier.

**C.**

The final category involves the witnesses whose informal immunity agreements were purportedly not provided to the defense at any time. The Defendants allege that the United States completely failed to disclose its assurances of non-prosecution to the following witnesses: Harold Dean Bentley, Bobby Reynolds, Charlotte Hall, Kenny Dyer, Paul Slone, Don Fugate, Sheila Calhoun, and Robert Graves. The Defendants also claim that the government failed to disclose that it granted virtually all of its witnesses state immunity as well. Although the Defendants make little distinction between their arguments about undisclosed state and federal

24

immunity agreements, the Court will address them separately.

Initially, the Court must determine whether these witnesses were actually provided with immunity agreements. There would be nothing for the government to disclose, and therefore no *Brady/Giglio* violation, if these witnesses did not receive immunity. To that end, it is the Defendants' burden to establish that such agreements were made. *See Bell*, 512 F.3d at 233 (noting that tacit agreement would qualify as favorable impeachment material under *Brady* "[i]f [the defendant] could prove that [the witness and the prosecutor] had reached a mutual understanding"). It is worth noting that the defense casts a wide net with its allegations regarding the supposedly undisclosed agreements.[16] Understandably, the defense's broad allegations concerning these witnesses are at least in part a product of the government's creation. That is, the government's use of unwritten agreements makes it much more difficult for the Defendants to establish exactly which witnesses received immunity. But difficult does not mean impossible, and it is ultimately the Defendants' burden to establish the existence of a *Brady* violation. The first step in that process requires proving that the government possessed evidence favorable to the Defendants. And here that means that the Defendants must prove that the government entered into immunity agreements with these witnesses.

The Defendants have fallen short of establishing that any of these witnesses actually received immunity. For example, a review of the trial testimony of Charlotte Hall, Sheila

---

[16]In Thompson's post-hearing memorandum [R. 329], which has been joined by other Defendants, he alleges that the Court should conclude that the following witnesses received state and/or federal immunity: Randy Campbell, Brandon Moore, Randy Gayheart, Tommy Hays, Craner Jacobs, Jeffrey Morgan, Stanley Stumbo, Orvil Pratt, Jerry Robinson, Ronnie Campbell, Danny Combs, Kelly Hall, Jeremy Morgan, Harold Dean Bentley, Charlotte Hall, Kenny Dyer, Paul Slone, Don Fugate, Sheila Calhoun, Robert Graves, and Bobby Reynolds. [*Id.* at 11.]

Calhoun, Don Fugate, and Robert Graves reveals that these witnesses were not exposed to any criminal liability. Charlotte Hall and Sheila Calhoun both testified about requesting blacktop for public roads. Don Fugate, who worked in the road department for Knott County, testified that he noticed what he deemed was improper paving but denied participating in the same. Finally, Robert Graves, the area supervisor for Mountain Enterprises, testified that his company had to pull out of Knott County due to other business obligations. He, too, denied putting any county purchased blacktop on private property. Thus, in light of their trial testimony, it is highly unlikely that these witnesses received any immunity, state or federal. More importantly though, the Defendants have failed to establish that any such agreements were actually made with these witnesses. Absent evidence of such agreements, there was nothing for the government to disclose and consequently no *Brady/Giglio* violation as it relates to these witnesses. *See Bell*, 512 F.3d at 234.

The Defendants have also failed to establish that the four remaining witnesses, Bobby Reynolds, Harold Dean Bentley, Kenny Dyer, and Paul Slone, received immunity from the United States. The grand jury transcripts for Reynolds and Bentley do not reflect any immunity assurances from the prosecutor. To the extent any assurances were made outside the grand jury, they would be undisclosed for purposes of the instant motions. The grand jury transcripts for the other witnesses, Dyer and Slone, are not in the record. The Court, therefore, has no way of determining whether any immunity assurances, if they were in fact provided, were reflected in the grand jury transcripts. If AUSA Taylor did offer Dyer and Slone immunity, and those assurances were not repeated on the record before the grand jury, they too would be undisclosed for purposes of the present motions.

Here, the record demonstrates that no immunity assurances were made to either Reynolds or Bentley. The Defendants rely in part on the government's Response [R. 303] to the initial motion for new trial. In that Response, the United States indicates that Bobby Reynolds "presumably" was present when AUSA Taylor provided the immunity assurance to a group of witnesses in the break room prior to their grand jury testimony. [*Id.* at 6.] They also point to a document filed in the *Brewer/Dobson* case which indicates that Reynolds received immunity. [*See* R. 95, 6:07-cr-112-GFVT.] However, AUSA Taylor clarified the record at the evidentiary hearing. Although he admits that he intended to give Reynolds, as a recipient of blacktop, the same immunity offer he gave many of the other witnesses, AUSA Taylor, whose testimony is the only actual evidence in the record on this point, now states that it is his belief that he in fact did not provide a non-prosecution assurance to Reynolds. [*See* R. 328, Hrg. Tr. at 23-24, 39, 50.] AUSA Taylor testified that he talked with both Bobby Reynolds and Harold Dean Bentley prior to the evidentiary hearing, and that neither recalled receiving any assurance of non-prosecution. [*Id.* at 23-24, 39.] According to AUSA Taylor, his conversation with Reynolds leads him to believe that Reynolds was running late the day he appeared before the grand jury and had no memory of waiting in the break room where the other group of witnesses had received an immunity assurance.

Although the Defendants bear the burden of establishing the existence of these agreements, they have offered no evidence to rebut AUSA Taylor's testimony. The Defendants had ample opportunity to develop the record. In fact, determining the existence and scope of these immunity agreements was the very purpose of the evidentiary hearing. The defense was free to call witnesses, including witnesses who testified before the grand jury and at trial, to ask

them about the immunity agreements. But they did not call Bobby Reynolds, Harold Dean Bentley, or any other witness who actually or purportedly had received immunity.

The United States suggests that the defense did in fact subpoena some witnesses for the evidentiary hearing but never called them. That, according to the government, was likely because their testimony was going to be unfavorable to the defense. The Court declines to join the government's speculation on this issue but again notes that the Defendants bear the burden of proving the existence of these agreements. The testimony of such a witness would be significant in establishing both the existence and scope of any immunity agreement, particularly where, like here, the agreements are unwritten. The record, as it stands, consists of AUSA Taylor's unrefuted testimony on the one hand, and the Defendants' allegations on the other. Under these circumstances, the Court finds that the Defendants have failed to demonstrate by a preponderance of the evidence that either Bobby Reynolds or Harold Dean Bentley received informal immunity assurances. Absent evidence of such agreements, there was nothing for the government to disclose and consequently no *Brady/Giglio* violation as it relates to these witnesses. *See Bell*, 512 F.3d at 234.

The Defendants' arguments about the government's allegedly undisclosed agreements with the other two witnesses, Kenny Dyer and Paul Slone, fare no better. In his Motion, Thompson maintains that the grand jury transcripts for Dyer and Slone were never disclosed to the defense. [R. 329, p. 3.] But the record suggests otherwise. Mr. Williams, counsel for Ronnie Adams, asked Paul Slone a specific question about his grand jury testimony. [R. 212, Trial Tr., Vol. 4 at 202.] And, during a bench conference, Mr. Williams noted that the government had just provided some Jencks Act materials, including a transcript of Kenny Dyer's

grand jury testimony.  [*Id.* at 7.]  Thus, contrary to the Defendants' allegations, the defense was clearly provided with the grand jury testimony of both Paul Slone and Kenny Dyer.

What remains unclear, however, is whether those grand jury transcripts contain informal immunity offers to Slone and Dyer.  Again, this is primarily because those transcripts are not in the record before the Court.  The other reason is that there is virtually no other evidence concerning these witnesses.  Unlike Reynolds and Bentley, there is no testimony that AUSA Taylor contacted either of these witnesses prior to the evidentiary hearing.  The United States has not specifically denied the existence of an immunity agreement with either Slone or Dyer.  Nor has there been testimony that Slone and Dyer have no recollection of non-prosecution assurances. It is further clear that both Slone and Dyer fell into the category of witnesses (those potentially exposed to criminal liability) whom the government typically offered immunity.

Yet the absence of denials from the government is not what matters.  Instead, it is the complete absence of evidence offered by the Defendants.  The defense nonetheless contends that any ambiguities in the agreements should be drawn against the United States, particularly because these agreements were unwritten.  That argument is inapposite for two reasons.  First, if the Court should, as the Defendants assert, presume the existence of agreements with Dyer and Slone simply because it was consistent with government's practice in this case, then the converse is equally probable.  That is, it is just as likely that the prosecutor made the non-prosecution assurances on the record before the grand jury as he typically did with the other witnesses.  And because the defense received the transcripts of Dyer's and Slone's grand jury testimony during the trial, the Court's prior analysis, finding no *Brady/Giglio* for the disclosures made during trial,

would apply here as well.[17]  Second, while it is true that any ambiguities in these agreements should be drawn against the United States, *see, e.g., United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995), that is not the case for the existence of the agreements themselves.  In other words, the Court cannot presume or assume that an informal immunity agreement existed when the Defendants have presented only speculation, and no evidence, of such an agreement.  Consequently, without evidence of such agreements, there was nothing for the government to disclose and therefore no *Brady/Giglio* violation as it relates to these witnesses.  *See Bell*, 512 F.3d at 234.

The Defendants' final argument concerns allegedly undisclosed state immunity agreements.  According to the Defendants, the government also granted nearly all of its witnesses state immunity as well as federal.  Their allegations in this regard are similarly broad and somewhat conclusory.  They seem to suggest that AUSA Taylor's use of the pronoun "we" in his non-prosecution assurances (i.e., "we have no interest in prosecuting you if you tell the truth") coupled with the fact that the investigation was conducted by a joint federal-state task force could lead the witnesses to reasonably believe that they were protected against both state and federal prosecution.

In this case, the Defendants may be partially correct.  Their arguments about the effect of AUSA Taylor's statements, though, are misplaced.  As a federal prosecutor, AUSA Taylor did not have authority to bind the state prosecutors.  Mr. Taylor, in his Affidavit, averred that he

---

[17]Even if those grand jury transcripts did not reflect any non-prosecution assurances, the defense has still not met its burden.

specifically avoided discussing state immunity because he had no authority to offer it.[18]  [R. 303, Ex. D, Taylor Aff. at ¶1.]  And the defense has submitted no authority suggesting otherwise. Further, the Defendants' allegation about a joint federal-state task force has been clarified in the record.  In his original Affidavit, AUSA Taylor described the investigation as consisting of a "team of interviewers . . . brought in from state and federal agencies . . . ."  [*See id.*]  His Supplemental Affidavit, however, notes that his description was in error and that he had confused the instant case with an investigation in a similar election fraud case.  [R. 318, Taylor Suppl. Aff. at ¶¶1-2.]  AUSA Taylor now states that this case did not involve a team of state and federal investigators and that Detective Hopkins did all of the interviews.  [*Id.* at ¶2.]  Thus, AUSA Taylor's use of the pronoun "we" in his immunity assurances is insufficient, standing alone, to confer state as well as federal immunity.

On the other hand, Detective Hopkins *may* have been able to bind the state with any assurances that he provided to witnesses.  Hopkins testified that he introduced himself to witnesses in his joint role as a KSP detective and FBI Task Force member.  [*See* R. 328, Hrg. Tr. at 61.]  It is also clear that he was vested with authority from AUSA Taylor to provide immunity assurances to witnesses who had likely received free blacktop or gravel and who appeared reluctant or concerned about answering questions.  [R. 303, Ex. E, Hopkins Aff. at ¶4; R. 318, Taylor Suppl. Aff. at ¶2.]

---

[18]Whether this is the best practice is questionable.  Given that AUSA Taylor recognizes that "many lay people have no clue about the layers of jurisdiction that exist in our system," [see R. 289, Ex. K], it would perhaps be advisable to state the specific authorities who are bound by such informal agreements rather than simply avoiding the topic altogether.  Such information is routinely described in plea agreements, and for good reason.  Nonetheless, AUSA Taylor's statements are insufficient to bind state authorities to any immunity he offered.

Whether or not any immunity assurances from Detective Hopkins could bind the state is unclear. The Defendants' briefs are devoid of authority supporting the proposition that Hopkins's joint role as a KSP detective and FBI Task Force agent automatically binds the state. Instead, their allegations are based only on the erroneous contention that the investigation in this case was conducted by a joint federal-state task force. Generally, "[s]tate agents are without authority to bind federal proceedings, *see United States v. McIntosh*, 612 F.2d 835, 837 (4th Cir. 1979); *United States v. Long*, 511 F.2d 878, 881-82 (7th Cir.), *cert. denied*, 423 U.S. 895 (1975), and the converse is no less true." *Johnson v. Lumpkin*, 769 F.2d 630, 634 (9th Cir. 1985). It must also be remembered that "[a]n agreement not to prosecute is contractual in nature, and subject to contract law standards." *United States v. Butler,* 297 F.3d 505, 512 (6th Cir. 2002) (quoting *United States v. Fitch*, 964 F.2d 571 (6th Cir. 1992) (citation omitted)). In other words, "where a prosecutor assures a grand jury witness that he or she will be immune from prosecution based upon the witness's testimony before the grand jury, the promise is contractual and only binds the parties to the original agreement." *United States v. Orlando*, 281 F.3d 586, 594 (6th Cir. 2002) (citation omitted). Such agreements, therefore, typically do not bind authorities in any other jurisdictions.

Despite his actual authority to grant federal immunity, there is no allegation, let alone evidence, that Detective Hopkins had similar actual authority to grant state immunity. *See United States v. Streebing*, 987 F.2d 368, 373 (6th Cir. 1993) (citing *Lumpkin*, 769 F.2d at 634 (court held that promise by federal agents that defendant would serve no time on state charges if he cooperated in the federal investigation was unauthorized)). But based on his joint role and the fact that he introduced himself to unrepresented individuals in that joint federal-state role,

Hopkins may have had apparent authority to grant state immunity. Thus, he may have effectively, if unintentionally, conferred state as well as federal immunity to several of the witnesses whom he interviewed. *See Long*, 511 F.2d at 881 (if the court finds that an agency relationship existed between the two sovereigns, a promise by one would be binding on the other). Regardless, it is not enough for the defense to argue that simply because Hopkins had the authority to grant immunity, he automatically, or even regularly, provided it to witnesses. Proving that Hopkins made separate state immunity agreements remains the burden of the defense. And like many of their other allegations, they have generally fallen short of meeting that burden.

There is very little evidence concerning any specific conversations that Detective Hopkins had with any of the witnesses. And that makes it difficult, if not impossible, to determine the recipients of any immunity offers he made. The record does, however, contain a list of witnesses interviewed by Hopkins. [R. 289, Ex. D.] That list, along with a CD of the recorded interviews, was provided to the Defendants on June 5, 2008, at the same time, and in conjunction with, the grand jury transcripts disclosed by AUSA Taylor prior to trial. [*Id.*] According to the letter, interviews with the following witnesses were recorded on that CD: Harold Dean Bentley, Randy Campbell, Ronnie Campbell, Danny Combs, Hoey Dobson[19], Ralph Dyer, Randall Gayheart, Kelly Hall, Tom Hays, Craner Jacobs, Brandon Moore, Bobby Reynolds, Jerry Robinson, Paul Slone, and Stanley Stumbo.

Unfortunately, the actual CD of the audio recordings is not in the record. Nor have the

---

[19]Because Dobson was not a witness in this case, any offer of immunity he received is irrelevant for the substantive purposes of the instant motions.

Defendants provided citations to or quotations (with one exception) from any of those interviews. The Court is again left only with speculation about the whether any of these witnesses were offered immunity by Detective Hopkins. Nonetheless, to the extent that such offers were made and were captured on the audio recordings, they would have been disclosed along with the grand jury transcripts approximately eight days before the trial.[20] And the Court's analysis about the grand jury transcripts provided prior to trial, finding no *Brady/Giglio* violation because that they were disclosed in time for effective use at trial, would apply here as well.

While the Defendants' allegations are generally lacking specificity, the alleged immunity agreements with three witnesses warrant further discussion. Those three witnesses are Bobby Reynolds, Randall Gayheart, and Randy Campbell. Reynolds is the only witness for whom the defense has supplied the audio recording of his interview with Detective Hopkins. [Hrg. Ex. A-1.] That recording was produced during the evidentiary hearing and admitted as an exhibit. [*Id.*] The parties agree, however, that it does not reflect any non-prosecution assurances. Despite the Defendants' arguments about whether the government actually intended to grant Reynolds immunity, there is no evidence to support those contentions. Neither the grand jury transcript nor the recorded interview reflects a non-prosecution assurance from AUSA Taylor or Detective Hopkins. "Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." *Bell*, 512 F.3d at 234.

---

[20]Counsel for Thompson noted the hectic pace prior to trial as a partial explanation for why she did not notice the immunity offers in the grand jury transcripts. [R. 329, p. 6.] Among other aspects of trial preparation, she specifically noted that they were "listening to Detective Hopkins' recorded interviews, which were produced by the government shortly before trial without transcripts." [*Id.*; *see also* R. 328, Hrg. Tr. 98-100, 118.]

At the evidentiary hearing, the defense did offer some evidence of Detective Hopkins's conversation with Randall Gayheart. The defense provided Hopkins with an unofficial transcript of this interview and asked him to read a portion of it. In that portion, Detective Hopkins informed Mr. Gayheart, "[a]s long as you're honest with me and truthful with me, I will work with you." [R. 328, Hrg. Tr. at 63.] The Defendants suggest that in light of the authority from AUSA Taylor, this statement amounted to an offer of immunity. The Court disagrees.

Detective Hopkins described this as meaning that he would pass along information about Gayheart's cooperation to the prosecutor. [*Id.* at 64.] Again, simply because Hopkins had authority to offer immunity to certain witnesses does not mean that he did. Nor does it automatically transform ambiguous statements into immunity assurances. Informing a witness that he would "work with him" must be contrasted with advising the witness that he would not be prosecuted if he told the truth. Passing along a witness's cooperation is not the same, nor can it reasonably be construed, as an informal immunity offer. Such a statement is insufficient to establish that Detective Hopkins provided Randall Gayheart with any type of non-prosecution assurance. Because the Defendants have offered no other evidence as it relates to Mr. Gayheart, the Court must conclude that there was no immunity agreement, and therefore, nothing for the government to disclose. *See Bell*, 512 F.3d at 234.

The final witness who merits further discussion is Randy Campbell. The Defendants allege that Campbell also received state immunity and that this agreement was never disclosed to them. The basis for this argument, and most likely the instant motions as well, stems from events subsequent to trial. Several months after the trial, Greg Mullins, Homeland Security Director for Knott County, Kentucky, filed a written complaint alleging that Randy Campbell had essentially

admitted during his trial testimony that he stole county-purchased blacktop. [R. 328, Hrg. Tr. at 86.] Mr. Mullins made this complaint to the Kentucky State Police and requested that they initiate an investigation. [*Id.*] Through the chain of command, that complaint eventually wound up on Detective Hopkins's desk. [R. 303, Ex. E, Hopkins Aff. at ¶8.] Shortly thereafter, Hopkins contacted Commonwealth Attorney Graham Martin and informed him that Randy Campbell had been granted federal immunity in exchange for his truthful testimony. [*Id.*] He further suggested that Mr. Martin contact AUSA Taylor. [*Id.*] AUSA Taylor has averred in his Affidavit that he contacted Mr. Martin prior to the evidentiary hearing in an attempt to refresh his memory about any conversations they may have had. [R. 303, Ex. D, Taylor Aff. at ¶8.] According to AUSA Taylor, Mr. Martin advised him that he "had never gotten around to making the call" and that "he had made the decision not to prosecute Campbell because he felt like the federal case more or less took care of all related matters . . . ." [*Id.*]

The Defendants contend that this amounts to federal intervention into a potential state prosecution and evidences that Campbell had also been granted state immunity. The Court disagrees. Both Detective Hopkins and AUSA Taylor specifically deny in their Affidavits that they ever discussed or granted state immunity with Campbell. [R. 303, Ex. D, Taylor Aff. at ¶9; Ex. E, Hopkins Aff. at ¶6.] AUSA Taylor notes that "[a]t no time did I have any agreement or understanding with Randy Campbell, tacit or otherwise, that he had immunity from state prosecution or that I or anyone else would intervene on his behalf if he faced prosecution. Nor did I tell Randy Campbell that I or anyone else would recommend against state prosecution." [*Id.* at ¶9.] Thus, contrary to the Defendants' argument, the Commonwealth's decision not to prosecute Campbell does not establish that the federal prosecutor intervened in any way with a

potential state prosecution. Further, even if this did amount to intervention, the mere fact of favorable treatment received by a witness following cooperation is also insufficient to substantiate the existence of an agreement. *Akrawi*, 572 F.3d at 263; *see also Bell*, 512 F.3d at 234 ("[I]t is not the case that, if the government chooses to provide assistance to a witness following trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*.").

Conversely, the record does support the conclusion that Detective Hopkins provided Campbell with a non-prosecution assurance. [R. 303, Ex. E, Hopkins Aff. at ¶5.] Despite Hopkins's specific denial of any discussion of state immunity, his joint role as a federal-state officer may have supplied apparent authority sufficient to make his immunity offer binding on the state. Again, the pre-trial disclosure of Hopkins's recorded interviews with Campbell was arguably a sufficient disclosure of any immunity agreement discussed therein. However, assuming, for the sake of argument, that the pre-trial disclosure was insufficient, any state immunity agreement with Campbell would be considered undisclosed impeachment evidence.

The Supreme Court has held that the failure to disclose impeachment evidence does not require automatic reversal. *Bagley*, 473 U.S. at 676-77. This is true even where the prosecution's case depends largely on the credibility of a particular witness. *Id.*; *Giglio*, 405 U.S. at 153-54. Undisclosed "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; s*ee also Agurs*, 427 U.S. at 112 ("the constitutional standard of materiality must impose a higher burden on the defendant" than "the customary harmless-error standard").

Even with all of the above assumptions, the Court finds materiality lacking in this case. As it relates to Randy Campbell, and any other witness who may have effectively been granted state immunity, the non-prosecution assurance from Detective Hopkins covers precisely the same conduct as the immunity conferred by AUSA Taylor during the grand jury proceedings. In other words, the informal agreements in this case, whether state or federal, provided immunity for the illegal receipt of county-purchased materials and any related crimes. To the extent that such agreements exist, the defense has failed to explain how they would provide a distinct basis for impeachment. This is particularly true because they uniformly failed to impeach a single witness with the existence of the federal immunity agreements which they clearly possessed. Indeed, there is no logical reason why the defense would ignore a federal immunity agreement which protected against prosecution for certain crimes yet would confront witnesses with state immunity agreements for exactly the same crimes. Under these circumstances, there is no reasonable probability that the result of the proceeding would have been different had the government disclosed that some of its witnesses also received state immunity.

To make the record clear, the Court has considered, as it is required to do, the suppressed evidence collectively. *Kyles*, 514 U.S. at 436; *see also Coyle*, 469 F.3d 441, 472 n.21 (better practice is to consider evidence collectively, not item by item, where there is mixture of belatedly disclosed and completely undisclosed evidence). Here, there was some impeachment evidence disclosed timely (or at least pretrial), some belatedly (during trial but prior to the witness's testimony), and arguably some completely undisclosed. What is unique about this case is that all of the impeachment evidence was not only of the same character but also was virtually identical. Unlike *Coyle*, which involved several different impeaching items (an immunity agreement, and

two separate inconsistent statements), everything in this case revolves entirely and exclusively around the informal immunity agreements. While there are numerous agreements at issue, they are the same for each witness. Considered collectively, the Court still finds no reasonable probability of a different result in this case.

In the context of its collective consideration of the suppressed evidence, the Court has also considered the Defendants' arguments about materiality. The Defendants rely heavily on a Third Circuit case, *United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006), which they claim is instructive here. In *Risha*, the government's key witness, Caito, had been granted federal immunity, and that agreement had been disclosed to the defense. What was not disclosed, however, was Caito's expectation of leniency on unrelated state charges pending against him. Following the trial and Risha's conviction, Risha learned that Caito had received a favorable disposition of his state charges. Risha then moved for a new trial, which the district court granted. On appeal, the Third Circuit held that such an expectation of future benefits was material impeachment evidence which must be disclosed to the defense. *Id.* at 303, n.5. Additionally, since Caito was the sole witness to offer incriminating evidence, information tending to impeach him was deemed essential to the defense. *Id.* The court ultimately remanded the case to the district court to determine whether the government had constructive possession of this evidence. *Id.* at 306.

The Defendants' reliance on *Risha* is misplaced, as that case is distinguishable on multiple levels. First, and perhaps most importantly, it is questionable whether the Sixth Circuit would reach the same result if faced with similar facts. That court, whose decisions are binding in this district, has held that "the mere fact that a witness desires or expects favorable treatment

39

in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*. *Akrawi*, 572 F.3d at 263 (citing *Bell*, 512 F.3d at 233) (emphasis in original). Such expectations, whether held by Campbell or any other government witness, are insufficient standing alone to create material impeachment evidence.

Another critical difference is that this case did not turn on the testimony of a single witness. Instead, the government called over twenty witnesses whose testimony often corroborated each other. *See Akrawi*, 572 F.3d at 264-65 (distinguishing *Harris*, 555 F.3d at 1034, on the grounds that the non-disclosure of impeachment evidence in that case was deemed to cause actual prejudice because the prosecution's case hinged on the testimony of one witness). Further, there is nothing in the record to suggest that, unlike Caito, any of the government's witnesses had state charges pending against them at the time of their testimony. Despite the defense's allegations about the state's decision not pursue a prosecution of Campbell, there is no evidence of a favorable outcome on separate charges for any witnesses in this case. It must also be noted that Caito's state charges were unrelated to the conduct for which he was granted federal immunity. The importance of that fact is that receiving a favorable disposition of an unrelated matter arguably provides a distinct basis for impeachment. And that must be contrasted with the situation in this case where, to the extent that any of the government's witnesses may have received state immunity through Detective Hopkins's assurances, that immunity covered exactly the same crimes that the informal federal immunity agreements covered.

The Defendants' other argument about materiality relates to the Court's failure to give a

proposed jury instruction concerning witnesses who testify under grants of immunity. *See Sixth Circuit Pattern Jury Instruction 7.07.*[21] The defense seems to concede that, based upon the evidence presented, this particular Instruction was in fact unwarranted. They nonetheless assert that had they received the requested *Giglio* materials in a timely fashion, this Instruction would have been appropriate and would have caused the jury to question the reliability of many of the government's witnesses. According to Thompson, "if the jury was made aware that the prosecution gave immunity to a significant number of witnesses called by the government at trial, the jury would likely have given significantly less weight to their testimony." [R. 289, p. 9.]

Implicit in this argument, though, is the premise that the Defendants would have necessarily elicited testimony about these informal immunity agreements. And that contention is belied by the record. The Defendants uniformly stopped short of confronting a single witness with the non-prosecution assurance. Prior to trial, the Defendants received the grand jury transcripts of six witnesses which reflected informal immunity offers. They also received audio recordings of interviews with fifteen witnesses, some of whom were presumably offered immunity by Detective Hopkins. Yet they did not ask any of those witnesses about the immunity

---

[21]Instruction 7.07 Testimony of a Witness Under Grant of Immunity or Reduced Criminal Liability reads as follows:

(1) You have heard the testimony of _____. You have also heard that the government has promised him that [he will not be prosecuted for _____ ] [he will _____ ] in exchange for his cooperation.

(2) It is permissible for the government to make such a promise. But you should consider _____'s testimony with more caution than the testimony of other witnesses. Consider whether his testimony may have been influenced by the government's promise.

(3) Do not convict the defendant based on the unsupported testimony of such a witness, standing alone, unless you believe his testimony beyond a reasonable doubt.

agreements.  During the course of the trial, the defense received additional grand jury transcripts which also reflected similar non-prosecution assurances.  Although the defense asked the witnesses multiple questions about other statements in their grand jury testimony, the Defendants again declined to ask any of those witnesses a single question about immunity.  This latter group of disclosures includes Randy Campbell, whom the Defendants appropriately characterize as the government's lead witness.  Even Mr. Webster, who admitted knowing prior to trial that Campbell had received immunity, never asked Campbell a specific question about his immunity.

Here, the simple reason that Instruction 7.07 was not given is that the defense did not explore that issue.  Although the instruction was proposed by both Thompson and Adams as part of their pretrial submissions [*see* R. 118, 121], there was no testimony in the record supporting the existence of immunity agreements for any of the government's witnesses.  *See United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993) (a jury instruction "should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation") (internal citation and quotation marks omitted).  Consequently, the Court did not include that instruction in the preliminary draft provided to counsel.  Despite the opportunity to object to any omitted instructions, no Defendant did so regarding the omission of Instruction 7.07.  The Defendants, therefore, cannot claim any prejudice for their own failure to develop the record regarding the existence of these immunity agreements.

In sum, despite broad allegations, the Defendants have failed to demonstrate that several of the government's witnesses actually received immunity.  The record further establishes that the Defendants possessed the immunity agreements for several witnesses prior to trial.  This includes the references to immunity in the grand jury transcripts as well as any non-prosecution

assurances reflected in the audio recordings of Detective Hopkins's interviews.  The Defendants' claims of prejudice ring hollow in light of their decision not to confront a single witness with the immunity agreements disclosed prior to or during the trial.  Finally, to the extent the government failed to disclose any immunity agreements, whether federal or state, there is no reason to believe that disclosure of the additional impeachment evidence would have so altered the jury's assessment of any witness's credibility as to give rise to a reasonable probability that the outcome of the trial would have been different.  *See Akwari*, 572 F.3d at 264.

### III.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.      The Defendants' Motions for New Trial [R. 289, 293] are **DENIED**;

2.      Defendant Adams's Motion for Joinder [R. 330] is **GRANTED**;

3.      The Clerk of Court is directed to provide a copy of the Order to the Clerk of Court for the Sixth Circuit Court of Appeals.

This the 4th day of April, 2011.

**Signed By:**

**_Gregory F. Van Tatenhove_**

**United States District Judge**